UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| DEBORAH R. SULLINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-3039 |
| | ) | |
| THE ILLINOIS DEPARTMENT OF PUBLIC AID, | ) | |
| | ) | |
| Defendant. | ) | |

**STATEMENT OF MATERIAL FACTS**

NOW COMES Defendant, Illinois Department of Public Aid, by and through its attorney, Lisa Madigan, Illinois Attorney General, and in support of its Motion for Summary Judgment presents the Court with its Statement of Material Fact:

The following exhibits will be referenced in the Motion and Memorandum in Support:

| Exhibit No. | Description |
|---|---|
| A | Plaintiff's Deposition, taken September 8, 2005 |
| B | Partial Organization Chart of the Bureau of Comprehensive Health Services |
| C | Deposition of Steve Bradley, taken July 12, 2005 |
| D | Journal Entry of Plaintiff, dated March 23, 2001 |
| E | Email from Plaintiff to Derrick Moscardelli, dated March 27, 2001 |
| F | Email from Steve Bradley to Mark Scheff, dated March 28, 2001 |
| G | Deposition of Lenna DeGroot, taken July 18, 2005 |
| H | Affidavit of Michael Sandidge |
| I | Affidavit of Jodie Edmonds |
| J | Deposition of Jodie Edmonds, taken July 13, 2005 |
| K | Internal Complaint by Mary Thallman, dated October 13, 2000 |

| L | Investigative Worksheet from Mary Thallman's Complaint - List of Witnesses interviewed in the investigation of Thallman's Complaint |
|---|---|
| M | 5-day suspension of Mark Scheff |
| N | Plaintiff's Amended EEOC Charge of Discrimination, dated July 13, 2001 |
| O | Plaintiff's Interview Sheet re: Complaint of Retaliation from interview of March 29, 2001 |
| P | Journal Entry by Plaintiff noting conduct of March 29, 2001, April 6, 2001, and April 9, 2001 |
| Q | Journal Entry by Plaintiff noting conduct of April 12, 2001, and April 17, 2001 |

The following facts are claimed to be undisputed:

**A.    Background information**

    **I.    Plaintiff's employment.**

1. Plaintiff began working as a Medical Assistance Consultant (MAC) in the hospital unit in February, 2000. (Ex. A, pp. 20-21).

2. This position was within the Bureau of Comprehensive Health Services (BCHS) and under the supervision of Bureau Chief Steve Bradley. (Ex. B).

3. Plaintiff was asked to transfer to the hospital unit by Jodie Edmonds and Cheryl Beckner, so that they could target her for a promotion to an Executive II position. (Ex. A, pp. 19-20).

4. Plaintiff's direct supervisor while working as a MAC in the hospital unit of the Bureau of Comprehensive Health Services (BCHS) was Lenna DeGroot. (Ex. A, pg. 21).

5. Marvin Ross also supervised MACs in the hospital unit. (Ex. B).

6. The hospital unit MACs worked in the basement of the Bloom Building. (Ex. A, pg. 38).

7. While working as a MAC in the hospital unit, Plaintiff shared an office with P.K. Luttrell. (Ex. A, pg. 38).

8. The office Plaintiff shared with Ms. Luttrell was adjacent to an office occupied by Joe Roberts and Mike Sandidge. (Ex. A, pg. 40).

9. Other MACs in the office, Mark Scheff and Jim Schuh, often congregated in Mr. Roberts and Mr. Sandidge's office late in the day and on breaks. (Ex. A, pp. 72, 77).

10. MACs, as part of their job duties, often had to spend time on the telephone with hospital billing agents; however, when they were not on the phone, they would often wear headphones. (Ex. A, pg. 36).

11. Plaintiff wore headphones after 3:00 p.m. almost every day. (Ex. A, pg. 36).

12. Plaintiff alleges that during the time that she worked out of the office next to Mr. Roberts and Mr. Sandidge's office, she overheard the following comments:

    a. In February, 2000, while in her office with co-worker Pam DuFour, Plaintiff overheard comments made by Mr. Scheff to Mr. Sandidge in the presence of Mr. Schuh and Mr. Roberts. (Ex. A, pp. 46-47).

    b. Mr. Scheff commented to Mr. Sandidge that he would be less grouchy if his "wife put out more." (Ex. A, pp. 46).

    c. In the spring of 2000, Mr. Scheff told Plaintiff that he enjoyed going to training seminars because he liked to stay at the hotel, liked the x-rated movies and the he "could go in there and find pleasure in [him]self at the end of the movie." (Ex. A, pg. 86).

    d. Plaintiff alleges that Mr. Scheff made similar comments about staying at hotels to Mr. Roberts and Mr. Sandidge. (Ex. A, pg. 86).

