E-FILED
Tuesday, 01 November, 2005 03:59:39 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

DEBORAH R. SULLINS,           )
        Plaintiff             )
Vs.                           )Cause No. 04-3039
THE ILLINOIS DEPARTMENT       )
OF PUBLIC AID,                )
        Defendant.            )

# ORIGINAL

DEPOSITION OF DEBORAH R. SULLINS, taken in

the above-entitled case before Christina J. Riebeling,

CSR, CCR, and Notary Public for Sangamon County,

acting within and for the Central District of

Illinois, Springfield Division, at 10:15 o'clock A.M.,

on September 8th, 2005, at 3000 Montvale Drive,

Springfield, IL, pursuant to notice.


GOLEMBECK REPORTING SERVICE
Connie S. Golembeck, Owner
(217) 523-8244
(217) 632-8244



EXHIBIT

A

```
1    APPEARANCES:

2

3    JAMES BAKER
     Baker, Baker & Krajewski, LLC
4    415 South Seventh Street
     Springfield, IL 62701
5        On behalf of the Plaintiff

6
     SARAH R. KERLEY
7    TOM KLEIN
     Assistant Attorney General
8    500 South Second Street
     Springfield, IL 62706
9        On behalf of the Defendant

10

11

12   ALSO PRESENT: Susan Moorehead, General Counsel,

13   Department of Healthcare and Family Services

14

15

16

17

18

19

20

21

22

23

24
```

3

1

2                            I N D E X

3   DEPONENT                                    PAGE

4   DEBORAH R. SULLINS

5        Direct Examination by Ms. Kerley        5

6

7

8                          E X H I B I T S

9   NUMBER                    MARKED FOR IDENTIFICATION

10  Defendant's Exhibit 1          157
    Defendant's Exhibits 2 & 3     167
11  Defendant's Exhibit 4          172

12

13

14

15

16

17

18

19

20

21

22

23

24

4

1                              -o0o-

2

3                     S T I P U L A T I O N

         It is stipulated and agreed, by and between the
4    parties hereto, through their attorneys, that the
     deposition of DEBORAH R. SULLINS may be taken before
5    Christina J. Riebeling, A Notary Public and Illinois
     Certified Shorthand Reporter and Missouri Certified
6    Court Reporter, upon oral interrogatories, on the 8th
     of September A.D., 2005, at the instance of the
7    Defendant at the hour of 10:15 o'clock A.M., at 3000
     Montvale Drive, Springfield, IL;

8
         That the oral interrogatories and the answers of
9    the witness may be taken down in shorthand by the
     Reporter and afterwards transcribed;

10
         That all requirements of the Civil Practice Act
11   and the Rules of the Supreme Court as to dedimus, and
     the reading over and signing of the deposition by the
12   witness was not expressly waived;

13       That any objections as to competency, materiality
     or relevancy are hereby reserved, but any objection as
14   to the form of the question is waived unless
     specifically noted;

15
         That the deposition, or any parts thereof may be
16   used for any purpose for which depositions are
     competent, by any of the parties hereto, without
17   foundation proof;

18       That any party hereto may be furnished copies of
     the deposition at his or her own expense.

19

20

21

22

23

24

1          (Whereupon the Deponent was sworn

2              by the Notary Public.)

3              DEBORAH R. SULLINS,

4   having been first duly sworn by the Notary Public,

5   deposeth and saith as follows:

6                 **DIRECT EXAMINATION**

7   BY MS. KERLEY:

8       Q.   Good morning, Ms. Sullins.  I previously

9   introduced myself as Sarah Kerley, an Assistant

10  Attorney General that is going to be asking you some

11  questions today.

12              Before we get started, I want to kind

13  of give some ground rules, which I'm sure Mr. Baker

14  has already kind of prepped you with.  I am going to

15  ask you questions and, as you can see, there's a Court

16  Reporter here today.  So, in the -- to be as helpful

17  as possible to her, if we could -- I will agree not to

18  speak when you're speaking, if you can try to not

19  speak when I am speaking.

20              Second big rule is, because she is

21  taking down everything that is said today, it's

22  important that you answer audibly and not use the

23  phrases uh-huh or huh-uh, because those are very hard

24  to read back and understand what it is you are trying

1   to say.

2           If you do not understand a question

3   it's probably because it was long and not that well

4   phrased, so if you would like -- if you don't answer a

5   question -- or if you don't understand a question,

6   rather, I do ask that you let me know that you don't

7   understand it and I'll try and rephrase.  If you

8   answer a question, I'll assume that you understand the

9   question that was asked and that you are answering

10  responsively to that question.

11          A.    (Nodded head up and down.)

12          Q.    Do you have any questions before we get

13  started?

14          A.    (Shook head from side to side.)

15          Q.    Okay.  If you could, please state your name

16  and address for the record?

17          A.    My name is Deborah Ruth Sullins.  I live at

18  3450 Woodhaven Drive in Springfield, Illinois.

19          Q.    Okay.  And I understand that you are

20  currently employed?

21          A.    Yes.  As --

22          Q.    And are you currently employed with the

23  newly named Department of Healthcare and Family

24  Services?

1    A.    Yes, I am.

2    Q.    For convenience sake today I hope that we

3    can agree to refer to it as the Department of Public

4    Aid; is that agreeable?

5    A.    That's agreeable.

6    Q.    Okay.  I'm going to ask you some questions

7    about your employment background.  And, specifically,

8    we're going to start back -- I guess we'll go ahead

9    and start back with your first job after high school.

10   If you could, please state what position you held?

11   A.    I worked for Long John Silvers in Marion,

12   Illinois as a cashier.  Just general all around...

13   Q.    Okay.  And what did you do after you left

14   Long John Silvers?

15   A.    Went to work at a discount store by the name

16   of More Value that was bought out by Wal-Mart.

17   Q.    And following that position?

18   A.    I believe that from that point I went to

19   work for the United Methodist Church at the Lighthouse

20   Youth Ministry Outreach in Brighton, Illinois.    I

21   worked part-time at Behman's (phonetic) Ice Cream Shop

22   called the Beehive in Brighton and attended classes at

23   Greenville College.

24   Q.    Okay.  And what time frame are we talking

1   about with those -- that work, school trifecta?

2        A.    That would have been the early '80s.

3        Q.    Okay.  And what did you do when you finished

4   school?

5        A.    I, actually, didn't finish school, I dropped

6   out of school and went to work for Hardee's -- that's

7   not correct.  I worked for Long John Silvers and left

8   Long John Silvers to go to work for Hardee's back in

9   the fast foods management.  And worked for Hardee's

10  until I came to Public Aid.

11       Q.    And when did you work at Hardee's?  What

12  time frame?

13       A.    Approximately '83 to '86, I would think.

14       Q.    Okay.  In these positions that we have just

15  talked about, were these -- why did you leave those

16  positions?

17       A.    I went to a higher position.

18       Q.    Okay.  So, you were seeking promotion --

19       A.    Yes.

20       Q.    -- when you were leaving?

21       A.    Yes.

22       Q.    Okay.  And what did you do in 1986 when you

23  changed positions?

24       A.    I came to work for the Department as a

1  caseworker in East Alton, Illinois, Madison County

2  local office.

3      Q.   Okay.  And who was your supervisor there, if

4  you recall?

