**E-FILED**
Tuesday, 01 November, 2005 04:00:56 PM
Clerk, U.S. District Court, ILCD



1      A.    When I was a MAC under Steve Bandy.

2      Q.    And you were no longer a LAN Coordinator

3  when you were on the Medical Unit?

4      A.    No.  But I noticed it on there and asked him

5  what he was doing with games still loaded on the --

6  his system.  Normally when we get a computer system,

7  they take all that stuff off.  You don't get a radio,

8  you don't get anything, you get what you're supposed

9  to have to do your job.  And as I was talking to him

10  about this hospital case.  He had a half wall in his

11  cube, and I kind of leaned on the wall and looked over

12  at him, you know, and just leaning and here he's

13  playing solitaire.  And I questioned him about

14  solitaire and he went into this long story about why

15  he plays solitaire and that -- because he used to care

16  about his job, but he doesn't care about his job

17  anymore because only gay people and woman·get a

18  promotion.  And I said, that's not true and it's no

19  reason to break the rules.

20           And by that time Pam came up here and

21  that's -- Pam is nosey.  That's just -- she is.  If

22  there's gossip, Pam knows the gossip.  And she came up

23  because she saw the two of us standing there talking,

24  and so she figured there's got to be something to hear

1  and came up and I said, Mark that is not true, other

2  people have got promotions that are not gay and that

3  are men.  He said, no, you know you have to have a

4  pussy -- if you got a pussy you get a promotion and

5  not a penis, you don't get one.  And Pam and I both

6  said something to him about it.  And at that time we

7  together went to Jodie's office.

8       Q.   Okay.  What did you tell Mark?

9       A.   What did I tell Mark?

10      Q.   Uh-huh.

11      A.   That it that wasn't true that other people

12  got promotions, and that was offensive and he

13  shouldn't be saying things like that.  And I was also

14  told him I was reporting the solitaire on the system.

15      Q.   And do you recall about when that was?

16      A.   September, August, somewhere in there.

17      Q.   Okay.  So Pam and you both went to Jodie?

18      A.   Yep.

19      Q.   And what did you tell Jodie?

20      A.   The conversation and about the solitaire.

21      Q.   And what was her response?

22      A.   As for the conversation she said, that's

23  just Mark, you're going to have to get used to it, you

24  know, that's the way he is.

1      Q.    Okay.  You said that you just -- you

2  previously testified that Mark made this same pussies

3  get promoted not penis type comment in front of Pam in

4  Pam's office.   When was that?

5      A.    In -- all those the pussies comment was made

6  during that time frame of when that was -- when that

7  job was posted and until that job was filled.  I think

8  Mark had some animosity about people getting promoted

9  but yet -- because when I talked to Lenna about it,

10  Lenna told me -- actually, Lenna approached me about

11  applying for that job that there was some good people

12  and that I may not get it.  And I said, that's fine,

13  if there's some -- a more qualified person, then they

14  need to get the job.  I don't have a problem with

15  being beat out in a competition like that.  There were

16  a whole lot of qualified people around and I said who

17  had bid against me?  Any one of them, except for one

18  exception, I thought really could have done the job

19  and done it very well if any one of those other three

20  people get it more power to them.  And that's why I

21  bid on other positions, nothing is a guarantee in

22  life.  And I said what about Mark, did he·bid?  And

23  she said, no, he didn't bid.  And I said -- she asked

24  me why, and I told her what he said to me again.  She





 1   said, Debbie, Mark isn't going to bid out of the

 2   Union.  The Union protects him.  And for what he has

 3   to say, he knows it's not true and he's just trying to

 4   get next to you.  And I said, is that a way to justify

 5   what he does?

 6        Q.   Okay.

 7        A.   And she changed the subject.

 8        Q.   Okay.  Of the people who were applying for

 9   the job, who was the one person that you thought

10   wouldn't be able to do the job?

11             MR. BAKER:  Excuse me.  I'm going to object

12   to the question because it has nothing to do with the

13   case.  And I'm going to instruct Debbie not to answer.

14   And let me tell you why so that we, perhaps, can move

15   on.  People form judgments all the time about

16   co-employees, and obviously, the deposition is usable

17   in a variety of context and I think that any negative

18   comment Debbie might make about a co-employee that's

19   unrelated to any issue in this case would just create

20   a potentially disruptive issue in the workplace.  So,

21   I would hope that you would withdraw the question, but

22   if you don't, unless you can show me how it relates to

23   the case, I'm going to instruct her not to answer.

24             MS. KERLEY:  I will -- I can rephrase the



1    question and if you have the same objection, I will

2    argue for the record why it's relevant.

3            MR. BAKER:  Okay.  And if you can give it to

4    me, I may withdraw the objection.

5    *BY MS. KERLEY:*

6        Q.   Was the one person that you thought could

7    not -- that would not do a good job in the E2 position

8    Jim Schuh?

9        A.   I don't remember.  I honestly don't

10   remember.  I know that two other people that had bid

11   were Donna Pinter and Pam Dufour, they are both very

12   knowledgeable hard workers, but the other two people,

13   I cannot remember what their names are today.

14       Q.   And one of those two people that you don't

15   remember that you thought -- that you had made the

16   comment?

17       A.   Yes.

18           MR. BAKER:  Okay.  Much to do about nothing,

19   wasn't it.

20           MS. KERLEY:  Yes, but eloquently done.

21   *BY MS. KERLEY:*

22       Q.   Okay.  We've talked about several comments

23   that you have heard Mark Scheff make.  Do you recall

24   any other comments that you heard Mark Scheff make?

1    A.    Conversation about standing out at the

2  coffee pot again, favorite hang out with state

3  employees.

4    Q.    And visiting attorneys.

5    A.    And visiting attorneys.

6            Three or four of us standing there and

7  something was said about Carla Collins, who had just

8  came over, and once again, there had to be food

9  because Carla had came over and got something to eat.

10  Carla Collins is Executive Secretary for Steve

11  Bradley, and Mark made a comment to -- Joe Roberts was

12  standing there, he was one -- he was one of the guys.

13  I know Velva was standing there, and I think Pam was

14  standing there, and he made a comment to Joe about she

15  ought to be in there on your big-breasted screen

16  saver -- women screen saver.  And Joe said something

17  like, shut up, Mark, you're going to get me in

18  trouble, or you're trying to get me in trouble.

19  Something to the comment, you're trying to get me in

20  trouble or going to get me in trouble.  And he said

21  something about, well, you know, Carla wears low cut

22  shirts and push up bras for us guys so that we can

23  look down her shirt and look at her boobs.  And the

24  three of us -- there were three woman standing there

1   and we all started in about, now, that's uncalled for.

2   And even if you do it, do you have to tell us that you

3   do it?  Nobody wants to know what your personal

4   problems are.  And it started out a general good

5   natured, don't do that, leave it alone, you know.

6   Mark never takes anything without taking it to an

7   extreme.  He has to get on a soap box and give a

8   dissertation, and he started in about Steve Bradley is

9   surrounding himself with strong pussy and big-breasted

10  woman and everyone knew that he and Carla had had an

11  affair the same way that everyone knew that Jodie

12  Edmonds and Brian Brinker had had an affair.  And they

13  talked about the merits of woman sleeping with their

14  bosses to get ahead in the Agency and that's why he as

15  a white man could get nowhere.  And, of course, as

16  he's carrying on like this we're trying to get him to

17  shut up.  And finally Pam stomps off down to Lenna's

18  office, I've gone back into my office and sat down,

19  and Lenna does come out and say to Mark, Mark go sit

20  down.  And that was -- and then she went back to her

21  office.  But he talked about Steve Bradley and

22  surrounding himself with woman.

23          Q.   Okay.  And when was that comment?

24          A.   September, October -- August, September,

1    October.

2        Q.    Okay.  Next comment that you recall?

3        A.    Of a sexual nature?

4        Q.    Yes.

5        A.    I'm trying to think.  It had to do with a

6    motorcycle.  I can't remember.  There's one about a

7    motorcycle and he was asking if -- Mark used to have

8    MGs.  I don't know if he still has MGs.  It's a car,

9    and he said something about, have you ever tried to

10   have -- actually what he said did you ever try to fuck

11   on a motorcycle?  It's a whole lot harder even than

12   trying to do it in an MG.  And I don't know who he was

13   talking to.  Once again, it was the guys next door and

14   he proceeded to tell about some -- I don't know if it

15   was his girlfriend who is now his wife at the time or

16   somebody from his past, I don't know, but he got

17   graphic about the position and what they did in the

18   MG.  And Mike Sandidge was going, oh, my God, that is

19   so gross, why are you even talking like that?  And,

20   once again, I went down and told Lenna and she came

21   down the hall that day.  There's two times I ever

22   remember her doing anything about anything; once she

23   told Mike to go to his office; this time she come down

24   and said:  You guys are a bunch of fucking babies.

