E-FILED
Tuesday, 01 November, 2005  04:02:37 PM
Clerk, U.S. District Court, ILCD

```
 1   small wall and you make a right, and there's a door
 2   and I sit right in front of that door.
 3       Q.   Okay.  Is that what's referred to as the
 4   east wing of the first floor?
 5       A.   Yeah.
 6       Q.   Has anyone besides me ever called it the
 7   east wing?
 8       A.   I think so.
 9       Q.   Okay.  It is the east side of the building
10   on the first floor, right?
11       A.   Yes.
12       Q.   Okay.  And who else -- what other units were
13   located around where your first floor desk was?
14       A.   In the room with me were other -- were MACs
15   for the NIPS Unit, MAC2s and I don't know if the other
16   two had been reported to 3s yet or not, but MACs for
17   the NIPS Unit.
18       Q.   Okay.  How many people were in your
19   office -- I guess back up.  Did you have an office?
20       A.   I was in a conference room that had been
21   converted into an office.
22       Q.   Were you the only one in the conference
23   room?
24       A.   No.  Three or four other people.
```

1          Q.    Either four or a five people shared this

2     conference room space as their workspace?

3          A.    Yes.

4          Q.    Were they divided by cubes?

5          A.    No.

6          Q.    By walls?

7          A.    No.

8          Q.    Okay.  And those were the MACs that you just

9     described that worked for the NIPS Unit?

10         A.    Yes.

11         Q.    Okay.  How did you come about moving to the

12    first floor?

13         A.    Conversation between myself and Steve

14    Bradley.

15         Q.    Okay.  And when did that conversation take

16    place?

17         A.    Sometime in May.

18         Q.    I'm sorry?

19         A.    Sometime in May of 2001.

20         Q.    Okay.  You previously testified that you

21    moved -- oh, maybe I misspoke.  I would like to know

22    how you moved to the first floor from the basement.

23    You previously testified that you moved to the first

24    floor in either March or April?

1      A.    I can't remember, did I?  I think it was --
2   whenever it was that I moved, I don't know.  I don't
3   know the exact month, but I moved because of a
4   conversation with Steve Bradley.

5      Q.    Okay.  And where was that -- where did that
6   conversation take place?

7      A.    When I was in -- he was in my office in the
8   Bloom Building in the bottom floor.

9      Q.    In the basement?

10      A.    In the basement and he was talking to me
11   about the problem between Jodie and myself and with
12   Mark Scheff and myself would not go away if I didn't
13   get out of the building.  He didn't think me promoting
14   to another position or demoting to another position
15   within the Bloom would stop either one.

16      Q.    Okay.  And as a result of that conversation,
17   you moved physical work locations within the Bloom
18   Building?

19      A.    Yes.

20      Q.    You just testified that Steve Bradley said
21   that you needed to move out of the building, was that
22   something that he worked toward?

23      A.    I told him that I had bid on a position
24   within BCHS, which he was still over, which was a

1  demotion, to get away from the situation with Mark and

2  Jodie, that I could not continue to work in the

3  atmosphere. And he said that position was under him

4  and he would see what he could help me do.

5      Q.   Okay. And what position was that?

6      A.   MOA1 drug rebate.

7      Q.   Okay. We will -- okay.

8      A.   I had bid on that position because I knew --

9  was a personal friend of Marvin Hazelwood. I ran with

10  his kid. And Marvin assured me that there was enough

11  distance between me and Jodie that I wouldn't suffer

12  any ill effects from what happened.

13      Q.   And who is Mr. Hazelwood?

14      A.   Retired Assistant Bureau Chief.

15      Q.   Was he still the Assistant Bureau Chief?

16      A.   Yes.

17      Q.   Over the drug rebate --

18      A.   Yes.

19      Q.   -- at the time you applied?

20      A.   Yes. He was with the entire pharmacy unit.

21      Q.   Okay. Let's, if we can -- and hopefully we

22  don't get too confused doing so, I'd like to

23  revisit -- now clarifying that you moved to the first

24  floor and had the same job duties, I'd like to revisit

1   the issue of retaliation that we've previously been

2   talking about.

3           And you had previously testified that

4   you were retaliated against by Mark Scheff for your

5   opposition to sexual misconduct and to being a witness

6   in Mary Thallman's internal investigation.  If you

7   could, please describe what conduct Mark Scheff

8   engaged in that you thought was in retaliation for

9   being a witness?

10      A.    Let's see, once he received the copies of

11  the investigation and read everyones and he had talked

12  to some people, it appeared that he had came to the

13  conclusion that I was behind the investigation and

14  that's where the comment you alluded to earlier about

15  a hard on comes from, it comes back clearly now, I had

16  a hard on for him, that I was coming after him, I was

17  out to get him, whatever.

18      Q.    Okay.

19      A.    He thought that I was behind Mary Thallman

20  calling OIG, because no one would have ever called OIG

21  if it hadn't been for me.  People knew that I was a

22  friend with Laura because after -- we became friends

23  before we became partners, that on lunchtime a lot of

24  times if she was in the Bloom Building, she would stop

1   and we would go out for lunch.  So people saw her

2   around and knew that she worked for Internal Affairs.

3       Q.   Okay.

4       A.   So, I'm assuming that's where that

5   assumption came from that I was behind it because of

6   my relationship with Laura.

7       Q.   Okay.

8       A.   Mark began to say things.  Hold

9   conversations with, like, Jim or Joe or anyone that

10  would give audience to him at his office or at the fax

11  machine outside of my office or to the clerical staff

12  sitting out in front of me about being drug through

13  the mud by five of his coworkers and one of their

14  girlfriends, and that he was going to sue everyone,

15  and sue them, and they would get theirs.  He had

16  worked 18 years, or however many years, for the Agency

17  and he had never been disciplined before and never had

18  any problems until this had happened.  During the time

19  when he was the most vocal, which was when I was

20  downstairs, because when I was upstairs, I couldn't

21  hear him.

22      Q.   So meaning October until about March?

23      A.   Yeah.

24      Q.   Okay.

1    A.   He would -- it's almost like he would go in

2  cycles, waves, I don't know, up and down.   Like he

3  would get past it or maybe something else would

4  happen, or -- because then all of a sudden he would be

5  right outside of my door and he was really good about

6  doing this right after lunch and wearing what I call

7  his Columbine coat.  I always knew that either he was

8  in trouble, he had been thinking about it, or

9  something was up, because instead of wearing -- he had

10  a short down filled jacket that he wore a lot, but on

11  the days that he seemed to be upset about the work

12  situation or whatever was going on, he would show up

13  in his long western duster.   And I called it the

14  Columbine coat, along with several other people who

15  would see him coming up in this, which he showed up in

16  for like two weeks straight in a row after he was

17  first being investigated on the Mary Thallman count.

18    Q.   With regard to that coat, do you -- was that

19  something new that Mark had acquired around the time

20  of the investigation?

21    A.   No.  I don't know that.

22    Q.   Do you recall ever seeing him wear it prior

23  to the investigation?

