IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| DEBORAH R. SULLINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  04-3039 |
| | ) | |
| THE ILLINOIS DEPARTMENT OF PUBLIC AID, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF THE PLAINTIFF, DEBORAH R. SULLINS, IN OPPOSITION TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

In October of 2000 DEBORAH R. SULLINS ["PLAINTIFF"] worked in the universal billing

unit of the Bureau of Comprehensive Health Services ["BUREAU"] of the Illinois Department of Public

Aid ["DEPARTMENT"].  At that time, she had worked for the DEPARTMENT for over fourteen

years and had recently been promoted to the position of Executive II.  In the wake of a complaint of

sexual harassment made by a co-employee, Mary Thallman, against another co-employee, Mark

Scheff, the PLAINTIFF cooperated with the investigation of that complaint by sharing with the

DEPARTMENT's investigators her experiences with Mark Scheff.  Thereafter, both Mark Scheff and

her supervisors in her work unit began acting out against her.  Eventually, the PLAINTIFF was forced

out of her work unit and took a voluntary demotion to another position.

In her complaint, the PLAINTIFF advances claims under Title VII of the *Civil Rights Act of

1964* ["ACT"] (42 U.S.C. §2000e *et.al.*).  In count I she alleges that she was the victim of sexual

harassment because of conduct directed her way by Mark Scheff which her supervisors failed to

address.  She claims this conduct constituted gender discrimination in violation of 42 U.S.C. §2000e-

2(a).  In count II of her complaint she claims that in the wake of her participation in an investigation of Mark Scheff she was the victim of retaliatory acts which eventually forced her out of her Executive II position which violated her rights under 42 U.S.C. §2000e-3.

Following discovery, the DEPARTMENT now seeks summary judgment with respect to each of the PLAINTIFF's claims.

With respect to her claims of sexual harassment, the DEPARTMENT advances two arguments. First, it claims that Mark Scheff's conduct was directed at both males and females and thus the PLAINTIFF is unable to demonstrate that the complained conduct was because of her sex.  Second, it asserts that Mark Scheff's conduct was not sufficiently severe to create a hostile work environment for the PLAINTIFF.

With respect to her claim of retaliation, the DEPARTMENT raises multiple contentions.  First, reasoning that Mark Scheff's behavior was not because of the PLAINTIFF's sex, it claims she did not engage in any conduct protected by 42 U.S.C. §2000e-3.  Second, it claims that she was not subjected to an adverse employment action.  Third, it argues that there is no evidence of a link between the protected activity and the complained conduct.  Finally, it claims that no similarly situated employee who did not oppose harassment was treated better than the PLAINTIFF.[1]

As we shall see, the DEPARTMENT's argument is based upon limited and selected portions of the record developed in discovery and an incorrect application of relevant law.

---

[1]    Given the manner in which the DEPARTMENT structures its argument, it presumes that the PLAINTIFF will attempt to demonstrate unlawful retaliation through the indirect proof methodology first adopted in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 36 L.Ed.2d 668 (1973) as later refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 67 L.Ed.2d 207 (1981).  As will later be discussed, the indirect proof method is not the only method of proving unlawful discrimination through the use of circumstantial evidence in a retaliation claim.

For reasons which follow, the DEPARTMENT has not demonstrated an entitlement to summary judgment.  Contrary to its assertions, there is plentiful evidence warranting a jury trial.

As will be seen, a reasonable jury could conclude that:  a) Mark Scheff's offensive conduct was directed more toward females than males and reflected an animus or resentment on his part toward females; b) Mark Scheff's conduct toward the PLAINTIFF was sufficiently frequent to alter for the worse her employment environment and create a hostile work environment; c) the PLAINTIFF did engage in conduct protected under the ACT in cooperating with the Thallman investigation and reporting the sexual misconduct of Mark Scheff; and d) that the conduct directed toward the PLAINTIFF in the wake of the Thallman investigation was motivated in large part because of the PLAINTIFF's actions in cooperating with that investigation.

## II.  STATEMENT OF FACTS

### The PLAINTIFF'S Response To The DEFENDANT'S
### Statement Of Material Undisputed Facts

**A.  Material Facts Which Are Undisputed For Purposes Of Summary Judgment.**

With respect to the material facts claimed to be undisputed by the DEFENDANT, the PLAINTIFF agrees that the following facts are undisputed and material except as otherwise shown:  1-12 (only to the extent that it represents some, but not all, of Mark Scheff's comments.  According to the PLAINTIFF, Mark Scheff made a great many sexually offensive comments which were made "almost every day" [PLAINTIFF's Dep.87]), 13 (only to the extent it represents some, but not all, of Mark Scheff's comments [PLAINTIFF's Dep.87]), 14,15,17 (only to the extent that the PLAINTIFF changed offices.  According to the PLAINTIFF, her initial office as an executive II was around the corner from her old office [PLAINTIFF's Dep.43]), 18-21,23,24 (only to the extent that Mark Scheff

received discipline.  The DEPARTMENT reduced his discipline to a four day suspension [Scheff

Dep.49-50]), 25 (only to the extent it represents some, but not all, of the DEFENDANT's action [see

PLAINTIFF's Affidavit]), 26 (only to the extent Steve Bradley approved the PLAINTIFF's

relocation.  Mr. Bradley told the PLAINTIFF that her problems with Mark Scheff would not go away

if she did not get out of the building [PLAINTIFF's Dep.127]), 27-29 (only to the extent it sets forth

some, but not all, of what the PLAINTIFF told Mr. Bradley.  Exhibit D reflected that Mr. Bradley and

the PLAINTIFF also discussed that she had been ostracized by her supervisors and "the hostility was

overwhelming" [see Ex.D]), 30 (only to the extent it reflects some, but not all, of what she stated in that

email.  The PLAINTIFF also told Derrick Moscardelli that she had been intimidated and subjected to

veiled threats by Mark Scheff and others.  She further indicated that Mark Scheff was walking past her

new work area and was attempting to "clearly seek her out."  She further indicated that Jodie

Edmonds, Marvin Ross and Lenna DeGroot were enabling his behavior.  She requested that the Office

of the Inspector General ["OIG"] investigate the situation [Ex.E]), 31-38,42-43 (only to the extent that

from August of 2000 to February of 2001 was the 180 day time period which is actionable under the

"Illinois Human Rights Act"), 44 and 45.

## B.  <u>Material Facts Claimed To Be Disputed.</u>

With respect to the DEFENDANT's claim of material facts which are undisputed, the

PLAINTIFF disputes paragraph 16 (Ex.H does not evidence that Sandidge ever complained to Lenna

DeGroot.  Lenna DeGroot denies receiving complaints [Ex.26].  Further, for reasons more fully stated

in her motion to strike DEFENDANT's Ex.H, the PLAINTIFF submits that it should be given no

consideration by this Court), 22 (see Ex.B and L to the DEFENDANT's motion for summary

judgment).

**C.  Facts Which The PLAINTIFF Claims Are Immaterial.**

The PLAINTIFF asserts that paragraph 39 (pay raises received by the PLAINTIFF after her voluntary demotion are immaterial to any issue in this case.  Had she remained in her Executive II position, she would also have received a salary increase), 40 (any promotion the PLAINTIFF received after her demotion is immaterial.  Had the PLAINTIFF remained in her Executive II position, she could also have competed for available promotional opportunities), 41 (the salary earned by the PLAINTIFF 18 months following her demotion in comparison to what she earned at the time of her demotion is immaterial.  It does not reflect what her salary would have been had she not accepted the voluntary demotion).

**D.  The PLAINTIFF's Additional Undisputed Facts.**

**The PLAINTIFF's Employment with the DEPARTMENT.**

1.  In the year 2000 the PLAINTIFF worked for the DEPARTMENT.  She began her employment with the DEPARTMENT in November of 1986 [¶2 of the PLAINTIFF's Affidavit].

2.  In February of 2000 the PLAINTIFF transferred to the BUREAU.  At that time Steve Bradley was the BUREAU Chief.  The PLAINTIFF was assigned the position of a Medical Assistant Consultant ["MAC"] and worked in the hospital unit which was headed by Jodie Edmonds [¶3 of the PLAINTIFF's Affidavit].

3.  When the PLAINTIFF began working in the hospital unit, Mark Scheff was working in that unit as a MAC.  She first met Mr. Scheff in 1995 or 1996 when she worked in the Springfield field office of the DEPARTMENT.  However, she had little contact with him until she joined the hospital unit [¶8 of the PLAINTIFF's Affidavit].

4.  In the late summer or early fall of 2000, the PLAINTIFF bid upon an open Executive II

position.  Eventually, she was the successful candidate and in early October of 2000 was promoted to that position [¶30 of the PLAINTIFF's Affidavit].

5.  Jodie Edmonds was the individual who promoted the PLAINTIFF to the Executive II position [Edmonds Dep.20-21].

6.  Upon her promotion to the Executive II position, the PLAINTIFF was reassigned to a new office in the basement of the Bloom Building.  Her new office was around the corner from the office of Mark Scheff.  After her promotion, the PLAINTIFF's work station was closer to Mark Scheff's than it had earlier been [¶32 of the PLAINTIFF's Affidavit].

7.  In her new position as an Executive II, the PLAINTIFF was the coordinator of the state renal program [Edmonds Dep.32].

8.  Based upon her contact and conversation with the PLAINTIFF Lenna DeGroot did not believe the PLAINTIFF to be a person who was rigidly intolerant to sexual comments [DeGroot Dep.68].

**The BUREAU.**

9.  Prior to her retirement from state government, Mary Thallman worked for many years for the Illinois Department of Public Aid [¶1 of Thallman Affidavit].

10.  During the year 2000 Mary Thallman worked in the BUREAU at the DEPARTMENT.  She worked as a MAC.  Her supervisor was Lenna DeGroot [¶2 of Thallman Affidavit].

11.  During the year 2000 Mr. Scheff also worked in Mary Thallman's work unit.  Her work station was in close proximity to the work station of Mr. Scheff.  Consequently, she would see him many times each work day [¶3 of Thallman Affidavit].

12.  In 2000 there were two teams of MACs who worked in the hospital unit.  One team was

headed by Marvin Ross.  The other team was headed by Lenna DeGroot.  The PLAINTIFF was a

member of the DeGroot team.  Lenna DeGroot was her immediate supervisor [¶4 of the

PLAINTIFF's Affidavit; Edmond Dep.12].

13.  The hospital unit in 2000 was located in the basement of the Bloom Building in Springfield,

Illinois.  Mr. Ross and his team and Ms. DeGroot and her team were located together along a u-shaped

corridor.  In the center of the corridor was a conference room and the office of Marvin Ross.  The

MACs along with Lenna DeGroot and Jodie Edmonds were located along the circumference of the

"U" [¶5 of the PLAINTIFF's Affidavit].

14.  As a MAC in the hospital unit, most of the workday was spent on the telephone assisting

providers with billing inquiries.  The telephone system closed at 3:00 p.m. each day.  For the balance of

the day, MACs would do paperwork and return phone calls which had been missed.  The

PLAINTIFF's quitting time was 5:00 p.m.[¶6 of the PLAINTIFF's Affidavit].

15.  In 2000 there were five female non-supervisory employees and five male non-supervisory

employees in the hospital unit [¶7 of the PLAINTIFF's Affidavit].

16.  During the year 2000, Jodie Edmonds was the manager of the universal billing unit

[Edmonds Dep.10].

17.  The universal billing unit was a part of the BUREAU [Edmonds Dep.11].

18.  In 2000 and 2001 the universal billing unit was located in the basement of the Bloom

Building [Edmonds Dep.13].

19.  A MAC working in the BUREAU dealt with hospital billers by training them and providing

them assistance with respect to billing the DEPARTMENT [Bixler Dep.8].

20.  Marvin Ross worked as a supervisor in the BUREAU of Comprehensive Services during

the year 2000 [Ross Dep.6-7]. During the year 2000, Marvin Ross supervised Mark Scheff [Ross Dep.7-8]. He supervised Mark Scheff from 1995 through February of 2001 [Ross Dep.9].

21. Lenna DeGroot was a supervisor in the BUREAU during the years 2000 and 2001. She supervised four MACs [DeGroot Dep.8].

22. During the year 2000 Lenna DeGroot supervised Jim Schuh, Mary Thallman, Velva Fletcher and the PLAINTIFF. Each of those individuals was a MAC [DeGroot Dep.9-10].

23. Lenna DeGroot's work unit provided training and assistance with respect to billing matters to persons and firms that provided medical services to the DEPARTMENT's recipients [DeGroot Dep.10].

24. In the year 2000 Mary Thallman and Jim Schuh shared an office which was next to the office occupied by Lenna DeGroot [DeGroot Dep.11-12].

25. At 3:00 p.m. each workday the telephone system closed and MACs would spend the rest of their workday returning telephone calls and engaging in paperwork [DeGroot Dep.16-17].

26. While serving as a supervisor in the DEPARTMENT, Lenna DeGroot at no time went to her supervisor to report a possible incident of sexual harassment [DeGroot Dep.26-27].

