3:04-cv-03039-JES-BGC     # 18-9     Page 1 of 20
7/18/05                Sullins vs. Illinois Dept. of Public Aid
Lenna Degroot

E-FILED
Tuesday, 20 December, 2005 10:00:45 AM
Clerk, U.S. District Court, ILCD

## Page 1

```
IN THE UNITED STATES DISTRICT COURT
  FOR THE CENTRAL DISTRICT OF ILLINOIS
          SPRINGFIELD DIVISION
DEBORAH R. SULLINS,
          Plaintiff,
     vs.                    No. 04-3039
THE ILLINOIS DEPARTMENT OF PUBLIC
AID,
          Defendant.
```

     THE DEPOSITION of LENNA DEGROOT, taken in the above-entitled case before Julie A. Brown, a Certified Shorthand Reporter of Christian County, acting within and for the County of Sangamon, State of Illinois, at 3:00 o'clock P.M., on July 18, 2005, at 415 South Seventh Street, Springfield, Sangamon County, Illinois, pursuant to notice.

          Baldwin Reporting & Legal-Visual Services
              Serving Illinois, Indiana & Missouri
           24hrs (217)788-2835   Fax (217)788-2838
                      1-800-248-2835

## Page 2

APPEARANCES:

    BAKER, BAKER & KRAJEWSKI, LLC
    BY:  James P. Baker, Esq.
         415 South Seventh Street
         Springfield, Illinois  62701
         On behalf of Plaintiff.

    MS. SARAH R. KERLEY
         Assistant Attorney General
         500 South Second Street
         Springfield, Illinois  62701
         On behalf of Defendant.

## Page 3

                    I N D E X
DEPONENT                              PAGE NUMBER
Lenna DeGroot
    Examination by Mr. Baker           5, 64
    Examination by Ms. Kerley          60


                  E X H I B I T S
NUMBER                    MARKED FOR IDENTIFICATION
Exhibit 26                           35
Exhibit 27                           47

ORIGINAL

## Page 4

             S T I P U L A T I O N

     It is stipulated and agreed, by and between the parties hereto, through their attorneys, that the deposition of LENNA DEGROOT may be taken before Julie A. Brown, a Certified Shorthand Reporter, upon oral interrogatories, on the 18th of July A.D., 2005, at the instance of the Plaintiff at the hour of 3:00 o'clock P.M., 415 South Seventh Street, Springfield, Sangamon County, Illinois;

     That the oral interrogatories and the answers of the witness may be taken down in shorthand by the Reporter and afterwards transcribed;

     That all requirements of the Federal Rules of Civil Procedure and the Rules of the Supreme Court as to dedimus, are expressly waived;

     That any objections as to competency, materiality or relevancy are hereby reserved, but any objection as to the form of question is waived unless specifically noted;

     That the deposition, or any parts thereof may be used for any purpose for which depositions are competent, by any of the parties hereto, without foundation proof;

     That any party hereto may be furnished copies of the deposition at his or her own expense.

3:04-cv-03039-JES-BGC   # 18-9   Page 2 of 20

7/18/05                 Sullins vs. Illinois Dept. of Public Aid
Lenna Degroot

### Page 5

1  (Whereupon the Deponent was
2  sworn by the Court Reporter.)
3            L E N N A   D E G R O O T
4  having been first duly sworn by the Court Reporter,
5  deposeth and saith as follows:
6                    EXAMINATION
7                    BY MR. BAKER:
8     Q   Would you state your name and address,
9  please?
10    A   Lenna J. DeGroot, 3 Cherry Drive,
11 Rochester, Illinois, 62563.
12    Q   Ms. DeGroot, are you employed?
13    A   Yes, I am.
14    Q   Where do you work?
15    A   Part-time at Memorial Medical Center.
16    Q   Were you at one time an employee of the
17 state of Illinois?
18    A   Yes, I was.
19    Q   And more specifically, did you work for
20 the Illinois Department of Public Aid?
21    A   Yes, I did.
22    Q   And when did you leave the Department of
23 Public Aid?
24    A   December, I think it was the 1st of

### Page 6

1  2002.  The 1st or the 31st.  I don't remember for
2  sure now but it was December of '02.
3     Q   Was that at a time when there was a mass
4  exodus of state employees?
5     A   Yes, it was.
6     MS. KERLEY: I think it was the 31st.
7     MR. BAKER:   Q   As they say, get out while
8  the gettin's good?
9     A   And I did.  Yes, I did.
10    Q   I take it then your employment with the
11 department came to an honorable end and you
12 retired?
13    A   Yes, it did.  I got to retire.  Yes, I
14 did.
15    Q   All right.  Have you ever given a
16 deposition before?
17    A   No, I have not.
18    Q   Okay.  Would you like to know what's
19 going to happen today?
20    A   Oh, sure.
21    Q   As you probably know by now I represent
22 Debbie Sullins and Debbie has filed a lawsuit
23 against the Department of Public Aid.  You have
24 been identified as someone that has some knowledge

### Page 7

1  of the facts that relate to that case.  So what
2  we're going to do for the next few minutes is I'm
3  going to interview you.
4     A   Okay.
5     Q   I'll ask you questions and ask that you
6  do the best you can to respond to those questions.
7  It's a little stuffy in here.  So if at any time
8  you want to get up and take a break or cool off,
9  that's fine.
10    A   Okay.
11    Q   If you don't understand a question, let
12 me know you don't understand.
13    A   Okay.
14    Q   I'm going to ask you respond verbally to
15 questions and I'm also going to ask that when you
16 answer a question you not do it by using either
17 uh-huh or uh-uh.
18    A   Okay.
19    Q   Those answers, and there's a real simple
20 reason for that.  She's going to write down what
21 you say and I can't tell the difference between
22 those two terms.
23    A   Okay.
24    Q   And there are some significant

### Page 8

1  differences between them.
2     A   Yes, there is.
3     MS. KERLEY: Although by now I'm sure she's
4  learn how to spell them or at least try to, right?
5     MR. BAKER: Oh, she does fine.  It's for me.
6     Q   At the time you left the Department
7  of Public Aid what was your job?
8     A   I was an Executive II.  I was a
9  supervisor for some of the medical assistant
10 consultants in the UB billing unit.
11    Q   How long had you held that position?
12    A   I was temporarily assigned from sometime
13 in '98 through May of '99 at which time I got it
14 permanently.
15    Q   All right.  The unit you worked in or
16 supervised, how many employees worked in that unit
17 in the year 2000?
18    A   I think there was, I think there was nine
19 at that time.  I don't remember for sure.  I think
20 I supervised four and Marvin had five is what I
21 think but I don't remember 100 percent.
22    Q   When you say Marvin, you're referring to?
23    A   Marvin Ross.  I'm sorry.  Yes.
24    Q   Did your unit and Marvin Ross's unit do

3:04-cv-03039-JES-BGC   # 18-9   Page 3 of 20
7/18/05
Lenna Degroot                    Sullins vs. Illinois Dept. of Public Aid

### Page 9

1  the same thing?
2  A    Yes, they did.
3  Q    Was there any difference between what
4  your two units did?
5  A    There was supposed to be I think on
6  paper. You know, I was over like maybe the renal
7  program and he had the hospice but bottom line was
8  they all did the exact same work.
9  Q    Okay. Did everyone in your unit and
10 everyone in Marvin's unit work in the same general
11 work area?
12 A    Yes, they did.
13 Q    Was your office located in that work
14 area?
15 A    Yes, it was.
16 Q    And was Marvin's office located in that
17 work area?
18 A    Yes.
19 Q    In the year 2000 do you recall the names
20 of the individuals you supervised?
21 A    Oh, let's see. 2000 was Jim Schun, Mary
22 Thallman, Deb Sullins.
23 Q    Okay.
24 A    Velva Fletcher I think and I think that

### Page 10

1  was it.
2  Q    Okay. Mary Thallman, Jim Schuh, Deb
3  Sullins and is it Velva?
4  A    Velva, V-E-L-V-A.
5  Q    Velva Fletcher. Did they all do the
6  same--
7  A    Yes.
8  Q    (Continuing.)--jobs?
9  A    Yes, they did.
10 Q    And they were, what is it? Medical
11 consultants?
12 A    Medical assistant consultants or known as
13 MACs. We just called them MACs.
14 Q    What was the job of a MAC?
15 A    They were primarily to train providers
16 that bill on a US92 form and to, it would either be
17 going out to do training or answering phone calls.
18 There was some reports. They would get mail in and
19 have to work on mail, telephone calls and then
20 other duties that we happen to come up. If there
21 were special projects that they had to be pulled to
22 work.
23 Q    How long had you supervised Jim Schuh?
24 A    From the time, well, from the time I was

