3:04-cv-03039-JES-BGC     # 18-10     Page 1 of 28

E-FILED

7/13/05     Sullins v. Illinois Department of Public Aid     Tuesday, 20 December, 2005 10:02:13 AM
Jodie Edmonds     Clerk, U.S. District Court, ILCD

## Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2         FOR THE CENTRAL DISTRICT OF ILLINOIS
                    SPRINGFIELD DIVISION
 3   DEBORAH R. SULLINS,
 4              Plaintiff,
 5        vs.                        No. 04-3039
 6   THE ILLINOIS DEPARTMENT OF PUBLIC
 7   AID,
 8              Defendant.
 9
10
11        THE DEPOSITION of JODIE EDMONDS, taken in
12   the above-entitled case before Julie A. Brown, a
13   Certified Shorthand Reporter of Christian County,
14   acting within and for the County of Sangamon, State
15   of Illinois, at 9:30 o'clock A.M., on July 13,
16   2005, at 415 South Seventh Street, Springfield,
17   Sangamon County, Illinois, pursuant to notice.
18
19
20
21
22
         Baldwin Reporting & Legal-Visual Services
23          Serving Illinois, Indiana & Missouri
         24hrs (217)788-2835   Fax (217)788-2838
24                1-800-248-2835
```

## Page 2

```
 1   APPEARANCES:
 2        BAKER, BAKER & KRAJEWSKI, LLC
          BY:   James P. Baker, Esq.
 3              415 South Seventh Street
                Springfield, Illinois  62701
 4              On behalf of Plaintiff.
 5        JOHN P. TAYLOR, ESQ.
                Attorney at Law
 6              2520 South Grand Avenue East
                Springfield, Illinois  62703
 7              On behalf of Plaintiff.
 8        MS. SARAH R. KERLEY
                Assistant Attorney General
 9              500 South Second Street
                Springfield, Illinois  62701
10              On behalf of Defendant.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 3

```
 1                    I N D E X
 2   DEPONENT                           PAGE NUMBER
 3   Jodie Edmonds
 4        Examination by Mr. Baker          4
 5
 6
 7
 8
 9
10              E X H I B I T S
11   NUMBER               MARKED FOR IDENTIFICATION
12   Exhibit 18                    44
     Exhibit 19                    45
13
14
15
16
17
18
19
20
21
22
23
24
```

ORIGINAL

## Page 4

```
 1           S T I P U L A T I O N
 2        It is stipulated and agreed, by and
     between the parties hereto, through their
 3   attorneys, that the deposition of JODIE EDMONDS may
     be taken before Julie A. Brown, a Certified
 4   Shorthand Reporter, upon oral interrogatories, on
     the 13th of July A.D., 2005, at the instance of the
 5   Plaintiff at the hour of 9:30 o'clock A.M., 415
     South Seventh Street, Springfield, Sangamon County,
 6   Illinois;
 7        That the oral interrogatories and the
     answers of the witness may be taken down in
 8   shorthand by the Reporter and afterwards
     transcribed;
 9
          That all requirements of the Federal
10   Rules of Civil Procedure and the Rules of the
     Supreme Court as to dedimus, are expressly waived;
11
          That any objections as to competency,
12   materiality or relevancy are hereby reserved, but
     any objection as to the form of question is waived
13   unless specifically noted;
14        That the deposition, or any parts thereof
     may be used for any purpose for which depositions
15   are competent, by any of the parties hereto,
     without foundation proof;
16
          That any party hereto may be furnished
17   copies of the deposition at his or her own expense.
18
19
20
21
22
23
24
```

1 (Pages 1 to 4)

3:04-cv-03039-JES-BGC    # 18-10    Page 2 of 28
7/13/05
Jodie Edmonds                    Sullins v. Illinois Department of Public Aid

Page 5

1            (Whereupon the Deponent was
2            sworn by the Court Reporter.)
3            J O D I E   E D M O N D S
4    having been first duly sworn by the Court Reporter,
5    deposeth and saith as follows:
6            EXAMINATION
7            BY MR. BAKER:
8        Q    Would you state your name and address,
9    please?
10       A    My name is Jodie Edmonds.  I live at 2205
11   Burgess Drive, Springfield, 62711.
12       Q    Have you ever given a deposition before?
13       A    No.
14       Q    Would you like to know what's going to
15   happen?
16       A    Sure.
17       Q    Okay.  As you probably know, my name is
18   James Baker.
19       A    Uh-huh.
20       Q    And I am Debbie Sullins' lawyer.  I think
21   you know Debbie has a lawsuit against the
22   Department of Public Aid.
23       A    Uh-huh.
24       Q    You have been identified as multiple

Page 6

1    sources, by multiple sources as an individual that
2    has information relating to that lawsuit.  So what
3    I'm going to do this morning is just ask you
4    questions to find out what information you have.
5        A    Okay.
6        Q    We're going to take a break sometime
7    later this morning, but if at any time you want to
8    take a break, just let me know.
9        A    Okay.
10       Q    That's no problem.  If you need something
11   to drink, let us know that as well and well take
12   care of it.
13       A    Okay.
14       Q    I'm going to ask as a preliminary matter
15   a couple of things from you.  First thing is if you
16   don't understand any question I ask--
17       A    Uh-huh.
18       Q    (Continuing.)--it's probably because it
19   wasn't a very good question.  So don't be
20   embarrassed.  Just let me know that--
21       A    All right.
22       Q    (Continuing.)--and I'll do my best to
23   rephrase it.  Secondly, I'm going to ask that you
24   respond verbally to questions rather than through

Page 7

1    body gesture.
2        A    Okay.
3        Q    And finally, I'm going to ask that in
4    responding to questions you not use the term uh-huh
5    or uh-uh.
6        A    Uh-uh.
7        Q    And the reason for that is when I look at
8    a transcript of a deposition I can't tell which is
9    which.
10       A    Okay.  All right.
11       Q    So with that in mind, let me as a
12   starting point ask you what you've done to prepare
13   for your deposition.
14       A    I just met with Sarah basically is all
15   I've done.
16       Q    Have you reviewed any documents?
17       A    I just gave her all my notes.  I have
18   handwritten notes that I had taken and I provided
19   those to her.  I looked over those, but.
20       Q    Can you describe those notes for me?
21       A    They're just my handwritten notes of
22   different things that transpired.
23       Q    Were those notes taken contemporaneous
24   with events?

Page 8

1        A    Yes.
2        Q    They were not notes that were prepared in
3    anticipation of this lawsuit?
4        A    Oh, no.  They've been sitting in my
5    cabinet for years, I mean.
6        MR. BAKER: Okay.  Sarah, I'd like a copy of
7    those notes.
8        MS. KERLEY: I can get them.  I in fact was
9    hoping to find time to cross reference with our
10   disclosures and see whether or not that you already
11   had them, but I can totally get them for you.
12       THE DEPONENT: If you can read them.  I mean
13   they're just, like I said I just--
14       MR. BAKER:   Q    Have you provided those notes
15   to anyone in either legal division of Public Aid or
16   to the Attorney General's office prior to providing
17   them to Sarah?
18       A    I don't think so.  I'm not sure.
19       Q    Okay.  I don't believe that I have
20   received them.
21       MS. KERLEY: Okay.
22       MR. BAKER: So if we could secure copies of
23   them.  And before we go on, I don't know if there's
24   anything in those notes that is going to invite me

## Page 9

1  to want to talk with Jodie again.
2      MS. KERLEY: I have them if you want to review
3  them.
4      MR. BAKER: Why don't we do that at your--
5      MS. KERLEY: During my break.
6      MR. BAKER: Your break.  Okay.
7          Q    Other than your notes, did you review
8  anything?
9      A    No.
10     Q    Okay.  How long have you been employed by
11 the Department of Public Aid?
12     A    Department of Public Aid I've been with,
13 let me see.  Since '91.  I've been with the state
14 26 years.  I've been with Public Aid since '91.  I
15 started in BCHS in '98.
16     Q    Okay.  And presently what is your job
17 title?
18     A    Manager of the billing and payment
19 section.
20     Q    Is that universal billing?
21     A    That's, no.  That was my job at the time
22 Debbie reported to me.  That was in '98 that I had
23 that position, public service administrator.  So
24 now I'm a broader picture than just universal

## Page 10

1  billing.
2      Q    Can you kind of trace for me the
3  positions you've held at Public Aid since you began
4  going up to the present?
5      A    Sure.  I was in claims processing when I
6  started.  I started as a supervisor in claims
7  processing and then I just worked my way up.  I was
8  in claims processing until '98 as a matter of fact
9  when I started with BCHS, so I was there for like
10 seven years.
11         Then I was a public service administrator
12 in '98.  Then I was promoted in 2003.  My boss
13 retired and I got her position as a manager.
14     Q    Okay.  Is that Cheryl Beckner?
15     A    Yes.
16     Q    You assumed her position?
17     A    Yes.
18     Q    In the year 2000 what was your job?
19     A    The year 2000 I was a public service
20 administrator and I was over the universal billing.
21     Q    Can you tell me what universal billing
22 does?
23     A    It's just UB92 claim billing.  That's
24 programs.  When a Public Aid recipient goes to a

## Page 11

1  provider, that provider can either be a hospital,
2  renal dialysis, ambulatory surgical treatment
3  center, hospice and they see that provider.  The
4  provider bills the Department of Public Aid.  Our
5  area's responsible for the billing and if the
6  providers have any questions they call us and
7  payments and eligibility of the recipients and that
8  type of thing.
9      Q    Okay.
10     A    Universal billing is just the name of the
11 claim form that they bill on is all that is.
12     Q    Okay.  I'm going to hand you what has
13 earlier been identified as Exhibit 7--
14     A    Uh-huh.
15     Q    (Continuing.)--I believe and I will
16 represent to you that that's a document which was
17 provided to us in discovery in this case.  It
18 appears to be an organizational chart of part of
19 the Bureau of Comprehensive Health Services.  Would
20 you agree with we--
21     A    Yes.
22     Q    (Continuing.)--so far?  And does that
23 chart show the organizational structure of the
24 universal billing unit at least as it existed in

## Page 12

1  February of 2001?
2      A    Yes.  Both these areas are universal
3  billing.
4      Q    You say both areas.
5      A    Uh-huh.
6      Q    You're talking about?
7      A    The people who report to Lenna DeGroot
8  and the people that report to Marvin Ross.  They
9  were all under the unit.  They're all part of the
10 universal billing.
11     Q    Now, if we go back to the year 2000--
12     A    Uh-huh.
13     Q    (Continuing.)--I understand there may
14 have been some different names in some of these
15 blocks, but was the organization the same?
16     A    Yes.  Yes.
17     Q    Okay.  It looks like there were two what
18 I'll call teams for lack of a better term.  One was
19 headed by Marvin Ross and the other was headed by
20 Lenna DeGroot.  Was there any functional difference
21 between what those teams did?
22     A    No.  No.  They were equal.
23     Q    Now, back in the year 2000, where was
24 your office located?

