3:04-cv-03039-JES-BGC   # 18-13   Page 1 of 20
9/14/05
Raven Knighten
Sullins v. Illinois Department of Public Aid
OCT 05 2005
E-FILED
Tuesday, 20 December, 2005 10:05:03 AM
Clerk, U.S. District Court, ILCD

## Page 1

```
            UNITED STATES DISTRICT COURT
         FOR THE CENTRAL DISTRICT OF ILLINOIS
                  SPRINGFIELD DIVISION

DEBORAH R. SULLINS,
             Plaintiff,
    vs.                          No. 04-3039
THE ILLINOIS DEPARTMENT OF
PUBLIC AID,
             Defendant.


        THE TELEPHONIC DEPOSITION of RAVEN
KNIGHTEN, taken in the above-entitled case before
Debra K. Baldwin, a Notary Public of Sangamon
County, acting within and for the County of
Sangamon, State of Illinois, at 9:10 o'clock A.M.,
on September 14, 2005, at 415 South Seventh Street,
Springfield, Sangamon County, Illinois, pursuant
to notice.


         Baldwin Reporting & Legal-Visual Services
            Serving Illinois, Indiana & Missouri
         24hrs (217)788-2835   Fax (217)788-2838
                    1-800-248-2835
```

## Page 2

```
APPEARANCES:

    BAKER, BAKER & KRAJEWSKI
    BY:  James P. Baker, Esq.
         415 South Seventh Street
         Springfield, Illinois 62701
         On behalf of Plaintiff.

    MS. SARAH KERLEY
         Assistant Attorney General
         500 South Second Street
         Springfield, Illinois 62706
         On behalf of Defendant via telephone.
```

## Page 3

```
                    I N D E X
DEPONENT                              PAGE NUMBER
Raven Knighten
    Examination by Mr. Baker          5, 67, 73
    Examination by Ms. Kerley         64, 72


                  E X H I B I T S
NUMBER                     MARKED FOR IDENTIFICATION
Exhibit 52                        55
Exhibit 53                        74
```

ORIGINAL

## Page 4

```
                    S T I P U L A T I O N
         It is stipulated and agreed, by and
between the parties hereto, through their
attorneys, that the deposition of RAVEN KNIGHTEN
may be taken before Debra K. Baldwin, a Notary
Public and Certified Shorthand Reporter and
Registered Professional Reporter, upon oral
interrogatories, on the 14th of September A.D.,
2005, at the instance of the Plaintiff at the hour
of 9:10 o'clock A.M., 415 South Seventh Street,
Springfield, Sangamon County, Illinois;

         That the oral interrogatories and the
answers of the witness may be taken down in
shorthand by the Reporter and afterwards
transcribed;
         That all requirements of the Federal
Rules of Civil Procedure and the Rules of the
Supreme Court as to dedimus, are expressly waived;
         That any objections as to competency,
materiality or relevancy are hereby reserved, but
any objection as to the form of question is waived
unless specifically noted;
         That the deposition, or any parts thereof
may be used for any purpose for which depositions
are competent, by any of the parties hereto,
without foundation proof;
         That any party hereto may be furnished
copies of the deposition at his or her own expense.
```

**Page 5**

1  (Whereupon the Deponent was
2  sworn by the Notary Public.)
3  R A V E N  K N I G H T E N
4  having been first duly sworn by the Notary Public,
5  deposeth and saith as follows:
6  EXAMINATION
7  BY MR. BAKER:
8  Q  Good morning, Ms. Knighten.
9  A  Good morning.
10 Q  Would you state for us your name and
11 address.
12 A  My name is Raven J. Knighten. My work
13 address is 401 South Clinton Avenue, Chicago,
14 60607.
15 Q  By whom are you employed?
16 A  The department of health and family
17 services formerly the department of public aid.
18 Q  For purposes of our discussion today, can
19 we call your employer the department of public aid?
20 A  Yes, we can.
21 Q  How long have you been employed by that
22 department?
23 A  Since 1987.
24 Q  Currently what is your position with the

**Page 6**

1  department?
2  A  My working title is chief EEOAA officer.
3  Q  And how long have you held that working
4  title?
5  A  About ten years.
6  Q  How long in your employment with the
7  department have you held EEO responsibilities?
8  A  Since I came to the department in '87.
9  Q  Have you done anything to prepare
10 yourself for this deposition today?
11 A  Slightly. Not a lot. I've reviewed the
12 case file a bit.
13 Q  When you say a case file, you're
14 referring to?
15 A  The case file in question. Sullins.
16 Q  What is a case file?
17 A  That is a file with documents and records
18 of activities that pertain to the complaint filed
19 by Deborah Sullins.
20 Q  Deborah Sullins I believed filed a charge
21 of employment discrimination at one time against
22 the department of public aid, am I correct?
23 A  Yes.
24 Q  And does a case file represent the work

**Page 7**

1  your office did with respect to that particular
2  case?
3  A  Yes.
4  Q  Other than reviewing materials related to
5  Debbie Sullins charge of employment of
6  discrimination with the department of human rights,
7  have you reviewed any documents?
8  A  I'm sorry? Any documents other than those
9  in this case file.
10 Q  Correct?
11 A  No.
12 Q  How voluminous is the case file?
13 A  Pretty much. It has exhibits, so it's
14 pretty thick.
15 Q  Okay. Has Ms. Kerley reviewed that file
16 today, or prior to today?
17 A  My file?
18 Q  Yes.
19 A  A few documents. Not a lot.
20 Q  Okay. Well, the reason for my question is
21 I don't know if information from that case file has
22 previously been produced as discovery in this
23 case. And I will throw the question open to both
24 Ms. Kerley and yourself whether you know one way or

**Page 8**

1  another if it has?
2  MS. KERLEY: Mr. Baker, it is my understanding
3  that when the department of human rights entered a
4  finding and the case was being sent to the
5  commission and the assistant attorney general in
6  the welfare litigation department, or bureau, who
7  were handling the case that they requested Ms.
8  Knighten to file for the purposes of turning it
9  over in discovery.
10 Secondarily, the documents that I have
11 reviewed are duplicative of documents that have
12 previously been turned over by the general law
13 bureau in the federal litigation at issue for the
14 deposition today.
15 So it's my understanding that you have
16 everything that she has. If it would make you more
17 comfortable, before I leave today I will review her
18 file and if there is anything that I think may not
19 have been turned over previously I will bring
20 copies and hand deliver them to your office.
21 MR. BAKER: That will be fine.
22 Q  Ms. Knighten, other than reviewing
23 your file, have you done anything to prepare
24 yourself for your deposition?

### Page 9

1  A  I've talked to the attorney. Sarah.
2  Q  You're referring to Ms. Kerley?
3  A  Yes.
4  Q  Other speaking with her, have you spoken
5  with anyone?
6  A  No.
7  Q  Can you give me a brief summary of your
8  educational background.
9  A  Some college here in Chicago.
10 Q  Before you began your work at the
11 department of public aid, what type of work did you
12 do?
13 A  I was an executive assistant II in the
14 office of the governor, Jim Thompson.
15 Q  Did you have any EEO responsibilities in
16 connection with--. Strike that.
17    Prior to joining the department of public
18 aid, had you ever held a job where you had EEO
19 responsibilities?
20 A  No. I had an EEO assignment, but it was
21 not for regular responsibilities, no.
22 Q  When you say an EEO assignment, you mean
23 what?
24 A  In representing the office where I worked

### Page 10

1  we reviewed an application for a state agency, so I
2  had to do some studying for that was the only
3  assignment.
4  Q  Since joining the department of public
5  aid, have you had any training in the general field
6  of equal employment?
7  A  Yes.
8  Q  And can you take me through generally the
9  types of training you've had.
10 A  Most often it was provided by the
11 Illinois Department of Human Rights as far as
12 responding to inquiries and reports, the inquiries
13 being complaints filed by employees with that
14 agency and with statistical reports. I've also
15 received training from the equal employment
16 opportunity commission and other regulatory
17 agencies, HHS being the third that I can think of
18 right now.
19 Q  Okay. With respect to the subject of
20 sexual harassment, have you received any training?
21 A  That brings me back. I missed one, the
22 central management services.
23    Are you familiar with that agency in the
24 state?

