3:04-cv-03039-JES-BGC    # 18-15    Page 1 of 20        E-FILED
7/12/05              Sullins v. Illinois Department of Public Aid    Tuesday, 20 December, 2005  10:06:48 AM
Mark Scheff                                           Clerk, U.S. District Court, ILCD

## Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2           FOR THE CENTRAL DISTRICT OF ILLINOIS
 3                      SPRINGFIELD DIVISION
 4
 5   DEBORAH R. SULLINS,
 6            Plaintiff,
 7       vs.                             No. 04-3039
 8   THE ILLINOIS DEPARTMENT OF PUBLIC
     AID,
 9
              Defendant.
10
11
12       THE DEPOSITION of MARK T. SCHEFF, taken in
13   the above-entitled case before Rhonda K. O'Neal,
14   CSR, RPR, a Notary Public of Sangamon County,
15   acting within and for the County of Sangamon,
16   State of Illinois, at 9:07 o'clock A.M., on July
17   12, 2005, at 415 South Seventh Street,
18   Springfield, Sangamon County, Illinois, pursuant
19   to notice.
20
21
22
         BALDWIN REPORTING & LEGAL-VISUAL SERVICES
23          SERVING ILLINOIS, INDIANA & MISSOURI
         24 hrs (217) 788-2835  Fax (217) 788-2838
24                   1-800-248-2835
```

## Page 2

```
 1   APPEARANCES:
 2       BAKER, BAKER & KRAJEWSKI, LLC
         BY: James P. Baker, Esq.
 3           415 South Seventh Street
             Springfield, Illinois 62701
 4           On behalf of Plaintiff.
 5       MS. SARAH R. KERLEY
             Assistant Attorney General
 6           500 South Second Street
             Springfield, Illinois 62701
 7           On behalf of Defendant.
 8       MS. KRISTIN A. ALFERINK
             Assistant Attorney General
 9           500 South Second Street
             Springfield, Illinois 62701
10           On behalf of Mark T. Scheff.
```

ORIGINAL

## Page 3

```
 1                    I N D E X
 2   DEPONENT                          PAGE NUMBER
 3   Mark Scheff
 4       Examination by Mr. Baker           5
 5
 ...
10                  E X H I B I T S
11   NUMBER                   MARKED FOR IDENTIFICATION
12   Exhibit 1                        42
     Exhibit 2                        47
13   Exhibit 3                        50
     Exhibit 4                        62
14   Exhibits 5 and 6                 74
15   (Exhibits retained by Counsel.)
```

## Page 4

```
 1              S T I P U L A T I O N
 2       It is stipulated and agreed, by and
     between the parties hereto, through their
 3   attorneys, that the deposition of MARK T. SCHEFF
     may be taken before Rhonda K. O'Neal, a Notary
 4   Public, Certified Shorthand Reporter, and
     Registered Professional Reporter, upon oral
 5   interrogatories, on the 12th of July A.D., 2005,
     at the instance of the Plaintiff at the hour of
 6   9:07 o'clock A.M., 415 South Seventh Street,
     Springfield, Sangamon County, Illinois;
 7
         That the oral interrogatories and the
 8   answers of the witness may be taken down in
     shorthand by the Reporter and afterwards
 9   transcribed;
10       That all requirements of the Federal Rules
     of Civil Procedure and the Rules of the Supreme
11   Court as to dedimus, and the reading over and
     signing of the deposition by the witness, are
12   expressly waived;
13       That any objections as to competency,
     materiality or relevancy are hereby reserved, but
14   any objection as to the form of question is waived
     unless specifically noted;
15
         That the deposition, or any parts thereof
16   may be used for any purpose for which depositions
     are competent, by any of the parties hereto,
17   without foundation proof;
18       That any party hereto may be furnished
     copies of the deposition at his or her own
19   expense.
```

3:04-cv-03039-JES-BGC   # 18-15   Page 2 of 20
7/12/05
Mark Scheff                    Sullins v. Illinois Department of Public Aid

## Page 5

```
 1              (Whereupon the Deponent was
 2              sworn by the Notary Public.)
 3              M A R K  T.  S C H E F F
 4   having been first duly sworn by the Notary Public,
 5   deposeth and saith as follows:
 6                    EXAMINATION
 7              BY MR. BAKER:
 8       Q   Good morning, Mr. Scheff. Would you
 9   state your name and address for me, please.
10       A   Mark T. Scheff at 16048 Central Drive,
11   Petersburg, Illinois.
12       Q   Are you employed?
13       A   I'm employed.
14       Q   Where do you work?
15       A   I work at the Bloom Building, Illinois
16   Department of Public Aid.
17       Q   And what is your present position for the
18   department?
19       A   I'm a medical assistance consultant II.
20       Q   Have you ever given a deposition before?
21       A   Yes.
22       Q   So you have some idea of what the
23   procedure is?
24       A   Yes.
```

## Page 6

```
 1       Q   I'm going to ask as a preliminary matter
 2   that you do certain things for me this morning.
 3   First thing is if you don't understand a question,
 4   let me know you don't understand it. And I'll do
 5   the best I can to rephrase it. Also going to ask
 6   that you respond verbally to questions, and if a
 7   question calls for an affirmative or a negative
 8   response, respond however you like other than I
 9   ask that you not use the words uh-huh and huh-uh.
10   Will you do that for me?
11       A   Yes.
12       Q   Okay. If at any time you want to take a
13   break, just let me know.
14           Are you represented by counsel here this
15   morning?
16       A   Yes.
17       Q   And who is representing you?
18       A   Kristin Alferink.
19       Q   Okay. Can you tell me what, if anything,
20   you did to prepare for your deposition?
21       A   Very little.
22       Q   Other than Ms. Alferink, did you speak
23   with anyone in preparation for your deposition?
24       A   No.
```

## Page 7

```
 1       Q   Did you review any documents in preparing
 2   for your deposition?
 3       A   No.
 4       Q   You didn't speak with anyone at the
 5   Department of Public Aid about your deposition?
 6       A   No.
 7       Q   How long have you worked for the
 8   Department of Public Aid?
 9       A   Since April 1, 1989, I believe.
10       Q   What I'd like to do is just talk a little
11   bit about your career in terms of chronologic
12   order. What was the first position you held at
13   the department?
14       A   I was a clerk III.
15       Q   And where did you work?
16       A   In what they call online.
17       Q   Online?
18       A   Online.
19       Q   Physically where did you work?
20       A   The first floor Bloom Building.
21       Q   Okay. What was your next position in the
22   department?
23       A   My next position was public aid
24   eligibility assistant in Logan County.
```

## Page 8

```
 1       Q   Was that at what's called the Lincoln
 2   office?
 3       A   Right.
 4       Q   The Logan County office?
 5           How long did you work in Logan County?
 6       A   From I believe September of '89 until
 7   April of '90.
 8       Q   Then where did you go?
 9       A   I became, took a promotion and became a
10   public aid income maintenance specialist I at the
11   Sangamon County Public Aid office.
12       Q   How long were you at the Sangamon County
13   office?
14       A   Until I believe January of '96.
15       Q   Then where did you go?
16       A   I've been at that office ever since.
17       Q   When you say that office, you mean what?
18       A   In the Bloom Building in the same title.
19       Q   Since moving to the Bloom Building in
20   1996, have you worked in a particular bureau?
21       A   I have always worked in the bureau of
22   comprehensive health services.
23       Q   Do you still work in that bureau?
24       A   I still work in that bureau.
```

3:04-cv-03039-JES-BGC # 18-15 Page 3 of 20
7/12/05 Sullins v. Illinois Department of Public Aid
Mark Scheff

### Page 9

```
 1    Q    When you worked at the Logan County
 2   office, were you ever the subject of any
 3   disciplinary action?
 4    A    No.
 5    Q    Were you ever, did you ever receive any
 6   counseling from a supervisor concerning conduct
 7   your supervisor felt might be offensive or
 8   inappropriate?
 9    A    No.
10    Q    When you worked in the Sangamon County
11   office, were you ever the subject of any
12   disciplinary action?
13    A    No.
14    Q    Were you ever counseled by a supervisor
15   concerning conduct that was considered
16   inappropriate or offensive either by coemployees
17   or recipients?
18    A    No.
19    Q    Since working at the Bloom Building, have
20   you ever been disciplined?
21    A    Yes.
22    Q    On how many occasions?
23    A    Twice.
24    Q    When was the first?
```

### Page 10

```
 1    A    February 2001.
 2    Q    What was the nature of the discipline
 3   that was assessed against you?
 4    A    The nature?
 5    Q    Yes.  What type of discipline did you
 6   get?
 7    A    I received a five-calendar-day
 8   suspension.
 9    Q    How is that different than a five-workday
10   suspension, or is it?
11    A    It started on a Sunday and ended on a
12   Thursday.
13    Q    Okay.  When was the second discipline?
14    A    I believe it was May of 2004, I believe.
15    Q    And what type of discipline did you
16   receive at that time?
17    A    Five-calendar-day suspension.
18    Q    Did that suspension extend over a
19   weekend?
20    A    I don't recall.
21    Q    What was the conduct you were alleged to
22   have engaged in that gave rise to that suspension?
23    A    An unsubstantiated telephone call from a
24   provider.
```

### Page 11