e.  Sometime between the spring and fall of 2000, Mr. Scheff commented to Plaintiff, everyone in the unit, student workers and workers of other units (male and female alike) that he carved a tree into the shape of a penis. (Ex. A, pp. 49-51).

f.  In the summer of 2000, Plaintiff, while in her office with Shari Bangert, overheard her male co-workers discussing realtor Fritz Pfister in the office next to hers. (Ex. A, pg.54).

g.  Plaintiff overheard Mr. Scheff make a comment to the other men in the office about "fisting her too" and "fisting her every time I get a chance." (Ex. A, pg. 54).

h.  In either June or July of 2000, Plaintiff overheard Mr. Scheff engage in a conversation with male co-workers in the office adjacent to Plaintiff's regarding the pros and cons of having sexual intercourse with a woman in various physical conditions. (Ex. A, pg. 76).

I.  Plaintiff overheard co-workers Mr. Roberts and Mr. Sandidge telling Mr. Scheff to "shut up" and Schuh "literally yelling at [Scheff] to shut up." (Ex. A, pg. 77).

j.  In July or August of 2000, Plaintiff overheard Mr. Scheff make a crude comment to Mr. Schuh and Mr. Roberts about Mr. Shuh's son. (Ex. A, pg. 82).

k.  Plaintiff overheard Mr. Scheff comment to Mr. Roberts that a female co-worker's anatomy should be on Mr. Roberts' screen saver. (Ex. A, pg. 66).

    l.    Plaintiff heard Mr. Scheff comment to a group of co-workers, male and female, that Bureau Chief Steve Bradley surrounds himself with "strong pussy" and "big-breasted women." (Ex. A, pg. 67).

    m.    Plaintiff overheard Mr. Scheff comment to male co-workers in a neighboring office making graphic comments about sexual intercourse in various vehicles. (Ex. A, pg. 68-69).

    n.    Plaintiff overheard Mr. Scheff comment to male-coworkers, that he had the biggest muscle, but that it wasn't in his arms. (Ex. A, pg. 72).

    o.    Mr. Scheff further commented to co-worker Mr. Sandidge that the only reason Mr. Sandidge was involved in bodybuilding is because he had not had sex in two years. (Ex. A, pg. 72).

    p.    Plaintiff also observed Mr. Schuh comment to co-worker Kevin Mayer that Mr. Sandidge was involved with body-building because he had not had sex in two years. (Ex. A, pg. 74).

    q.    Plaintiff was present when Mr. Scheff commented to a group of co-workers, both male and female, about supervisor Marvin Ross's being gay. (Ex. A, pp. 91-92).

13.    During the time Plaintiff worked as a MAC, she alleges that Mr. Scheff made the following comments to her:

    a.    From May to October of 2000, Mr. Scheff called Plaintiff a "prude, a bitch, a dike bitch, a yes person, and a snitch." (Ex. A, pg. 88).

    b.    These comments were made in conversations where Mr. Scheff confronted Plaintiff about office procedures and how she transferred calls to Mr. Scheff. (Ex. A, pg. 89).

  c. In August or September, 2000, Mr. Scheff, in the presence of Ms. Fletcher, asked Plaintiff if she had applied for the promotion to the Executive II position, and further commented that she would likely get the job because she has a "pussy and not a penis." (Ex. A, pp. 56-57).

  d. Mr. Scheff made a similar comment to Plaintiff in front of Ms. DuFour. (Ex. A, pg. 59).

  e. Another time in August or September, Mr. Scheff related to Plaintiff that he did not care about his job because "only gay people and women get a promotion" and that if you have "a pussy, you get a promotion" and if you have "a penis, you don't get one". (Ex. A, pp. 61-62).

  f. Mr. Scheff made it no secret to his co-workers in the office that he thought women got promoted more often in the bureau and that men did not get fair promotions. (Ex. G, pp. 42-43).

14. Mr. Scheff engaged in vulgarity most days from 3:15 to 4:00 or 4:30 p.m. (Ex. A, pg. 52).

15. Male employees got tired of Mr. Scheff's crude and sexual comments, because Mr. Scheff could turn anything into something sexual in order to demonstrate how powerful he was in his manhood. (Ex. A, pg. 80).

16. Male employees complained about Mr. Scheff's vulgar language. (Ex. H).

17. Two to three weeks before Plaintiff began working as an Executive II, approximately the end of September, first of October, Plaintiff moved from the office she

shared with Ms. Luttrell to her own office, which was located away from the other MACs' offices. (Ex. A, pp. 38-39).