5      A.   Started out with Peggy Wagnor, who left the

6  Agency.  And then it was Rebecca Sulsberger.  The LOA

7  was Norma Shaffer and the Assistant LOA was Patsy

8  Cowsert.

9      Q.   Okay.  And how long did you work in that

10 position?

11     A.   I'm not quite for sure.  I was promoted from

12 there into a -- we had -- back at that time we had

13 caseworkers 2s, 3s and 4s.  You came in as a 2, you

14 were certified, you went automatically to a 3 and from

15 a 3 position I went to a 4 position, it would have

16 been approximately a year, year and a half.

17     Q.   Okay.  And where was your Caseworker 4

18 position?  Was it in the same --

19     A.   It started in Madison County and I ended up

20 going to work for regional out of East St. Louis under

21 the old Region 9 under the direction of John Barnett.

22     Q.   And what was your position at regional?

23     A.   I was a floating Caseworker.

24     Q.   And were your duties similar to that of when



1    you were a Caseworker 2 and 3?

2        A.    Similar, other than the fact that I also was

3    trained to do any clerical function and any first

4    level supervisory function, so that in the absence of

5    any one of those people, I could fill in.

6        Q.    And that was your role was to fill in for

7    wherever they needed assistance?

8        A.    Yes.

9        Q.    Okay.  And you said that you were in the

10    Caseworker 3 position for approximately one year.  How

11    long were you working in the regional office?

12        A.    Close to two years.

13        Q.    Okay.  And from the regional office where

14    did you go or what position did you take?

15        A.    Bumped from the regional office position to

16    a caseworker position in Granite City, Illinois.

17        Q.    And when you say "bumped" is that a

18    reference to a Collective Bargaining Agreement bumping

19    rights?

20        A.    Yes.  There was a layoff situation.

21        Q.    Okay.  And I'm sorry could you repeat where

22    that was at?

23        A.    Granite City.

24        Q.    Okay.  And how long were you in the Granite

1    City office?

2        A.    Approximately three to six months.

3        Q.    Okay.  And who was your supervisor there?

4        A.    My direct supervisor was -- started with

5    Jeri Kilmer and switched to -- when they shifted loads

6    to Pat Gochlan.

7        Q.    Okay.  And why did you leave that position?

8        A.    My partner at the time and I felt that it

9    would be mutually to our -- mutually agreeable -- it

10   would be to our advantage to move to Springfield for

11   upward mobility reasons.  So, I took a lateral

12   transfer to Sangamon County.

13       Q.    Okay.  And from what I can tell from your

14   answer was that you requested that transfer?      :

15       A.    Yes.

16       Q.    And you stated two reasons, and correct me

17   if I'm wrong, but one was a family reason -- a

18   personal change in where your family would choose to

19   be geographically located; and then secondly you

20   mentioned upward mobility purposes; is that correct?

21       A.    Yes.

22       Q.    And could you please explain what you meant

23   by "upward mobility"?

24       A.    In Southern Illinois because of the effect

1    of the layoff it was harder to be recalled to a higher

2    position once you had been bumped, because of the

3    seniority issues.  I happened to be very fortunate,

4    when I went to a Caseworker 4 I had a little over

5    three years experience and normally people who get

6    those positions are people who have 20 to 30 years.

7    And in that particular situation that someone thought

8    that the highest bidder or highest seniority person

9    was going to bid and they didn't and I got it because

10   I was the only person that bid.  And, so, the

11   likelihood of getting back into a position like that

12   in downstate Illinois is one in a million.

13        Q.    So when you say upward mobility, it was a

14   fear of being bumped?

15        A.    No.  I went back to -- I wanted to come to

16   Sangamon County because I knew in Sangamon County,

17   from having friends in Sangamon County, that I could

18   be back into a Caseworker 4 position in a matter of

19   months.

20        Q.    So, promotional opportunity?

21        A.    Yes.

22        Q.    Okay.  So I understand from your answer that

23   you then began working as a caseworker in Sangamon

24   County?



1       A.    Yes.

2       Q.    Okay.   And was that a Caseworker 3 position?

3       A.    No.   They had changed the titles.

4       Q.    Okay.

5       A.    I'm not familiar with -- I don't remember

6   what the titles were at that time.

7       Q.    Was it equivalent to the work that you did

8   as a Caseworker 3?

9       A.    Yes.

10       Q.    Okay.   And who was your supervisor there?

11       A.    For a month, approximately, it was Jon

12   Gentry.

13       Q.    Okay.

14       A.    And then they switched me to an AFDC, which

15   is now called TANF, which is Temporary Assistance for

16   Needy Families, and I began to work for --

17       Q.    I'm --

18       A.    That's terrible.

19       Q.    Let me tell you, I'm impressed by your

20   memory thus far, so.

21       A.    I can see her name, Bonnie Fearson.

22       Q.    Okay.   You mentioned that you were

23   transferred to TANF -- what is now referred to as

24   TANF.   Was that merely a different working unit but

1    the same position and duties?

2        A.    Yes.    Most of my experience and my

3    background has been in the total package of cash,

4    medical and food stamps when I was a caseworker.

5    Where when I first came in, they put me on a medical

6    only program.

7        Q.    When you first came in to Sangamon County?

8        A.    To Sangamon County.

9        Q.    Okay.

10       A.    So they moved me where I had a greater area

11   of expertise.

12       Q.    And you said approximately one month you

13   were in the medical only program; is that correct?

14       A.    Correct.

15       Q.    And how long were you working in the

16   Sangamon County office under what's now TANF?

17       A.    I don't remember exactly how many months,

18   but in X amount of months, I was put back into the

19   next position, which would have been the old

20   Caseworker 4 but was considered and intake position.

21       Q.    Okay.

22       A.    And then I worked in that until I left

23   Sangamon County.

24       Q.    Okay.    So, you're not sure how long you were



1    in any of the three positions.  Can you give me a

2    ballpark as to how long total you worked it at the

3    Sangamon County office?

4        A.    Not right off the top of my head.  I would

5    say around three years, maybe more.  I would have to

6    go back and look.

7        Q.    Okay.  Approximately -- do you know

8    approximately what year you started in Sangamon County

9    when you made the move?

10        A.    '94, '95.

11        Q.    Okay.  And from the Sangamon County -- I

12    understand that's the County field office?

13        A.    Correct.

14        Q.    What position did you take following that?

15        A.    Went to a MOA, which is -- 1, which is a

16    Management Operations Analyst 1 for what was then the

17    newly formed DHS in the child care section -- child

18    care and policy, I think is what it's called, to

19    become a representative monitor -- monitor.  I

20    contract for child care entities in Cook County.

21        Q.    Okay.  When you left Sangamon County to go

22    to the newly formed DHS, why did you leave your

23    Sangamon County position?

24        A.    Money.

16

1        Q.    So I assume that the DHS was a promotion?

2        A.    It was a promotion.

3        Q.    Okay.  And how long did you work as a MOA?

4        A.    Less than a year.

5        Q.    Okay.  And who was your supervisor there?

6        A.    My direct supervisor was Mike Jones, who was

7  stationed in the Clinton Building in Chicago.

8        Q.    Okay.  And where were you physically

9  located?

10       A.    Iles Park Place in Springfield.

11       Q.    So do I understand that you didn't have a

12  supervisor at your work area?

13       A.    I had his supervisor directly above me was

14  there.

15       Q.    And who was that?

16       A.    Anne Wharf.

17       Q.    Anne Wharf, okay.

18               And why did you leave that position?

19       A.    I decided to go back to school and I didn't

20  want to be on the road so that I could take classes.