1    When are you going to learn to keep your mouth shut

2    and told him to get out of that office. Two times in

3    six, eight months.

4        Q.   And when was this comment?

5        A.   August, September.

6        Q.   And you've -- well, okay. And where were

7    you when you heard that comment?

8        A.   Seated at my desk.

9        Q.   Okay. And where was Mark Scheff?

10       A.   He was in the room next door.

11       Q.   The office that Mike Sandidge and Joe

12   Roberts shared?

13       A.   Uh-huh. And he was sitting in a chair right

14   beside the door.

15       Q.   Okay. And when you said that Mark was

16   graphic about a position, do you recall what he said?

17       A.   He talked about putting this lady's butt on

18   the windowsill and she was laying down with, like,

19   where her head would probably be at the gearshift

20   between the two seater, and that he was kneeling over

21   her kind of on the armrest and he was talking about

22   shoving her and how fast he was and how hard he was

23   and he was telling about how that she couldn't get

24   enough of him and...

1    Q.    Okay.  You have identified several comments

2  that were either August, September, October; do you

3  recall whether the Carla Collins comment, the

4  motorcycle comment --

5    A.    Some of that --

6    Q.    The Fritz Pfister comment, do you recall any

7  order that they would have come in?

8    A.    Not off the top of my head right now.  I

9  know one of those conversations -- a couple of those

10  conversations happened in July because I had had a

11  conversation one evening.  I had went to work at the

12  church to do some outside landscaping and M.T. Vann

13  was there, she was one of the members of the church

14  M.T. stands for Mary Theresa, that's a secret she

15  doesn't want out.  And she said something·about me

16  being kind of down.  And I said I had a rough day this

17  afternoon.  And I told her the circumstance of how I

18  went down and talked to a supervisor.  And she told

19  me, you know, for your own safety, if you're not

20  documenting it, you should begin to document it, she

21  said, because that man is sick and some day he's going

22  to do something sick in that workplace.

23    Q.    Did you begin --

24    A.    That was in July.

Q.    Okay.  And you don't recall what comment or
what conversation you overheard that led to that
conversation with M.T. Vann?

A.    No.  Not right off the top of my head.  I
know that it had been one of those weeks that he had
been particularly graphic, but, no, right off the top
of my head, no, I can't remember.  I just remember
talking to M.T. because normally people -- when I'm at
church or when I'm away from work, people think I'm
one of the most outgoing people you've ever seen.  But
since all of this has happened.  I've become a very
withdrawn person at work and on the outside, too, and
that night I just wasn't myself.

Q.    Okay.

A.    And she said what's the matter?  What's
going on?

Q.    Okay.  Can you recall another comment or
conversation?

A.    A conversation where close to the end of
summer, maybe the beginning of fall, Mike Sandidge
filed for divorce or was separated, a legal separation
or a divorce, and Mike had began to work out, and he
was letting his hair grow longer, and he was taking on
a whole different look, as far as his appearance.  And



1   one afternoon I think it was Jim said to Mark -- or to

2   Joe -- or to Mike, I mean, something about I can tell

3   you've been working out you're starting to get some

4   biceps.  And big guys they were talking about flexing

5   their arms and who has got the biggest muscles and

6   that kind of stuff, and Mark said, well, I have the

7   biggest muscle, but it's not in my arms.  And Mike

8   told him to shut up that he didn't want to talk about

9   sex, that they were talking about bodybuilding.  And

10  he said the only reason you're doing bodybuilding is

11  because you haven't had sex for two years.  And Mike

12  just totally come unglued and come flying out of the

13  room and stomping off down the hallway.  And,

14  actually, I got up and went after him to see if he was

15  okay.  I didn't know that he was separated.  And when

16  I found him, he started to telling me that he was

17  separated or divorced and this was not an easy time

18  for him and he didn't need Mark, you know, saying

19  things like that, making it any rougher on him.  And

20  he had been to Lenna and asked Lenna about moving and

21  they said they didn't have a office or cubical

22  position where they can move Mike, because he wanted

23  to get away from being with the guys every afternoon.

24  But Mark had started in on him about not having sex

1   for two years.

2       Q.   And you said that was end of summer or fall?

3       A.   Somewhere around in there, I think, was when

4   it was --

5       Q.   And you were in your office?

6       A.   Right next to the door and Mark was

7   sitting --

8       Q.   And they were in -- and Mark was in Mike and

9   Joe's office?

10      A.   They had had a seating arrangement that they

11  did.  Mike faced -- if this was the office and that

12  was the door, Mike set here facing that -- that's

13  where his computer faced and his desk, Joe sat here

14  facing -- that's not nice is it?  North -- or south

15  and north.  And next to the wall, which we'll say was

16  west, was a chair where the visitors usually sat when

17  they came in.  And then there was a chair back over

18  against the east wall.  Joe would usually turn around,

19  unless it was something he didn't want to talk about

20  and he would keep his back turned.  Mike would turn

21  around and Jim always sat over against the east wall

22  and Mark always sat next to the door.  Always.  And if

23  somebody was sitting in his chair, he asked them to

24  get up.  That was his spot.



1      Q.    Okay.  And was there anyone else in your

2   office when you overheard this comment regarding Mike

3   Sandidge working out?

4      A.    No.  But later that afternoon Jim Schuh came

5   in with Kevin Mayer and Kevin Mayer had brought down a

6   picture of when he was a body builder, because he

7   was -- he was talking about he too had started working

8   out again, and him and Mike, I think, were working out

9   together or compete -- something about they were

10  always talking about bodybuilding.  And Kevin said

11  something to me about that he had been in bodybuilding

12  competitions and I said, really?  And he said, yeah.

13  So he went to his desk and brought a picture down.

14  And Jim came in, it was close to their quitting time,

15  which was going on 4:15, 4:20, something like that.

16  And it was the same afternoon.  And I said to Kevin, I

17  said, are you going to start competing again?  Is this

18  something that you're going to do?  And how does your

19  wife feel about this time away from your kids and

20  stuff?  And we were just talking, general

21  conversation.  And Jim said something about, well,

22  Mike should go into it the way he's working out

23  because you would do that too if you hadn't had sex

24  for two years.  And I said, you know, I said to Jim,

1    Jim you shouldn't talk that way about Mike.  That

2    conversation was hard on him this afternoon.  And he

3    said, I know, he got angry at Mark.  He said, but we

4    were just teasing.  And I said, he didn't take it that

5    way.  He took it hard because it's a hard time in his

6    life.

7        Q.    Okay.  Did you do anything after you heard

8    Mark make the original comment?

9        A.    Yes, I did.  After I talked to -- to Mike, I

10   told Mike I was going to tell -- talk to Lenna about

11   it and he told me to quit wasting my breath going in

12   there and complaining all the time.  He said, they're

13   not going to move me and they're not going to do

14   anything with Mark.  And I said, well, at least it's

15   on the record that I'm complaining because this can't

16   continue to go on.  He said, well, as long as you work

17   in this bureau you're going to watch them sweep it

18   under the carpet.

19       Q.    And following --

20       A.    I went to Lenna.

21       Q.    And what did you tell Lenna?

22       A.    I told her about the conversation with Mike

23   and she said that that was uncalled for and she would

24   talk to Mark.  But it wasn't going to do any good for

1  her to do it, because he was going to say what he

2  wanted to say because Mark was Mark.

3      Q.    Okay.  Do you recall any other comments?

4      A.    Let's see.  There was a conversation between

5  the pros and cons of having intercourse - except Mark

6  never called it intercourse, it was fucking - someone

7  when they're on a period versus when they're not on a

8  period and that how he missed that now that his

9  girlfriend, who is now his wife, I've heard, was real

10  dry because she had her ovary or uterus or something

11  removed, because she had cancer.  And he proceeded to

12  tell about how much more lubrication and how much

13  faster you could go and how much more sensual it was.