24    A.   Maybe once.



1    Q.   Okay.

2    A.   When he wore jeans one day.

3    Q.   Okay.

4    A.   But the rest of the time he wore -- usually

5    he wore the -- if it was real cold, he wore the

6    quilted type down filled thing.  But a lot of times he

7    wore a black nice dress overcoat.

8    Q.   Okay.

9    A.   No.  The Columbine coat would be -- it was

10   just -- it was like he was out to intimidate or to be

11   Mr. Tough Guy.  I don't know what it was.  But he

12   would come across in this coat, and this happened to

13   be about the time not very long after the Columbine

14   incident, so it really became a stir about him wearing

15   that coat for intimidation factors, and the way he

16   talked about guns was he going to bring a gun in.

17   Q.   And did you have these conversations with

18   other coworkers?

19   A.   I even had these conversations with Jodie

20   that she was scared that he was going to do that.

21   Q.   And when was that?

22   A.   Between October and a March.  And to further

23   go along with that, I was told last August by Brian

24   Brinker that at that time, and even since then, that

1    Jodie Edmonds has complained to the current Director

2    about Mark Scheff and his issues.

3         Q.    Okay.

4         A.    Because of the Columbine coat and fear

5    factor.

6         Q.    Okay.  To maybe clarify some of the players

7    jumping back to your employment history.  Off the

8    record.

9                        [WHEREUPON THERE WAS A SHORT

10                        DISCUSSION OFF THE RECORD.]

11   *BY MS. KERLEY:*

12        Q.    Did at some point you leave the first floor

13   of the Bloom Building?

14        A.    When I took a demotion to an MOA1 in BCHS,

15   2001, June 1st.

16        Q.    June 1?

17        A.    I went to work at 2200 Churchill Building.

18        Q.    And who was your supervisor there?

19        A.    Alberta LeVan.

20        Q.    Could you say that name again?

21        A.    Alberta, A-L-B-E-R-T-A; LeVan, L-E-V-A-N.

22   Who is now retired.

23        Q.    Okay.  And who was her supervisor?

24        A.    Marvin Hazelwood.

1        Q.    And did at some point your supervisor

2   change?

3        A.    Yes.

4        Q.    And who did it change to?

5        A.    In October of 2001 it changed to Bradley

6   Wallner.  He was above Alberta.  Alberta was above me,

7   so the chain of command was Alberta, Brad, Brian

8   Brinker and then Fred Backfield.  And then Brian was

9   only there for 30 or 60 days and he moved into another

10  unit within Finance and Budget and there was no one

11  between Brad and Backfield.

12       Q.    Did Backfield take Hazelwood's position or

13  was Hazelwood above all those people?

14       A.    Hazelwood stayed with BCHS.  We, as a unit,

15  on October 1st was placed under the Division of

16  Finance and Budget.

17       Q.    Okay.  So the unit had a reorganization?

18       A.    (Nodded head up and down.)

19       Q.    Okay.

20       A.    Actually, we had one twice in a three-month

21  period.  We went under John Hyde first, and then we

22  went -- the next month we went under Backfield.

23       Q.    Okay.  All right.  That should clarify who

24  the parties are that you're referring to.  Okay.  We

1    were previously discussing conduct -- retaliatory

2    conduct by Mark Scheff.  Do you recall any other

3    retaliatory conduct by Mark Scheff?

4         A.   Let's see, they put dirt clods in his office

5    and told people that if I was going to throw dirt at

6    him, at least I should be big enough to do it to his

7    face and not to his back.

8         Q.   When was that comment made?

9         A.   Sometime between October and May, somewhere

10   in there.  I don't remember exactly.

11        Q.   Do you recall if it was when you were in the

12   basement or when you were on the first floor?

13        A.   No.

14        Q.   Okay.

15        A.   No, not at this moment.  He taped a screw to

16   his wall - and if you're wanting the names of people

17   that he told this to Sue Kramer, Pam Dufour.

18        Q.   And who is Sue Kramer?

19        A.   I guess she still works for the Agency, I

20   don't know.  Susan Kramer, she was a switchboard

21   operator when we worked together in BCHS, and then

22   went to Kid Care as a caseworker.

23        Q.   At the time of these comments, was she the

24   switchboard operator?

1    A.    Maybe.  I don't remember.

2    Q.    Okay.

3    A.    Because during this time frame she also was

4    working with Kid Care because when I left the building

5    she was at Kid Care.  I think she had just gone to Kid

6    Care.

7    Q.    Okay.  Anything else?

8    A.    He taped a screw to the wall about -- to

9    represent me screwing him on his job with all of this

10    investigation that I initiated through Mary Thallman,

11    and then when I initiated on myself with the

12    retaliation that I was screwing him.

13    Q.    Do you know when that happened, when was

14    that?

15    A.    About the same time when I came back to work

16    one day for Alpha signs for himself and Beta signs for

17    the rest of the guys.  That he was the head dog and

18    the rest of them followed him in the retaliation and

19    everything else.

20    Q.    Did you ever overhear a comment by Mark

21    Scheff about what the Alpha and Beta signs meant?

22    A.    Yes, I did.

23    Q.    And what did he say?

24    A.    That he was the head dog, and Steve Bradley

1    was a head dog, he considered Steve Bradley a head

2    dog, and everyone else was Beta dogs and they followed

3    whatever they told them to do.

4        Q.    Okay.  Any other conduct?

5        A.    Let me see.  I guess cartoons on the outside

6    of his cube putting down woman and management - they

7    had two different ones up there - and how that these

8    represented the woman management and me for all the

9    problems we gave him.

10       Q.    And are you relating to me a conversation

11   that you overheard?

12       A.    I'm relating to you a conversation that he

13   had with Sue Kramer.

14       Q.    Okay.

15       A.    A couple of different times.

16       Q.    So Mark Scheff told Sue Kramer that cartoons

17   referred to something and Sue related them to you?

18       A.    Uh-huh.

19       Q.    And what time frame?

20       A.    And Sue Kramer also related the

21   conversations to Roni Kaluza, who was still there as

22   an Assistant Bureau Chief.

23       Q.    And were you with Sue when she told

24   Ms. Kaluza?

1      A.    No, Roni told me.

2      Q.    Roni told you?

3      A.    Yeah.

4      Q.    Okay.  When did Roni tell you that Sue

5   Kramer had related conversations to her?

6      A.    Whenever I went to talk to Roni about -- let

7   me see.  I went in to have a conversation with Roni

8   because Steve Bradley was off, and Roni had told me

9   that she knew because Sue had came and reported them

10   to her, but they were still up.

11      Q.    The cartoons?

12      A.    And the dirt clods were still there, and the

13   Alpha, Beta signs, and the screw.  In fact, I came

14   back in on the weekend and took a picture.

15      Q.    Do you have a copy of that picture?

16      A.    I think I turned it over to John Taylor.

17           MS. KERLEY:  Off the record.

18                       [WHEREUPON THERE WAS A SHORT

19                       DISCUSSION OFF THE RECORD.]

20   BY MS. KERLEY:

21      Q.    Back on.  We were just discussing

22   retaliatory conduct by Mark Scheff and in the midst of

23   that you mentioned that you went to have a

24   conversation with Roni Kaluza because Steve Bradley

1    was out of the office.  What was the purpose of that

2    conversation?