27. The BUREAU provides billing assistance, policy interpretation and development and the promulgation of administrative rules [Bradley Dep.7-8].

28. In 2000 Steve Bradley was the BUREAU chief [Bradley Dep.7,10].

29. In 2000 two teams reported to Jodie Edmonds. One was headed by Marvin Ross and the other was headed by Lenna DeGroot. The function of each team was to provide information concerning billing matters to hospitals and medical providers. The teams were composed of individuals holding the position of a MAC [Bradley Dep.17-18].

30. Ms. DeGroot and Mr. Ross had first level responsibility with respect to disciplining employees in their unit. They would have also been the individuals to whom employees could have addressed concerns [Bradley Dep.20].

31. Supervisors within the BUREAU when confronted with a complaint of inappropriate behavior in the workplace on the part of an employee are expected to notify both the BUREAU personnel office and OIG. They should also give the subject employee direct orders concerning their behavior [Bradley Dep.20-22].

32. During the year 2000 in the BUREAU if an employee complained to a supervisor about the behavior of another employee the supervisor was supposed to take some action in investigating the complaint [Bradley Dep.23-24].

33. In the year 2000 Mark Scheff worked as a MAC within the BUREAU [Scheff Dep.17].

34. As a MAC, Mark Scheff between 8:30 a.m. to 3:00 p.m. spoke constantly on the telephone except for his lunch and break periods.

**The Conduct of Mark Scheff Prior to Mid October of 2000.**

35. Between February of 2000 when the PLAINTIFF joined the hospital unit and October of 2000, she worked around Mr. Scheff on a daily basis. During that time period she saw him multiple times each day and was able to observe him interacting with both male and female employees [¶9 of the PLAINTIFF's Affidavit].

36. The PLAINTIFF noticed that he tended to talk differently around women than men. Around women when he addressed them, he would typically make comments associated with their sex. For example it would not be unusual for him to mention to Velva Fletcher, a female MAC who is short, "how's the little woman today?" With other females he would refer to their physical characteristics.

For example, with respect to P.K. Luttrell, he would often refer to her as the big blonde bombshell [¶10 of the PLAINTIFF's Affidavit].

37.  Mr. Scheff tended to talk down to women when he was around them [¶11 of the PLAINTIFF's Affidavit].

38.  In almost every conversation that the PLAINTIFF was present with Mr. Scheff or overheard him having with a female employee, he would turn every conversation into an opportunity to make a sexual comment.  While he would frequently make sexual remarks in front of men, it was not with the same frequency that he did in the presence of females.  There was rarely a conversation the PLAINTIFF heard Mark Scheff have with any female employee that he did not turn it into an opportunity for him to make a sexually suggestive comment [¶12 of the PLAINTIFF's Affidavit].

39.  A reoccurring subject of conversation by Mark Scheff was the inability of men to advance within the BUREAU.  On several occasions promotional opportunities came open.  On each occasion, Mark Scheff would find out who was interested in applying and would make comments that the females had a better chance of securing the position than did men.  Mark Scheff maintained statistics of the relative number of females and males in the BUREAU and the relative numbers of females and males that had high ranking positions [¶13 of the PLAINTIFF's Affidavit].

40.  Mark Scheff referred to Steve Bradley, the BUREAU Chief, as a traitor to men who tended to surround himself with "strong pussy."  He made this comment frequently in connection with his conversations about males being unable to secure advancement in the BUREAU [¶14 of the PLAINTIFF's Affidavit].

41.  It was common that MACs would consult with one another concerning how to deal with a particular problem.  Not only was this common it was encouraged by their supervisors.  All MACs

sought out assistance from other MACs. Mark Scheff would never seek out assistance from female MACs. Frequently, he would comment that they were not as intelligent as men. This was a comment that he made on a number of occasions during the time period the PLAINTIFF worked with him in the hospital unit [¶15 of the PLAINTIFF's Affidavit].

42. In 2000 Ed Maddox, a male employee who worked in a policy writing unit, was passed over for promotion in favor of a female employee. When that occurred, Mark Scheff made demeaning comments about the female who received the promotion and asserted that the Maddox situation was another example of men being discriminated against in favor of females. This was not an isolated topic of discussion on Mark's part. He talked about that situation all the time [¶16 of the PLAINTIFF's Affidavit].

43. Outside of the presence of both Marvin Ross and Lenna DeGroot, Mark Scheff would make frequent comparisons of the supervisory abilities of Marvin and Lenna. In this respect, he characterized Marvin as the superior supervisor because he was a male and had more sense than Lenna [¶17 of the PLAINTIFF's Affidavit].

44. With respect to both male and females employees in the hospital unit, it was not uncommon for most of them to occasionally either utter a profanity or to make a comment or joke having a sexual connotation. In the PLAINTIFF's experience that was fairly typical of the way adults behaved both in and out of the workplace [¶18 of the PLAINTIFF's Affidavit].

45. Beginning with the first week the PLAINTIFF was in the hospital unit and continuing on, she noticed that Mark Scheff was different than other employees in the unit when it came to using profanities and making comments that had a sexual connotation. While others did it occasionally, Mark Scheff did it all the time. In all the conversations the PLAINTIFF had with Mark Scheff or was present

when he was talking between February of 2000 and October of 2000 there was only one conversation where a comment of a sexual nature was not made [¶19 of the PLAINTIFF's Affidavit].

46.  Mark Scheff's conversations not only turned upon sexual topics, but they were fairly graphic in their subject matter.  He would frequently describe sex acts that either he engaged in or had observed in pornographic movies.  These types of comments were made by Mark Scheff all of the time between February and October of 2000 [¶20 of the PLAINTIFF's Affidavit].

47.  Initially, the PLAINTIFF's work station in the hospital unit was in an office she shared with P.K. Luttrell which was located adjacent to an office shared by Mike Sandidge and Joe Roberts [¶21 of the PLAINTIFF's Affidavit].

48.  On almost a daily basis Mark Scheff after the phones were turned off at 3:00 p.m. would come to the office of Sandidge and Roberts.  Frequently, Jim Schuh would also be present.  During this time period each day, the four men would engage in conversations much of it non business related.  The females in the unit began referring to this daily conclave as the "boys club" [¶22 of the PLAINTIFF's Affidavit].

49.  On a daily basis during these conclaves in the office of Mike Sandidge and Joe Roberts, Mark Scheff would make comments of a sexual nature.  His conversation during these sessions was laced with a wide variety of comments having either subtle or explicit reference to matters of a sexual nature.  Oftentimes he would talk in graphic terms about sex acts.  These were not isolated comments on his part, but instead occurred during these boys club sessions almost every time they got together.  While Jim, Joe and Mike would also talk during these conversations, Mark Scheff always elevated the level of his voice so that it could be heard outside of the office [¶23 of the PLAINTIFF's Affidavit].

50.  Eventually, after 3:00 p.m. when the PLAINTIFF was working, she would put a cd

headphone set over her ears with the hope that music would drown out what she was hearing from the next room. She would also close the door to her office. Even doing that, however, Mark Scheff's voice was loud enough that the PLAINTIFF could still hear him [¶24 of the PLAINTIFF's Affidavit].

51. Occasionally, Lenna DeGroot on her way to the conference room would tell the individuals in Sandidge's office that they should not speak quite so loud because people in the conference room were complaining that they could be heard [¶25 of the PLAINTIFF's Affidavit].

52. After several weeks in the hospital unit the PLAINTIFF began complaining to Lenna DeGroot about Mark Scheff's comments. At that time she had worked fourteen years in state government and was amazed that an employee would be allowed to engage in the behavior such as Mark's. She asked Lenna DeGroot why management put up with what he was doing. Frequently, between February and October the PLAINTIFF would complain to Lenna asking her if she could do something to get Mark to shut up. Lenna's comments generally ranged from "boys will be boys" to "that's just Mark" to "Jodie has tried before to correct Mark and it has not worked." At no time did Lenna ever indicate to the PLAINTIFF that she would talk to Mark or take other steps to change his behavior [¶26 of the PLAINTIFF's Affidavit].

53. The PLAINTIFF also spoke with Marvin Ross, Mark Scheff's supervisor, about Mark's comments. She talked with Marvin after she had spoken with Lenna and no change had occurred in Mark's behavior. She spoke with Marvin Ross several times about Mark's comments. His typical reaction was that if everyone went to their office and did their jobs this would not be a problem. Marvin never indicated to the PLAINTIFF that he would speak with Mark or would look into the problem [¶27 of the PLAINTIFF's Affidavit].

54. When the PLAINTIFF had no success in complaining about Mark to Lenna DeGroot and

Marvin Ross, she began speaking to Jodie Edmonds. She first went to Jodie sometime in the early spring of 2000 and talked with her periodically thereafter complaining about Mark's comments. She indicated to the PLAINTIFF that she had in the past tried to correct Mark and it had not worked. She stated that that is just how Mark was and that we would have to put up with it [¶28 of the PLAINTIFF's Affidavit].

55. Between February and October of 2000 female workers in the unit would tend to avoid Mark Scheff. In this respect, when they were at a place where he was they would tend to excuse themselves and tried to avoid having contact with him [¶29 of the PLAINTIFF's Affidavit].

56. When Mark Scheff discovered that she had been awarded the Executive II position, he came to the PLAINTIFF's work station and commented to her that the only reason she got the position was "because she had a vagina and not a penis" [¶31 of the PLAINTIFF's Affidavit].

57. Prior to working in the hospital unit, the PLAINTIFF rarely used sick time. Between March 2000 and October 2000 she began taking sick time so that she could leave the office around or about 3:00 p.m. The PLAINTIFF did not do this all the time, but began doing it with increasing frequency so that she could avoid hearing Mark Scheff [¶65 of the PLAINTIFF's Affidavit].

58. Throughout the time period Mary Thallman worked around Mr. Scheff he would on a constant basis make comments of a graphic sexual character. In this respect he would talk about various sexual acts he had either engaged in himself or observed [¶4 of Thallman Affidavit].

59. Mr. Scheff's conduct in making sexually graphic comments was consistent. He did it all the time, day in and day out [¶5 of Thallman Affidavit].

60. Mary Thallman would frequently complain to her supervisor, Lenna DeGroot, about Mark Scheff's conduct in making commentary of a sexual nature. Frequently, she would ask Ms. DeGroot if

there was something she could do to stop his conduct. Typically, Ms. DeGroot would respond that there was nothing she could do. Even after Mary Thallman complained to Ms. DeGroot there was no change in Mark Scheff's commentary about graphic sexual matters [¶6 of Thallman Affidavit].

61. From her contact with Mark Scheff, Cindy Cox was aware that he would constantly complain about gender discrimination in the sense that women rather than men were placed in supervisory positions. He thought that there was a glass ceiling for males within the BUREAU [Cox Dep.14-15].

62. At no time prior to October of 2000 had Marvin Ross or Lenna DeGroot ever consulted with Jodie Edmonds about taking disciplinary action against Mark Scheff [Edmonds Dep.43].

63. Judy Bixler worked in the same area with Mark Scheff on two separate occasions. The first was at the Logan County office in late 1989 and early 1990. The second was while working for the BUREAU in the Bloom Building in late 1990 [Bixler Dep.14-15].

64. According to Judy Bixler, when she worked with Mark Scheff in the Bloom Building, he would make comments of a sexual nature [Bixler Dep.29-30]. When Mark Scheff was around females, he would make comments having a sexual connotation directly or indirectly on a daily basis [Bixler Dep.30-31]. When Mark Scheff's comments became too sexually graphic, Judy Bixler would get up and leave the area where he was located [Bixler Dep.34-35].

65. According to Judy Bixler, Mark Scheff was a flirt with pretty much any woman [Bixler Dep.45-46].

66. Judy Bixler did not appreciate the sexual comments made by Mark Scheff [Bixler Dep.47].

67. In a statement she gave to the DEPARTMENT's EEO officer on April 30, 2001 Lenna

DeGroot indicated that it was well known Mark Scheff believed men were not given promotions fairly and that women were given a preference in promotions [Ex.26].

68. According to Lenna DeGroot, Mark Scheff was not quiet in expressing his belief that women got promoted more often in the BUREAU than did men.  He did not feel men were promoted as fairly.  He made these comments to Lenna DeGroot [DeGroot Dep.42-43].

69. Lenna DeGroot believes that Mark Scheff felt that sometimes women in the BUREAU were promoted who did not deserve the promotion [DeGroot Dep.55].

70. At some time in late 2000 or early 2001, the PLAINTIFF complained to Steve Bradley by an email concerning conduct by Mark Scheff.  In her email she referred to crude remarks made to her by Mark Scheff which she reported to Lenna DeGroot.  Steve Bradley understood those remarks to be related to a belief on Scheff's part that only women were being promoted in the BUREAU [Ex.9, Bradley Dep.36-38].

71. Other than a conversation in Chicago where Mr. Scheff shared a sexual anecdote with Jim Schuh to test his trustworthiness he has no recollection of any other conversations with Mr. Schuh of a sexual nature [Scheff Dep.27-31].