### Page 11

1  temporarily assigned in '98 up until I retired in
2  '02.
3  Q    Before you became a supervisor in that
4  unit what was your job?
5  A    I was also a medical assistant consultant
6  for, from like '89 through '98.
7  Q    And when you were a medical assistant
8  consultant did you also work around Jim Schuh?
9  A    Yes. Yes, I'm sure I did. I can't
10 remember for sure when he came to the unit, but.
11 Q    Okay. Do you know a man named Mark
12 Scheff?
13 A    Yes, I do.
14 Q    Did you ever supervise Mark?
15 A    No.
16 Q    In the year 2000 did you work in the same
17 area where Mark worked?
18 A    Yes.
19 Q    Where was your office located in relation
20 to Mark Scheff's work?
21 A    Right next door to each other.
22 Q    And where was your office in relation to
23 Jim Schuh's work area?
24 A    At the opposite end of the hall. Well,

### Page 12

1  no. At that time I think there was, there maybe
2  was two offices between us. I don't think he moved
3  to the end of the hall until later on because I
4  think when he first came there was, God, that's
5  been five years ago. Six years ago.
6  Q    Do you recall him sharing an office at
7  one time with Mary Thallman?
8  A    Yes, now that you say that, yes. That
9  was the office that was right next door to mine at
10 that time.
11 Q    Okay. And when his, when his office and
12 Mary Thallman's office was next door to yours where
13 was Mark Scheff's work area?
14 A    I don't remember. I think he was in the
15 other hallway. It was just around the corner.
16 Q    In walking distance, how far would you--
17 A    Oh, from here probably maybe out to your
18 front door would be to the corner and I think he
19 had that corner office right there.
20 Q    So maybe 25 to 30 feet?
21 A    Possibly. Yeah. Yes.
22 Q    Okay.
23 A    But within walking. I mean it was just
24 right there.

3:04-cv-03039-JES-BGC   # 18-9   Page 4 of 20
7/18/05                           Sullins vs. Illinois Dept. of Public Aid
Lenna Degroot

Page 13

1   Q   Did the work space of the MACs, were
2   those cubicles or enclosed offices?
3   A   Some of them had offices. Some of them
4   were cubicles that were like two sided walls and
5   then it was just open, well, half walls in the
6   front.
7   Q   Okay. Mary Thallman and Jim Schuh, did
8   they have an office?
9   A   Yes.
10  Q   And the walls went to the ceiling?
11  A   Yeah, door and the whole, yes, they had
12  an actual office.
13  Q   And Mark Scheff back at that time in 2000
14  did he have an office?
15  A   No. He had the, like the cube, the
16  cubicle.
17  Q   Okay. Did you know Mike Sandidge?
18  A   Yes.
19  Q   Did you know Joe Roberts?
20  A   Yes.
21  Q   In the year 2000 were they office mates?
22  A   I don't remember. I know, I mean I
23  supervised Joe but I don't remember if he was there
24  then or not. I just, I don't remember.

Page 14

1   Q   When you supervised him he worked in the
2   same unit that the other MACs did?
3   A   Yes. Yes.
4   Q   Okay. When you supervised him where was
5   his work area?
6   A   The only thing I remember is the last
7   office he had and that was one of the cubes in the
8   other hall. I'm trying to remember back then where
9   he sat and I don't remember. I think at one point
10  when he came over I think he had the first office
11  at the opposite end of the hall from where my
12  office was but I couldn't swear to that.
13  Q   Okay. The job that MACs did, was that
14  telephone intensive work?
15  A   Yes.
16  Q   And during the workday would a MAC spend
17  most of his or her time on the telephone?
18  A   Depends on the given day, but they could
19  spend a lot of their time on the telephone, yes.
20  Q   In a way that I can understand it,
21  apparently Ms. Kerley understands it but she's
22  smarter than I am and she'll understand more, can
23  you explain to me what a MAC does?
24  A   Yeah. They, we dealt with hospitals,

Page 15

1   hospices, renal providers and ambulatory surgery
2   centers and these were providers that billed on
3   what I told you earlier, a UB92 claim form and
4   their job primarily consisted of dealing with mail
5   that came in. You know, providers would send
6   claims if they had problems. Dealing with
7   telephone calls if they had rejected claims or, you
8   know, they just needed to answer, have billings
9   questions answered. They possibly would do on-site
10  training sessions for providers. They may have
11  providers come in and do training sessions for
12  them. We did seminars that the MACs helped conduct
13  some of the training for. So, but they, primarily
14  it was to help providers to be able to get claims
15  in and billed and paid.
16  Q   When you use the term provider, are you
17  talking about a facility that provided some sort of
18  medical services to a Public Aid recipient?
19  A   Yes.
20  Q   And that would, the Public Aid recipient
21  would be eligible for medical assistance benefits?
22  A   Yes.
23  Q   So the MACs then would answer questions
24  and maybe deal with problems that the providers

Page 16

1   were having in either billing or getting their
2   bills paid?
3   A   Yes.
4   Q   Okay. And I'm assuming that when a
5   provider had problems the most common way of
6   contacting the department was by way of telephone?
7   A   At that time, yes. Now they do some
8   e-mail but at that time pretty much it would be to
9   pick up the phone and call and speak to their
10  consultant. Instate providers were assigned
11  specific consultants. We dealt, also dealt with
12  providers all over the country and those were just
13  done by alphabet. So they were broken down by
14  alphabet between the consultants.
15  Q   So if I am a provider in Decatur, I know
16  who my MAC is if I have questions?
17  A   Hopefully, yes. Yes.
18  Q   If the system works as it's supposed to.
19  A   If the work system works like it should
20  they would know because we very rarely changed
21  providers, you know, unless somebody left.
22  Q   Okay. Was there a time of the day when
23  the telephones would shut down?
24  A   Yes. Usually at 3:00 o'clock. From 3:00

3:04-cv-03039-JES-BGC    # 18-9    Page 5 of 20
7/18/05                              Sullins vs. Illinois Dept. of Public Aid
Lenna Degroot

## Page 17

to 5:00 or depending on their work hours. If they worked 'til 4:30, 2:30 to 4:30, they were given two hours at the end of the day to do paperwork, mail, return phone calls, whatever they needed to do for their time.

Q So let me see if I have this straight. Assuming an individual worked an eight hour or a seven and a half hour workday, the first five and a half to six hours would be principally spent communicating with providers most commonly by telephone?

A Yes.

Q And the last two hours would be spent kind of catching up doing paperwork--

A Right.

Q (Continuing.)--returning phone calls, that sort of thing?

A Right.

Q Okay. In your job as a supervisor of this unit how would you spend your day? What type of work would you do?

A Well, you know, if providers called us, we dealt with providers. If the MACs came to us with questions we were available for that. We were

## Page 18

dealing with, you know, in the process of trying to change a provider that billed what we called on the professional side transferring them over to the UB side so we were busy with that and then HIPPA came into being and we spent numerous hours, numerous days dealing with that. Correspondence, letters, just about anything.

Q Back in 2000 I think that predated HIPPA. Am I correct?

A Yes, it did.

Q How would you spend your days back then?

A Pretty much like I told you without the HIPPA. You know, meetings. Just, I don't know. I was busy. I'm just not sure what I did but I was busy doing it.

Q Was most of your workday spent in your office?

A Not necessarily. I mean we attended a lot of meetings. So I mean I was in my office quite a bit but I was also was in meetings a lot too but usually if I wasn't in a meeting I was in my office.

Q I guess meetings come up from time to time. You may have three meetings one day and then

## Page 19

go a couple of days without any meetings. Is that a--

A Yeah. You know, like I said, by the time I left there we were so into HIPPA it seemed like I was in meetings all day every day but, you know, in 2000, yeah, probably. I just don't remember for sure.

Q Okay. Did you ever supervise Mark Scheff?

A Not, you know, like if Marvin was gone out of town, Marvin Ross was out of town and, you know, and I was the supervisor at hand, you know, if he had questions or anything or needed time off he might come to me but otherwise, but, you know, as far as being his supervisor no, I never was his official supervisor.

Q Describe for me if you could your relationship with Mary Thallman back in the year 2000.

A Well, I was her supervisor. You know, I mean we got along very well. I had known Mary for years because we had worked off and on together in different places. So, you know, we just, you know, didn't do a lot, you know, most of the time unless

## Page 20

they came to us if there were issues. Most of them just kind of worked on their own and did their own thing but, you know, that's about the best I can remember. You know, we were--

Q Well, I'm assuming that the relationship you had with her was a work relationship. You didn't socialize.