3 (Pages 9 to 12)

3:04-cv-03039-JES-BGC    # 18-10    Page 4 of 28
7/13/05
Jodie Edmonds
Sullins v. Illinois Department of Public Aid

## Page 13

1    A    My office was located, there was a
2  hallway, still is a hallway, and in that hallway
3  was Marvin and Lenna and then all the consultants
4  and then you go down this hallway, around the
5  corner and that's my office, wherever that is.
6    Q    So you were--
7    A    I was out of sight.
8    Q    You were in the basement of the Bloom
9  Building?
10   A    Yes.
11   Q    And in walking time--
12   A    Oh, yes.
13   Q    (Continuing.)--how far would it take,
14  would it have taken me to walk from your office say
15  to the area where the medical assistant consultants
16  work?
17   A    Oh, seconds.  I mean it's just around the
18  corner but there's walls between us.
19   Q    Okay.  In you doing your job--
20   A    Uh-huh.
21   Q    (Continuing.)--how frequently would you
22  have contact with the medical assistant
23  consultants?
24   A    Not very often at all.  If I had

## Page 14

1  questions I would meet with Lenna and Marvin.
2    Q    How frequently would you go to the work
3  area where Marvin and Lenna worked?
4    A    Not very.  They would come to my office
5  or we would have meetings in the conference room
6  with all the staff or with them individually.  So I
7  didn't actually, I very seldom went to any of
8  their, the consultants' offices at all and very
9  seldom went to Lenna and Marvin's.
10   Q    Now from your office--
11   A    Uh-huh.
12   Q    (Continuing.)--could you hear sounds that
13  were coming from the work area where the medical
14  consultants were?
15   A    I couldn't hear phone rings.  You know,
16  no, I don't think I could hear people talking
17  either.  I mean if somebody was yelling, I could
18  hear somebody yelling probably, but not a normal
19  voice talking.
20   Q    Okay.  So if a medical consultant in the
21  medical consultants' work area--
22   A    Uh-huh.
23   Q    (Continuing.)--said things or did
24  things--

## Page 15

1    A    Oh.
2    Q    (Continuing.)--you would not be able in
3  the normal sequence of events to have first hand
4  knowledge of those things.
5    A    No.
6    Q    Is that correct?
7    A    Right.
8    Q    Now, Mr. Ross and Ms. DeGroot as I
9  understand it worked proximate to the medical
10  consultants.
11   A    Work approximate?
12   Q    Proximate.  Close to.
13   A    Oh, yes.  They're in the same hallway.
14   Q    And from their office to the work areas
15  of the medical consultants maybe a door or two
16  away?
17   A    Right.  Right.
18   Q    Okay.  If you know, from their offices
19  would they be able to hear what was said by medical
20  consultants?
21   A    No.  Not always, no, because there's
22  walls.  I mean they have individual offices and
23  sometimes they would shut the door if they were
24  working on things too, so.

## Page 16

1    Q    Okay.  I want to take you back to October
2  of 2000 just as a reference point.  At that point
3  in time, were you personally acquainted with Mark
4  Scheff?
5    A    Yeah, I knew Mark Scheff.  He's worked
6  there since I started there in '98.
7    Q    Has he always worked under your chain of
8  command since you came into the Bureau in 1998?
9    A    Yes.
10   Q    And did you have any role or involvement
11  in the process of evaluating him as an employee
12  during the periodic evaluations?
13   A    No.  Marvin did that.  I mean I had sign
14  off.  I mean I approved the evaluations but I did
15  not complete the evaluations.
16   Q    Okay.  What was, what was your general
17  assessment of the adequacy of Mark Scheff as an
18  employee say in October of 2000?
19   A    He knows his stuff.  He's, he knows it
20  inside and out.  He's been there for a long time so
21  he's always been one that if I had questions or if
22  providers had questions, they got answers from him.
23   Q    And how would you evaluate his attitude
24  as an employee again in October of 2000?

## Page 17

     A    Well, Mark's a different guy.  I mean
attitude wise, you know, he always did what you
asked him to do.  Would he go a step further to do
something extra?  Probably not, but he never said
that he wouldn't do anything.  So he always did his
job very well and he always did what was asked of
him, but, you know, would he go the extra mile?
No.

     Q    You characterized Mark as being a
different guy.

     A    Uh-huh.

     Q    What do you mean by that?

     A    He's just different.  You know, I don't
know.  I mean everybody has different
personalities.  You know, he's not someone that,
you know, I would carry on a lengthy conversation
with, but I have no reason to think that, you know,
I don't know.  I mean he's just different.  I don't
know how to explain that, but.

     Q    Prior to October of 2000, did anyone ever
complain to you about Mark Scheff?

     A    One provider did and I disciplined him
and it was overturned.

     Q    Who was that?  Don't tell me who the

## Page 18

 1  provider was.  Can you describe when the provider
 2  complained?
 3       A    Yes.  I can't give you dates.  I don't
 4  remember dates.
 5       Q    An approximation?
 6       A    Okay.  I don't even know approximate, but
 7  what happened, I can tell you what happened.
 8       Q    All right.
 9       A    Supposedly he was talking to a provider
10  on the phone and he basically said to this provider
11  that his dog was smarter than they were and she of
12  course complained.  This is her word against his
13  word, you know.  We have no way of knowing if that
14  occurred and, so anyway, she said he said this and
15  so I asked her to put it in writing.  She sent it.
16  I don't even know who the hospital was.  They sent
17  it to me in writing and based on that written
18  documentation, I did a predis and we, I think we
19  gave him an oral or a written reprimand.  I can't
20  remember which.
21            Prime example, it was overturned.  I mean
22  he filed a grievance and he won and it was removed
23  so, because it was his word against their word and
24  that's all I had to go on and, you know, I did not

## Page 19

 1  hear it.  Nobody heard it.  There was no way of
 2  hearing it.  So that was the only time.
 3       Q    Okay.  That was the only complaint about
 4  Mark?
 5       A    Yes.
 6       Q    Okay.
 7       A    And I have lots of letters though from
 8  providers that praise him.  I mean because--
 9       Q    Why are you telling me that?
10       A    Just because, you know, there are
11  providers that really like him because he knows his
12  stuff.  Like I stated earlier, he knows his job,
13  but, you know, then there was one that, you know,
14  didn't.  So, you know, that's all I'm saying.
15       Q    Did Mark Scheff ever verbalize to you
16  concerns or complaints he had about not moving up
17  in the Bureau?
18       A    No, not to me personally, but I, you
19  know, I heard remarks that he said but he did not
20  say anything to me but I did not talk to Mark all
21  that much either and I still don't.  I mean he's
22  not, he reports to Marvin, so.
23       Q    In October of 2000 did you know Debbie
24  Sullins?

## Page 20

 1       A    Uh-huh.  She was a consultant.
 2       Q    Is that a yes?
 3       A    Oh.  I'm other sorry.  Yes.  Sorry.
 4       Q    And did you know Debbie because she
 5  worked under your chain of command?
 6       A    Yes.  She was a medical consultant.
 7       Q    At some time in the fall of 2000, was
 8  Debbie promoted?
 9       A    Uh-huh.  Yes.  I promoted her.
10       Q    Okay.  Was that as a result of some sort
11  of competitive process?
12       A    Oh, yes.  Yes.
13       Q    Where she competed for the job and she
14  was interviewed with others?
15       A    Yeah.  There was selection and
16  recruitment and she was the highest qualified
17  candidate for the job.
18       Q    Okay.  Prior to Debbie coming in to a
19  position under your chain of command did you know
20  her?
21       A    Yes.
22       Q    And how was it you knew her?
23       A    She was one of our medical consultants
24  that reported to Lenna and I knew her that way.

                                    5 (Pages 17 to 20)

**Page 21**

1     Q     Okay.
2     A     Yeah.  She worked under me, but not
3  directly for me until she became the Executive II.
4     Q     Okay.  While she worked under Lenna--
5     A     Uh-huh.
6     Q     Am I pronouncing her name correctly?
7     A     Lenna.
8     Q     Lenna.  Were you in a position where you
9  could assess or evaluate how good of an employee
10  she is, Debbie was?
11     A     Yes.  I mean like I said, she didn't
12  report directly to me, but I interact very closely
13  with Lenna and Marvin both and yes, she was a good
14  employee.  I mean she knew her job and she did it
15  well, but there was a period of time that that kind
16  of changed and--
17     Q     When did that change?
18     A     I don't remember the dates.  It was when
19  she started having personal issues.  She had--
20     Q     Was that before or after she became an
21  Executive I?
22     A     That was before.  Right before.  I don't
23  remember the date, but.
24     Q     And could you describe for me how she

**Page 22**

1  changed?
2     A     She changed.  I think she was well
3  grounded and like I said, she took her job
4  serious.  She did her job and she had been with
5  someone for years she told me and then that went
6  awry and she met someone else and at that
7  transition, then that's when everything changed.
8     Q     Describe for me the change.
9     A     Her personality.  Her absenteeism got
10  worse.  She started having personal problems I
11  think that she told us about because she, you know,
12  was arguing with this other person because she had
13  left that other person for this other person and,
14  you know.  So she got very, there were several
15  times that she told me in detail about her personal
16  issues which I did not repeat but she went into
17  detail about them.
18     Q     Okay.  Unless you've led a blessed life,
19  I am sure you like all of us have from time to time
20  had personal problems in your life?
21     A     Oh, yes.  Yes.
22     Q     And I guess that's part of the living
23  process.
24     A     Uh-huh.  Oh, yes.

**Page 23**

1     Q     It may be a financial problem.  It may be
2  a death in the family.  It may be a divorce or a
3  break up in a relationship.  Those things happen.
4  And as I understand it, Debbie verbalized to you
5  and perhaps to other supervisors that she was
6  encountering personal problems in her life.  Am I
7  correct?
8     A     Yes.
9     Q     Tell me how those personal problems
10  seemed to affect her as an employee.
11     A     Well, she started missing a lot of work
12  because she was having problems moving and all
13  that.
14     Q     What was the time period she was missing
15  work?  Are we talking about before she became an
16  Executive II?
17     A     It started before she became, let's see.
18  She became an EII on October 16th of 2000 and, or
19  2000.  So it kind of overlapped.  It started before
20  she got, during, right before she got the job it
21  started and actually, I know that's when it was
22  because it started right before I started the
23  interviews and I had already picked her for the job
24  when all these other issues started occurring and

**Page 24**

1  because I went back and I said, you know, if I had
2  to do it over again, if I would have known all this
3  was going to happen, I probably wouldn't have put
4  her if that position because she went down hill
5  after that.  She, her concentration wasn't there on
6  her job.  She wasn't the employee she was prior to
7  that and so things changed drastically.
8     Q     And you provided some sort of written
9  counseling concerning her performance?
10     A     I don't remember.  I know I disciplined
11  her for her time because she got without pay
12  status.  She had no time on the books and she was
13  calling in and I did counsel her or gave her some
14  kind of discipline on that.
15     Q     If she was not performing her job
16  satisfactorily in your view and you were doing your
17  job as a supervisor--
18     A     Right.
19     Q     (Continuing.)--there should be something
20  in her personnel file memorializing your concerns
21  about her performance.
22     A     Right, and it might be and there's an
23  evaluation.  I remember the evaluation specifically
24  that I gave her.  I received a call from the person

Baldwin Court Reporting & Legal Video Services
1-800-248-2835

## Page 25

```
 1   she's with now saying that it was a very inadequate
 2   evaluation because she was deserving of a higher
 3   evaluation than I gave her.  So I did reflect it in
 4   her evaluation.
 5       Q    Was it an unsatisfactory evaluation?
 6       A    No, I don't think it was unsatisfactory
 7   but under the supervisor's comments I made
 8   statements about her performance and her
 9   absenteeism.
10       Q    Did you talk with her about her
11   evaluation?
12       A    Yes.  Yes.
13       Q    And do you recall when that occurred and
14   who was present?
15       A    It was just her and I.
16       Q    And do you recall when that was?
17       A    No, I don't.
18       Q    Do you recall anything about what
19   occurred during that session?
20       A    No.  She was very upset after I gave her
21   her evaluation.  That's when I received a call from
22   Laura telling me that it was a unsatisfactory
23   evaluation.  It probably was her probationary.  I'm
24   guessing six months.
```