### Page 11

1  Q  The Illinois Department of Central
2  Management Services?
3  A  Yes.
4  Q  I have a general familiarity, yes.
5  A  Okay. They provided training for sexual
6  harassment that all EEO officers were required to
7  take. When I say all EEO officers, I mean those
8  that were assigned to each state agency.
9  Q  Do you recall when it was you took that
10 training?
11 A  I can't remember exactly, but I do
12 remember it was during the time the then governor
13 issued an executive order on sexual harassment and
14 how it should be handled by a state agency.
15 Q  Who was the governor that issued that
16 order?
17 A  Well, two were issued. One was issued by
18 Governor Edgar. And I believe one was issued before
19 that, but I think this training came under Governor
20 Edgar.
21 Q  So it would have been sometime prior to
22 1991?
23 A  I'm really not sure.
24 Q  Well, let me put it to you this way. It

### Page 12

1  was prior to Governor Edgar leaving office?
2  A  Oh, yes.
3  Q  Okay. Fine.
4     How long did the sexual harassment
5  training last?
6  A  I think it was a day's training.
7  Q  Did you receive any written materials,
8  course books, outlines, that type of thing?
9  A  Yes.
10 Q  Do you recall who the instructor was?
11 A  No.
12 Q  If you could, take me through kind of the
13 general areas of instruction you received.
14 A  When you say the kind of general--what
15 constitutes a sexual harassment?
16 Q  No. It was a bad question. Let me start
17 over.
18    Can you tell me a little bit about the
19 type of training you received when you took this
20 course?
21 A  What the agency's policy was? Not the
22 agency's, the state's policy. But the state's
23 policy was regarding sexual harassment, what
24 supervisors' responsibilities were, what employees'

3:04-cv-03039-JES-BGC  # 18-13  Page 4 of 20
9/14/05
Raven Knighten                            Sullins v. Illinois Department of Public Aid

## Page 13

1  responsibilities were and what the agency itself,
2  what responsibilities they had regarding sexual
3  harassment in the workplace.
4     Q   Did you receive any instruction or
5  training either at that course or in other courses
6  with respect to sexual harassment investigations?
7     A   Yes.
8     Q   And can you tell me the type of training
9  you received on that topic?
10    A   Well, I received it from CMS and I
11 received training from the department of human
12 rights regarding sexual harassment in particular
13 from EEOC as one of the basis for filing a
14 complaint. From the department of human rights--.
15    I'm sorry. You want to know what
16 particular type of training in particular was
17 received from these regulatory agencies?
18    Q   Well, actually, my question was what type
19 of training have you received in the topic of
20 sexual harassment investigations?
21    A   What constitutes sexual harassment, and,
22 again, what the employee's responsibility is, the
23 supervisor and the agency in general.
24    Q   Let me ask you this. It's my

## Page 14

1  understanding, and maybe I have it wrong, and, if I
2  do, be sure to tell me that, but it's my
3  understanding that a part of your job involves
4  investigating claims of sexual harassment. Am I
5  correct?
6     A   Yes.
7     Q   And can you tell me what kind of training
8  you have received with respect to investigating
9  claims of sexual harassment?
10    A   Interviewing witnesses. First identifying
11 witnesses and then interviewing those witnesses,
12 including the charging party and the alleged
13 perpetrators, determining the value of witness
14 statements, reporting what we have found, in other
15 words, submitting sexual harassment complaint
16 reports and evaluating the material that we pull
17 together as far as whether or not there's merit to
18 the complaint.
19    Q   Where did you receive your training in
20 conducting sexual harassment investigations?
21    A   Well, again, with the department of human
22 rights. This agency has had consultants in the EEO
23 office together with internal affairs received
24 training from a consultant, an outside consultant.

## Page 15

1  That was one of them. But, basically, from the
2  department of human rights.
3     Q   Do you know when you received your
4  training in sexual harassment investigations?
5     A   Early on. First of all, I received
6  training hands-on from staff here. Staff in the
7  office where I was working was long time an
8  experience. One has a law degree. Another had been
9  a long time investigator. So I got some training
10 from the staff in fact that I was supervising, what
11 they had been doing and how they had been doing it
12 and where why. And then during that time, not just
13 sexual harassment, but investigating complaints in
14 general when I first came on board in '87 or the
15 early part of '88.
16    Q   Okay. So at least by 1990 you would have
17 completed your training in sexual harassment
18 investigations?
19    A   Before 1990.
20    Q   Thank you.
21    Early on, or not so early on, but a few
22 moments ago you indicated you had received some
23 training in the policies I guess of the department
24 of public aid with respect to sexual harassment. Am

## Page 16

1  I correct?
2     A   I don't think so.
3     Q   All right.
4     A   The policies at public aid were developed
5  from the executive order issued by the governor. We
6  had to establish our policy based on that executive
7  order.
8     Q   And I believe the department did
9  establish some sexual harassment policies. Am I
10 correct?
11    A   Yes. And those policies were reviewed by
12 the department and approved by the department of
13 human rights, not only for this agency, but for all
14 state agencies.
15    Q   I want to refer you to Exhibit 22, which
16 I think Mr. Kerley brought along with her today.
17    A   Yes.
18    MS. KERLEY: One of the select few. She has it.
19    MR. BAKER: Off the record for a second.
20    (Discussion off the record.)
21    MR. BAKER: Q Ms. Knighten, do you have
22 Exhibit 22 in front of you?
23    A   Yes.
24    Q   Are you familiar with that document?

### Page 17

1    A    Yes.
2    Q    Can you identify it, please.
3    A    Will I identify it? It is Section 245.15
4 from the department's administrative manual.
5    Q    Is that the department's sexual
6 harassment policy?
7    A    Yes.
8    Q    And was this the policy that was in
9 effect back in nineteen--back in the year 2000?
10    A    I'm looking at the dates on here. It
11 would--. Yes.
12    Q    Earlier you indicated that you had
13 received some training in the responsibilities of
14 various constituencies with sexual harassment and
15 one was the responsibility of employees, I believe?
16    A    Yes.
17    Q    Can you tell me what the employee's
18 responsibility is when it comes to sexual
19 harassment?
20    A    If they--. If it has been made known to
21 the employee--. If this behavior that could be
22 described as sexual harassment has been made known
23 to the employee, whether they're receiving the
24 behavior or whether they've just been made aware of

### Page 18

1 it, they should report it.
2    Q    To whom?
3    A    Their supervisor, the EEO office, or the
4 office of internal affairs.
5    Q    And I assume also that employees of the
6 department have an obligation to refrain in
7 engaging in conduct that would constitute sexual
8 harassment?
9    A    That's correct.
10    Q    If an employee violated that policy,
11 either by failing to report or by engaging in
12 conduct that could constitute sexual harassment, is
13 that grounds for discipline?
14    A    Yes. Depending on how egregious their
15 behavior was, what the issue was.
16    Q    Back in the year 2000, did the department
17 have a zero tolerance policy for engaging, for an
18 employee engaging in conduct that would constitute
19 sexual harassment?
20    A    When you say a zero tolerance policy, I'm
21 not clear just on what you mean by that.
22    Q    That it was strictly forbidden.
23    A    The behavior is forbidden, yes.
24    Q    And is there any instance where if an

### Page 19

1 employee engages in sexual harassment, at least as
2 that term is defined in Exhibit 22, that the
3 employee would not face some sort of disciplinary
4 action?
5    A    You're saying that they would not?
6    Q    Is there a situation where they would not
7 be disciplined for engaging in that conduct?
8    A    I never say never, so I'd have to have
9 the specifics of that particular situation.
10    Q    Are you aware of any situation where an
11 employee has been found to have engaged in conduct
12 that constitutes sexual harassment and the
13 department of public aid has not assessed some sort
14 of discipline against that individual?
15    A    Nothing comes to mind.
16    Q    What is the responsibility of a
17 supervisor when it comes to sexual harassment?
18    A    They are to take action immediately to
19 stop it if they are made known to it and to report
20 it to this office or to internal affairs.
21    Q    And what action are they expected to take
22 to stop it?
23    A    It depends on what it is that they're
24 trying to stop. If it is alleged to have been

### Page 20

1 verbal, then they should issue a directive that, if
2 that is the case, they should discontinue that
3 behavior and to advise them that it is being
4 reported.
5    Q    So should the supervisor when an
6 allegation is made that one individual has engaged
7 in some sort of sexual harassment against another
8 individual, should the supervisor both tell the
9 alleged perpetrator to stop the conduct and report
10 it to some other authority?
11    A    This office. They should report it to
12 this office. And, as I said it, it depends on what
13 the behavior is. If they witnessed it, they can say
14 obviously. But if it's been reported to them,
15 that's the frame that they should use and they're
16 recommended to stop it. If this behavior has, in
17 fact, occurred, it is to stop immediately. Please
18 be advised that it is being reported to the equal
19 employment opportunity office or to internal
20 affairs for further investigation. And, in fact,
21 they are reissued a copy of the sexual harassment
22 policy.
23    Q    So, in either event, the supervisor is
24 supposed to report the allegation, whether it's

3:04-cv-03039-JES-BGC    # 18-13    Page 6 of 20
9/14/05
Raven Knighten                              Sullins v. Illinois Department of Public Aid

Page 21

1  truthful or not truthful, at least report the
2  allegation either to your office or to internal
3  affairs?
4     A   Yes.
5     Q   Now, once it is reported to your office,
6  what is the responsibility of your office when it
7  comes to that subject?
8     A   If it is reported to this office, an
9  officer is assigned to investigate the complaint.
10    Q   And back in 2000 and 2001 in the
11 Springfield area who was the individual that
12 investigated sexual harassment complaints?
13    A   In that area, it was Janice Johnson.
14    Q   Now, if there is a report made to the --
15 division of internal affairs?
16    A   Yes.
17    Q   (Continuing) -- would your office also
18 participate or conduct an investigation?
19    A   It has occurred. There have been times
20 when internal affairs has requested the
21 participation of this office, but we always get a
22 copy of their report and we provide information
23 upon their request or based upon additional
24 information that we deem as necessary.