```
 1    Q    When you say a provider, you're talking
 2   about someone that provides services to the
 3   department?
 4    A    A billing service for a hospital.
 5    Q    And what was the nature of this
 6   unsubstantiated allegation?
 7    A    She stated that I stated something which
 8   did not occur.
 9    Q    What did she say you did?
10    A    Excuse me?
11    Q    What did she say you did?
12    A    She stated that I said I was.  Quote.
13   touching myself.  End quote.
14    Q    Let me get this straight.
15         She claimed that you told her you were
16   touching yourself?
17    A    Correct.
18    Q    And what part of the body did she claim
19   you said you were touching?
20    A    Never stated.
21    Q    Was there any, anything in writing
22   presented to you in connection with that
23   particular discipline?
24    A    An e-mail.
```

### Page 12

```
 1    Q    Okay.  Can you describe who the e-mail
 2   was from and to whom it was sent and what the
 3   content of it was?
 4    A    It was from an Angela Diamond at Pacific
 5   Coast Billing--or Pacific Medicaid Billing; my
 6   correction--to Bureau Chief Steve Bradley.
 7    Q    Okay.
 8    A    Stating hi, Steve.  Sincerely, Angie.
 9    Q    What was between the hi and the
10   sincerely?
11    A    That, as I stated previously.
12    Q    Okay.  And I take it you denied engaging
13   in any of that type of conduct?
14    A    I did and so did my coworker.
15    Q    Who is your coworker?
16    A    James Fitzpatrick.
17    Q    And Mr. Fitzpatrick apparently overheard
18   that conversation or claims to have?
19    A    He wrote a statement stating he had never
20   heard me engage in any unprofessional telephone
21   communication.
22    Q    Mr. Fitzpatrick lives in Menard County,
23   does he not?
24    A    No, he does not.
```

3:04-cv-03039-JES-BGC   # 18-15   Page 4 of 20
7/12/05
Mark Scheff
Sullins v. Illinois Department of Public Aid

Page 13

1  Q   He doesn't? Where does he live?
2  A   He lives Morgan County.
3  Q   Did he at one time live in Menard County?
4  A   Never.
5  Q   Are you a friend of Mr. Fitzpatrick's?
6  A   I would like to think so.
7  Q   Do you socialize together either at work
8  or away from work?
9  A   I wouldn't say socialize, no.
10 Q   How would you describe your relationship
11 with him?
12 A   One of the few people I would trust.
13 Q   Can you explain what you mean by that?
14 A   I believe he is very honest, has
15 integrity, ethics, and is not afraid to honor
16 truth.
17 Q   Was it your sense that the lady who
18 lodged the complaint against you thought that this
19 comment you made had some sexual connotation to
20 it?
21 A   I'm not certain sure she ever made the,
22 she ever sent the e-mail or had any, had any
23 statement except being coerced to issue an e-mail.
24 Q   Who do you believe coerced her to issue

Page 14

1  the e-mail?
2  A   Certain individuals at my work.
3  Q   Would you identify them by name for me,
4  please?
5  A   I'm not certain that I can due to the
6  fact that I have no proof. I have only my
7  assumption.
8  Q   Okay. I understand that.
9  MS. ALFERINK: You can answer however you--.
10 If you don't have an answer, you don't have to
11 give one, but he's just asking what your opinion
12 is.
13 THE DEPONENT: I have no answer that I, I have
14 no proof to the answer that I possibly could give.
15 MR. BAKER: Q   Okay. Well, I understand you
16 have no proof and you're speculating that some
17 individuals may have, may have been doing this,
18 and I just want you to tell me based upon your
19 speculation who you believe they may be.
20 A   I believe they may be Marilyn Muchorski.
21 Q   Who is she? What position does she hold
22 at the department or elsewhere?
23 A   I'm not certain of her title.
24 Q   Does she work with you?

Page 15

1  A   No. She works in the same bureau.
2  Q   Does she have a higher level in the
3  bureau than you do?
4  A   No.
5  Q   She's--
6  A   Clerical.
7  Q   Okay, fine.
8      Who else?
9  A   Steven Bradley.
10 Q   Mr. Bradley is the bureau chief?
11 A   Correct.
12 Q   All right. What is the basis for your
13 belief that Marilyn Muchorski may have had
14 something to do with this?
15 A   I feel this has been an ongoing
16 retribution from my cooperation with a Department
17 of Human Rights investigation in October of 2000.
18 Q   And did Marilyn have some involvement
19 with that particular investigation?
20 A   No.
21 Q   Okay. Then how does she enter into the
22 picture here, in your view?
23 A   She is close to Steve Bradley.
24 Q   Okay. And is it your suspicion that

Page 16

1  Mr. Bradley may be retaliating against you because
2  of your activities in some sort of human rights
3  investigation?
4  A   Yes.
5  Q   Okay.
6  A   That was concluded.
7  Q   The investigation was concluded?
8  A   Correct.
9  Q   That involved another employee, did it
10 not?
11 A   Yes, it did.
12 Q   What was that employee's name?
13 A   Edward Maddox.
14 Q   And how was Mr. Maddox' investigation
15 concluded?
16 A   The state settled with Mr. Maddox in
17 regards to age- and gender-based discrimination.
18 Q   And were you a witness in support of
19 Mr. Maddox's claim?
20 A   Yes, I was.
21 Q   Were there other individuals, if you
22 know, that were also witnesses in support of his
23 claim?
24 A   Yes.

Page 17

1  Q    Did any of those individuals ever form a
2  belief that because of their support for
3  Mr. Maddox they too had been retaliated against?
4  A    Yes.
5  Q    Who are those individuals?
6  A    Shirley Bromida or Boromida.
7  Q    Okay.
8  A    Dena Sale. And I don't know of anyone
9  else.
10 Q    Okay. I want to go back to the year
11 2000. During that year what was your position at
12 the department?
13 A    Medical assistance consultant II.
14 Q    And as a medical assistance consultant II
15 at that time, what did your job involve?
16 A    I dealt with hospitals in regards to
17 billing on the EB92 form, information in regards
18 to processing and payment of medical bills from
19 hospitals, verifying calculations of payment,
20 adjustments, and anything billed on a EB92.
21 Q    Did you do that work throughout the
22 entire year of 2000?
23 A    Yes.
24 Q    Did you also do it during the year 2001?

Page 18

1  A    Yes.
2  Q    In that particular job back in 2000 and
3  2001, did you speak frequently on the telephone as
4  a part of your job?
5  A    Constantly.
6  Q    Okay. So back in 2000 and 2001, what
7  time of the day did you begin work?
8  A    8:30 in the morning.
9  Q    And when was quitting time?
10 A    Five in the afternoon.
11 Q    And you had some sort of lunch break?
12 A    From 11:45 until 12:45.
13 Q    And during either the morning or the
14 afternoon, did you have any breaks?
15 A    Yes.
16 Q    How long were your breaks during each?
17 A    Fifteen minutes.
18 Q    You indicate that you were on the phone
19 constantly? I'm assuming your job basically
20 involved fielding calls or talking with
21 individuals who had some concerns related to your
22 area of responsibility?
23 A    Correct.
24 Q    Was there a point in time during your

Page 19

1  workday before the normal quitting time, before
2  your normal quitting time that you ceased talking
3  on the phone?
4  A    There was an unwritten rule that we would
5  not receive phone calls after 3 in the afternoon
6  to process claims and mail that was requested to
7  be sent then for a consultant's review.
8  Q    Okay. And after, between 3 in the
9  afternoon and your quitting time, how did you
10 spend your work time?
11 A    I didn't actually follow that criteria.
12 If a person contacted me between 3 and 5, I
13 answered their telephone and answered their
14 situation.
15 Q    Okay. Do you know a man named Mike
16 Sandidge?
17 A    I know a person named Mike Sandidge.
18 Q    Did you at one time work with him?
19 A    He worked, he showed up at the same
20 location.
21 Q    What was his job, if you know? And I'm
22 talking about during the year 2000.
23 A    He was the same title as I.
24 Q    Did you both have the same supervisor?

Page 20

1  A    I don't believe so.
2  Q    During the year 2000, who was your
3  supervisor?
4  A    Marvin E. Ross.
5  Q    And do you know the individuals that
6  Mr. Ross supervised in 2000 in addition to you?
7  A    No.
8  Q    In the year 2000, was your workstation
9  located in the Bloom Building?
10 A    Yes.
11 Q    Was it located in the basement of the
12 Bloom Building?
13 A    Yes.
14 Q    Was it located in the same general area
15 where Mr. Ross's office is located?
16 A    Yes.
17 Q    How far was your workstation from
18 Mr. Ross's office?
19 A    I would say seven feet through the wall.
20 Q    Okay. Was there some space that
21 separated your workstation from Mr. Ross's office?
22 A    A walkway and a wall.
23 Q    Okay. And how far from Mr. Ross's office
24 was the workstation or the work area of Mike

3:04-cv-03039-JES-BGC   # 18-15   Page 6 of 20
7/12/05
Mark Scheff
Sullins v. Illinois Department of Public Aid

## Page 21

1  Sandidge?
2  A   I believe his office was probably 15 feet
3  from his office down the, down his same door
4  opening hallway.
5  Q   Okay. So it would be at approximately
6  15 feet from Mr. Ross's office to Mr. Sandidge's
7  workstation?
8  A   I would probably say 20 feet.
9  Q   Okay. I understand you don't have
10 measuring sticks, so just give me your best
11 approximation.
12 A   Right.
13 Q   In 2000 did you know a lady named Lenna
14 DeGroot?
15 A   Yes.
16 Q   In 2000 where was Ms. DeGroot's office in
17 relation to your workstation?
18 A   I don't recall whether she became a
19 supervisor in 2000 or not. Otherwise, if she
20 weren't the supervisor, which would have been
21 directly across from Marvin Ross, she would have
22 been the next office closest to Mr. Ross on the
23 opposite side or approximately 15 feet from
24 Mr. Ross's office.

## Page 22

1  Q   So before she became a supervisor, she
2  was a little closer to Mr. Sandidge's work area
3  than was Mr. Ross?
4  A   Correct.
5  Q   And at some point in time, she became a
6  supervisor?
7  A   Correct.
8  Q   And do I understand at that point in time
9  her office was directly across from the office of
10 Mr. Ross?
11 A   Correct.
12 Q   I'm assuming the hallway separated their
13 offices?
14 A   Correct.
15 Q   So if I understand your testimony, her
16 office would have been approximately the same
17 distance from Mr. Sandidge's workstation as
18 Mr. Ross's?
19 A   Correct.
20 Q   Okay. Do you know Deborah Sullins?
21 A   Yes.
22 Q   Do you recall when you first met Debbie?
23 A   Yes.
24 Q   And when was that?

## Page 23

1  A   In approximately July of 1990.
2  Q   Where was she working at that time?
3  A   As a floater for the regional office of
4  the Department of Public Aid temporarily assigned
5  to Sangamon County.
6  Q   Okay. At any time after July of 1990,
7  did Debbie Sullins and you work in the same work
8  area?
9  A   Yes.
10 Q   When was that?
11 A   I don't recall when she got a position as
12 a medical consultant in my section.
13 Q   All right. And that again would have
14 been in the basement of the Bloom Building?
15 A   Correct.
16 Q   In 2000 where was her workstation in
17 relation to the workstation of Mike Sandidge?
18 A   I believe her office was right beside it.
19 Q   Okay. So Mr. Sandidge's office and
20 Debbie Sullins' office were next door to one
21 another?
22 A   Correct.
23 Q   Okay. Did Mr. Sandidge share his office
24 with anyone?

## Page 24

1  A   Joe Roberts.
2  Q   And did Ms. Sullins share her office with
3  anyone?
4  A   Yes. But I don't remember who.
5  Q   Prior to October of 2000, would
6  you describe for me your relationship with
7  Ms. Sullins?
8  A   There was no relationship.
9  Q   Okay. You knew her?
10 A   As I know you.
11 Q   Okay. Well, we met a half an hour ago.
12 Did you--
13 A   That's the extent that I know of her.
14 Q   You didn't speak with her at work?
15 A   No.
16 Q   Prior to October of 2000, had you ever
17 had any involvement or incidents with Ms. Sullins
18 which caused either of you to have hard feelings
19 toward the other that you're aware of?
20 A   That I had with Ms. Sullins?
21 Q   Yes.
22 A   No.
23 Q   Okay. Prior to October of 2000, did you
24 have any reason to believe that Ms. Sullins was in

3:04-cv-03039-JES-BGC   # 18-15   Page 7 of 20
7/12/05                                     Sullins v. Illinois Department of Public Aid
Mark Scheff

### Page 25