18. Plaintiff was promoted to the position of Executive II effective October 16, 2000. (Ex. A, pp. 21-22).

19. Plaintiff's direct supervisor while working as an Executive II was Jodie Edmonds. (Ex. J, pg. 21).

20. On October 13, 2000, Mary Thallman filed an internal charge of sexual harassment against Mark Scheff. (Ex. K).

21. The following employees, all of whom worked in the hospital unit, were interviewed as part of the investigation of Ms. Thallman's complaint: Plaintiff, Ms. Mary Thallman, Mr. Mark Scheff, Mr. Jim Shuh, Mr. Mike Sandidge, Mr. Joe Roberts, Ms. Velva Fletcher, Ms. Pam DuFour, supervisor Mr. Marvin Ross, and supervisor Lenna DeGroot. (Ex. L).

22. Every employee of the hospital unit, who was not on a leave of absence, was interviewed as part of the investigation of Ms. Thallman's complaint of sexual harassment. (Ex. B).

23. On October 27, 2000, Plaintiff was interviewed by Terry Tranquilli, of the Internal Affairs section of the Office of the Inspector General in relation to Thallman's complaint. (Ex. L).

24. As a result of the investigation of Ms. Thallman's complaint, Mr. Scheff received a five-day suspension for discourteous treatment. (Ex. M).

25. Plaintiff alleges that she was retaliated against for her role as a witness in the Mary Thallman investigation in the following ways:

a. Plaintiff alleges that the Department retaliated against her for her role as a witness in the investigation of a sexual harassment charge lodged by Ms. Thallman. (Ex. A, pp. 102-103).

b. Plaintiff's supervisor Jodie Edmonds told Plaintiff she needed to toughen up. (Ex. A, pg. 103).

c. Following Ms. Thallman's internal sexual harassment charge, Ms. Edmonds treated Plaintiff differently and that Ms. Edmonds' attitude toward Plaintiff changed. (Ex. A, pg. 104).

d. Ms. Edmonds held meetings which included other programs, but not the program that Plaintiff oversaw. (Ex. A, pg. 108).

e. The practice of not inviting the Executive II over the State Renal Program had been established since before Plaintiff took that position. (Ex. I).

f. The male hospital unit MACs retaliated against Plaintiff and the female hospital unit MACs by not speaking to them. (Ex. A, pp. 109-110).

g. Mr. Sandidge retaliated against Plaintiff by making comments to other employees within Plaintiff's earshot about the investigation, about Plaintiff, and about Plaintiff's partner Laura Whetstone, specifically that Ms. Whetstone had screwed up the Thallman investigation. (Ex. A, pp. 111-112).

h. Mr. Sandidge further retaliated against Plaintiff by failing to timely turn in applications for the program that Plaintiff managed. (Ex. A, pg. 111).

i.  Mr. Sandidge also avoided Plaintiff and the other female MACs following the Thallman investigation. (Ex. A, pg. 114).

j.  Mr. Sandidge retaliated against Plaintiff, after feeling the heat coming out of Plaintiff's office, by commenting that Plaintiff was "roasting and burning in hell for all the trouble she's caused." (Ex. A, pg. 117).

k.  Supervisors Ms. DeGroot and Mr. Ross retaliated against Plaintiff by failing to direct their subordinate employees, the MACs, to take their questions to Plaintiff, but rather taking questions from the MACs to Plaintiff themselves. (Ex. A, pg. 115).

l.  Ms. Edmonds, Ms. DeGroot, and Mr. Ross retaliated against Plaintiff by talking down to her. (Ex. A, pg. 116).

m.  Ms. DeGroot commented that she would not invite "that bitch," referring to Plaintiff, to a potluck. (Ex. A, pg. 121).

n.  Mr. Scheff and Mr. Schuh retaliated against Plaintiff by failing to timely turn in applications for the program that Plaintiff managed. (Ex. A, pg. 111).

o.  Mr. Scheff and Mr. Shuh retaliated against Plaintiff by giving her the finger and standing in the lobby area while Plaintiff was on break. (Ex. A, pg. 119).

p.  Mr. Scheff stated that Plaintiff had a "hard on" for him and was out to get him. (Ex. A, pg. 129).

q.  From October, 2000, to March, 2001, Mr. Scheff would make comments outside Plaintiff's office about being drug through the mud

    by "five of his co-workers and one of their girlfriends" and that he was going to sue everybody.  (Ex. A, pg 130).

  r. Mr. Scheff wore a black duster overcoat to work, which he had worn to work prior to the investigation.  (Ex. A, pg. 131; Ex. J, pg. 95).

  s. Mr. Scheff put dirt clods on his office half-wall and commented that if people were going to throw dirt at him, they should throw it at his face. (Ex. A, pg. 135).

  t. Mr. Scheff taped a screw to the wall, representing Plaintiff screwing him on his job.  (Ex. A, pg. 136).

  u. Mr. Scheff placed an "Alpha" sign on his office and "Beta" signs at the offices of the other male MACs for the purpose of pointing out that he was the "head dog."  (Ex. A, pp. 136-137).