21       Q.    Okay.  So I understand that the MOA position

22  you were expected to travel?

23       A.    Extensively.

24       Q.    Okay.  And do I take it that you did go back

```
 1   to school?

 2        A.   Yes, I did.

 3        Q.   And where did you go?

 4        A.   I attended Lincoln Land Community College

 5   for computer courses.

 6        Q.   Okay.  And about -- if you recall, when were

 7   you at Lincoln Land?

 8        A.   Still.

 9        Q.   Okay.  Do you know when you began taking

10   courses at Lincoln Land?

11        A.   No.

12        Q.   Okay.

13        A.   No.  Not off the top of my head.

14        Q.   You previously testified that you came to

15   Sangamon County in 1994 or 1995 and that you stayed

16   there approximately three years, does it jive, then,

17   that you would have been at DHS approximately 1997,

18   1998?

19        A.   It had to be '98.

20        Q.   And that you stayed there for less than a

21   year, so sometime in either 1998 or 1999 you took time

22   off to go to school?

23        A.   I didn't take time off.  I demoted to a MAC

24   at the Bloom Building.
```

1    Q.    Okay.  So following the MOA position, you

2    took a voluntary demotion?

3    A.    Yes, to get off the road so I could go to

4    school.

5    Q.    Okay.  Do you recall when you started as a

6    MAC?

7    A.    No.

8    Q.    And from your previous time line that we

9    just talked -- could we agree that it's close --

10   around 1999?

11   A.    I would say somewhere in 1999.

12   Q.    Okay.

13   A.    '98, '99.

14   Q.    Okay.  And what were your duties as a MAC?

15   A.    I worked for Steve Bandy and I did what they.

16   call Collins versus Bradley claims and it was -- that

17   dealt with people who were responding to what they

18   thought were -- it was a place where people

19   complained, filed grievances, complaints about medical

20   bills that they felt like should have been paid by the

21   Agency and wasn't.

22   Q.    Okay.

23   A.    That was part of my job.  The other part of

24   my job was I worked with electronic transmission of

1    bills from pharmacies.

2        Q.   Okay.  So am I to understand that you did

3    not -- when you started as a MAC you didn't work

4    with -- directly with hospitals?

5        A.   No, I started in a different section.  I was

6    asked to transfer to the Hospital Unit by Cheryl

7    Beckner and Jodie Edmonds.

8        Q.   So my understanding is there's more than --

9    MACs have more than -- the title of MAC has more than

10   one set of duties?

11       A.   Depends on the section that you're in.

12       Q.   So what section did you start in?

13       A.   Collins versus Bradley.

14       Q.   And that's what they called it?

15       A.   Uh-huh.

16       Q.   Okay.  And how long were you -- were you

17   working as a MAC doing Collins versus Bradley claims

18   under Steve Bandy?

19       A.   Less than a year.

20       Q.   And why did you transfer to the Hospital

21   Unit?

22       A.   Because Cheryl Beckner asked me to and she

23   was the Assistant Bureau Chief at the time.

24       Q.   And how did your duties change when you went



1    from working in the Collins versus Bradley Unit to the

2    Hospital Unit?

3        A.    Let me clarify something.  She asked me --

4        Q.    Please.

5        A.    She asked me at the end of 1999 to take a

6    transfer to the hospital section to set myself into a

7    role where that they could pull me from a unit,

8    because when they do a promotion they normally go

9    in-house within a unit and then look outside, as far

10   as qualifications.  Because of my going back to school

11   and doing programming and working in that field, she

12   wanted my expertise in the Hospital Unit.  So she

13   asked me to take a transfer.  There was a position

14   coming open in early 19 -- 2000 to come to the

15   Hospital Unit because she was going to put me into an

16   E2 position in the hospital section, which eventually

17   they did, which was a five-day posting.

18       Q.    Okay.  So, when you -- did you request that

19   transfer?

20       A.    Yes, I did.

21       Q.    Okay.  And when you requested the transfer

22   to the Hospital Unit, was it with the understanding

23   that you were being groomed for a promotional position

24   as need to?

1      A.    I was told that, yes.

2      Q.    Okay.  How did your duties change from being

3   a MAC under Collins V Bradley to a MAC in the Hospital

4   Unit?

5      A.    Instead of dealing with recipients, I began

6   to deal more -- I dealt with hospital staff, billing

7   clerks.

8      Q.    And am I correct in my understanding that

9   you would answer their questions about using certain

10  billing forms?

11     A.    Correct.

12     Q.    Okay.

13     A.    And why a bill was rejected, how to keep a

14  bill from getting rejected if they had special

15  circumstances that they needed to have billed.

16     Q.    Okay.  And is that the UB92?

17     A.    I think it still is.  I'm not for sure.

18     Q.    Is that what you dealt with at the time?

19     A.    At that time.

20     Q.    Okay.  And who was your supervisor when you

21  were a MAC in the Hospital Unit?

22     A.    Lenna DeGroot.

23     Q.    And how long was she your supervisor?

24     A.    From February 2000 to October 2000 when I

1    was promoted to an E2.

2        Q.    Okay.  And what position did Cheryl Beckner

3    hold?

4        A.    Senior PSA, Assistant Bureau Chief to Steve

5    Bandy -- or to Steve Bradley, excuse me.  She has

6    since retired.

7        Q.    So she would have been above the chain of

8    command of Lenna DeGroot?

9        A.    Yes.  Above Lenna DeGroot was Jodie Edmonds;

10   above Jodie Edmonds was Cheryl Beckner; above Cheryl

11   Beckner was Steve Bradley.

12       Q.    Okay.  We have spent a little bit of time

13   discussing your past work history.  Through any of

14   those positions that we've talked about or at the time

15   of any of those positions, did you find -- did you

16   ever file any internal complaints of discrimination?

17       A.    Would you clarify discrimination?

18            MR. BAKER:  And complaint.

19            MS. KERLEY:  Yes.  To both of you.

20            MR. BAKER:  Thank you.

21   BY MS. KERLEY:

22       Q.    Have you ever filed an internal complaint,

23   either lodged a - for lack of a better term - formal

24   internal written complaint if your employer had a

1    complaint structure or complaint of discrimination to

2    a supervisor.  And when I say "discrimination", I'm

3    referring to either sexual harassment, gender

4    discrimination, race discrimination, or religious

5    discrimination.

6        MR. BAKER:  Sarah, for purposes of

7    clarification, what would what you're requesting

8    include verbal complaints Ms. Sullins might have made

9    to a supervisor about a co-employee's conduct.

10       MS. KERLEY:  Yes.

11       MR. BAKER:  So any type of complaint,

12   written, verbal, formal, or informal, she may have

13   had?

14       MS. KERLEY:  Yes.

15       MR. BAKER:  Okay.  Do you understand that,

16   Debbie?

17       THE WITNESS:  Uh-huh.  I filed a complaint

18   sometime when I worked in the Intake Unit for June

19   Denton, with June Denton as my supervisor.  It was

20   verbal as a Union Steward, as a first level grievance,

21   against Mark Scheff.

22   BY MS. KERLEY:

23       Q.   Who was June Denton?

24       A.   My immediate front-line supervisor.



1      Q.    At what location?

2      A.    Sangamon County local DHS office.

3      Q.    Okay.  And with regard to that verbal

4  complaint that you filed with Ms. Denton, to the best

5  of your recollection can you please tell me what your

6  complaint was, in using the most specific terms as you

7  recall them?