14      Q.    Were you in your office when you heard this

15  conversation?

16      A.    Yes, I was.

17      Q.    And was Mark in Mike and Joe's office?

18      A.    Yes, he was.

19      Q.    Do you recall when this conversation was

20  taking place?

21      A.    That was in the summer.

22      Q.    You think earlier than August, September,

23  October time frame that you've set up for other ones?

24      A.    I say it was either June or July.

1        Q.    Okay.

2        A.    That was about the time that I -- that --

3   probably the first time I asked to be moved.

4        Q.    Okay.  Following this conversation, what

5   action did you take?

6        A.    I went to the Lenna and I went to Marvin

7   again, and I went to Mark -- I mean to Jodie over that

8   one -- it was -- it was gross.  It was real gross.  It

9   was to the point that Joe and -- Joe and Mike both

10  were trying to get him to shut up.  And Jim was

11  yelling at him, literally yelling at him to shut up,

12  and he just kept getting louder and louder.

13       Q.    Okay.  What did you tell Lenna and Marvin?

14       A.    The conversation and what was -- how the

15  others acted and what was going on.  And Lenna didn't

16  even come out of her office.  See said, Debbie,

17  they're on their break.  There's nothing we can do

18  about people on their break.  I said, they're in a

19  public place where other people are hearing what

20  they're saying.  She said, I can't do anything about

21  it.  So I went to Marvin.  Marvin said, nothing is

22  going to be done to him -- or to them.  Jodie has

23  tried, she failed, end of story.  You need to quit

24  bothering us about this.  I went to Jodie.  Jodie

1    said, I'll have Lenna and Marvin take care of it.

2        Q.    Okay.  You mentioned requesting to be moved?

3        A.    Uh-huh.

4        Q.    When did you make that request?

5        A.    That day.

6        Q.    Following this conversation?

7        A.    Uh-huh.

8        Q.    And who did you request that from?

9        A.    To Lenna and she told me that Mike was

10   first.  I asked again at the end of September, first

11   of October before I was moved and Jodie said, yes,

12   we'll go ahead and move you.  And Lenna was in on the

13   conversation that day.  It was Jodie and Lenna and I

14   in Jodie's office.  We had been in there talking about

15   something that I was doing on a special project, and I

16   don't remember exactly, but it was something to do

17   with doing some testing on a new system that was

18   coming in.

19       Q.    Okay.

20       A.    And Jodie said, yeah, we'll go ahead and

21   move you because, you know, we were waiting for the

22   official yes.  This is your position, you know,

23   personnel hasn't got back with me, so, we'll go ahead

24   and do it.  And Lenna said, no you can't.  You

1  promised Mike that he can have this first move.  And

2  if you do that this early, then they will know that

3  she was hand picked for this position.

4      Q.   And you said that that conversation took

5  place at the end of September or early October?

6      A.   It was a week or two before they actually

7  moved me.

8      Q.   And they moved you two weeks before you

9  actually started the position, correct?

10      A.   Yes.  Two to three weeks before.  So I asked

11  early in September.  I think maybe the interviews were

12  in August, I think.

13      Q.   Okay.  Other comments, do you recall any?

14      A.   You have to realize every day almost any

15  conversation Mark turned into sexual.  You could say

16  trains and by the time you finished saying is leaving

17  the station at 3:30 he had found a way to make it into

18  a sexual comment -- to turn the conversation into sex.

19  So, a lot of the conversations every day were about

20  sex in some way or another he would turn it back to

21  sex, and that is the time when usually people would

22  start leaving the room.

23      Q.   Meaning whatever room Mark was in, or?

24      A.   Like Jim would leave and say my break is



1  over now and go back to his office.  One of the other

2  two would say, I think we need to go back to work.

3  Even the guys got tired of it because every day there

4  were sexual connotations made about trains and -- or

5  you could talk about a book title, you know, I'm

6  reading this -- Mike and Joe were readers.  And they

7  would discuss whatever book they were reading.  Mark

8  would take the title of the book and totally make it

9  into something sexual and start in about one of his

10  sexual experiences and how powerful he was in his

11  manhood and how he -- you know, they should write a

12  book about him.  He always turned it around to sex.

13      Q.   Do you recall a specific instance when he

14  did that?  Turned a book title into about his

15  sexuality?

16      A.   Right off the top of my head, I can't

17  remember right now.

18      Q.   Okay.  Do you recall any other specific

19  comments or conversations that you heard?

20      A.   There was a conversation between Mark and

21  Jim.  I don't think Mike was there that day.  I think

22  Mike was off.  And Joe was there and Mike -- no, Jim

23  was talking about they -- his wife had a relative a

24  little girl staying with them who was young, six or

1  seven years old, and how that he was talking about how
2  that she had been sexually abused by different
3  boyfriends of the mother and that the mother was an
4  alcoholic and drug addict and he called her a whore
5  and that she would do anything for drugs and alcohol
6  even to selling her own child, and they had taken the
7  child in.  And Mark asked him questions about, well,
8  how do you know that she was a whore?  How do you know
9  that she sold herself and her child?  And Jim was
10  telling about a counter at a restaurant where this
11  little girl told the story of being put on this
12  counter where they served donuts, I guess the mother
13  was working in a restaurant and it was after close or
14  before opening and she -- the girl had told a social
15  worker something about being put on a counter top and
16  that she had been raped.  And it was really kind of
17  strange because it was kind of an eerie silence from
18  Joe and the room was just really strangely quiet and
19  Mark was listening very intently as Jim was talking
20  and -- because usually Mark can't keep his mouth shut.
21  He has to interrupt every conversation and do a one up
22  on people.  And when Jim finished telling this story,
23  Mark started talking about how the little girl was
24  going to be just like her mother.  And that it won't



1   be any time before you'll be telling me that, you

2   know, that she's screwing your son and she's taught

3   your son how to have oral sex and masturbate and he'll

4   like it up the ass because, you know, that's the way

5   people usually get raped.  And he went into this whole

6   scenario to Jim about this little girl and what she --

7   what she was going to turn out to be like.  And Jim

8   was loud, not screaming but loud and threatening to

9   Mark.  About don't talk that way.  You don't know

10  that.  This girl can change, you know.  And he just --

11  he just didn't -- wouldn't shut up.  And Jim walked

12  out of that room and I don't know if he went to

13  Lenna's office or if he went to his own office,

14  wherever he went, he slammed that door.  So that, you

15  know, it was just a wham, you know.  And Mark just

16  laughed.  He just sat there and laughed.  And I

17  waited, I don't know, probably 20 minutes just

18  thinking that maybe Jim had went in to talk to Lenna

19  or Jodie and walked down to Lenna and he hadn't said a

20  word to Lenna about it.  He went into his office and

21  he shut the door.  And I don't know what he did in his

22  office, I didn't go in and check on him.  And I told

23  Lenna what was going on.  And, once again, that's just

24  Mark, you know, he's rude, he's crude, if you don't

1   want to talk to him, just ignore him, leave him alone.

2   You know, if Jim doesn't want to talk to him, he knows

3   better than to go in that room with him.

4       Q.   Okay.  And when -- what's the time frame of

5   that conversation, if you recall?

6       A.   That was summer -- sometime in the summer

7   because there had been some conversation about a

8   swimming pool just before that about kids playing in a

9   pool.

10      Q.   Okay.  Prior to the August, September,

11  October time?

12      A.   Yeah.  July, August.

13      Q.   Okay.

14           THE WITNESS:  Can we take a break and I can

15  get some more coffee?

16           MS. KERLEY:  We can.

17                [WHEREUPON THERE WAS A SHORT

18                DISCUSSION OFF THE RECORD.]

19  BY MS. KERLEY:

20      Q.   We're back on the record after a break and

21  continue with the same line of questioning.  You were

22  telling me about comments that you overheard Mark

23  Scheff or Jim Schuh make.  Do you recall any other

24  comments?

1          MR. BAKER:  I think they were comments about

2    Mark Scheff was what the questions were.

3          MS. KERLEY:  And she testified as to

4    comments made by Jim Schuh, as well.  So, we can keep

5    the question to Mark Scheff.  And if others come up, I

6    can ask you about them separately, if you would

7    prefer.