3         A.    I had never came to work and told any of my

4    coworkers that I was gay.

5         Q.    Okay.

6         A.    I had told -- Pam knew because I used to

7    work with Pam.  Velva, who I had worked with, didn't

8    know it until after the investigation and it came out

9    that I was gay.  I had broke up a relationship back in

10   August and I talked -- several months later I was

11   at -- somewhere and ran into somebody and they told me

12   that Pam Dufour had told me that I had broke -- I was

13   no longer with Patsy that I was with Laura.  And that

14   Pam told them that I had -- or that Patsy tried to

15   commit suicide when I broke up with her.  And I said,

16   I never told Pam that.  I said, the only person --

17   people that knew that was management staff.  I told

18   them the week that it happened and that week was

19   probably going to be a hard week because Patsy was

20   still calling me and wouldn't leave me alone.  And I

21   said but give me the one week to get past getting her

22   to calmed down and I'll be back on track because I

23   had -- I was happy to be out of the relationship.  It

24   had been dead a long time.  And I went to Roni and

1   this person told me that Pam told her that Lenna

2   DeGroot had told Pam.

3       Q.   Who are you having the conversation with?

4       A.   Michelle Hare.

5       Q.   Okay.

6       A.   I think she's an Assistant Deputy Director,

7   or something like that, in DHS.

8       Q.   So Michelle Hare --

9       A.   Uh-huh.

10      Q.   -- related to you that Pam Dufour --

11      A.   Had told her at bingo.

12      Q.   -- had told her --

13      A.   That Lenna DeGroot had told her that Patsy

14  had tried to commit suicide. And I had told nobody

15  but Lenna, Jodie and Marvin that.

16      Q.   And you took that string of conversation to

17  Roni Kaluza?

18      A.   Yes.

19      Q.   Because Steve Bradley was out of the office?

20      A.   Yes. And asked that because Jodie and

21  Cheryl -- Lenna, Jodie and Cheryl were in Chicago at

22  some kind of a meeting. They were all out of the

23  office. And Marvin you didn't bother with personal

24  issues. He would flat out tell you, hold it until



```
 1    Jodie gets here.  I don't deal with personnel.

 2         Q.   Okay.  Do you recall when you found that

 3    out?

 4         A.   I found it out on a weekend, and this was a

 5    few days later when Pam came into my office to tell me

 6    that Mark was being called over to OIG for some reason

 7    and she wanted to know if I had been called over.  And

 8    I said, no, and if I had I wouldn't tell you and you

 9    need to quit telling things, too.  And I told her what

10    had been told to me and she turned around and walked

11    out of the office.  And I walked over and sat down and

12    talked to Roni about it.  When I stopped by Steve's

13    office and he was gone and Carla Collins, his

14    secretary, told me that he was off but I should go

15    talk about Roni about whatever was going on.  Because

16    see said, you look upset.  And I said, I am.  So I

17    went over and told her what had happened over the

18    weekend.  Because I was going to take it to Jodie when

19    Jodie got back.  I was going to hold off on it.  Since

20    it happened on the weekend, this was the first -- the

21    week and they were still in Chicago but here now Pam

22    was coming down trying to get something and it just

23    kind of stirred me to the point that I emotionally

24    went over and...
```

142

Q.    Now is this --

A.    Roni Kaluza.

Q.    When did this Roni Kaluza conversation take place?

A.    I don't remember. I don't remember. I just know it was in the time frame that the dirt clods and all that stuff started appearing and I even talked to her about that stuff and she said Sue Kramer had even talked to her about it.

Q.    Okay. And this is sometime after the investigation began?

A.    Uh-huh.

Q.    Okay. Other conduct by Mark Scheff, if you recall any, that you thought was in retaliation for your being a witness?

A.    Of course the stalking of when I moved upstairs that he would come and stand outside of my office.

Q.    Okay.

A.    And stare.

Q.    And when did that occur?

A.    From the first day I was upstairs.

Q.    And you said that he would stare at you?

A.    He would stand out there and stare.

143

```
 1        Q.    He would stand outside of your office?

 2        A.    Yeah.   There is -- right outside of my

 3   office was a copy machine that was behind the wall,

 4   and then there was another wall and sometimes they

 5   would put a mail cart there or boxes from claims

 6   processing where they would box - I don't know what

 7   they box - but they boxed it up and they would stack

 8   it up until somebody came and took it somewhere else

 9   to be stored or processed.   He would lean against the

10   boxes and just stand out there and stare at me and

11   laugh.

12        Q.    And how often did that occur?

13        A.    Whenever he went to his cigarette break, two

14   or three times a day.   In the morning and afternoon

15   both.

16        Q.    Okay.   And --

17        A.    And that occurred -- I complained about it

18   daily until I saw it was getting nowhere.   And another

19   girl came to me and said she knew what was going on,

20   she had been observing it for some time, and she

21   called Carla Collins, who called Steve Bradley, and

22   then Shari Bangert.

23        Q.    Shari Bangert is who observed this conduct?

24        A.    And him coming through my office.   He would
```

```
 1    just come down there -- he never was on -- I don't
 2    want to say never.  He was upstairs every day, every
 3    morning that he was there, walking through my area,
 4    when he didn't have a need to, he wasn't doing
·5    business with anybody else in my section.  But he
 6    would come walking through there on his way to the
 7    break room, which break room is on the west side of
 8    the building.  He would come up and use the copy
 9    machine versus the one that was right around the
10    corner from his office.  He would find people to pull
11    over and do conversation right in front of the door.
12    Roy Klein, Mike Beal, of course, Ms. Watts.  What was
13    her first name?  The Union Steward, I should know
14    this.
15              MR. BAKER:  Is it Marie.
16              THE WITNESS:  Marie, very good.
17    BY MS. KERLEY:
18         Q.   And any other conduct besides what we've
19    already talked about and the stalking upstairs
20    conduct?
21         A.   There was a couple several nights that he
22    followed me home.
23         Q.   In his car?
24         A.   Oh, no, nice old gray Ford pick-up truck.
```

1    Q.    Okay.

2    A.    I called Southern View police about it and

3    they said there was nothing they could do as long as

4    he was just driving by.  That went on for a couple of

5    weeks.

6    Q.    Did you talk -- complain to anyone?

7    A.    Yeah.  I talked to Jodie and Steve Bradley

8    both.

9    Q.    Okay.

10    A.    It got to the point that I was getting

11    hang-up calls at home and at work.  I put a privacy

12    manager on my telephone, found out that he had my

13    Social Security Number, as well as everybody else's.

14    I talked to Social Security about changing my Social

15    Security Number.  And they told me that they very

16    rarely change a Social Security Number.  And they give

17    me this whole line of things that I had to prove over

18    the next 18 months --

19    Q.    Okay.

20    A.    -- in order to change my Social Security

21    Number.

22    Q.    Okay.  Did -- did you ever experience

23    something that made you think that your Social

24    Security Number was being used by someone, other than

1    yourself?

2         A.    I began to get all kinds of packages and

3    things sent to my house that I refused.