72. On April 30, 2001 Lenna DeGroot gave a statement to Janice Johnson, the DEPARTMENT EEO officer, in connection with her investigation of the PLAINTIFF's internal complaint.  In that statement Lenna DeGroot told her that no one had complained to her about Mark Scheff's vulgar comments [Ex.26].

### The DEPARTMENT's Sexual Harassment Policy.

73. According to Jodie Edmonds, a supervisor in the DEPARTMENT was supposed to monitor the workplace to ensure that sexual harassment was not occurring [Edmonds Dep.34].

74. According to Jodie Edmonds, if a supervisor for the DEPARTMENT observed an incident that constituted sexual harassment, it was supposed to be reported to OIG [Edmonds Dep.34-35].

75. In the fall of 2000 Jodie Edmonds understood that sexual harassment could include verbal comments of a sexual nature which were deemed offensive [Edmonds Dep.35].

76. According to Jodie Edmonds, if a supervisor did not report up his chain of command an event that possibly constituted sexual harassment, the supervisor would not be doing his job and could be exposed to disciplinary action [Edmonds Dep.35-36].

77. According to Jodie Edmonds, supervisors were supposed to remind subordinate employees that sexual harassment in the workplace is forbidden and they were to conduct themselves in a professional manner [Edmonds Dep.38-39].

78. According to Jodie Edmonds, a supervisor could not ignore a complaint by one employee regarding sexually inappropriate conduct on the part of another [Edmonds Dep.40-41].

79. Jodie Edmonds understood that a DEPARTMENT employee has a right to raise a good faith claim of sexual harassment against another employee. When that occurs, the complaining individual is entitled to be free from retribution by the individual who is the subject of the claim. Supervisors are to take appropriate steps to make sure that the workplace environment is such that the person who is the subject of the sexual harassment does not do things or say things that intimidate people who make or cooperate in the investigation [Edmonds Dep.64-65].

80. According to Janice Johnson, an EEO officer of the DEPARTMENT, under the DEPARTMENT's sexual harassment policies a supervisor should ensure that an employee bringing a complaint of sexual harassment would not be the victim of retaliation [Johnson Dep.31-32].

81. Within the DEPARTMENT, if a person who is alleged to have engaged in sexual

harassment threatened to take some action of a retaliatory nature against a person making the

complaint, that would at the least be considered conduct unbecoming an employee and could be

grounds for discipline [Hensey Dep.13-14].

82.  It was the policy of the DEPARTMENT to protect employees who either maintained

allegations of sexual harassment or cooperated in sexual harassment investigations [Hensey Dep.16-

17].

83.  As a supervisor, Marvin Ross was to bring incidents of sexual harassment to the attention

of his immediate supervisor.  He understood that offensive comments of a sexual nature could constitute

sexual harassment [Ross Dep.12-13].

84.  Managers in the DEPARTMENT had to report sexual harassment allegations to their

supervisor, the Bureau of Internal Affairs or EEO.  They could also contact labor relations [Whetstone

Dep.79-80].

85.  According to Lenna DeGroot as a supervisor in the DEPARTMENT if she became aware

of an incident she felt constituted sexual harassment or if an employee complained to her about an

incident which constituted sexual harassment it was her responsibility to report that information to her

supervisor [DeGroot Dep.24-25].

86.  Lenna DeGroot in 2000 believed that if she had not reported complaints of sexual

harassment to her supervisor she would not have been doing her job and could have been in trouble

[DeGroot Dep.40-41].

87.  Raven Knighten, during the years 2000 and 2001, was the chief EEO officer of the

DEPARTMENT [Knighten Dep.5-6].

88.  The sexual harassment policy issued by the DEPARTMENT was derived from an

executive order issued by the Governor. The DEPARTMENT's policy was approved by the Illinois Department of Human Rights [Knighten Dep.16].

89. Under the DEPARTMENT's sexual harassment policy, employees are required to report conduct that might constitute sexual harassment [Knighten Dep.17-18].

90. Raven Knighten is not aware of any situation where an employee has been found to have engaged in conduct violating the DEPARTMENT's sexual harassment policy and not been disciplined for his conduct [Knighten Dep.19].

91. Under the DEPARTMENT's sexual harassment policy, a supervisor who becomes aware of conduct constituting sexual harassment is supposed to take action immediately to stop that conduct and to report it to both the EEO office or to OIG [Knighten Dep.19-21].

92. During the course of a sexual harassment investigation, the DEPARTMENT normally separates the alleged perpetrator from the alleged victim [Knighten Dep.32].

93. If it is requested and deemed necessary during the course of a sexual harassment investigation, the DEPARTMENT will separate the alleged perpetrator from individuals who have offered evidence against him. This would occur in situations where the witness may feel uncomfortable or unsafe [Knighten Dep.33-34].

94. If an alleged perpetrator of sexual harassment retaliates either against an alleged victim or individuals who testified against him, he is subject to disciplinary action. The nature of the discipline would depend upon a number of factors including the nature and frequency of his retaliatory conduct [Knighten Dep.34-35].

95. In the event an employee surveilled, stalked or threatened an employee who had cooperated in a sexual harassment investigation against him that conduct if proven would warrant a

fairly serious form of discipline [Knighten Dep.62-63].

96. According to Steve Bradley under the policies of the DEPARTMENT a supervisor was to take steps to ensure that employees did not feel intimidated or harassed because of sexually related comments or conduct which they deemed offensive [Bradley Dep.27-28].

97. According to Steve Bradley during the year 2000 if an employee complained to a supervisor that another employee is making comments of a sexual connotation which were offensive to the complaining employee the supervisor was to take steps to ensure that the conduct came to an end. That would include talking to the offending employee and monitoring the situation [Bradley Dep.30-31].

98. According to Steve Bradley a supervisor should not ignore a complaint of sexually inappropriate conduct in the workplace if the complaint is specific [Bradley Dep.33-34].

99. Mark Schuh understood in 2000 that comments of a sexual nature could constitute sexual harassment which was forbidden by the policies of the DEPARTMENT [Scheff Dep.41].

100. Under the DEPARTMENT's sexual harassment policies, a supervisor is responsible for maintaining the work place free from sexual harassment. In this respect, a supervisor must act quickly and responsibly when incidents of possible sexual harassment occur. They must address the incident and take prompt and appropriate action to investigate and document it [Ex.8].

101. Under the DEPARTMENT's policies, a supervisor is to take steps to end acts of sexual harassment, report them to the EEO office, take appropriate disciplinary action, and observe strict confidentiality [Ex.22].

**The Thallman Complaint.**

102. In October of 2000 Mary Thallman came to the PLAINTIFF's work station. She related an incident that occurred with Mark Scheff and asked for the telephone number of friend of the

PLAINTIFF's who was an investigator in the OIG. The PLAINTIFF gave Mary the telephone number of her friend, Laura Whetstone. The PLAINTIFF then called Laura Whetstone and informed her that she would be receiving a call from Mary Thallman [¶33 of the PLAINTIFF's Affidavit].

103. In October of 2000 Mary Thallman shared an office with Jim Schuh. One day during that month Mr. Scheff came into the office and engaged in a discussion with Mr. Schuh. During the discussion he made some comments of a fairly graphic sexual nature. His comments that day were of a character similar to the types of comments he made all the time [¶7 of Thallman Affidavit].

104. Mary Thallman left the office when those comments were made and went to the work station of the PLAINTIFF. Mary Thallman explained to the PLAINTIFF the comments Mark had made. During their conversation Mary Thallman indicated that if we were to put an end to his behavior a formal complaint should be filed with the OIG [¶8 of Thallman Affidavit].

105. Despite her complaints to Ms. DeGroot, Mr. Scheff had continued to make the offensive sexual comments. She felt the only way to put an end to them was to make a formal complaint [¶10 of Thallman Affidavit].

106. Mary Thallman made a complaint with Laura Whetstone, an investigator in the OIG. The nature of her complaint related to the sexual comments made immediately prior to going to the PLAINTIFF's office [¶11 of Thallman Affidavit].

107. Laura Whetstone works for the DEPARTMENT as an internal security investigator II in its Bureau of Internal Affairs [Whetstone Dep.5-6]. She was involved in an investigation of Mary Thallman's complaint [Whetstone Dep.7-8].

108. On October 13, 2000 Laura Whetstone spoke with the PLAINTIFF. The PLAINTIFF informed her that Mary Thallman needed to talk with her and gave her Mary's telephone number.

Laura Whetstone then contacted Mary Thallman [Whetstone Dep.28-29]. The PLAINTIFF did not identify Mary Thallman's concerns to her [Whetstone Dep.32].

109. Laura Whetstone made her initial contact with Mary Thallman at 8:46 a.m. on October 13, 2000 by calling her. They talked and Laura Whetstone asked Ms. Thallman to write up her complaints so they could meet and talk about them [Whetstone Dep.31-32, Ex.30]. Mary Thallman prepared a written statement which Laura Whetstone received when they met on October 13, 2000 [Whetstone Dep.36, Ex.31].

110. After her meeting with Mary Thallman, Laura Whetstone spoke with Steve Bradley. She informed him of the allegation of sexual harassment against Mark Scheff. He questioned the veracity of the allegation. Laura Whetstone felt Mary Thallman was very credible [Whetstone Dep.37-38, Ex.31].

111. Sexual harassment cases were usually assigned to Laura Whetstone because she was the only female investigator in the office. She was expected to devote her immediate attention to that type of investigation [Whetstone Dep.43-44, Ex.32].

112. Laura Whetstone has participated in 20 to 25 sexual harassment investigations [Whetstone Dep.149-150].

113. Lenna DeGroot was well acquainted with Mary Thallman. It was her judgment based upon her knowledge of Mary Thallman that Mary was not easily offended when sexual comments were made in her presence [DeGroot Dep.37-39].

114. On October 19, 2000 Steve Bradley sent a memo to Mark Scheff informing him that he was to cease immediately engaging in activities of an unprofessional nature including making comments of a sexual nature. He also informed him that he was to have no contact with Mary Thallman [Ex.1, Bradley Dep.38-39].

115.  In October of 2000 Mark Scheff had a conversation with Jim Schuh in the presence of Mary Thallman relating to an incident in which a woman claimed that a man violated her with his finger [Scheff Dep.32-34].

116.  On October 19, 2000 Mark Scheff received a memo from Steve Bradley indicating that he should cease making unprofessional comments including comments of a sexual nature.  He was further informed that he was to have no contact with Mary Thallman [Ex.1, Scheff Dep.42-43].

117.  Prior to receiving Mr. Bradley's memorandum on October 19, 2000, Mark Scheff had never been informed by his supervisor, Marvin Ross, about his language or behavior in the workplace. He had also not received any criticism from Jodie Edmonds about his language or behavior in the workplace [Scheff Dep.45].

118.  Mark Scheff formed the belief that the PLAINTIFF was attempting to discredit him on about October 23, 2000 when he read the allegations and statements made against him by Mary Thallman, the PLAINTIFF and other co-workers.  At that time he was informed by OIG of those statements [Scheff Dep.60-61].

119.  During a meeting with OIG on October 23, 2000 Mark Scheff became aware that the PLAINTIFF had led Mary Thallman to Laura Whetstone.  He was told this by Terry Tranquilli of OIG [Scheff Dep.61-62].

120.  Mark Scheff, in concluding Mary Thallman lied about him, believes that Mary Thallman also hates men [Scheff Dep.67-68].

121.  Mark Scheff believed that the PLAINTIFF coached Mary Thallman with respect to her claims of sexual harassment against him [Ex.4, Scheff Dep.68-69].

122.  Mark Scheff believed that if the Mary Thallman incident had been reported to the

PLAINTIFF's direct supervisor, Jodie Edmonds, the problem would have been dropped at that level [Ex.4].

123.   Mark Scheff believed that the PLAINTIFF retaliated against him by encouraging the Thallman complaint because of testimony Scheff had given in a gender discrimination claim on behalf of a co-worker [Scheff Dep.75-76].

**The Investigation of the Thallman Complaint.**

124.   Eventually, the PLAINTIFF was interviewed by Mike Brown, an OIG investigator, concerning the Mary Thallman incident.  During that interview, Mr. Brown had a series of questions which he posed to the PLAINTIFF.  The interview consisted of her answering those specific questions [¶34 of the PLAINTIFF's Affidavit].

125.   When the OIG began its investigation of Mark Scheff, the male medical consultants and the female medical consultants refused to talk to one another [Edmonds Dep.70-71].

126.   Janice Johnson interviewed employees concerning the PLAINTIFF's allegations of sexual harassment after the PLAINTIFF filed a charge with the Illinois Department of Human Rights. According to Janice Johnson, only female employees complained to her that Mark Scheff made comments of a sexual nature [Johnson Dep.37-38, 45-46].

127.   Prior to October 2000, Laura Whetstone had experience investigating allegations of sexual harassment.  The process of investigating a sexual harassment claim is generally the same as any other investigation [Whetstone Dep.13-14].  A report of investigation is prepared at the conclusion of an investigation.  It includes the allegation, case summary, interviews, documents, and conclusion [Whetstone Dep.16].