A Outside of work, no. Very rarely they might get together for a birthday but no, it was pretty much 8:00 to 4:30 and that was about it.

Q Okay. As best you can tell, at least from your point of view, in the year 2000 did you have a good working relationship with her?

A Yeah. I was trying to remember when Mary left there but yes, as far as, yeah, we had a fine working relationship. We got along fine.

Q Did you become aware that at one time Mary lodged a complaint against Mark Scheff?

A No. I mean did I become aware of it? After I got called to the OIG's office but at that point no, I did not know that. Not in 2000 or whenever it happened.

Q At some point in time you did become aware that she had lodged a complaint?

3:04-cv-03039-JES-BGC    # 18-9    Page 6 of 20
7/18/05
Lenna Degroot                                    Sullins vs. Illinois Dept. of Public Aid

## Page 21

1  A  Yes.
2  Q  And you found out about that through OIG?
3  A  Possibly. I can't remember what was
4  related to Mary and what was related to Deborah.
5  Any of it ever officially related to Mary to tell
6  you the truth of the matter. I really don't
7  remember. I said some of that stuff, you know, I
8  don't remember. I don't know when I heard it.
9  Like I said it's been five years and I've been out
10 of there for almost three years. So I really don't
11 remember it I, I honestly don't remember if I heard
12 about it, if it referenced Mary or just referenced
13 Deb. I just don't remember.
14 Q  Okay. Let's try and push Deb to the back
15 burner for a moment.
16 A  Okay.
17 Q  We'll talk about her later on. As you
18 sit here today do you have an understanding one way
19 or another as to whether Mary ever made a complaint
20 against Mark Scheff?
21 A  No.
22 Q  Okay. Do you know as you sit here
23 whether Deb Sullins ever maintained a complaint
24 against Mark Scheff?

## Page 22

1  A  In regards, now that I'm not sure how to
2  answer. I did know that that happened through the
3  OIG but prior to that no, I did not know.
4  Q  Okay. Well, I guess that's where I'm
5  going. The first you knew about any complaints was
6  when OIG informed you?
7  A  Honestly I don't remember. I don't know
8  if, you know, if it was through Jodie and she came
9  to us after it was officially lodged or, I just
10 don't remember how the sequence of events happened
11 that I became aware that she had filed a complaint
12 about Mark. I don't remember how it happened to
13 tell you the truth of the matter.
14 Q  Okay. You do recall at some point in
15 time speaking with someone at OIG--
16 A  Yes, I do. That I do know.
17 Q  (Continuing.)--about some complaint
18 directed against Mark Scheff?
19 A  Yes.
20 Q  You don't recall the particulars of the
21 complaint?
22 A  Like I said, how the sequence of events
23 happened. I know that it was a sexual harassment
24 complaint. I just don't remember, well, I'm sure I

## Page 23

1  became aware of it before I got called to the OIG's
2  office because at that point, I just don't
3  remember. You know, like I said that's been five
4  years ago. I just don't remember the sequence of
5  events that set it off but yes, I remember once I
6  got to the OIG's office what was going on.
7  Q  At any time after becoming aware of an
8  OIG complaint do you have recollections of talking
9  about Mark Scheff with either Mary Thallman or Deb
10 Sullins?
11 A  No. No, because I mean we were told at
12 that point not to discuss anything.
13 Q  Who told you that?
14 A  The OIG people and Jodie. Well, pretty
15 much went without saying. We were just told we
16 were not allowed to discuss, to discuss the
17 situation at, you know, that it was not to be
18 discussed at work.
19 Q  Nothing was to be discussed at work?
20 A  As far as in regards to this situation
21 with anyone, you know, well, with anyone really.
22 We were, it was not to be discussed. That it was,
23 I'm not sure what the term would be to use, but we
24 were not to discuss it.

## Page 24

1  Q  I'm going to hand you what has been
2  marked as Exhibit 22.
3  A  Yeah. I have read this before.
4  Q  Can you identify Exhibit 22 for me,
5  please?
6  A  Yes. It's a conditions of employment
7  regarding sexual harassment and the steps to be
8  taken if the sexual harassment complaint is filed.
9  Q  How did you first become acquainted with
10 Exhibit 22?
11 A  When they handed it to me. Prior to
12 this?
13 Q  Yes.
14 A  Well, I mean it was stuff that was given,
15 you know, in the, it's an employee handbook or the,
16 I would assume an employee handbook but I don't
17 remember for sure but I believe it's an employee
18 handbook.
19 Q  As a supervisor at the Department of
20 Public Aid did you receive any training on sexual
21 harassment?
22 A  I was trying to think if I went to, I
23 honestly don't remember if I went to, I think we
24 went to sexual harassment training back when it was

3:04-cv-03039-JES-BGC   # 18-9   Page 7 of 20
7/18/05                          Sullins vs. Illinois Dept. of Public Aid
Lenna Degroot

### Page 25

1  first, but I couldn't swear to that now.
2      Q    Okay.  In 2000 what was your
3  understanding about what you were to do as a
4  supervisor to see that the workplace was free of
5  conduct that might constitute sexual harassment?
6      A    If someone came to me with a complaint
7  that they were uncomfortable I would have gone to
8  Jodie and said this is the situation, how do we
9  handle it.
10     Q    If you observed conduct that you
11 determined might constitute sexual harassment, no
12 one complained about it but you observed it.
13     A    That I thought it wasn't right?  I would
14 have done the same.  I would have gone to Jodie and
15 said is this a problem, do we need to do something
16 with this.  She had been a supervisor for a number
17 of years before she came as our supervisor.
18     Q    And you're referring to Jodie Edmonds
19 now?
20     A    Yes.  I was a friend of Jodie Edmonds
21 then.
22     Q    I beg your pardon?
23     A    I was a friend of Jodie's then.  We never
24 associated outside of work.  Just, you know, but we

### Page 26

1  were still friends, yeah.
2      Q    Okay.  Back in 2000 what was your
3  understanding about conduct that constituted sexual
4  harassment?
5      A    That's, well, I would say, you know, I
6  mean based on the guidelines it would be anything
7  that, I mean cussing could have been considered
8  sexual harassment.
9      Q    Then we'd all be guilty of that.
10     A    Exactly.  And that's where, it's a very
11 fine line to draw there.
12     Q    Right.  I'm kind of interested, we're
13 not, we don't live in a Victorian age and we've all
14 heard certain words that are not to be stated in
15 polite society.  I understand that.  I'm interested
16 back in 2000 where you drew the line between what
17 might be a poor choice of words and conduct that
18 could be sexual harassment.
19     A    I'm not sure.  I mean that I personally
20 would have heard?  It would have had to have been,
21 I think it would have to have been something that
22 was extremely provocative or, you know, out and out
23 right, you know, touchy feely type that I would
24 have considered, you know, having worked with those

### Page 27

1  people for so many years, you know, it was, I'd say
2  something very provocative would have been, you
3  know, that I would have probably said but, you
4  know, I may have said to the person, you know,
5  given them the opportunity to say I don't like
6  this.  It makes me feel, well, as a supervisor I
7  probably would have gone to Jodie and said this is
8  so and so saying this, do we need to proceed
9  farther with this.  Just call them in and say, you
10 know, this is not appropriate in the workplace.
11 You know, deal with it.
12     Q    At any time between 1998 when you became
13 a supervisor up until December 31st, 2002 which I
14 assume was your retirement date.
15     A    Actually, I think it was December 1st but
16 that's okay.
17     Q    Up until your retirement date, whenever
18 that was, at any time did you ever go to Jodie
19 Edmonds and say someone said such and such or
20 someone did such and such, does that create a
21 sexual harassment issue?
22     A    No, I did not.
23     Q    Okay.  Other than Deborah Sullins and
24 perhaps Mary Thallman while you were a supervisor

### Page 28

1  in the unit we've been talking about--
2      A    Yes.
3      Q    (Continuing.)--were you aware of any
4  other employee who made any type of allegation of
5  sexual harassment?
6      A    No.
7      Q    During your years at the Department of
8  Public Aid other than Deborah Sullins and Mary
9  Thallman were you ever involved or aware of any
10 allegations of sexual harassment?
11     A    No.
12     Q    Okay.  On an average workday in 2000 if
13 you were in the office and Mark Scheff was in the
14 office would you and he see each other at least
15 once a day?
16     A    On an average work, average it out,
17 possibly.  Maybe.  Yeah, maybe once a day, maybe.
18 Some days I might go all day without seeing him.
19 You know, because like I said, if Marvin was there,
20 we didn't usually have a lot of interaction unless
21 maybe Marvin was at a meeting that I wasn't in and
22 he might come and ask me a question but if Marvin
23 was there I didn't have to have a lot of dealings
24 with him.  They go to their own supervisors if they