## Page 26

```
 1       Q    Did she complete her probation?
 2       A    Uh-huh.  Yes.
 3       Q    Was she certified as an Executive II?
 4       A    Yes.  Yes.
 5       Q    So whatever personal problems she had
 6   they were not so severe that she was not capable of
 7   satisfactorily completing her probation.
 8       A    Right, at that time, but she had only,
 9   the issues started right before she got, probably
10   two weeks before she got the promotion and then,
11   it's not six months.  I think it's what?  Two and a
12   half or three months before she's certified.  So it
13   was, it doesn't give you a lot of time but yes, she
14   did.
15       Q    It was enough time so if you thought she
16   wasn't doing her job well enough you could have put
17   her back in her old position.
18       A    I could have if I, I don't know if I
19   necessarily knew at that time how bad it was going
20   to get, but yes, I did certify her.
21       Q    Did you do anything to discipline her?
22       A    That's what I don't remember.  I know I
23   did for her absenteeism but I don't know if I did
24   for her--
```

## Page 27

```
 1       Q    Excuse me.  I interrupted you.  I
 2   apologize.
 3       A    I don't know if I did for her work.
 4       Q    Your management style when an employee is
 5   not performing the job in a fashion that you deem
 6   to be satisfactory.
 7       A    Right.
 8       Q    What do you do with that employee?
 9       A    I do a corrective action plan and I put
10   them on notice that they have to perform and no, I
11   did not do that.  I know I did not do that.
12       Q    That's something that's in writing?
13       A    Yes.
14       Q    So Debbie's performance was not bad
15   enough to justify a corrective action plan.  Am I
16   correct?
17       A    Yes.
18       Q    It may not have, her performance may have
19   slipped from what your assessment of it was at and
20   earlier point in time.
21       A    Yes.
22       Q    But it was still adequate?
23       A    Yes.
24       Q    Okay.  When did Debbie verbalize to you
```

## Page 28

```
 1   the problems she had which I guess relates to
 2   either a failed relationship or a new relationship
 3   or both?
 4       A    Both.
 5       Q    When did she verbalize those concerns to
 6   you?
 7       A    A date?
 8       Q    Approximately.
 9       A    Well, I don't recall.  I think it was,
10   you know, prior to her getting the promotion
11   because it was during that time that all that
12   happened, but I do not recall the date.
13       Q    What was her context in bringing that
14   information to your attention?
15       A    I don't know.  She just felt like she
16   could tell me that, I guess.  You know, she came in
17   and--
18       Q    Did she tell you that she had some
19   personal problems she was working through that
20   might affect--
21       A    She told me a lot of things.
22       Q    I'll make a deal with you.  I'll let you
23   finish your question or your answer before I ask
24   another question.  I want you to let me finish my
```

Baldwin Court Reporting & Legal Video Services
1-800-248-2835

Page 29

1    question before you answer.
2        A    Okay.
3        Q    Was the context of her telling you this
4    that she wanted you to know she had personal
5    problems that might be affecting her work?
6        A    No.
7        Q    Okay.  Did you consider Debbie a social
8    friend?
9        A    No.
10       Q    Did you ask her why she was telling you
11   these things?
12       A    No.
13       Q    Did you find it curious that she was
14   telling you these things?
15       A    No.
16       Q    Why not?
17       A    Because she told everybody, not just me.
18   So she was one that would tell you what was going
19   on in her personal life.
20       Q    Okay.  Do you know a woman named Mary
21   Thallman?
22       A    Yes.
23       Q    Do you believe Mary Thallman is a
24   truthful person?

Page 30

1        A    Truthful?  Yes.  Probably, yes.
2        Q    Do you know Pam Dufour?
3        A    Yes.
4        Q    Do you believe Pam Dufour is a truthful
5    person?
6        A    I don't think as highly of Pam as I do
7    Mary and the only reason I say that is because she
8    just likes a lot of controversy.  But is she
9    truthful?  I guess.  I don't know.
10       Q    Well, do you have any reason to believe
11   she's not?  Let's put it that way.
12       A    I'm a little leery, yes, because she's
13   kind of like a shit stirrer.  I hate to say that
14   but that's what she is and very good in her job.
15   She really knows her job.
16       Q    You use the word shit stirrer.
17       A    Yeah.
18       Q    And I don't want you--
19       A    I don't know what that, I mean she just
20   likes a lot going on.  She likes to be the center
21   of attention and she likes things in a turmoil at
22   times.  She just, she has to know everything that's
23   going on in the office.  She, she's very nosey and
24   she's just that type of person.

Page 31

1        Q    Did you ever become aware that Mary
2    Thallman made a complaint about Mark Scheff?
3        A    Yes.  The day she made it.
4        Q    And how did you become aware of that?
5        A    Investigations I think called after she
6    contacted them if I recall right.  It's been a long
7    time.
8        Q    What was your understanding as to her
9    complaint?
10       A    That there was a complaint regarding
11   comments that had been made by Mark Scheff and I
12   think Jim Schus is my understanding if I remember
13   right.
14       Q    Is it your understanding that the Office
15   of Investigator General, OIG as we call it by
16   acronym, conducted some investigation into that
17   incident?
18       A    Yes.
19       Q    Were you interviewed in connection with
20   that investigation?
21       A    Yes.
22       Q    Do you recall who interviewed you?
23       A    I, I know I've been interviewed by Loren
24   Larsen but I don't know if he was the one that did

Page 32

1    it for that.  I think it was him but I can't say
2    100 percent.
3        Q    Okay.  Did you ever become aware of
4    information shared in this investigation by Debbie
5    Sullins?
6        A    Became aware.  What do you--
7        Q    Were you made aware that Debbie Sullins
8    was interviewed in connection with the
9    investigation?
10       A    Yes.  I mean I knew who was interviewed
11   because they would call for them to come over.
12   They would have to call the supervisors.
13       Q    Were you ever informed of any of the
14   information Debbie provided during her interview?
15       A    No.
16       Q    Don't have any idea as we sit here today
17   what she said during the interview?
18       A    No.
19       Q    As an Executive II what was Debbie's job?
20       A    She was over the state renal program.
21       Q    Which meant she did what?
22       A    She was the coordinator of a program,
23   recipients that had to have renal dialysis services
24   that were not Medicaid eligible.  That's what this

8  (Pages 29 to 32)

7/13/05
Jodie Edmonds

Sullins v. Illinois Department of Public Aid

## Page 33

1  program was for.
2      Q    Okay.  At any time during your service
3  with the Department of Public Aid as a supervisor
4  have you ever dealt with an employee who has
5  complained about sexual harassment in the
6  workplace?
7      A    No.
8      Q    Have you ever dealt with a situation
9  where one of your subordinate employees was accused
10  of sexual harassment?
11     A    No.
12     Q    Okay.  At any time during your career
13  with the Department of Public Aid have you received
14  any sexual harassment training?
15     A    Yes.
16     Q    And did you receive that training before
17  October of 2000?
18     A    Yes, I think I did.  Yes.
19     Q    Was this training that was made available
20  to all employees of the Department of Public Aid or
21  was it for supervisory employees?
22     A    It was mandated I think that everyone
23  attend if I recall right, but.
24     Q    Were you given any handouts during this

## Page 34

1  training?
2      A    Yes, I'm sure I was.
3      Q    Did you read the handouts?
4      A    Yes.
5      Q    And during the course of the training was
6  there any information shared about what the role
7  was of a supervisor in the workplace in either
8  dealing with or preventing incidents of sexual
9  harassment?
10     A    Yes.
11     Q    Okay.  In October of 2000 what was your
12  understanding of the role of a supervisor at the
13  Department of Public Aid with respect to policing
14  against sexual harassment?
15     A    Well, if it's ever reported, you report
16  it to your supervisor and they get in contact with
17  OIG and get them involved.  That was my
18  understanding of the process that had to be done.
19     Q    Was the supervisor supposed to monitor
20  the workplace to make sure it was not, sexual
21  harassment was not occurring?
22     A    Yes.
23     Q    And if a supervisor observed an incident
24  that in his or her judgment constituted sexual

## Page 35

1  harassment what was the supervisor to do?
2      A    Was supposed to report it to their
3  supervisor and get OIG involved.
4      Q    Okay.  In October of 2000 what was your
5  understanding of what sexual harassment meant?
6      A    Inappropriate behavior between people or
7  speaking inappropriately.
8      Q    Okay.  Would you agree with me that
9  sexual harassment could include verbal comments of
10  a sexual nature which were deemed offensive?
11     A    Yes.
12     Q    If a subordinate employee complained to a
13  supervisor--
14     A    Uh-huh.
15     Q    (Continuing.)--about offensive or
16  inappropriate sexual comments made in the workplace
17  by another employee, what was that supervisor
18  supposed to do, again back in 2000?
19     A    They were supposed to report it to their
20  immediate supervisor and take it up the chain
21  and then get OIG investigations involved.
22     Q    Were they required or supposed to conduct
23  any investigation on their own part to determine
24  whether it occurred?

## Page 36

1      A    No.
2      Q    Were they supposed to talk with the
3  offending employee?
4      A    No.
5      Q    If they did not report the event up their
6  chain of command would that supervisor be doing his
7  job?
8      A    No.
9      Q    And if the supervisor did not report it
10  up the chain of command could that supervisor be
11  exposed to disciplinary action?
12     A    Yes.
13          (Discussion off the record.)
14     MR. BAKER:   Q   I'm going to hand you what's
15  been marked as Exhibit 8 and before you go through
16  it I will represent something to you.  What I'm
17  representing is this is a document which Public Aid
18  provided to us which appears to be an excerpt from
19  a document called Administration manual.  Do you
20  know what the administration manual is?
21     A    Uh-huh.
22     Q    What is it?
23     A    It's the guidelines that you're supposed
24  to follow for employees.