Page 22

1     Q   When you say you provide information,
2  generally what types of information would you
3  provide?
4     A   It depends. We would respond to their
5  questions.
6     Q   Let me see if I'm correct. Your office
7  has some level of expertise in the topic of sexual
8  harassment. Am I correct?
9     A   Yes.
10    Q   And would you serve as an advisor to
11 internal affairs, or a sounding board to internal
12 affairs, in providing them with your thoughts and
13 your views and your opinions--
14    A   Yes.
15    Q   (Continuing)--appropriate to a particular
16 investigation?
17    A   Yes.
18    Q   Now, as I understand it, you also receive
19 a copy of the internal affairs report?
20    A   Yes.
21    Q   Is that a report that is prepared at the
22 conclusion of an investigation?
23    A   Yes.
24    Q   And for what purpose do you receive a

Page 23

1  copy of the report?
2     A   We review it to determine if we feel that
3  additional information is required or if we agree
4  with it and if we can support their findings.
5     Q   Okay. When you say support their
6  findings, you mean what?
7     A   They make a determination as to whether
8  there is merit.
9     Q   Okay.
10    A   We determine if we agree with that, make
11 a determination agreeing or disagreeing with that.
12    Q   Okay. And that would be based--
13    A   We don't necessarily put it in writing.
14 If we have a question, we will submit that
15 question.
16    Q   Now, who do you report whether you agree
17 or disagree with internal affairs?
18    A   Well, if we disagree, we discuss it with
19 their bureau chief.
20    Q   Is there ever a situation where the
21 department or where internal affairs begins a
22 sexual harassment investigation and never prepares
23 a report?
24    A   Not that I'm aware of.

Page 24

1     Q   Are you aware of an investigation
2  instituted based upon allegations made by a woman
3  named Mary Thalman?
4     A   Yes.
5     Q   Against a man named Mark Scheff?
6     A   Yes.
7     Q   Do you know if the division of internal
8  affairs prepared any type of report as a result of
9  that investigation?
10    A   I believe they did. I was looking for my
11 records on that. I haven't come across them yet.
12    Q   If they did previous that type of report,
13 as a matter of course, you would receive it?
14    A   Yes.
15    Q   And if you did receive that report, would
16 that be in the file that you looked at in
17 preparation for your deposition today?
18    A   Not necessarily.
19    Q   What type of file would it be in?
20    A   It would be in a file pertaining to the
21 Thalman investigation.
22    Q   And is that a file that would be
23 accessible to you, as we talk today?
24    A   Yes.

3:04-cv-03039-JES-BGC   # 18-13   Page 7 of 20
9/14/05                                        Sullins v. Illinois Department of Public Aid
Raven Knighten

## Page 25

1  Q   What I would like to do is to take a
2  moment and see if you can locate the Thalman file,
3  and what I would like you to do is to look and see
4  if you can find a copy of that report.
5  A   Okay. How much do you want me to look for
6  this? How much time do you want to set aside for
7  this.
8  Q   Well, that's a good question. I had the
9  sense that the file was pretty accessible to you.
10 Am I mistaken on that point?
11 A   It should be right--. It's probably
12 looking me in the face and I'm not looking back.
13 Shouldn't take but a few minutes.
14 Q   I'll tell you what.  Let's then take a
15 short break for you to see if you can locate that
16 file and--
17 MS. KERLEY: Do you want us to call you back,
18 Jim?
19 MR. BAKER: Sure.  That would be great. And if
20 it's not going to be a short break, if it's going
21 to be longer, Sarah, give me a call back in a few
22 minutes and we'll decide where to go.
23 MS. KERLEY: Okay.  We'll call you back in a
24 few minute.

## Page 26

1           (Whereupon a short recess
2           was taken at 9:35 a.m.)
3  MR. BAKER:  Q  Ms. Knighten, I understand you
4  have the file your office maintained with respect
5  to the sexual harassment allegations maintained by
6  Mary Thalman?
7  A   I have the file that I maintained. Jan
8  Johnson maintained the official file in Springfield
9  because she was the officer of record. I maintained
10 information that was pertinent where I could
11 provide information as necessary to the
12 administration or to an attorney. I might not have
13 everything. The Springfield file is more complete.
14 Q   Okay. Typically, when the internal
15 affairs department completes an investigation
16 concerning sexual harassment, do you personally
17 receive a copy of the report?
18 A   Yes.
19 Q   In your file do you see a copy of that
20 report?
21 A   No.
22 Q   As you sit here today, do you know one
23 way or another if internal affairs did prepare a
24 report with respect to the Mary Thalman

## Page 27

1  investigation?
2  A   I don't remember.
3  Q   When and under what circumstances in
4  sexual harassment investigations has it been that
5  your office has not received a copy of a report
6  prepared by internal affairs?
7  A   I don't remember not having received a
8  report on sexual harassment from internal affairs.
9  It could have happened, but I don't remember it.
10 Q   Are you aware of any circumstances in
11 which the division of internal affairs following an
12 investigation into an allegation of sexual
13 harassment does not prepare a report?
14 A   I'm not aware of that.
15 Q   What I would like to do is go back to the
16 year 2000 and I would like you to take me through
17 the steps of what is done after an allegation of
18 sexual harassment is made beginning with the first
19 step in the process and going through the last step
20 in the process. Could you do that?
21 A   Sure. In my office or in internal
22 affairs?
23 Q   Well, if you know, can you do both?
24 A   Sure.

## Page 28

1  Q   Okay.
2  A   In my office we submit a copy of our--if
3  it is filed directly by the charging party, if the
4  charging party is the alleged egressed person, we
5  respond to them in writing to let them know whether
6  we have found information that will support their
7  position or not.
8      If we find information that warrants that
9  the division administrator be advised because we're
10 going to recommend discipline or further
11 administrative action by the agency, we advise the
12 division administrator. A copy of that would go to
13 our office of labor relations. They would make the
14 final decision as to whether or not the agency
15 could support further administrative action. We
16 would give a recommendation to that office, but
17 they have to make the final decision.
18 Q   You would give the recommendation to?
19 A   Labor relations.
20 Q   Labor relations?
21 A   Yes. The office of internal affairs
22 submits--.
23     Do you have any one of their reports,
24 because they have a list of people on there that

3:04-cv-03039-JES-BGC   # 18-13   Page 8 of 20
9/14/05
Raven Knighten
Sullins v. Illinois Department of Public Aid

Page 29

1  they submit copies of their reports to?
2      Q    Yes, ma'am, I do.
3      A    You have that list there, okay. They
4  submit it to the inspector general, to labor
5  relations, to personnel, if it's sexual harassment,
6  to EEO, and I think to the auditor. And they
7  request a response from the administrator within a
8  certain period of time.
9      Q    Okay.
10     A    And did I name labor relations? If I
11 didn't, labor relations gets a copy of that.
12     Q    Let me go back and fill in a few details,
13 or have you fill in a few details, if I can. If an
14 employee reports to your office a belief that
15 another employee is engaging in sexual harassment,
16 does your office bring in the internal affairs
17 division?
18     A    Not necessarily. Unless it appears there
19 might be criminal intent.
20     Q    Now, if the employee reports to internal
21 affairs an allegation of sexual harassment, I think
22 I understand from your earlier testimony that
23 internal affairs would at least report to your
24 office that allegation?