```
 1   any respect upset or angry with you?
 2       A   No.
 3       Q   How frequently did you go to the office
 4   of Mike Sandidge in 2000?
 5       A   Infrequently.
 6       Q   Less than daily?
 7       A   Less than daily.
 8       Q   Okay.  Would it be less than weekly?
 9       A   No.
10       Q   What would be the circumstances that
11   would take you to the office of Mike Sandidge?
12       A   Work related.
13       Q   How in you doing your job and him doing
14   his job would you come together?
15       A   I was one of the most knowledgeable
16   people in my bureau in regards to my job.  He was
17   new.  And Joe Roberts was in the same office as
18   Mike Sandidge, and I would communicate with Joe
19   Roberts.
20       Q   The sense I'm getting is you would
21   provide Mike Sandidge with some advice or
22   assistance?  Is that what you're telling me?
23       A   If he would request it, yeah.
24       Q   Why would you communicate with Joe
```

### Page 26

```
 1   Roberts?
 2       A   If he were to ask questions or just
 3   communication.
 4       Q   Work-related communication?
 5       A   Usually.
 6       Q   Did you ever go to Mike Sandidge's office
 7   and talk about things that were not work related?
 8       A   Yes.
 9       Q   How frequently would that be?
10       A   Very rarely.
11       Q   Very rarely would mean less than once a
12   week?
13       A   Correct.
14       Q   Less than once a month?
15       A   I wouldn't say that I spoke with Sandidge
16   on any level other than work related anything less
17   than once a month.
18       MR. BAKER:  Could you read that answer back.
19   Got several negatives here.
20                (Whereupon the requested
21                portion of the record was read
22                back by the Reporter.)
23       MR. BAKER:  Q  So is it your testimony that
24   you spoke with him about nonwork-related things
```

### Page 27

```
 1   less frequently than monthly?
 2       A   Yes.
 3       Q   Okay.  Do you know a man named Jim Schuh?
 4       A   I know Jim Schuh.
 5       Q   And in the year 2000, did you work with
 6   Mr. Schuh?
 7       A   Yes, I did.
 8       Q   Did you consider Mr. Schuh to be a friend
 9   in 2000?
10       A   At that point?
11       Q   Correct.
12       A   Yes.
13       Q   Do you still consider him to be a friend?
14       A   No.
15       Q   Why is that?
16       A   Mr. Schuh does not have the ability to
17   maintain a confidential friendship.
18       Q   What do you believe Mr. Schuh did that
19   causes you to feel that way about him?
20       A   I believe Mr. Schuh divulged information
21   to other individuals of a personal nature.
22       Q   What information do you believe he
23   divulged and to whom did he divulge it?
24       A   The information was a conversation in
```

### Page 28