26. On March 14, 2001, Mr. Bradley offered Plaintiff the opportunity to move her work location to the first floor of the Bloom Building to put more distance between herself and Mr. Scheff.  (Ex. A, pg. 127; Ex. C, pg. 56).

27. On March 16, 2001, Plaintiff began working on the first floor, and continued with the same job duties as she had when working as an Executive II in the basement of the Bloom Building.  (Ex. A, pg. 124).

28. When Plaintiff was relocated to the first floor, Mr. Bradley directed Mr. Scheff that he was not be near the location of Plaintiff's new work space.  (Ex. C., pg. 58).

29. On March 23, 2001, Plaintiff related to Steve Bandy that things were going "good" and that she "loved being upstairs."  (Ex. D).

30. On March 27, 2001, Plaintiff wrote an email to Derrick Moscardelli of the Office of Internal Affairs and wrote, "I have been on the first floor since 03/16/01 and I

experienced a positive change and improvement in my overall mental health and look forward to coming to work again." (Ex. E).

31.   On March 28, 2001, Mr. Bradley e-mailed Mr. Scheff indicating to him again Bradley's instructions not to be on the first floor anywhere close to Plaintiff. (Ex. C, pg. 59; Ex. F).

32.   In April, 2001, a Management Operations Analyst I (MOA) position within BCHS was posted for bidding. (Ex. A, pg. 160).

33.   Plaintiff bid on the (MOA) position, which had a work location in a different building and with different supervisors. (Ex. A, pp. 128, 161).

34.   Between March 27, 2001, and the end of April, 2001, Plaintiff noted in her journal the following conduct:

    a.   On March 29, 2001, Mr. Scheff gave Plaintiff a red-faced angry, dirty look and was watching the hallway to her area. (Ex. P).

    b.   On April 6, 2001, Mr. Scheff was standing outside the Bloom Building with a group of people where he could see the door. (Ex. P).

    c.   On April 9, 2001, Mr. Scheff gave Plaintiff a dirty look. (Ex. Q).

    d.   On April 12, 2001, Mr. Scheff had a screwdriver and screw taped to the wall of his office in the basement of the Bloom Building. (Ex. Q).

    e.   Also on April 12, 2001, a co-worker on the first floor of the Bloom Building used Mr. Scheff's name within earshot of Plaintiff's office while instructing another employee to take something to Mr. Scheff. (Ex. Q).

    f.   On April 17, 2001, Mr. Scheff gave Plaintiff an angry, red-faced look, which changed to a smirk. (Ex. Q).

35.     Mr. Bradley worked with the supervisor of the MOA position to assist in Plaintiff's pursuit of the transfer to that position. (Ex. C, pg. 62).

36.     Plaintiff was offered and accepted the MOA I position and began work as a MOA I on June 1, 2001. (Ex. A, pg. 133).

37.     In that MOA position, Plaintiff was paid the same salary as she had in her Executive II position and did not experience a change in benefits. (Ex. A, pg. 161).

38.     Plaintiff worked as a MOA from June 1, 2001, until November 1, 2002. (Ex. A, pp. 133, 163).

39.     During the first year Plaintiff worked as a MOA, she received a raise. (Ex. A, pg. 165).

40.     In October, 2002, Plaintiff was promoted to another Executive II position. (Ex. A, pg. 165).

41.     At the time of her promotion to an Executive II position in October, 2002, Plaintiff was being paid more than when she was working as an Executive II in BCHS in May, 2001. (Ex. A, pg. 166).

  ii.     **Plaintiff's charges of discrimination.**

42.     On February 27, 2001, Plaintiff filed a charge of discrimination with the Illinois Department of Human Rights naming respondents the Illinois Department of Public Aid and Mark Scheff and alleging sex discrimination and retaliation; Plaintiff amended this charge on July 13, 2001, to include a charge against respondent Jim Schuh. (Ex. O).

43.     Plaintiff alleges in her charge of discrimination that she was subjected to "sexual harassment from August, 2000, sporadically, and continuing until February, 2001." (Ex. O).

44. Plaintiff further alleged in her charge of discrimination that she was retaliated against by the Department of Public Aid from October, 2000, and continuing because of her opposition to the "sexually harassing behavior of Mr. Scheff." (Ex. O).

45. On March 27, 2001, Plaintiff filed an internal complaint of retaliation with the Department's Office of Internal Affairs. (Ex. O).

        Respectfully submitted,

        ILLINOIS DEPARTMENT OF PUBLIC AID,

         Defendant,

        LISA MADIGAN, Attorney General,
        State of Illinois

By:  s/ Thomas H. Klein
     Thomas H. Klein, #6271653
     Sarah R. Kerley, #6283449
     Assistant Attorneys General
     500 South Second Street
     Springfield, Illinois 62706
     Telephone: (217) 785-4555
     Facsimile: (217) 524-5091
     E-Mail: tklein@atg.state.il.us