8            MR. BAKER:  You want her to do her best to

9  recall what she was complaining about?

10           MS. KERLEY:  And how she stated her

11 complaint.

12           THE WITNESS:  As a Union Steward it was a

13 complaint on behalf of several people in the unit.

14 BY MS. KERLEY:

15     Q.    Is it my understanding that you were the

16 Union Steward?

17     A.    Yes, ma'am.

18     Q.    Okay.  And I'm sorry, I just broke one of

19 our rules cutting you off.  You were saying that you

20 were the Union Steward and you were complaining on

21 behalf of a number of employees in the unit?

22     A.    Yes.

23     Q.    Okay.  Please proceed.

24     A.    It had to do with Mark and some way that he

1    treated a client and we overheard the conversation

2    that he was having during the course of an intake

3    interview with this recipient -- I don't remember the

4    terminology he used.  I don't remember but it was --

5    but it was discourteous treatment of a client.  But it

6    was filed on behalf of the unit because they were

7    upset at how he treated this person.

8        Q.   Okay.  You have mentioned, number of

9    employees in the unit and that it was filed on behalf

10   of the unit.  Who were the other members of the unit

11   that your complaint was filed on behalf of?

12       A.   Brenda Farmer, Pam Lynch -- no I take it

13   back, it wasn't Pam it was Kim Harter that sat in a

14   cube.  Darelyn Potter.  I don't remember the

15   fourth person.  It was the cubes right around Mark

16   that overheard this conversation, because he was

17   pretty loud in it, and it was those people.

18       Q.   Okay.  So there were four employees who had

19   overheard a conversation from Mark Scheff and wanted

20   to issue a complaint.  And, as Union Steward, you

21   lodged that complaint to June Denton?

22       A.   Right.  On behalf of them.  But as a Union

23   Steward I also filed numerous complaints for different

24   reasons for different people from things such as they

1  didn't agree with their quarterly review or their

2  yearly evaluation, or they felt like somebody got a

3  job when they had more seniority.  So to go back and

4  tell you complaint by complaint where I've personally

5  filed, no, I haven't, because as long as I was a Union

6  employee at different times I was a Union Steward.

7      Q.   Okay.  When -- when you refer tò this

8  complaint filed that you filed as a Union Steward, you

9  filed it on behalf of those four employees; is that

10  correct?

11      A.   Uh-huh.

12      Q.   Okay.



13      A.   I myself, other than -- not to my knowledge

14  do I remember filing a complaint about discrimination.

15      Q.   In any of the positions that you've

16  previously held?

17      A.   I never -- I don't remember.  I·just don't

18  remember if I have.

19      Q.   Okay.  With regard to this statement that

20  these four employees overheard Mark Scheff make, do

21  you recall the general subject of his comment?

22      A.   I remember that it was discriminating

23  against the person's gender and economic status.

24      Q.   Okay.  Do you remember the client's name?

1      A.    No, ma'am, I sure don't.

2      Q.    Okay.  With regard to the complaint that we

3  were just discussing that was filed when you were a

4  Union Steward, do you recall the time period when you

5  were a Union Steward and filed that complaint?

6      A.    Probably -- no, I don't.  I can't tell you

7  for sure.

8      Q.    Okay.  And do you recall what the resolution

9  of that complaint was?

10      A.    No, I don't.

11      Q.    Okay.  With -- with the exception of the

12  internal complaint that we've just talked about and

13  the various complaints that you would have filed as a

14  Union Steward, have you engaged in any other

15  litigation?  Have you ever -- let me clarify.  Have

16  you ever been a plaintiff or a defendant in a lawsuit?

17      A.    Yes, I have.

18      Q.    Okay.  Can you describe that for me, please?

19      A.    I was involved in a car wreck.

20      Q.    Okay.

21      A.    I think it was 1982.

22      Q.    Okay.  And where was that filed?

23      A.    Godfrey, Illinois, Madison County.

24      Q.    And were you the plaintiff in that case?

1        MR. BAKER:  Did you bring the suit?

2        THE WITNESS:  Yes, I did.

3   BY MS. KERLEY:

4        Q.   With the exception of the 1982 car wreck

5   suit that you've just discussed, have you been party

6   to any other litigation either having filed suit or

7   having been sued?

8        A.   Sure.  Eighteen months to the day I was in

9   another car wreck.

10        Q.   Oh, you poor, unfortunate woman.  And was

11   that also in Madison County, Illinois?

12        A.   That's not true, I didn't file suit.  I

13   didn't file suit.  I was just in a car wreck 18 months

14   to the day and there was a hundred dollar settlement.

15        Q.   Okay.  So it would have been something that

16   was handled by the insurance company and not something

17   that went to court?

18        A.   I'm sorry.  Yeah.  Sorry.

19        Q.   Other than that unlucky two-year period,

20   where have you been involved in any other litigation,

21   either by bringing suit or being sued?

22        A.   Bankruptcy.

23        Q.   Okay.  And when was that?

24        A.   '98.

1      Q.    Okay.  And any other litigation?

2      A.    Not to my knowledge.  I've been a witness

3 before in court, but never...

4      Q.   With the exemption of the incident case

5 that's been filed against the Department of Public

6 Aid?

7      A.   No.

8      MR. BAKER:  Sarah, just for purposes of

9 clarification, there is a parallel case that is

10 pending before the Human Rights Commission and I think

11 the State and I assume when you talk about this case

12 you're talking globally?

13 *BY MS. KERLEY:*

14      Q.   Yes.  The cases that arose out of the same

15 fact pattern, so I would include both the federal

16 litigation against the Department and whatever may be

17 ongoing in the Department of Human Rights or Human

18 Rights Commission.  So, other than that global issue

19 and the car wreck and the bankruptcy is there any

20 other litigation that you've been involved in?

21      A.   No.

22      Q.   Okay.  Have you ever been convicted of a

23 crime, felony or misdemeanor?

24      A.  No.

1     Q.   Okay.  One thing I didn't mention at the

2  outset, if you ever need a break for whatever reason

3  if it's to get more coffee, bathroom break, or if you

4  just need a minute, please let me know.  And that goes

5  for you too Mr. Baker?

6          MR. BAKER:  Off the record.

7                   [WHEREUPON THERE WAS A SHORT

8                   DISCUSSION OFF THE RECORD.]

9  *BY MS. KERLEY:*

10     Q.   I am going to direct your attention to the

11  time that you were a MAC in the bureau that is

12  generally called BCHS?

13     A.   Okay.

14     Q.   And is that the Bureau of Comprehensive

15  Health Services?

16     A.   Yes, ma'am.

17     Q.   And would your position as a MAC under Steve

18  Bandy also be under the Bureau of BCHS?

19     A.   Yes, it was.

20     Q.   Okay.  So there's -- they were just

21  different units within the same bureau?

22     A.   Yes.

23     Q.   Okay.  And was Steve Bradley the Bureau

24  Chief the whole time you were in the Bureau of

1    Comprehensive Health Services?

2        A.    I think.

3        Q.    Okay.

4        A.    There might -- that might have been a time

5    just around when I came to be BCHS that Roni Kaluza

6    was the Bureau Chief and took a demotion to an

7    Assistant Bureau Chief and that Steve came in as

8    Bureau Chief.  I think that all came in about the time

9    that I was coming or just got there.