8          THE WITNESS:  Whatever is best -- easiest.

9          Okay.  Hospital MACs when it was fully

10   staffed, prior to the time that I came into that unit,

11   used to go out and do hospital seminars.  And what

12   they would do is they would rent, like, the Holiday In

13   or find the hospital that had a huge conference room

14   and they would borrow it and they would go in and they

15   would train billing procedures for your new billing

16   people at the hospitals.  Like a lot of other jobs,

17   billing people seemed to go -- to be run through real

18   easy at hospitals and doctor's offices.  And I was

19   going -- they had one during the time frame that I was

20   a hospital MAC sometime in spring.  I don't remember

21   exactly the date but it was in spring, and Lenna was

22   giving the training seminar, it was in St. Louis, and

23   I, Lenna, Mike and Joe rode down to this seminar.

24   They took us because we had never seen one of these

1   training seminars and in hoping that someday they

2   would go back to full staff where they could go out

3   and do these training seminars again, they wanted us

4   to be at least familiar with what happened in a

5   training seminar.

6        Q.    Okay.

7        A.    So, when word got around that we were going

8   to these training seminars, Mark came to my room.  I

9   think he was on the way next door and he stopped in,

10  hi, how are you doing?  Hi, Mark.  What's up?  Oh, I

11  just found out you guys were going to a billing

12  seminar.  Those are really good.  You'll learn a lot

13  of things.  You'll get to hear a lot of questions.

14  And he was, you know, he said, I'm really good of

15  giving training seminars.  And he said, I enjoy going

16  and doing them.  And I said, really, have you done

17  very many?  And he proceeded to tell me some of the

18  different places he had been.  And he said, but do you

19  know what I like best about training seminars?  And I

20  said, oh, being out of the office.  And he said, no,

21  staying in a motel.  And I said, really?  And he said,

22  yeah, well, most of the hospitals are in the Chicago

23  area and he said I like to go and stay in a hotel

24  because I like the X-rated movies and I can go in

1    there and find pleasure in myself at the end of the

2    movie.  I was shocked.  Literally shocked.  In fact, I

3    wasn't for sure that what he was saying to me was --

4    that he was saying it.  You know, it was like what?

5    And I said something about, that was totally too much

6    information for me.  And I said, please don't share

7    like that with me again.  And I said, we've already

8    had a conversation about me finding things you say

9    offensive and I asked you to please refrain from this.

10            So, the next day when we went -- or the

11    next week, I think we went on a Monday, whenever the

12    four of us were in the car I said to Lenna, so that it

13    would be in front of witnesses, which is conveniently

14    forgotten, I'm sure, what he said to me, and one of

15    the guys said, oh, no, he's told that story several

16    times that that is his favorite part of training, and

17    we heard it too before we came.

18        Q.    Do you recall who made that statement?

19        A.    It was Joe or Mike, I don't know which one.

20    I sat up front with Lenna, they sat in the back.  And

21    I don't know which one said it.

22        Q.    Okay.

23        A.    But it was said.

24        Q.    Okay.

1      A.    And Lenna got really angry and she said, you

2    know he's not going to change and I wish we could

3    change him, there's nothing we can do, we've tried and

4    it just isn't working.

5      Q.    Okay.  Do you recall any other statements?

6      A.    You know, there were lots of them.  I'm

7    telling you it happened almost every day, but right

8    now I'm starting to -- everything seems to run

9    together and I'm getting tired.  Off the top of my

10   head right now.

11     Q.    Okay.  Is that -- the comments and specific

12   conversations that we've discussed thus far, as you

13   sit here today, is that the extent of your

14   recollection?

15          MR. BAKER:  I think that's what she said.

16          MS. KERLEY:  I'm just clarifying for the

17   record that the witness' recollection has been

18   exhausted.

19          THE WITNESS:  For the moment, yes.

20   BY MS. KERLEY:

21     Q.    Okay.  Do you recall a conversation or

22   recall a comment where Mark Scheff said that you had a

23   hard on?

24     A.    Let me see, no.  Not off the top of my head

1    right now.  I remember him calling me a prude.  I

2    remember him calling me a lot of other things, but.

3        Q.    What were some of the other things that he

4    called you?

5        A.    I've been called a prude, a bitch, a dike

6    bitch, a yes person, which, that's okay.

7        Q.    I'm sorry.  What was that last one?

8        A.    A yes person.

9        Q.    Oh, a yes person.  Sorry.

10       A.    A snitch.  Those are a few of the things

11   that I, right off the top of my head, can remember him

12   calling me.

13       Q.    Did he say those things to you?

14       A.    Yes, he said those things to me.

15       Q.    And where were you when he said those things

16   to you?

17       A.    Usually in conversation.  Either him

18   standing right in the doorway of my office or in

19   conversations in the hallway where he would stop me

20   and talk to me and confront me.

21       Q.    And what's the time frame of these comments?

22       A.    This was before -- between, I would say, May

23   and October.

24       Q.    And what were the conversations referencing?

1      A.    Usually to do with procedures of, you know,

2   phone calls that were being transferred that shouldn't

3   have been transferred.  Or, you know, a lot of times

4   we would get billing people who would call and say,

5   Mr. Scheff is my billing person but I don't want to

6   talk to him.  So what they would do is put them

7   through to somebody else and when you got a call like

8   that, you were supposed to transfer it to Mark or to

9   the supervisor.  And Mark preferred that we cover for

10  him and let -- just take the call and answer the

11  problems, and if you sent it to Lenna or Marvin --

12  like, if Marvin wasn't there, you sent it to Lenna,

13  since it was Marvin's person, you sent it to Marvin.

14  And, of course, they're going to say something to him

15  about, why doesn't this person want to talk to you?

16  You were snitching on him, you were narking on him,

17  you were a bitch for doing that, you know, that kind

18  of stuff.

19      Q.    Okay.  And, so, the comments that you just

20  have set out were comments that he said to you based

21  on the call transfers?

22      A.    Yeah.

23      Q.    Okay.  And this would have -- and did you

24  give me a time frame between May and October?

1    A.    Yeah.

2    Q.    Okay.

3    A.    The first month that you're usually in that

4    position, they don't have you take a lot of phone

5    calls and they carefully screen your phone calls so

6    that you won't get something you don't know and cause

7    a lot of liability issues for the Billing Unit.

8    Q.    Right.

9    A.    So, you're almost -- your first month,

10   basically, almost every phone call you have somebody

11   sitting with you.

12   Q.    Okay.

13   A.    The second month then they lax up a little

14   bit, you know, have somebody sitting with you but

15   before you make very many answers, you're putting that

16   person on hold and you're running back and forth

17   between your office and the supervisor's office to

18   make sure that you're telling the procedure correctly

19   or that your -- that was the right policy that you

20   quoted or read to them, or whatever.  So the first two

21   months in the training process it's -- you don't get a

22   lot of outside calls.

23   Q.    Right.

24   A.    You just get what they want you to get.

1      Q.    Okay.   When -- as a result of the

2   conversations where Mark called you the things that

3   you just mentioned, what did you do in response to

4   those conversations?

5      A.    Same thing.   Talked to Lenna.   Talked to

6   Marvin.   Talked to Jodie.

7      Q.    Do you recall any of those conversations

8   specifically?

9      A.    No.   I will tell you this, that almost every

10  one of them had the phrase, that's just Mark, we'll

11  take care of it, it won't happen again, for it to

12  happen again.

13     Q.    Okay.   And you don't recall those

14  conversations, though --

15     A.    No.

16     Q.    -- specifically?

17     A.    No.

18     Q.    Okay.   Do you recall overhearing a

19  conversation or a comment made by Mark Scheff with

20  regard to Marvin Ross?

21     A.    Oh, yeah.   Marvin's birthday.   Marvin is gay

22  and Marvin called off the day after his birthday

23  celebration and Mark told that the reason -- Mark said

24  that the reason he called off was because he got too

1    much beef up the ass.  It was a comment about anal sex

2    and Marvin getting too much.

3        Q.    And where were you when you heard that

4    comment?

5        A.    I don't know if it was said when I was

6    standings in the hallway at the coffee machine and

7    Mark was there or after we sat down.  It was in the

8    morning -- the morning right after his birthday.  It

9    was done in the morning, I remember that, but I don't

10   remember where I was standing or sitting, but I

11   remember that conversation.