4         Q.    And --

5         A.    Like, you know, books, tapes, CDs from

6    places that I wouldn't order.

7         Q.    Like what?

8         A.    Well --

9         Q.    If you recall any?

10        A.    Yeah.  Let me see The Rifleman, or National

11   Rifle Association, what is that NRA?

12        Q.    Uh-huh.

13        A.    Music from different music groups.  Music

14   companies.  Magazine from an Outdoorsman, or

15   something.  And then there was a few -- I got a

16   Playgirl that I refused.  I think he thought that

17   probably would be funny that that would be to my

18   liking.  Different pieces of things that I would just

19   refuse.  I would see where it was coming from, know I

20   hadn't ordered those things, put "refuse" and take it

21   back to the Post Office.

22        Q.    Okay.  And from your testimony do I

23   understand that you think these were coming from Mark?

24        A.    Uh-huh.

1    Q.    Okay.   Anything beyond what we've talked

2  about?

3    A.    There are other instances.   I'm probably

4  just not plugging into them right now.

5    Q.    Okay.   So, do I take that to mean that your

6  recollection is exhausted as to any other conduct by

7  Mark?

8    A.    For now.

9    Q.    Okay.

10    A.    Because like when you made the comment

11  earlier about the hard on, when you brought up the

12  other situation it was like, oh, yeah, this happened,

13  this happened, that happened.   So, it triggers.

14    Q.    Okay.   Of the conduct my Mark Scheff, you

15  previously said that you complained daily.   Who did

16  you complain to?

17    A.    To Jodie.   And I had been told by Jodie

18  several times that I was not to take anything above

19  her ever again.

20    Q.    Okay.

21    A.    After the OIG investigation that Mary

22  Thallman has, I was told never to go above her.   The

23  time I went to Roni Kaluza she came in and she shut my

24  door and told me, I told you before that you were not

148

1   supposed to do that.  You should have waited until I

2   got here.  And I didn't even -- I didn't even answer.

3   It got to the point I knew whatever my reasoning

4   behind what I was going to tell her, it was going to

5   go against me, so I didn't even answer her.

6       Q.   Okay.  Were these complaints written or

7   e-mails?

8       A.   I would verbally -- now the one about the

9   dog poop, I did send in the mail.  No, I verbalized

10  them, and then I documented them in my own notes,

11  which you should have copies of all of that stuff.

12      Q.   Since you bring that up, I'm going to --

13           MS. KERLEY:  How are we looking at on time?

14  What time is it?

15           COURT REPORTER:  2:44.

16           MS. KERLEY:  Oh, then I will wait one second

17  on that.  Okay.

18           MR. BAKER:  Off the record.

19                    [WHEREUPON THERE WAS A SHORT

20                    DISCUSSION OFF THE RECORD.]

21  BY MS. KERLEY:

22      Q.   Back on.  Ms. Sullins, you alluded to,

23  earlier in your testimony, the Department of Public

24  Aid's employee handbook?

```
1          A.    Uh-huh.

2          Q.    Is that a yes?

3          A.    Yes.   That's a yes.

4          Q.    And you are aware that there is a handbook?

5          A.    Yes, I am.

6          Q.    And at the time you were employed at BCHS,

7     you knew of the handbook?

8          A.    Yes.

9          Q.    Okay.  And were you -- are you also aware

10    that the Department of Public Aid has a sexual

11    harassment policy?

12         A.    I do.

13         Q.    Okay.  And were you trained on the

14    Department's sexual harassment policy?

15         A.    Yes, I was.

16         Q.    And what is your understanding of what an

17    employee's responsibility is?

18         A.    I better understand it today than I did then

19    because since -- now I've taken the class twice.

20         Q.    Okay.  Well --

21         A.    As a manager, and then again as an employee

22    to make sure that I understood if this ever happened

23    to me again.

24         Q.    Okay.  Well, as of 2000, what did you
```

150

1    understand an employee's responsibility was under the

2    Department's sexual harassment policy?

3        A.    To report it to your supervisor.

4        Q.    Okay.  And was that your understanding that

5    that was your only option?

6        A.    Yes.

7        Q.    Okay.

8        A.    When I took sexual harassment, it was under

9    someone who is no longer with the Agency.  For the

10   first time it was Marie Watts, she drove home the idea

11   everything goes to your supervisor.  Now, when I took

12   it later under Gail or Sandy I can't remember, Gail

13   Longmeyer or Sandy Lee, they brought in EEO, they

14   talked about Internal Affairs with us, it was totally

15   different.

16       Q.    Okay.  Well let's talk about 2000.  In 2000

17   you were aware of the Office of Internal Affairs or

18   OIG?

19       A.    I was aware it was there.

20       Q.    Okay.  At some point in the summer of 2000,

21   am I correct in assuming that you were more aware of

22   the office, due to your relationship with Laura?

23       A.    I was more aware that there was an Internal

24   Affairs.  As to what she actually did on the



1    day-to-day, she told me she worked with employee

2    conduct.  Did we actually talk about that, honestly,

3    no.

4         Q.   Right.  Okay.

5         A.   Did we actually talk about reporting and

6    those kind of things?  No.  This is what a lot of

7    people don't understand.  My personal life is my

8    personal life.  My work life is my work life.  When I

9    come to work, my employees do not know if I've had a

10   fight at home.  I do not show that.  It's none of

11   their business.  On the other hand, because I spend

12   more time at home -- or at work than I do at home,

13   yes, I can bring home some bad attitudes.  But we do

14   not discuss things that do not -- that are considered

15   confidential on Laura's part or on my part.  And,

16   quite honestly, I didn't want to know what she was

17   doing because at that time we were getting to know

18   each other.  We were talking about where we grew up,

19   where we went to school, about our parents, about a

20   lot of similarities.  We were in that young love stage

21   where we didn't talk about OIG.  I could have cared

22   less there was an OIG, because at work I felt that I

23   was doing everything that I had been instructed to do,

24   and that was to go to my supervisors.

1    Q.    Okay.   You have, prior to -- strike all

2  that.

3                Okay.   At some point in late 2000,

4  early 2001, it's my understanding that you became

5  aware of the ability to file an internal complaint of

6  employee misconduct with the Office of Inspector

7  General; is that correct?

8    A.    Correct.

9    Q.    Okay.   At any time prior to, we'll say

10 October 13th, 2000, the date of Mary Thallman's

11 complaint, did you ever file an internal complaint of

12 employee misconduct?

13   A.    No, because I had been told by Jodie Edmonds

14 and Cheryl Beckner these issues would be taken care

15 of.

16   Q.    At any time after October 13th, 2000, did

17 you ever file an internal complaint of employee

18 misconduct?

19   A.    When I went and gave my statement, I was

20 told that I could not.   When I filed -- when I went to

21 give my statement in the Mary Thallman and I told all

22 the different things that I was party to -- or some of

23 the incidences that I had heard.   I was told that I

24 could not file a separate complaint by Terry

1    Tranquilli.  When I filed my complaint against the

2    retaliation in March and asked to bring back up the

3    sexual harassment, Terry Tranquilli told me -- left

4    and came back told me that he had been told by

5    personnel, whoever that was at that time, that I could

6    not reopen that.