128.   No final report was prepared of the Mary Thallman investigation [Whetstone Dep.56].

129.  When investigating sexual harassment cases Laura Whetstone has seen discipline which included discharge, suspension, last chance agreements for matters less severe than what was alleged against Mark Scheff by Mary Thallman [Whetstone Dep.61-64].

130.  Laura Whetstone was involved in one other sexual harassment investigation in the same DEPARTMENT that Mark Scheff worked.  In that investigation, Mr. Bradley was the supervisor, the allegations were substantiated.  The employee was discharged.  The allegations against Mark Scheff were far more serious than those against the employee who was terminated [Whetstone Dep.87-88].

131.  Ms. Bangert informed Laura Whetstone during her investigation that she was offended by a sexual comment Mark Scheff made when they were in Deborah Sullins' office.  He was talking about a local realtor, Fritz Pfister [Whetstone Dep.91-92].

132.  Both Marina Powell and Judy Stephenson talked in their interviews with Laura Whetstone about Mark Scheff making comments of a sexual nature.  Scheff made comments to Ms. Powell about having to be a female to be promoted and he did not have the equipment.  Ms. Powell felt Mr. Scheff was unprofessional in leering at Ms. Edmonds.  She was aware of other comments by Scheff [Whetstone Dep.96-97, Ex.28].

133.  Laura Whetstone and Deborah Sullins never talked about Mark Scheff prior to October 12, 2000.  Deborah Sullins had told her about an offensive person at work, but did not identify the person by name [Whetstone Dep.109-110].

134.  In the statement she gave on April 30, 2001 to the DEPARTMENT's EEO officer, Lenna DeGroot indicated that no one ever complained to her about Mark Scheff's alleged vulgar comments [Ex.26].

135.  At no place in her statement to the DEPARTMENT's EEO officer does Lenna DeGroot

indicate that anyone ever complained to her about Mark Scheff [Ex.26].

136.  During the Thallman investigation, Pamela DuFour indicated that Mark Scheff made sexual comments daily, many of which were derogatory toward women.  She characterized some of his comments as mind blowing in their sexual nature.  Often his comments referred to his sexual escapades.  In referring to women getting promotions, Scheff indicated that people having a penis hanging down could not go anywhere [Ex.43].

137.  At the conclusion of an investigation of sexual harassment, OIG normally prepares a written report.  That report is submitted to the EEO office.  In the report, a determination is made as to whether the allegations of sexual harassment have merit [Knighten Dep.22-23].

138.  Raven Knighten is not aware of a situation where an internal affairs investigation into an allegation of sexual harassment has begun and a report has never been prepared [Knighten Dep.23].

139.  When the internal affairs prepares a report of a sexual harassment investigation, it is provided to Raven Knighten [Knighten Dep.26].

140.  Ms. Knighten's file does not include a copy of any report prepared by OIG with respect to the Mary Thallman investigation [Knighten Dep.26].

141.  It was the view of Raven Knighten that if Mark Scheff had actually engaged in the conduct alleged against him by Mary Thallman he should have been subject to stringent discipline [Ex.39, Knighten Dep.42-44].

142.  Ms. Knighten typically made a disciplinary recommendation with respect to individuals determined to be guilty of conduct constituting sexual harassment within the DEPARTMENT.  Normally, her recommendation would be in written form.  There is nothing in her file indicating she gave a written recommendation in the Mary Thallman situation and she has no recollection of making a

recommendation with respect to Mark Scheff [Knighten Dep.50-53].

143. Except for the Mary Thallman case, Rave Knighten cannot recall any instance where her office did not make a disciplinary recommendation with respect to an employee found guilty as a result of a sexual harassment investigation [Knighten Dep.53-54].

144. At no time did either the BUREAU or OIG ever seek out advice from Raven Knighten concerning whether Mark Scheff should be disciplined because of conduct he engaged in with respect to Mary Thallman [Knighten Dep.61-62].

145. In February of 2001 Mark Scheff received a five calendar day suspension. His suspension began on a Sunday and ended on a Thursday [Scheff Dep.9-10].

146. In January of 2001 upon the completion of the OIG investigation, the DEPARTMENT proposed suspending Mark Scheff for five calendar days for discourteous treatment and conduct unbecoming a state employee. It alleged that on October 13, 2001 while he was with Jim Schuh and Mary Thallman he referred to a police report concerning his brother's arrest for rape. He stated in Mary Thallman's presence that "when I stick my finger in my woman I tend to stroke her" [Ex.2, Scheff Dep.48].

147. Eventually, Mark Scheff's suspension was reduced by the DEPARTMENT from a five day suspension to a four calendar day suspension [Scheff Dep.49-50].

148. At the time of his suspension Mark Scheff received copies of statements given by witnesses during the OIG investigation of Mary Thallman's complaint [Scheff Dep.56].

149. Mark Scheff doubts that truthfulness of Velva Fletcher, a female co-worker, because of statements she made during the Thallman investigation [Scheff Dep.72-73].

150. Mark Scheff does not believe Pam DuFour, a female worker, was truthful to OIG

investigators during the Thallman investigation.  He believes that she does not like men that have a strong personality [Scheff Dep.73-74].

**Mark Scheff's Behavior Following the Thallman Complaint.**

151.  After the PLAINTIFF moved to the office around the corner from Mark Scheff and prior to the Mary Thallman incident, Mark Scheff rarely passed her office.  In order for him to enter and exit his work area, go to the restroom, go to break areas, and to communicate with his supervisors and other MACs, it was not necessary for him to walk past the PLAINTIFF's office.  Thus, he almost never went by her office during the time period she was in it prior to the Mary Thallman incident [¶42 of the PLAINTIFF's Affidavit].

152.  After the Mary Thallman incident, Mark Scheff went by the PLAINTIFF's office multiple times each day.  Outside of her office was the work stations of several clerical employees.  Prior to the Mary Thallman incident, Mark had never gone to the work station of those employees.  After the Mary Thallman incident, he would frequently go to the work station of Angie Dieffenbach, a clerical employee who was located outside of the PLAINTIFF's office.  While her door was open, he would frequently comment to Angie about the pending investigation and the lawsuit he was going to file against people who had given information in the investigation [¶43 of the PLAINTIFF's Affidavit].

153.  When Mark Scheff walked by the PLAINTIFF's office, he would tend to look into it and would often scowl at her.  She rearranged the furniture in her office so that when she was sitting at her desk she would not be looking out the office door, but instead toward a wall.  From time to time when the PLAINTIFF was working at her desk she would turn to her right and notice Mark staring at her from the hallway [¶44 of the PLAINTIFF's Affidavit].

154.  The PLAINTIFF also noticed that following the Mary Thallman incident while her office

was still in the basement of the Bloom Building, Mark Scheff changed his dress. Formerly, he had

typically worn a coat and tie to work.  After the Mary Thallman incident he began wearing boots and

blue jeans and started to wear a duster of the type that the boys involved in the Columbine massacre

had worn [¶45 of the PLAINTIFF's Affidavit].

155.  Following the investigation into the Mary Thallman complaint, it was reported to Jodie

Edmonds that Mark Scheff was engaging in offensive behavior by wearing a long trench coat of the

type the students at the Columbine School incident wore [Edmonds Dep.60-62].

156.  According to Jodie Edmonds, in early 2001 the PLAINTIFF was moved at her request

from the basement of the Bloom Building to the first floor of the Bloom Building because of concerns

[Edmonds Dep.85-86].

157.  On March 13, 2001 Jodie Edmonds at the request of Mark Scheff wrote a memo

indicating that after the internal affairs investigation began Mark Scheff had no contact with the

PLAINTIFF.  It also states that the PLAINTIFF never reported to either Lenna DeGroot or Jodie

Edmonds any sexual harassment toward her by Mark Scheff [Ex.19, Edmonds Dep.91-92].

158.  On October 19, 2000 Steve Bradley met with Mark Scheff.  At that time they discussed

the investigation of Mark Scheff as a result of complaints by Mary Thallman.  At the conclusion of that

meeting, Mark Scheff told Steve Bradley that he would have his retribution against individuals who

made frivolous accusations against him [Ex.10].

159.  Between October 19, 2000 when he sent a memorandum to Mark Scheff concerning

Mary Thallman and the time of Mark Scheff's pre-disciplinary hearing in early 2001, Steve Bradley

does not believe he provided anything in writing to Mark Scheff indicating that he would not tolerate

inappropriate conduct in the workplace [Bradley Dep.51-52].

160.  In the grievance filed by Mark Scheff protesting his five day suspension, he alleged that the PLAINTIFF had been making comments about Scheff urging people to make complaints against him [Ex.3, Scheff Dep.51-52].

161.  Both Jodie Edmonds and Lenna DeGroot cooperated with Mark Scheff by agreeing to be included on a witness list he gave to his lawyer in connection with his defense with respect to the Thallman complaint [Ex.5 and 6, Scheff Dep.74-77].

162.  Following Mark Scheff's return from suspension, he and other male co-workers began using military jargon as a result of his suspension [Scheff Dep.78-79].

163.  In the grievance protesting his suspension, Mark Scheff accused the PLAINTIFF of making comments about him for four to six weeks prior to the Mary Thallman incident urging co-employees to complain about Mark [Ex.3].

164.  On April 30, 2001 Mark Scheff made a statement.  In it he accused the PLAINTIFF of fabricating sexual harassment against him indicating that there was no validation to any of her statement "except she is female" [Ex.3].

165.  On March 28, 2001 Steve Bradley sent an email to Mark Scheff informing him that he had been seen on the first floor of the east side of the Bloom Building.  It directed him to remain away from that area of the workplace [Ex.13].

166.  Velva Fletcher told an OIG investigator in the spring of 2001 that Scheff informed her that he had copies of the witness statements pertaining to the Thallman investigation and everyone had better have copies of their statements and their stories had better not change.  Fletcher considered this a veiled threat since she participated in the investigation.  She accepted a position outside of the BUREAU primarily to get away from Mark Scheff [Ex.20,21].

167.  In a statement given to OIG in connection with its investigation of the PLAINTIFF's complaint, Pamela DuFour informed the OIG investigator that in the wake of the Thallman investigation there was tension and a hostile work environment in the BUREAU.  As she characterized it, males are divided against females and Mark Scheff encouraged that type of atmosphere [Ex.43].

**The PLAINTIFF's Work Environment Following the Thallman Complaint.**

168.  Within several days of the day the PLAINTIFF gave Mary Thallman Laura Whetstone's telephone number, Laura came to her office to meet her for lunch.  When she arrived in the PLAINTIFF's office, Jodie Edmonds came into the office and appeared to be very angry.  Raising her voice, she asked Laura Whetstone what was going on with Mark Scheff.  Laura shut the door and explained to Jodie that she had discussed the subject with Steve Bradley, the BUREAU Chief, and that Mr. Bradley would tell Jodie what she needed to know.  Laura explained to her that she was not free to discuss that subject with Jodie.  Jodie then made a derogatory remark that Laura was tearing up her unit and turned around and walked out of the office slamming the door behind her [¶35 of the PLAINTIFF's Affidavit].

169.  As an Executive II the PLAINTIFF's immediate supervisor was Jodie Edmonds.  Prior to the Mary Thallman incident, the PLAINTIFF had a very cordial working relationship with Jodie.  They would engage in both work and non work related conversations frequently [¶36 of the PLAINTIFF's Affidavit].

170.  Following the incident described above in the PLAINTIFF's office between Jodie Edmonds and Laura Whetstone, Jodie Edmonds changed in her treatment toward the PLAINTIFF.  She would no longer speak to her unless it was absolutely necessary for purposes of a work related matter.  She frequently excluded the PLAINTIFF from staff meetings [¶37 of the PLAINTIFF's

Affidavit].

171.   During several work related conversations the PLAINTIFF had with Jodie Edmonds, she indicated that she did not believe that the PLAINTIFF was a part of the management team because of the incident involving Mark Scheff.  These conversations with Jodie occurred in late February and early March of 2001 [¶38 of the PLAINTIFF's Affidavit].

172.   After the PLAINTIFF moved to the first floor of the Bloom Building, Jodie Edmonds refused to talk to her.  Their mode of communication at that time was through either email or Jodie's secretary delivering to the PLAINTIFF both work and messages from her.  On several occasions, the PLAINTIFF attempted to talk with Jodie.  On each of those occasions, she was in her office.  She kept her head bowed toward her desk as if she was working and would do nothing more than make curt responses to each comment the PLAINTIFF made to her [¶39 of the PLAINTIFF's Affidavit].

173.   Within a day or two of the day the PLAINTIFF gave Mary Thallman the telephone number of Laura Whetstone, Lenna DeGroot came to her office.  She began engaging in small talk and then asked the PLAINTIFF about the investigation into Mark Scheff.  Lenna was aware from earlier conversations the PLAINTIFF had with her that she had an ongoing relationship with Laura Whetstone.  She began asking the PLAINTIFF what Laura had told her about the investigation.  the PLAINTIFF indicated to her that Laura had told her nothing about the investigation and she knew little about it [¶40 of the PLAINTIFF's Affidavit].