3:04-cv-03039-JES-BGC   # 18-9   Page 8 of 20

7/18/05                                          Sullins vs. Illinois Dept. of Public Aid
Lenna Degroot

## Page 29

1  have questions.
2      Q   I understand that when it comes to
3  substantive work assignments Marvin would deal with
4  Mark.
5      A   You're talking just generally speaking?
6  Hi, good morning, how are you? Probably, yeah.
7      Q   At the coffee pot, that sort of thing.
8      A   Well, I mean on the way, because where
9  his desk originally was at I usually had, well,
10  sometimes I had to pass that way to go to the
11  restroom. Yeah, I might see him once a day.
12     Q   Okay. How did you get along with him?
13     A   I got along okay with him. You know, I
14  didn't associate with him other than in the
15  workplace but, you know, I mean it was, I never had
16  any real issues with Mark.
17     Q   In the year 2000 how did you get along
18  with Debbie Sullins?
19     A   I thought okay. You know, I mean we
20  were, same thing. We never associated outside of
21  work but in the workplace we'd chitchat. We
22  visited. You know, we would exchange books or my
23  mom worked there. She brought books in for her
24  and, you know, I thought we got along fine.

## Page 30

1      Q   Okay. At any time were you ever offended
2  because of something Mark Scheff said or did?
3      A   There was one incident where he had, my
4  other half goes away to Kentucky for about a week
5  and a half out of the month and he was coming going
6  home that particular day and he asked me about him,
7  when he was coming back and I said he's coming home
8  today and he made some, just happened at the end of
9  the hall by where my mom was sitting and he made
10  some reference about it's a hot time in Sherman
11  tonight and I said Mark, my mom doesn't appreciate
12  hearing that. It didn't really bother me. I would
13  have laughed at him but my mom was sitting there
14  and I know that that's uncomfortable for her and I
15  said I'd appreciate it if you don't say anything
16  like that in front of her. He apologized. He said
17  he was sorry and he would never do that again and
18  he didn't. That was about the, I mean that was the
19  only incident that I can really say that stuck out
20  in my mind and it really didn't offend me but I
21  didn't want it to offend her, so.
22     Q   So your concern at that time was not so
23  much for your sensibilities and your mother's.
24     A   My mother's, yes. Yes.

## Page 31

1      Q   Okay. If you know, was that an unusual
2  comment to come from Mark Scheff's mouth?
3      A   No, probably not. You know, I mean I
4  don't know that I could, you know, put my finger on
5  other things he would have said to me because we
6  didn't usually just sit and visit, you know. I
7  mean it was just something in passing but I don't
8  remember any other incidents where I was concerned
9  that I, that he, but usually like I said at that
10  point we were so busy, you know, we just didn't
11  spend a lot of time chitchatting with the MACs
12  because he usually got there in time to go to work
13  and I was usually already there working, so.
14     Q   Okay. Where did you, did you get breaks
15  as a supervisor?
16     A   Well, we were supposed to but I never
17  took them. I never took a break.
18     Q   Okay. So you didn't take a smoke break--
19     A   Oh, no.
20     Q   (Continuing.)--or go get coffee or
21  anything like that?
22     A   Coffee was right across the hall in
23  Marvin's office. At that point it was just down a
24  couple of offices. It sat out in our hall and I

## Page 32

1  would just run down there and grab a cup of coffee
2  and come back to my desk but I never took assigned
3  breaks.
4      Q   Okay. At any time did you as a
5  supervisor ever receive any training on what you
6  would be expected to do in monitoring the workplace
7  where one employee made an allegation of sexual
8  harassment against another?
9      A   I, I think when this all came up, I was
10  thinking they had, and we may have had training
11  prior to that but I think we all had to go through,
12  I know we did. We all went through sexual
13  harassment training again after the complaint was
14  lodged. They had all the supervisors, actually I
15  think all the staff period went through sexual
16  harassment training again.
17     Q   Okay. And at that time did you learn
18  anything about what you were to do as a supervisor
19  when an allegation of sexual harassment existed in
20  the workplace?
21     A   Same thin I would have done before. I
22  would have gone to Jodie and said this happened,
23  what do we do or do we, you know, is this something
24  that requires, you know, calling them in and just

3:04-cv-03039-JES-BGC    # 18-9    Page 9 of 20
7/18/05                              Sullins vs. Illinois Dept. of Public Aid
Lenna Degroot

Page 33

1  saying, you know, this is not appropriate or is
2  this something that requires, you know, going
3  farther and filing a complaint with, you know,
4  Steve Bradley, OIG, whoever it was, how it was
5  handled.
6     Q    You should have in front of you Exhibit
7  2.
8     A    Uh-huh.
9     Q    Is that correct?
10    A    Yes. Yes, it is.
11    Q    Can you identify Exhibit 2 for me?
12    A    It's a, well, it says it's charges. It's
13 about a suspension for Mark Scheff is what it looks
14 like.
15    Q    Are you aware that Mark was suspended
16 because of some incident involving Mary Thallman?
17    A    I'm not sure I remember. Well, I mean I
18 know Mark was suspended. I mean I probably would
19 have forgotten it until I read this, yes.
20    Q    Did you, let me ask you this. During the
21 period of time you were a supervisor in the--
22    A    UB unit.
23    Q    UB unit, thank you, with respect to
24 anyone who was a MAC either under your supervisor

Page 34

1  or under Marvin's supervision do you recall any of
2  them that was suspended other than Mark Scheff?
3     A    No.
4     Q    And let me ask you this. Do you believe
5  while you were supervisor any MAC was suspended
6  other than Mark Scheff?
7     A    Repeat that again.
8     Q    Okay. Well, I asked you if you recalled
9  if anyone had been suspended other than Mark Scheff
10 and you said no and I guess my question is does
11 that mean that no one was suspended?
12    A    Yes.
13    Q    Or you just don't remember?
14    A    Yes, that's what that means. No one was
15 suspended.
16    Q    Okay. Did you have any involvement in
17 Mark Scheff's suspension?
18    A    No.
19    Q    Did you attend any disciplinary meetings
20 regarding Mark?
21    A    None that I remember. I don't know if I
22 was called in when this all came about or if it was
23 just dealt with between Marvin and Jodie and maybe
24 Steve Bradley, the bureau chief. I don't remember

Page 35

1  being called in on anything.
2     MR. BAKER: Let's mark this.
3         (Whereupon said document was
4         duly marked for purposes of
5         identification as Exhibit 26,
6         as of this date.)
7     MR. BAKER:  Q   Tell you what let's do. You
8  have in front of you what's been marked as Exhibit
9  Number 26?
10    A    Uh-huh.
11    Q    And can you identify that document for
12 me, please?
13    A    Yes. I believe this is, was my statement
14 that I made to Janice Johnson at the EEO office.
15    Q    Do you recall how that came about?
16    A    Not really. I mean I know that it was
17 all done through the sexual harassment and after
18 the OIG we got called down there but I don't
19 remember the specifics of it, no.
20    Q    Does your signature appear on each of the
21 pages?
22    A    All but the last page and I don't know
23 what that is. I don't know what that is.
24    Q    Is the last page in your handwriting?