9  (Pages 33 to 36)

## Page 37

1    Q    And is the administration manual
2    something that is available to all supervisors?
3    A    They each have one in their office.
4    Q    Okay.  If you open the front page to, in
5    the lower left-hand corner there should be a number
6    PO-245 with a 10 in parentheses.
7    A    Yes.  Uh-huh.
8    Q    That document, that page seems to address
9    the subject of sexual harassment.
10    A    Uh-huh.  Yes.
11    Q    Okay.  Now, what you will discern is that
12    in the photocopying process we have every other
13    page.  I'm not sure we have them all here so I'm
14    not going to go through all of it, but if you could
15    turn to the next page which I think is PO-245 in
16    parentheses 11.  Do you see that?
17    A    Yes.
18    Q    And you see down midpoint the Section C
19    which would be responsibility of supervisory
20    personnel?  Do you see that?
21    A    Yes.
22    Q    Is that, was that material which is
23    headed in subparagraph C, at least down to the
24    bottom of the page, what was in existence in

## Page 38

1    October of 2000--
2    A    Yes.
3    Q    (Continuing.)--at the Department?  And
4    that was something that was available to all
5    supervisory employees?
6    A    Yes.
7    Q    Okay.  And this document says in
8    paragraph C beginning each supervisor is
9    responsible for maintaining the workplace free of
10    sexual harassment.  Is that your understanding of
11    what a supervisor had to do?
12    A    Yes.
13    Q    And that meant that a supervisor would
14    not only sit back and wait for complaints, it had
15    to be proactive to make sure--
16    A    That that did not occur.
17    Q    (Continuing.)--that sexually
18    inappropriate things did not occur.
19    A    Yes.
20    Q    Whether they saw something or observed
21    something they had to take action whether someone
22    complained about it or not.
23    A    Yes.
24    Q    Okay.  And supervisors were supposed to

## Page 39

1    at least remind employees that, that sexual
2    harassment in the workplace is forbidden and they
3    were supposed to conduct themselves in the
4    workplace in a professional sort of way.
5    A    Yes.
6    Q    Okay.  And if you go on down towards the
7    bottom there's a phrase that starts a supervisor
8    must colon and then there are two bullet points.  I
9    will represent to you we think there are other
10    bullet points.  We just don't know what they are
11    because we don't have them, have that page.
12    A    Okay.
13    Q    One of the things a supervisor must do is
14    to address an observed incident of sexual
15    harassment, meaning if a supervisor sees an
16    incident of sexual harassment, he or she has to
17    deal with it.
18    A    Yes.
19    Q    And also has to address a complaint with
20    seriousness.
21    A    Yes.
22    Q    What does the phrase with seriousness
23    mean to you?
24    A    Any inappropriate comments in the

## Page 40

1    workplace.
2    Q    Well, sometimes it may be one person's
3    word against another, he said she said type of
4    situation.
5    A    Right.
6    Q    And would you agree with me that a
7    supervisor is not in a position to necessarily
8    decide guilt or innocence?
9    A    Right.
10    Q    But nonetheless, the supervisor needs to
11    respond to the complaint and address it and see
12    that it is dealt with in a thorough sort of way.
13    A    Yes.
14    Q    If you move on, it says a supervisor must
15    take prompt action to investigate and document it.
16    Does that in your judgment mean that a supervisor
17    has to do some at least preliminary investigation
18    to find out what occurred?
19    A    Yes.  I mean they have to get the facts
20    and as soon as they receive the facts, then they
21    report it.
22    Q    They would talk to the complaining
23    employee.  They would talk to the alleged
24    perpetrator.  They might talk to any people who

10  (Pages 37 to 40)

Sullins v. Illinois Department of Public Aid

## Page 41

```
 1   overheard the alleged incident.
 2        A    Well, I would say that they would talk to
 3   the alleged person that's saying that sexual
 4   harassment occurred and do not delay the
 5   interaction with the supervisors and the OI's
 6   office.  I mean you don't have, I mean it's them
 7   complaining so you don't have to get the other side
 8   of it.  I mean you need to get it reported as soon
 9   as possible.
10        Q    A supervisor cannot ignore the complaint
11   though.
12        A    Right.  Right.
13        Q    What would happen to a supervisor that
14   did ignore a complaint?
15        A    He would be disciplined.
16        MS. KERLEY:  Let's go off the record for a
17   second.
18                     (Whereupon a short break was
19                     taken.)
20                     (Whereupon the requested
21                     portion of the record was read
22                     back by the Reporter.)
23        MR. BAKER:   Q    Putting aside sexual
24   harassment for a moment, what role does a
```

## Page 42

```
 1   supervisor in your unit have with respect to
 2   discipline being taken against a subordinate
 3   employee?
 4        A    What role?  I mean I guess I don't
 5   understand the question.
 6        Q    Okay.  That's fair enough.  Can a
 7   supervisor recommend discipline?
 8        A    Yes.
 9        Q    Can a supervisor make a disciplinary
10   decision?
11        A    Yes, after discussing with their
12   immediate supervisor and also we always go to our
13   personnel office before we do any discipline.
14        Q    Okay.  So individuals that hold positions
15   at the level of Ms. DeGroot and Mr. Ross--
16        A    Uh-huh.
17        Q    (Continuing.)--have the authority to
18   discipline an employee?
19        A    Not without going further up in the chain
20   and also involving our personnel office.
21        Q    What is the, we're back in 2000, what was
22   that process?
23        A    They would go, if they felt like someone
24   needed to be disciplined, they would go to myself
```

## Page 43

```
 1   and then I would go to my boss who would have been
 2   Cheryl Beckner and then she would have okayed it
 3   with Steve Bradley.  Everybody had to be on the
 4   same page and then we would also get personnel
 5   involved to make sure we were following the right
 6   guidelines before we took any action.
 7        Q    Okay.  So basically--
 8        A    A counseling is different, I mean.  We
 9   don't go through all those chains if you're just
10   counseling somebody.
11        Q    Okay.  The chains would begin with what?
12   A reprimand?
13        A    No.  The chains, I mean the supervisor
14   chains, but you start with a counseling unless it's
15   so severe that you go directly to an oral reprimand
16   or a written reprimand.  So it depends upon the
17   severity of the issue.
18        Q    Okay.  If you know, prior to October of
19   2000 had either Mr. Ross or Ms. DeGroot ever
20   consulted with you about contemplated disciplinary
21   action against Mark Scheff?
22        A    No.
23        Q    Had they ever talked with you about any
24   concerns they had with respect to his behavior in
```

## Page 44

```
 1   the workplace?
 2        A    No.
 3        Q    Let's mark this.
 4                     (Whereupon said document was
 5                     duly marked for purposes of
 6                     identification as Exhibit 18,
 7                     as of this date.)
 8        MR. BAKER:   Q    I have handed you what has
 9   been marked as Plaintiff's Exhibit Number 18 and
10   what that is supposed to be is a photocopy of the
11   notes that were provided to me by Ms. Kerley
12   earlier this morning.  I'd like to ask you
13   generally how, let me ask you this.
14             Is that document written in your hand?
15        A    Yes.  This is my handwriting.
16        Q    Okay.  Was this document written all at
17   one time or was it kind of a piecemeal effort?
18        A    Right.  As it went along I just wrote
19   things down so I wouldn't forget and so that's what
20   this is.
21        Q    All right.  I want to take you through
22   it.  The first page begins with the word Deb.
23        A    Uh-huh.
24        Q    Might I assume that refers to Deb
```

11 (Pages 41 to 44)

Page 45

1  Sullins?
2     A     Uh-huh.
3     Q     Is that a yes?
4     A     Oh.  I'm sorry.  Yes.
5     Q     And then beneath it are some
6  handwriting.  Can you tell me what caused you to
7  write the material that appears on the first page?
8     A     This was after, if I remember right, this
9  was when it was reported to us and after Mary had
10  contacted Investigations and we told Steve and this
11  is when I started writing and this is the
12  statements that I was told that were said.
13     Q     So this would have been written sometime
14  in the fall of 2000?
15     A     I, it looks like in February.  I don't
16  know.  Well--
17     Q     Oh.  You're right.
18     A     But see, I was looking at these because I
19  hadn't looked at them in so long and the dates, I
20  can't say that the dates are right or not.  I don't
21  know.
22     Q     Well, you have first incident of
23  harassment and then 2, 2000--2, 2001.  What does
24  that refer to?

Page 46

1     A     I don't know because this was, this was
2  when it all started but that wasn't in February.
3  So I don't know if these dates are right to be
4  honest with you.
5     Q     Were these notes you took based upon
6  something Deb Sullins told you?
7     A     No.  They were after the investigation
8  started and when I was interviewed and stuff.
9     Q     What was the information you utilized to
10  prepare these notes?  At least the notes of the--
11     A     When I was interviewed by OIG.
12     Q     So OIG provided you information?
13     A     Yeah.  They asked if these, if I had
14  heard that these statements were made and that type
15  of thing and I said no, I had not heard these
16  statements.
17     Q     Okay.  So this, if I have this correct,
18  this is a list of things, at least on the first
19  page, which OIG reported to you that someone had
20  told them.
21     A     Right.  And also, I think Deb also stated
22  to me that these things occurred also.
23     Q     All right.
24     A     That I can recall.  It's been so long.

Page 47

1  And some of these things I think are some issues
2  that Deb had told me also.
3     Q     Okay.  Tell me what are the issues you
4  think Deb had also told you.
5     A     I don't, I don't recall.  I mean there's
6  just--
7     Q     Some of the things on the first page?
8     A     Well, I know she said, following the
9  first incident she said she went to Marvin and
10  Lenna and reported the next day.  So I don't know
11  without reading all these.
12     Q     Well, take your time and take a look at
13  them if you want if that will refresh your
14  recollections.
15     A     And I don't, I think Deb brought this
16  instance, this issue to me also when she applied
17  for the EII position.  We did a five day posting.
18     Q     What did she bring to your attention when
19  she applied for the EII position?
20     A     That these things were being said.  That
21  mark stated that these statements regarding Steve
22  Bradley and stuff, that he only hires women versus
23  men and that type of thing.
24     Q     Okay.  Now, you have a date 8/8--

Page 48

1     A     Yeah, I guess that's--
2     Q     (Continuing.)--0 applied for Exec II.
3  I'm assuming that would have been the date Deb
4  applied for the Executive II position.
5     A     I'm assuming that's what that is.
6     Q     And are you telling me you believe on
7  that date she brought to your attention some things
8  Mark had said?
9     A     Right.  I think that's what this is, that
10  I recall.  This is very rough notes.
11     Q     Okay.  Do you have any recollection of
12  what she told you on August 8, 2000?
13     A     No.
14     Q     Okay.  So I don't want to put word in
15  your mouth, and if I do that tell me I'm doing it.
16  I'm sure Ms. Kerley will throw a brick at me or
17  something, but it's your belief that on August 8,
18  2000 when she applied for the Exec II position Deb
19  Sullins verbalized to you some concerns she had
20  about Mark Scheff's inappropriate behavior?
21     A     No.  No.  That had nothing to do with
22  that.
23     Q     What did she tell you?
24     A     I don't know.  I mean all I have is these

Baldwin Court Reporting & Legal Video Services
1-800-248-2835

Page 49

1  notes and I'm trying to make sense of them and I
2  don't know, yeah, I don't know if she stated this
3  information.  I don't know.  I don't recall to be
4  honest with you.
5       Q    So the information on the first page--
6       A    Any of it.  I just, like I said, this is
7  stuff that I jotted down as things went along and I
8  have not looked at it for five years, I mean, so.
9       Q    Well, do you have any idea when you began
10  jotting material down?
11       A    It was after the investigation started.
12       Q    And why did you jot material down after
13  the investigation started?
14       A    So I would remember what occurred but,
15  what statements supposedly were made.
16       Q    Is there any, well, let's go through page
17  by page if we could.  It looks to me like the first
18  page are some information which came from Deb
19  Sullins either directly to you or information she
20  told OIG that was later reported to you.
21       A    Right.
22       Q    Is that correct?
23       A    I, I'm guessing that's how I got it.
24       Q    Okay.  And if we go to the second page,

Page 50

1  is that again information--
2       A    OIG.
3       Q    (Continuing.)--that Deb reported to you
4  or came to you through OIG?
5       A    Yes.
6       Q    Okay.  And it looks like the second page
7  again is information that either directly or
8  indirectly came to you from Deb Sullins.
9       A    This, all this probably would have come
10  from OIG because of the detail.  I wouldn't have
11  known what was stated in their conversations in
12  their rooms and stuff that day.
13       Q    Were you provided with any statements by
14  OIG that others had given?
15       A    I don't recall.  I know he asked me if I
16  had heard these comments and, but whether he
17  provided anything I'm not sure.
18       Q    Okay.  If you go to the top of the third
19  page there's a phrase and I want you to give me
20  what you understand it to mean.  Velva went to
21  Deb's room and Mark walked by.  I don't even let my
22  husband.
23       A    Yeah.  I don't know what that is.
24       Q    Is that something Velva told you?