Page 30

1      A    Yes. You're right.
2      Q    And then when the department of internal
3  affairs has received a report, would it be that
4  office that conducts the investigation?
5      A    It depends on the matter at hand. If it
6  appears that there's criminal intent, they would.
7  If not, they would refer it to our office for
8  investigation.
9      Q    So the next step then would be that
10 either your office or the division of internal
11 affairs would conduct an investigation?
12     A    Yes.
13     Q    And I think, and I want you to correct me
14 if I'm mistaken here, but in the Mary Thalman case
15 it was the division of internal affairs that
16 actually did the investigation?
17     A    It was, yes.
18     Q    Your office didn't do any investigation,
19 did it?
20     A    Briefly, from the time I talked to you
21 earlier, I'm looking at these e-mails, it doesn't
22 appear so. It appeared that they asked her for an
23 opinion based on their investigation.
24     Q    Sure.

Page 31

1      A    We did not do a hands-on.
2      Q    Now, during the course of an
3  investigation, whether it's done by your office or
4  internal affairs, would both the alleged victim and
5  the alleged perpetrator be interviewed?
6      A    I'm sorry. I didn't get all that. My
7  fault, not yours.
8      Q    That's okay.
9      A    Could you repeat that, please?
10     Q    Sure. During the course of an
11 investigation, whether it's done by your office or
12 by internal affairs, would both the alleged victim
13 and the alleged perpetrator of the misconduct be
14 interviewed?
15     A    Yes.
16     Q    And would interviews also be undertaken
17 of individuals who might have some relevant
18 information?
19     A    Yes.
20     Q    During the course of the investigation,
21 at any time would the alleged perpetrator ever
22 receive copies of statements given by any witness?
23     A    In my office? No. Unless there have been
24 questions raised. At the end of the investigation

Page 32

1  if labor relations is going forward with
2  discipline, the union will request certain
3  witness--copies of certain witness statements.
4  But, otherwise, I don't provide them.
5      Q    So if at the end of the investigation
6  process the department contemplates taking
7  discipline against an employee, at that point do I
8  understand the employee may secure copies of the
9  statements of other witnesses?
10     A    From labor relations.
11     Q    During the course of an investigation, as
12 a matter of course, is there anything done to
13 separate the alleged perpetrator from the alleged
14 victim?
15     A    Yes.
16     Q    And what is done in that respect?
17     A    It depends on the situation. We have, in
18 fact, changed the seating arrangements or the floor
19 they're working on in the same building. We've
20 provided relief for the alleged--for the charging
21 party, based on their request, sometimes to move to
22 a different bureau.
23     Q    Okay.
24     A    Or we change the work process. If they're

Page 33

1  handling documents or papers of any type that have
2  to be transferred from one person to another, we
3  change that working process.
4      Q    When you say "we", who do you mean?
5      A    When I say what?
6      Q    When you say "we", you say "we" change
7  that or "we" do this, who is the "we"?
8      A    The agency. Management.
9      Q    And would that include your office?
10     A    No. That would be their supervisor or a
11 bureau chief.
12     Q    Okay. What is done to separate an alleged
13 perpetrator from individuals who offer evidence in
14 support of the allegation during the course of an
15 investigation?
16     A    You're saying what would be done to
17 separate a witness out of that?
18     Q    Let me start over so we're both on the
19 same page. Is there anything done during the course
20 of a sexual harassment investigation to separate
21 the person accused of the misconduct from
22 individuals who may have offered evidence against
23 him?
24     A    If it is requested and if it is deemed

Page 34

1  necessary.
2      Q    Who makes the determination as to whether
3  it is deemed necessary?
4      A    A recommendation could come from this
5  office. It could be made by the bureau chief or
6  the manager.
7      Q    And under what circumstances would it be
8  deemed necessary?
9      A    If the alleged victim or the witness, in
10 this case I believe you identified her, would feel
11 her uncomfortable or unsafe.
12     Q    I think you cut out a bit. Did you say
13 if the victim or witness felt uncomfortable or
14 unsafe?
15     A    Yes.
16     Q    Okay. Thank you.
17     If an alleged perpetrator, whether guilty
18 or innocent of sexual harassment, retaliates either
19 against the alleged victim or individuals who
20 testified against him, is that grounds for
21 disciplinary action?
22     A    If there are facts to support the action.
23     Q    Sure.
24     Assuming that there is evidence to

Page 35

1  support that, yes. In that case would discipline be
2  in order?
3      A    I would recommend it. The level is
4  questionable because each case is treated
5  differently, but I would certainly recommend some
6  level of discipline.
7      Q    Sure.
8      And I suppose the measure of discipline
9  would depend upon a number of factors, including
10 the nature and frequency of the conduct--
11     A    Yes.
12     Q    (Continuing)--and the employee's overall
13 work record, that sort of thing?
14     In your office, as I understand it, you
15 recommend discipline with respect to people accused
16 and found guilty of sexual harassment. Am I
17 correct?
18     A    Yes.
19     Q    And you make that recommendation to
20 whom? Labor relations?
21     A    Labor relations.
22     Q    What is the process that you go through
23 in making that recommendation?
24     A    Generally, their manager and I discuss

Page 36

1  the issues involved. We want to be sure that these
2  issues are handled the same way all of the time
3  with all of our employees, that nothing changes
4  from office to office and what can be supported.
5      Q    So the first thing is you have to
6  determine is there evidence of misconduct?
7      A    Yes.
8      Q    And then you want to make sure that there
9  is some sort of uniformity, meaning that specific
10 types of misconduct--
11     A    Are handled the same way.
12     Q    Right.
13     A    Right.
14     Q    How do you do the uniformity process? Do
15 you have some preexisting standards that would say
16 if the conduct is "X" the discipline would be "Y"?
17     A    No.
18     Q    What is your process in determining
19 uniformity in making a recommendation?
20     A    We do maintain a database where we can
21 check to determine how similar cases were handled
22 or what the process was in similar situations.
23     Q    And what type of data would go in to the
24 database?

3:04-cv-03039-JES-BGC   # 18-13   Page 10 of 20
9/14/05
Raven Knighten
Sullins v. Illinois Department of Public Aid

Page 37

1  A  General information goes into the data--.
2  General information goes into the database so we
3  can pull from that to determine what records need
4  to be reviewed.
5  Q  So I'm assuming in making a
6  recommendation you would have to look first at the
7  nature of the misconduct?
8  A  Yes.
9  Q  And then you would look at the employee's
10 work record in the department?
11 A  Not always. That might not concern the
12 behavior at all. Labor relations is looking at any
13 related behavior as far as the work history is
14 concerned for that person.
15 Q  And then I think you indicated you would
16 meet or talk with someone about the discipline?
17 A  The manager for labor relations.
18 MR. BAKER: Sarah, let's go off the record for
19 a second.
20           (Discussion off the record.)
21 MR. BAKER:  Q  Ms. Knighten, I would like to
22 take you through your role with respect to the Mary
23 Thalman investigation.
24 A  Okay.

Page 38

1  Q  And I understand you have the file out.
2  If you need to look at anything in the file to
3  refresh your recollections, that's fine, but what I
4  would like you to do when you do that is to at
5  least identify for the record what the document is
6  you're looking at. Okay?
7  A  Okay.
8  Q  How did you become aware that Mary
9  Thalman had made an allegation?
10 A  I don't remember exactly. I'm thumbing
11 through here quickly. Okay. I'm reading a
12 paragraph. Let me read this. I became aware through
13 e-mail from Derrick Moscardelli, the bureau chief
14 from IA.
15 MS. KERLEY: And, for the record, Jim, she is
16 looking at your previously marked Exhibit Number 39
17 that was faxed to us this morning.
18 MR. BAKER: Very good.
19     Q  Raven, you have Exhibit 39 in front of
20 you?
21 A  Yes.
22 Q  And that appears to me to be a series of
23 e-mails exchanged I think between October 13 and
24 October 17 of 2000. Am I correct?

Page 39

1  A  Yes. That's what it looks like. Well,
2  there are two pages here. This goes back as far as
3  October 12th.
4  MS. KERLEY: Jim, for clarification, on
5  Exhibit 39, just to make sure that we're looking at
6  the same document, it appears to me that the bottom
7  e-mail, if you're looking at the first page of
8  Exhibit 39 in what would be the first e-mail in the
9  sequence, it's from Laura Wetstone, on the 13th at
10 4:52, and then in the body of that e-mail are
11 several bullet points, and those bullet points may
12 have different dates, but they're all a portion of
13 the same October 13th e-mail. Is that correct?
14 MR. BAKER: Well, that's how I read it as well.
15 MS. KERLEY: We're looking at the same thing
16 then.
17 MR. BAKER: Yes. I think that's correct.
18 MR. BAKER:  Q  Is that how you read it as
19 well, Raven?
20 A  Yes, it is.
21 Q  So would have been made aware of the Mary
22 Thalman allegations perhaps sometime late on
23 October 13th, or maybe October 14th, of 2000?
24 A  Yes. Uh-huh.