```
 1   Chicago.  And to who he had, to who he divulged it
 2   to I'm not certain.
 3       Q   How do you know he divulged it or why do
 4   you believe he divulged it?
 5       A   I received the information via an
 6   investigation by the Office of Inspector General.
 7       Q   And was that an investigation in either
 8   2000 or 2001?
 9       A   Correct.
10       Q   And tell me what information you believe
11   Mr. Schuh divulged?
12       A   A testing of whether he was a close
13   enough friend to maintain confidentiality in
14   regards to a communication.
15       Q   I don't understand.
16       A   I stated something to him in Chicago in
17   which I wished to see whether that information
18   would be divulged in the office setting.
19       Q   When did you make this statement to
20   Mr. Schuh in Chicago?
21       A   In a hotel lobby in I believe the Swiss
22   Hotel.
23       Q   What hotel?
24       A   Swiss Hotel.
```

3:04-cv-03039-JES-BGC    # 18-15    Page 8 of 20
7/12/05
Mark Scheff
Sullins v. Illinois Department of Public Aid

Page 29

1  Q  Okay. And when was it you made that
2  statement to him?
3  A  Prior to, prior to working hours and
4  prior to a training seminar, which I gave a
5  morning session and he gave a afternoon session at
6  Union Station.
7  Q  What year was that that you made this
8  statement to him?
9  A  2000.
10  Q  Was it before October of 2000?
11  A  Yes.
12  Q  And what was the statement you told him?
13  A  I told him that I rented a pay-per-view
14  movie and masturbated. And rolled over and went
15  to sleep.
16  Q  And why was it at that particular time
17  you told Mr. Schuh that?
18  A  Why?
19  Q  Yes, sir.
20  A  I personally wanted to see what kind of
21  confidence I could have in Mr. Schuh as a friend.
22  Q  Why did you feel you needed to test his
23  friendship?
24  A  I had doubts about Mr. Schuh.

Page 30

1  Q  And had something occurred that gave rise
2  to these doubts?
3  A  Just a gut feeling.
4  Q  Okay. If I understand your testimony--if
5  I have it wrong tell me--you had some doubts about
6  Mr. Schuh, so you told him something that was not
7  true that you had done as a test of whether he
8  would keep it in confidence?
9  A  Correct.
10  Q  Did you tell him when you made this
11  statement to him that he shouldn't tell it to
12  anyone?
13  A  I believe I did.
14  Q  Why was it you chose to tell him that
15  particular anecdote as opposed to something else?
16  A  They were available at the hotel.
17  Q  When you say they, you're talking about
18  the--
19  A  Movies.
20  Q  Movies?
21      Any other reason?
22  A  No.
23  Q  At any other time, did you and Mr. Schuh
24  ever talk about matters of a sexual nature with

Page 31

1  one another?
2  A  Locker-room communication.
3  Q  Okay. I think I understand what you're
4  telling me. How frequently would you have this
5  locker-room communication?
6  A  Infrequently.
7  Q  And where would you have it?
8  A  I can't really recall that there was that
9  many other conversations in regards to a sexual
10  matter with Mr. Schuh.
11  Q  Okay. Other than Mr. Schuh, did you ever
12  have these locker-room type conversations as you
13  describe it with any other individuals who worked
14  for the department?
15  A  No.
16  Q  Do you know a lady named Mary Thallman?
17  A  Yes.
18  Q  Prior to October of 2000, did you work
19  either with Mary or close to where she worked?
20  A  I knew Mary Thallman from 1995.
21  Q  Okay. Prior to October of 2000, how
22  would you have characterized for me your
23  relationship with Mary?
24  A  Mary Thallman was one of my best friend's

Page 32

1  living partner.
2      MR. BAKER: Can you read the last part of his
3  answer.
4          (Whereupon the requested
5          portion of the record was read
6          back by the Reporter.)
7      MR. BAKER: Q  I don't understand the living
8  partner aspect.
9  A  Happy Hanna lived with Mary Thallman. I
10  had been to Mary Thallman's house 50 times.
11  Q  Okay. So one of your best friends was,
12  lived with Mary Thallman?
13  A  Correct.
14  Q  I got you. Prior to October of 2000,
15  would you have considered Mary to be a friend?
16  A  An acquaintance.
17  Q  Did you ever have any of these
18  locker-room conversations as you describe it in
19  the presence of Mary Thallman?
20  A  I wouldn't call it a locker-room
21  discussion. It was a police report question.
22  Q  When did the police report question come
23  up?
24  A  In October of 2000.

Page 33

1  Q  Was that at work?
2  A  Prior to the start of work, yes.
3  Q  And where did this conversation occur?
4  A  In an office that Jim Schuh shared with
5  Mary Thallman.
6  Q  And was the conversation between you and
7  Mary or between you and Jim or among all of you?
8  A  Between me and Jim.
9  Q  And what did you say to--well, tell me
10 about this conversation.  What was said?
11 A  I read directly off of the police report
12 and wanted Jim Schuh's opinion.
13 Q  I'm not going to ask you to tell me
14 verbatim what was in the police report, but could
15 you give me a sense as to what you read?
16 A  I read a report of an accusation of a
17 woman who stated that a man violated her with a
18 finger for one minute without moving.
19 Q  Okay.  Why was it you read that to Jim
20 Schuh?
21 A  Because I felt that it was improbable and
22 impossible that a woman would be violated for 60
23 seconds and not attempt to remove herself from
24 that situation.

Page 34

1  Q  Did you share your observation in
2  that respect to Mr. Schuh in the presence of
3  Ms. Thallman?
4  A  Yes.
5  Q  What did you say?
6  A  That was exactly what I stated.
7  Q  Okay.  Where did you come upon the police
8  report?
9  A  It's public knowledge.
10 Q  Well, in your job do you deal with police
11 reports?
12 A  No.
13 Q  So where did you get this police report?
14 A  From my brother.
15 Q  Okay.  And I take it that you brought the
16 police report to work?
17 A  That's correct.
18 Q  And brought it in and read it to
19 Mr. Schuh?
20 A  Correct.
21 Q  And said to him words to the effect what
22 you've testified to this morning?
23 A  Correct.
24 Q  Okay.  If you know, how did Mary Thallman

Page 35

1  react to that particular event?
2  A  I don't recall what her actions were.
3  Q  Okay.
4  A  My conversation was with Jim Schuh as I
5  was asking his opinion.
6  Q  We'll come back and talk about that a
7  little more later on.
8     Do you smoke?
9  A  Yes.
10 Q  And did you smoke in 2000?
11 A  Yes.
12 Q  And typically during your workday, did
13 you take smoke breaks?
14 A  Yes.
15 Q  How many times on average each day would
16 you take a smoke break?
17 A  It was set up in our office that in lieu
18 of a 15-minute break that you could have three
19 cigarettes in the morning, three cigarettes in the
20 afternoon.  And due to my job, a break time was
21 not necessarily a set period of time due to the
22 phone conversation that you'd be on.
23 Q  In warm-weather months, did you take
24 three smoke breaks in the morning and three in the

Page 36

1  afternoon?
2  A  It varied.
3  Q  When you took them in warm-weather
4  months, where would you take your smoke breaks?
5  A  Generally outside.
6  Q  Was there a particular location outside?
7  A  I believe in 2000 there was.
8  Q  And where in 2000 was the place outside
9  that people would take smoke breaks?
10 A  Generally in the front of the building.
11 Q  That would be--?
12 A  South side of the building.
13 Q  Looking on to South Grand Avenue?
14 A  Correct.
15 Q  In cold-weather months or when the
16 weather was inclement, where would you take your
17 smoke breaks in 2000?
18 A  They have a first-floor conference room
19 or a first-floor break room, I should correct
20 myself.
21 Q  And where was the, in what portion of the
22 first floor was the break room located?
23 A  On the west side of the first floor.
24 Q  Okay.  I've been in the Bloom Building

3:04-cv-03039-JES-BGC   # 18-15   Page 10 of 20
7/12/05
Mark Scheff
Sullins v. Illinois Department of Public Aid

### Page 37

1  once or twice, but I'm not real familiar with it.
2  It's basically a long rectangular building, is it
3  not?
4     A   Correct.
5     Q   And as you go into the front door, you
6  could go down a hallway to the east or a hallway
7  to the west?
8     A   Yes.
9     Q   And is the hallway to the east kind of
10 sometimes referred to as the east wing?
11    A   I've never heard it called that.
12    Q   Okay. To go to the first-floor smoking
13 room, one would go down the hallway to the west?
14    A   No.
15    Q   No? Where would one go then?
16    A   One would go from the lobby across the
17 hallway to a door opening to the break room.
18    Q   Okay. During the year 2000, other than
19 to take smoking breaks, what other reasons would
20 there be for you to go on to the first floor of
21 the Bloom Building?
22    A   Acquiring documents that have been
23 previously submitted to Illinois Medicaid,
24 retrieval from microfilm.

### Page 38

1     Q   Where would you go to do that?
2     A   Would be going on the west side of the
3  building and down a hallway towards the north
4  section of the building.
5     Q   Okay. How frequently in 2000 would you
6  go to that particular area to retrieve documents
7  or for any other purpose?
8     A   It would vary.
9     Q   Would it be as frequently as daily?
10    A   Possibly.
11    Q   You say possibly?
12    A   Possibly more than once or twice or three
13 times daily.
14    Q   Is it your testimony that at least once
15 each day on average in 2000 that you would go to
16 this area to retrieve documents?
17    A   I couldn't say that, no.
18    Q   What other reasons would you have to go
19 to the first floor during the year 2000?
20    A   I have a number of acquaintances.
21    Q   Are you referring to acquaintances that
22 are on the first floor?