10       Q.    Okay.

11       A.    I think that happened maybe shortly after I

12   came into the bureau.

13       Q.    Okay.  I'm going to direct your attention

14   specifically to when you were a MAC in the Hospital

15   Unit?

16       A.    Okay.

17       Q.    And you had briefly mentioned your duties as

18   they related to dealing with hospital billers.  Could

19   you expand on that and how -- and tell for me how you

20   spent your time as a MAC in the Hospital Unit?

21       A.    From the time that you start work, which I

22   started work at 8:30 in the morning and worked until

23   5:00 in the afternoon.  From 8:30 to whenever your

24   break time was, and brakes were scattered, some people

1   went 10:00 to 10:15, some people went to 10:15 to
2   10:30 until your allotted break time, switchboard
3   would put phone calls through to you from the
4   hospitals that were on your hospital list of clients
5   to cover and you would take calls from them. If you
6   didn't have a call, then you worked on billing
7   problems that had been given to you or through the
8   mail or maybe you told them to mail you something, so
9   you could get it processed differently than just the
10  general ways. Sometimes we had to do what we call
11  program override for programming purposes for the
12  computer.

13      Q.   Okay.

14      A.   So you were either on the telephone, unless
15  it was your break time or lunchtime, or you worked on
16  paperwork dealing with the billing issues from the
17  different hospitals that you were responsible for.

18      Q.   Okay. So was the majority of your time
19  spent on the phone?

20      A.   Not really.

21      Q.   Okay. And if you can give me your best
22  guesstimate as an average amount of time during the
23  day that you spent on the phone?

24      A.   Roughly two to three hours.

1    Q.    Okay.

2    A.    It depended on the hospitals that you were

3  assigned to.  Since I was the newest MAC in the area,

4  I was not given the hard hospitals.  They don't break

5  you in that way.

6    Q.    The problem child hospitals, if you will?

7    A.    Those go to the people that are -- have been

8  around for some time.  I was assigned hospitals, since

9  I was the last one to come into the unit, that were

10  relatively easy with problems and that they generally

11  didn't call, they just sent their problems in with a

12  note that these needed to be done such and such

13  because what had happened.  There are certain computer

14  glitches back at that time before we got a more

15  advanced system, where that you just knew that claim

16  wasn't going to go through and that you needed an

17  override on it given by someone within the Claims

18  Processing Unit.  So, it had to come through a MAC

19  through the Hospital Unit first before it could go to

20  claims processing.

21    Q.    Okay.  So you spent a great deal of your

22  time doing mail and problem solving with billing

23  questions that came through the mail?

24    A.    And renal applications for the renal

1    dialysis program.

2        Q.    Was that the renal dialysis program, was

3    that a regular duty of a MAC?

4        A.    It wasn't, then it was, then it wasn't, then

5    it was.

6        Q.    So, at some times?

7        A.    At the time that I was working, yes, because

8    of the fact that that position was vacant, which was

9    the position they were going to promote me into.

10        Q.    Okay.  So to make sure that I understand

11    what you're saying.  The renal -- the position of the

12    person who would handle the renal --

13        A.    Was vacant.

14        Q.    -- was vacant; therefore, those duties were

15    farmed out to the MACs?

16        A.    Correct.

17        Q.    And when that position was filled, the MACs

18    no longer did the renal work?

19        A.    Sometimes.

20        Q.    Okay.

21        A.    There's a database that was being kept by

22    the renal worker, who also took calls from renal

23    social workers and set up subcommittee meetings around

24    the state and did an overall general board committee

1    meeting that had to be held once a year.  But,

2    generally, the actual work of getting the information

3    into the system was done by MACs.  But during this

4    time frame, while that position was empty, more of

5    that work was given to the MACs than in what would

6    have been a normal time frame.

7         Q.    More than just the data entry portion of the

8    renal work?

9         A.    Right.

10        Q.    And the time frame you're talking about is

11   from February 2000 to October 2000?

12        A.    (Nodded head up and down.)

13        Q.    Okay.

14        A.    Yes, for the record.

15        Q.    Good to catch yourself.

16               Was there a time of the day where MACs

17   did not take phone calls?

18        A.    From 3:00 o'clock to the end of the day --

19   the end of their workday.

20        Q.    And what was that time set aside for?

21        A.    To do paperwork.

22        Q.    And would that have been necessary because

23   of some of the MACs spent a great deal more time on

24   the phone than others?

36

```
 1        A.    Correct.

 2        Q.    Okay.  During -- when a MAC did, not have a

 3   phone call, was it normal to wear headphones or listen

 4   to music?

 5        A.    While working on their paperwork, yes.

 6        Q.    And that was common within the MACs?

 7        A.    For some of us.  For some of us, it wasn't.

 8        Q.    Okay.  When you say "us" am I to take that

 9   as you were one of the MACs who did wear headphones?

10        A.    Occasionally.

11        Q.    Okay.  And on average how often do you think

12   you were wearing headphones during the week?

13        A.    After 3:00 o'clock a lot.  Almost every day.

14        Q.    Okay.  So you would -- when you --

15        A.    Depending on the conversation next door to

16   me.

17        Q.    Okay.  So it was common practice for you to

18   have headphones on during the end of the day?

19        A.    If the conversation next door was not in

20   what I would call a professional manner, okay.

21        Q.    I promise we will get to that.

22              You also testified that in October 2000

23   you received a promotion to an E2 position; is that

24   correct?
```

1    A.    Yes, I did.

2    Q.    And would that have been the renal position

3  that we were just talking about that had been vacant?

4    A.    Yes.

5    Q.    Okay.  And do you recall what your start

6  date was as an E2?

7    A.    I think it was the 16th or the 17th of

8  October.

9    Q.    Okay.  October 16th-ish.

10              And what were your duties in that

11  position?

12    A.    To oversee about a $1.2 million budget to

13  see that the funds were appropriated out correctly to

14  the renal dialysis units, based on the applications

15  that were sent to the Agency.  And that the people

16  were, based on the information the social workers gave

17  us, that the information was correct to release the

18  funds.

19    Q.    Okay.

20    A.    It also included training sessions for

21  social workers, when needed; rewriting the policy,

22  because this was a program that had been given to the

23  Agency - I say "given" loosely - from Public Health

24  and the -- there was no policy or procedure manual,



1    there was just a statute that, depending on who was

2    doing the program, interpreted it to make the rules

3    the way they wanted to, okay.

4        Q.    Not to be confusing, and I apologize I want

5    to jump back real quick to when you were a MAC.

6            Where physically were you located?  You

7    had mentioned that you worked at the Bloom Building,

8    where were you located within the Bloom Building?

9            MR. BAKER:. Are you talking about when she

10   was in the Medical Unit?

11           MS. KERLEY:  When she was in the Hospital

12   Unit.

13           THE WITNESS:  When I worked in the Hospital

14   Unit, I worked in the basement of the Bloom Building.

15   *BY MS. KERLEY:*

16       Q.    Did you have an office?

17       A.    I shared an office with P.K. Luttrell.

18       Q.   And was she the only person that you shared

19   and office with?

20       A.    Yes.

21       Q.    And did you share an office with her the

22   entire time you were in the Hospital Unit?

23       A.    The entire time I was a MAC -- no, two weeks

24   before I was promoted -- two to three weeks before I

1    was promoted I was moved into the office that I would

2    have as an E2.

3        Q.    Okay.  So -- but that was just a transition

4    period?