12       Q.    Was -- were any other employees around?

13       A.    Oh, yeah.  Oh, yeah.

14       Q.    Who do you --

15       A.    Mary Thallman was around and -- which,

16   really upset Mary.  And I remember that because Mary

17   and Marvin had been at one time good friends.  When

18   Marvin had left his wife and told her he was gay, and

19   there was a lot of issues with that because they both

20   worked for the same agency at the time and it wasn't

21   very pretty the break up, from what I understand, I

22   don't know, I wasn't around then.  And Mary had really

23   supported Marvin and tried to, you know.

24       Q.    Be a good friend, is that what you're trying



1    to say?

2        A.    Yeah.

3        Q.    Who else besides Mary Thallman was present?

4        A.    Velva may have been.  Because, like I said,

5    I think we were at the coffee machine and that's

6    usually one of those collection spots.  I don't know

7    if Jim was there or not because Jim was a heavy coffee

8    drinker, or he used to.  Be I don't know if he still

9    is.  And Jim may have been there, too.  And Jim really

10   liked Marvin, so.

11       Q.    Do you recall, as you sit there today,

12   whether or not Jim was present?



13       A.    I don't remember right now.  I can't

14   remember.

15       Q.    Okay.

16       A.    I know for sure Mary Thallman was because

17   Mary Thallman had talked to me later about how

18   offensive it was and how that you would think that as

19   close friends as Marvin and Lenna and Jodie all are

20   that this would have been something that would have

21   pushed them or motivated them to take action with

22   Mark.

23            MS. KERLEY:  Okay.  I think that this would

24   be a good place to stop.

1          MR. BAKER:  Okay.

2          MS. KERLEY:  Oh, wait, one last question.

3   Or, as the kids, say psyche.

4   *BY MS. KERLEY:*

5      Q.   With regard to the Marvin's comment, did you

6   complain about that comment to anyone?

7      A.   Yes, I did.

8      Q.   And to whom?

9      A.   To Lenna and Jodie both, and they were in

10  the same room.

11     Q.   And where were they?

12     A.   Lenna was sitting at her desk, Jodie was

13  standing just beyond the door, and I was standing

14  right inside of the door.

15     Q.   Of Lenna's office?

16     A.   Of Lenna's office.

17     Q.   And what did you tell them?

18     A.   I told them that down at the coffee pot and

19  what was said and that's why later I said to Mary and

20  I talked about it.  I told her that I had said

21  something to them and thinking that maybe that would

22  motivate them.  I told them the story and who was

23  there.

24     Q.   Okay.  And do you recall about when that



1    was?

2        A.    Marvin's birthday.  The actual day after his

3    birthday, the day the comment was made.

4        Q.    Was the day after Marvin's birthday?

5        A.    Yeah.  It was the day after his

6    39th birthday.

7        Q.    And you don't recall when Marvin's birthday

8    is --

9        A.    Well, no.

10        Q.    -- as you sit here?

11        A.    No.

12        Q.    Okay.  With regard to the comments that

13    we've discussed where you had testified about verbal

14    complaints that you made to various officials, were

15    any of those -- did you complain in writing as to any

16    of the comments that we've just discussed?

17        A.    Between May and October of 2000 or February

18    is that what you're saying?

19        Q.    Yeah.  February and October of 2000?

20        A.    Not prior to the Internal Affairs, it was

21    all verbal.

22        Q.    And when you say "Internal Affairs" you're

23    referring to the complaint filed by Mary Thallman on

24    October 13th of 2000?

1    A.    Yes.

2         MS. KERLEY:  Okay.  Now we're at a good

3    place to stop.

4         MR. BAKER:  Okay.

5         MS. KERLEY:  Off the record.

6              [WHEREUPON A SHORT LUNCH BREAK WAS

7              TAKEN.]

8    *BY MS. KERLEY:*

9    Q.    Welcome back from lunch.  We're going to

10   shift gears a little bit and talk about something a

11   little different.  You had testified -- just touched

12   on briefly that there was a complaint of sexual

13   harassment filed by Mary Thallman with the Office of

14   Internal Affairs?

15   A.    Yes.

16   Q.    Is that correct?

17   A.    Yes.

18   Q.    You're aware of that complaint?

19   A.    Yes.  I was a witness in it.

20   Q.    Okay.  It's my understanding -- well,

21   actually, if you know, how did Mary Thallman lodge

22   that complaint?

23   A.    She came to my office the morning that it

24   happened -- the incident that she wanted to complain

1    about.   She told me that she had been talking to Velva

2    Fletcher and Velva Fletcher told her that I had a

3    friend that worked for the OIG office and would I give

4    her that person's phone number or have her call me.

5    And I said, whatever you want.   And she said, well,

6    ask her to call me.   And I said, well, I know that

7    she's in this building today.   So, I left a phone

8    number -- I called Laura's beeper and left a number

9    and she called me and I told her to call Mary Thallman

10   and gave her Mary Thulman's number and told her that

11   Mary Thallman wanted to file a complaint of sexual

12   harassment.   And she said the next question was, who

13   was her supervisor?   And I told her.   And that's what

14   happened.

15        Q.    Okay.   And that would have been on

16   October 13th, 2000; does that sound about right?

17        A.    Somewhere around in there.

18        Q.    Okay.   And the friend that you have in OIG

19   is Laura Whetstone?

20        A.    Yes.

21        Q.    And is it correct that you and Laura live

22   together?

23        A.    Yes.

24        Q.    And did at the time of that call?



| | |
|---|---|
| 1 | A. Just started. |
| 2 | Q. Just started. And Laura and -- you and |
| 3 | Laura are in a relationship currently? |
| 4 | A. Yes. |
| 5 | Q. Okay. And when did that relationship begin? |
| 6 | A. August kind of more -- we moved in together |
| 7 | the end of September, first of -- we rented a house |
| 8 | together in October. We were living together at the |
| 9 | end of September. |
| 10 | Q. Okay. And Laura is an internal investigator |
| 11 | with the Department of Public Aid; is that correct? |
| 12 | A. Yes. |
| 13 | Q. And she was at the time? |
| 14 | A. Yes. |
| 15 | Q. In 2000? |
| 16 | A. Yes. |
| 17 | Q. Okay. And that relationship is one of a |
| 18 | romantic nature; is that correct? For lack of a |
| 19 | better term. And an appropriate answer can be, |
| 20 | sometimes it's romantic. |
| 21 | MR. BAKER: Committed relationship. |
| 22 | THE WITNESS: It's a committed relationship. |
| 23 | MR. BAKER: To be politically correct. |
| 24 | *BY MS. KERLEY:* |

1      Q.    So, in or around the time frame that we've

2    been talking about late 2000, early 2001, if you

3    referred to either a partner or a spouse, would you

4    have been referring to Laura Whetstone?

5      A.    Yes, I would have.

6      Q.    Okay.  Give me one second.

7            THE WITNESS:  Off the record.

8            MS. KERLEY:  Off the record.

9                        [WHEREUPON THERE WAS A SHORT

10                       DISCUSSION OFF THE RECORD.]

11   BY MS. KERLEY:

12     Q.    Back on the record.  In your complaint you

13   have a separate count where you allege that the

14   Department discriminated and retaliated against you

15   because of your efforts in opposing sexual misconduct

16   described above; is that correct?

17           MR. BAKER:  Do you want her to look at it?

18           MS. KERLEY:  You may.

19           MR. BAKER:  Where are you, Sarah?

20           MS. KERLEY:  For the record, we are looking

21   at the complaint.  If you look at Page 6 of 7 of the

22   complaint in Paragraph 17.

23           THE WITNESS:  Okay.  What was the question?

24   BY MS. KERLEY:

1        Q. · The original question was that in your

2   complaint you allege the Department discriminated and

3   retaliated against you because of your efforts in

4   opposing the sexual misconduct described throughout

5   the complaint and the failure of your supervisor to

6   intervene; is that correct?

7        A.    Yes.

8        Q.    We're going to talk a little bit about that

9   retaliation now.  I would like for you to describe for

10  me what allegations you're making of retaliation.

11  What conduct you believe was in retaliation for you

12  opposing sexual misconduct?

13                   Actually, I'll ask you that question in

14  about 30 seconds.  Before that, when you say -- when

15  you allege that you oppose sexual misconduct, are you

16  referring to your role in the Mary Thallman

17  investigation which you previously testified as a

18  witness -- or that you testified you were a witness?