7          Q.   Okay.

8          A.   So I tried.

9          Q.   At the time --

10         A.   In October --

11         Q.   -- of October 2000?

12         A.   In October when I was told what my rights

13   were in the OIG office, I tried.  And I tried again in

14   March and I was told emphatically no.

15         Q.   Okay.

16         A.   And since that time I have had someone else

17   come to me and tell me they have been told no until

18   this is settled between and the State regarding Mark.

19         Q.   Who was that?

20         A.   The girl's name is Suzie and she was -- I

21   don't know if she still is, I haven't talked to this

22   girl in ages, she was Jodie's secretary.  I don't know

23   her last name.

24         Q.   Okay.  And where did she have this

1    conversation with you?

2        A.    She had the conversation and had somebody

3    call me and ask me if that was true.

4        Q.    Who did she have the conversation with?

5        A.    With Pam Dufour and asked Pam to call me.

6        Q.    When did Pam call you?

7        A.    It was a few months ago.  I don't know how

8    long it's been ago.  I don't remember.  I don't

9    remember.  It was when she had filed a complaint with

10   Internal Affairs about Mark and wanted to go through

11   EEO and the Department of Human Rights and she was

12   told she couldn't.

13       Q.    And who told --

14       A.    I don't know who told her because I never

15   personally called her.  I told her if she wanted to

16   talk to me to call me and I would give her some names

17   of people to call and left it at that.  I gave Pam the

18   names and told Pam to call her.

19       Q.    Okay.

20       A.    Because Pam and her worked in the same

21   section.

22       Q.    Okay.  You said you have since -- you

23   previously testified that you have, since 2000, taken

24   the sexual harassment training on two separate

1   occasions, once as employee and once as a supervisor?

2        A.    I think it's two.

3        Q.    Okay.  As you sit here today, what is your

4   understanding of what the Public Aid sexual harassment

5   policy is, as to what an employee's responsibility is?

6        A.    Their responsibility is first to tell the

7   person that they don't want to hear it.  Second, take

8   it to their supervisor.  And, if that doesn't work, to

9   take it to the next level, to the next level.  If none

10  of those reach satisfaction or it doesn't stop, they

11  have a right to go to EEO.  And they have a right to

12  contact Internal Affairs anywhere along that chain.

13       Q.    Okay.

14       A.    But I will tell you in the Bureau of

15  Comprehensive Health Services and in the Division of

16  Finance, you are told not to take anything to Internal

17  Affairs, absolutely, positively not to -- not to call

18  Labor Relations or personnel.

19       Q.    And who has told you those things?

20       A.    I have been told that by Cheryl Beckner.  I

21  was told that by Jodie Edmonds when I worked for BCHS.

22  I was -- and that was also came out in a meeting in

23  January of 2002 from Cheryl Beckner.  The only

24  supervisor meeting I was ever called into attendance

1  to attend.

2      Q.   Do you mean January 2001?

3      A.   2001.  I'm sorry.

4      Q.   Okay.

5      A.   I've been told by Brad Wallner and Brian

6  Brinker and, of course, how could I forget Mr. Andy

7  Kane?

8      Q.   And who is Andy Kane?

9      A.   He used to be Deputy Administrator -- or the

10  Administrator for the Division of Finance.  That we do

11  not conduct those things.  But when I see no

12  satisfaction done or no justice being done to people,

13  I have decided that even under directives that I will

14  step in if it hurts other people.  Even if it's a

15  direct order because it says in the handbook that I

16  have that right and responsibility because my civil

17  rights are being stepped on when I'm being told no.

18      Q.   Okay.

19      A.   And I've been told that several times within

20  this Agency, I've had personnel Kevin Conner tell me I

21  cannot contact the Governor's office.  It's in

22  writing.

23      Q.   Was that --

24      A.   Totally about something --

157

1        Q.    -- communication about anything to do with
2    this case?

3        A.    No.   But I'm just staying that is standard
4    operating procedures in the Department of Public Aid
5    that is passed along, that people keep quiet about and
6    do.

7        Q.    Okay.   Did you ever file -- have you ever
8    filed a complaint with the Illinois Department of
9    Human Rights?

10       A.    Yes.

11       Q.    Have you filed more than one complaint with
12   the Illinois Department of Human Rights?

13       A.    Are you calling the amendment to include Jim
14   Schuh a different one?

15       Q.    No.

16       A.    Not to my knowledge.   I think there's just
17   one.

18       Q.    I'm assuming that you're saying the
19   amendment arises out of the same fact pattern we've
20   been talking about today?

21       A.    As far as -- if I'm understanding the
22   question right, I filed one complaint.

23       Q.    Okay.   I'm going to show you what is -- I
24   guess we can mark that.

158

```
 1                    (Whereby, Defendant's Exhibit 1

 2                    was marked for identification.)

 3    BY MS. KERLEY:

 4        Q.    You can have this copy.  Ms. Sullins, I'm

 5    showing you what's been marked Defendant's Exhibit 1

 6    for the purposes of that deposition.  Do you recognize

 7    to document?

 8        A.    Yes I do.

 9        Q.    And what is it?

10        A.    It's a complaint with the Department of

11    Human Rights.

12        Q.    Okay.  And is this the complaint that we

13    were just talking about?

14        A.    Yes, it is.

15        Q.    And this is the only complaint that you

16    filed with the Department of Human Rights?

17        A.    Regarding this matter, yes, it is.

18        Q.    Okay.  Have you --

19        A.    To my knowledge.

20        Q.    Have you filed a complaint with the

21    Department of Human Rights with regard to any other

22    incidents of employment?

23        A.    I don't remember ever.

24        Q.    Okay.
```

```
 1        A.   I thought about it.

 2        Q.   Okay.

 3        A.   But I'm not for sure that I followed

 4   through.

 5        Q.   Okay.  Okay.  You have -- you just testified

 6   about an amendment to a Department of Human Rights

 7   complaint to include conduct of Jim Schuh?

 8        A.   Jim Schuh.

 9        Q.   Would that be an amendment to this charge --

10   or what has been labored as Defendant's Exhibit 1?

11        A.   I think so.  You should have that.

12        Q.   So there's an amendment somewhere that is

13   not housed in Defendant's Exhibit 1?

14             MR. BAKER:  Are you talking about is there

15   an initial charge that predates this one?

16             THE WITNESS:  No, it just includes the

17   changes and adds one name.

18   BY MS. KERLEY:

19        Q.   If it --

20        A.   It's the same charge.

21        Q.   And just had an amendment?

22        A.   Yeah.

23        Q.   That's just what I wanted to clarify that

24   this isn't necessarily --
```

1          A.    That's why I was confused, because I know

2     that they called it an amendment to this charge.

3          Q.    That is fine.

4          A.    But I didn't know if it was considered

5     separate or not.

6          Q.    I'm just clarifying that that's all the same

7     fact pattern that there was an amendment just to this

8     charge.  Okay.

9                     You have previously talked about taking

10    a voluntary demotion to the position of MOA, right?