174.   After the conversation described in the preceding paragraph, both Lenna DeGroot and Marvin Ross refused to speak to the PLAINTIFF.  When she might have a chance encounter with either of them, each would turn and walk the other way [¶41 of the PLAINTIFF's Affidavit].

175.   While the PLAINTIFF's office was still located in the basement of the Bloom Building,

she complained to Jodie Edmonds about Mark's conduct toward her.  Ms. Edmonds indicated that the PLAINTIFF had upset Mark and he was doing nothing wrong.  She also said it would get worse before it got better [¶46 of the PLAINTIFF's Affidavit].

176.  While the PLAINTIFF was in the basement of the Bloom Building, she spoke on several occasions with Steve Bradley about Mark Scheff's conduct.  During her first conversation with Mr. Bradley, he seemed to be supportive of her.  He indicated she had done nothing wrong and he would speak to Mark [¶47 of the PLAINTIFF's Affidavit].

177.  Because there was no change in Mr. Scheff's behavior, the PLAINTIFF spoke with Mr. Bradley again.  During this conversation, he indicated that he would again speak with Mark Scheff and would also speak with Jodie Edmonds, Marvin Ross and Lenna DeGroot [¶48 of the PLAINTIFF's Affidavit].

178.  While the PLAINTIFF's office was still in the basement of the Bloom Building, one evening when she left work and went to her car she discovered that feces had been spread on her door handle.  She reported that incident to Jodie Edmonds and the security office of the DEPARTMENT [¶49 of the PLAINTIFF's Affidavit].

179.  At some time in early March 2001 the PLAINTIFF had another conversation with Steve Bradley.  At that time, she explained to Mr. Bradley once again the conduct of Mark Scheff toward her which is more fully described above.  There had been no change in Mr. Scheff's conduct between the time the Thallman investigation began and this conversation with Mr. Bradley.  She also complained to Mr. Bradley that she felt Jodie Edmonds had been abusive to her.  The PLAINTIFF explained to Mr. Bradley how Jodie had been treating her as more fully described above.  Mr. Bradley indicated that he did not think anything could be done to change the situation for the PLAINTIFF as long as she

remained in the Bloom Building.  He told her about an open position at the Churchill Road facility of the

DEPARTMENT.  The PLAINTIFF explained to him that she was aware of the position and had

applied for it [¶50 of the PLAINTIFF's Affidavit].

180.  The next day Mr. Bradley again spoke to the PLAINTIFF.  At that time he indicated that

he could not move her to the Churchill Road position at that time, but could relocate her to the first

floor of the Bloom Building [¶51 of the PLAINTIFF's Affidavit].

181.  During the conversation described in the preceding paragraph, Jodie Edmonds was

present with Mr. Bradley.  When Mr. Bradley left the room, Jodie stated "I hope you're satisfied."  She

then accused the PLAINTIFF of being a crybaby and turned and left the PLAINTIFF's office [¶52 of

the PLAINTIFF's Affidavit].

182.  The PLAINTIFF was moved sometime in the middle of March 2001 to the first floor of

the Bloom Building.  Her office was located in the east wing of that building.  While she was a MAC in

the hospital unit, the PLAINTIFF did the same type of work as Mark Scheff.  In her job in that unit,

she never had business that took her to the first floor of the Bloom Building.  Moreover, other MACs

did not have work related business which took them to the first floor of the Bloom Building in the area

where the PLAINTIFF's office was assigned [¶53 of the PLAINTIFF's Affidavit].

183.  When the PLAINTIFF was relocated to the first floor of the Bloom Building, she was

assigned to a room which had formerly been a conference room.  Three other individuals worked in

that room as well.  There was a door at each end of the room [¶54 of the PLAINTIFF's Affidavit].

184.  At approximately 9:30 a.m. on the PLAINTIFF's first day at her new work station on the

first floor of the Bloom Building, Mark Scheff entered the conference room at one door and walked

through the conference room to another door.  He had no reason to be in that room.  Thereafter, Mark

Scheff would come to the area where her work station was located 5-6 times a day. Although there was a copying machine in the basement of the Bloom Building fairly close to his work station, Mark Scheff would use the copy machine located outside of the PLAINTIFF's new work station on the first floor of the Bloom Building. He would copy and stare in at her [¶55 of the PLAINTIFF's Affidavit].

185. In the hospital unit employees took breaks at fifteen minute increments between 9:45 a.m. and 10:30 a.m. From her assignment in the hospital unit, the PLAINTIFF was aware that Mark Scheff typically took his break between 10:00 a.m. and 10:15 a.m. Accordingly, she began taking her break between 10:15 a.m. and 10:30 a.m. She continued that practice after she moved to the first floor of the Bloom Building [¶56 of the PLAINTIFF's Affidavit].

186. When weather was nice during her break, the PLAINTIFF would walk several blocks outside the building with a friend. After she moved to the first floor of the Bloom Building, Mr. Scheff began altering his break time and took it between 10:15 a.m. and 10:30 a.m. During periods of nice weather he would loiter outside the building in the area the PLAINTIFF had to pass when she returned to the Bloom Building from her walk [¶57 of the PLAINTIFF's Affidavit].

187. When weather was not nice the PLAINTIFF typically took her break by sitting on a bench in the main entrance to the Bloom Building. Mr. Scheff began visiting with a security officer at the security desk of the Bloom Building in open view of where the PLAINTIFF took her breaks. While she was on the first floor of the Bloom Building, Mr. Scheff would have contact with her almost every day during break periods. Prior to moving to the first floor of the Bloom Building, this had never occurred [¶58 of the PLAINTIFF's Affidavit].

188. The PLAINTIFF's scheduled quitting time was 5:00 p.m. After she moved to the first floor of the Bloom Building, she noticed that whenever she left the building at the end of the day Mr.

Scheff would be waiting at the front door of the Bloom Building. She would have to pass him and then he would leave the Bloom Building behind her. The PLAINTIFF began staggering the times she left the Bloom Building. She would leave as early as 4:55 p.m. or as late as 5:15 p.m. That made no difference. Whenever she left the Bloom Building, Mr. Scheff was at the doorway [¶59 of the PLAINTIFF's Affidavit].

189. Because of Mr. Scheff's efforts to be around her at break time, the PLAINTIFF discontinued leaving her work station at lunchtime [¶60 of the PLAINTIFF's Affidavit].

190. In April of 2001 the PLAINTIFF complained to Jodie Edmonds about Mark Scheff's behavior. She did not acknowledge the PLAINTIFF's complaint. The PLAINTIFF also complained to Ronni Kulsa, the Assistant BUREAU Chief. That complaint was not productive in changing Mark Scheff's behavior [¶61 of the PLAINTIFF's Affidavit].

191. In early 2001 because of emotional and physical symptoms the PLAINTIFF was experiencing she began taking much more time off of work [¶66 of the PLAINTIFF's Affidavit].

192. Prior to becoming an Executive II on October 16, 2000, the PLAINTIFF's attendance at work was good. After she became an Executive II, the PLAINTIFF on a progressive basis began missing work. By early 2001 Jodie Edmonds believed that the PLAINTIFF's absence from work was excessive [Edmonds Dep.72-73].

193. At one point Jodie Edmonds counseled the PLAINTIFF about her absenteeism. The PLAINTIFF explained that she was required to take time away from work to go to doctors appointments and counseling sessions as the result of problems she was experiencing at work. The PLAINTIFF exhausted her sick days and was beginning to take time away from work for which she had no compensatory entitlement [Edmonds Dep.74-75].

194.  Following the Mary Thallman investigation, the PLAINTIFF spent a lot of time in the office of Steve Bradley.  This is not a normal part of her job.  Mr. Bradley believes she sought him out because of her fears of retaliation and reprisals [Bradley Dep.48-49].

195.  Steve Bradley recalls after the Thallman investigation the PLAINTIFF was moved to a different office in the basement of the Bloom Building and then was moved to the first floor of the Bloom Building.  Eventually she was moved out of the Bloom Building altogether to eliminate the fear and discomfort she was experiencing [Bradley Dep.48-49].

196.  Steve Bradley recalls the PLAINTIFF complaining to him about conduct by Mark Scheff that made her feel uncomfortable in the workplace following the Mary Thallman investigation [Bradley Dep.54-55].

197.  In the wake of the PLAINTIFF's complaint Steve Bradley with her consent moved her to another location in the basement [Bradley Dep.54-55].

198.  After the PLAINTIFF was moved to a new location in the basement, she continued to complain about Mr. Scheff's behavior.  Mr. Bradley did not investigate her complaints [Bradley Dep.55-56].

199.  Eventually, the PLAINTIFF was moved to the first floor to give her more distance from Mr. Scheff.  There was no reason for Mr. Scheff to be on the first floor to do his job [Bradley Dep.56-57].

200.  After the PLAINTIFF was moved to the first floor, Mark Scheff was informed by Mr. Bradley that he was to have no contact with her [Bradley Dep.58].

201.  On March 28, 2001 Steve Bradley sent an email to Mark Scheff informing him that he had been seen on the first floor of the Bloom Building.  He was directed to remain away from that area

[Ex.13].  When he wrote his memorandum on March 28, 2001 to Mark Scheff, Steve Bradley had heard from several persons that Mr. Scheff had been on the first floor in the area where the PLAINTIFF's office was located [Bradley Dep.59-60].

202.  Mr. Bradley has no reason to offer why he did not initiate any discipline against Mark Scheff when he learned that Mr. Scheff had not complied with his instructions to stay away from the PLAINTIFF [Bradley Dep.60].

203.  In March of 2001 Steve Bradley felt Mark Scheff believed that the PLAINTIFF had responsibility for the events giving rise to his discipline [Bradley Dep.66].

204.  In March of 2001 Steve Bradley had received anecdotal evidence from both the PLAINTIFF and others that Mark Scheff was acting out against the PLAINTIFF [Bradley Dep.66].

205.  Steve Bradley was aware that an individual who acted out against an individual who participated in a sexual harassment investigation against him would be engaging in conduct warranting discipline [Bradley Dep.66-67].

206.  On March 28, 2001 Jodie Edmonds sent an email to Steve Bradley making reference to a complaint filed by the PLAINTIFF that Mark Scheff was walking by her work area and then pointing out to Bradley that the PLAINTIFF walked by Scheff's work area even though there was another route she could have taken [Ex.16].

207.  In February of 2001 Steve Bradley told Mark Scheff he was not to communicate with the PLAINTIFF or be on the east side of the first floor of the Bloom Building [Scheff Dep.47].

208.  Between October of 2000 and July 1, 2001 no supervisor talked to Mark Scheff concerning his behavior in the workplace other than the February, 2001, conversation with Steve Bradley [Scheff Dep.46-47].

209.  Mark Scheff believes that the PLAINTIFF hates men and what they stand for.  He felt that the PLAINTIFF had a concern with him because of his gender and it was for that reason that she complained about his sexually inappropriate comments [Scheff Dep.56-57].

210.  Mark Scheff believes that the PLAINTIFF urged females to make complaints against him [Ex.3, Scheff Dep.56-58].

211.  Mark Scheff believed that the PLAINTIFF participated in the Thallman investigation in an effort to discredit him because of testimony he had earlier given in a gender discrimination claim [Scheff Dep.59-60].

212.  During the course of an OIG investigation in the spring of 2001, Cheryl Bangert informed the OIG investigator that after the PLAINTIFF was moved to the first floor of the Bloom Building Mark Scheff was observed walking past the PLAINTIFF's work station at least once or twice a day. On March 26, 2001 she observed Scheff giving the PLAINTIFF "a mean dirty look" [Ex.20].

**The PLAINTIFF's Relocation from the Bloom Building.**

213.  In early March of 2001 the PLAINTIFF had bid on another position on Churchill Road as a Management Operations Analyst I.  That position was in a lower job series than her position as an Executive II and would have represented a demotion.  The only reason the PLAINTIFF bid on that position was to get away from her work environment around Mark Scheff and Jodie Edmonds [¶62 of the PLAINTIFF's Affidavit].

214.  In May the PLAINTIFF interviewed for the Management Analyst I position.  She was awarded that position and in June of 2001 relocated to the Churchill Road facility of the DEPARTMENT.  Although her position was still in the BUREAU, the PLAINTIFF did not work under the supervision of Jodie Edmonds and her new work location was many miles away from the

Bloom Building and Mark Scheff.  In order to relocate, however, the PLAINTIFF was required to take a demotion to one pay grade lower [¶63 of the PLAINTIFF's Affidavit].

215.  As a Management Analyst I, the PLAINTIFF's opportunities for promotion within the DEPARTMENT were diminished from what they had been as an Executive II [¶64 of the PLAINTIFF's Affidavit].

216.  In the spring of 2001 the PLAINTIFF took another position in the BUREAU away from the Bloom Building.  Jodie Edmonds understood she took this job because she was unhappy working in the Bloom Building [Edmonds Dep.76-77].