Page 36

1     A    No, it's not.
2     Q    Okay. I want to ask you some questions
3  about this document if you want to take at a moment
4  to go through it.
5     A    I think I read this the other day when I
6  talked to Sarah because it was--
7     MS. KERLEY: Read it again because I think it
8  may have different Bates stamped numbers.
9     MR. BAKER:   Q   Let me go through this with
10 you if I could for a moment.
11    A    Okay.
12    Q    On page 1 comments the attributed to you
13 that, reads that the unit has talked about Mark
14 Scheff seeming to know something about everything.
15 What did you mean by that?
16    A    That Mark, no matter what topic you bring
17 up, whether it's medical, political, you know,
18 business, he always seems to know something about
19 every topic you bring up.
20    Q    Okay. Then you say that most listen to
21 Mark rattle or tune him out, what did you mean by
22 that?
23    A    The same thing. After I while, because
24 he could tend to go on a subject and people would

3:04-cv-03039-JES-BGC  # 18-9  Page 10 of 20
7/18/05
Lenna Degroot
Sullins vs. Illinois Dept. of Public Aid

Page 37

1 either let him talk or tune him out and go back to
2 work.
3  Q  Would this be during work time that he
4 would have these conversations?
5  A  It could be. Or, you know, yeah, because
6 most of the time I never associated with him
7 outside of work. I mean he took smoke breaks and I
8 know that there was some of the guys that went that
9 took smoke breaks with him. I didn't smoke so I
10 didn't go to the smoke break room and, you know, it
11 could be, but yeah, some of the time, it could be
12 during work hours.
13  Q  At the time you gave this statement was
14 Mary Thallman still in your work unit?
15  A  Oh. This with Janice Johnson? This date
16 here?
17  Q  Yes.
18  A  I don't remember because I don't remember
19 when Mary left the, when she went, she got a
20 promotion to another unit and I don't remember when
21 she left there.
22  Q  Do you have an opinion one way or another
23 about Mary's truthfulness?
24  A  As far as Mary being, I never had any

Page 38

1 issues to doubt Mary's truthfulness but I also had
2 shared an office with Mary for a number of years
3 before I became a supervisor and Mary was, you
4 know, was not pure as the driven snow, so to
5 speak. She could tell an off color joke or make an
6 off color comment just the same as anybody else
7 could, so.
8  Q  So can we agree that Mary Thallman was
9 not an usually prudish person?
10  A  No, she was not. Yes, we can agree on
11 that.
12  Q  And how would you characterize yourself
13 in that respect?
14  A  Oh. I'm not either. No, I never, you
15 know, thought that I was ever a prudish person.
16 Some of the comments that I read in here that he
17 supposedly made I might have taken exception to
18 because I think they were more graphic than I think
19 needs to be discussed between coworkers. But no, I
20 don't consider myself a prudish person either.
21  Q  So in your judgment based upon your
22 knowledge of Mary and your exposure to what she
23 said and also to what she heard from others and how
24 she reacted to it, she was not a person that was

Page 39

1 easily offended with sexual comments?
2  A  No.
3  Q  Is that correct?
4  A  Yes, that's correct.
5  Q  Okay. I'm a little confused as we get
6 down to kind of the middle of the first page
7 because I see there's an arrow drawn. Do you see
8 that arrow?
9  A  Yes, and I was confused when I first read
10 it and then I reread it where it says she states
11 that Mary Thallman heard the comment, then it goes
12 down and says something to the effect that I don't
13 want to listen to this and he left.
14  Q  That refers to Mary?
15  A  To Mary saying that when we were in that
16 meeting, yes.
17  Q  Okay. And is, was that the meeting that
18 dealt with P.K. Luttrell's husband's death?
19  A  I would say yes and I only know that
20 because I'm reading it here. I would not have
21 remembered it otherwise but, yes.
22  Q  Putting, hopefully this refreshes your
23 recollection a little bit. Do you recall that
24 meeting?

Page 40

1  A  Yes, I vaguely do recall that we had
2 called them all in to tell them that P.K.'s husband
3 had died.
4  Q  And at that time did Mary leave the
5 meeting?
6  A  I don't remember her doing that but based
7 on what I read here I would say yes. I mean at
8 that point the meeting was pretty well over with
9 and we just called them in to tell them what had
10 happen and arrangements were pending but had I not
11 read this, I would not have remembered this, no.
12  Q  All right. You then go on, I'm going to
13 read it into the record and then maybe we can
14 attach nouns to pronouns.
15  A  Okay.
16  Q  She states that she is not familiar, I'm
17 assuming that's an abbreviation for with and I'm
18 assuming that's an abbreviation for Public Aid's
19 sexual harassment policy. She does have the
20 employee handbook and the administrative manual.
21 Is that referring to you, the she?
22  A  Yes, I'm assuming it's referring to me,
23 yes.
24  Q  Back in 2000 and 2001 if I'm

3:04-cv-03039-JES-BGC    # 18-9    Page 11 of 20
7/18/05                                    Sullins vs. Illinois Dept. of Public Aid
Lenna Degroot

Page 41

1  understanding what this statement means is you had
2  at your disposal the administrative manual and the
3  employee handbook but were not familiar with what
4  Public Aid's sexual harassment policy was?
5      A    Well, based on what is written here, yes,
6  that's what that says, although I do know that, you
7  know, had somebody approached me with, I would have
8  taken the steps to follow up. You know, did I know
9  it verbatim? No, probably not.
10     Q    If someone had approached you, you would
11 have taken the steps to do what?
12     A    To go to Jodie to find out what I needed
13 to do from that point forward.
14     Q    If you had not done that do you believe
15 you would not have been doing your job as a
16 supervisor?
17     A    Yes.
18     Q    Could you have gotten in trouble for not
19 doing your job?
20     A    Yes. Yes.
21     Q    Moving down on that page she states that
22 it was well known that Mark believed that men did
23 not get promoted fairly. Women usually were. Does
24 the she refer to you?

Page 42

1      A    Yes. I'm assuming that's what she's
2  referring to.
3      Q    How was that a well known--
4      A    Mark was not quiet about the fact that he
5  thought that men, you know, that women just got
6  promoted more often in that bureau over men. You
7  know, because he made a comment to me at the time I
8  got my job that he thought mine was deserved
9  because I had worked my way up through the ranks,
10 but he had just, you know, he said he would, you
11 know, that, and I know I've heard this through
12 conversations, you know, that he had made comments
13 that he didn't feel like men were promoted as
14 fairly as women were.
15     Q    So he made those comments to you?
16     A    Yes.
17     Q    And you also heard from others that he
18 had made comments to them?
19     A    Well, I don't, I don't remember. I mean
20 I'm going on the assumption that since it's here
21 that yes, but I don't remember.
22     Q    Okay. I just want you to do the best you
23 can to recall.
24     A    Yes. Yes, but I'm sure, yes, Mark made

Page 43

1  no secret that he felt like men did not get fair
2  promotions around there.
3      Q    Okay. I'm trying to make sure I
4  understand this and it may be a punctuation
5  problem. If you go to page 2 the third line down
6  you see there's a semicolon?
7      A    Yes.
8      Q    And then there's a phrase that Mark said
9  that Steve Bradley surrounded himself with strong
10 pussy.
11     A    Uh-huh.
12     Q    Do you see that phrase?
13     A    Yes.
14     Q    I'm a little unclear what is meant
15 there.
16     A    I'm very unclear because I never heard
17 that comment until it was said to me. I mean
18 either here, maybe at the OIG's office that he had
19 made this comment. You know, I'm not sure what
20 they perceived that he meant by that. You know, he
21 had, I was trying to think of the supervisors that
22 were in place under Steve when he first came there,
23 one of which was Cheryl Beckner who had been there,
24 I mean Cheryl was like Jodie's manager who had been

Page 44

1  there forever and the other one, I think it was
2  Mary Ann Daley for the other side of the office
3  that did the professional side and Mary Ann had
4  been there forever.
5      Q    Let's go off the record.
6               (Discussion off the record.)
7      THE DEPONENT: Okay. Mary Ann was the other
8  supervisor that was, that was already there when
9  Steve became bureau chief. You know, so I'm not
10 really sure what this is in connection with because
11 those two, I mean they were the two right
12 underneath Steve. You know, it's just like your
13 little bracket. Steve Bradley, then the other two
14 supervisors and then it went on down from there as
15 far as the chain of command went, so.
16     Q    Okay. If you go down there's several
17 lines that deal with Deborah and I assume that
18 refers to Deborah Sullins talking with you about
19 some issues in her personal life.
20     A    Yes.
21     Q    Let me see if I have the context of this
22 correct and if I don't tell, me I don't.
23     A    Okay.
24     Q    In sometime in 2000, maybe the late

3:04-cv-03039-JES-BGC   # 18-9   Page 12 of 20
7/18/05
Lenna Degroot
Sullins vs. Illinois Dept. of Public Aid

**Page 45**

1  summer, early fall 2000, did Deb explain to you
2  that she had a relationship problem or the break up
3  of a relationship?
4      A   Based on what I read here, yes. I mean,
5  you know, once again I don't know that I would have
6  remembered it but having read it here, yes.
7      Q   Does the context of her telling you that
8  indicate that might affect her work and she wanted
9  you to understand that?
10     A   Yes.
11     Q   If you go down to the bottom of the
12 second page the statement states she, and I am
13 assuming that's you, believes the IA, I'm assuming
14 that's internal affairs, investigation was
15 precipitated by something that Mark said while he
16 was in Jim Schuh and Mary Thallman's office but
17 Mary took exception to this comment.
18     A   Uh-huh.
19     Q   Comments. How did you know that back at
20 the time of this investigation?
21     A   Because I had already been to the OIG's
22 office and they said somewhere through the course
23 of this this is what was said, you know, whoever
24 took exception to it and at that point it was said