Page 51

1       A    I, no.  I think, I don't know what this
2  is to be honest with you.  I don't even who told me
3  the information.
4       Q    Does Velva refer to Velva Fletcher?
5       A    Yes.  I can tell you that much.
6       Q    Was Velva an employee that worked under
7  your chain of command?
8       A    She reported to Marvin or Lenna.  I don't
9  know which, but.
10       Q    Do you know Velva--
11       A    Oh, yes.
12       Q    (Continuing.)--personally or did you know
13  her?
14       A    Yes.  Yes.
15       Q    Did you ever talk with Velva about any
16  concerns she had with Mark Scheff?
17       A    No.  No.
18       Q    Did you ever review any statements Velva
19  gave to either OIG or the EEO office at the
20  Department of Public Aid?
21       A    I don't recall that.
22       Q    Do you believe Velva to be a truthful
23  person?
24       A    Yes, I think she was.

Page 52

1       Q    Okay.  If you go down to the phrases
2  promoted to Exec II and new office 10/16?
3       A    That's when her promotion was effective.
4       Q    When she got a new office where was it?
5       A    It was a ways from where everyone else
6  was in that hallway.  It was completely on the
7  other, there was a conference room in between her
8  and the other hallway.
9       Q    Okay.  So she would have been somewhat
10  removed from the other IIs?
11       A    Yes.
12       Q    And then there's a phrase didn't have to
13  listen to this any more.  What did that refer to?
14       A    I, I think she must have made the
15  statement and see, I don't even know.  These
16  statements weren't made to me but they were made to
17  other people who told me I think.  I'm not sure how
18  you I got this information but she said that she
19  got to move to this office and she wouldn't have to
20  listen to Mark, I guess.  I don't know.
21       Q    Other than, excuse me.  I interrupted
22  you.  Go ahead.
23       A    No.  I don't know.  These are just, like
24  I said, they're very rough.

13 (Pages 49 to 52)

Page 53

1    Q    Other than OIG and Deb, who else might
2  you have talked to about the Mark Scheff incident?
3    A    Nobody other than her and them after the
4  investigation started.
5    Q    Prior to the investigation, had you
6  talked with anyone about Mark Scheff?
7    A    I talked, after the complaint was made,
8  that day that it was made by Mary to the OIG's
9  office I did talk to Lenna and Marvin both and then
10  of course, we got Steve involved and everybody else
11  but it had already been reported at that time.
12    Q    Okay.  Can you tell me about your
13  conversation with Lenna and Marvin?  Did you meet
14  with them together or was it separate?
15    A    No.  I don't recall that.  I'm sure it
16  was separate because really, I mean she reported
17  to, I'm not sure who Mary reported to, if she
18  reported to Marvin or Lenna.  I'm not sure.
19    Q    Why did you want to talk with Lenna and
20  Marvin?
21    A    Because they reported it to me after they
22  found out that she had called OIG.  They came to
23  tell me.
24    Q    Okay.  Other than them telling you that

Page 54

1  Mary had reported some incidents to OIG, what else
2  was discussed?
3    A    They told me the statements that were
4  made and why they called and why Mary called
5  because Mary had told them.
6    Q    So Mary told them what statements she
7  claimed Mark had made and she also told them that
8  she had reported the incident to OIG?
9    A    Yes.
10    Q    And so they basically reported that to
11  you.
12    A    Yes.
13    Q    Okay.
14    A    And I reported it to Steve and--
15    Q    So was it just a matter of them going up
16  the chain of command?  They reported an incident to
17  you and then you reported it to Steve Bradley?
18    A    Uh-huh.
19    Q    And that was about all the discussion you
20  had with them?
21    A    Yes.
22    Q    You didn't interview them at that time
23  about Mark's behavior or other incidents or--
24    A    No.

Page 55

1    Q    (Continuing.)--any complaints by
2  employees.  Okay.  If you turn to what I think is
3  the fourth page and it begins with the phrase Jim's
4  defense.  Do you see that?
5    A    Uh-huh.
6    Q    And then down the page is says reported
7  to Lenna or Lenna, dash, he would not even bid on
8  this job.  Is that something OIG told you?
9    A    Yes.  All of this is.  I'm a hundred
10  percent sure it is.
11    Q    Okay.  Why was it that you made notes of
12  what OIG told you?
13    A    So I would remember because I knew it was
14  an investigation and there was no way to remember
15  five years from now what took place which I don't
16  remember very well anyway even with the notes.
17    Q    Took notes to prepare you for meeting
18  someone like me?
19    A    Well, I guess, but they're not very good
20  notes.  Michael Taylor.  This tells me that it was
21  Michael Taylor that interviewed me.
22    Q    I take it he is an OIG investigator?
23    A    Yes.  Yes.
24    Q    It says 10/19 e-mail and did an

Page 56

1  addendum.  Do you know what that refers to?
2    A    No.
3    Q    If you go down to, there's a phrase that
4  says Mike, Jim, Joe, Mark quit talking to Mary,
5  Deb, Velva, Pam because they told of all these
6  incidents.  Let me ask you this.  Are the male
7  names, the male MCs that worked in this unit?
8    A    Yes.
9    Q    And are the female names the females that
10  worked in that unit?
11    A    Yes.
12    Q    Okay.
13    A    And I think this was, I gave them a
14  direct order.  I did call them all in and because
15  we were being told, we were told by somebody, I
16  don't know who, that they were discussing the
17  investigation.  So I gave them a direct order to
18  quit discussing it.  They all were.
19    Q    That's not what this says though.
20    A    I know that's not what it says but I know
21  that that's what occurred.
22    MS. KERLEY: Which, for clarification, if yours
23  looks different than mine, mine looks like it says
24  quiet talking.  When you said, did you say quit

## Page 57

1    talking.
2         MR. BAKER: I did.
3         MS. KERLEY: You know your handwriting better.
4         MR. BAKER:   Q   Is that quit or quiet?
5         A    Where at?  Oh.  Here?
6         MS. KERLEY: Yes.
7         THE DEPONENT: I don't know.
8         MR. BAKER:   Q   Well, was there a time where
9    the male MCs and the female MCs just weren't
10   talking to one another?
11        A    Oh.  There was a time that nobody talked
12   to anybody because everybody had just had it.  You
13   know, I mean they were just, you know, they were
14   given direct orders not to discuss it any more and
15   there was, you know, there was tension and so no
16   one talked to anybody for a long time.  I mean it
17   just, everyone just came in and did their job and
18   there was hardly any communication.
19        Q    No socialization?
20        A    Oh.  There was never, I can't say that
21   any of these people socialized together.
22        Q    When, well when I say socialization, I'm
23   talking about conversations that were related to
24   non work business.

## Page 58

1         A    Right.  That did not, after this happened
2    that stopped completely.
3         Q    Okay.  Who is Shirley--
4         A    Bermida (sp).
5         Q    Bermida?
6         A    She worked in another area in Bureau of
7    Comprehensive Health Services.
8         Q    There's, her name appears and then the
9    date 10/20.
10        A    I know.
11        Q    And then there's a phrase beneath it.  Is
12   there any connection between the name and the
13   phrase?
14        A    Well, I don't know if I, kind of read
15   that, I don't know, that maybe Mark was talking to
16   Shirley about it but I don't know and that's why I
17   know, you know, after the investigation started,
18   there was a lot of conversation going on and I was
19   being told that people were talking about it.  So
20   we were to give them a direct order which I did.
21        Q    A direct order not to talk about the
22   investigation.
23        A    Right.  I called them all.
24        Q    You didn't give them a direct order that

## Page 59

1    said don't talk about non work related things?
2         A    No.
3         Q    If they wanted to talk about how the
4    Cardinals were going to do this weekend, that was
5    okay.
6         A    Yes.
7         Q    Provided it didn't interfere with work, I
8    guess.
9         A    Right.
10        Q    Being a dutiful state employee, I guess.
11        A    Yeah.
12        Q    If you turn to the next page there's
13   reference to dirt in Mark's office.
14        A    Yeah, he complained to, I don't know if
15   it was, it was probably Marvin, that's who he
16   reported to, that there was dirt in his office, I
17   do remember that, and he made the statement if they
18   wanted to throw dirt at him.
19        Q    Was there any investigation done of that?
20        A    No, because there's dirt in everybody's
21   office.  I mean our office is so filthy.  So I
22   don't, I don't know what kind of dirt it was to be
23   honest with you.
24        Q    Then there is a reference to 11/2 and the

## Page 60

1    name Roni Kaluza?
2         A    That was our bureau chief at the time.
3         Q    And then opposite, it's a female, her
4    name.  The dirt was because of the investigation?
5         A    Yeah.  I don't--
6         Q    Do you have any idea what that refers to?
7         A    No.
8         Q    Then beneath it the big dog signs.  She
9    has pictures.  Is the she Roni or someone else?
10        A    I'm not sure to be honest with you.
11        Q    Do you know what the big dog signs refers
12   to?
13        A    I think these were in Mark's office
14   because he has big dogs and I think he's got a
15   Rottweiler or something and I think he had these
16   signs up and we had all, I think we had all of them
17   taken down because somebody complained about them.
18   I told them they couldn't have any and they were
19   just, I don't even know what they, they weren't
20   inappropriate.  They didn't say things
21   inappropriate but it was offensive to people.
22        Q    Do you have any recollection of Mark
23   using the phrase alpha dog and beta dog?
24        A    Alpha, bay, no.  He made the statement

Page 61

1  that his doing was smarter than the provider.  That
2  was what the complaint was from the provider, but
3  that's.  And I remember the coat.  It was this long
4  coat.
5      Q    The Columbine coat, I'm assuming that
6  refers to the Colorado school--
7      A    I guess.
8      Q    (Continuing.)--incident?
9      A    Yeah.  I think it was during that time.
10     Q    Tell me what you know about that
11 incident.
12     A    I don't really, other than people were
13 saying that it was offensive because it was a long
14 trench coat type coat that he always wore.
15     Q    And did he just start wearing that after
16 the investigation?
17     A    I think that's why I put it in there
18 because they felt that that was, he started wearing
19 that because of the investigation.  I think that's
20 why I put it in there.
21     Q    And certain employees were concerned
22 about that?
23     A    Well, they thought it was odd but, I mean
24 it was just a long coat.  There wasn't anything,

Page 62

1  you know.
2      Q    Was he wearing the long coat during work
3  time?
4      A    Oh, no.  No.  He would wear it to work
5  and take it off and wear it home.
6      Q    Did you see the coat?
7      A    Yes.
8      Q    Can you describe it for me?
9      A    It was like a raincoat.  I mean it wasn't
10 a leather coat.  It was just a raincoat, a long
11 trench coat type is what I remember it to be.
12     Q    Did it strike you as unusual that he was
13 wearing it?
14     A    No.  I mean I've seen numerous coats like
15 it but they just kind of tied it, I think the issue
16 here was they tied it to, he started wearing it
17 after the investigation which I don't know that
18 there was anything that connected the two at all.
19     Q    Well, you are aware that after the
20 investigation occurred Mark Scheff did make
21 comments evidencing his displeasure with the
22 investigation.
23     A    I'm not aware of that.
24     Q    You're not aware of it at all?