Page 40

1  Q  When you were made aware of it, what did
2  you do? And I'm speaking about you personally as
3  opposed to your office.
4  A  This office took no immediate action
5  because it was an internal affairs investigation.
6  We simply opened our internal file in order to
7  house any information we got concerning this
8  complaint.
9  Q  So then while the EEO investigation was
10 underway, you took a fairly passive role?
11 A  While the internal affairs investigation
12 was underway we took a fairly passive role.
13 Q  During the course of the internal affairs
14 investigation, did you communicate with any
15 officials in the office of internal affairs?
16 A  Let me look. When you say official--.
17 Let's see. A question was asked from Laura
18 Wetstone. Yes.
19 Q  There is a communication you had with
20 Laura Wetstone that appears to be on the face of
21 Exhibit 39. Am I correct?
22 A  Yes.
23 Q  Other than Laura, did you have any
24 communications with any other representative of

3:04-cv-03039-JES-BGC    # 18-13    Page 11 of 20
9/14/05                                         Sullins v. Illinois Department of Public Aid
Raven Knighten

Page 41

1  internal affairs?
2      A    Let me look. It doesn't appear that I
3  did.
4      Q    On the second page of Exhibit 39 it looks
5  like that document is copied to Janice Johnson?
6      A    Yes.
7      Q    And Janice Johnson worked under your
8  chain of command. Am I correct?
9      A    Yes.
10     Q    And she worked in your Springfield
11 office?
12     A    Yes.
13     Q    With respect to the Mary Thalman
14 complaints, what role did Janice Johnson have?
15     A    She would not have taken any action
16 either inasmuch as it was an internal affairs case.
17     Q    Okay. Let's go up to--if you look toward
18 the top of Exhibit 39, on October 16th it looks
19 like Laura Wetstone sent you an e-mail at
20 approximately 5:26 p.m.
21     A    Uh-huh.
22     Q    And above that it appears that on the
23 following day, October 17th, you responded to her
24 e-mail.

Page 42

1      A    Yes.
2      Q    At the time you responded to that e-mail,
3  what was your understanding about the allegations
4  made against Mark Scheff?
5      A    At that point in time all I had was the
6  information that was provided by Laura Wetstone. I
7  did not have any direct information.
8      Q    All right. In her e-mail she poses a
9  question to you, and I'm going to read the question
10 into the record. It is: Do you think these, from a
11 sexual harassment standpoint, merit termination?
12 Would you agree that's what she said?
13     A    Yes. Uh-huh.
14     Q    And then in your e-mail in response you
15 state: If not D, slash, C, certainly stringent
16 discipline. Two preliminary questions. I assume D,
17 slash, C is an acronym for discharge?
18     A    Yes.
19     Q    And I assume that sentence was in
20 response to the question I raised--by the question
21 Laura raised to you that I earlier read?
22     A    Yes.
23     Q    Now, I understand that you didn't have in
24 front of you conclusive evidence of guilt or

Page 43

1  innocence, but at least had allegations and had
2  some understanding as to what the allegations were
3  that were made against him. Am I correct?
4      A    I believe so.
5      Q    And your sentence was, I assume, premised
6  on the assumption that there would be evidence
7  supporting he actually engaged in what these
8  allegations were. Am I correct?
9      A    I'm not clear on the question.
10     Q    That's because it wasn't a very good
11 question.
12          On October 17th the investigation into
13 Mr. Scheff was very preliminary. Am I correct?
14     A    Yes.
15     Q    And at that time you didn't know whether
16 he was guilty or innocent of the charge, you just
17 knew what the allegations were that were made
18 against him?
19     A    Yes.
20     Q    So when you made the sentence, if not D,
21 slash, C, certainly stringent discipline, you made
22 them conditioned on there being evidence that he
23 actually engaged in that conduct?
24     A    That they could support the information

Page 44

1  they had provided at that point.
2      Q    Right.
3           What did you mean by the term stringent
4  discipline?
5      A    More than a slap on the wrist.
6      Q    Well, what would be more than a slap on
7  the wrist?
8      A    Could be suspension. A step down from
9  suspension would be a written reprimand. But a
10 suspension primarily and the length of time the
11 suspension would encompass.
12     Q    I'm a little unclear when you say the
13 length of time the suspension would encompass?
14     A    We're not talking two day suspension.
15 Perhaps ten days, 15 days. Stringent.
16     Q    Based upon your experience with respect
17 to sexual harassment matters and your knowledge of
18 the types of discipline assessed against employees
19 who engaged in the type of conduct alleged against
20 Mr. Scheff, if he was guilty of that conduct, and
21 just to be uniform in his treatment, would a ten to
22 15 day suspension be in order?
23     A    I'm not prepared to say at this moment.
24 I'd have to re-read this entire record.

Page 45

```
 1      Q    When you say re-read the entire record,
 2   you're referring to what?
 3      A    More than just this Thalman case.
 4      Q    Okay. Tell me what you would have to
 5   review in addition to the Thalman case.
 6      A    The Sullins case.
 7      Q    I'm sorry. I'm not following you.
 8      A    Would you pose that question again,
 9   please?
10      Q    Okay. Well, earlier you indicated that
11   you make recommendations concerning discipline for
12   conduct that constitutes sexual harassment?
13      A    Yes.
14      Q    And you indicated that based upon the
15   allegations made against Mark Scheff, if he had
16   engaged in that conduct, he should receive
17   stringent discipline, and then you made reference
18   to a ten to 15 day suspension. Am I correct?
19      A    In describing stringent?
20      Q    Yes.
21      A    Yes.
22      Q    And my question to you is, assuming back
23   in the fall of 2000 he had actually engaged in
24   conduct of the type described in Exhibit 39, based
```

Page 46

```
 1   upon your understanding as to how the department
 2   assessed discipline against other individuals
 3   engaging in similar types of misconduct, would a
 4   ten or 15 day suspension be a fair form of
 5   discipline?
 6      A    I can't say at this point. I would say
 7   the same thing that I said here in the e-mail. More
 8   information would be needed before a recommendation
 9   could be made.
10      Q    One of the types of information you need
11   is if he had SH training?
12      A    One of the things.
13      Q    Is that sexual harassment training?
14      A    Yes.
15      Q    Why did you think that was needed?
16      A    Obviously alleged perpetrators would
17   always have the argument, well, I didn't think
18   there was anything wrong with that, I didn't know
19   that was against agency policy. We want to know if
20   he had been told and received training letting him
21   know that it was a policy that employees not
22   participate in sexual harassment.
23      Q    Okay. So if he did not have any of the
24   training, that might be a mitigating factor?
```

Page 47

```
 1      A    Yes.
 2      Q    If he did have training, then he should
 3   have known better than to have engaged in the
 4   conduct?
 5      A    Yes.
 6      Q    Your next statement is, has he had
 7   previous counseling or discipline for inappropriate
 8   behavior. I think I understand that. But can you be
 9   a little more explicit in saying how that's
10   relevant?
11      A    If he's ever been accused of this
12   sexually harassing behavior before, was he
13   counseled or has he had--the level of discipline
14   would change.
15      Q    Well, if he had not had any counseling or
16   had never prior been accused of that type of
17   behavior, what would that mean in terms of the
18   level of discipline?
19      A    If he had not?
20      Q    Yes.
21      A    Is that what you're saying, if he had not
22   had previous counseling?
23      Q    Yes, ma'am.
24      A    Generally, the labor relations officer
```

Page 48

```
 1   would start at a lower level of discipline,
 2   depending upon the egregiousness.
 3      Q    Well, with the types of conduct alleged
 4   in Exhibit 39, if Mr. Scheff had had no prior
 5   discipline for this type of conduct, what would
 6   typically be, in your experience, have been the
 7   level of discipline that would have been assessed
 8   if he were determined to be guilty?
 9      A    I would be speaking for someone else, the
10   labor relations person if I answered that, so I'd
11   rather not.
12      Q    You go on to say, other personnel rules
13   could apply here also. What other personnel rules
14   were you referring to?
15      A    The behavior of the employee. I think
16   it's personnel rule number 3 whereby one employee's
17   behavior toward another employee is assessed.
18      Q    I'm not sure I understand that. Could you
19   be a little more clear?
20      A    Behavior--. Let me look at these charges
21   here. Behavior might be unacceptable but not
22   necessarily be described as sexual harassment. It
23   could be discourteous treatment perpetrated by one
24   employee against another one. So it might be that
```