23    A   Correct.
24    Q   And why would you go to see these

### Page 39

1  acquaintances?
2     A   Well, one issue was with Roy Klein in
3  regards to a bolt broke off in a motor of my
4  vehicle, and he is a mechanical nature.
5     Q   So you went to see Mr. Klein about
6  replacing or repairing the bolt?
7     A   Removing the bolt.
8     Q   Removing the bolt, okay.
9  That was one occasion you went to the
10 first floor in 2000.
11    A   Sure.
12    Q   To see Mr. Klein.
13 What other acquaintances did you see on
14 the first floor?
15    A   I know a number of people on the first
16 floor. I can't really tell you.
17    Q   Are these people you would go visit at
18 lunch time or on break time?
19    A   They could be. Not at lunch time, no.
20    Q   So it would be a break time?
21    A   Possibly.
22    Q   Were these people that in order for you
23 to do your job you would have to interact with?
24    A   Other acquaintances?

### Page 40

1     Q   The acquaintances on the first floor you
2  would see.
3     A   Some are, some aren't.
4     Q   Who are the acquaintances on the first
5  floor that you interacted with for work-related
6  reasons in 2000?
7     A   Michael Beal, Chris Antonacci, Donna
8  Antonacci, Loretta I don't know her last name.
9  That's not her last name, by the way, but I just
10 don't know what it is. And a number of other
11 people.
12    Q   These individuals you've identified by
13 name, the four people, where were their
14 workstations located on the first floor?
15    A   Mike's office was as you went through the
16 west double doors and took the first hallway, his
17 office was the second office. He was a supervisor
18 over I believe vouchering and microfilm.
19    Q   Okay.
20    A   Donna and Chris. Chris was a personal
21 friend of mine, and Donna, his wife, both worked
22 in voucher retrieval and microfilm retrieval in
23 regards to pulling of microfilmed claims. Same
24 with Loretta. Same with a number of other people.

Page 41

1  Q  Okay. Prior to October of 2000, as an
2  employee for the Department of Public Aid, had you
3  ever received any training in sexual harassment?
4  A  I believe we did.
5  Q  In 2000 did you have--prior to October of
6  2000, did you have an understanding as to what
7  might constitute sexual harassment?
8  A  I read my employee handbook.
9  Q  Is that a yes?
10 A  Yes.
11 Q  Prior to October of 2000, what was your
12 understanding as to what constituted sexual
13 harassment?
14 A  An individual who would harass an
15 individual in a sexual manner.
16 Q  Did you have an understanding one way or
17 another as to whether verbal comments of a sexual
18 nature could constitute sexual harassment?
19 A  Certainly.
20 Q  Did you have an understanding that as an
21 employee of the Department of Public Aid, verbal
22 comments of a sexual nature were forbidden at
23 work?
24 A  Yes.

Page 42

1  Q  And did you have an understanding that in
2  the event you engaged in verbal comments of an
3  offensive sexual nature while at work, you could
4  be subjected to discipline?
5  A  Correct.
6  Q  Okay.
7  A  I do have to go to the bathroom, if you
8  don't mind.
9  MR. BAKER: Not a bit.
10            (Whereupon a short recess
11            was taken at 10:06 a.m.)
12           (Whereupon a document
13           was duly marked for
14           purposes of
15           identification as
16           Exhibit Number 1 as of
17           this date.)
18 MR. BAKER: Q  Mr. Scheff, I'm going to hand
19 you what has been marked as Exhibit Number 1.
20 Take a moment to read that over, and let me know
21 when you're ready to testify.
22      Can you identify Exhibit 1?
23 A  Yes.
24 Q  Would you?

Page 43

1  A  Yes. It's a notice to cease activity in
2  regards to Mary Thallman.
3  Q  It's a memo you received from Steve
4  Bradley dated October 19, 2000?
5  A  Correct.
6  Q  Do you recall receiving a copy of that
7  document sometime proximate to October 19, 2000?
8  A  Prior to?
9  Q  Well, proximate to October 19, 2000?
10 A  Yeah.
11 Q  Before receiving that document, had any
12 supervisor of yours ever discussed Mary Thallman's
13 claims or concerns with you?
14 A  No.
15 Q  Had you ever been interviewed by any
16 representative of the Department of Public Aid
17 concerning Mary Thallman's concerns prior to
18 receiving Exhibit 1?
19 A  No.
20 Q  Prior to receiving Exhibit Number 1, were
21 you aware that Mary Thallman had some concerns
22 about something you had said or done?
23 A  No.
24 Q  Did you attempt to contact Mary Thallman

Page 44

1  on the evening of October 18, 2000?
2  A  I don't recall that I attempted to
3  contact her. I left a note on her chair in
4  regards to something, but I don't recall what it
5  was about.
6  Q  Okay. What did you do after you received
7  Exhibit 1?
8  A  I ceased all contact with Mary Thallman.
9  Q  Did you talk with Mr. Bradley about it?
10 About the information contained in it?
11 A  I told him that she was not at work, and
12 I had left a message or left a note on her chair
13 to contact me. And I believe it was in regards to
14 moving a, I think it was a treadmill because I had
15 a truck, if I recall correctly. But it was
16 nothing in regards to IDPA.
17 Q  Okay. Prior to receiving Exhibit Number
18 1, were you aware that any of your coemployees had
19 any concerns about your activities in the
20 workplace?
21 A  No.
22 Q  You were not aware that Debbie Sullins
23 ever had any concerns about your activities in the
24 workplace?

Page 45

1   A   No.
2   Q   Prior to receiving Exhibit Number 1, had
3   Marvin Ross, who I believe is your supervisor,
4   ever talked to you about your language or behavior
5   in the workplace?
6   A   No.
7   Q   Prior to receiving Exhibit Number 1, had
8   Lenna DeGroot ever talked with you about your
9   language or behavior in the workplace?
10  A   No.
11  Q   Prior to receiving Exhibit Number 1, had
12  Jodie Edmonds ever spoken with you about your
13  behavior or language in the workplace?
14  A   No.
15  Q   Prior to receiving Exhibit Number 1, had
16  Steve Bradley ever spoken to you about your
17  behavior or language in the workplace?
18  A   No.
19  Q   After receiving Exhibit Number 1, did
20  Steve Bradley ever either speak with you or write
21  to you concerning your behavior or language in the
22  workplace?
23  A   After?
24  Q   Yes.

Page 46

1   A   No.
2   Q   After receiving Exhibit Number 1, did
3   Jodie Edmonds ever speak to you about either your
4   language or behavior in the workplace?
5   A   No.
6   Q   After receiving Exhibit Number 1, did
7   Marvin Ross ever speak to you about your behavior
8   or language in the workplace?
9   A   I need some clarification.  Are we
10  talking about from then until now, or are we
11  talking about 2000?
12  Q   Let's talk about the time period between
13  October 19, 2000 and July 1st, 2001.
14  A   No.
15  Q   And would the same hold true for the
16  other individuals I've asked you--
17  A   Right.
18  Q   Okay.  After receiving Exhibit Number 1,
19  did Lenna DeGroot ever speak to you about your
20  language or behavior in the workplace at least
21  prior to July 1st, 2001?
22  A   No.
23  Q   Okay.  At any time did anyone who was
24  above you in your chain of command prior to July

Page 47

1   1st, 2001 ever speak to you about your
2   interactions or dealings with other employees?
3   A   Yes.
4   Q   And do you recall who that was?
5   A   Mr. Bradley.
6   Q   And when did Mr. Bradley do that?
7   A   I believe it was February of 2001.
8   Q   What did he tell you?
9   A   He told me that I was to not communicate
10  with Sullins or be on the east side of the first
11  floor of the Bloom Building.
12  Q   What was on the east side of the first
13  floor of the Bloom Building?
14  A   Roy Klein, other individuals that I knew,
15  and Sullins' office was transferred to the first
16  floor.
17  Q   Do you know why her office was
18  transferred to the first floor?
19  A   I believe she got a different position.
20      (Whereupon a document
21       was duly marked for
22       purposes of
23       identification as
24       Exhibit Number 2 as of

Page 48

1       this date.)
2   MR. BAKER:  Q   Take a look at Exhibit Number
3   2, and when you're ready to testify, I'm going to
4   ask you to identify that document.
5   A   I've seen this document.
6   Q   Can you identify it for me?
7   A   Yes.
8   Q   Would you?
9   A   It was a complaint brought against me in
10  regards to Mary Thallman and a disciplinary
11  suspension.
12  Q   Early in your deposition you indicated
13  you received a five-calendar-day suspension in
14  February of 2001.  Does Exhibit 2 relate to that
15  suspension?
16  A   Yes, it does.
17  Q   Okay.  In the middle of Exhibit 2 is a
18  paragraph that describes what I believe is the
19  same incident you talked about a few moments ago
20  in the, that occurred in conversation with Jim
21  Schuh concerning a police report.  Am I correct?
22  A   That's correct.
23  Q   Does Exhibit Number 2 in your judgment
24  accurately characterize what occurred in that

### Page 49

1  incident?
2  A   No.
3  Q   And how is it inaccurate?
4  A   First off, my brother was not arrested
5  for rape. And second of all, I never stated that
6  I tend to stroke her. And that it's--. Well,
7  that's it.
8  Q   Okay. Did you appeal or grieve the
9  discipline?
10 A   Yes.
11 Q   You're a union employee?
12 A   Yes.
13 Q   And what was the result of the grievance?
14 A   The grievance was followed through, and
15 the suspension was decreased to a four-day
16 suspension with the union giving me back Sunday,
17 violating the administrative handbook rules of a
18 suspension being reduced and to the benefit of the
19 employee of which Sunday was not a benefit to me
20 as an employee as it was a nonworkday and a
21 nonpayday.
22 Q   Okay. So the suspension got reduced from