5        A.    Right.

6        Q.    Okay.  So if I understand -- to make sure I

7    understand:  When you were a MAC in the non-Hospital

8    Unit, you worked in the same location as the MACs who

9    did work in the Hospital Unit; is that correct?

10        A.    When I was non-Hospital?

11        Q.    Yes.

12        A.    No, I worked on the first floor.

13        Q.    Okay.  So when you moved to -- your first

14    location in the Bloom Building was the first floor?

15        A.    Let me think about this.  They moved us

16    about three times.  When I went to work as a MAC for

17    the Collins versus Bradley, I worked in the basement

18    floor in a huge conference room with one, two,

19    three -- three other people directly across from the

20    elevator.  Then they moved us to the first floor and I

21    was on the first floor until I transferred to the

22    Hospital Unit, and then I went into the office that I

23    stayed in until the few weeks before I became an E2.

24        Q.    Okay.  So your whole time in the Hospital

1    Unit you shared an office with P.K. Luttrell with the

2    exception of the two-week transition time?

3         A.    Two to three week.

4         Q.    Okay.  And where physically was that

5    located, in relationship to the other MACs?

6         A.    One wall starting at one end was a clerical

7    supervisor with a different unit, and then there was

8    two MACs in that office, two MAC's in that office,

9    myself and P.K., two MACs in that office, then Lenna

10   DeGroot, then across from her was Marvin Ross and

11   right outside of our office was long tables like this,

12   not quite as long, with coffee pots and microwave

13   where we would get our coffee daily, which would have

14   been right outside of my office.

15        Q.    Okay.  And who -- what MACs were in the

16   office directly to -- on either side of you?

17        A.    On one side of me was Mike Sandidge and Joe

18   Roberts, and on the other side was Jim Schuh and Mary

19   Thallman.

20        Q.    Okay.  I also understand that when you were

21   a MAC in the Hospital Unit, you also worked with Mark

22   Scheff?

23        A.    Yes, I did.

24        Q.    And he would have worked in a location

1    somewhat removed from the offices you just described?

2         A.    Around the corner.

3         Q.    Okay.   And there were -- he wasn't the only

4    MAC on the other -- there were other MACs around the

5    corner as well, correct?

6         A.    Correct.   There was him, there was Pam

7    Dufour and then there was an empty office.

8         Q.    Okay.

9         A.    No, that's not true.   It wasn't empty.   She

10   was a field consultant, so she traveled.   She was more

11   gone than she was there.

12        Q.    Okay.   And when you became an E2, where was



13   your office in relationship to the former office you

14   shared with P.K. Luttrell?

15        A.    Where I said the empty office was that

16   really isn't empty that was a field position, it was

17   right around the corner.   Directly around the corner

18   there's the first office.

19        Q.    Okay.   So you shared a wall with the field

20   supervisor's office?

21        A.    Yes, I would have.

22        Q.    Okay.   And was --

23        A.    There was an incove (sic) -- there was an

24   incove of the main wall where there's a fax machine.

1   The only fax machine for the unit -- the whole section

2   was downstairs, was right there.

3       Q.   So the fax machine incove would have been

4   between your office and the field supervisor's office?

5       A.   We share the same back wall.

6           MS. KERLEY:  Okay.  I think now would be a

7   good time to take a quick break and get you some

8   coffee.

9                        [WHEREUPON THERE WAS A SHORT

10                       DISCUSSION OFF THE RECORD.]

11  BY MS. KERLEY:

12      Q.   Okay.  We have heard from your testimony

13  that you worked with Mark Scheff at the Sangamon

14  County local office?

15      A.   Yes.

16      Q.   And that would have been, I think you said,

17  around -- actually, you said you didn't know when that

18  was.  Do you recall about when you worked with him?

19      A.   Mid-'90s.  I'm not quite sure.

20      Q.   Okay.  And how long did you work with him?

21      A.   I don't remember.

22      Q.   Okay.

23      A.   He left and went to the Hospital Unit after

24  I came into intake section, but I don't remember.

Q.    Whether it was right when you went to intake
or later?

A.    It was later.

Q.    Okay.

A.    But I don't remember how long, or.

Q.    Okay.  You had testified that you -- when
you worked at the Sangamon County office that you
worked there for only approximately a month in the
medical program and then you went to TANF?

A.    (Nodded head up and down.)

Q.    And then you were promoted to the intake
position, which would have been the old caseworker
position?

A.    Uh-huh.

Q.    Which of those three positions at the
Sangamon County office did you work with Mark Scheff?

A.    Intake.

Q.    Okay.  And he was also an intake worker?

A.    Yes.

Q.    Okay.  And then again when you became a MAC
in the Hospital Unit in early 2000, you again worked
with Mark Scheff; is that correct?

A.    Yes.

Q.    Okay.  And you testified that Jim Schuh was

1   also a MAC.  So, during that same time you worked with

2   Jim Schuh, as well?

3       A.   Yes.

4       Q.   Okay.  In your complaint you allege that you

5   were exposed to verbal comments of a graphic sexual

6   nature uttered by Mark Scheff and Jim Schuh; is that

7   correct?

8       A.   Yes.

9       Q.   Okay.  What I would like to do now is go

10  through your best recollection of the comments that

11  you overheard while a MAC, starting with the first

12  comment of a graphic sexual nature that you

13  overheard -- or that you heard Mark Scheff utter while

14  you were a MAC?

15          MR. BAKER:  Do you want her to speak to each

16  one?

17          MS. KERLEY:  As best as she can recall.

18          MR. BAKER:  We're not going to be out by

19  4:00 o'clock.

20          MS. KERLEY:  We might.

21          THE WITNESS:  I think the first time was in

22  February of 2000.  That was when a conversation was

23  about one of the gentleman that worked in the office

24  next to me Mike Sandidge was having problems at home

1  and what it was -- he was having marital problems, but

2  on that particular day his child had been sick and he

3  had been up most of the night with the youngest one.

4  It appeared from what I could see as an outsider from

5  talking to him as a person that he took more of an

6  active role at night when he was home than his wife

7  did.  They both worked, but he seemed to take more of

8  the parenting issues.  And Mike was very grouchy that

9  day.  He had talked to me earlier in the day.  I told

10  him, you don't look very good, are you okay?  And he

11  said he had been up most of the night with a sick

12  child.  And he said, I'm not in a really good frame of

13  mind.  So if I act snorty just blow it off.  We were

14  standing at the coffeepot.  That was early in the

15  morning.  So, later that afternoon, I think it was Pam

16  Dufour, maybe, was sitting at my office explaining

17  something at my desk, and the proximity of my office

18  and the office that Mike Sandidge and Joe Roberts

19  shared, this was my office, this was their office.

20  Where this staple is is my door, if there was a staple

21  there, that would be the door and it was a paper thin

22  wall.

23          MS. KERLEY:  Let the record reflect --

24          MR. BAKER:  That the two doors adjoin.

1       MS. KERLEY:  The two doors adjoin and they

2  share a central wall between the doors.

3       THE WITNESS:  My desk faced the outer wall

4  and was right next to the door.

5  *BY MS. KERLEY:*

6       Q.   And by "outer wall" you mean door to the

7  hallway?

8       A.   Door to the hallway.  The only door in the

9  room.  And Pam was sitting beside me.  Since I was

10  new, she was one of the ones that was helping to train

11  me.  And we were -- this was about 3:30 in the   .