19               MR. BAKER:  Are you talking about a specific

20  paragraph of the complaint?

21               MS. KERLEY:  No.  She's making -- in

22  Paragraph 17 she makes a general allegation of

23  discrimination in retaliation and she goes on to say

24  that her efforts in opposing sexual misconduct.  What

1   is she referring to when she says opposing sexual

2   misconduct?

3           MR. BAKER:  For the record, I'm going to

4   lodge a general objection.  The allegations in the

5   complaint are statements of law that are interwoven

6   with the federal statute that prohibits certain types

7   of conduct and creeds liability for engaging in the

8   type of conduct.  But the complaint is a legal

9   instrument prepared by a lawyer and I have no

10  objection of the witness answering facts to the extent

11  she knows them.  But, to the extent answering this

12  would require her to exercise legal judgments or

13  certain legal knowledge, there's been no foundation

14  made that she has the capability of doing that.

15  *BY MS. KERLEY:*

16      Q.   Ms. Sullins, without coming to a legal

17  conclusion, I am asking for the factual basis as you

18  know it and as you best recollect it as to your

19  opposition to sexual misconduct?

20      A.   I'm still lost in what -- did you call it

21  legalese or lawyerese?

22           MS. KERLEY:  Except it's not easy, so I

23  don't know why we call it that.

24           THE WITNESS:  My objections to sexual

1    misconduct?  Is that what it says?

2    BY MS. KERLEY:

3    Q.    Yes.  Your opposition to sexual misconduct I

4    can rephrase.

5    Is it your allegation that you were

6    retaliated against for being a witness in the OIG

7    investigation of Mary Thulman's complaint?

8    A.    Yes.

9    Q.    Okay.  Is there anything, in addition to

10   your being a witness in -- for the Mary Thallman's OIG

11   investigation that you think was the basis for

12   retaliation on the part of the Department?

13   A.    I think what you're asking me is, and let me

14   clarify this, why do I think I was retaliated against

15   for witnessing -- for being a witness?  I'm confused.

16   Q.    That was a better question than the one that

17   I asked.

18   A.    I'm sorry.  Maybe not enough sugar at lunch.

19   Q.    No.  No.  You're doing fine.  It's a complex

20   issue.

21   So, you just -- and I'll try and

22   rephrase again.  I want to make sure that you

23   understand what I'm asking you.

24   You previously, just very previously,

1    testified that it's your allegation that the

2    Department has retaliated against you for your role as

3    a witness in Mary Thulman's investigation and that you

4    being a witness was the basis of retaliation by the

5    Department?

6        A.    Okay.

7        Q.    Is there any other conduct that you engaged

8    in that you think the Department retaliated against

9    you for?

10        A.    Not to my knowledge.

11        Q.    Okay.  And now to your well-worded question

12    and easily understandable question:  What acts of

13    retaliation do you allege the Department engaged in?

14        A.    One, they fostered Mark's conduct by not

15    stopping it from being ongoing on a daily basis.  And

16    telling me that, as a supervisor, even though I wasn't

17    a supervisor, I supervised no one when I came into the

18    position after I was a witness, was told that I had to

19    toughen up and take whatever people could dish out.

20        Q.    And who made that comment?

21        A.    Jodie Edmonds.

22        Q.    Okay.

23        A.    I was told by Jodie Edmonds that I was to

24    take all complaints directly to her and never refer



```
 1 │ people to outside of the Unit ever again.
 2 │     Q.   And --
 3 │     A.   Which does not follow the employee's
 4 │ handbook.
 5 │     Q.   We'll get to that too, okay.  Anything else?
 6 │     A.   I was retaliated on -- I was treated
 7 │ differently from the time that this all came out --
 8 │ actually, I began to be treated differently the day
 9 │ that Jodie Edmonds came into my office on a lunch
10 │ break when Laura was in there and she demanded -- came
11 │ in and demanded to know what the investigation was all
12 │ about and asked her about what was going on.  And
13 │ she -- then Laura told her to shut the door.  And she
14 │ shut the door.  And Laura made the comment to
15 │ something to the effect of, this is not an appropriate
16 │ conversation.  You know that you're not supposed to be
17 │ asking this, and you're not supposed to be asking it
18 │ in front of one of your subordinates, too.  And I've
19 │ talked to Steve Bradley and if you need to talk to me,
20 │ we can go to Steve's office.
21 │     Q.   And from this conversation --
22 │     A.   From that point on, I was treated
23 │ differently by Jodie.  Before Jodie had been
24 │ lighthearted, easy to get along with, when I went down
```



 1   and ask questions, I normally got an answer.  By the

 2   time I left I couldn't hardly get an e-mail out of the

 3   lady much less an answer for a question.  Her

 4   attitude -- it turned totally around.  I mean, it was

 5   like Dr. Hyde (sic), Dr. Jekyll type atmosphere.  And

 6   I was not placed in that position -- I was not Jodie's

 7   pick, I was Cheryl Beckner's pick for that position

 8   because of my background with computers and what they

 9   were wanting to do with that system and take it from

10   the antiquated version that the program was into a

11   more updated system.  And I think that just

12   fostered -- I don't want to say "fostered."  I think

13   that Jodie began to -- Jodie thought from that point

14   on that I wasn't a team player because of the fact

15   that I testified with the Union people against

16   management.  And, see, I don't believe that there's an

17   us against them attitude.  I think we all should be a

18   team.  Yes, there's a time that you have to, as a

19   manager, discipline, or whatever, but I think when we

20   are all taxpayers paying each other's salary that we

21   need to work together as a group.  But I believe Jodie

22   took this as me going against management.

23          Q.    And by "this", you mean --

24          A.    Witnessing -- being a witness.

Q.    Being a witness?

A.    For -- against Mark Scheff and the
Department's lack of action with his and Jim Schuh's
conduct.  I think she saw that as I wasn't part of the
management team.

Q.    Okay.  The conversation that you related --

A.    And I think she saw that as; I'm the boss.
I demand to know everything and, Laura, you should be
saying it to me.  And Laura is -- Laura and I never
discuss the case as long as she was on the case.  When
we began our relationship there was a line in the sand
that was drawn that we never crossed, that we don't
cross now.  If she's out on surveillance and going to
be home late, she calls me and tells me, I'm in
surveillance, I'm in town or I'm out of town.  I
expect to be home at such and such.  I don't know who
she is doing surveillance on or who the case that she
has.  Both of us have high ethical standards.  So, for
Jodie -- I believe Jodie assumed I knew what was going
on by her doing that.  And I believe that she took a
personal threat, or whatever, I'm not for sure, but I
think that that was the catalyst for starting the
retaliation was the fact that I just didn't push
anything under the carpet the way management does in





1  BCHS.

2      Q.    Okay.   The conversation -- just to clarify,

3  the conversation that -- that you have just related

4  between Jodie and Laura took place in your office on a

5  break?

6      A.    (Nodded head up and down.)

7      Q.    Is that a yes?

8      A.    Yes.   Sorry.

9      Q.    Those are both yeses?

10      A.    Sorry.

11      Q.    That was my bad for asking a question while

12  you were drinking.

13          MR. BAKER:   Coca-Cola.

14  BY MS. KERLEY:

15      Q.    When is the time frame?   Was this

16  conversation shortly after a complaint was lodged?

17  Was it after -- do you recall if it was after

18  interview statements were made or do you recall?

19      A.    I don't recall.

20      Q.    Where that conversation was made?

21      A.    No.

22      Q.    Okay.   You have related that Jodie's

23  attitude towards you changed and you thought that was

24  an act of retaliation.   Is there -- what other conduct



1    or comments or things do you think were based on

2    retaliation?

3              MR. BAKER:   Objection; ambiguous.

4    *BY MS. KERLEY:*

5        Q.   Do you understand the question or do you

6    need me to clarify?

7        A.   Would you please?

8        Q.   Sure.  You have just related one instance of

9    retal -- well, several instances of retaliation, the

10   last being Jodie's change in behavior.  Do you recall

11   anything else that occurred that you believe was

12   retaliation by the Department against you?

13       A.   I think that when she would hold meetings

14   and invite the other programs that didn't supervise

15   besides me into a meeting and then I wouldn't be

16   invited in, but yet, there was things discussed in the

17   meeting from the agenda that was given to me by other

18   parties.