11         A.    Yes.

12         Q.    Is that correct?

13         A.    Yes.

14         Q.    What is an MOA?

15         A.    Management Operations Analyst 1.

16         Q.    Okay.  And when did you bid on that job?

17         A.    I think it was posted in April.

18         Q.    And how did the duties differentiate or how

19    were they different than the work you were doing as an

20    E2?

21         A.    It was more analytical in that in Direct

22    Rebate every time a medical card is used for a

23    prescription through a federally funded program, the

24    state is allowed to receive a rebate on each drug,

1    of the salary range is now.

2    BY MS. KERLEY:

3         Q.    What it was at the time that E2?   Do you

4    know?

5         A.    It's an E2. I think it's around 5200.   MOA

6    is not 5200, it's less than that.   It's a step

7    underneath that.

8         Q.    Okay.   Is my understanding correct that an

9    Executive 2 is kind of a general title that has a

10.   bunch of working titles under it --

11        A.    No.

12        Q.    -- where a MOA -- okay.

.13       A.    No, I don't --

14        Q.    Is your MOA position -- was the MOA position

15   an E2 position?

16        A.    No.

17        Q.    Those are different positions?

18        A.    It's a step grade under.

19        Q.    Okay.

20        A.    Okay.   The potential earning power within a

21   MOA1 is not as high as a potential earning power of an

22   E2.

23        Q.    E2?

24        A.    It is a step seven and I went to a step six.

1    So there is differences of several hundred dollars

2    between the top salary of an E2 versus the top salary

3    of a MOA1.

4        Q.    When you were an E2, you were not making a

5    top salary?

6        A.    No.  But the potential was taken away.

7        Q.    I understand that.  I'm talking about at the

8    time of your change in position?

9        A.    Right.

10       Q.    Okay.  Have you since been promoted from --

11   are you in a different position now than a MOA1?

12       A.    Yes, I am.

13       Q.    And what position are you in?

14       A.    I'm an E2.

15       Q.    Okay.  And when did you get promoted?

16       A.    October 2002.  October or November of 2002,

17   I think.

18       Q.    So you would have been a MOA for just a

19   little over a year from June --

20       A.    June 1st -- June '01 to, actually, it was

21   November 2002.

22       Q.    Okay.  Did you receive any raises while you

23   were a MOA1?

24       A.    Did I get a step increase?  Did I get a

1    raise?  I think I got -- yes.

2        Q.    Do you recall what your raise was?

3        A.    No, I don't.  I do remember that when I was

4    being promoted into the E2, I'm not for sure that I

5    got a raise because Brad wanted to negotiate that

6    because he said that if I did -- something about if

7    you took a raise or if you didn't take a raise that

8    you -- something about not getting the full 10 percent

9    that you would get within the Division of Finance and

10   Budget because they only get 10 percent versus the

11   Medical Unit which gives 15 percent for a raise.

12       Q.    So, you don't recall --

13       A.    I can't remember if I got one or not because

14   there was something to do with they were --

15       Q.    Because your units were changing back

16   between BCHS and Finance?

17       A.    No, because it had been a year.  But it was

18   the way that Bureau of the Budget, Division of Finance

19   and Budget looked at -- I didn't quite understand it.

20       Q.    Okay.

21       A.    I still don't quite understand it.

22       Q.    Well then I surely won't, so.

23       A.    It's something to do with trying to help me

24   get the most money.  I'm not quite for sure what he



1    meant out of that, because I would never get a total

2    of more than 10 percent from the two of them, he said,

3    anyway.  So I'm not sure how that ended up.  I don't

4    remember.

5         Q.   Okay.

6         A.   I would have to go back and look at my check

7    stubs and see.

8         Q.   Okay.  In October of 2002 when you were

9    promoted to an E2 position, were you making more than

10   when you left your E2 position on May 30th, 2001?

11        A.   I understand.  I got it.  Yes, I was because

12   Alberta LeVan did my next payee valuation and Martin

13   Hazelwood and, yes, I did get a pay raise.  I don't

14   think I got a pay raise under Bureau of Budget in that

15   year.  I would have to go back and see.

16        Q.   So, you're unsure whether you got a raise as

17   a MOA, but you did get a raise as an E2?

18        A.   I got a raise the first year through Marvin

19   Hazelwood.  I don't know for sure if I got one the

20   next year.

21        Q.   The first year as a MOA?

22        A.   Yes.

23        Q.   Okay.

24        A.   Did I get one the second year, I don't know



1   because of the fact that they were getting ready to

2   promote me.  I would have to go back and check.

3       Q.   Okay.  And then is your answer -- was your

4   answer, yes, then, that when you were -- when you were

5   promoted to an E2 in October 2002, you were making

6   more money than when you were an E2 in May of 2001?

7       A.   I believe so.

8       Q.   Okay.  All right.  Just so we're clear.

9       A.   But can I clarify that?

10      Q.   Sure.

11      A.   Bureau of the Budget and the Bureau of

12  Division of -- and BCHS gave out different amounts of

13  money.

14      Q.   Right.

15      A.   And I lost money by having to come over here

16  because they did not pay as high on their raises --

17      Q.   Yearly raises?

18      A.   Yearly raises or their promotional rates as

19  BCHS did.

20      Q.   Okay.

21      A.   And BCHS, if things would have gone

22  according to Cheryl's plan, by the time I was an E2 in

23  Drug Rebate, I would have already had been to a PSA,

24  which I would have got a 15 percent raise, plus a



1    couple raises in between to get me into the position

2    she wanted me to get into.

3        Q.    Which was?

4        A.    She was going to put me into a PSA working

5    in the computer side and having something to do

6    ultimately with Steve Bandy's unit and whatever Cindy

7    Cox and those guys did, but it had to do with the

8    financial part.

9        MS. KERLEY:  Okay.  Let's go off the record

10   for a second.

11                    (WHEREBY A SHORT BREAK WAS TAKEN.)

12   BY MS. KERLEY:

13       Q.    Back on the record.  Ms. Sullins, I'm going

14   to show you just a couple of things that we've touched

15   on briefly and just to have you identify them.

16                    (Whereby, Defendant's Exhibits 2 &

17                    3 were marked for identification.)

18   BY MS. KERLEY:

19       Q.    Ms. Sullins, I'm going to hand you two

20   documents marked Defendant's Exhibits 2 and 3.  Do you

21   recognize these documents?

22       A.    I've never seen this one.

23       Q.    Okay.  Well, let me show --

24       A.    Is this me?  Okay.  I thought it was Mark's.

1    I'm sorry.

2         Q.   Okay.   Can you identify Defendant's

3    Exhibit 2?

4         A.   Should be my witness statement, I'm

5    assuming, from the Mary Thallman investigation.

6         Q.   Okay.   I'm going to direct your attention

7    to -- to the third -- to the third page of that

8    exhibit.   Do you recognize this document or the

9    document within a document?

10        A.   My handwritten investigation sheet.

11        Q.   Okay.   And so the handwriting that appears

12   there is yours?

13        A.   Yes.

14        Q.   And the signature at the bottom page is your

15   signature?