217.  On March 13, 2001 the PLAINTIFF requested an opportunity to transfer because of backlashes from her supervisor.  She asked about the possibility to transfer to a management operations analyst I position.  That position would have represented a demotion [Ex.14, Bradley Dep.61-62].

218.  Steve Bradley assisted the PLAINTIFF in her demotion to the management operations I position.  In that position she was physically removed from the Bloom Building [Bradley Dep.62-63].

### III.   STANDARDS WHICH ARE APPLICABLE IN A SUMMARY JUDGMENT PROCEEDING

Rule 56 of the *Federal Rules of Civil Procedure* provides that a motion for summary judgment shall be granted only if the pleadings, depositions, answers to interrogatories and admissions on file together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law [*Celotex v. Catrett*, 477 U.S. 317, 91 L.Ed.2d 265 (1986)].

Summary judgment is only appropriate when the record reveals that no reasonable jury could

find for the non-moving party [See *Karazanos v. Navistar International Transportation Corp.*, 948

F.2d 332 (7th Cir.  1991); *Konowitz v. Schnadig Corporation*, 965 F.2d 230 (7th Cir.  1992);

*Anderson v. Stauffer Chemical Company*, 965 F.2d 397 (7th Cir.  1992); and *McCoy v. WGN*

*Continental Broadcasting Company*, 957 F.2d 368 (7th Cir.  1992)].

     In a summary judgment proceeding the facts and inferences drawn from underlying facts must

be viewed in a light most favorable to the party opposing the motion [See *United States v. Diebold,*

*Inc.*, 369 U.S. 654, 8 L.Ed.2d 176, 82 S.Ct.  993 (1962); and *Matsushita Electric Industrial*

*Company, Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 89 L.Ed.2d 538, 106 S.Ct. 1348

(1986)].

     At the summary judgment stage of a case it is not the court's function to weigh the evidence and

determine the truth of the matter, but instead to determine whether there is a genuine issue for trial.  The

role of the court is not to determine whether it thinks the evidence unmistakably favors one side or the

other, but to instead determine whether a fair minded jury could return a verdict for the party opposing

the motion on the basis of the evidence presented [See *Anderson v. Liberty Lobby, Inc.* (op.cit.

1985); and *Shager v. Upjohn Company*, 913 F.2d.  398 (7th Cir. 1990)].  If evidence is subject to

conflicting interpretations or if reasonable people might differ as to its significance summary judgment

must be denied [See *Egger v. Phillips*, 669 F.2d 497 (7th Cir. 1982); and *O'Connor v. Chicago*

*Transit Authority*, 985 F.2d 1362 (7th Cir. 1992)].

     Summary judgment is often not appropriate in cases involving claims of discrimination where

motive or intent are at issue [See *Stumph v. Thomas Skinner, Inc.*, 770 F.2d.  93 (7th Cir. 1985);

*Bartman v. Allis-Chalmers Corporation*, 799 F.2d. 311 (7th Cir. 1986); and *McCoy v. WGN*

*Continental Broadcasting Company* (op.cit. 1992)].  In the area of employment discrimination intent

and credibility are particularly crucial issues. Accordingly, in those cases the burden which must be satisfied before granting summary judgment is applied with added vigor [see *Sarsha v. Sears, Roebuck & Company*, 3 F.3d 1035, 1038 (7th Cir. 1993); *Sample v. Aldi, Inc.*, 61 F.3d 544, 546 (7th Cir. 1995); and *Perdomo v. Browner*, 67 F.3d 140 (7th Cir. 1995)]. Summary judgment is only to be granted if the record before the court had it been the record of a complete trial would have entitled the defendant to a directed verdict [See *Sarsha v. Sears, Roebuck and Company*, 3 F.3d 1035 (7th Cir. 1993); *Robinson v. PPG Industries, Inc.*, 23 F.3d 1159 (7th Cir. 1994); *CSX Transport, Inc. v. Chicago & North Wester Transportation Company, Inc.*, 62 F.3d 185, 188 (7th Cir. 1995); and *Illinois Conference of Teamsters v. Steve Gilbert Trucking*, 71 F.3d 1361 (7th Cir. 1993)].

Particular caution is required before granting summary judgment in a claim maintained under a law which allows for trial by jury [See *McCoy v. WGN Continental Broadcasting Company* (op.cit. 1992); *Vissar v. Packer Engineering Company, Inc.*, 924 F.2d. 655 (7th Cir. 1991); and *Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999) quoting *Huff v. Uarco, Inc.*, 122 F.3d 374, 380 (7th Cir. 1997)].

Summary judgment is proper if there is no reasonably contestable issue of fact which is potentially outcome determinative. Rule 56 was not intended to permit a summary judgment proceeding as a substitute for a trial [*Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396-97 (7th Cir. 1997)].

## IV. ARGUMENT

## A. THE PLAINTIFF'S BURDEN OF PROOF

Summary judgment should not be granted where a genuine dispute exists with respect to any issue of material fact. Materiality is determined by the substantive law governing a particular claim.

Thus, in ruling on a motion for summary judgment, the trial court must view the evidence presented through the prism of the proof burden imposed upon the litigants [See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1985); and *Carson v. Allied News Company*, 529 F.2d 206 (7th Cir. 1976)].

The DEPARTMENT's request for summary judgment, therefore, must be considered within the context of the PLAINTIFF's burden of proof.

In a claim maintained under the ACT, it is the ultimate burden of the PLAINTIFF to prove that she was the victim of an adverse employment action because of her protected status. She need not prove that her protected status was the sole factor motivating the employer's actions, but that it was a "determinative factor" in the sense that she would not have been exposed to that treatment "but for" her status [See *La Montagne v. American Convenience Products, Inc.*, 750 F.2d. 1405 (7th Cir. 1984); *McNeil v. Economics Laboratory, Inc.*, 800 F.2d. 111 (7th Cir. 1986); and *Brown v. M&M/Mars*, 883 F.2d. 505 (7th Cir. 1989)].

The PLAINTIFF can avert the DEPARTMENT's motion for summary judgment by presenting evidence, whether direct or circumstantial, of a discriminatory motivation sufficient to create a triable issue of fact or, in the alternative, by establishing a *prima facie* claim under the *McDonnell Douglas* formulation [see *Rudin v. Lincolnland Community College*, 420 F.3d 712 (7th Cir. 2005)]. A plaintiff proceeding under the direct method may rely upon either direct or circumstantial evidence [see *Rudin* at pp.720-21; and *Troupe v. May Department Stores Company*, 20 F.3d 734, 736 (7th Cir. 1994)].

Under the direct method, a plaintiff may employ either direct or circumstantial evidence of a discriminatory motive [see *Rudin* at footnote 3]. Circumstantial evidence allows a trier of fact to infer

intentional discrimination by the decisionmaker.  Our Circuit has recognized three distinguishable kinds of circumstantial evidence of intentional discrimination.  The first consists of suspicious timing, ambiguous statements, behavior toward or comments directed at the claimant or others or other bits and pieces from which an inference of discriminatory intent might be drawn.  The second is evidence whether or not rigorously statistical that employees similarly situated to the PLAINTIFF other than the protected characteristic received better treatment.  The third is evidence satisfying the indirect proof formulation [see *Rudin* at pp.720-21; and *Troupe* at p.736].

### B.  <u>THE PLAINTIFF'S SEXUAL HARASSMENT CLAIM</u>

The ACT, in pertinent part, makes it unlawful for an employer to discriminate against any individual with respect, among other things, to the terms, conditions or privileges of employment because of that individual's sex [42 U.S.C. §2000e-2(a)(1)].

In *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 91 L.Ed.2d 49 (1986), the Supreme Court recognized that the foregoing portion of the ACT was not limited in application to conduct that effected the tangible aspects of employment, but instead "evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment" [p.64].  Thus, sexual harassment which was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment is actionable under the ACT [p.67].

In *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 126 L.Ed.2d 295 (1993), the Court reinforced *Meritor* by reiterating that when the workplace is permeated with discriminatory intimidation, ridicule and insult which is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, the ACT is violated. The *Harris* Court developed a non-exhaustive list of factors relevant to considering on a case to case basis whether

a work environment has been rendered hostile or abusive.  The frequency of the conduct, its severity,

whether it is physically threatening or humiliating, or merely offensive and whether it reasonably

interferes with an employee's work performance is all relevant according to the *Harris* Court in

determining whether a hostile work environment is present.  *Harris* requires that the relevant factors be

viewed from both an objective and subjective point of view.

To prevail on her claim of sexual harassment based upon a hostile work environment, the

PLAINTIFF must establish that:  a) she was subjected to unwelcome conduct of a sexual nature; b) the

conduct was severe or pervasive enough to create a hostile work environment; c) the conduct was

directed at her because of her sex; and d) there is a basis for employer liability [see *Hall v. Bodine*

*Electric Company*, 276 F.3d 345, 355; and *Rhodes v. Illinois Department of Transportation,* 359

F.3d 498, 505 (7th Cir. 2004)].[2]

In arguing for a dismissal of the PLAINTIFF's sexual harassment claims, the DEPARTMENT

---

[2]    Wisely, the DEPARTMENT does not contend that it would not be liable for Scheff's conduct if his actions were based upon sex and sufficiently egregious to create a hostile work environment.  Although Scheff was not the PLAINTIFF's supervisor and had no supervisory responsibilities, an employer is liable for a hostile work environment created by an employee who is not the PLAINTIFF's supervisor when the PLAINTIFF proves the employer has been negligent in either discovering or remedying the harassment [see *Rhodes* at p.505-06; and *Parkins v. Civil Construction of Illinois, Inc.,* 163 F.3d 1027, 1032 (7th Cir. 1998)].  There is plentiful evidence in this record to enable a fact finder to conclude that the DEPARTMENT was negligent in failing to address Scheff's abusive conduct.  Under the DEPARTMENT's sexual harassment policies, a supervisor cannot stand idly by when it knows that an employee is engaging in sexually offensive conduct.  Rather, the supervisor must intervene and take appropriate action to abate the conduct and then report it to other constituencies within the DEPARTMENT [¶73-101 of the PLAINTIFF's Statement].  In this case there is abundant factual information (although disputed by the DEPARTMENT) that the PLAINTIFF between February of 2000 and October of 2000 complained about Scheff's conduct to three supervisors in the hospital unit, Jodie Edmonds, Lenna DeGroot and Marvin Ross (¶52-54 of the PLAINTIFF's Statement).  Moreover, Mary Thallman also complained to Lenna DeGroot about Scheff's behavior [¶60 of the PLAINTIFF's Statement].

attempts to make two points.  First, it claims that the conduct complained of by the PLAINTIFF was not sufficiently egregious to, at least from an objective point of view, alter her working conditions and create a hostile work environment.  Second, it characterizes the behavior of Mark Scheff as merely boorish conduct which was extended equally to men and women.  Thus, under its second argument the PLAINTIFF cannot establish that the conduct was committed by him because of her gender.

**1)  A Reasonable Jury Could Conclude That Scheff's Conduct Was Sufficiently Egregious To Alter For The Worse The PLAINTIFF's Working Conditions And     Create A Hostile Work Environment.**

In *Carr v. Allison Gas Turbine Division,* 32 F.3d 1007 (7th Cir. 1994), our Circuit recognized that a line exists which separates merely vulgar and mildly offensive behavior from deeply offensive and sexually harassing conduct.  According to the *Carr* Court, this is not always a bright line. When it is uncertain as to which side of the line the defendant's conduct lies, it is the province of the jury to make that judgment [see also *Baskerville v. Culligan International Company,* 50 F.3d 428, 430-31].

The frequency or infrequency of offensive sexual comments is relevant to an assessment of whether conduct from an objective point of view creates a hostile work environment.  While a handful of comments containing a sexual connotation or inference made over a span of months is unlikely to have an impact sufficient to create a hostile work environment, that might not be the case with a concentrated or incessant barrage of sexually offensive comments [see for example *Dey v. Colt Construction and Development Company*, 28 F.3d 1446, 1456 (7th Cir. 1994); *Doe v. RR Donnelley and Sons Company*, 42 F.3d 439, 444 at N.3 (7th Cir. 1994); and *Baskerville* at p.431].

In *Dey*, the plaintiff claimed to have been subjected almost daily to comments, gestures and innuendo that she considered sexually suggestive.  Although she was unable to remember the specifics

of many of the alleged harassing comments, she was able to recount in some detail five incidents. Our Circuit concluded that the plaintiff had presented sufficient evidence of conduct likely to alter her work environment from both an objective and subjective point of view to warrant a trial. The *Dey* court recognized that gender related comments occurring on a daily basis including ones not directed specifically at the claimant would be sufficient to warrant a jury trial even where she was unable to remember precisely what the perpetrator said and did on each occasion.