**Page 46**

1  in Jim's office. I knew he shared an office with
2  Mary so I put my own assumption on it.
3      Q   Okay. Also on the third page you refer
4  or you're attributed to refer to something about
5  dirt in a box?
6      A   Yeah. And I don't remember this
7  particular instance. Mark is a tremendous
8  gardener. I mean he's always got pictures of his
9  plants and stuff he grows at home so he was often
10 bringing in, you know, bulbs or plants that he had
11 dug up for different people at work and I'm
12 assuming that if he had dirt sitting on his, on
13 the, that I would have assumed it was because he
14 brought plants or something in for somebody and
15 wouldn't have paid a lot of attention to it.
16     Q   What was the context for that dirt in a
17 box finding its way into your statement?
18     A   Well, I'm going on the assumption that
19 Janice Johnson asked me about dirt in a box.
20 Because I think this is stuff where she would ask
21 me questions and I answered them and then she just
22 wrote my answers down. So that's the only thing I
23 can assume is she asked me something about dirt in
24 a box and that's--

**Page 47**

1      Q   Okay.
2      A   Because like I said, he always brought
3  plants and stuff in so I never paid a lot of
4  attention.
5                  (Whereupon said document was
6                   duly marked for purposes of
7                   identification as Exhibit 27,
8                   as of this date.)
9      MR. BAKER:  Q   Before we go to the next
10 exhibit I'm going to hand you the back page of
11 Exhibit 26 and there are some dates with question
12 marks. July 7th, 2000, July 13th, 2000, 8/8,
13 2000. Do you know what those refer to?
14     A   No. I don't even know who this paper
15 belongs to. It doesn't--
16     Q   I don't either. I didn't put it
17 together.
18     A   The only thing I mean I could think of
19 since it's with this deal from Janice Johnson it
20 was questions she had written down and it's not my
21 handwriting so it's nothing that I recognize or,
22 and the dates don't, nothing that would bring a
23 bell with me that would be anything, you know, that
24 I would have remembered--

**Page 48**

1      Q   Okay.
2      A   (Continuing.)--on that one.
3      Q   I'm going to hand you what has been
4  marked as Exhibit 27.
5      A   Okay.
6      Q   And it's my only copy. I don't even have
7  one.
8      MS. KERLEY: That's fine.
9      THE DEPONENT: Okay.
10     MR. BAKER:  Q   What is written there is
11 fairly straight forward. I assume that is in your
12 handwriting?
13     A   Yes, it is.
14     Q   Do you recall what circumstances were for
15 you writing that document?
16     A   No, I don't.
17     Q   Did someone request you to write it?
18     A   Would be my guess since I wrote it but I
19 don't remember what was behind it or why I did it.
20     Q   Okay. With the permission of the two
21 ladies across the hall, across the table, I'm going
22 to come around so I can--
23     A   Oh, sure.
24     MS. KERLEY: I may have a copy that you can

3:04-cv-03039-JES-BGC   # 18-9   Page 13 of 20

7/18/05
Lenna Degroot                                    Sullins vs. Illinois Dept. of Public Aid

Page 49

1  use.
2  MR. BAKER:  Q  At the top of your exhibit,
3  we're both reading from the same one, contains a
4  sentence that I'm going to read a part of into the
5  record. Okay?
6  A  Okay.
7  Q  To the best of my knowledge, Mark Scheff
8  has had no contact with Deborah Sullins since the
9  initial complaint filed in October of 2000. Have I
10 accurately read that?
11 A  Yes, you have accurately read what I have
12 in front of me.
13 Q  How do you know that to be the case or
14 how did you know that to be the case on March 15,
15 2001?
16 A  At this point I would not know other than
17 just to the best of my knowledge at that time, you
18 know, because I did not keep, you know, I wasn't
19 with mark seven and a half hours a day or Debbie
20 for that matter. So, you know, I could only go
21 based on--
22 Q  At any time prior to March 15, 2001 did
23 you become aware that there might have been some
24 sort of issue between Mark and Debbie?

Page 50

1  A  Well, I became aware of it when I, you
2  know, the alleged harassment suit was filed but I'm
3  not sure when I became aware of that, if it was
4  prior to that or if it was, I just don't remember
5  the dates that that all came down.
6  Q  Okay. At any time prior to March 15,
7  2001 did you make any kind of effort to kind of
8  watch out for where Mark was or where Debbie was?
9  A  If I was in the basement, you know, if I
10 would have seen him approach her or vise-versa, I
11 would have probably gone to Jodie and said, you
12 know, there could possibly be issues but, you know,
13 that's why I said to the best of my knowledge
14 because I never saw it happen.
15 Q  Well, I guess that's my kind of my
16 point. Did you do anything in terms of watching
17 Deb and Mark after October 2000 than you did prior
18 to October of 2000?
19 A  Yes. Well, I think because, and I only
20 remember this based on something that was, you
21 know, that I read on one of my statements or maybe
22 it was this one prior to, you know, that Steve had
23 given a direct order that he was not, they were not
24 to have any, what's the word I'm looking for?

Page 51

1  Direct involvement with each other and so, you
2  know, I mean it was, we were just told, I'm
3  assuming that we were just told to just keep an eye
4  out and to make sure that it didn't happen. And at
5  some point I think Debbie was moved to another
6  floor but I don't remember for sure when that
7  happened.
8         (Discussion off the record.)
9         (Whereupon a short break was
10        taken.)
11 MR. BAKER:  Q  I'm going to show you what
12 has been marked as Exhibit 1 and that's a memo to
13 Mark Scheff from Steve Bradley dated October 19,
14 2000?
15 A  Yes, it is.
16 Q  And at that point in time was Mary
17 Thallman one of your subordinate employees?
18 A  I don't remember. I don't know when Mary
19 left. I mean I'm thinking that yes, she was still
20 there in October of 2000.
21 Q  Did you get a copy of this memo or become
22 aware of its content?
23 A  No. I mean I think somewhere through the
24 course of this I imagine that we were called. We

Page 52

1  were probably told that he was not to have any
2  contact with her but I don't remember ever reading
3  the memo to tell you the truth of the matter.
4  Q  Okay. At any time did you do anything to
5  monitor what Mark was doing in relation to Mary
6  Thallman?
7  A  Well, at that point if Mary was still
8  working for me her office was right next to mine.
9  Q  Right.
10 A  So if we were out, you know, if I was out
11 in the hall but, you know, no, I don't ever, I
12 don't remember taking a direct attempt to make sure
13 that he never talked to Mary or vise-versa.
14 Q  Do you recall in October of 2000 Deb
15 Sullins was promoted?
16 A  I knew she was promoted. I didn't
17 remember when it happened but I knew Deb got
18 promoted to an Exec II.
19 Q  Okay. And that's the same level you--
20 A  That Marvin and I were at, yes.
21 Q  And after her promotion did she relocate
22 to another office or to another work location in
23 the basement of the Bloom Building?
24 A  I thought she had got, I remember, well,

13 (Pages 49 to 52)

3:04-cv-03039-JES-BGC    # 18-9    Page 14 of 20
7/18/05                           Sullins vs. Illinois Dept. of Public Aid
Lenna Degroot

Page 53

1  I remember her office. Yeah, she had a little, I
2  mean it was still down there where her first office
3  was at and I don't remember, I was thinking
4  somewhere to this she got moved to first floor but
5  I don't remember when that happened.
6     Q  Okay. Well, before she got moved to the
7  first floor--
8     A  Yes, when she got the promotion she got
9  her own office.
10    Q  And when she got her own office was that
11 office in the basement of the Bloom Building?
12    A  Yes.
13    Q  And where was her office at that time in
14 relation to yours?
15    A  Oh, well, it was in, it was in a
16 different hall. I mean we were all still down
17 there together. You could go from like my office
18 up a couple, cut through a conference room and her
19 office was over there. So I mean it was, we were
20 still downstairs in the basement together but it
21 was--
22    Q  Was it more removed from your office than
23 what it had been before her promotion?
24    A  Yes. Yeah.

Page 54

1     Q  So in an average day if you were doing
2  your job and Deb was doing her job, could you
3  visually see one another?
4     A  No. No, we could not.
5     Q  And could you overhear one another if
6  you're talking in a normal conversational tone of
7  voice?
8     A  No.
9     Q  So, if Mark Scheff did have some contact
10 with Deb Sullins after her promotion that could
11 have occurred and you would not have known about
12 it?
13    A  Yes, that's true.
14    Q  Okay. You indicate some reference to
15 some contact that Deb and Mark had at a training
16 session and something that was stated by a Maureen
17 Powell?
18    A  Yes. She's one of the other Executive
19 IIs that were in the unit.
20    Q  She told you about their, Mark and
21 Deb's--
22    A  Based on this I'm assuming that we
23 probably asked her, you know, if everything went
24 okay in the meeting because she was in there too.