Page 63

1      A    That he what?  He didn't--
2      Q    That he was not happy with the
3  investigation and was not happy that people had
4  cooperated with the investigation?
5      A    Oh, well, yes, and he was suspended and
6  everything and so yes, I know he wasn't happy.
7      Q    And he had made some comments about
8  retribution.  Do you recall that?
9      A    I don't recall any comments on it.
10     Q    Mr. Bradley didn't tell you about that?
11     A    I don't recall that.
12     Q    Is it your testimony you don't recall?
13     A    I don't recall.
14     Q    You don't recall one way or another?
15     A    I don't recall.
16     Q    Okay.  I'm not trying to put you in word
17 games but I'm trying to find out if it's one of two
18 scenarios when you say you don't recall.  One
19 scenario is you have no recollection of that
20 occurring and you don't believe it happened or
21 another is it's been too long ago, you just don't
22 recall one way or another.
23     A    I know he wasn't happy about the findings
24 of the investigation and the suspension and that

Page 64

1  type of thing, but that's all I can recall.  What
2  he said or what he did or anything like that, I
3  don't recall any of that.
4      Q    Okay.  Under the sexual harassment
5  policies of the Department, does an employee have a
6  right to bring what they feel is a good faith claim
7  of sexual harassment against another employee?
8      A    Uh-huh.  Yes.
9      Q    And is an employee who observes sexual
10 misconduct not involving him but involving someone
11 else obligated to report that?
12     A    Yes.
13     Q    And is that individual also obligated to
14 truthfully provide information in an OIG
15 investigation?
16     A    Yes.
17     Q    And if an individual reports sexual
18 harassment either to him or to others or
19 participates in an OIG investigation, is that
20 person entitled to be free of any retribution on
21 the part of the individual that's the subject of
22 the sexual harassment?
23     A    Yes.
24     Q    And are supervisors in the workplace

16 (Pages 61 to 64)

Page 65

1  supposed to take appropriate action to make sure
2  that the work environment is such that the person
3  who is the subject of the sexual harassment
4  investigation does not do things or say things that
5  intimidates people who cooperate in the
6  investigation?
7      A    Yes.
8      Q    And if a supervisor does not take those
9  steps is that supervisor not doing his job?
10     A    Correct.
11     Q    Okay.  Do you recall a point in time
12 where Deb Sullins moved from the basement to the
13 first floor of the Bloom Building?
14     A    Yes.
15     Q    And did you have any involvement in the
16 decision to move her to that location?
17     A    I don't recall if she came to me or if
18 she went to Steve.  I'm not sure.
19     Q    Do you know why it was she moved to the
20 first floor?
21     A    Yes, because she said that he was walking
22 by, Mark was walking by her office and she felt
23 uncomfortable with him being around her work area.
24     Q    Was that something that was brought to

Page 66

1  your attention?
2      A    Yes.
3      Q    And did you do anything to look into her
4  concerns in that respect?
5      A    Yes.  I mean we moved her because, and
6  that's what I don't remember.  I don't know if she
7  came to me or if she went directly to Steve Bradley
8  but we moved her at her request.
9      Q    Did you ever speak with Mark Scheff about
10 his conductor, alleged conduct?
11     A    Yes, and he said he was not walking by
12 her office and doing the things that she said he
13 was doing.
14     Q    Did you interview any employees to see
15 who was right?
16     A    I don't recall.
17     Q    If you were doing your job, should you
18 have done that?
19     A    I, I don't know.  I'm not sure about
20 that.
21     Q    Okay.  It looks from the fifth page of
22 Exhibit 18 that it was March 16th when Deb Sullins
23 moved upstairs.
24     A    Yes.  That's what I have here.

Page 67

1      Q    Let's go to the next page, 11/30,
2  Chicago.  What does that refer to?
3      A    Well, I'm not sure.  I think there was a
4  conversation that got brought into the
5  investigation or something between Ann and Rita
6  but, and I think it's when Deb Sullins, I think she
7  was on this trip to Chicago with these two people.
8      Q    Okay.
9      A    But I, I don't, really I don't recall.
10     Q    Okay.  There's a phrase and I'm assuming
11 you're quoting someone--
12     A    Right.  Right.
13     Q    (Continuing.--that says Lenna was saying
14 she did not want to be a fucking supervisor any
15 more.  Boys will be, is that bay or boy?
16     A    Boys will be boys.
17     Q    What does that refer to?
18     A    I think that was a statement that they
19 brought up that Lenna supposedly had said and they
20 were asking me if I was aware of that and I said no
21 because to begin with I wasn't on this trip to
22 Chicago.
23     Q    Okay.  Who brought that up to you?  Was
24 that Ann or Rita?

Page 68

1      A    I think it was investigations maybe.  I
2  don't know.  Maybe, I don't, I don't recall.  I
3  really, like I said these are just--
4      Q    Okay.  Did Rita at one time supervise you
5  or train you?  Go ahead and answer.
6      A    Rita was my supervisor in claims
7  processing.
8               (Whereupon Mr. John Taylor
9               joined the deposition.)
10     MR. BAKER:    Q    Is Rita Altman someone you
11 see from time to time or someone you saw from time
12 to time back in 2002 and 2001?
13     A    Yes.  They work in the basements for
14 BCHS.
15     Q    Did you ever talk to Rita about her
16 version of this Chicago incident?
17     A    No.
18     Q    Do you know Ann, is it Lattig?
19     A    Yes.  Rita reports to Ann.
20     Q    Did you ever talk to Ann Lattig about
21 that incident?
22     A    No.
23     Q    Okay.  There's a date January 25, 2001
24 and then beneath it some reference to a car and a

17 (Pages 65 to 68)

Page 69

```
 1   person named Mike.  Do you know what that refers
 2   to?
 3        A.    Something, I think this was when Deb got
 4   a new car and she went out to go leave one night in
 5   her car and somebody had put dog shit on her car is
 6   what she had said.
 7        Q.    Okay.
 8        A.    And that was reported to personnel and,
 9   but I don't think anything, they couldn't prove who
10   did it or anything, so.
11        Q.    Just one of those things that happens in
12   the state of Illinois.
13        A.    Not normally, no.
14        Q.    If you are aware, back at the time this
15   occurred to Deb Sullins had there been a rash of
16   vandalism with respect to cars of employees that
17   worked in the Bloom Building?
18        A.    Not that I was aware of or that I could
19   recall.
20        Q.    Are you aware of anyone else who at times
21   proximate to Deb Sullins also had dog feces or some
22   sort of feces put on their car?
23        A.    No.
24        Q.    If we move down to beneath the car
```

Page 70

```
 1   comments there is a reference to Pam and is that
 2   Pam Dufour?
 3        A.    Uh-huh.
 4        Q.    Do you know what this refers to?
 5        A.    No, I don't.  No, I don't.  I know they
 6   were given a direct order to quit talking about it
 7   but what this incident, I don't know.
 8        Q.    And then there's a comment attributed to
 9   Lenna.  I assume it's attributed to her.
10        A.    Yeah.
11        Q.    Do you know what that refers to?
12        A.    No.
13        Q.    Then down at the bottom of that page
14   there is the date 1/29/01 and beneath it is the
15   word Jodie and then 4/15--discomfort level, guys
16   against the girls?
17        A.    Right.  That's when there was just no
18   conversation whatsoever.  The guys stayed to
19   themselves and the girls stayed to themselves and
20   that was when the investigation started.
21        Q.    Okay.  Would the guys talk to the guys
22   and the girls talk to the girls?  The guys and
23   girls wouldn't talk to one another?
24        A.    Uh-nuh.
```

Page 71

```
 1        Q.    Is that the situation?
 2        A.    Yes.
 3        Q.    Okay.  Did something occur on January
 4   29th at 4:15?
 5        A.    I think I, I don't know.  I don't know
 6   what happened at 4:15.
 7        Q.    Okay.
 8        A.    I have no idea.
 9        Q.    If we go to the next page we have chose
10   to stay in her office because the hostile work
11   environment.  Her mental health--scared of Mark.
12   Verbal only by mark.  What does that phrase refer
13   to?
14        A.    I have no idea.
15        Q.    Beneath that is the phrase excessive
16   amounts of ABT.  What is ABT?
17        A.    Available benefit time.  That's when she
18   started missing work and I had to counsel her
19   because she got a without pay status.  She had no
20   time on the books.
21        Q.    I got you.
22        A.    Because she was going to counseling and
23   stuff.
24        Q.    If we focus on when she started missing
```

Page 72

```
 1   work, would that have been sometime in early 2001?
 2        A.    No.  She started missing when, before
 3   this started when the relationship broke up but
 4   then it got worse as we got into the investigation
 5   also.
 6        Q.    Okay.  Using the date that Deb became an
 7   Exec II which I think--
 8        A.    October 16th.
 9        Q.    I think was October 16th, 2000.  Prior to
10   that time what was her attendance like?
11        A.    It was good.  I mean because just two
12   weeks, a couple of weeks before that that's when
13   the breakup happened.
14        Q.    So did she start missing time after she
15   became the Exec II?  Is that when it became a
16   problem?
17        A.    Yes.
18        Q.    All right.  Okay.
19        A.    A couple of weeks maybe before too.
20        Q.    Okay.  And was it a progressive situation
21   whereas time passed she started to take more and
22   more time away from work?
23        A.    Uh-huh.  (Moved head up and down.)
24        Q.    So it started slowly and built up?
```

18 (Pages 69 to 72)

Page 73

```
1     A    Yes.  Right.
2     Q    Okay.  And was it in early 2001 where it
3  appeared to you that her time away from work was
4  excessive?
5     A    Uh-huh.
6     Q    Is that yes?
7     A    Yes.
8     Q    Okay.  That's all right.  We'll get you
9  trained.
10    A    Sorry.
11    Q    Now, if I understand your earlier
12 testimony you believe that at some point in time
13 you counseled Deb?
14    A    Yes.
15    Q    And was that at the point that it was
16 starting to get worse?
17    A    Yes.
18    Q    So that would have been when?  Late 2000,
19 early 2001?
20    A    I, I don't know a date exactly.
21    Q    Okay.  Do you recall where you were when
22 you counseled her?
23    A    What position I was in?
24    Q    No.  Was it in your office?
```

Page 74

```
1     A    Oh.  I'm sorry.  It was in my office.
2     Q    What did you say to her at that time and
3  what did she say to you?
4     A    Well, she was very upset.  I told her I
5  was counseling her for excessive OHD time and it
6  was unauthorized and she was very upset because she
7  said she was having to go to all these doctor's
8  appointments and she started getting counseling and
9  then I also put in her eval, put it in her
10 evaluation.
11    Q    Did you ask her why she was away from
12 work?
13    A    Oh, yes.  She told me too why she was
14 away.
15    Q    What did she tell you?
16    A    She said that she had to take doctor's
17 appointments for counseling but it wasn't all just
18 the doctor's appointments.  There were a lot of
19 call ins too.
20    Q    Did she say what the reason was she was
21 away from work?  Was there a particular problem?
22    A    She started doing counseling when the
23 relationship broke up and then she continued the
24 counseling when all this started because there were
```

Page 75

```
1  just a lot of other things going on too, so.
2     Q    The other things being the problems in
3  the workplace we've been talking about?
4     A    That's what she said.
5     Q    Okay.  So as I understand it earlier in
6  2000 Deb had a relationship problem?
7     A    Uh-huh.
8     Q    And started getting counseling?
9     A    Uh-huh.
10    Q    And the relationship problem was
11 upsetting to her?
12    A    Right, and she missed a lot of work then
13 because she was moving out and there were fights
14 and she would talk about that.
15    Q    You say a lot of work.  Was that several
16 days during a particular period of time?
17    A    I don't recall.
18    Q    Okay.  I am assuming that somewhere we
19 can secure her attendance records that will
20 identify when she was away from work?
21    A    Yes.  Yes, we can do that I'm sure.
22    Q    And Ms. Kerley is making a note of that.
23 I'm sure she will get them for us.  And I guess at
24 some point in time in early 2001 she had exhausted
```