3:04-cv-03039-JES-BGC   # 18-13   Page 13 of 20
9/14/05                                    Sullins v. Illinois Department of Public Aid
Raven Knighten

### Page 49

1  labor relations could look at that and is there an
2  argument that they could, "they" because it was
3  their case, that internal affairs could not support
4  a finding of sexual harassment, but certainly they
5  could support a finding of discourteous treatment,
6  or one of the other personnel rules.
7     Q    And whether conduct was sexual harassment
8  or not as opposed to courteous behavior would be--
9     A    Discourteous.
10    Q    Discourteous behavior would be governed
11 by the sexual harassment policy of the department
12 that's set forth in Exhibit 22?
13    A    It would be defined by what information
14 internal affairs provided to support their position
15 of sexual harassment if that's what they were
16 taking.
17    Q    But ultimately whether conduct that has
18 been concluded to have occurred as discourteous
19 behavior or sexual harassment depends upon whether
20 the conduct meets the definition of sexual
21 harassment. Am I correct?
22    A    I don't--. I'm not clear on that, because
23 I'm looking at the charges here and apparently made
24 the decision on--

### Page 50

1     Q    Let's try it a different way. What's the
2  difference between discourteous behavior and sexual
3  harassment?
4     A    Discourteous treatment or discourteous
5  behavior might not necessarily be sexual in nature.
6     Q    So if the conduct is--
7     A    There might be some sexual connotation,
8  but not rise to the level of harassment.
9     Q    And what would be the point that it would
10 rise to the level of harassment? I guess, in other
11 words, what would tip the scales from discourteous
12 behavior to sexual harassment with respect to
13 conduct of a verbal nature?
14    A    Each case is looked at differently. I
15 cannot give you a blanket statement to describe
16 behavior and match one case against another one.
17    Q    Okay. With respect to the Mary Thalman
18 investigation, did you ever receive copies of the
19 investigations undertaken or the investigation
20 reports of the division of internal affairs?
21    MS. KERLEY: Jim, for clarification, are you
22 referring to any interview sheets or things of that
23 nature?
24    MR. BAKER: Q Well, let's do it this way.

### Page 51

1  Raven, at any time did you receive any work product
2  of the division of internal affairs with respect to
3  what they did in the Mary Thalman investigation?
4     A    I don't see anything in the file other
5  than what you have now. As I said, this is not the
6  official case file.
7     Q    Okay.
8     A    But I don't have any in this file.
9     Q    Do you have any recollection of ever
10 receiving copies of any witness statements?
11    A    I don't have any recollection.
12    Q    You indicated that one of your jobs is to
13 make recommendations concerning discipline for
14 employees accused of sexual harassment. Am I
15 correct?
16    A    You're saying is that one of my jobs?
17    Q    Yes.
18    A    Yes.
19    Q    With respect to the Mary Thalman
20 investigation, did you ever make recommendations
21 concerning whether Mark Scheff should be
22 disciplined or not?
23    A    I don't see information in this file.
24    Q    Do you have any recollection one way or

### Page 52

1  another whether you did or did not?
2     A    I don't have recollection.
3     Q    If someone in your office had made a
4  recommendation one way or another concerning
5  disciplinary action against Mark Scheff, and the
6  recommendation could be I don't think he did
7  anything that justifies discipline, recommendation
8  could be I think you should get a written reprimand
9  or you should be fired, whatever it may be--
10    A    You're asking if a recommendation could
11 have come from someone else in my office?
12    Q    Well, you're getting there. Would you be
13 the person that made the recommendation or could it
14 be someone else?
15    A    If it came from the EEO office, it would
16 be me. It should be me.
17    Q    And when you made a recommendation, would
18 the recommendation be in written form, or would it
19 be verbal?
20    A    Generally, it would be written.
21    Q    And in your file do you have any evidence
22 that you made any type of recommendation?
23    A    No.
24    Q    If you had made a recommendation in

3:04-cv-03039-JES-BGC  # 18-13  Page 14 of 20
9/14/05
Raven Knighten
Sullins v. Illinois Department of Public Aid

Page 53

1  written form, would you suspect that recommendation
2  would be, or a copy of that recommendation, would
3  be in the file in front of you?
4      A    Yes.
5      Q    And I think maybe we've already covered
6  this, but let me see in the interest of fullness.
7  Do you have any recollection one way or another of
8  making any recommendation concerning Mark Scheff?
9      A    In the Thalman case?
10     Q    Yes, ma'am.
11     A    No. I don't have any recollection.
12     Q    Are there occasions in a sexual
13 harassment investigation in the department of
14 public aid in which your office would not make a
15 recommendation concerning proposed discipline or
16 whether discipline was in order?
17     A    It would be unusual.
18     Q    Can you recall any--
19     A    I can't say never.
20     Q    Can you recall any cases, putting aside
21 the Mary Thalman case, where you have not made a
22 recommendation?
23     A    I cannot recall any.
24     Q    Can we agree that in the normal course of

Page 54

1  events where there is some investigation concerning
2  whether an employee engaged in conduct of an
3  inappropriate sexual nature that your office would,
4  in the normal case, give some recommendation
5  concerning discipline?
6      A    In the normal case we would give a
7  recommendation. There could be a situation where
8  the determination by labor relations would be
9  acceptable and it wouldn't be necessary.
10     Q    Do you have any information in your file,
11 Ms. Thalman, or, excuse me, Ms. Knighten, one way
12 or another as to whether your office was ever
13 informed of whether any discipline was taken
14 against Mark Scheff?
15     A    Yes.
16     Q    Can you describe what you have in that
17 respect?
18     A    I have form number 1751, personnel
19 transaction request, signed by Jan Johnson with a
20 copy of the charges.
21     MS. KERLEY: Mr. Baker, I'm going to direct
22 Ms. Knighten to expound on what is shown by the
23 personnel transaction request so that we are...
24     MR. BAKER: I got a better idea. Could you fax

Page 55

1  that to me, Sarah, and we'll mark it as an exhibit?
2      MS. KERLEY: Yes. Let's go off the record for a
3  second.
4                (Discussion off the record.)
5                (Whereupon a document was duly
6                 marked for purposes of
7                 identification as Exhibit 52,
8                 as of this date.)
9      MR. BAKER: Q  Raven, do you have in front
10 of you what the court reporter has marked as
11 Exhibit 52?
12     A    Yes, I do.
13     Q    And the first, I guess that's a two page
14 document, but one of the pages has material on both
15 sides. Am I correct?
16     A    Yes.
17     Q    And one page is identified personnel
18 transaction request and the second page is
19 identified charges. Am I correct?
20     A    Yes.
21     Q    With respect to the document headed
22 personnel action request, can you identify what
23 that document is?
24     A    It is a document that simply advises that

Page 56

1  the EEO office or a designee has reviewed the
2  proposed personnel transaction form, or request.
3      Q    And the request would be the charges?
4      A    The request would be--. It's a
5  suspension.
6           Do you see the suspension box checked on
7  the side of the page?
8      Q    I do.
9      A    You do?
10     Q    Yes.
11     A    Okay. The request is suspension. The
12 charge relates what the suspension is for.
13     Q    And in the upper right-hand corner it
14 says reviewed by Janice Johnson and it looks like a
15 date of 2/14. I'm assuming that's '01?
16     A    Yes.
17     Q    For what purpose would your office review
18 that type of document?
19     A    We're required to review proposed
20 transactions of a certain nature by the department
21 of human rights according to the Human Rights Act.
22     Q    So if the department proposes to suspend
23 me for five days because I've been sleeping in late
24 a lot and not getting to work on time, is that

14 (Pages 53 to 56)

Page 57

1  something which, as a matter of course, you would
2  review?
3      A    Yes.
4      Q    And is that done to make sure that the
5  disciplinary action might not be discriminatory,
6  meaning that a black is disciplined more severely
7  than a white, or a female more severely than a
8  male, or vice-versa?
9      A    It could.
10     Q    In this instance, do you know why your
11 office was asked to review this?
12     A    Because it is a suspension and we look at
13 all suspensions.
14     Q    Regardless of what people are suspended
15 for?
16     A    Yes.
17     Q    And I notice that down in the body of the
18 document Mr. Scheff's race and gender is
19 identified.  Am I correct?
20     A    Yes.
21     Q    And that would typically be done in any
22 document you would review?
23     A    Yes.
24     Q    So this would be different than a

Page 58

1  recommendation concerning proposed discipline.  Am I
2  correct?
3      A    It's different than a recommendation,
4  yes.
5      Q    Earlier we talked about your office being
6  involved in making recommendations of discipline in
7  matters relating to sexual harassment.  Do you
8  recall that?
9      A    Yes.
10     Q    And you indicated that, as a matter of
11 course, your recommendations would be in written
12 form.  Do you recall that?
13     A    Usually.  Yes.
14     Q    Exhibit 52 is not that type of
15 recommendation, I take it?
16     A    No, it is not.
17     Q    Did you ever become aware that Deborah
18 Sullins, before she went to the department of human
19 rights, had made some complaints to the division of
20 internal affairs concerning Mark Scheff?
21     A    I believe so.  In fact, I believe she
22 filed a complaint.
23     Q    Okay.  She filed a complaint with the
24 division of internal affairs?