23 five days to four days, but the day that was taken
24 off was a nonworkday?

### Page 50

1  A   Was the first day of the suspension.
2  Q   Okay. And I'm assuming that resolution
3  was a product of some agreement between management
4  and your union?
5  A   That's correct.
6        (Whereupon a document
7         was duly marked for
8         purposes of
9         identification as
10        Exhibit Number 3 as of
11        this date.)
12 MR. BAKER: Q  Have you had an opportunity to
13 look at Plaintiff Exhibit Number 2?
14 A   Yes.
15 Q   Have you ever seen it before?
16 A   You mean 3?
17 Q   Excuse me. You're right. It is 3. I
18 apologize.
19       Have you had--have you ever seen Exhibit
20 3 before?
21 A   Yes.
22 Q   What is it?
23 A   This is the grievance filed in regards to
24 the charges brought against me by the department

### Page 51

1  in regards to the Mary Thallman case.
2  Q   If you go to the second and third,
3  second, third, and fourth pages to that document,
4  there is handwriting. Do you see that?
5  A   Yes, I do.
6  Q   Is that your handwriting or someone
7  else's?
8  A   That is Marie Watts' handwriting.
9  Q   And was Marie your union steward or
10 representative?
11 A   Yes, she was. Yes, she was.
12 Q   And is the information that's contained
13 in the handwriting information that was given to
14 Marie by you?
15 A   Yes.
16 Q   Okay. So in some respects, she
17 interviewed you concerning the basis for your
18 grievance and based upon that interview made this
19 handwriting?
20 A   That is correct.
21 Q   Okay. If you go to the second page, and
22 there's a number down in the lower right-hand
23 corner, 000180, am I correct?
24 A   Yes.

### Page 52

1  Q   Okay.
2  A   Page 2?
3  Q   Yes. And I'd like to go to the second
4  paragraph.
5  A   Uh-huh.
6  Q   And there is a phrase, and I'm going to
7  read it into the record. It says: Deb Sullins
8  had been making comments for four to six weeks
9  about Mark, more or less urging people to make
10 complaints against Mark.
11      Do you see where I'm reading?
12 A   Yes, I do.
13 Q   What are the facts upon which you base
14 that allegation?
15 A   That was entered by Marie Watts
16 personally. Not from any comments that I made to
17 Marie Watts.
18 Q   Where did Marie Watts work?
19 A   In BCHS as a medical consultant.
20 Q   Where did she work in relation to where
21 Deb Sullins worked?
22 A   She worked on the first floor.
23 Q   And Deb Sullins worked in the basement?
24 A   Yes.

3:04-cv-03039-JES-BGC  # 18-15  Page 14 of 20
7/12/05
Mark Scheff
Sullins v. Illinois Department of Public Aid

### Page 53

    Q    Did she tell you how she knew that--
    A    I believe that Deb Sullins actually worked on the first floor originally, came from the Sangamon County office and worked in the physician's unit for a while before transferring to the hospital unit in the basement.
    Q    Did Marie ever indicate to you why she believed Deb Sullins was urging people to make complaints against you?
    A    She never brought that to my attention.
    Q    Did you have any information that led you to believe that Deb Sullins was making or urging people to make complaints against you?
    A    Only after the investigation was completed in October of 2000.
    Q    What happened in October of 2000 that led you to believe that?
    A    Michael Sandidge and Jim Schuh after being strong-armed by Laura Whetstone, who was Deb Sullins' partner, filed addendums to their initial depositions by the Office of Inspector General that they were strong-armed by Laura Whetstone, who was an investigator, in regards to the Sullins case. Or in regards--pardon me. Let me correct

### Page 54

it. In regards to the Thallman case.
    Q    Did Mr. Schuh or Mr. Sandidge tell you that they were strong-armed by Laura Whetstone?
    A    Yes.
    Q    What did they tell you she did, and who told you that?
    A    Mr. Schuh filed a complaint against Ms. Whetstone when he was having a cigarette outside and grabbed his arm forcibly and stated that we are not after you.
    Q    Okay. When was that?
    A    I believe it was either October or November of 2000.
    Q    And did Mr. Schuh report to you shortly after that incident occurred?
    A    Yes.
    Q    He just came in and told you what had happened?
    A    Yes.
    Q    And what did Mr. Sandidge tell you?
    A    That he recanted a number of statements that he had made to the Office of Inspector General Investigator Whetstone.
    Q    And he, what statements had he given her

### Page 55

that he recanted?
    A    I was never given a copy of what he had recanted.
    Q    Did he tell you what he had recanted?
    A    No.
    Q    Did he tell you why he recanted it?
    A    Because he had been intimidated into telling falsehoods to Ms. Whetstone.
    Q    Did he tell you what Ms. Whetstone did that had intimidated him?
    A    He did not, no.
    Q    Did someone else?
    A    Mr. Schuh did.
    Q    So Mr. Schuh reported to you what Mr. Sandidge told him?
    A    And what he stated, yes.
    Q    And what did Mr. Schuh tell you that Laura Whetstone had done to Mr. Sandidge?
    A    Mr. Schuh never told me what Ms. Whetstone did to Mr. Sandidge but stated to me as it says later on in this statement that if they didn't, if they did not cooperate fully that they'd lose their jobs, their houses, their families, and they would lose everything.

### Page 56

    Q    That particular paragraph which appears toward the bottom of the second page beginning with the words Laura Whetstone. Was that information that you gave to Marie Watts, or did she know about it from someone else?
    A    I believe she knew about it. I believe she knew about it.
    Q    Do you know where she got that information?
    A    I have no idea.
    Q    If you go down to the bottom of the second page, there's a paragraph that begins, Deb Sullins made several false statements in her testimony.
    A    Uh-huh.
    Q    How was it you knew what her testimony was?
    A    I received copies of the depositions.
    Q    When did you receive them?
    A    At the time of my suspension.
    Q    And what were the false statements you recall Deb Sullins making?
    A    She stated she was working in the office right next to me. She never did.

3:04-cv-03039-JES-BGC    # 18-15    Page 15 of 20
7/12/05                                    Sullins v. Illinois Department of Public Aid
Mark Scheff

**Page 57**

1  Q   What else did she say that was false?
2  A   I had never used the words vagina and
3  penis in regards to anyone promoting in regards to
4  that kind of language in regards to promotions.
5  Q   Anything else she said that you believe
6  is false?
7  A   Most everything Ms. Sullins has said has
8  been completely false.
9  Q   Do you know why she would falsify
10 information relating to your conduct?
11 A   I think, I think Ms. Sullins has a
12 problem in regards to my gender.
13 Q   What do you mean by that?
14 A   I think she hates men or what they stand
15 for.
16 Q   And why do you believe that?
17 A   Because I feel I've been unjustly
18 attacked by Ms. Sullins utilizing her partner in
19 regards to attacking my credibility.
20 Q   Other than your belief that Ms. Sullins
21 hates men, do you know of anything else that might
22 have motivated her to make false statements about
23 you?
24 A   No.

**Page 58**

1  Q   Do you know of any other men that
2  Ms. Sullins has made false statements about?
3  A   No.
4  Q   Do you know of any other men that
5  Ms. Sullins has encouraged female employees to
6  complain about?
7  A   Would you repeat that?
8  Q   Are you aware of any other men that
9  Ms. Sullins encouraged female employees to
10 complain about other than you?
11 THE DEPONENT:  Would you repeat that back,
12 please?
13          (Whereupon the requested
14           portion of the record was read
15           back by the Reporter.)
16 THE DEPONENT:  I don't understand that
17 statement.
18 MR. BAKER: Q  Okay.  If you go back to the
19 second page of the statement and the second
20 paragraph, there is an allegation that Deb Sullins
21 urged people to make complaints against you.
22     Do you see that?
23 A   Yes.
24 Q   Do you know if she urged employees to

**Page 59**

1  make complaints against any other male other than
2  you?
3  A   No.
4  Q   Okay.  And if I understand from your
5  earlier testimony, prior to October 1, 2000, you
6  had no relationship with Ms. Sullins?
7  A   Correct.
8  Q   You had never done anything that you
9  believe would have been, created her, a reason for
10 her to dislike you?
11 A   None at all.
12 Q   As I understand, one of your defenses to
13 the discipline was a belief that in some respect
14 the discipline was being taken because you had
15 participated in a discrimination investigation
16 involving another employee?
17 A   A gender- and age-based discrimination
18 filed by a 64-year-old man, yes.
19 Q   Do you have any reason to believe that
20 Debbie Sullins had any interest or involvement in
21 that particular case?
22 A   Yes.
23 Q   And what involvement do you believe she
24 had?

**Page 60**

1  A   I believe she had involvement in regards
2  to attempting to discredit me and the testimony
3  that I provided.
4  Q   Why would she want to do that?
5  A   I believe she was friends with the bureau
6  chief at that time.
7  Q   And somehow the bureau chief was putting
8  her up to discrediting you?
9  A   Either that or upon herself.
10 Q   Okay.  Prior to October 1, 2000, did you
11 believe that to be the case?
12 A   Prior to October?  Nothing ever happened
13 prior to October.
14 Q   When did you first form the belief that
15 she was attempting to discredit you in connection
16 with that investigation?
17 A   I believe if my testimony, I believe it
18 was October 23rd of 2000 when I read the
19 allegations and statements against me and