12  afternoon and Joe and Mike were in their office and

13  Mark Scheff had came down there and Jim Schuh and they

14  were all sitting in there.  And Pam and I were sitting

15  there going over whatever she was training me on, I

16  don't remember.  And somebody said something and Mike

17  said something to the effect, you can all leave any

18  time now brake is over.  And Mark started in about,

19  well, you wouldn't be so grouchy if your wife put out.

20  And, you know, I know that you like it and he began to

21  describe different styles of intercourse.  And I said

22  to Pam, I said, what is going on in the room next

23  door?  And she said, that's typical.  She said, that's

24  almost an every day occurrence.  She said, if not four



1   or five days out of the week, as long as Mark is

2   around.  And I said, I don't understand.  Have you

3   complained about it?  And she says, oh, yeah, we've

4   all complained, but nothing has ever been done about

5   it.  And that was in my first week or two of being

6   there.  And I said, well, I'm not going to sit here

7   and listen to it.  So, I got up and I went to Lenna's

8   office and I told Lenna that I did not appreciate what

9   Mark was doing and what was being said down there.

10   And the response that I got that day, and I would get

11   many days of complaining, was, that's just Mark and

12   boys will be boys.

13         Q.    Okay.

14         A.    So that's --

15         Q.    So you testified that you and Pam were in

16   your office and that Mark Scheff, Jim Schuh, Joe

17   Roberts and Mike Sandidge were in the office next to

18   you?

19         A.    Yes.

20         Q.    With regard to the comment that you

21   overheard Mark say, you mentioned that his wife put

22   out or that -- something to the effect of Mike's wife

23   putting out?

24         A.    Uh-huh.

Q.   And then described intercourse?

A.   Uh-huh.

Q.   Do you recall what language he used when he was describing the intercourse?

A.   I will tell you that he -- word for word, no I can't, but I will tell you that he talked about a shaft in the back end.

Q.   Okay.  And that is in -- okay, shaft.  And that's the best you recall?

A.   Of that one.

Q.   Okay.

A.   Because I immediately got up and left the room and went down to Lenna's office because I thought, I'm not going to sit here and listen to this.

Q.   Okay.  And when you went to Lenna's office, to the best that you recall, what did you tell Lenna?

A.   I told her verbatim what was said because it was still fresh in my mind, and I told her that I didn't appreciate it and I didn't think the workplace was a place for that kind of conversation.

Q.   Okay.

A.   And actually she told me to get used to it.

Q.   Okay.  When is -- and that's -- and you said in February of '02 -- or, I mean, February of 2000?

1        A.    Uh-huh.

2        Q.    When do you recall as -- and something that

3    may speed it along is if you start with the statement

4    and I can follow-up.  But, of course, it's your

5    prerogative.

6                     What do you recall is the next

7    statement that you overheard that you found to be a

8    comment of graphic sexual nature?

9        A.    I can't tell you an exact date.  I can tell

10   you that almost every day between February and October

11   that I complained about the comments coming from next

12   door, as well as Velva Fletcher and Mary Thallman.

13   And that -- comments were anywhere from talking about

14   anal sex and talking about -- and describing anal sex

15   to describing sex when a woman was on her period to

16   coarse remarks about other employees by Mark was a

17   daily thing when Mark was there for the four of them

18   to meet -- or the three of them, depending on who was

19   there, to meet almost every day.

20       Q.    Okay.

21       A.    Different times different people -- I mean,

22.  there's the time that Mark talked about the penis

23   tree.  He carved a penis tree, he says, in his home in

24   his front yard and supposedly that it had balls and

1    everything.  He went around and told everybody in the

2    unit about this.  He told student workers in the smoke

3    room.  He told people in the other units what he had

4    done.

5         Q.    With regard to the penis tree comment, did

6    you -- did Mark tell you about the penis tree?

7         A.    Yes, he did.

8         Q.    And where were you when he told you about

9    the penis tree? .

10         A.    I think I was standing at the coffee

11    machine.  I think there was food there.

12         Q.    Like most state offices there's often food.

13         A.    Yeah.

14         Q.    Yes.

15         A.    And I think he was getting food and I was

16    getting coffee.  He told me he had a new chainsaw.

17    That's something that Laura and I do lawn care service

18    on the side, but I've always been a person who likes

19    to work outside, to talk about chainsaw to me was a

20    common ground, so we were talking about a chainsaw.

21    And he got a new Dremel drill too and he had used it

22    on carving a penis and balls into a tree.  And I said,

23    Mark, why do you have to talk like this?  And, of

24    course, he always laughed off anything you said to

1    him.  And, once again, I told him I didn't appreciate

2    his conversation.

3         Q.   Okay.  So, you were at the coffee machine or

4    that area.  Were there any other employees there?

5         A.   I think Velva Fletcher was standing there.

6         Q.   And, so, she overheard the conversation, as

7    well?

8         A.   And she also got the privilege of hearing

9    the entire story again as he was telling it in the

10   smoking break room.  Because she came down and

11   asked -- I complained that day, she complained that

12   day, that not only was he telling it outside of the

13   unit and that they were letting it go on outside of

14   the unit, now he was spreading it all through the

15   smoking break room.  And Lenna's remark was -- and

16   Jodie's was, we can't stop people from doing what they

17   want to do on their break.  That it's their time.

18        Q.   Let's back up.  You said you complained

19   about the penis tree story.

20        A.   I complained to Lenna DeGroot and Marvin

21   Ross on an average to three times a week from February

22   to October.  I was in and out of Jodie's office at

23   least once a week complaining about Mark Scheff's

24   mouth.  You know, it's one thing if you go to work and

1    somebody tells a joke or they stub their toe and they

2    cuss, but every day when you have to hear between

3    3:15 and 4:00 o'clock, or 4:30 some days vulgarity day

4    after day after day, it gets old real fast.  So I

5    complained constantly.

6         Q.    Okay.

7         A.    I asked to be moved.

8         Q.    Okay.  Let's, if we can, focus on the penis

9    tree comment.  With regard that comment, who did you

10   complain to?

11        A.    Lenna and to Jodie both.

12        Q.    Okay.  And what did you tell Lenna?

13        A.    That Mark was telling the story and I felt

14   like it was something that he needed to keep to

15   himself and that was maybe something for after hours

16   if he wanted to tell someone about it that was his

17   prerogative then.

18        Q.    And what did you tell Jodie?

19        A.    That -- once again, that Mark was out

20   telling things.  And I told her about the tree and I

21   told her that it was very offensive.

22        Q.    Okay.  And do you recall a time frame -- so,

23   you don't recall a specific date, do you recall a time

24   frame to the penis tree comments when you overheard

1  that?

2      A.   Not today.

3      Q.   Do you recall whether it was in the spring?

4      A.   No, I don't.

5      Q.   Do you recall if it was in the summer?

6      A.   No, I don't.

7      Q.   Okay.

8      A.   I don't remember the time frame now.

9      Q.   Okay. And you don't recall whether it was

10  close to the time that you were promoted or close to

11  the time that you began in the Hospital Unit?



12      A.   I know it wasn't, like, February or March

13  because it was too cold for us to be talking about

14  outside work.

15      Q.   Okay.

16      A.   So, it had to be between spring and fall

17  when most people are out in their yard, but today I

18  can't tell you off the top of my head a date.

19      Q.   Okay.

20      A.   But I know it wasn't February or March

21  because it was too cold for outside work.