19       Q.   And by many "she" you mean Jodie Edmonds?

20       A.   Meaning Jodie Edmonds.

21       Q.   Okay.

22       A.   From the conversation that she has passed on

23   to other people about me, calling me a trouble maker

24   in the Department.

1    Q.    And who -- okay.  Who did you hear those

2    comments from?

3    A.    Brad Wallner told me that Brian Brinker told

4    him that Jodie Edmonds told him during that time

5    frame.  And that he was not to promote me, and then

6    Brian was moved to another section and Brad did

7    promote me.  But then after Brian came back to the

8    section, we began to have problems again.'

9    Q.    Okay.

10    A.    And I believe it has to do with what Jodie

11    Edmonds has said and done.

12    Q.    Okay.

13    A.    I believe in the local office or in the

14    local central unit when the retaliation was going on,

15    I was ostracized.  I was even asked about it by Steve

16    Bandy, who in previous time had been my supervisor.

17    Q.    When you say "local central unit"?

18    A.    Meaning the unit.

19    Q.    You mean the hospital MACs?

20    A.    Yeah.

21    Q.    Okay.

22    A.    I don't think I was retaliated against by --

23    well, let me say this:  The women of the unit --

24    entire unit retaliated were against by the men.  They

1    quit speaking to everyone but P.K. Luttrell.  I do not

2    believe that any of the woman in that unit retaliated

3    against me.  I believe Mark Scheff, Jim Schuh, Joe

4    Roberts and Mike Sandidge did retaliate against me.  I

5    did believe that Marvin, Lenna and Jodie retaliated

6    against me and my position and chose not to deal with

7    me in the position that I was in, unless it was

8    absolutely necessary, because I brought to light some

9    things that were misconduct in the unit.

10        Q.    Okay.  Let's go through those one by one.

11            What -- how do you think that Mike

12    Sandidge retaliated against you?

13        A.    When this investigation started -- Mike and

14    I would talk.  We talk about work, we talk about his

15    kids, measles, chicken pox, things kids go through,

16    about books, just normal conversation in the course

17    that coworkers would talk about.

18            After this happened, he would stand

19    outside of my office -- you come outside of my office

20    and then there was a long wall, it was a half wall,

21    and then there was what we called the clerical pool

22    out in front of it.  And there was a gal that sit out

23    there and her name was Angie Defanbach and he would

24    stand out there and talk about me saying things about

1   myself, about Laura, about the investigation, which he

2   shouldn't have even been talking about, and what a

3   waste of everyone's time for me -- and that I

4   instigated it.  And he was very -- his remarks were

5   pointed, so that I would understand what was being

6   said.  And it was always aloud so that I would hear

7   what he was saying, if I didn't have your radio on --

8   you know how sometimes you turn your radio on, you

9   know.  But he made a point of not doing -- turning in

10   the renal applications timely, when always before he

11   had been an excellent worker.  That whole slow down --

12   all the guys started to slow down in their work.  A

13   lot of comments were made about me and about my

14   relationship with Laura.

15       Q.   And these are from Mike?

16       A.   Mike and Mark and Jim.

17       Q.   And do you -- with regard to the comments

18   that you have said that Mike made, do you recall

19   specifically any of the comments that he made about

20   you and/or about your relationship with Laura?

21       A.   He made a comment about -- this happened

22   about the time -- I thought I was having a nervous

23   breakdown because of so many things that was going on

24   outside of my office, and all the guys saying



1    different things, Jodie being nasty toward me when she

2    had to talk to me, and Marvin and Lenna wouldn't give

3    me an answer and told me to talk to Jodie, and she

4    would give me a curt, nasty answer.  I thought I was

5    going to have a nervous breakdown.

6         Q.   What time frame are you talking about there?

7         A.   Towards the end of October.

8         Q.   Okay.

9         A.   And I got to where I would close my door

10   because I didn't want to come to work.  And when I

11   would come to work, I would sit there and cry while I

12   did my job.  Just sob.  And this one particular day I

13   had my door open, I had just came back from somewhere,

14   I don't know, copy machine, something I'm not for

15   sure, and Mike was standing out there talking to Angie

16   and asked her why did I always have my door closed and

17   remarked about, you know, after her girlfriend blew

18   the investigation on Mark that probably would have got

19   him fired or dismissed, he used one of those two

20   words, I don't remember exactly, but he made a comment

21   that it was all Laura's fault and Angie defended Laura

22   and that, you know, she got out of that interview and

23   she didn't do anything wrong.  You know, everyone else

24   is talking and breaking confidentiality is what

1  screwed up on that one.

2      Q.    Okay.  Do you recall any other comments from

3  Mike?

4      A.    He did give me a warning that somebody was

5  going to do something to my car.

6      Q.    And when was that?

7      A.    I don't remember the date, but it was a few

8  days before I walked out and found poop -- actually, I

9  was driving Laura's car that day, so it was on the

10  handles of the car door.

11      Q.    And you said that was a couple days -- his

12  warning was a couple days before that?

13      A.    Uh-huh.

14      Q.    And?

15      A.    It was -- he said, I notice you have a new

16  car.  And I said, yeah, and he asked me how I liked

17  it.  It was a Monte Carlo and I said, you·know, it's a

18  nice car, sporty, makes me feel young, you know.  And

19  he said, well, be careful and take care of it and

20  watch it.  So that night I went home and said

21  something to Laura and she said, well, don't drive it.

22  Drive mine.  So I started driving her car to work and

23  it wasn't very many days and there was poop.·

24      Q.    Okay.  And at that time Laura worked in a

114

1    different building than the Bloom Building; is that
2    correct?
3         A.    She only works in the Bloom Building if
4    she's doing an investigation or is over there to talk
5    to somebody.
6         Q.    But that's not where her office is?
7         A.    Right.
8         Q.    Her regular reporting place?
9         A.    Right.
10        Q.    Okay.
11        A.    And at that time I was paying for parking.
12   I had an assigned lot behind the Bloom Building.
13        Q.    Uh-huh.  Okay.  Is there anything else that
14   you can recall that -- a way that you thought that
15   Mike was retaliating against you?
16        A.    Other than they wouldn't -- the whole -- if
17   you went to get a cup of coffee and he was standing
18   there, he would immediately turn off and run, like,
19   wouldn't even stop.  He would just leave his cup and
20   go off.  I mean, it was like I was a leper and that's
21   the way I was treated by all the guys.
22        Q.    Okay.
23        A.    But I wasn't just the only one.  I seen them
24   do that to Velva and to Mary Thallman, too.

1      Q.    Okay.

2      A.    There was totally -- totally a change of

3  atmosphere.  The only woman that they spoke to was, of

4  the Union employees, was Lynn -- P.K. Luttrell,

5  because she had been off during this time because her

6  husband had shot himself.

7      Q.    Okay.  With regard to the conduct by Mike

8  that you feel was retaliatory, did you complain about

9  that behavior to anyone?

10     A.    Yes, I did.  I complained about it to Jodie.

11 I complained about it to Marvin and Lenna.  The -- it

12 got to the point where that if they were doing renal

13 applications that -- where always before they would

14 come to me and ask me questions, but since it was my

15 program, they quit going to me, they would go to Jodie

16 or Lenna or Marvin.  And instead of referring them to

17 me so that they wouldn't have to talk to me, they

18 would answer the question or take care of the issue or

19 bring it to me that so and so, you know, had this

20 problem -- Mike had this problem.  Yes, we did talk

21 about it.  And what I was told in a meeting with all

22 three of them present is that you aren't a supervisor

23 and they do not report to you.

24     Q.    Okay.

1      A.    So they don't have to ask you questions,

2    even though I'm ultimately responsible for the work,

3    whether it was done correctly or not.

4      Q.    Okay.  Do you recall about what time frame

5    these conversations took place?

6      A.    No, not off the top of my head.

7      Q.    Okay.

8      A.    Actually, those conversations were

9    continual.  Every couple weeks issues would come back

10   and forth.  It was a hostile environment.  If I asked

11   a question of Jodie or Lenna or Marvin, I was talked

12   down to.  All of a sudden I was stupid.  I didn't know

13   anything.

14     Q.    Okay.

15     A.    Things like, well, I thought you knew

16   computer programs, I thought you knew the program, I

17   thought you knew this, demeaning and degrading.

18     Q.    Okay.  So is that what we've previously

19   discussed what you feel was retaliatory by Mike?