16        A.   Yes, it is.

17        Q.   Okay.   And I see that by flipping through

18   there, there are six pages of -- of your handwritten

19   statement; is that correct?

20        A.   Correct.

21        Q.   On the page following the sixth page of your

22   written statement, do you recognize that sheet of

23   paper?

24        A.   That's an acknowledgment that I signed.

1    Q.    Okay.  And that would have been still for

2  the same Mary Thallman investigation; is that correct?

3    A.    Correct.

4    Q.    Okay.  And the following page, do you

5  recognize though document?

6    A.    Yes.  I got an e-mail from Michael Taylor

7  asking me some more questions and that he was sending

8  me some additional -- I guess they're called written

9  statement sheets, and I answered his questions.

10    Q.    Okay.  If a document refers to an addendum

11  to your statement in the Mary Thallman investigation,

12  would it be referring to these three or four pages?

13    A.    Okay.

14    Q.    Is that correct?

15    A.    Yes.

16    Q.    Okay.  And at the time you gave your

17  statements to Mr. Taylor, was that a complete and

18  accurate statement of your recollection at that time?

19       MR. BAKER:  Recollection of what?

20       MS. KERLEY:  Of the events that she's

21  describing in her statement.

22       MR. BAKER:  Okay.

23       THE WITNESS:  I would say yes.

24  *BY MS. KERLEY:*

1      Q.    Okay.   Let's look at Defendant's Exhibit 3.

2  Do you see that this document is in the same format as

3  Defendant's Exhibit 2?

4      A.    Yes.

5      Q.    Okay.   And do the first three pages of that

6  document represent a sort of write up of the documents

7  to follow?

8      A.    From the -- I'm sure it does.   I haven't

9  read it to see if it's word to word.

10      Q.    Is that your understanding of what the first

11  part is to be?

12      A.    My understanding?

13      Q.    On the third page, do you recognize that

14  document?

15      A.    Yes I do.

16      Q.    And what is that?

17      A.    Acknowledgment of interview for

18  administrative purposes only.

19      Q.    And is the first of the three signatures on

20  the bottom of that third page your signature?

21      A.    Yes, it is.

22      Q.    And if you could please read the date that

23  that was signed.

24      A.    March 29th, '01.

1    Q.    Okay.    And in the following 14 pages, do you

2    recognize those generally?

3        A.    Yes.    It's my handwriting.

4        Q.    Okay.    Is that your handwritten statement?

5        A.    Yes, it is.

6        Q.    And is the signature on the bottom of the

7    page yours?

8        A.    Yes, it is.

9        Q.    And this would have been -- rather, was this

10   statement the statement that you gave when you filed

11   an internal complaint of retaliation that we've been

12   discussing?

13       A.    Yes.

14       Q.    Okay.    And at the time you gave this

15   statement to the OIG, was that a complete and accurate

16   statement of your recollection at that time?

17       A.    Yes.

18       Q.    Okay.    I am going to show you one other

19   thing which you eluded to previously in your

20   testimony.    During your time at BCHS, you testified

21   that you kept notes; is that correct?

22       A.    Part of the time.

23       Q.    Okay.    And do you know about when -- or you

24   testified that that started sometime in the summer?

172

1        A.     I did a few earlier in the year based on the

2    fact of a meeting -- actually, it was learning -- a

3    training session at a church where it talked about

4    dealing with frustrations of being a Christian in a

5    non-Christian world and -- to use journaling as a way

6    to put things into perspective by writing it down and

7    setting it aside and going back and looking at it to

8    see if the events -- if you were over applying it,

9    making it too big, making it too small.

10       Q.     And that was not necessarily related to work

11   alone, that seminar?

12       A.     I tried it at work off and on.  And --

13   because I'm more disciplined at work than I am in my

14   home life.

15       Q.     Okay.  And the state of Illinois is glad for

16   that.  I don't have a copy and I'm not going to mark

17   it into the record but I'm going to show you a set of

18   documents that I have received through discovery in

19   this case.  And I'd like for you to identify,

20   generally, what these documents are, if you can.

21             MR. BAKER:  Off the record.

22                         [WHEREUPON THERE WAS A SHORT

23                         DISCUSSION OFF THE RECORD.]

24                         (Whereby, Defendant's Exhibit 4

```
 1                      was marked for identification.)
 2   BY MS. KERLEY:
 3        Q.   I'm going to show -- Ms. Sullins, I'm going
 4   to show you what will be later marked as Defendant's
 5   Exhibit 4 and I will tell you that these are some
 6   documents that I received from Mr. Baker in discovery
 7   in this case. Can you please identify those documents
 8   for me?
 9        A.   E-mails, some journaling notes that I kept.
10        Q.   Okay. So, you do recognize the
11   typed-written dated entries as part of what you would
12·  have journaled?
13        A.   Uh-huh, yes, I do.
14        Q.   Okay. The journal entries represent several
15   dates throughout a chunk of time?
16        A.   Uh-huh.
17        Q.   Would you have given Mr. Baker your entire
18   journal that would have then been given to me?
19        A.   I think --
20        Q.   Let me rephrase that question.
21                   Do you have journal entries that relate
22   to the issues in this case that we've been talking
23   about today that you have not turned over to your
24   attorney?
```

174

1          A.    No.

2          Q.    Okay.  And when did you usually make journal

3     entries?

4          A.    When I felt something significant had

5     happened.

6          Q.    Okay.  And would these journal entries be an

7     accurate, complete depiction of what significant

8     events you --

9          A.    I think they were a summary.

10         Q.    -- that occurred?

11         A.    They were a topographical.

12               MR. BAKER:  Snapshot.

13               THE WITNESS:  Snapshot of the incident.

14    BY MS. KERLEY:

15         Q.    Okay.  Was it always word for word verbatim?

16         A.    No, it would have took me quite a long time

17    to journal like that.

18         Q.    Got you.  Okay.

19               I would like to ask you a few questions

20    on a different subject.  In your complaint, you allege

21    that as a result of the conduct described in the

22    complaint, and, namely, that that we've talked about

23    today, you sustained monetary damages, loss of

24    employment benefits, physical and emotional trauma,



1  mental anguish, embarrassment, humiliation,
2  inconvenience and loss of enjoyment of life; is that
3  correct?
4      A.    Yes, it is.
5      Q.    Okay.  We've talked about loss of employment
6  benefits, correct?
7      A.    Correct.
8      Q.    Okay.  And I understand that you're going to
9  complete some discovery, some written discovery as to
10 your monetary damages in full, or, I guess you can say
11 as best as you know.
12     A.    Okay.
13     Q.    Okay.  I'd like to ask you about this kind
14 of other category of damages where you describe -- or
15 where you say that the conduct described resulted in
16 the physical and emotional trauma, et cetera.  If you
17 could, please, describe for me what allegations or
18 what allegations you have of physical and emotional
19 trauma, and any of the things that fall into those
20 categories?
21     A.    Because of the situation I at first had a
22 loss of appetite and began to cry a lot.  And I am an
23 emotional person when I talk, I'm not a crier by
24 nature.  I'm not a person that breaks down, but in the