In the instant case, the PLAINTIFF is not complaining about isolated or infrequent comments of a sexual nature by Mark Scheff. Instead, she complained about graphically, sexual comments which occurred on a daily basis[¶38,40,45,46,49,58,59,64 of the PLAINTIFF's Statement]. In the interest of good taste, the precise nature of Scheff's comments will not be repeated in this instrument.[3]

These comments were not isolated or occasional. Instead, they were the type of "barrage" which our Circuit in *Dey* concluded would be actionable under the ACT.

The evidence in this record from both the PLAINTIFF and others, such as Judy Bixler, Pamela DuFour, Cheryl Bangert and Mary Thallman, was that Scheff on a frequent basis made comments of an offensive sexual nature in the presence of women [¶58,59,64,136 of the PLAINTIFF's Statement]. This evidence at the very least creates a jury issue as to whether this conduct would from an objective and subjective point of view be sufficient to alter for the worse the conditions of a female's employment

_____

[3] In paragraph 12 of the DEPARTMENT's statement of undisputed facts, the DEPARTMENT recounts over fourteen incidents where, according to the PLAINTIFF, Scheff made comments of a sexual nature. Paragraph 13 identifies other incidents in which Scheff made comments in the presence of the PLAINTIFF having either a sexual connotation or evidencing resentment toward women [¶13 of the DEFENDANT's statement]. This is a non-exclusive list of what the PLAINTIFF observed. According to her deposition testimony, Scheff's sexually offensive comments were made "almost every day" [PLAINTIFF's Dep.87].

and create a hostile work environment.

**2)  The PLAINTIFF Has Successfully Demonstrated That A Reasonable Fact Finder Could Conclude That Scheff's Offensive Conduct In The Workplace Was Because Of Sex.**

Observing that in order for conduct to constitute actionable sexual harassment under the ACT, it must in some respect be motivated by sex, the DEPARTMENT argues that the PLAINTIFF's claim of sexual harassment against Scheff is infirm.  According to it, his conduct was equally objectionable to both men and women.  While the DEPARTMENT is correct in its analysis of the relevant law, its argument breaks down when it attempts to apply that law to the facts in this case.  The DEPARTMENT is attempting to place a square legal peg into a round hole.

In *Oncale v. Sun Downer Offshore Services, Inc.*, 523 U.S. 75, 140 L.Ed.2d 201 (1998), the Supreme Court reaffirmed the principle that in order for conduct to be actionable sexual harassment under the ACT, it must have arisen in some respect because of sex.  An individual who engages in offensive conduct but in that respect treats both sexes the same is not engaging in conduct prohibited by 42 U.S.C. §2000e-2 [see for example *Holman v. State of Indiana*, 211 F.3d 399, 403 (7th Cir. 2000)].

Using that principle as the foundation for its argument, the DEPARTMENT, ignoring much of the record, presumes that a reasonable trier of fact could only conclude that Mark Scheff treated both males and females in the same manner with respect to his objectionable conduct.  To buttress that argument it relies upon selected and incomplete portions of the record including the affidavit of one employee, Mike Sandidge, who essentially assumes that he "would have" complained about Scheff's

conduct to a supervisor.[4]

Oncale teaches that there is no single means of establishing the discriminatory aspect of sexual harassment.  So long as a plaintiff demonstrates in some manner that she would not have been treated in the same way had she been a man she has proven her case [*Oncale* at p.1002; and *Shepherd v. Slater Steels Corporation*, 168 F.3d 998, 1009 (7th Cir. 1999)].  It is clear that the means of proving discrimination cannot be reduced to a rigid formula.  Such proof can come in a variety of means so long as a reasonable fact finder could infer from the facts that the PLAINTIFF was harassed in some respect because of her sex [see *Shepherd* at p.1009].  A reasonable trier of fact may deduce that an individual is being harassed because of her sex even when the harassing behavior is not overtly gender based [see *Rizzo v. Sheahan*, 266 F.3d 705, 713 (7th Cir. 2001); and *Haugerud v. Amery School District*, 259 F.3d 678, 693-94 (7th Cir. 2001)].

The question thus becomes whether based upon the record developed in this case a reasonable fact finder could conclude that the PLAINTIFF was harassed by Scheff in some respect because of her sex.  Whether the sexual content of the harassment is indicative of sex discrimination must be examined within the context in which the harassment occurs [see *Shepherd* at p.1009].

Contrary to the conclusionary denials of the DEPARTMENT, there is plentiful evidence in the record developed in this case that Scheff's conduct toward the PLAINTIFF was in large part motivated because of an animus he had toward women.  Before examining that evidence, however, it is

---

[4] For reasons more specifically addressed in her motion requesting this Court strike the affidavit of Sandidge, the PLAINTIFF asserts that his affidavit failed to satisfy the fundamental requirements of Rule 56 (e) of the *Federal Rules of Civil Procedure*.  Moreover, Sandidge's assertions that he would have complained to Lenna DeGroot is at odds with her denial of receiving any such complaints [¶72 of the PLAINTIFF's Statement].

important to point out that unlike many of the cases cited by the DEPARTMENT in its brief, there is no evidence that Scheff's sexual conduct directed toward the PLAINTIFF was motivated for some reason other than gender.  There is no evidence that they had any type of personal animosity or dislike for the PLAINTIFF prior to the Thallman incident.  Neither Scheff nor the PLAINTIFF have presented any evidence suggesting or indicating that they had a problematic relationship unrelated to gender prior to the Thallman incident.

On the other hand, there is plentiful evidence in the record that Scheff at the very least had a problem with women in the workplace.

In the first place, the DEPARTMENT's contention that Scheff's boorish behavior was equally disbursed among males and females is belied by the record.  Earlier, we have identified numerous females who witnessed Scheff's sexually offensive conduct.  On the other hand, Jim Schuh, a male confidant of Scheff, has no recollections of Scheff making comments of a graphic sexual nature other than an isolated anecdote Scheff shared with him during a trip to Chicago [¶71 of the PLAINTIFF's Statement].

Secondly, a reasonable trier of fact could conclude that Scheff was condescending to women. In addressing them, he would refer to them with reference to some gender based characteristic (*i.e.*, "the little woman" or the "big blonde bombshell") [¶36 of the PLAINTIFF's Statement].

Third, he had little regard for the competence of women in the workplace.  While MACs typically sought advice and assistance from one another, Scheff made a point of never seeking assistance from his female counterparts characterizing them as being less competent than men.  Scheff repeatedly made denigrating comparisons of the female supervisor to the male supervisor [¶41,43 of the PLAINTIFF's Statement].

Fourth, it is almost universally acknowledged in this case that Scheff was driven by a belief that women within the BUREAU were given unfair advantage over men when it came to promotions. He referred to the BUREAU Chief as a traitor to men who surrounded himself with "strong pussy" [¶39, 40, 42 of the PLAINTIFF's Statement]. At some point the PLAINTIFF complained to Steve Bradley concerning Scheff's sexually offensive conduct. Upon receiving those complaints, Steve Bradley understood Scheff's remarks to be related to a belief on Scheff's part that only women were being promoted in the BUREAU [¶70 of the PLAINTIFF's Statement]. He made reference to a requirement that in order to get a promotion one had to have a "vagina" rather than a "penis" [¶56 of the PLAINTIFF's Statement]. These comments on Scheff's part about a gender bias in the BUREAU were not isolated, but were instead the preoccupation on his part to constantly make reference to the unfairness in treatment men received in the BUREAU when it came to promotions [¶39,40,42,61,68 of the PLAINTIFF's Statement].

Finally, while Scheff may occasionally have used profanities and vulgarities in his talk with men in the unit, it was different with women. Both Mary Thallman and the PLAINTIFF acknowledged that Scheff on a daily basis would make comments which were graphically sexual in the presence of women [¶38,45,58,59,64 of the PLAINTIFF's Statement]. Moreover, the PLAINTIFF noticed that unlike his treatment around men Scheff in any conversation with a woman would turn the conversation in a direction where he could make an offensive sexual comment [¶38 of the PLAINTIFF's Statement].

Given all of this evidence a reasonable trier of fact could conclude that Scheff's offensive conduct arose out of misdirected beliefs on his part to the inferiority of women and the unfairness in which men were treated in the BUREAU as compared to females with respect to promotional opportunities. It could also conclude that his offensive conduct was more pronounced with women.

The PLAINTIFF has created, as required by *Oncale,* an evidentiary path which would allow a jury to conclude that in some respect Scheff's offensive conduct was motivated because of sex.

## C.  <u>THE PLAINTIFF'S CLAIM OF UNLAWFUL RETALIATION</u>

42 U.S.C. §2000e-3(a) provides in pertinent part as follows:

"It shall be an unlawful employment practice for an employer to discriminate against any of his employees - - - because <u>he has opposed any practice made an unlawful employment practice</u> by this title  - - -, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title" (emphasis added).

Under either the direct or indirect methods, the PLAINTIFF has presented evidence of a *prima facie* claim of retaliation sufficient to entitle her to a trial.

A reasonable trier of fact could conclude that in the wake of the Thallman investigation Mark Scheff began acting out against the  PLAINTIFF.  In this respect, he surveilled the PLAINTIFF at her work station, stalked her during break periods, and made veiled threats to both the PLAINTIFF and others who cooperated in the Thallman investigation.  All of this created a chilling and hostile environment in which the PLAINTIFF worked.  During the course of his behavior, the PLAINTIFF was required to relocate her work station.  This did not deter his conduct.  Eventually, to escape his wrath the PLAINTIFF bid on a position where she would work in a building distant from the Bloom Building.  To do that, however, she had to accept a voluntary demotion.

Our Circuit seems to view favorably the notion that the ACT imposes liability on an employer for the "creation or toleration of a hostile environment motivated purely by the plaintiff's filing of a complaint of sexual harassment".  According to our Circuit this is a form of retaliation [see *Heuer v. Weil-McLain*, 203 F.3d 1021, 1024 (7th Cir. 2000); and *Berry v. Delta Airlines Incorporated,* 260

F.3d 803, 808 (7th Cir. 2001)].[5]

**1) The PLAINTIFF's Protected Activity.**

It is undisputed in this case that in the wake of the Thallman complaint the PLAINTIFF spoke with OIG investigators and related her experiences with Mark Scheff in the workplace. The investigation was undertaken because of a complaint made by a female that Mark Scheff had uttered comments of a graphically sexual nature. For purposes at least of summary judgment, the DEPARTMENT does not deny the PLAINTIFF's role in the investigation.[6]

In a statement given to OIG in connection with its investigation into the PLAINTIFF's complaint, Pamela DuFour informed its investigators that in the wake of the Thallman investigation there was tension and a hostile environment in the BUREAU. She characterized the environment as males pitted against females, an atmosphere encouraged by Mark Scheff [¶167 of the PLAINTIFF's Statement].

The DEPARTMENT claims that the PLAINTIFF had not engaged in activity protected by 42 U.S.C. §2000e-3 in spite of her conduct because her complaints related to matters other than gender discrimination.

For reasons earlier explained, a reasonable trier of fact in this case could conclude that Scheff's conduct in the workplace prior to October of 2000 was "because of sex". Among other things, he

---

[5] Other circuits have recognized that the ACT creates liability for the creation of a hostile work environment motivated because an employee protests the violation of her civil rights [see for example *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 791-94 (6th Cir. 2000); and *Richardson v. New York State Department of Correctional Service*, 180 F.3d 426, 445-46 (2nd Cir. 1999)].

[6] According to Mark Scheff, the PLAINTIFF was the driving force for the Thallman complaint. He believes it was done by her because she hated men [¶121,209,210 of the PLAINTIFF's Statement].

resented females success in advancing within the BUREAU, felt they were inferior, and tended to look down upon them.  Moreover, when he engaged in conversation with females the topic typically turned to matters of sex.  The PLAINTIFF is not alone in this observation.  As previously mentioned, Mary Thallman, Pamela DuFour, Judy Bixler and other females shared in this viewpoint.

According to Janice Johnson, who investigated the PLAINTIFF's allegations of sexual harassment, in her interviews it was only female employees who complained to her that Mark Scheff made comments of a sexual nature [¶126 of the PLAINTIFF's Statement].  Moreover, the PLAINTIFF had an honest belief that there was a difference in the workplace in the manner in which Scheff treated female employees from male employees.

Our Circuit has recognized that an employee need not use the magic words "sex" discrimination or "gender" discrimination to bring her speech within the ACT's retaliation protections provided that she has said something to indicate that gender is an issue [see *Sitar v. Indiana Department of Transportation*, 344 F.3d 720, 727 (7th Cir. 2003)].

What is apparent is that the PLAINTIFF was not the only individual cooperating with the OIG investigators.  Other females did as well indicating that Mark Scheff was prone to engage in sexually vulgar commentary in the workplace [¶126 of the PLAINTIFF's Statement].

A reasonable jury could conclude that the PLAINTIFF was one of several female employees who supported the complaint of Mary Thallman by indicating that Scheff had engaged in vulgar behavior in the workplace.  All of this would enable a reasonable juror to conclude that the complaints about Scheff's behavior was related to conduct on Scheff's part which in some respect reflected animus or condescension toward women.