Page 55

1  I'm assuming. I don't know. I'm just assuming
2  that we may have said did everything go okay in the
3  meeting? Was anything said? Was Mark basically
4  behaving himself, you know.
5     Q  Okay. The last paragraph in that
6  statement refers to never hearing Mark Scheff make
7  condescending statements regarding women and I
8  think I know what condescending means, but I'm not
9  sure I know what you meant with that term.
10    A  I would say based on, you know, the, from
11 the statement that was in one of the other, you
12 know, the strong pussies and that type of thing, I
13 would take real condescending remarks. You know,
14 the fact he made a statement that he felt like
15 women got promoted over men in that bureau, I don't
16 find that condescending. It was true. There were
17 more women promoted than men. It's not secret. I
18 didn't find that condescending.
19    Q  Was it your sense that Mark felt that
20 sometimes women were promoted who did not deserve
21 the promotions?
22    A  I think that's what he thought, yes.
23    Q  Why don't we take a minute break?
24       (Whereupon a short break was

Page 56

1       taken.)
2     MR. BAKER:  Q  In the unit where you worked
3  back in 1999 and 2000, would it have been common or
4  uncommon for employees to tell jokes that have some
5  sexual connotation to them?
6     A  Oh, I'm sure it would, it would have
7  happened, yes. I mean I can't, you know, think of
8  an incident when it happened but I don't know that
9  it, I couldn't tell you it didn't happen.
10    Q  Okay. And back in 1999 and 2000 would it
11 have been common or uncommon for employees to make
12 statements in their conversations with other
13 employees that had some sort of sexual connotation
14 to them?
15    A  Well, yeah. I mean Mark made one to me
16 so yeah, I think it would probably have happened.
17    Q  Did you ever hear the term the boy's
18 club?
19    A  No.
20    Q  In late 2000 were approximately half the
21 MACs male and half the MACs female?
22    A  Probably. Yeah, probably. I would say
23 yeah, that's probably pretty close.
24    Q  Was it common that toward the end of the

3:04-cv-03039-JES-BGC   # 18-9   Page 15 of 20
7/18/05                                    Sullins vs. Illinois Dept. of Public Aid
Lenna Degroot

**Page 57**

1  work day that some of the male employees would
2  congregate down in the office or work location
3  where Mike Sandidge was?
4      A   I don't remember.  I mean it possibly
5  could have happened, yeah.  I normally, because my
6  hall, my office was at the other end of the hall
7  so, and I usually just, when I left if I left on
8  time which I usually did because I was getting
9  picked up I just, like from out my office nor you
10 just went across the hall and that took you to go
11 out the back way to leave.  So I normally would not
12 have had reason to walk down the other way.
13     Q   What was your quitting time?
14     A   In '99 and, I was trying to think because
15 I had, I think I got off at, I think I got off at
16 4:00 because when my grandfather was alive I took
17 care of him and I think I worked 7:30 to 4:00
18 then.  It was either 4:00 or 4:30.
19     Q   I'm want you to take a look at Exhibit 6
20 if you could.
21     A   Okay.  I don't remember doing this but
22 that's my handwriting.  So I mean the part where it
23 says name and address, I mean the part, my name and
24 my address is in my handwriting.

**Page 58**

1      Q   Back in 2000, 2001 was your address as
2  noted on this document?
3      A   Yes.
4      Q   And were you work and home telephone
5  numbers those that are identified on this
6  document?
7      A   Yes, it was.
8      Q   And you have no recollection for how it
9  was that, that you provided that information?
10     A   No.  It must be rough to get old because
11 I don't remember.  I just, I just don't remember
12 it.
13     Q   Did it reach a point in late 2000 or
14 early 2001 where the relationship among the
15 employees in your unit and in Marvin's unit for
16 that matter was less cordial than what it had been
17 before?
18     A   You know, I don't remember.  I think
19 probably the atmosphere of this, that might have
20 tended to make things a little more strained but,
21 you know, like I said, Marvin and I were so busy
22 with other areas, you know, I just didn't really,
23 you know, other than to say hi, how are you guys or
24 they'd come in and ask questions, we just, you

**Page 59**

1  know, and I didn't take breaks with any of them and
2  usually Marvin and I went to lunch together.  So I
3  don't, you know, I didn't really have a lot of, you
4  know, interaction other than, or to see what so
5  they were doing because like I said, we were just
6  usually busy.
7      Q   In 2000, in late 2000, early 2001, did
8  you and Marvin have some particular assignments
9  that were keeping you real busy?
10     A   I mean it just was an every day, you
11 know, there was just stuff going on all the time.
12 We were just, you know, I can't give you any
13 specifics.  I mean it's just that normally we were
14 just busy.  You know, I can't tell you what it was
15 but like I said, I don't remember what I did but I
16 was busy doing it.  You know, we just seemed to be
17 busy pretty much from the time we got there until
18 we left and sometimes even after hours we'd stay
19 and work, so.
20     Q   Okay.  Was your focus kind of directed
21 toward keeping up with your substantive work?
22     A   Oh, yes.
23     Q   And you really didn't spend a whole lot
24 of time with your employees?

**Page 60**

1      A   Right.
2      Q   Okay.  And if you know, you may not, was
3  the same true of Marvin?
4      A   Oh, yeah.  I mean, you know, like I said,
5  it was just we were there if they needed to ask us
6  a question, but there just wasn't a lot of time
7  spent.  Yeah, we may occasionally go in and say hi,
8  how are you and get on, you know, like my daughter
9  did this or my grandkids did that but for the most
10 part we were usually pretty busy.  So it was kind
11 of done in passing.
12     MR. BAKER:  Okay.  Very good.  Go ahead home.
13     MS. KERLEY:  In just a couple of minutes.  I
14 just have a couple of questions.
15     MR. BAKER:  Tell her to kiss off.  I want to go
16 home.
17     THE DEPONENT:  Would that be on the record or
18 off the record?
19     MS. KERLEY:  On the record.  I have five more
20 work minutes left.
21                  EXAMINATION
22              BY MS. KERLEY:
23     Q   You testified about the comment Mr.
24 Scheff made in front of your mom.  Do you remember

3:04-cv-03039-JES-BGC   # 18-9   Page 16 of 20

7/18/05  Sullins vs. Illinois Dept. of Public Aid
Lenna Degroot

Page 61

1 about when that was?
2   A   No, I don't. I really don't remember.
3   Q   Do you recall if it was prior to October
4 2000 when the first OIG complaint came up?
5   A   No.
6   Q   Okay.
7   A   I don't remember when it happened.
8   Q   Okay. And just for clarification, maybe
9 I heard it wrong but just to make sure it's clear
10 for the record, when you were questioned about part
11 of your statement in Exhibit 26 about an allegation
12 that Mark Scheff had made, the comment that Steve
13 Bradley surrounds himself with strong pussy.
14   A   Uh-huh.
15   Q   There was some discussion on the record
16 about that. For clarification, did you hear Mr.
17 Scheff make that comment?
18   A   No.
19   Q   Did anyone tell you that Mr. Scheff had
20 made that comment?
21   A   Not at work. I mean I heard it through
22 the course, either the OIG's office or Janice
23 Johnson. I don't remember where but that was the
24 first time I had heard it.