Page 76

```
1  her vacation time, she had exhausted her personal
2  time, she had exhausted her sick days and she was
3  taking time she was not eligible to take and get
4  compensated for?
5     A    Right.  I don't know the date when that
6  occurred.  We'd be able to find that out for you
7  too.
8     Q    Beneath the excessive amount of ABT
9  there's a phrase there's nothing that can be done.
10 She would not move him.  I would not detail him.  I
11 stated that she should make the best of a bad
12 situation.  Do you know what that refers to?
13    A    I think it was her unhappiness in the
14 Bureau and she didn't want to work there and
15 that's, at one point we got her a different job at
16 her request.
17    Q    Did she tell you she was unhappy in the
18 Bureau?
19    A    Yes, and she told Steve Bradley too.
20    Q    And I believe at sometime in the spring
21 or early summer of 2001 she did leave the Bureau or
22 she left the building?
23    A    Right.  She stayed in the Bureau but she
24 left the building but I don't recall what the date
```

Page 77

```
 1   was when that happened.
 2        Q     Without the date do you agree with me she
 3   took a job out on Churchill Road?
 4        A     Yes.
 5        Q     And she took that job because she was
 6   unhappy working in the Bloom Building?
 7        A     Yes.
 8        Q     Okay.  And when she took the job on
 9   Churchill Road do you know what position it was?
10        A     It was I think equal to what she was.  It
11   was a different title, but it was equal pay if I
12   remember right.
13        Q     Okay.  There's a date 1/30/01, 11:50.  Do
14   you know what that refers to?
15        A     No.
16        Q     Then beneath it Steve stopped her.
17        A     Yeah.
18        Q     Do you know what that refers to?
19        A     Yeah.  I don't know if that's regarding
20   the new position.  I don't know.
21        Q     Then the phrase the situation can only
22   get worse.  Do you know what that refers to?
23        A     Uh-uh. (Moved head from side to side.)
24        Q     There's a phrase that says February daily
```

Page 78

```
 1   conversations about investigation.  Deb could not
 2   get away from him.  Do you know what that refers
 3   to?
 4        A     No.
 5        Q     Okay.  She said that I stopped talking to
 6   her.  Does the she refer to Deb and the I refer to
 7   you?
 8        A     Yeah.  I think that's, which that wasn't
 9   true but she said that nobody would talk to her
10   except for Marvin I think.
11        Q     Prior to Deb becoming an Executive II, I
12   guess is her position--
13        A     Uh-huh.
14        Q     (Continuing.)--what was your opinion on
15   her truthfulness?
16        A     I really had no problems with her up
17   until that point, up until all this started.
18        Q     And I take it once the investigation
19   started and she raised complaints about Mr. Scheff
20   you took issue with her truthfulness?
21        A     I took issue?
22        Q     You believed she was not truthful?
23        A     Oh, no.  I didn't say that.
24        Q     Did you believe her to be truthful?
```

Page 79

```
 1        A     Well, I did not know.  It was her word
 2   against his so I had, I had no reason to think that
 3   he would lie and I had a reason to think that she
 4   would ever lie.
 5        Q     Okay.  Did you know anything about Deb
 6   Sullins' record as a Department of Public Aid
 7   employee before she came into your work unit?
 8        A     No.  Well, she came highly recommended
 9   when we got her but that's all I know.
10        Q     Okay.  If we look at the bottom of the
11   page we're on it refers to March management.  I was
12   going to say March Madness.  March Management, 3
13   slash 5, met with Deb.
14        A     Yes.  This was when I gave her her
15   evaluation and she wasn't happy with it.  Her
16   probationary.
17        Q     Okay.
18        A     You asked me earlier what I gave her.
19   Looks like I gave her an accomplished with one
20   exceeds and she said it was the worst eval.
21        Q     I'm assuming you're referring what she
22   said the worst evaluation in 15 years?
23        A     Was Deb.
24        Q     That's what she said?
```

Page 80

```
 1        A     Yes.
 2        Q     And then you have I have also has
 3   excellent.  What does that mean?
 4        A     I think she said that she had always had
 5   an excellent evaluation but I'm just, I'm
 6   guessing.  My notes are pretty bad.
 7        Q     Okay.  Do I understand your overall
 8   evaluation of her performance was accomplished?
 9        A     It was accomplished with only one exceeds
10   but there were several comments that I made under
11   the supervisory comments that she had been
12   counseled and I'm not sure what else was in there.
13        Q     Okay.
14        A     Because you put your comments in there
15   and I'm not sure what they said.
16        Q     Right.  Other than, than the fact that
17   she had taken some time away from work that
18   appeared to be excessive, did you have any
19   recollection of other concerns you had with her
20   performance while she was in the--
21        A     Yes.  Her work was not up to par either.
22   I mean she wasn't performing like she performed
23   before.
24        Q     Okay.
```

20 (Pages 77 to 80)

Page 81

1     A    But I don't know what was put in the
2   evaluation without seeing it.
3     Q    Right.
4     A    And we would be able to get that too.
5     Q    Sure.  Sure.  But you believe from your
6   notes that the overall evaluation was accomplished?
7     A    Yes, obvious.  I mean I don't remember.
8   All I can do is say what's written here.  I don't
9   know.
10    Q    Okay.  In state government parlance is
11  accomplished above or below satisfactory?
12    A    It's not below and it's not above.  It
13  just means that you're doing your job.
14    Q    Okay.  There's a reference to cases over
15  done.  Do you have any idea what that refers to?
16    A    No.  I have no idea.
17    Q    There's a reference to a meeting, Marvin,
18  Lenna, Jodie and Deb?
19    A    Yeah.
20    Q    Do you recall attending any meetings with
21  those three individuals?
22    A    No.
23    Q    Now, there's an entry 3/7/01 at 10:00
24  o'clock.  Would that be the date of a meeting?

Page 82

1     A    I'm not sure.
2     Q    Stated they had to respond.  Do you know
3   that refers to?
4     A    Uh-uh.  (Moved head from side to side.)
5     Q    The ground had been, can you read that
6   for me?  I'm not sure.
7     A    The ground had been led to everyone's
8   behavior.  I don't know.  I think the whole issue,
9   if I remember but I don't know if I do, I think she
10  was concerned that no one was talking I think is
11  what the issue was.
12    Q    Jodie could not make them tougher skin as
13  MC.  What does that refer to?
14    A    The MCs.  The medical consultants.
15    Q    What does the tougher skin refer to?
16    A    I have no idea.
17    Q    I stated she needed to change.  I'm
18  assuming I refers to Jodie.  Does the she refer to
19  Deb?
20    A    I'm assuming but I don't know.  I think
21  the issue was that, I don't know, if somebody
22  wasn't responding because the next statement talks
23  about Jim does not have to respond.  I don't know
24  what that's about either.

Page 83

1     Q    You just know how boys will be boys?
2     A    That was the statement that somebody
3   made.  That was earlier in this too.  I don't know.
4     Q    You don't know who made that statement?
5     A    No.
6     Q    Having reviewed the materials we've just
7   gone over under the heading meeting, is it your
8   belief that your notes refer to comments that were
9   made at a meeting with Marvin, Lenna, Jodie and
10  Deb?
11    A    Yes.  I would assume it probably was,
12  but.
13    Q    And that meeting occurred on March 7th?
14    A    (Moved head up and down.)  Why?  I don't
15  know.
16    Q    Okay.  There's March 7th, 10:00 o'clock.
17  I'm assuming that's 10:00 A.M., not 10:00 P.M.
18    A    Right.
19    Q    My interpretation is that's the date of
20  the meeting and the time of the meeting.  Do you
21  think I have it right in that respect?
22    A    Yes.  Yes.
23    Q    Okay.
24    A    This was a conversation that she had with

Page 84

1   Carla, I guess, the next one.
2     Q    Is that Carla Beckner?
3     A    No.  Cheryl Beckner.
4     Q    Who is Carla?
5     A    Carla Lawson, Steve's secretary.
6     Q    Okay.  Is that a comment that you
7   received from Carla or is that a comment that you
8   received from Deb?
9     A    That was a comment, I'm assuming that
10  Carla stated it.  I don't know.
11    Q    Okay.
12    A    I don't know what the screw driver to the
13  wall is.
14    Q    Did you ever become aware that at some
15  point in time Mark Scheff taped either a screw
16  driver or a screw to the door of his office?
17    A    Oh.  Is that what that is?  I don't
18  know.  I don't know.  I don't recall that.  I must
19  have wrote that and maybe he did.
20    Q    Okay.
21    A    I don't know.  I don't recall that.
22    Q    Okay.
23    A    I had to write that about something
24  though and I must have interviewed with Loren

21 (Pages 81 to 84)

## Page 85

1  Larsen too because I had that down for 3/9.
2     Q    If you move to the last page there's what
3  I'm assuming is an interview that you had with
4  Janice Johnson.
5     A    The last--
6     Q    The last page of this document.
7     A    Yeah.  EEO, wasn't it?
8     Q    Correct.  And down at the bottom it says
9  Jodie, no, she did not ask to be moved.  What does
10 that refer to?
11    A    I don't know.  I don't know.
12    Q    After she was promoted to an Executive II
13 she was moved.  Am I correct?
14    A    That's correct.
15    Q    Was that a part of the promotion?  Just a
16 new job, that's where she's working?
17    A    Right.  She had her own office.
18    Q    Okay.  And then sometime later she moved
19 from the basement to the first floor.
20    A    Yes.
21    Q    And was that at Deb's request?
22    A    Yes.
23    Q    And that was because she had some
24 concerns about the environment and Mr. Scheff?

## Page 86

1     A    Yes.
2     Q    Okay.  And then she stayed on the first
3  floor during the balance of the time she worked in
4  the Bloom Building?
5     A    Yes.
6     Q    Am I correct--
7     A    For the remainder, yes.
8     Q    (Continuing.)--in that respect?  And then
9  she did move in taking a new job in a completely
10 different building.
11    A    Yes.
12    Q    And that again was at her request.
13    A    Yes.
14    Q    Okay.  Can you, I'm going to hand you
15 these documents.  Can you go to Exhibit 14?
16    A    Uh-huh.
17    Q    Exhibit 14 appears to be an e-mail
18 written by Deb Sullins to Steve Bradley on March
19 13th, 2001.  Am I correct?
20    A    Yes.
21    Q    And you were copied in on it?
22    A    Yes.
23    Q    And in that e-mail Deb asked to transfer
24 to another supervisor?

## Page 87

1     A    Yes.
2     Q    And as I read it, it looks to me like she
3  was not particularly happy with her relationship
4  with our at that point in time.
5     A    No, she wasn't.
6     Q    Was that a mutual thing, you were not
7  happy with the relationship either?
8     A    No.  I didn't treat her any differently.
9     Q    Were you surprised when she wrote this
10 e-mail?
11    A    Yes.
12    Q    Did you talk to her about it?
13    A    Yes.
14    Q    Do you recall when you talked to her
15 about it in relationship to the e-mail?
16    A    No.
17    Q    Do you recall when you talked to her
18 about it?
19    A    No.
20    Q    Do you recall if it was one conversation
21 or several conversations?
22    A    No, I don't recall.
23    Q    Do you have any recollection of what you
24 said to her and she said to you when you talked

## Page 88

1  about it?
2     A    No.
3     Q    We talked a moment ago about an interview
4  you had with a woman named Janice Johnson.
5     A    Yes.
6     Q    Did Ms. Johnson tell you or were you
7  aware at that time that Deb had filed a charge of
8  discrimination with the Department of Human Rights?
9     A    I don't recall whether she told me that.
10 I don't know.
11    Q    Were you aware at sometime in 2001 that
12 Deb had filed a charge with the Department of Human
13 Right?
14    A    I don't know.  I don't remember if I was
15 or when I was told or if I was told.  I don't.
16    Q    At any time during your supervisory
17 tenure at Department of Public Aid has a
18 subordinate employee ever filed a claim either with
19 the Department of Public Aid's EEO office or with
20 some external agency that they felt they were
21 discriminated against?
22    A    Not that I can recall, no.
23    Q    Okay.  Can you go to Exhibit 16?
24    A    Okay.