Page 59

1      A    I believe so.
2      Q    If a witness to a matter of sexual
3  harassment files a complaint with the department of
4  internal affairs that the person who is alleged to
5  be the perpetrator of the sexual harassment is
6  retaliating against her because she offered
7  supporting evidence, would your office become
8  involved in that type of investigation?
9      A    It could.
10     Q    And what, if any, role, did your office
11 have with the investigation done by the division of
12 internal affairs relating to Deborah Sullins'
13 complaint?
14     A    I'm not really sure.  I would have to
15 check the record.  At that time the complaint is not
16 usually filed with internal affairs.
17     Q    Who is it usually filed with?
18     A    EEO.
19     Q    And do you have any knowledge one way or
20 another whether Ms. Sullins filed any complaint
21 with EEO?
22     A    I don't have one of record.
23     Q    When you say "of record", you mean what?
24     A    I don't have one of--a file indicating

Page 60

1  she filed an internal complaint with this office.
2      Q    And, as I understand it your testimony,
3  it's your belief she did file a complaint with
4  internal affairs?
5      A    I believe.
6      Q    Did your office have any involvement of
7  any type with respect to the complaint Deborah
8  Sullins filed against Mark Scheff with internal
9  affairs?
10     A    I don't recall.
11     Q    Did you open any file of your own dealing
12 with Deborah Sullins' complaint that she filed with
13 internal affairs?  And I'm distinguishing that from
14 the file you opened concerning her human rights
15 claim with the department of human rights.
16     A    I'd have to check.
17     Q    Could you could that for me?
18     A    Okay.  I'm going to go into the database.
19 Can you hold for that amount of time?
20     Q    Sure, we can.
21     A    (Looking up information.)
22 MS. KERLEY:  We can go back on the record.
23 MR. BAKER:  I'm here.
24 THE DEPONENT:  I don't find anything.

3:04-cv-03039-JES-BGC   # 18-13   Page 16 of 20
9/14/05
Raven Knighten
Sullins v. Illinois Department of Public Aid

## Page 61

    1    MR. BAKER:  Q  So just so we can clear this up
    2  on the record, Raven. It's my understanding that
    3  you have never opened a file with respect to any
    4  complaint Deborah Sullins made, internal complaint
    5  within the department of public aid, concerning
    6  conduct she complained of that came from Mark
    7  Scheff?
    8    A  No. I'm sorry. I'm reading. I'm trying to
    9  answer you and read too. No, we have not opened a
   10  case, a Sullins file against Mark Scheff through
   11  internal affairs.
   12       Was that your clarifying your question?
   13    Q  That's it.
   14    A  Okay. No.
   15    Q  At any time did anyone in either labor
   16  relations or the division of medical programs or
   17  the office of internal affairs ever seek out your
   18  advice or opinions concerning whether or not Mark
   19  Scheff should be disciplined because of conduct he
   20  engaged in with respect to Debbie Sullins?
   21    A  In the Sullins' complaint or the Thalman
   22  complaint?
   23    Q  Well, I was talking about conduct
   24  relating to the Sullins' complaint.

## Page 62

    1    A  I don't see anything of record. I don't
    2  recall.
    3    Q  If Ms. Sullins' supervisors reported to
    4  them an allegation by Ms. Sullins that Mr. Scheff
    5  was stalking her, or surveilling her, or
    6  threatening her because she had cooperated with the
    7  Thalman investigation, what should they have done?
    8    MS. KERLEY: Jim, for clarification, I think
    9  you cut out. Did you say if Sullins' supervisors
   10  had had that information reported to them, what
   11  should they have done?
   12    MR. BAKER: Actually, what I'm going to do is
   13  have the question read back.
   14    MS. KERLEY: Okay.  I think we missed the first
   15  part.
   16              (Whereupon the requested
   17               portion of the record was read
   18               back by the Reporter.)
   19    MR. BAKER:  Q  Let me start over. Raven, if
   20  Ms. Sullins had reported to her supervisors that
   21  after she had cooperated with the Thalman
   22  investigation Mark Scheff had acted out against her
   23  by surveilling her office, or stalking her in the
   24  building where she worked, or making threatening

## Page 63

    1  comments or gestures, what should her supervisors
    2  have done in that situation?
    3    A  I would have recommended that they speak
    4  with the bureau of internal affairs because that's
    5  akin to criminal behavior.
    6    Q  Okay. If that conduct, assuming it did
    7  occur, is that conduct that would warrant
    8  discipline being assessed against Mr. Scheff?
    9    A  If it could be proven, yes.
   10    Q  And would that be a very fairly serious
   11  form of discipline?
   12    A  I would think so.
   13    Q  At any time during your involvement with
   14  the Mary Thalman investigation, did you ever speak
   15  with a woman named Jody Edmonds concerning--
   16    A  I don't recall.
   17    Q  I beg your pardon?
   18    A  I do not recall.
   19    Q  Do you know who Jody Edmonds is?
   20    A  I believe she's one of the supervisors,
   21  isn't she?
   22    Q  She is.
   23       Do you know her personally?
   24    A  I do not.

## Page 64

    1    Q  Did you ever speak with Steve Bradley?
    2    A  I don't recall having spoken with Steve
    3  Bradley regarding this investigation.
    4    Q  Are you personally acquainted with Mr.
    5  Bradley?
    6    A  I know Steve Bradley.
    7    MR. BAKER: Give me just a second here. I think
    8  we're almost done. I don't believe I have any
    9  further questions. Thank you very much.
   10    MS. KERLEY: Jim, I just might have one or two
   11  clarifications, but just give me one second,
   12  please.
   13    MR. BAKER: Sure.
   14    MS. KERLEY: I think I have three.
   15              EXAMINATION
   16              BY MS. KERLEY:
   17    Q  Ms. Knighten, you previously testified,
   18  or you were previously asked a question about
   19  whether you recalled any circumstances where,
   20  following an investigation by internal affairs,
   21  that the internal affairs department would not make
   22  a report. Do you recall that question?
   23    A  I think so.
   24    Q  Vaguely at least?

### Page 65

1  A   Vaguely.
2  Q   In your role as chief EEO officer, which
3  that's your position, right?
4  A   Yes.
5  Q   Okay. In your role as chief EEO officer,
6  would you be in a position to be aware of all of
7  the intricacies of the internal affairs' office
8  policies?
9  A   You're describing intricacies. Their
10 policies and procedures?
11 Q   Yes.
12 A   Their normal procedures in investigating
13 a sexual harassment complaint. Not all of their
14 decision procedures because all of their procedures
15 would not cover activities handled by my office.
16 Q   So internal affairs could have a policy
17 and/or procedure that you would be unaware of?
18 A   They could have.
19 Q   Just one other question. You had
20 previously testified about the responsibilities of
21 employees when they either perceive themselves a
22 victim of sexual harassment or they observed such
23 behavior. Correct?
24 A   Yes.