20 formulated by Mary Thallman, Deb Sullins, and the
21 11 other coworkers of which a number of them,
22 number of them's statements were slanted as they
23 were interviewed by Laura Whetstone.
24 Q   You use the date October 23, 2000.  What

3:04-cv-03039-JES-BGC  # 18-15  Page 16 of 20
7/12/05
Mark Scheff
Sullins v. Illinois Department of Public Aid

Page 61

1  happened on that day?
2     A    I believe that's the day that I was with
3  internal affairs.
4     Q    And you were provided with copies of the
5  statements at that time?
6     A    Not those, not the entire statements, no,
7  not at that time.
8     Q    You were just told?
9     A    Yes.
10    Q    What they said or given a summary of what
11 they said?
12    A    Correct.
13    Q    So do I understand that it was at that
14 time on October 23, 2000 you were aware that Deb
15 Sullins had given some statement against you?
16    A    That she had led Mary Thallman to Laura
17 Whetstone rather than following the normal chain
18 of command as through the supervisor, as it says
19 in the employee handbook.
20    Q    And how did you know on October 23, 2000
21 that Deb had done that?
22    A    I believe I was told that out at the
23 Office of Inspector General.
24    Q    Okay.  Do you recall who you spoke with

Page 62

1  at the Office of the Inspector General that day?
2     A    I believe it was Terry Tranquilli.
3     Q    And on October 23, 2000, did you give
4  some sort or statement to Mr. Tranquilli?
5     A    Yes.  I believe it was the 23rd.  I'm not
6  positive.  I mean, this is only five years ago,
7  four and a half years ago, but it's pretty close
8  to that.
9     Q    I'm not going to hold you to precise
10 dates, but it was sometime in late October of
11 2000?
12    A    Correct.
13            (Whereupon a document
14             was duly marked for
15             purposes of
16             identification as
17             Exhibit Number 4 as of
18             this date.)
19    MR. BAKER:  Q  Can you identify Exhibit 4 for
20 me, please?
21    A    Yeah.  I think this was a position
22 statement filed with, I believe with the, after my
23 suspension but prior to the conclusion of, I think
24 this was filed with the third-level grievance, if

Page 63

1  I'm not mistaken.
2     Q    Okay.  Did you prepare it?
3     A    I believe I prepared most of it.
4     Q    And if you go to the second page, is that
5  your signature?
6     A    That is my signature.
7     Q    And it looks like you signed it on April
8  30, 2001?
9     A    Correct.
10    Q    So at least at the time you signed it,
11 you had the opportunity to review it to make sure
12 it was accurate?
13    A    Yes.  To the best of my ability.
14    Q    If you go down to the bottom of the first
15 paragraph, I'm going to read this into the record,
16 then ask you about it.
17           She--I believe referring to Mary
18 Thallman--then went to Velva Fletcher who notified
19 her that Deborah Sullins had a friend at OIG and
20 Debbie could get in touch with her.  This occurred
21 and Mary gave a statement around 2 p.m. on
22 10-13-2000.
23           What was the source of information that
24 you relied upon for that particular statement?

Page 64

1     A    I believe I was given that information
2  and I believe Velva Fletcher's statement to OIG.
3     Q    And is that something you became aware of
4  in late October of 2000?
5     A    No.
6     Q    When did you become aware of it?
7     A    I believe at my, when I was given notice
8  that I would be suspended in February of 2001.
9  The day after the department I believe was
10 notified that Ed Maddox' case was to be settled by
11 the department.
12    MR. BAKER:  Can you read his answer back.
13            (Whereupon the requested
14             portion of the record was read
15             back by the Reporter.)
16    MR. BAKER:  Q  Okay.  If you go down to the
17 third paragraph, you make a comment about Laura
18 Whetstone.  How do you know she was Deb Sullins'
19 partner?
20    A    It was common knowledge in the department
21 that Deb Sullins had, her long-time partner, Patty
22 someone, had broken up that fall because Sullins
23 made it known and that she had now taken up with
24 Laura Whetstone.

16 (Pages 61 to 64)

## Page 65

1  Q   Okay. So you knew that sometime--
2  A   Prior to this--
3  Q   (Continuing)--at least by October of
4  2000?
5  A   This is correct.
6  Q   Okay. And that just came from the
7  grapevine in the office?
8  A   Correct.
9  Q   Okay. And you go on to say in the third
10 paragraph that Laura Whetstone should have removed
11 herself from the investigation due to a conflict
12 of interest, knowing Deb Sullins would also be
13 investigated.
14     My understanding is the investigation
15 related to the Mary Thallman complaint?
16 A   Correct.
17 Q   How did you know that Deb Sullins was
18 also going to be investigated?
19 A   She wasn't investigated. She thought was
20 interviewed by Office of Inspector General.
21 Q   Okay.
22 A   And therefore, if she was going to be a
23 part of the investigation process, I felt it would
24 be a conflict of interest that you would have an

## Page 66

1  investigator who interviewed 11 of my coworkers,
2  someone else interviewed Sullins, and me, that
3  Sullins wouldn't have privileged information from
4  the other 11 individuals that Whetstone
5  interviewed.
6  Q   So you think that Laura Whetstone would
7  have told Deb Sullins what these interviews were
8  with the other individuals?
9  A   I have no doubt in my mind.
10 Q   Okay. And why do you have no doubt in
11 your mind that that occurred?
12 A   I'm here.
13 Q   I don't make the connection. I'm sorry.
14 A   I believe that Laura Whetstone and Deb
15 Sullins communicated in regards to the Mary
16 Thallman case.
17 Q   Okay. Do you have any evidence that that
18 occurred?
19 A   I was never at their house.
20 Q   Is that a no?
21 A   I have no evidence.
22 Q   Okay. Would it surprise you to know that
23 I've never spoken with Laura Whetstone about this
24 case?

## Page 67

1  A   I wouldn't care.
2  Q   Would it surprise you to know that?
3  A   Nothing surprises me anymore.
4  Q   Okay. If you go down to the second
5  sentence in the fourth paragraph, you have a
6  phrase that says: The charge of sexual harassment
7  was dropped.
8      What charge are you referring to?
9  A   The charge by Mary Thallman of sexual
10 harassment. You don't have it. It originally
11 began on the investigation by the Office of
12 Inspector General of sexual harassment, conduct
13 unbecoming a state employee, and discourteous
14 treatment to a coworker.
15 Q   Did Mary Thallman claim you had done
16 things other than this incident about the police
17 report?
18 A   Yes. She stated that I did have a
19 conversation with her in the break room. Which
20 never occurred.
21 Q   Okay. Why would--maybe I've already
22 asked you this, but can you think of any reason
23 why Mary Thallman would lie about what you did?
24 A   Yes.

## Page 68

1  Q   Why is that?
2  A   Because Mary Thallman also hates men.
3  And I was Happy's best friend at the time.
4  Q   What is Happy's full name?
5  A   Happy Hanna.
6  Q   Is Happy male or female?
7  A   Happy is male.
8  Q   Okay. And Happy and Mary lived together
9  for a number of years?
10 A   A number of years.
11 Q   And somehow you believe that Mary didn't
12 like men?
13 A   Yes.
14 Q   Other than she complained about you, why
15 do you believe she didn't like men?
16 A   Her comments to a number of people and
17 her comments about Happy. She was forthcoming
18 numerous times.
19 Q   Okay. If you go down to the bottom of
20 the first page, I'm going to read this sentence in
21 the record and then going to ask you about it.
22     It seems as though Deb Sullins was the
23 coach because she knew that to report it to her
24 direct supervisor, Jodie Edmonds, there would be

3:04-cv-03039-JES-BGC   # 18-15   Page 18 of 20
7/12/05
Mark Scheff
Sullins v. Illinois Department of Public Aid

Page 69

1  no validity found and the problem would be
2  resolved at that level.
3         What do you mean that Deb Sullins was the
4  coach? The coach of Mary Thallman?
5     A   Correct.
6     Q   And it's your belief that if Mary
7  Thallman reported this incident within her chain
8  of command in the bureau, nothing would come of
9  it?
10    A   Because there would be no validity found.
11    Q   Why did you think the Office of Inspector
12 General might find validity but your bureau would
13 not?
14    A   Because Sullins' partner was an
15 investigator on the team in regards to the
16 investigation and could contrive anything she
17 wished to.
18    Q   And is it your belief that that's what
19 Laura Whetstone would do?
20    A   Yes, it is.
21    Q   Why do you believe that?
22    A   I've seen it.
23    Q   Have you seen her contrive anything in
24 any investigation that involves anyone other than

Page 70

1  you?
2     A   No.
3     Q   But you think that somehow she contrived
4  your investigation?
5     A   Yes, I do. And I would love to have the
6  recantations of Jim Schuh and Michael Sandidge
7  from Office of Inspector General.
8     Q   Okay. And is it your belief that
9  whatever Laura Whetstone did to skew the
10 investigation, is your information concerning
11 that, does that come from what Jim Schuh told you?
12    A   Yes.
13    Q   Any other source of information other
14 than that?
15    A   No.
16    Q   And if I wanted to know what Laura
17 Whetstone did to intimidate or coerce your
18 coworkers, as you claim at the bottom of page 1,
19 I'm assuming that the individuals I should speak
20 to would be those coworkers?
21    A   I truly agree with that.
22    Q   And that would be Mr. Sandidge and
23 Mr. Schuh?
24    A   And I would probably contact all the

Page 71

1  other people interviewed by Ms. Sullins or