22      Q.   Okay. We've talked about the comment that

23  you overheard Mark make with regard to Mike's grouchy

24  mood in February and the penis tree comment. What is

1   another comment that you overheard?

2         A.    I was on break and Shari Bangert came down

3   from the NIPS Unit which is Non-Institutional

4   Providers Service.  She was a MAC 2 up there.  And she

5   came down and we were just generally talking and next

6   door they were talking about somebody wanting to sell

7   a house, I'm not for sure which of the guys because I

8   wasn't really zeroing in on the conversation, I was

9   listening to Shari, and then somebody said something

10  about having listed it with the real estate dealer

11  Pfister, I can't remember his first name.

12        Q.    Are you referring to Fritz?

13        A.    Yes.

14        Q.    Do you recall who made the comment?

15        A.    About listing their house, no.  I can recall

16  what Mark Scheff said because Shari and I discussed

17  what he said and then she told her supervisor and I

18  told my supervisor.  He made a comment about fisting

19  her too and about fisting her every time I get a

20  chance.  And went on.  At which point, we shut the

21  door and Shari said to me, how often do you hear these

22  kind of conversations?  And I said, Shari, constantly

23  every day this type of conversation goes on next door.

24  And she went to her supervisor, who at that time was

1    Kim Knox and I went to Lenna DeGroot that afternoon

2    and talked to Lenna.  And then seeing it wasn't

3    getting anywhere, I went across the hall to Mark's

4    supervisor, Marvin Ross, who refuses to acknowledge

5    anything that anybody does.  If you don't want to talk

6    to him about work, he don't want to talk to you.

7        Q.    Okay.

8        A.    And he doesn't see that as a work problem,

9    as long as the work is being done.

10       Q.    What did you tell -- when -- to the best of

11   your recollection, what language did you use to

12   complain to Lenna?

13       A.    I explained that, hey, we're making fun of

14   the realtor's name and that -- what he said.  And she

15   laughed.  She said, it is funny.

16       Q.    Okay.  And what did you tell Marvin?

17       A.    That they were making fun of the -- that I

18   had been across the hall to Lenna and told Lenna about

19   it, and Lenna didn't see it as an issue, and I thought

20   as his supervisor he should be aware of it and maybe

21   he should take control since, obviously, my supervisor

22   wasn't going to.  And I told him the story and he made

23   a remark about he's just blowing off and as long as he

24   does his job he's going to get by with it.  Jodie has



1    tried to discipline him and didn't get it, so we

2    pretty much leave him alone.

3        Q.   Okay.  And when did you -- when did you

4    overhear this comment?

5        A.   It was --

6             MR. BAKER:  Excuse me.  When you say "this

7    comment" are you talking about Scheff's comment?

8             MS. KERLEY:  Scheff's comment regarding the

9    realtor.

10            THE WITNESS:  I think it was in the summer,

11   I think.

12   *BY MS. KERLEY:*

13       Q.   Okay.

14       A.   I'd have to check dates.

15       Q.   Okay.  If you can please relate another

16   comment that you overheard?

17       A.   The conversation when the E2 position was

18   posted that I filled.

19       Q.   The E2 position?

20       A.   For the state renal program.  Velva Fletcher

21   had came down to my office and was waiting for P.K.

22   Luttrell to get off the phone and go to smoking break

23   with her and Mary Thallman.  Mark came up to the door

24   and said, did you apply for the E2 position.  And I

1    said, yes, I did, and I also applied for a MOA1

2    position out of the Bargaining Unit in the direct

3    rebate program.  And he said, are you the one that

4    it's posted for - something to that effect - since

5    it's only a five-day posting.  And I avoided a direct

6    answer because I knew that it was posted for me and

7    said something about, well, we'll have to wait and see

8    who gets it to know who it was posted for.  And then

9    side stepped to say something else.  And he said,

10   well, you'll probably get it if you did because you

11   have a pussy and not a penis.  That I come unglued at

12   and even Velva said something to him about, Mark, you

13   know you're really gross.  And we both went to, once

14   again, our supervisor.  She went to Marvin, who was

15   her supervisor.  I went to Lenna, and then I went to

16   Jodie, she went to Jodie.

17        Q.    Did you go to Jodie's office with Velva?

18        A.    No.  We went separately.  I also talked to

19   Cheryl Beckner about it.

20        Q.    And what --

21        A.    I told Cheryl what was said to me and she

22   told me she would talk to Jodie about it.  And what I

23   got from Jodie was, don't ever go over my head again.

24   You follow the chain of command.  And I said, I did

1    and it didn't set well.

2         Q.    What did you tell Mark -- or did you respond

3    in any way to Mark when he made that comment?

4         A.    I told him that it was uncalled for and I

5    was offended and that I would be saying something to

6    his supervisor and my supervisor and Jodie about it.

7    And he laughed at me and he said, so.

8         Q.    Okay.  You said that this conversation

9    occurred when the E2 position was posted?

10        A.    Uh-huh.

11        Q.    And it was -- you had mentioned that it was

12   a five-day posting and that you started on

13   October 16th or 17th, so this -- would this comment

14   have been made in the early part of October?

15        A.    Huh-uh.

16        Q.    Is that a no?

17        A.    That's a no.  That comment probably would

18   have happened in August or September.

19        Q.    Okay.

20        A.    Because you have to post a position, then

21   you have to call for a list, and then you have to do

22   an interview -- a routine interview, and then

23   there's -- sometimes you get the call the same day.

24   They have up to two weeks to tell you.

1      Q.    Okay.  So it would have been some lag time

2   between the posting and the starting of the position?

3      A.    It would have been the day after the posting

4   was up.

5      Q.    Okay.

6      A.    Whenever that was.

7      Q.    Okay.  And Velva overheard the comment?

8      A.    Yes, ma'am.

9      Q.    And P.K. would not have because she was on

10  the phone?

11     A.    She was on the phone.

12     Q.    Okay.

13     A.    And he said the same comment to me later in

14  front of Pam Dufour, once again, questioning me while

15  I was over at Pam's office talking about some renal

16  applications, Mark came back - and I'm assuming he was

17  coming from smoking because he wasn't carrying any

18  papers at that time - he made the comment again.  And

19  he, in fact, said it the third time to me, and both of

20  which I think Pam was standing there also, was the

21  time I -- I was standing in his cube asking him about

22  a case and noticed on his computer he was playing

23  solitaire and prior to coming into the Hospital Unit I

24  had been what they call a LAN coordinator, which is --

1      Q.    LAN, L-A-N?

2      A.    L-A-N.

3      Q.    Is that computer or something?

4      A.    Local - I want to say - area network.    I

5    know local and network -- applications -- Local

6    Applications Network Coordinator, which means that

7    when a person had a problem with their PC, you would

8    report it to that person first, and I would try to

9    resolve it.  And we had to go through a training that

10   says if there was certain issues that we were to try

11   those things before we sent it on to the next level

12   for them to keep from having computer consultants and

13   computer management people or any computer technician

14   coming out because somebody accidentally unplugged

15   something.  You know, by pulling too hard on the

16   mouse, they unplugged their mouse or something.  So

17   there were certain things that we were trained to look

18   for.  We were also trained to look for things that

19   were not to be on a system.

20     Q.    Okay.

21     A.    Such as games, outside screen savers, that

22   kind of stuff.

23     Q.    And you were a LAN Coordinator when you were

24   in what position?