20     A.    Yeah.

21     Q.    Okay.  With regard to Joe, you previously

22   testified that all of the men in the Unit, which would

23   include Joe, treated you like a leper?

24     A.    Uh-huh.

1    Q.    That they slowed down in their work and that

2  they weren't timely?

3    A.    Uh-huh.

4    Q.    Besides these -- those issues that you

5  previously identified, what conduct by Joe did you

6  deem to be retaliatory?

7    A.    Joe would walk past with any of the guys --

8  usually Joe and Mike walked past together, like,

9  being -- to a meeting or doing something, and they

10  would walk past and make remarks to each other about

11  me.

12    Q.    Like?  Do you have an example?  Do you

13  recall specific comments?

14    A.    This would have been -- it was winter

15  because I had my heater on and I had it on full blast

16  and the basement can be pretty cold sometimes, and I

17  guess there was a lot of heat coming out of my office

18  and there was a remark made about hoping that I

19  would -- that something about my heater coming on and

20  that she's in there roasting and burning in Hell for

21  all the trouble that she's caused.

22    Q.    And who made that comment?

23    A.    Mike Sandidge to Joe.  And Joe said

24  something about, that wouldn't be good enough.

1        Q.    And did you complain about that comment to

2    anyone?

3        A.    Yes, I did.

4        Q.    To who?

5        A.    Ms. Edmonds, who never has any conversations

6    with me.

7        Q.    And what did you tell Jodie?

8        A.    The comment what was said and she said, you

9    know, when you became a witness, you pitted yourself

10   and you're only getting what you deserve.

11       Q.    And where was that conversation?

12       A.    In Jodie's office.

13       Q.    Okay.  Anything else with Joe?  Any other

14   retaliatory conduct by Joe?

15       A.    Not off the top of my head.

16       Q.    Okay.  How about Jim Schuh?  What conduct

17   did he engage in that you deemed to be retaliation?

18       A.    Mr. Schuh.  Let's see, him and Mark would

19   trade off.  They were assigned certain breaks.  They

20   had been assigned these breaks for months and months

21   and months, maybe even years, who knows, as to when

22   they could go take their smoking break, their regular

23   break.  And I would, knowing what their schedule is,

24   would try to vary my break so that I wouldn't have to

1    run into them and have any issues.  And if I was

2    upstairs or outside or wherever and Jim would see me,

3    he would put his cigarette out if he was outside

4    smoking and run downstairs and miraculously Mark would

5    appear.  That went on from October to the end of May

6    when I moved over to the Churchill Building when I

7    took my demotion.  I've been given the finger by

8    Mr. Schuh and Mr. Scheff in the building.  I had

9    watched them stand -- I would be sitting on a bench

10   for a while - there were benches and then they took

11   the benches out and now they're back in - in the lobby

12   of the Bloom Building the girl that I did break with

13   Maria Hayes, who is no longer with the Agency, we

14   would sit on one of the benches and take our break

15   because she had had open-heart surgery, and we had a

16   tendency to try to walk when the weather was in the

17   right condition for her to walk, but we would be

18   sitting on the benches and, like, after Steve Bradley

19   gave him an ultimatum -- or a directive not to come

20   near my side of the building, if I was sitting on this

21   bench, then he would stand over where the Sebastians

22   coffee shop is in the lobby, Jim and Mark and stand

23   and watch Maria and I and laugh out loud and try to do

24   the intimidation thing.



1          But Jim just pretty much was a person

2    that, it appeared from the outside to me, that would

3    just feed Mark the information and Mark was the one

4    that would carry out whatever was going to happen that

5    day.

6          Q.    Okay.

7          A.    Whether it be following me around at the

8    book fair upstairs or the craft show or the plant

9    sale.

10          Q.    Okay.  We will touch on Mark momentarily.

11              You have -- with regard to Marvin,

12    Jodie and Lenna, you mentioned several things; that

13    they didn't include you in meetings, that they tried

14    not to deal with you, that Jodie was curt with you and

15    that Marvin and Lenna wouldn't direct their

16    subordinate employees to take their questions to you.

17    Beyond those things that you've previously testified

18    about, are there any other instances of retaliation

19    that we haven't previously discussed about with either

20    of those three employees?

21          A.    Well, let's see.  There was the time that I

22    went to go to the bathroom and Mark's office was in

23    the corner and I needed to drop some stuff off at

24    Jodie's office, which would have been catty corner to

1    the corner from Mark's cube, and -- plus I had things

2    to drop off at other people's offices along the way,

3    so I went around the back hallway, because I didn't

4    want to walk past Mark's cube, so I was going to kill,

5    like, 15 birds -- multi task.

6        Q.    Right.

7        A.    So I was going to drop these applications

8    off and drop some stuff off at Marvin and Lenna's

9    office, go by Jodie's, drop something off there, and

10   then go to the bathroom and go back upstairs.  Make

11   one big swoop.

12       Q.    This is when you worked on the first floor?

13       A.    When I worked on the first floor.

14       Q.    And we'll clarify that in a moment, too.

15       A.    And I went to go to Marvin's office and

16   Lenna was in there, and there was -- somebody was

17   leaving or something -- there was some type of potluck

18   being planned.  And Marvin said something about, well,

19   we got to remember to make sure we invite Deb.  And

20   Lenna says, we're not inviting that bitch,

21       Q.    Okay.  And you were outside Marvin's office?

22       A.    I was standing in the doorway and he looked

23   up and saw me and she is continuing to talk about me.

24   And I'm standing right there.  And I let her finish

1   going on about the bitch and we're not inviting that

2   bitch, she's nothing but a troublemaker, and her day

3   is coming, and she'll get it and Marvin goes (witness

4   makes sound of clearing throat) and clears his throat.

5   And he looks around and I said, the bitch is standing

6   here.

7        Q.    And what was her response?

8        A.    Nothing.  Not one word.

9        Q.    Did you relate this conversation you

10  overheard to anyone?

11       A.    Well, actually, what she did, she about

12  plowed me over trying to get to Jodie's office.

13       Q.    So, Lenna went to Jodie's office?

14       A.    Yep.  And I followed.

15       Q.    And did a conversation occur following that?

16       A.    Yes, it did.

17       Q.    And what was that conversation?

18       A.    That -- what happened?  And Lenna was told

19  that she was out of line.  And she said to Lenna she

20  said, I will deal with you in a minute.  Go ahead and

21  leave.  And she asked me to sit down and shut the

22  door, and I did.  And she said, I told you this before

23  but you deserve whatever comes to you for stirring up

24  this problem down here that won't seem to die down.

123

1          Q.    Okay.

2          A.    And my responses to that was, if you guys

3     were effective managers, this problem would have gone

4     away a long time ago.

5          Q.    Okay.  And when did this conversation occur?

6          A.    I don't know.  It was after I moved

7     upstairs.

8          Q.    And do you recall when you moved upstairs?

9          A.    March or April 2001.

10         Q.    Okay.  We will clarify that in just a

11    minute.

12                Okay.  Anything else by Marvin, Lenna

13    or Jodie that we haven't already talked about that you

14    deem to be retaliatory?

15         A.    Not right now.

16         Q.    Before we visit any retaliatory conduct by

17    Mark Scheff, I think it will clarify the record if we

18    revisit momentarily your employment history.

19                My understanding is we have your

20    employment history from the early '80s until you

21    became an E2 in October of 2000; is that correct?

22         A.    Yes.

23         Q.    Okay.  You previously testified that when

24    you became an E2 or shortly there -- shortly before

124

1    you became an E2, you moved to another office in the

2    basement; is that correct?

3         A.   Correct.

4         Q.   Okay.  And from your recent testimony --

5    your recent testimony, I understand that at some point

6    you moved to the first floor?

7         A.   Yes.

8         Q.   Okay.  Please tell me about what led up to

9    you being moved to the first floor and where you

10   moved.

11                Let me break that down.  You previously

12   testified that you moved to the first floor in March

13   or April?

14        A.   Uh-huh.

15        Q.   Okay.  When you were on the first floor,

16   were you doing the same job duties as you had as an E2

17   when you worked in the basement?

18        A.   Yes.

19        Q.   Okay.  Where was your office location in --

20   on the first floor?

21        A.   If you came in the front door, there was a

22   set of double doors on the right.  You go through

23   those, and then you make a left immediately, and you

24   go to the end of a short hallway, which is just a