|   |   |
|---|---|
| 1 | beginning stages of when this started, especially |
| 2 | around October of 2000 of that year, I began to cry |
| 3 | daily, and would try to pull it together by the time I |
| 4 | got to the house so that Laura wouldn't know it |
| 5 | because, once again, we were in the first stages of a |
| 6 | relationship and I was trying to separate home from |
| 7 | work as best as I could. But it got to the point that |
| 8 | I couldn't quit crying. And I locked myself in the |
| 9 | room one night and I didn't want to come out and Laura |
| 10 | called my -- I had went to a therapist because Laura |
| 11 | told me she said, you're not acting right, maybe you |
| 12 | need to go see a doctor and see if you need to talk to |
| 13 | someone since we can't talk about what's going on at |
| 14 | work, maybe you need to find someone you can talk to. |
| 15 | So, -- |
| 16 | Q.    And that was in October of 2000? |
| 17 | A.    Yes, because I had began -- I was having |
| 18 | some changes in my personality and behavior. |
| 19 | Q.    Okay. |
| 20 | A.    And, so, I went to see Deborah Taylor. |
| 21 | Q.    Okay. |
| 22 | A.    And we talked about the work issues and she |
| 23 | asked me if I thought that this situation with parting |
| 24 | from Patsy had anything to do with it, and after we |





```
 1   talked and she questioned me about that, she also came
 2   to the understanding that I was more than happy to be
 3   out of that relationship and well on my way into a new
 4   one.  But what was bothering me was work.  And that I
 5   also was in a situation where normally you get to go
 6   home and you have pillow talk or get to go over your
 7   day's work, I didn't have that at home.  You know, so,
 8   I didn't have a release for all of the nonsense going
 9   on at work.  And, so, when I -- Laura ended up
10   breaking into the bedroom, and I ended up having to go
11   to Urgent Care and get medicine that night.
12        Q.   What kind of medicine did you get?
13        A.   I got an antidepressant and I spent probably
14   an hour to hour and a half with Dr. Yu that night.
15   And he had been my doctor ever since I had come to
16   Springfield and he was quite concerned because he had
17   said -- being in the basement, I had had a chronic
18   sinus infection and been back and forth.  And he had
19   told me that night that he had noticed that I wasn't
20   my cheerful self and he said, you know, I've seen you
21   go through momentary things that bothered you, he
22   said, but, this has gone deeper than that, that you're
23   really -- this is really hurting you.
24             So, he talked about putting me on an
```

1   antidepressant and doing follow-ups and coordinating

2   it through with Debbie Taylor.  And, so, they could

3   refer me to a psychiatrist, which, for me, was very

4   hard.   It was a very hard situation because I was

5   raised that you don't go to a psychiatrist or to a

6   therapist for help.  That you pull yourself up by your

7   bootstraps and you go on.

8                    But I went on the medicine and I went

9   back to see Debbie and began to realize that it's okay

10  that sometimes you do what you got to do.

11          Q.    Uh-huh.

12          A.    But I was -- then I went from not eating to

13  binging on ice cream every night, half a gallon at a

14  time, which, as of this last two weeks knowing this

15  date was coming, I'm doing it again.  I'm going

16  through about a five quart gallon of ice cream every

17  two days right now, without any help.  Because this

18  brings up bad memories, you know.

19                    I had rashes that -- welts, just red

20  welts all over my body that came out.  I quit going

21  home.  I wouldn't go down to visit my family, because

22  I'm the baby of nine children and I have older

23  brothers that are very protective and one, if not two,

24  would threaten to come and whip somebody.  I didn't

1    want to go there, because they're older and having

2    health problems.  And I did call my sister, who lived

3    in Alabama, every morning and night and talk and cry

4    about what was going on.

5                     We started going to a different church

6    and the Pastor Kreston Lipscomb began to come over

7    every night to talk with me and pray with me,

8    basically, to hold my hand through·a lot of it.

9                     And antidepressants had to keep being

10   changed.  They weren't working.  They weren't being

11   effective.  Finally ended up going to a different one

12   that seemed to stabilize where I didn't cry all the

13   time.

14                    But in the meantime, I also started

15   having blood pressure problems from internalizing.  I

16   went on -- and I'm still on high blood pressure

17   medicine, which means I'm also on a water pill because

18   you have to take a water pill when you go on blood

19   pressure medicine, and this is all from hypertension,

20   and they believe it's from the stress factor.

21       Q.    "They" being?

22       A.    Medical physicians.

23       Q.    Just to clarify, off the record.

24                    [WHEREUPON THERE WAS A SHORT

1              DISCUSSION OFF THE RECORD.]

2    *BY MS. KERLEY:*

3        Q.    When you went to Urgent Care you said in

4    October and you spent time with Dr. Yu that was your

5    physician who just happened to be at Urgent Care?

6        A.    Yes.

7        Q.    And were you -- was there a diagnosis made

8    by Dr. Yu?

9        A.    I don't know.

10       Q.    Okay.  And the only other question I have --

11       A.    I'll be real honest with you, that night is

12   just -- a lot of what he said to me is was kind of

13   foreign in the fact that it was like this can't -- in

14   my mind I was thinking, I can't believe I'm here.  I

15   can't believe I'm here.  I can't believe this is me.

16       Q.    Okay.

17       A.    So, I kind of went in and out of the

18   conversation.

19       Q.    Okay.

20       A.    Because I was in denial that I had got that

21   bad.

22       Q.    Okay.  Prior to October 2000, had you ever

23   seen a therapist before?

24       A.    1996 or 1997 I went for about six months --

1  maybe not six months with Karen Broquet to deal with
2  grief therapy.  My mother had not died yet, but she
3  was in that stage where she didn't know us and she was
4  slipping away every day.  And I didn't understand what
5  was happening because I never dealt with death before
6  because I was so young when my father passed away and
7  it was the first death in my family.  And being a
8  mommy's baby, I went to learn that I was grieving her,
9  because, other than the shell, she as already gone
10 from me.  And I went to understand to learn how to
11 deal with letting go.
12     Q.   And, other than that, have you ever seen a
13 therapist?
14     A.   No.  Nope.
15     Q.   Okay.
16          MS. KERLEY:  That's as good of spot as we'll
17 find to stop for today.
18          MR. BAKER:  Very good.
19                    (Whereby, the deposition was ended
20                     for today and will be resumed on
21                     an unspecified later date.)
22                    (Whereby, signature was not
23                     waived.)
24

```
STATE OF ILLINOIS          )
                           ) SS
COUNTY OF SANGAMON         )
```

          I, Christina J. Riebeling, do hereby certify that I am a Certified Shorthand Reporter, Certified Court Reporter and Notary Public within and for the County of Sangamon and State of Illinois, and that I reported by stenographic means the proceedings and had on the hearing of the above-entitled cause on September 8th, 2005, and that the foregoing is a true and correct transcript of my shorthand notes so taken.

        Dated this 21st day of September., A.D., 2005

Certified Shorthand Reporter
Certified Court Reporter
Notary Public
(CSR # 084-004006)

My commission expires:

November 12, 2006

Official Seal
Christina J Riebeling
Notary Public State of Illinois
My Commission Expires 11/12/06