**2)  The Treatment Directed Toward The PLAINTIFF Constituted A Materially**

**Adverse Employment Action.**

An adverse employment action is one that significantly alters the terms and conditions of the employee's job [see *Stutler v. Illinois Department of Corrections,* 263 F.3d 698, 703 (7th Cir. 2001); and *Hilt-Dyson v. City of Chicago,* 282 F.3d 456, 465 (7th Cir. 2002)].

Whether conduct by an employer is sufficiently material to constitute an adverse employment action must be decided on a case by case basis and normally will depend upon the facts of each situation [*Bryson v. Chicago State University,* 96 F.3d 912, 916 (7th Cir. 1996)].

Whether conduct rises to the level of an adverse employment action must be viewed broadly [*McDonnell v. Cisneros,* 84 F.3d 256, 258-9 (7th Cir. 1996) and *Silk v. City of Chicago*, 194 F.3d 788 (7th Cir. 1999)].

Actionable activity on the part of an employer is not limited to conduct resulting in monetary consequences to the employee. Instead, it can encompass other forms of adversity in the workplace [see *Collins v. State of Illinois,* 830 F.2d 692, 703 (7th Cir. 1987) and *Smart v. Ball State University,* 89 F.3d 437 (7th Cir. 1996)]. Adverse employment actions cannot be condensed into a precise list, but includes a variety of consequences some of which might be reasonably unique to a particular situation [ *Rebando v. United Airlines, Inc.,* 200 F.3d 507, 510 (7th Cir. 1999) and *Hilt-Dyson* at pp.465-66].

Our Circuit has recognized three category of cases in which an employer's actions create a materially adverse employment action. The first is when the financial terms of employment are diminished. The second occurs when a nominally lateral transfer without a change in the employee's financial terms of employment significantly reduces his career prospects by preventing him from using his skills and experience. The third category occurs in situations in which an employee is not moved to

a different job or the skill requirements of his present job are not altered, but instead the conditions

under which he works are changed in a way that subjects him to humiliating, degrading, unsafe or

unhealthful conditions or otherwise significantly alters his workplace environment in a negative respect

including an alteration which can be objectively characterized as creating a hardship [see *Tart v.*

*Illinois Power Company,* 366 F.3d 461, 475 (7th Cir. 2004) and *Herrnreiter v. Chicago Housing*

*Authority,* 315 F.3d 742, 744-5 (7th Cir. 2002)].  A quantitative or qualitative change in the terms and

conditions of an individual's employment which is more onerous than not honoring her subjective

preferences is sufficient to constitute an adverse employment action [*Johnson v. Cambridge*

*Industries, Inc.,* 325 F.3d 892, 901 (7th Cir. 2003)].

     In order for an employer's conduct to rise to a materially adverse employment action, the

challenged action must be material to a reasonable person [*Washington v. Illinois Department of*

*Revenue,* 420 F.3d 658, 662 (7th Cir. 2005)].

     A reasonable jury could conclude that the PLAINTIFF's situation at the very least falls within

the third category of situations in which an adverse employment action occurs.  Following her

cooperation in the Thallman investigation, the PLAINTIFF was subjected to conditions which a

reasonable person would consider as a significant change for the worse in her employment environment.

     Under the DEPARTMENT's policies, an employee who cooperates in a sexual harassment

investigation is entitled to be free from retributive conduct by the subject of the investigation.

Supervisors within the DEPARTMENT are to take such precautionary measures as might reasonably

be necessary to ensure that this occurs.  An employee who acts out against other employees who have

cooperated in an investigation into his misconduct is engaging in behavior which could warrant severe

disciplinary consequences [¶73-101 of the PLAINTIFF's Statement].

In this case, it is abundantly clear that Mark Scheff held the PLAINTIFF responsible for Mary Thallman's actions in instigating a complaint against him [¶121 of the PLAINTIFF's Statement]. Furthermore, on October 19, 2000 in a meeting with Steve Bradley, Scheff threatened retribution against individuals who, according to him, made frivolous accusations against him [¶158 of the PLAINTIFF's Statement].

A reasonable jury could conclude that from the day Scheff became aware that the PLAINTIFF had cooperated in the investigation in October of 2000 through the balance of the time period she worked in the Bloom Building he engaged in a concerted campaign to make her life miserable.

Prior to the Thallman incident, Scheff rarely walked by her work station. After the Thallman complaint, he walked by her work station multiple times each day sometimes staring, sometimes giving the PLAINTIFF menacing stares and at other times telling individuals working proximate to the PLAINTIFF's work station that he might institute legal action against those cooperating in the Thallman investigation [¶151-154 of the PLAINTIFF's Statement].

Eventually, the PLAINTIFF transferred to the first floor of the Bloom Building. Even though Scheff was instructed not to go to areas proximate to her office, he disregarded those instructions and consistently loitered around her office even though he had no work related business in that area of the Bloom Building [¶183-184 of the PLAINTIFF's Statement]. Scheff's conduct was noticed by others and reported to the BUREAU Chief [¶212 of the PLAINTIFF's Statement]. Nonetheless, Scheff's conduct continued undeterred.

Even on break periods, the PLAINTIFF could not avoid Scheff. He would loiter in vicinities close to where she was taking her break. At the conclusion of the workday regardless of when she left

work, Scheff would be at the door where she was leaving work [¶186-189 of the PLAINTIFF's Statement]. A reasonable juror could conclude that Scheff's conduct created a "hellish" atmosphere for the PLAINTIFF to work.

Notwithstanding the DEPARTMENT's policies, her immediate supervisor, Jodie Edmonds, disregarded her complaints about Scheff's behavior. A common reaction by her was that Scheff was doing nothing wrong and she should expect that treatment because of what she did. She even promised the PLAINTIFF that his conduct would get worse [¶175 of the PLAINTIFF's Statement]. Edmonds accused her of being a crybaby and following the Scheff complaint refused in most instances to even speak to her. Both Edmonds and DeGroot even went far enough to sign on at Scheff's request to be witnesses for him in an investigation relating to those issues [¶168-172,181 of the PLAINTIFF's Statement].[7] Steve Bradley acknowledged that despite his admonitions to Scheff, Scheff's conduct continued and he could offer no reason why he did not discipline Scheff for his behavior around the PLAINTIFF even though he was aware that an employee who retaliated against an individual in such circumstance could be subject to serious discipline [¶202-205 of the PLAINTIFF's Statement].

All of this would allow a reasonable jury to conclude that not only did Scheff make the PLAINTIFF's work life hellish, but also that supervisors, notwithstanding the DEPARTMENT's policies to the contrary, refused to take any effective action to deter his conduct.

Eventually, because Scheff's conduct persisted and her supervisors took no action to abate the

---

[7] DeGroot and Edmonds obviously had a motive for supporting Scheff. They refused to intervene to stop Scheff's conduct in the workplace prior to the Thallman complaint. Their actions in this respect were contrary to the DEPARTMENT's policies and placed them in a position where they potentially could be disciplined. Thus, they had a motive to side with Scheff with respect to that subject [¶73-101 of the PLAINTIFF's Statement].

conduct, the PLAINTIFF bid with the encouragement of her BUREAU Chief on another job where she would work in a building away from Scheff.  In order to bid on that job, however, she had to accept a voluntary demotion.  While the demotion did not reduce her salary, it certainly implicated for the worse her opportunities for upward mobility in state government [¶213-218 of the PLAINTIFF's Statement].

For these reasons and others, a reasonable jury could conclude that the PLAINTIFF in the wake of the Thallman investigation was subjected to activities which under the standards of our Circuit constituted a materially adverse employment action.

### 3)  There Is Plentiful Evidence Connecting The PLAINTIFF's  Protected Activities And The Adverse Actions Taken Against Her.

Under the direct method, the PLAINTIFF can establish a *prima facie* claim of retaliation by indicating that:  a) she engaged in a statutorily protected activity; b) an adverse action was taken against her by her employer; and c) a causal connection exists between the two [see *Sitar* at p.728; and *Stone v. City of Indianapolis*, 281 F.3d 640, 644 (7th Cir. 2002)].

Our Circuit has recognized that a causal connection may be established through evidence that the complained conduct took place in close proximity to the protected activities [see for example *Collins v. Illinois*, 830 F.2d 692, 702 (7th Cir. 1987); *Johnson v. Sullivan*, 945 F.2d 976 (7th Cir. 1991); and *Dey v. Colt Construction and Development Company*, 28 F.3d 1446, 1458 (7th Cir. 1994)].  According to it, a "telling, temporal sequence" in which the employer's adverse action follows on the heels of the employee's protected activities can be sufficient to establish the causal nexis [see *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796-97 (7th Cir. 1997); and *Holland v. Jefferson National Life Insurance Company*, 883 F.2d 1307, 1315 (7th Cir. 1989)].

Given the sequence of events which unfolded with respect to the PLAINTIFF, a reasonable trier of fact could find a connection between the PLAINTIFF's cooperation in the OIG investigation and the conduct directed toward her by Mark Scheff which was essentially ignored by her supervisor as well as her supervisor's conduct. The evidence of a connection in this case is much more compelling than merely the temporal relationship between the PLAINTIFF's protected activities and the complained conduct.

At the outset it should be noted that prior to October of 2000 Mark Scheff had no disputes with the PLAINTIFF other, of course, than she was a female. It is also apparent that Scheff held the PLAINTIFF responsible for the Thallman complaint. According to him, the PLAINTIFF was a driving force in that complaint because he believed she hated men [¶123,209,210 of the PLAINTIFF's Statement]. Not only did he hold the PLAINTIFF responsible, but indicated to Steve Bradley on October 19, 2000 that he would have his retribution against individuals who complained against him [¶158 of the PLAINTIFF's Statement].

Following the Thallman complaint, Scheff began acting out against the PLAINTIFF in the manner described earlier. He uttered veiled threats, surveilled her work station and began stalking her in the workplace. This was conduct which had never occurred previously and fell on the heels of the Thallman complaint.

Given the uneventful relationship between Scheff and the PLAINTIFF prior to the Thallman incident, Scheff's belief that the PLAINTIFF was responsible for the Thallman incident, his threats of retribution and the immediate change in Scheff's conduct toward the PLAINTIFF following the Thallman incident, a reasonable trier of fact could conclude that Scheff's conduct toward the PLAINTIFF was based upon his belief that she had been responsible for the Thallman complaint.

The record would also support a finder of fact concluding that the PLAINTIFF's supervisor, Jodie Edmonds, was upset with the PLAINTIFF's involvement in the Thallman complaint.  In the wake of the Thallman complaint, she:  a) refused to communicate with the PLAINTIFF; b) accused the PLAINTIFF of being a crybaby; c) indicated she would be a witness for Mark Scheff; d) in the presence of the PLAINTIFF angrily accused Laura Whetstone of wrecking her unit referring to the Scheff investigation; e) accused the PLAINTIFF of not being a member of the management team because of her cooperation with the Thallman investigation; and f) despite the DEPARTMENT's policies to the contrary ignored the PLAINTIFF's complaints about Scheff's retributive conduct toward her.  All of this suggests an animus on her part directed toward the PLAINTIFF which was manifested, among other ways, by empowering Mark Scheff to continue his vindictive behavior toward the PLAINTIFF.

A reasonable trier of fact could readily conclude from this evidence that the hostile employment environment to which the PLAINTIFF was exposed after the Thallman investigation was connected to her actions in cooperating with that investigation.

## V.  CONCLUSION

For reasons more fully stated above, each point relied upon by the DEPARTMENT in its request for summary judgment is not supported by the evidentiary record developed in this proceeding. A reasonable trier of fact, based upon evidence developed, could see this case from a viewpoint significantly different than the one portrayed by the DEPARTMENT.  Accordingly, this is a case which should go to trial.  The PLAINTIFF, DEBORAH R. SULLINS, respectfully requests, therefore, that the DEPARTMENT's motion for summary judgment be denied.

DEBORAH R. SULLINS

BY:  ___s/ James P. Baker_____
        James P. Baker
        Bar Number: 0097802
        Baker, Baker & Krajewski, LLC
        415 South Seventh Street
        Springfield, Illinois 62701
        Telephone: (217) 522-3445
        Facsimile: (217) 522-8234
        E-mail: brendabakerlaw@sbcglobal.net
        (Memorandum/sullinsdmsjopposition 112805)

        John P. Taylor (6256758)
        Attorney at Law
        P.O. Box 3364
        Springfield,  Illinois   62708
        Telephone: (217) 525-5100
        Facsimile: (217) 523-1594
        E-mail: johnptaylor@insightbb.com

## **CERTIFICATE OF SERVICE**

        I hereby certify that on December 16, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Sarah Kerley
Office of the Illinois Attorney General
500 South Second Street
Springfield,  Illinois   62701

        By:___s/ James P. Baker_____
        James P. Baker
        Baker, Baker & Krajewski, LLC
        415 South Seventh Street
        Springfield, Illinois 62701
        Telephone: (217) 522-3445
        Facsimile: (217) 522-8234
        E-mail: brendabakerlaw@sbcglobal.net