Page 62

1   Q   So you were only made aware of it by
2 someone outside of your unit.
3   A   Yes.
4   Q   Okay. And we talked a little bit about
5 Mary Thallman and yourself--
6   A   Yes.
7   Q   (Continuing.)--being prudish. With your
8 experience working with Deb Sullins, was she an
9 overly prudish person, for lack of a better term?
10   A   Not that I, no, not that I was ever
11 aware. You know, at one point, and I never said
12 anything about this because I thought Deb, I mean
13 we were friends and this was when all of her issues
14 were going on with her, the ex-girlfriend and she
15 had found somebody else that she was very
16 interested in and oh, God, I told you I wasn't
17 prudish but I mean, and this was before work
18 hours. She came in. It was early in the morning
19 and I was there and she came in to talk and she was
20 very fond of this other woman and she made the
21 comment to me that she wanted to go, she would like
22 to go fuck Laura's brains out and I'm like okay,
23 and I just, you know, I didn't say anything because
24 like I said, we were friends. She was venting and

Page 63

1 I'm like okay, fine. You know, I don't understand
2 it but okay, and like I said, she was just having a
3 real rough time all the way around. So, you know,
4 and I said and I didn't bring it up. I didn't
5 mention it before I left there. Somebody at the
6 Attorney General's office had called me and I told
7 them but I said I never said anything because it's
8 kind of like well, she said this about me, then
9 I'll say this about her. So, you know, I just
10 never really told anybody about it.
11   Q   Did you talk to somebody from the
12 Springfield Bureau of General Law, the office I'm
13 from?
14   A   I thought he was from Chicago because it
15 was right before I was getting ready to retire and
16 for whatever reason they called me and I let them
17 know that I was going to be retiring and he told me
18 to make sure to leave my name and address so they
19 could find me. I'm like no, but I finally did. It
20 was just so somebody knew where to find me.
21   Q   When you testified about that Deb talked
22 to you about her personal life, is that something
23 that happened beyond this, the one incident where
24 she was having a break up? Was this just kind of a

Page 64

1 general thing where she came to you?
2   A   Yes, it was just a general and it was
3 prior to any of this. You know, it was when all
4 this was going on with her, the woman that she was
5 living with and, you know, it was prior to anything
6 going on. We were, like I said we were friends. I
7 mean not, we didn't associate after work but during
8 work hours she came down and we got along well
9 together.
10   Q   Okay. And then finally when you were
11 asked about whether or not the men congregated at
12 the end of the day you testified that you wouldn't
13 necessarily have occasion to see that. Do I take
14 that to mean that you don't know one way or another
15 whether they did or did not congregate?
16   A   Right, because like I said, I very
17 rarely, I didn't a reason to really go down at the
18 end of the hall there when I was leaving for the
19 end of the day so I don't know if they did or not.
20      MS. KERLEY: That is all I have.
21          EXAMINATION
22          BY MR. BAKER:
23   Q   Just a couple of follow up questions.
24   A   Yes.

3:04-cv-03039-JES-BGC   # 18-9   Page 17 of 20
7/18/05                                           Sullins vs. Illinois Dept. of Public Aid
Lenna Degroot

Page 65

1  Q   How far is the end of the hall, how far
2  was the end of the hall from--
3  A   From my office? There's, you know, it's
4  like my office door was here and then it was my
5  office and then it would have been Mary Thallman
6  and Jim's office, you know, took up from that space
7  over. So their office door was there and the
8  office next to them, those two doors were
9  together. So there was like one, two, like four
10 offices between my, the end of the hall that I was
11 at and the end of the hall that those guys were at.
12 Q   Okay. So if you were leaving your office
13 could you look down the hall and see--
14 A   No. They were flat against, you know,
15 the wall here. So like when I walked out of my
16 office if anybody was in any of the offices I
17 couldn't see them. I mean if they were standing
18 outside the office door in the hall, yes, I could
19 see them but if they were actually in the office I
20 couldn't see them.
21 Q   And Deb Sullins' office, was it located
22 between the office at the end of the hall we've
23 been talking about and your office?
24 A   At the time when she worked for me, yes.

Page 66

1  She was I think the second office down from mine.
2  I think it was the second office down from mine
3  when she worked for me.
4  Q   Did the employees in your unit have
5  staggered work shifts, meaning they didn't all come
6  and leave at the same time?
7  A   Yes, they did. Yes, they did.
8  Q   And you worked the same number of hours
9  that they worked?
10 A   Well, yes.
11 Q   I know you're going to say you worked
12 many more.
13 A   I worked many more. No. We worked seven
14 and a half hours a day. That's an actual state
15 workday.
16 Q   And if you know, did you come to work
17 earlier than Mark Scheff if you came at your normal
18 assigned work time?
19 A   Yes, I did.
20 Q   And if you left at the end of the day
21 your normal assigned work time you would leave
22 before Mark would?
23 A   Yes.
24 Q   Now, I want to get back to what Ms.

Page 67

1  Kerley asked you about, the comment Deb Sullins
2  made about this Laura.
3  A   Yes.
4  Q   And I guess we can say, at least I'm
5  perceiving that that was a comment that you didn't
6  find particularly comfortable?
7  A   It made me a little uncomfortable but,
8  you know, I wasn't one, you know, I just--
9  Q   Were you uncomfortable because it related
10 to her interest in having a sexual relationship
11 with another female?
12 A   No. I was just uncomfortable with the
13 drama. No, I mean am I homophobic? No. My
14 dearest best friend in the world is Marvin Ross who
15 is gay. No, I have no problem with somebody's
16 sexual persuasion. Just generally speaking, you
17 know, would that have been part of it? Yeah. I
18 was just a little taken back by the comment.
19 Q   Okay. In your conversations with other
20 females--
21 A   Uh-huh.
22 Q   (Continuing.)--and you don't have to give
23 me specifics, but in your conversations with other
24 females over a beer, wherever females congregate--

Page 68

1  A   Congregate, right.
2  Q   (Continuing.)--have you heard females
3  indicate in fairly graphic terms an interest in
4  having some sort of sexual relationship with a
5  female from time to time?
6  A   Not graphic, no, but I don't go out a lot
7  any more. No. I mean over the years I don't know
8  that I've ever, I guess, no, not from work. Not
9  from a work stance, no.
10 Q   Okay. I take it from that comment that
11 was made by Deb Sullins and your acquaintance with
12 her you did not consider her to be a particularly
13 prudish person?
14 A   No, I didn't.
15 Q   And you didn't feel her to be a person
16 who was rigidly intolerant to sexual comments?
17 A   No.
18 Q   No, you did not?
19 A   No, I did not feel that she was that kind
20 of a person.
21    MR. BAKER: Okay. Very good. All right.
22 Thank you very much.
23    MS. KERLEY: Now we're really done.
       (Whereupon signature was
       reserved.)
24    FURTHER DEPONENT SAITH NOT.

3:04-cv-03039-JES-BGC  # 18-9  Page 18 of 20

7/18/05  Sullins vs. Illinois Dept. of Public Aid
Lenna Degroot

Page 69

```
 1       I, LENNA DEGROOT, having read the above and
 2   foregoing, find the same to be true and correct
 3   with the following additions and/or corrections, if
 4   any:
 5   Page_____Line_____Change:
 6   Page_____Line_____Change:
 7   Page_____Line_____Change:
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24   LENNA DEGROOT (7/18/05)        DATE
```

Page 70

```
 1   STATE OF ILLINOIS )
                       ) SS
 2   COUNTY OF CHRISTIAN)
 3              C E R T I F I C A T E
 4       I, Julie A. Brown, a Certified Shorthand
 5   Reporter in and for said County and State do hereby
 6   certify that the Deponent herein, LENNA DEGROOT,
 7   prior to the taking of the foregoing deposition,
 8   and on the 18th of July A.D., 2005, was by me duly
 9   sworn to testify to the truth, the whole truth and
10   nothing but the truth in the cause aforesaid; that
11   the said deposition was on that date taken down in
12   shorthand by me and afterwards transcribed, and
13   that the attached transcript contains a true and
14   accurate translation of my shorthand notes referred
15   to.
16       Given under my hand this 16th day of
17   August A.D., 2005.
18
19
            Certified Shorthand Reporter
20
21
22
23   License No. 084-004174
24
```

7/18/05                    Sullins vs. Illinois Dept. of Public Aid
Lenna Degroot

1        I, LENNA DEGROOT, having read the above and
2    foregoing, find the same to be true and correct
3    with the following additions and/or corrections, if
4    any:
5    Page  10   Line  16   Change: US to UB
6    Page  16   Line  19   Change: Delete the word work
7    Page  19   Line  10   Change: Change Not to No
8    Page 19 Line 23 - Starting @ So, you know through Pg 20 Line 4
9    doesn't make sense
10   Pg 25 Starting on Line 10 Q&A segment doesn't to make
11   sense at the bottom of the pg.
12   Pg 29 Line 22 + 23 starting with You know & ending
13   with worked there makes no sense.
14   Pg 30 line 5 remove the word going.
15   Pg 32 Line 21 the word should be thing not then.
16   Pg 33 line 24 should be supervision not supervisor
17   Pg 47 Line 22 the word bring should be ring.
18   Pg 54 Line 16 Maureen should be chgd to Marina
19
20
21
22
23
24   LENNA DEGROOT (7/18/05)              DATE
     _Lenna J. DeGroot_    Page 69      August 25, 2005

3:04-cv-03039-JES-BGC   # 18-9   Page 20 of 20