22 (Pages 85 to 88)

Page 89

1      Q    Exhibit 16 appears to be an e-mail that
2  you sent on March 28, 2001 to Steve Bradley
3  concerning Deb Sullins.
4      A    Uh-huh.
5      Q    Is that a yes?
6      A    Yes.  Sorry.
7      Q    That's okay.  Just out of curiosity why
8  did you cc yourself?
9      A    I cc myself on all my e-mails.
10     Q    Okay.  Why was it you wrote that e-mail
11 to Mr. Bradley?
12     A    Just to let him know that she had filed a
13 complaint.
14     Q    Okay.  Why did you write the rest of it?
15     A    Why did I write the rest of what?
16     Q    About her means of, her route of travel
17 to your office?
18     A    I don't know.  I was just making a
19 comment, I guess, that she could have went a
20 different way.
21     Q    Do you draw some significance about the
22 route she chose to travel?
23     A    I don't recall.
24     Q    What was Deb's complaint?

Page 90

1      A    Just that he was walking by her work area
2  after she got moved upstairs.
3      Q    And is that a complaint she brought to
4  your attention?
5      A    Yes, and I talked, I called Mark in and
6  talked to him about it and he said he wasn't.
7  That's when, actually, I didn't call him in.  I
8  think I had Marvin call him in.
9      Q    So Marvin called him in and Marvin talked
10 to him and Marvin reported back to you that he
11 denied doing it?
12     A    Yes, and I think that's what this
13 statement is, maybe.
14     Q    Can you, is there an exhibit number on
15 that statement?
16     A    Hold on.  17.
17     MS. KERLEY: Which we only have one copy of,
18 which is the one--
19     MR. BAKER: Yes.  Can I see that for just a
20 second?
21     Q    Exhibit 17 is a statement that Marvin
22 Ross gave to someone.  Was that provided to you?
23     A    I don't recall if he gave this to me or
24 if he just made a note to himself.  I don't

Page 91

1  recall.
2             (Whereupon said document was
3             duly marked for purposes of
4             identification as Exhibit 19,
5             as of this date.)
6      MR. BAKER:  Q    I'm going to hand you what's
7  been marred as Exhibit 19.  Since we only have one
8  copy of that document in the room can you identify
9  it for us and then read the text of it into the
10 record if you would?
11     A    Identify what?  That this is a statement
12 by me?
13     Q    Yes.
14     A    Okay.
15     Q    What's the date of it?
16     A    March 13th, 2001.  Once internal affairs
17 investigation began, Mark Scheff did not have any
18 contact whatsoever with Deb Sullins.  I also would
19 like to state that Deb Sullins never reported to
20 myself or Lenna DeGroot any sexual harassment
21 towards her by Mark Scheff or anyone else.
22     Q    Okay.  What is the basis for those
23 statements?
24     A    Mark asked me to provide that to him and

Page 92

1  I did.
2      Q    Mark Scheff?
3      A    I think it went to him.
4      Q    So he requested that statement from you
5  and you provided it?
6      A    I think so.
7      Q    How do you know one way or another what
8  Mark Scheff did or didn't do after the
9  investigation began?
10     A    Because his supervisor said he had had no
11 contact with her.
12     Q    Okay.
13     A    Because they monitor their employees.
14     Q    Well, they're supposed to monitor their
15 employees.
16     A    And they do.
17     Q    How do you know they did?
18     A    Well, I know what they told me and they
19 said they did.
20     Q    Okay.  And if they didn't do, if they
21 didn't monitor their employees I think we've agreed
22 they could be disciplined.
23     A    That's correct.
24     Q    So you're assuming that what they told

Page 93

1  you was correct.
2       A    Yes.
3       Q    Okay.
4       A    I have no reason not to.
5       Q    Well, of course they have a reason not
6  to.  They could be disciplined.
7       A    I know.
8       Q    That would be a pretty good reason,
9  wouldn't it?
10      A    Right, but I have no reason not to
11 because they're good supervisors, so.
12      Q    Well, Deborah Sullins was a good
13 employee, wasn't she?
14      A    Yes.  Yes, she was.
15      Q    And the other females who worked in that
16 unit were good employees, weren't they?
17      A    Yes.
18      Q    And you have no reason to believe they
19 would lie, do you?
20      A    Right.
21      Q    And we've talked about incidents that,
22 things Mark Scheff did during the investigation,
23 don't we?
24      A    Yes.

Page 94

1       Q    And those were things that he did in
2  close proximity where both Mr. Ross and Ms. DeGroot
3  worked.  Is that not correct?
4       A    What things are you referring to.
5       Q    Well, the raincoat.
6       A    I don't find that--
7       Q    The comments about the investigation.
8       A    Right.  The raincoat isn't a misconduct
9  though, because somebody wears a raincoat.  There
10 was no reason to report or, report that he was
11 wearing a raincoat.
12      Q    Are you aware of the Workplace Violence
13 Act?
14      A    Workplace Violence Act.  I, I know
15 there's work rules on--
16      Q    Do you have any recollections of the
17 incident that occurred in Columbine High School in
18 Colorado?
19      A    Do I know about it?  Yes.
20      Q    Do you know what type of coats the young
21 men that were perpetrators of that incident wore?
22      A    Yes.
23      Q    And would you agree with me they were
24 similar to the coat that Mark Scheff wore?

Page 95

1       A    He always wore that coat though.  It's
2  not a new coat.  It wasn't a new coat.
3       Q    If other individuals disagreed with you
4  that worked around him every day, would they be
5  lying?
6       A    I'm not going to say they'd be lying.
7  I'm not going to call anybody a liar.
8       Q    Would you say they'd be mistaken?
9       A    I don't know.
10      Q    Did you see Mark Scheff every workday?
11      A    No.
12      Q    Did you see him enter the building and
13 leaving the building?
14      A    No.
15      Q    Do you know what type of coats he
16 normally wore to work prior to October of 2000?
17      A    No.
18      Q    Would you agree with me that the
19 information that was contained in the statement you
20 just read into the record was based upon what
21 others told you?
22      A    Yes.  Yes.
23      Q    With the exception I think you claim that
24 Debbie Sullins never verbalized to you complaints

Page 96

1  about sexual harassment.
2       A    That she didn't?
3       Q    She never told you that there was sexual
4  harassment.
5       A    Right.  Right.
6       Q    That's your testimony?
7       A    Right.
8       Q    And if she had told you those things and
9  you ignored them you would not be doing your job.
10      A    That's correct.
11      Q    And you would be subject to disciplinary
12 action.
13      A    Uh-huh.
14      Q    Is that a yes?
15      A    Yes.
16      Q    Thank you.  Since Debbie Sullins left
17 your work unit has Mark Scheff ever been
18 disciplined?
19      A    No.
20      Q    Are you aware of any complaint made about
21 Mark Scheff by a vendor or a person who was a
22 provider of services to your department?
23      A    No.
24      Q    You're not aware that a provider made a

24  (Pages 93 to 96)

Page 97

1 written complaint that Mark Scheff said
2 inappropriate things to her during a telephone
3 call?
4     A    If I did I forgot. I don't know. I mean
5 I'm not aware but that's been a long time.
6     Q    Are you aware of any newspaper article
7 that appeared I believe in Toby McDaniel's column
8 that related to an incident that occurred in your
9 work unit?
10     A    I remember the article. I don't remember
11 what it was about.
12     Q    Did you ever look into the events after
13 you read the article?
14     A    I don't remember what it was about. If
15 you could tell me. I don't know. I don't remember
16 what it was about.
17     Q    Okay. At any time after October 1st,
18 2000 up until the time Debbie Sullins left your
19 work unit did you ever have any conversations with
20 Steve Bradley concerning the conduct of Mark Scheff
21 in the workplace?
22     A    After she left?
23     Q    No. I'm using the time period between
24 October, let's do it this way. Let's strike that.

Page 98

1          Between the time Debbie was promoted to
2 an Executive II--
3     A    Right.
4     Q    (Continuing.)--which I believe was
5 October 16th, 2000 up until she left your unit and
6 went out to Churchill Road--
7     A    Uh-huh.
8     Q    (Continuing.)--during that particular
9 time period did you ever have any conversations
10 with Steve Bradley concerning Mark Scheff's
11 conductor and behavior in the workplace?
12     A    Not that I recall.
13     Q    During that same time period did you ever
14 have any conversations with Steve Bradley
15 concerning Debbie Sullins or any concerns you had
16 with respect to her?
17     A    Not that I recall.
18     Q    During that same time period did you ever
19 have any discussions with Steve Bradley about
20 concerns that Debbie had verbalized either to him
21 or to you?
22     A    I don't recall. I don't, I don't
23 remember what happened five years, four years ago.
24 I don't recall.

Page 99

1     Q    Actually, let's go off the record.
2               (Whereupon a short break was
3               taken.)
4 MR. BAKER: I have no further questions.
5 MS. KERLEY: I have no questions for you.
6     We're going to reserve.
7               FURTHER DEPONENT SAITH NOT.

Page 100

1     I, JODIE EDMONDS, having read the above and
2 foregoing, find the same to be true and correct
3 with the following additions and/or corrections, if
4 any:
5 Page_____Line_____Change:
6 Page_____Line_____Change:
7 Page_____Line _____Change:

24  JODIE EDMONDS (7/13/05)            DATE

Page 101

```
 1    STATE OF ILLINOIS  )
                         )  SS
 2    COUNTY OF CHRISTIAN)
 3                  C E R T I F I C A T E
 4          I, Julie A. Brown, a Certified Shorthand
 5    Reporter in and for said County and State do hereby
 6    certify that the Deponent herein, JODIE EDMONDS,
 7    prior to the taking of the foregoing deposition,
 8    and on the 13th of July A.D., 2005, was by me duly
 9    sworn to testify to the truth, the whole truth and
10    nothing but the truth in the cause aforesaid; that
11    the said deposition was on that date taken down in
12    shorthand by me and afterwards transcribed, and
13    that the attached transcript contains a true and
14    accurate translation of my shorthand notes referred
15    to.
16          Given under my hand this 9th day of
17    August A.D., 2005.
18
19
                        Certified Shorthand Reporter
20
21
22
23    License No. 084-004174
24
```

Baldwin Court Reporting & Legal Video Services
1-800-248-2835

7/13/05
Jodie Edmonds

Sullins v. Illinois Department of Public Aid

```
1         I, JODIE EDMONDS, having read the above and

2    foregoing, find the same to be true and correct

3    with the following additions and/or corrections, if

4    any:

5    Page  20  Line  3  Change:  Oh. I'm sorry. Yes.

6    Page  24  Line  5  Change:  Hur concentration...

7    Page  30  Line  23  Change:  She's very nosey...

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    Jodie Edmonds                    8/22/05

24    JODIE EDMONDS (7/13/05)          DATE

              Page 100
```