### Page 66

1  Q   And you recall that question?
2  A   Yes.
3  Q   You previously testified that they
4  should--that an employee should report behavior to
5  their supervisor, the OIG, or the EEO office,
6  correct?
7  A   Yes. Correct.
8  Q   If an employee reports to a supervisor
9  and that employee doesn't feel the supervisor has
10 resolved the situation to their liking, does the
11 employee have an added responsibility at that
12 point?
13 A   Yes.
14 Q   And what is that responsibility?
15 A   To contact the next person in authority,
16 which would be the EEO office.
17 Q   The EEO office?
18 A   Yes.
19 MS. KERLEY: I have no further questions.
20 MR. BAKER: Ms. Knighten, a followup to Ms.
21 Kerley's last question of you.
22
23
24

### Page 67

1           EXAMINATION (CONT'D)
2           BY MR. BAKER:
3  Q   Is there anything in writing that
4  identifies what that responsibility is to report
5  sexual harassment to your office if the supervisor
6  does nothing?
7  A   I have to look at the policy again that
8  she's just put in my hand now.
9  MS. KERLEY: I'm showing the witness what is
10 marked as Exhibit 22.
11 MR. BAKER: Okay. Thanks.
12 THE DEPONENT: An employee who was aware of the
13 situation that could be construed as sexual
14 harassment, they're required to notify the EEO
15 office or the bureau of investigations immediately.
16 They may also notify their immediate supervisor.
17 MR. BAKER: Q   Where does it say that?
18 A   In the administrative manual at 93.11(b).
19 MS. KERLEY: It's bate stamped number 001084,
20 subsection (b) is where she was reading from.
21 MR. BAKER: Q   If you know, how is this policy
22 disseminated to employees?
23 A   Through the employee handbook.
24 Q   If I were to tell you this document was

### Page 68

1  not in the employee handbook, would you disagree
2  with me?
3  A   I wouldn't disagree. I'd look.
4  MR. BAKER: All right. Well, we can both look
5  again.
6  THE DEPONENT: That was in 2000?
7  MR. BAKER: Yes, ma'am.
8  MS. KERLEY: Off the record.
9          (Discussion off the record.)
10 MS. KERLEY: For the record, Ms. Knighten has
11 retrieved an employee handbook that has a date of
12 1997 through July 14th, 2002. And that is what she
13 is reviewing.
14 MR. BAKER: Okay.
15 MS. KERLEY: Jim, I believe the witness has
16 reviewed the employee handbook enough to be
17 prepared to answer questions.
18     Ms. Knighten, do you remember the
19 previous question? Or would you like to have it
20 read back?
21 MR. BAKER: Was there one pending?
22 MS. KERLEY: I think there may have been.
23 MR. BAKER: We'll check and see.
24          (Whereupon the requested

3:04-cv-03039-JES-BGC  # 18-13  Page 18 of 20
9/14/05
Raven Knighten
Sullins v. Illinois Department of Public Aid

Page 69

1        portion of the record was read
2        back by the Reporter.)
3    MR. BAKER:  Q  Ms. Knighten, we have taken a
4  break, and, as I understand it, you have secured
5  and have in your possession right now a copy of the
6  employee handbook, at least as it existed during
7  the year 2000?
8    A  (No response.)
9    Q  Am I correct?
10   A  Yes.
11   Q  And does that handbook have any
12 discussion in it concerning the department's sexual
13 harassment policy?
14   A  Yes.
15   Q  What I'm going to ask--. Well, let's do
16 it this way. Is there any portion of that policy
17 that speaks to an employee's obligation in
18 reporting misconduct, sexual harassment rather?
19   A  Yes.
20   Q  And what's does it?
21   A  In Section 10.3 of the handbook, if you
22 have observed a situation that could be construed
23 as sexual harassment, you are required to report it
24 immediately. It goes on to talk about the

Page 70

1  supervisor's responsibility.  Supervisors are
2  required to notify the EEO office of the incident
3  observed and may request help in investigating the
4  allegation.
5    Q  Does it identify to the employee who she
6  is to report to it, or who he is to report it to?
7    A  If you believe you have been sexually
8  harassed, you are encouraged to immediately notify
9  your supervisor, or, if the supervisor's the person
10 alleged to have engaged, the next person in the
11 chain of command, or the EEO office, or the bureau
12 of internal affairs. But it goes on to say that
13 complaints will be promptly investigated and that
14 all allegations of sexual harassment are forwarded
15 to EEO.
16   MR. BAKER: Very good. Let's go off the record
17 for a second.
18       (Discussion off the record.)
19   MR. BAKER: For the record, Ms. Knighten, has
20 been reading from the department's employee
21 handbook, at least as that existed back in the year
22 2000. We have agreed that she is going to transmit
23 to us at this time the cover page and the sexual
24 policy that is identified in that document which we

Page 71

1  will mark as 53. Is that agreeable to you, Ms.
2  Kerley?
3    MS. KERLEY: Yes. That's what I have as well.
4    MR. BAKER:  Q  Ms. Knighten, the document
5  marked as Exhibit 22, as I understand it, that is
6  five or six pages from a much larger document?
7    A  Yes.
8    Q  And in the larger document, is that the
9  department's administrative manual?
10   A  Yes.
11   Q  And back in 2000 who had access to the
12 administrative manual?
13   A  Each office. One was on file in each
14 office available to all employees. That's my
15 understanding.
16   Q  Okay. Very good.
17   A  I never checked all offices.
18   Q  Fair enough.
19      Was a copy of that administration manual
20 provided to supervisors, other than the office
21 having a copy?
22   A  It was available to supervisors, yes.
23   MR. BAKER: All right. I have no further
24 questions. Thank you very much.

Page 72

1          EXAMINATION (CONT'D)
2          BY MS. KERLEY:
3    Q  And my only final question is, Ms.
4  Knighten, it's your understanding that all
5  department of public aid employees receive sexual
6  harassment training, is that correct?
7    A  Yes.
8    Q  And that would be training on the policy
9  that is in the employee handbook and also
10 encompassed--well, the employee handbook section
11 that has been marked as Plaintiff's Exhibit 53 and
12 also encompasses the section of the administrative
13 manual that's marked as Exhibit 22. Is that
14 correct?
15   A  Is this in here? Is that what you're
16 meaning?
17   Q  Let me rephrase. I'm sorry. You just
18 testified that public aid employees received sexual
19 harassment training?
20   A  Yes.
21   Q  And that training encompasses the policy
22 that is housed in both the employee handbook, which
23 is the section that's been marked Exhibit 53, and
24 the administration manual, the section that's been

Page 73

```
 1  marked as Exhibit 22?
 2     A    (No response.)
 3     Q    Is that correct?
 4     A    You're asking me if the training
 5  encompasses this?
 6     Q    Yes. Both documents.
 7     A    It is my understanding that it does.
 8     MS. KERLEY: No further questions.
 9     MR. BAKER: I'm not sure I heard her last
10  answer.
11     THE DEPONENT: It is my understanding that the
12  training encompasses the information found in both
13  documents.
14     MR. BAKER: Okay. Just a followup question or
15  to two.
16                 EXAMINATION (CONT'D)
17                 BY MR. BAKER:
18     Q    Do you provide the training yourself,
19  Ms. Knighten?
20     A    No longer.
21     Q    Prior to the year 2000, did you provide
22  that training?
23     A    Some years prior to the year 2000.
24  Exactly how many I don't remember. But it was
```

Page 74

```
 1  several years prior to that.
 2     MR. BAKER: Fine. I have nothing further.
 3     MS. KERLEY: Me neither.
 4          We're going to reserve. And I'll explain
 5  to Ms. Knighten off the record what that
 6  encompasses.
 7                 FURTHER DEPONENT SAITH NOT.
 8              (Whereupon a document was duly
 9              marked for purposes of
10              identification as Exhibit 53,
11              as of this date.)
```

Page 75

```
 1     I, RAVEN KNIGHTEN, having read the above and
 2  foregoing, find the same to be true and correct
 3  with the following additions and/or corrections,
 4  if any:
 5  Page_____Line_____Change:
 6  Page_____Line _____Change:
 7  Page_____Line _____Change:




















24  RAVEN KNIGHTEN (9/14/05)            DATE
```

Page 76

```
 1  STATE OF ILLINOIS  )
                      ) SS
 2  COUNTY OF SANGAMON )
 3              C E R T I F I C A T E
 4     I, Debra K. Baldwin, a Notary Public and
 5  Certified Shorthand Reporter and Registered
 6  Professional Reporter in and for said County and
 7  State do hereby certify that the Deponent herein,
 8  RAVEN KNIGHTEN, prior to the taking of the
 9  foregoing deposition, and on the 14th of September
10  A.D., 2005, was by me duly sworn to testify to the
11  truth, the whole truth and nothing but the truth in
12  the cause aforesaid; that the said deposition was
13  on that date taken down in shorthand by me and
14  afterwards transcribed, and that the attached
15  transcript contains a true and accurate translation
16  of my shorthand notes referred to.
17          Given under my hand and seal this 3rd day
18  of October A.D., 2005.
19                  Debra K. Baldwin
20                  Notary Public and
                    Certified Shorthand Reporter and
21                  Registered Professional Reporter
22
23  License No. _____
24
```

OFFICIAL SEAL
DEBRA K. BALDWIN
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 5-20-2006