2  Ms. Whetstone.
3     Q   Okay. Other than Debbie Sullins and Mary
4  Thallman, were there other individuals who worked
5  in your work area that had the same job title as
6  you who were females?
7     A   Can you read that back to me?
8     Q   I'll start over.
9         In the fall of 2000, were there
10 individuals at your level in your work unit
11 who were female other than Ms. Thallman and
12 Ms. Sullins?
13    A   Yes.
14    Q   Who were they?
15    A   I believe Judy Stevenson was still there.
16 Velva Fletcher. Pam DuFour. And I'm not sure
17 when some other people moved. Lenna DeGroot.
18 Lenna DeGroot became a supervisor. And PK
19 Luttrell. I believe her name is Patricia.
20    Q   In the fall of 2000, was PK Luttrell away
21 from work on a leave of absence?
22    A   Yes.
23    Q   In the fall of 2000, did you have a good
24 relationship with Velva Fletcher?

Page 72

1     A   I didn't have a problem with Velva
2  Fletcher.
3     Q   Do you have any reason to believe she's
4  not a truthful person?
5     A   I do now.
6     Q   Why is that?
7     A   Some of the statements she made were not
8  factual.
9     Q   Okay. She made statements that you had
10 engaged in verbal comments of a sexual nature in
11 the workplace, am I correct?
12    A   I don't recall whether she did or not.
13 What her fallacy that she stated was the fact that
14 PK Luttrell's husband committed suicide, and I had
15 stated to her that I had seen a show on forensic
16 files of a very similar situation where a wife had
17 had an individual in a bedroom closet and shot
18 their husband.
19        Not implying that that was what had
20 occurred with her but that it was a very similar
21 situation. And she had taken it that that was,
22 she had passed that information on that I had
23 stated that there was a possibility that PK had
24 killed her husband, which was not the intent.

3:04-cv-03039-JES-BGC  # 18-15  Page 19 of 20
7/12/05                                    Sullins v. Illinois Department of Public Aid
Mark Scheff

Page 73

1   Q   Do you think Velva just got it wrong?
2   A   I think Velva just got it wrong. And I
3   mean, I'd love to have been able to play the tape
4   of the--and I've since seen it again of the exact
5   situation.
6   Q   In the fall of 2000, how did you get
7   along with Pam DuFour?
8   A   How did I get along with Pam DuFour? Pam
9   DuFour was an individual I had worked with in the
10  local office and understood that if I wanted the
11  entire office to know anything, I would
12  communicate that point to her and everyone would
13  hear.
14  Q   Do you have any knowledge of information
15  Pam DuFour shared about you during the OIG
16  investigation?
17  A   Yes, I do.
18  Q   And do you believe what she told the
19  investigators was truthful?
20  A   No, I do not.
21  Q   Do you have any reason why Pam would lie
22  about you?
23  A   I think Pam is an easily directed
24  individual to say what anyone wants her to say.

Page 74

1   Q   Do you believe she hates men?
2   A   I don't know. I know she does not like
3   men that have a stronger personality than she. I
4   know her husband is very domineered.
5   Q   Okay.
6       (Whereupon documents
7       were duly marked for
8       purposes of
9       identification as
10      Exhibit Numbers 5 and 6
11      as of this date.)
12  MR. BAKER: Q Have you seen Exhibits 5 and 6?
13  A   Yes, I have.
14  Q   Are they written in your hand?
15  A   Yes, they are. Most of it.
16  Q   Okay. What portion is not written in
17  your hand of each document?
18  A   Name, the individuals' names, the
19  individuals' addresses, the individuals' phone
20  numbers and their titles.
21  Q   Okay. You refer at the top to a federal
22  investigation?
23  A   Yes, sir.
24  Q   Do you know what type of federal

Page 75

1   investigation was being undertaken of you?
2   A   It was a proposed federal investigation.
3   Q   Do you know what federal agency was
4   investigating you?
5   A   No federal investigation was
6   investigating me. It was in regards to a federal
7   investigation for me against the department and
8   other individuals in regards to the treatment
9   received by the department.
10  Q   What agency of the federal government was
11  conducting that investigation?
12  A   None. It was a proposal through
13  communication with my attorney.
14  Q   Okay.
15  A   That we're going to--
16  Q   You don't have to tell me what you and
17  your lawyer talked about.
18  A   Right. We were going to initiate.
19  Q   What agency of the federal government
20  were you going to have conduct an investigation?
21  A   Whatever agency which would have been
22  appropriate with the information that we had
23  available.
24  Q   Okay. And you don't have any idea what

Page 76

1   agency that might be?
2   A   We had not gotten to the point of
3   discussing it.
4   Q   Okay. And I just want your state of
5   mind, not what your lawyer told you. But what did
6   you think was being done to you that warranted a
7   federal investigation?
8   A   I felt that I was being retaliated
9   against and retribution was taken against me due
10  to the fact of cooperation in regards to the
11  Edward Maddox case and that they had utilized not
12  only my coworkers, i.e., Deb Sullins, but the
13  Office of Inspector General, i.e., Laura Whetstone
14  and any other individuals in regards to my human
15  rights.
16  Q   Okay. Have you at any time between
17  October of 2000 up to this very day ever
18  instituted any type of claim or legal proceeding
19  against anyone based upon your position that you
20  had been retaliated?
21  A   No.
22  Q   Okay. If you know--well, with respect to
23  Exhibits 5 and 6, I'm assuming what occurred is
24  you gave these documents to both Jodie Edmonds and

19 (Pages 73 to 76)

3:04-cv-03039-JES-BGC   # 18-15   Page 20 of 20
7/12/05
Mark Scheff
Sullins v. Illinois Department of Public Aid

## Page 77

1  Lenna DeGroot and they filled them out?
2    A    Correct.
3    Q    And that was to provide some sort of
4  reference so that your lawyer could contact them
5  and talk with them?
6    A    Correct.
7    Q    If you know, did your lawyer ever speak
8  with them?
9    A    I don't know.
10   Q    Okay. Did you ever tell any of your
11 coworkers that you had carved a tree or a brush in
12 the shape of a penis?
13   A    Yes.
14   Q    Who did you tell that to?
15   A    I believe that was told to Jim Schuh and
16 that the neighbor was disturbed of the fact that I
17 had cut this tree off, and my neighbor was
18 dis--was disgusted because I hadn't cut it all the
19 way to the ground yet.
20   Q    Did you ever tape a screw to either the
21 door or wall of your office?
22   A    Yes, I did.
23   Q    When did you do that?
24   A    Sometime in 2001.

## Page 78

1    Q    And was there any symbolism associated
2  with doing that?
3    A    Of course.
4    Q    What was the message you were attempting
5  to convey?
6    A    This is what happens when you cooperate.
7    Q    Cooperate with whom?
8    A    Department of Human Rights.
9    Q    You're talking about the Maddox
10 investigation now?
11   A    Correct.
12   Q    Okay. Did you ever either write or use
13 the term alpha dog or beta dog in the workplace in
14 either late 2000 or sometime in 2001?
15   A    Certainly.
16   Q    And what was the significance of your use
17 of those terms?
18   A    After I returned from my suspension, a
19 number of the other male coworkers had taken
20 military jargon terms for letters and went by
21 those names, posted those names on the wall. And
22 since alpha dog had not been taken, I chose alpha
23 dog.
24   Q    Who was beta dog?

## Page 79

1    A    I believe that Kevin Mayer wrote up and
2  hung beta dog on Jim Schuh's wall.
3    Q    Okay. Other than Jim Schuh being beta
4  dog and you being alpha dog, what other employees
5  adopted these military names?
6    A    Sandidge, Roberts.
7    Q    What was Sandidge?
8    A    I don't recall.
9    Q    Do you remember what Roberts was?
10   A    I'm not certain. One was Zulu, and I
11 don't remember what the other one was.
12   Q    Did--
13   A    It wasn't really significant to me so it
14 didn't matter.
15   Q    Did all of this come up through some sort
16 of group discussion you had with those fellows?
17   A    It occurred while I was off work.
18   Q    When you were off work?
19   A    Yes. Yeah. That had all occurred while
20 I was on suspension.
21   Q    Sometime in early 2001?
22   A    Yeah.
22   MR. BAKER:  Okay.  I have no further
questions. Thank you very much.
23   MS. ALFERINK:  We don't have any questions.
I've spoken to my client about waiving signature,
24 and he's prepared to waive signature today.
     (Further deponent saith not.)

## Page 80

1  STATE OF ILLINOIS )
                    ) SS
2  COUNTY OF SANGAMON )
3        C E R T I F I C A T E
4    I, Rhonda K. O'Neal, a Notary Public,
5  Certified Shorthand Reporter, and Registered
6  Professional Reporter, in and for said County and
7  State do hereby certify that the Deponent herein,
8  MARK T. SCHEFF, prior to the taking of the
9  foregoing deposition, and on the 12th of July
10 A.D., 2005, was by me duly sworn to testify to the
11 truth, the whole truth and nothing but the truth
12 in the cause aforesaid; that the said deposition
13 was on that date taken down in shorthand by me and
14 afterwards transcribed, and that the attached
15 transcript contains a true and accurate
16 translation of my shorthand notes referred to.
17     Given under my hand and seal this 26th day
18 of July A.D., 2005.
19         Rhonda K. O'Neal
20         Notary Public and
           Certified Shorthand Reporter
21         and Registered Professional Reporter
22
23 License No. 084-004158
24

OFFICIAL SEAL
RHONDA K. O'NEAL
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 9-13-2008