3:04-cv-03039-JES-BGC    # 18-16    Page 1 of 30

8/26/05
Laura R. Whetstone

Sullins v. Illinois Department of Public Aid

E-FILED
Tuesday, 20 December, 2005 10:08:27 AM
Clerk, U.S. District Court, ILCD

## Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE CENTRAL DISTRICT OF ILLINOIS
 3                      SPRINGFIELD DIVISION
 4
    DEBORAH R. SULLINS,
 5
                Plaintiff,
 6
        vs.                          No. 04-3039
 7
    THE ILLINOIS DEPARTMENT OF
 8  PUBLIC AID,
 9              Defendant.
10
11          THE DEPOSITION of LAURA R. WHETSTONE,
12  taken in the above-entitled case before Tricia L.
13  Gudgel, a Notary Public of Menard County, acting
14  within and for the County of Sangamon, State of
15  Illinois, at 9:55 o'clock A.M., on August 26, 2005,
16  at 415 South Seventh Street, Springfield, Sangamon
17  County, Illinois, pursuant to notice.
18
19
20
21
22
            Baldwin Reporting & Legal-Visual Services
23            Serving Illinois, Indiana & Missouri
          24hrs (217)788-2835   Fax (217)788-2838
24                  1-800-248-2835
```

## Page 2

```
 1  APPEARANCES:
 2      BAKER, BAKER & KRAJEWSKI, LLC
        BY:  James P. Baker, Esq.
 3           415 South Seventh Street
             Springfield, Illinois 62701
 4           On behalf of Plaintiff.
 5      MS. SARAH KERLEY
             Office of the Attorney General
 6           500 South Second Street
             Springfield, Illinois 62701
 7           On behalf of Defendant.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

ORIGINAL

## Page 3

```
 1                    I N D E X
 2  DEPONENT                          PAGE NUMBER
 3  Laura R. Whetstone
 4      Examination by Mr. Baker          5
        Examination by Ms. Kerley       151
 5
 6
 7
 8
 9
10
11                  E X H I B I T S
12  NUMBER                  MARKED FOR IDENTIFICATION
13  Exhibit 29                      24
    Exhibit 30                      29
14  Exhibit 31                      36
    Exhibit 32                      41
15  Exhibits 33, 34, 34A, 35, 35A   45
    Exhibit 36                      54
16  Exhibits 37, 37A                68
    Exhibit 38                      72
17  Exhibit 39                      74
    Exhibit 40                      77
18  Exhibit 41                      89
    Exhibit 42                      95
19  Exhibit 43                     100
    Exhibit 44          :          111
20  Exhibit 45                     124
    Exhibit 46                     126
21  Exhibit 47                     129
    Exhibit 48                     131
22  Exhibit 49                     132
    Exhibit 50                     133
23
24
```

## Page 4

```
 1              S T I P U L A T I O N
 2          It is stipulated and agreed, by and
    between the parties hereto, through their
 3  attorneys, that the deposition of LAURA R.
    WHETSTONE may be taken before Tricia L. Gudgel, a
 4  Notary Public and Certified Shorthand Reporter upon
    oral interrogatories, on the 26th of August A.D.,
 5  2005, at the instance of the Plaintiff at the hour
    of 9:55 o'clock A.M., 415 South Seventh Street,
 6  Springfield, Sangamon County, Illinois;
 7          That the oral interrogatories and the
    answers of the witness may be taken down in
 8  shorthand by the Reporter and afterwards
    transcribed;
 9
            That all requirements of the Federal
10  Rules of Civil Procedure and the Rules of the
    Supreme Court as to dedimus, are expressly waived;
11
            That any objections as to competency,
12  materiality or relevancy are hereby reserved, but
    any objection as to the form of question is waived
13  unless specifically noted;
14          That the deposition, or any parts thereof
    may be used for any purpose for which depositions
15  are competent, by any of the parties hereto,
    without foundation proof;
16
            That any party hereto may be furnished
17  copies of the deposition at his or her own expense.
18
19
20
21
22
23
24
```

Page 5

```
 1                   (Whereupon the Witness was
 2              sworn by the Notary Public.)
 3           L A U R A  R.  W H E T S T O N E
 4    having been first duly sworn by the Notary Public,
 5    deposeth and saith as follows:
 6                   EXAMINATION
 7              BY MR. BAKER:
 8    Q    May I call you Laura?
 9    A    Yes.
10    Q    Laura, will you state your name and
11    address, please.
12    A    Laura R. Whetstone:  W-H-E-T-S-T-O-N-E;
13    3450 Woodhaven Drive, Springfield.
14    Q    Have you ever given a deposition before?
15    A    Yes.
16    Q    So you have some idea what the process
17    is?
18    A    Yes.
19    Q    Where are you employed?
20    A    I'm employed with Health Care and Family
21    Services, formerly the Department of Public Aid.
22    Q    And let's just call it Public Aid, if we
23    can.
24    A    Thank you.  Thank you.
```

Page 6

```
 1    Q    That's one thing we can all agree on.
 2    A    I feel better already.  Public Aid.  You
 3    won't have to remember the name.
 4    Q    How long have you worked at Public Aid?
 5    A    12 years, maybe 11, 12 years.
 6    Q    What is your job at Public Aid presently?
 7    A    I'm an internal security investigator
 8    two, and I work for the Bureau of Internal Affairs.
 9    Q    How long have you worked in that bureau?
10    A    Since Public Aid employment, 11 or 12
11    years.
12    Q    For the record, prior to this morning,
13    have we met?
14    A    We met once at the Human Rights, I guess
15    it was a hearing, and I was introduced to you at
16    the corner by the Stratton Building, that's it.
17    That's the first time I had met you.
18    Q    Okay.  What have you done to prepare for
19    this deposition?
20    A    Prayed.
21    Q    Good move.
22    A    And I've reviewed.
23    Q    Other than that, what have you done?
24    A    I've reviewed my notes, case file that I
```

Page 7

```
 1    have.
 2    Q    My understanding was that you were
 3    involved in an investigation relating to a woman
 4    named Mary Thallman?
 5    A    That's correct.
 6    Q    Have you reviewed the case file of that
 7    investigation?
 8    A    Can you define "case file"?
 9    Q    Well, I'm assuming that when an
10    investigator conducts an investigation based upon a
11    complaint, during the course of the investigation,
12    there is paperwork which accumulates:  Witness
13    statements, summaries of interviews, memos back and
14    forth concerning various findings or
15    recommendations, that sort of thing; and all of
16    that material is deposited in some sublocation, and
17    I will call that material the case file.
18    A    The original case file.
19    Q    Okay, the original case file.
20    A    No, I've not had an opportunity to review
21    that.
22    Q    Have you made any request to do that?
23    A    Yes.
24    Q    And who did you make that request with?
```

Page 8

```
 1    A    My bureau chief, Derrick Moscardelli.
 2    Q    And are you not allowed to?  What
 3    happened?
 4    A    I made the request on Monday of this week
 5    to review the case file, to get the case file.  I
 6    went to the master file, it was not there.  He had
 7    checked it out January 5 -- or January of '05, so
 8    that means it was housed in his -- he's had it in
 9    his possession, and he's had it since that time.
10    I asked him if I could review the file to
11    prepare for depositions, which I think were going
12    to be on Wednesday.
13    MS. KERLEY:  Yes.
14    THE DEPONENT:  To review my participation
15    which would have consisted of the interview sheets.
16    MR. BAKER:  Q  Did you look at them then?
17    A    No.  I've not seen them.  I have my own
18    copies which I prepared prior to the case being
19    transferred.
20    Q    If you know, is there anything active
21    going on with that particular case?
22    A    No, other than this -- these proceedings
23    here.
24    Q    Do you know any reason why the case file
```

2 (Pages 5 to 8)

## Page 9

1    was checked out to your boss?
2        A    No, I don't.
3        MR. BAKER:  Off the record.
4            (Discussion off the record.)
5        MR. BAKER:  Q  Laura, I will represent to you
6    that Ms. Kerley, earlier this week, provided to me
7    some documents which I believe you gave her, --
8        A    Yes.
9        Q    (Continuing)--and I've had an opportunity
10   to look through those documents.  Have you had an
11   opportunity to look through those documents, as
12   well, to prepare you for your deposition?
13       A    Yes, those are the ones I've looked at.
14       Q    In anticipation of your deposition, have
15   you spoken with anyone?
16       A    Ms. Kerley, my mother to tell her to pray
17   on Wednesday, and now it got pushed back to Friday,
18   so you got a lot of prayer wars going about an hour
19   ago.
20       Q    Okay.  Very good.
21            Is Ms. Kerley your lawyer?
22       A    She represents me, yes.  She produced me.
23       Q    Well, tell me what the lawyer/client
24   relationship is.

## Page 10

1        A    I was prepped Monday, you know, to say
2    that I've been called to be deposed.  I think Sue
3    or Susan Moorhead was there, as well.
4        Q    So Ms. Kerley has prepared you for your
5    deposition?
6        A    (Nodding head up and down.)
7        Q    You understand you're not a defendant in
8    this lawsuit?
9        A    Correct.
10       Q    And would your relationship with
11   Ms. Kerley have been limited to her preparing you
12   for your deposition?
13       A    Yes.
14       Q    And you understand she is going to be
15   assisting you in your deposition today?
16       A    Yes.
17       Q    When did you meet with Ms. Kerley?
18       A    Monday.  This Monday.
19       Q    And there was someone else present?
20       A    Sue Moore -- Sue Moorhead?
21       MS. KERLEY:  Yes, Sue Moorhead.
22       MR. BAKER:  Q  And who is Sue Moorhead?
23       A    I never meet her, I just saw her ID.  I
24   assume she's with general counsel.

## Page 11

1        Q    How long did you meet with them?
2        A    11:05 to maybe 12:50, 1:00 o'clock.
3        Q    Spoken like a true investigator.
4            Can you tell me what information was
5    exchanged during that interview?
6        A    What my role -- you know, what did I
7    prepare as far as the interview sheets; we talked
8    about my removal or recusal or transfer from the
9    case; talked about my relationship with
10   Debbie Sullins; tried to get some time frames down,
11   which I polished-up on.
12       MS. KERLEY:  Excellent.
13       MR. BAKER:  Got to have those time frames
14   right down.
15       THE DEPONENT:  Yeah.
16            I think that was just basically about it.
17       MR. BAKER:  Q  Have you done anything else
18   other than what we've talked about to prepare you
19   for your deposition?
20       A    No.
21       Q    I'd like to get some background
22   information from you, if I could.
23            What is the extent of your education
24   following high school?

## Page 12

1        A    I have an Associate's Degree in
2    Administration of Justice.
3        Q    And where did you get the associate's
4    degree?
5        A    Belleville Area College.
6        Q    Did you get your associate's degree right
7    after high school?
8        A    Kind of sort of.  I was one class away
9    from graduating and then I went to work.  So
10   from '84 to '90, I piddled around and worked, and
11   then I just took my class, and that was it.
12       Q    When you almost --
13       A    Yes, almost.
14       Q    (Continuing)--got your degree, when you
15   almost got your degree, what did you do after that?
16       A    I -- during and after my degree, I worked
17   at the St. Louis University in the campus police
18   department.  From there --
19       Q    Okay.
20       A    (Continuing)--I went to the Department of
21   Corrections as a parole agent in '92 to my current
22   position.
23       Q    So your professional background would be
24   in the general field of law enforcement, criminal

3 (Pages 9 to 12)

## Page 13

1  justice; is that correct?
2      A    Yes.
3      Q    While you have worked for the Department
4  of Public Aid as an investigator, had your duties
5  always generally been the same?
6      A    Yes.
7      Q    Can you describe for me what you do as an
8  investigator.
9      A    We investigate allegations of employee
10  misconduct; we review and research allegations that
11  come in; we collect evidence, material, documents,
12  that either supports or denies an allegation,
13  present those in a comprehensive written report; be
14  called to testify if need be in civil service
15  hearings, juries, whatever.
16      Q    So the subject matter of your
17  investigations, as I understand it, would be --
18  would deal with allegations of misconduct by
19  Department of Public Aid employees?
20      A    Not -- or to include vendors, perhaps
21  clients at that time, funeral homes, ambulances.
22      Q    Have you had any experience --
23          Or prior to October of 2000, did you have
24  any experience in your job with the department in

## Page 14

1  investigating allegations of sexual harassment made
2  against department employees?
3      A    Yes.
4      Q    And can you give me generally an idea of
5  how frequently you would be involved in those
6  investigations?
7      A    It would vary depending upon when an
8  allegation was received, that subject matter.  I've
9  probably done 20 or 25, that could be a little high
10  as far as allegations stemming from investigations.
11      Q    With the process of conducting a sexual
12  harassment investigation in terms of what you do
13  and the procedure you would follow from the
14  beginning of the investigation to the end, was that
15  generally the same as any investigation you would
16  do of a department employee?
17      A    Yeah, I would say so.
18      Q    During the time period you've worked for
19  the department, has there been any change in terms
20  of procedure with respect to the manner in which an
21  investigation is conducted?
22      A    Any investigation or specifically sexual
23  harassment?
24      Q    Well, I'm talking about any investigation

## Page 15

1  of employee misconduct.
2      A    No.
3      Q    What I would like for you to do then is
4  to kind of take me through the process of
5  conducting an investigation into alleged employee
6  misconduct from the time you first become aware of
7  the incident up until the case is closed.
8      A    Once an allegation comes in, it's
9  reviewed by the bureau chief, and he determines
10  whether or not it speci... -- hits a certain
11  criteria, it meets all the criteria standards.  He
12  will assign it out to whomever.
13          Along with that information, the
14  allegation, it would include who would have been
15  named in the allegation, if people know the names
16  or work locations.  Any type of supporting
17  documents that bureau chief's been given when we
18  receive a complaint, that's all given back to us.
19  And basically just proceed with your interviews
20  that are necessary.
21          Oftentimes, you know, the bureau chief,
22  or assistant bureau chief at that time, or the
23  acting bureau chief now will, you know, say, hey,
24  you might want to interview so and so, or take a

## Page 16

1  look at look at this avenue.  It's like a think
2  tank.  The more people involved, the better it is
3  to get a better view of who to interview.
4          Set up interviews; interview individuals
5  named; prepare written -- or prepare interview
6  sheet based upon a written statement that's come
7  from the interview; again, gather any other type of
8  documentation that would support or refute, and
9  prepare that in the report of investigation which
10  is turned into the assistant bureau chief for
11  review and/or currently the acting bureau chief --
12  acting assistant bureau chief, and it's gone to the
13  bureau chief for his review.
14      Q    What does the report of investigation
15  entail?
16      A    The report of investigation consists of
17  the allegation; the case summary; however many
18  interviews you conduct or whatever evidence or
19  documents you secure; conclusion; what the
20  investigation revealed; and the attachments, which
21  is all documents that we gather which is
22  documented, and that is put together in a report
23  and passed forward.
24      Q    Who does the report go to after it leaves

```
                                            Page 17
1   your bureau chief?
2       A    Depending upon -- depending upon -- can
3   you read the question? Can I have the question
4   read back to me again?
5       Q    Sure.
6            What I was just getting at is once the
7   report is reviewed and signed-off on by your bureau
8   chief, who in the department gets a copy of it?
9       A    If the alleg... -- I believe if the
10  allegation substantiated, there's a host of folks
11  that are given copies of either the report of
12  investigation or the report of investigation and
13  the documents and the attachments; perhaps, general
14  counsel, labor relations, the particular division
15  that is affected by the report.
16           And even if the allegation wasn't
17  substantiated, there would still be notification
18  throughout the department. Those particular heads
19  of the allegations been looked at or investigations
20  been completed and nothing further is needed or you
21  might want to do this if it didn't warrant the
22  discipline.
23       Q    With the employee who is the subject of
24  the investigation, the alleged perpetrator, would
```

```
                                            Page 18
1   that employee get a copy of the report?
2       A    He would get -- he or she would get
3   copies, my understanding is the information that
4   supports the allegations that came in, and that
5   would be up to labor relations to determine what is
6   given to the subject.
7       Q    And would the subject get that -- could
8   the subject get that information during the course
9   of the investigation or would it be withheld until
10  the investigation is concluded?
11      A    It would be concluded regardless of merit
12  comp. or bargaining unit. I believe that
13  information once discipline has been -- once a
14  collective bargaining unit employee has been told
15  there's a pre-D or pre-disciplinary meeting or
16  hearing, it would be after that or at that time as
17  far as what -- this is what we have, blah, blah,
18  blah, blah.
19      Q    Let me put a hypothetical to you, let's
20  assume that I have a client that has gotten into
21  some trouble down at the department and is the
22  subject of an investigation, and you're in the
23  process of interviewing witnesses and conducting
24  the investigation, if I contacted you as that
```

```
                                            Page 19
1   individual's lawyer, could I get a copy of the
2   witness statements and materials you had collected
3   during the investigation?
4       A    Not from me. I would -- if you were a
5   bargaining unit employee or a merit comp., I would
6   refer you to labor relations. I would notify my
7   supervisors of, hey, I've got an inquiry on this
8   stuff. I will pass it up. I will normally tell
9   whomever, if they are with the union, you need to
10  go -- your union steward needs to ask for that, and
11  they know where to go, they need to go to labor
12  relations.
13      Q    So labor relations would be the
14  appropriate entity to decide whether it would go
15  out or not go out?
16      A    Yes. We don't have any play in that.
17      Q    Now, if, during the course of an
18  investigation, when you take the statement of a
19  witness, does that statement go to labor relations
20  before the final report is prepared?
21      A    There are times where either a written
22  statement or an interview sheet or a combination of
23  both will be requested by labor relations, or the
24  bureau chief might want to say, hey, let's get this
```

```
                                            Page 20
1   completed, let's get labor's view on it, see what
2   they think. So it's -- it happens, it's not often,
3   but it does happen.
4       Q    What about the supervisor of the
5   individual who's the subject of the investigation,
6   would that supervisor be able to get copies of
7   statements or findings concerning the investigation
8   while the investigation is in progress?
9       A    No.
10      Q    Do you know an individual named
11  Raven Knighten?
12      A    Yes.
13      Q    And for the record, her name -- last name
14  is spelled: K-N-I-G-H-T-E-N; is that correct?
15      A    Correct.
16      Q    Who is Ms. Knighten or who was she back
17  in 2000?
18      A    She was then and still is the bureau
19  chief of the EEO for the department.
20      Q    When you were involved in investigations
21  of sexual harassment, would Ms. Knighten become
22  involved, in any respect, in those investigations?
23      A    Yes.
24      Q    And can you explain to me what role she
```

5 (Pages 17 to 20)

## Page 21

1   would play?

2       A    I -- I would talk with her or E-mail her

3   information on a particular allegation that I have

4   to get some guidance from her from the EEO

5   standpoint.  She could be called on, you know, if a

6   case is completed, to make sure everything is up to

7   their standards as far as, you know, it's substantiated

8   or, no, it's not substantiated.  I oftentimes

9   talked with her about cases.

10      Q    During the course of a sexual harassment

11  investigation, would you ever speak to anyone in

12  labor relations concerning any aspect of the

13  investigation?

14      A    Sure.  I could get guidance from them, as

15  well.

16      Q    And as a general matter, when and under

17  what circumstances would you be attempting to get

18  guidance from them?

19      A    That would be at my inquiry.  I mean if I

20  had a question that I had about an allegation or

21  material I received, is this enough, do I need to

22  ask additional questions, if so, what would you

23  suggest.

24      Q    When an investigation into sexual

## Page 22

1   harassment is concluded by you, and you submit your

2   report, I'm assuming that you had situations where

3   your report has said the claim was unfounded, I

4   found no evidence of sexual harassment or sexually

5   offensive misconduct, and there are other

6   situations where you have found evidence of

7   sexually offensive misconduct; am I correct in that

8   respect?

9       A    Yes.

10      Q    If you know did, back in 2000 and before

11  and after, for that matter, did the department have

12  any policy with respect to when and under what

13  circumstances it would discipline employees who

14  were believed to be guilty of some form of sexually

15  inappropriately conduct?

16      A    It would depend on the findings of the

17  investigation.  And again, it would be up to labor

18  to determine what the issues are, what the

19  discipline could be, should be, shouldn't be,

20  whatever.

21      Q    When discipline is assessed against an

22  employee that you have investigated, do you become

23  aware of the nature of the discipline that's taken?

24      A    Sometimes.

## Page 23

1       Q    You say "sometimes," that suggests that

2   sometimes you don't.

3            When and under what --

4            What type of circumstances would you find

5   out?

6       A    Normally we are notified as far as a

7   closure memo, we would get what's called a closure

8   memo, which is shipped to whatever entities are

9   addressed, general counsel, labor relations, the

10  division.  It's up to the division to report back

11  to us what type of discipline is imposed or, you

12  know -- I would say, for the most part, we are

13  notified.  It will get back to us that we're

14  notified that something's been -- someone's been

15  disciplined and what that is, but sometimes we're

16  not.

17           You know it's -- it doesn't do anything

18  for an investigator to really know except in times

19  of discharge or suspensions if something's going to

20  be grieved, you automatically -- I retract, I

21  assume everything's going to be grieved, so I have

22  notes in case of --

23      Q    Keeps guys like me busy, right?

24      A    Yes.

## Page 24

1       Q    And Ms. Kerley, too, of course.

2       A    Yes.

3       Q    You referred to the term "division," and

4   do you mean by that term, the operating unit where

5   the employee who is the subject of discipline

6   works?

7       A    Yes.

8       Q    If you know, would the discipline, the

9   nature and extent of the discipline against an

10  employee who investigation revealed had engaged in

11  sexual misconduct, would the discipline be made by

12  the chief of that division, or by labor relations,

13  or by someone else, or by a combination?

14      A    My understanding it's a combination

15  between labor relations and the division, that's

16  the way it's supposed to be.

17      Q    Okay.  Very good.

18           Let me for a moment --

19               (Whereupon said document was

20               duly marked for purposes of

21               identification as Exhibit 29

22               as of this date.)

23      Q    I'm going to hand you Exhibit 29.  And

24  before you get too far into, I'll certainly give

Page 25

1   you ample opportunity to review it before I ask you
2   any substantive questions about the document.  I'm
3   handing you this just by way of example for a
4   moment.  If you look through that document, you
5   will find that the first three pages are typed on a
6   form that's headed:  Office of Inspector General
7   Interview Sheet.
8          And then the next series of pages appear
9   to be basically handwritten and are headed:
10  Illinois Department of Public Aid Written
11  Statement; do you see that?
12     A    Yes.
13     Q    I want to ask you questions generally
14  about these types of documents.  The document
15  that's headed:  Written Statement; might I
16  correctly assume that that's a document that is
17  written out by the individual who is being
18  interviewed?
19     A    Correct.
20     Q    And is that typically done in the
21  presence of the investigator?
22     A    Typically.
23     Q    Prior to the statement being prepared,
24  would an investigator or would you interview the

Page 26

1   witness?
2      A    Yes.
3      Q    And would you ask the witness a series of
4   questions which are germane to the subject of the
5   investigation?
6      A    Yes.
7      Q    After you completed that interview, would
8   you give the witness any instructions about what
9   type of information should go into the statement?
10     A    Information that was talked about in the
11  interview, we would address the allegations, we
12  would ask for as much detail as possible that they
13  provide us.  Ask them if there's anything else they
14  need to put in their written statement because it
15  was their written statement, and they can put
16  anything in there that they want that is associated
17  with the allegation, anything that they think is
18  pertinent that the investigators overlooked.
19     Q    So when they prepare the written
20  statement, they have some idea of what the
21  allegations are?
22     A    Yes.
23     Q    And they have already provided you that
24  information?

Page 27

1      A    Verbally, yes.
2      Q    Do you dictate them what should go into
3   the statement?
4      A    No.
5      Q    After they give the statement, do they
6   have an opportunity to review it?
7      A    I'm sorry?
8      Q    After they fill out the written
9   statement, do they have an opportunity to review
10  the statement?
11     A    Yes, they have an opportunity to review
12  it.  During the review, we would go through, if
13  they would have anything scratched out, or if they
14  had to mark over something, they would be allowed
15  to initial that, it shows that they made the
16  correction; it protects them, the investigator, and
17  then sign off in the appropriate areas.
18     Q    Let's go back then to the first three
19  pages which is entitled:  Interview Sheet; that
20  looks like it's typed, and I'm assuming, and if I
21  have it wrong, tell me I have it wrong, that those
22  typed sheets are something which is either dictated
23  or Word processed by the investigator?
24     A    Correct.

Page 28

1      Q    And the information that is contained on
2   the interview sheet, does that come from the
3   written statement or the oral interview that
4   precedes the statement or a combination of both?
5      A    It should be from the individual's
6   written statement.  There are times where I have,
7   in the past, added something verbally, so and so
8   said, if it's pertinent to either explaining what
9   the subject was trying to explain to us, maybe they
10  were having problems doing that.
11     Q    Well, the individual who apparently was
12  the subject of this interview, the person
13  interviewed, that is, was Mary Thallman; am I
14  correct?
15     A    Correct.
16     Q    Prior to October of 2000, were you
17  personally acquainted with Ms. Thallman?
18     A    No.
19     Q    In October of 2000, did you have any
20  contact with Ms. Thallman?
21     A    Yes.
22     Q    And can you tell me when and under what
23  circumstances you first had contact with her.
24     A    It was a Friday, I would like to say it

## Page 29

1  was the 13th of October, around 9:38 or 9:48.
2      Q    What happened?
3      A    And Debbie Sullins had told me that Mary
4  Thallman needed to speak with me.
5      Q    How did Debbie tell you that?
6      A    She told me verbally, one-on-one.
7      Q    Was that by telephone?
8      A    No, I was in her presence.
9      Q    And where did that conversation take
10 place?
11     A    That happened in her office on the -- in
12 the basement at the Bloom Building, I was there on
13 a break.  I had been at the building on another
14 matter, on another investigation, and had come down
15 for a break.  And Debbie told me that Mary Thallman
16 needed to talk with me and she gave me the phone
17 number.  And then I contacted Mary Thallman.
18                    (Whereupon said document was
19                     duly marked for purposes of
20                     identification as Exhibit 30
21                     as of this date.)
22     Q    Laura, I'm going to hand you what's been
23 marked as Exhibit 30.  And if you would, can you
24 identify that document for me.

## Page 30

1      A    That is my personal, I call it case log
2  or -- yeah, it's a case log.
3      Q    When you were involved in a case, do you
4  maintain some sort of log of activity?
5      A    Yes.
6      Q    And is that something all investigators
7  do or is that just your practice?
8      A    I can only attest to what I do, so.
9      Q    Tell me what your practice was back in
10 2000 in terms of the types of information you would
11 place in a case log.
12     A    Hopefully every contact or discussion
13 that was pertinent to the case to show the life of
14 the case and my actions involved in the case.
15     Q    I'm going to ask you some questions this
16 morning about that document, and what I'm going to
17 do is kind of go through it in connection with
18 another document because I think it has a pretty
19 good chronology.  If you need a moment to review
20 it, we can take that time now for you to do that.
21     A    Okay.
22     Q    Let's go off the record.
23                    (Whereupon a short recess
24                     was taken.)

## Page 31

1      MR. BAKER:  Q  Have you had an opportunity to
2  look --
3      A    Yes.
4      Q    Okay.  Good.
5           Is Exhibit 30 your log for work you did
6  on a case involving Mary Thallman?
7      A    Yes.
8      Q    And if we go down through that document,
9  the first entry appears to be October 13 at 8:46
10 a.m.
11     A    Yes.
12     Q    Was that your initial contact with Mary?
13     A    Yes.
14     Q    And did she call you or did you call her?
15     A    I called her.
16     Q    Tell me about that conversation.
17     A    With Mary?
18     Q    Yes.
19     A    I probably told her that I had got her
20 name and number, you know, I got her message
21 through Debbie, and I was just told to call, and
22 she -- then she made a couple comments about she
23 needed to talk to someone about something that had
24 been going on in the office regarding another

## Page 32

1  employee who I thought was the last name of "Shut"
2  but it wasn't Shut.
3           I told her to write up information about
4  what her complaints were, and that I would meet
5  with her later on to talk with her, and I think I
6  probably told her that afternoon.
7      Q    Had Debbie Sullin identified to you what
8  Mary's concerns were when you spoke with her?
9      A    No.
10     Q    The next --
11     A    I did ask her if she knew, and she said
12 she knew.  I didn't ask any more.
13     Q    When you say "she," you're referring to
14 Debbie?
15     A    "She," Debbie, yes.
16     Q    By the way -- and I'm going to ask you
17 more questions about this in a little while.  On
18 October 13, 2000, could you describe for me your
19 relationship with Debbie Sullins.
20     A    My relationship with Debbie Sullins in
21 October was we were involved in a relationship
22 which started in -- which was firm in September.  I
23 mean, remember how I said July or August, I'm
24 sorry, I couldn't remember.

Baldwin Court Reporting & Legal Video Services
1-800-248-2835

## Page 33

1      MS. KERLEY:  Off the record for a second.
2                  (Discussion off the record.)
3      MR. BAKER:  Q  You had a relationship with her
4  of an ongoing nature that had been in existence for
5  at least some period of time prior to October 13?
6      A    We had become acquainted through church,
7  and she was -- she was the pastor of a church, and
8  so that's how I become -- came to know her.
9      Q    Let's then go to the next entry which
10  appears to be the same day at 9:00 a.m.
11      A    9:00 a.m. estimate.  EST, that was an
12  estimate.
13      Q    Before we get to that though, back in the
14  October 13 entry, there's a name, appears to be
15  Jodi Edmonds?
16      A    Yes.
17      Q    What is the significance of that entry
18  with her name?
19      A    When we need to interview someone or talk
20  with someone, it's courtesy to notify their
21  supervisor or their bureau chief or division head
22  and say, hey, I need to speak to so and so, and
23  we'll be conducting an interview at 2:30 in the
24  small conference room.  So it's notification to her

## Page 34

1  that I needed to speak with Mary.
2      Q    And you apparently talked with her right
3  after you talked to Mary?
4      A    Yes.
5      Q    Do you recall anything about that
6  conversation?
7      A    No.  It was just to the point.
8      Q    And then it looks like at 9:00 a.m. --
9  can you read that entry for me?
10      A    Yes.  Advise BC, Bureau Chief Steve
11  Bradley, of need to speak to his staff, Thallman,
12  slash, unknown content, and I'd update him ASAP.
13      Q    ASAP being an acronym, as soon as
14  possible?
15      A    Correct.
16      Q    Did Mr. Bradley say anything to you at
17  that time?
18      A    No.  Because after learning from Mary
19  what her complaint was, I most likely would have
20  alerted him to, you know, the allegation of, you
21  know, like, in this case, it was an allegation of
22  sexual harassment, of a sexual nature.
23  Investigators don't categorize or define the nature
24  and the incident.

## Page 35

1      Q    It looks like the next entry is at 2:00
2  p.m. on that day, were you --
3      A    Yeah.
4      Q    Excuse me.
5      A    If I could say, the time categories
6  aren't necessarily -- it's a combination of when I
7  recall things occurred or when I jotted -- or when
8  I said, okay, I might have gone back to the office
9  in the afternoon and wrote down at 3:00 o'clock,
10  this is what I did at 9:20, or this is what I did,
11  it could be a surmise of my activities.
12      Q    So the time would be your best estimate
13  as to when it occurred, and you might be off a
14  little bit one way or another?
15      A    Certainly.
16      Q    Do you typically prepare your activity
17  sheet at the end of the day or beginning of the
18  following day?
19      A    Activity sheet?
20      Q    I'm sorry.  The log, case log?  Excuse
21  me.
22      A    I like to keep on top of it so as it
23  occurs.  And depending on my work load, or if I
24  have nine interviews, it's kind of hard to pin in

## Page 36

1  what my activities were, and I'll surmise them at
2  the end of the day.  Back then it was the evenings,
3  I worked a lot of over time.
4      MR. BAKER:  Let's go off the record for a
5  second.
6                  (Discussion off the record.)
7                  (Whereupon said document was
8                  duly marked for purposes of
9                  identification as Exhibit 31
10                  as of this date.)
11      MR. BAKER:  Q  I will hand you what is marked
12  as Exhibit 31.  If you -- referring to your entry
13  at 2:00 p.m. for October 13th on your log, you're
14  saying, I think:  Met with Thallman and secured a
15  written statement?
16      A    Yes.
17      Q    Is Exhibit 31 the written statement that
18  we're talking about?
19      A    Written documentation, yeah, because I'd
20  asked her to prepare something in writing.
21      Q    In any event, Exhibit 31 is what she
22  produced for you --
23      A    Yes.
24      Q    (Continuing)--at your request?

Sullins v. Illinois Department of Public Aid

**Page 37**

1    A    Yes.
2    Q    At that time did you interview
3  Mary Thallman or have any conversations with her
4  other than just securing that statement?
5    A    I received her written statement, her
6  four little pieces of paper, so we reviewed it so
7  that I understood everything in here, and got her
8  to sign off on it to show that she prepared it, she
9  authored it.
10    Q    Okay.  Very good.
11        Is that about everything that occurred
12  during that meeting with her?
13    A    Yeah.  I would have talked with her to
14  make sure I understood what her complaint was.
15    Q    Your next entry is 2:50, and it refers
16  apparently to a conversation you had with
17  Mr. Bradley?
18    A    Correct.
19    Q    Can you share with me what occurred in
20  that conversation.
21    A    I was in Steve Bradley's office after --
22  this was after I spoke with Mary and got her
23  statement, told him that we had an allegation of
24  sexual harassment, and it had to do with Mark

**Page 38**

1  Shut.  And I told Mr. Bradley that, after he
2  inquired about -- he asked:  Do you think so, do
3  you really think so.  Something to that affect.
4  That this was legit.  And I --
5    Q    And he doubted the legitimacy of it?
6    A    He was -- I think he was surprised by
7  it.  And I said Ms. Thallman appears very credible
8  because she was visibly upset in the interview.
9    Q    What do you mean by that?
10    A    She teared up, her bottom lip quivered,
11  she was fed up, she was tired, and I picked that up
12  from her body language, her facial expressions.
13  And I have a tendency to remember that because it's
14  -- it's burned.  I mean true victims, in my
15  experience, it's one thing if I said, well, yeah, I
16  was hit upside the head, but it's almost like she
17  relived it again from what she was telling me.
18        And the other thing with Mr. Bradley is,
19  or anyone that we say, hey, we have an allegation
20  of something, we just say, hey, we're going to be
21  interview folks, this is going to disrupt your
22  operations, but it has to be, you know.  And
23  managers don't like to have their operations messed
24  up because they're trying to put out a good work

**Page 39**

1  product.
2        I didn't think Mr. Bradley thought this
3  was an issue and that's a personal insight, it was
4  just my instinct.
5    Q    After the word "chain of command" in your
6  entry of October 13, there is a phrase, could you
7  read that phrase into the record for us.
8    A    Bradley suggested we check Mark Scheff's
9  computer for computer games.  Bradley told Scheff
10  six weeks ago to remove same from his system.
11    Q    Do you recall your conversation with
12  Mr. Bradley about the computer games?
13    A    Just that he -- Mr. Bradley thought Mark
14  still had computer games on his computer system at
15  work.
16    Q    Did he indicate there was anything sexual
17  associated with the computer games?
18    A    No.
19    Q    Can you read your entry for what appears
20  to be 3:10 p.m.
21    A    3:15 p.m.
22    Q    3:15.
23    A    Excuse me, it's public school.
24        Advise DJM, Derrick J. Moscardelli, of

**Page 40**

1  complaint.  Copy of Thallman's written statement
2  given to DJM.  He provided PEPPA info on Scheff and
3  Thallman.  Advised of computer games on Scheff's
4  system.  And he said he was not interested in it.
5    Q    When was not interested in it, what is
6  the "it"?
7    A    That information about the computer --
8  the possibility of computer games on Scheff's
9  computer.
10    Q    Okay.  Fine.
11        What's a --
12    A    PEPPA.
13    Q    (Continuing)--PEPPA?
14    A    PEPPA is a personnel document which the
15  bureau chief and assistant bureau chief and one
16  clerical person in or office has access to.  When
17  we have investigations with employees that are
18  identified, we have their identifiers, their name,
19  their soc. number, their home address, their pay
20  roll title, their possession, their appropriation
21  codes, stuff like that, so when we fill out an
22  interview sheet, we don't necessarily have to ask
23  them, you know, their soc. number, their date of
24  birth, stuff like that.

10 (Pages 37 to 40)

Page 41

1           (Whereupon said document was
2           duly marked for purposes of
3           identification as Exhibit 32
4           as of this date.)
5      Q    For the moment, I'm just interested in
6  the first two pages of that document.
7      A    Sorry.
8      Q    Are they out of order?
9      A    Yeah.  This is the second page of this
10 particular E-mail, I think it should be your third
11 page.
12     Q    Can you read the numbers?  Can you see
13 down on the bottom there are Bate stamp numbers --
14     A    Yes.
15     Q    (Continuing)--at the bottom of each
16 document, --
17     A    Yes.
18     Q    (Continuing)--what should be the second
19 number?
20     A    001721.
21     Q    Okay.  Very good.  Thank you.
22     MR. BAKER:  Off the record.
23           (Discussion off the record.)
24     MR. BAKER:  Q  For the moment, Laura, I am

Page 42

1  interested in the first two pages of this document
2  which appears to be a series of E-mails; am I
3  correct?
4      A    Correct.
5      Q    And if we go down to maybe the middle --
6  start of the middle third of the page, there is the
7  word "Laura Whetstone" and then 10-13-00 at 4:52
8  p.m., would that be the first E-mail?
9      A    Yes, that would be the first E-mail.
10     Q    And who is that E-mail sent to?
11     A    Derrick Moscardelli.
12     Q    And for what purpose did you send it to
13 Derrick?
14     A    I needed to make him aware of the
15 allegation.
16     Q    At that point in time, you had not been
17 officially assigned --
18     A    Correct.
19     Q    (Continuing)--to any work on the case; am
20 I correct?
21           And it looks like to me like in that
22 E-mail, you gave Mr. Moscardelli kind of the high
23 points of what information had been provided you by
24 Ms. Thallman?

Page 43

1      A    Yes.
2      Q    And then at the bottom of the E-mail, you
3  say:  Do you want me to handle this case, if a
4  priority, before the priority case with Larry.
5           What I'm reading into that is you were
6  working on another case?
7      A    Probably several.
8      Q    And do I understand you had two questions
9  for him, the first question was do you want me to
10 do anything with this case, and if you do, what
11 priority should I give it; --
12     A    Yes.
13     Q    (Continuing)--is that correct?
14           Okay.
15           And if we go back to the first page then
16 there is back up at the top, there is the word:
17 Derrick Moscardelli, 10-13-00, 5:06 p.m., --
18     A    Uh-huh.
19     Q    (Continuing)--it says:  Laura, please
20 handle as your first priority.  Thank you.
21     A    Yes.
22     Q    Did you understand this was to be the
23 case you should devote your immediate attention to?
24     A    Yes.  Because normally when we take

Page 44

1  complaints, not always, but often, the investigator
2  that takes it usually gets assigned the case
3  because they have a familiarity of what the
4  allegation was.  And plus, I was the only female in
5  the office, and sexual harassment cases were
6  usually assigned to me, sexual harassment
7  allegations are usually assigned to me.
8      Q    Okay.  Very good.
9           If we go back to Exhibit 30, on the
10 second page, there's an entry for 10-16-00.
11     A    Yes.
12     Q    Can you read that entry for me, please.
13     A    The first entry?
14     Q    The first entry for 10-16.
15     A    Schuh interviewed, written statement
16 obtained.  Jodi Edmonds telephoned for second
17 interview, 10:25, Velva Fletcher interview, Velva
18 Thallman, written statement secured.
19     Q    So if I understand, you interviewed two
20 people that day?
21     A    Yeah.
22     Q    And between the interviews, you
23 apparently called Jodi?
24     A    Yes.

Baldwin Court Reporting & Legal Video Services
1-800-248-2835

## Page 45

```
1      Q     And why did you call Jodi?
2      A     She was my contact within BCHS to set up
3   the interviews.
4      Q     So was the conversation involving
5   anything more than saying I need to talk to
6   Velva Fletcher?
7      A     It just would have been I need so and so
8   at such and such a time.  That was it.
9      MR. BAKER:  We are off the record.
10                  (Discussion off the record.)
11                  (Whereupon said documents were
12                  duly marked for purposes of
13                  identification as Exhibits 33,
14                  34 as of this date.)
15     MR. BAKER:  Laura, to give you a jump start on
16  the documents and to keep them from being lost, I'm
17  going to hand them to you.
18     THE DEPONENT:  Great.
19                  (Whereupon said documents were
20                  duly marked for purposes of
21                  identification as Exhibits 35,
22                  35A as of this date.)
23     Q     Laura, let's go to Exhibit 33, and let me
24  ask you this:  Is that document written in your
```

## Page 46

```
1   hand?
2      A     No.
3      Q     Do you know whose handwriting it is?
4      A     No.
5      Q     Do you know what it is?
6      A     Highlights of an interview sheet, and
7   someone who can't spell the word "vagina," which is
8   scary because it looks like a female's writing.
9      Q     Let me ask you this:  Is that
10  Terry Tranquilli's handwriting?
11     A     Absolutely not.
12     Q     Is it Derrick Moscardelli's handwriting?
13     A     Absolutely not.
14     Q     In your office, with respect to the
15  Thallman investigation, was there anyone involved
16  other than you, Mr. Moscardelli, and
17  Mr. Tranquilli?
18     A     Mike Taylor was involved in some of the
19  interviews.
20     Q     Is that his handwriting?
21     A     No.
22     Q     Okay.  Let's go to 34 and 34A and let's
23  talk about them together, if we could.  Let's talk
24  about 34A first.  Can you identify that document
```

## Page 47

```
1   for me?
2      A     That is Jim Schuh's written statement.
3      Q     Was Mr. Schuh the first person you
4   interviewed after your meeting on a Friday with
5   Ms. Thallman?
6      A     Yes.
7      Q     Tell me about your interview with
8   Mr. Schuh.
9      A     Mr. Schuh was scared.
10     Q     What lead you to believe he was scared?
11     A     He voiced concern in the interview that
12  he was uncomfortable with Mr. Scheff.  And what
13  struck me odd with Mr. Schuh is when he explained
14  an exchange between he and Scheff, I want to say
15  Naperville, in a hotel, describe Scheff talking
16  about whether or not Mr. -- asked Mr. Schuh if
17  Mr. Schuh had watched an HBO flick.  And Jim said
18  no.
19                  Mark continued to say I watched it and
20  jacked off or masturbated and rolled over.  That
21  was my first experience of a man in an interview
22  offended by another man's remark and that stuck
23  with me.
24     Q     Anything else you noticed unusual about
```

## Page 48

```
1   Mr. Schuh?
2      A     He was nervous, just nervous.
3      Q     Was anyone present with him during the
4   interview other than you?  Did he have, for
5   example, union representation?
6      A     No.  He did not ask for one.
7      Q     Could he have been represented by his
8   union?
9      A     If he asks.
10     Q     Can you tell me what you told Mr. Schuh
11  at the outset of the interview.
12     A     That he was a source of information, his
13  name had come up on an allegation, which is
14  standard in interviews I conduct, that he was a
15  source of information, and I needed to ask him
16  questions about this particular allegation.
17     Q     Was Mr. Schuh cooperative during the
18  interview?
19     A     Yes.
20     Q     With respect to the written statement
21  marked Exhibit 34A, when during the course of the
22  interview was that prepared?
23     A     That was prepared at the end of the
24  verbal interview.  And my standard statement to
```

Sullins v. Illinois Department of Public Aid

## Page 49

1  people is we're going to review what we have talked
2  about, we are going to put it in written statement
3  format, and there may be other questions that come
4  up, as you write, things that I recall that I
5  forgot to ask you, and we would add those at that
6  point.
7      Q    Did you dictate this document to
8  Mr. Schuh?
9      A    No.
10     Q    Did you tell him what to write down?
11     A    No.
12     Q    If at any time during the course of the
13  interview Mr. Schuh felt uncomfortable, could he
14  have requested union representation?
15     A    Most definitely.  Or if he wanted to take
16  a break, he could have done that, as well.
17     Q    Do he ever make either of those requests?
18     A    No.
19     Q    If you go to Exhibit 34, and I'm just
20  looking at the second paragraph, do I understand
21  that you were not only the investigator present at
22  Mr. Schuh's investigation?
23     A    That's correct.
24     Q    Why was Mike Taylor there?

## Page 50

1      A    Mike Taylor had just come on board on
2  loan from the Bureau of Investigations which is our
3  client unit.  We needed another investigator in the
4  interim of getting one hired, and since it was a
5  sexual harassment allegation, and at that point in
6  an investigation, it's always good to have two
7  investigators present.  And I would assume because
8  Mr. Schuh was male that he was included, Mike was
9  included to show up.
10     Q    With respect to the interviews you've
11  conducted, beginning with Mr. Schuh's interview,
12  did Mr. Taylor participate in all of them or was it
13  just this one?
14     A    I'm not sure without looking at the other
15  interview sheets.
16     Q    All right.  Fair enough.
17          Let's go to Exhibit 35 and 35A.
18          By the way, before I -- we do that, if
19  you look at the top of Exhibit 34, it has a box for
20  investigator and then the name
21  Terrance Tranquilli.
22     A    Uh-huh.
23     Q    And it looks like the day of the report
24  is prepared on October 27, 2000, do you see that?

## Page 51

1      A    Yeah, I do.
2      Q    Why was Mr. Tranquilli's name inserted in
3  that box?
4      A    I don't know.
5      Q    Let me ask you this:  Did there come a
6  point in time where you no longer played a role in
7  the Mary Thallman investigation?
8      A    October 18 around 10:30, firm, around
9  that time frame.
10     Q    Okay.  What happened on October 18 at
11  10:30?
12     A    That Derrick and perhaps Terry had talked
13  with labor relations either Debby Davis or
14  Debbie Henesy to get -- to remove me, or recuse me,
15  or transfer me, or whatever word you would like to
16  use, from the case.
17          Because that particular morning, Pam
18  DeFour had called me on the elevator of the Bloom,
19  she come off the elevator of the Bloom while I was
20  there in order to conduct more interviews, and she
21  said that both the union and merit comp. employees
22  were complaining about my involvement in the
23  investigation.
24     Q    Why were they complaining about your

## Page 52

1  involvement in the investigation?
2      A    I don't -- because I knew Debbie.  I
3  would imagine I -- no one ever told me nor did I
4  ask.
5      Q    Let's go back to Exhibit 32.  I think
6  it's Exhibit 32.  And I'm looking at what used to
7  be the second page, but an E-mail dated October 16
8  at 9:13 a.m., it's Bate stamp number 1720; do you
9  see that E-mail?
10     A    Yes.
11     Q    Looks like there are two E-mails there;
12  am I correct?
13     A    Yes.
14     Q    And the first E-mail looks like it was
15  written by you?
16     A    Yes.
17     Q    Was that an E-mail you sent to
18  Mr. Moscardelli?
19     A    That was an E-mail I sent to
20  Mr. Moscardelli as a follow-up to our conversation
21  on the 13th of October around 3:30 when I returned
22  to the office from the Bloom building, when I told
23  him at that point that I had a familiar
24  relationship with Debbie Sullins, and I would not

Baldwin Court Reporting & Legal Video Services
1-800-248-2835

Page 53

1  be conducting her interview.
2        And he asked if there was any reason why
3  I -- was there any reason -- how did he put it.
4  Basically is there anything else I need to know
5  that would preclude me from interviewing other
6  people involved in this. And I said no.
7        Q    Did you know any of the other people
8  involved?
9        A    No.
10       Q    So your E-mail to Mr. Moscardelli on
11 October 16 at 8:53 a.m., is that just a summary of
12 what you told him the preceding Friday?
13       A    Yes. Yes.
14       Q    And then he E-mailed you back the same
15 morning at 9:13 a.m., and that's up at the top,
16 would that be correct?
17       A    Yes.
18       Q    And let me read that into the record and
19 then we'll talk about it:  Laura, any reason you
20 feel that you need or should recuse overall from
21 this case or just from Ms. Sullins' interview?
22 Please discuss with Terry and then you two get back
23 to me.  Thanks.
24       In the wake of that E-mail, did you talk

Page 54

1  with Terry?
2        A    Yeah. That was my directive. Yeah.
3        Q    I'm assuming that's Mr. Tranquilli?
4        A    Tranquilli, yeah. And basically this is
5  what Derrick said on the 13th, you know, is there
6  any reason why you need to be removed or is there
7  any other issues I need to be aware of. I told him
8  no. I didn't know anybody that was identified.
9        Q    And can you relate to me the discussion
10 you had with Mr. Tranquilli in furtherance of
11 Derrick's E-mail to you?
12       A    It was basically the same, you know, I
13 would imagine that, hey, I don't know anybody else,
14 I'm pretty much good to go.
15                  (Whereupon said document was
16                   duly marked for purposes of
17                   identification as Exhibit 36
18                   as of this date.)
19       A    I'm ready. I'm multi-tasking.
20       Q    You're a better person than I.
21       A    Not really.
22       Q    There are two E-mails that appear on
23 Exhibit 36, as I understand it. The first is one
24 you wrote on October 18 at 9:17, colon, 52 a.m.,

Page 55

1  why did you write that E-mail?
2        A    That was a written follow-up to the
3  verbal discussion I had with Rick about my
4  interaction with Pam DeFour and I put it in
5  writing. And I believe -- I didn't want anything
6  to get in the way of Mr. Scheff's -- the
7  investigation.
8        Q    Did you ever discuss your role in the
9  case with Debby Davis?
10       A    I believe after the case -- after
11 interviews had been finished, I don't believe the
12 case was finished from our unit, I think it was
13 automatically sent over to labor relations for them
14 to review.
15       Q    Why wasn't it finished by your unit?
16       A    Probably because of my involvement in the
17 case and the issues that had surfaced from the
18 union and merit comp. complaining.  Oftentimes --
19 I'll use the word "celebrated cases," if we don't
20 want to render our final findings in the
21 conclusion, it's referred to labor relations for
22 them to handle it.
23       There was another case that I did that
24 the same thing happened, we didn't -- we weren't

Page 56

1  able to complete the conclusion aspect, and it was
2  shipped to labor for them to review and for them to
3  determine the --
4        Q    I'm glad you raised that because I was
5  going to ask you later on. In reviewing the
6  documents, I didn't find any final report of this
7  investigation from your unit. And we talked a
8  little earlier about how those were prepared during
9  when I was a part of the closing of the case.
10       Is it your understanding that no final
11 report was ever prepared with respect to this
12 investigation?
13       A    That's my understanding.
14       Q    And the case was transferred to labor
15 relations?
16       A    Yes. And I just learned that this week.
17       Q    How did you learn that?
18       A    With Rick. I was upset after deposition
19 prep., and I was off when I got back to the
20 office. I wasn't in my normal routine as far as
21 nose to the grindstone, that kind of thing because
22 in that deposition preparation, it had hit me --
23       MR. BAKER:  We'll take a break.
24                  (Whereupon a short recess

14 (Pages 53 to 56)

## Page 57

1          was taken.)
2     THE DEPONENT:  It hit me of what I suffered
3  from this because I had never -- I had not dealt
4  with it because I had to be the strong one.  My
5  approach and my handling of this case, as I shared
6  in prep depositions -- deposition preparation on
7  Monday, I wouldn't have changed my role in this
8  whatsoever.
9          And my mind set at that time, which is
10 still my mind set today, as a lesbian, I'm not a
11 protected class.  I answer to a higher authority
12 than my bureau chief, my inspector general, and I
13 handle different cases of liability.
14         I enjoy my job, and I would -- I wouldn't
15 trade it for anything in the world.  When this was
16 going -- after I was removed, after I was taken off
17 the case on the 18th, I saw every day the impact it
18 had on Debbie at home.
19         And during the course of the day if I'd
20 call her, and I never -- I never processed it
21 because I knew that I had to take an investigative
22 approach to it at all times in order to stay solid.
23    MS. KERLEY:  Let's go ahead and take just a
24 one-minute break, if that's okay.

## Page 58

1               (Whereupon a short recess
2               was taken.)
3               (Whereupon the requested
4               portion of the record was read
5               back by the Reporter.)
6     MR. BAKER:  Q  I think you were kind of in mid
7  stream with your answer, do you want to continue
8  or...
9     A     I was clinical.  The actions I took were
10 deliberate as far as handling the investigation,
11 apprising Rick of my familiarity with Debbie.  I
12 handled that case no different than I do any other
13 case.
14    Q     As I understand your testimony, Laura,
15 when you came back from the interview with
16 representatives of the attorney general's office
17 and Ms. Kerley, you were upset?  I mean I don't
18 want to put words in your mouth, would that be a
19 fair characterization?
20    A     Yeah, I was upset.  I was sick to my
21 stomach.  I took a couple hours off.  I couldn't
22 concentrate.
23    Q     Did something happen during the course of
24 the interview that was upsetting to you or was it

## Page 59

1  just reliving or realization of what had occurred
2  that was upsetting to you?
3     A     It was the first time I had ever talked
4  about it, that I really had to think about it.  I
5  know that I talked with my mother in the past about
6  my feelings but nothing in depth because I didn't
7  want to burden her, so.
8     Q     Now, do I understand that after you were
9  interviewed by Ms. Kerley, you talked with
10 Derrick Moscadelli?
11    A     Yeah.
12    Q     Tell me about that conversation.
13    A     It was real brief, it was in the hallway
14 outside Mary Lou Seymour-Smith's office.  And I
15 don't -- I don't remember how it got started, but
16 -- he'd come into my -- he'd come to the door,
17 actually, of my office, and I was sniffling, and he
18 says:  Oh, your sinuses are bothering you.  I'm
19 like:  No.  He said:  Well, you were sniffling this
20 morning.  I said:  No, my throat was kind of
21 froggy.  Or maybe it was yesterday he was talking
22 about.  And I said:  My throat was kind of harsh.
23 And that was it.
24         And then I come out to the fax or to get

## Page 60

1  a cup of coffee and we talked.  And I'm not quite
2  sure how the conversation -- I don't want to say
3  conversation, just little snippets happened, but I
4  just said I just didn't think that it had that
5  affect on me.  It just really hit me.
6          And I told him that I wouldn't have
7  changed anything.  And he said -- basically
8  supported me then as he did in 2000, that, you
9  know, he supported my involvement in the case.  And
10 then that's -- I remember mentioning to him that I
11 thought --
12         And like there was some time period where
13 we were in a lull as far as investigations, and we
14 were assigned -- our task was to pull out
15 duplicated materials out of our files so it will
16 give the investigators something to do.  And I
17 said:  Well, I -- I said he was only disciplined
18 for like five days or something like that, meaning
19 Mark Scheff.
20         And he says:  Well, what do you -- I
21 said:  I thought I saw something on a closure
22 memo.  Which is Derrick's closure memo to the
23 different divisions or what have you.  He says:
24 Well, no, I don't think you read that right.  I

Page 61

1  said: Well, I remember seeing the case, and once I
2  realized it was Mark Scheff, I gave it to Lauren
3  Larson to handle because I didn't want to touch it.
4         And then he said, well, that case was --
5  that was given to labor relations, it was -- labor
6  relations made the decisions or something like
7  that.
8      Q    What did you mean when you said he was
9  disciplined for only five days?
10     A    I remember seeing a document that he was
11 disciplined for five days for discourteous
12 treatment. And I believed it was -- I believed it
13 was a closure memo and it was reference to 01073,
14 this case here, and he only got five days for
15 discourteous treatment.
16     Q    I mean do you think that was not enough?
17     A    In my experience --
18     MS. KERLEY: Objection to relevance just
19 because she has testified that she's not a decision
20 maker and doesn't have a role in decisions.
21     MR. BAKER: Q    Laura, I understand you may
22 have personal views about conduct. Based upon your
23 experience at the department, in your experience
24 for how people were disciplined for doing things of

Page 62

1  a sexual nature, do you think Mr. Scheff came out
2  pretty well with what he got?
3      MS. KERLEY: Objection. Foundation. She
4  hasn't testified that she has any recollection of
5  any other discipline of conduct of a sexual
6  nature.
7      MR. BAKER: That's not her testimony.
8      MS. KERLEY: Her testimony was that sometimes
9  they didn't -- they weren't made aware if there was
10 any discipline at all.
11     MR. BAKER: That was her testimony;
12 sometimes. I asked based upon her experience if
13 she thought he got a pretty light discipline.
14     MS. KERLEY: I will object again to foundation
15 because she hasn't testified that with regard to
16 sexual harassment that she's ever been made aware
17 of what discipline's been needed out.
18     MR. BAKER: I think you're mischaracterizing
19 her testimony but we could go on all day.
20     Q    Laura, do you understand my question
21 or would you like me to repeat it?
22     A    Repeat it, please.
23     Q    Based upon your prior experiences in
24 being involved in investigations of sexual

Page 63

1  harassment at the department, and the information
2  you received concerning discipline that was
3  assessed against individuals who were the subjects
4  of investigations you did, do you believe the
5  discipline assessed against Mr. Scheff was fairly
6  mild?
7      A    For allegations that were founded in
8  areas of allegations of sexual harassment, I have
9  seen individuals disciplined, I have seen
10 discharge, I have seen suspension, last-chance
11 agreements for a lot less than the information that
12 was reported to me in interviews which I conducted.
13     Q    Okay. So if I understand your testimony,
14 and I don't want to put words in your mouth, even
15 if I did, Ms. Kerley will tell me.
16     A    Please don't.
17     Q    Based upon investigations of similar --
18 of conduct similar to what Mr. Scheff engaged in or
19 conduct not as serious as what Mr. Scheff engaged
20 in, you're aware of people who have been
21 discharged?
22     A    I've seen people discharged for a lot
23 less.
24     Q    Less than what Scheff did?

Page 64

1      A    That was less than what was reported in
2  the interview sheets --
3      Q    Okay.
4      A    (Continuing)--and provided in written
5  statements.
6      Q    And you talked about a last chance or
7  suspension of last --
8      A    Last chance agreement.
9      Q    What is that?
10     A    Usually it's a hardy suspension, anything
11 up to 30 or 35 days, not necessarily related to
12 sexual harassment but other founded investigations
13 where you're disciplined for this amount of time,
14 and if you do it again within a certain amount of
15 time period, you will be automatically discharged,
16 last-chance agreement.
17     Q    Let's go to Exhibits 35 and 35A. Let's
18 talk about Exhibit 35 first, which is a typed
19 interview sheet, is it not?
20     A    Yes.
21     Q    Is that something you prepared or was it
22 prepared by someone else in your unit?
23     A    On the 18th of October, you know, I was
24 told basically to get the interview sheets

16  (Pages 61 to 64)

Page 65

1  completed and turn them over to Terry Tranquilli.
2  I would think that the interview sheet that I
3  completed, I don't recall if I put a date in the
4  date of report area.
5      Q    If we look at the body of the interview
6  sheet, do you have any reason to believe that's not
7  something that you either dictated or wrote out or
8  Word processed?
9      A    I completed it on the computer and it was
10  most likely tweaked for composition errors.
11     Q    That's typically done, is it not?
12     A    Yeah.  That's just -- yeah.
13     Q    There's nonsubstantive editorial
14  decision?
15     A    Right.
16     Q    Do you notice any substantive changes
17  between what you prepared on the computer and what
18  appears in the body of Exhibit 35?
19     A    I don't -- I don't know.  I can't answer
20  that.
21     Q    If we go to Exhibit Number 35A for a
22  moment, that's the handwritten statement of
23  Velva Fletcher; am I correct in that respect?
24     A    Yes.

Page 66

1      Q    Do you recall anything about
2  Ms. Fletcher's demeanor during the course of her
3  interview?
4      A    She was fine, she was comfortable, a
5  little nervous because I mean she works with
6  Mr. Scheff and...
7      Q    Let's go back then to Exhibit Number 30
8  on the second page, it looks like at 1:15 there's
9  an entry for 1:15, can you read that entry,
10  please.
11     A    Debbie Sullins interviewed, slash,
12  written statement secured, interview 10-24,
13  completed by Mike Taylor.
14     Q    Did you have any involvement in
15  Debbie Sullins' interview?
16     A    No.
17     Q    And were you present during that
18  interview?
19     A    No.
20     Q    If we go then to October 16 at 2:30, can
21  you read that entry for me.
22     A    Interview Mike Sandidge, written
23  statement obtained, advise Ken Coal of Sandidge's
24  concern over Scheff's instability in the workplace,

Page 67

1  heart punch, donut shop, seeing someone killed,
2  taking all he has -- takes all he has not kill
3  someone every day, unidentified summer worker.
4      Q    What does that mean?
5      A    That was information that I received from
6  Mike Sandidge in his interview that he was
7  concerned about Mr. Scheff's behavior in the
8  workplace.
9      Q    Did he have some concern about his own
10  safety?
11     A    He was concerned that Mr. Scheff -- and
12  he was not the only one concerned but, from the
13  interviews -- that Mr. Scheff would become violent,
14  physically violent, do something to people within
15  the workplace based upon his conversations --
16  Scheff's conversations shared with him in the past.
17     Q    Did he relay any of those conversations
18  to you?
19     A    I don't have Mr. Scheff's --
20  or Mr. Sandidge's interview sheet.
21         Ask and you shall --
22     Q    Ask and you shall -- hold on, we got to
23  mark it first.
24         (Whereupon said documents were

Page 68

1             duly marked for purposes of
2             identification as Exhibit 37 &
3             37A as of this date.)
4      MR. BAKER:  Take a minute and look at that.
5             (Discussion off the record.)
6      MR. BAKER:  Q  You had an opportunity to
7  review both Exhibit 37 and 37A?
8      A    Yes.
9      Q    And going to 37A first, is that the
10  statement that -- or a copy of the statement that
11  Michael Sandidge prepared in your presence?
12     A    Yes.
13     Q    By the way, I have not photo copied and
14  made them a part of the record, but typically is
15  there a last page to every statement, handwritten
16  statement?
17     A    You mean the acknowledgment form?
18     Q    Yes.
19     A    Yes.
20     Q    What does that say generally?
21     A    The acknowledgment form stipulates that
22  you need to cooperate fully and completely.  Back
23  in 2000 it would have been in the investigation,
24  now it's specified written and verbally.  If you

## Page 69

1  refuse to cooperate, you could face disciplinary
2  action up to and including discharge.
3         You are not to discuss any aspect of the
4  investigation without first receiving consent from
5  the Office of Inspector General.  And if you break
6  that confidentiality, you could face disciplinary
7  action up to and including discharge.  You are not
8  to discuss the investigation with anyone,
9  basically.
10     Q    What about truthfulness, is there
11 anything in it?
12     A    I believe it's full -- truthfully and
13 fully, something to that.
14     MR. BAKER:  Ms. Kerley, in the interest of
15 sparing central Illinois with as many trees as we
16 can, I made a conscious effort not to reproduce the
17 acknowledgment pages for most of these statements,
18 can we stipulate that in this case those statements
19 were attached?
20     MS. KERLEY:  We can stipulate that they all
21 had acknowledgment.
22     THE DEPONENT:  And those forms are explained
23 and completed prior to the interview beginning.
24     MR. BAKER:  Very good.

## Page 70

1      Q    Was Mr. Sandidge cooperative during
2  the interview?
3      A    Yes.
4      Q    And did he have a right to union
5  representation?
6      A    Yes, he did.
7      Q    Was he aware of that right?
8      A    That's his issue.  He needs to know his
9  contract.
10     Q    At any time did he request union
11 representation?
12     A    No, he did not.
13     Q    At any time during the course of the
14 interview, did he ever want to take a break or
15 express a concern about the interview continuing?
16     A    No.
17     Q    Did you offer to Mr. Sandidge, during the
18 course of the interview, any of your views or
19 opinions concerning this particular case you were
20 investigating?
21     A    No.
22     Q    Did you make any comments concerning
23 males in general or Mr. Scheff in particular?
24     A    No.

## Page 71

1      Q    Did you make any comments during the
2  course of that interview that might be interpreted
3  as having -- as you having some bias against males?
4      A    That would have been covered in the
5  complaints that were filed against me which are
6  covered, which are documented, which I prepared,
7  and my responses are in there.
8      Q    We'll get to those in due course then.
9      A    Not a problem.
10     Q    Was Mr. Sandidge nervous during the
11 course of the interview?
12     A    No.
13     Q    As you look through the interview, do you
14 recall any comments made during the course of
15 the interviews that lead you to believe he had some
16 concern about Mr. Scheff?
17     A    Yes.  He had said that he is
18 uncomfortable around Scheff due to Scheff's -- he
19 may not have said this specifically, but the
20 interview sheet reflects he was uncomfortable
21 around Scheff due to Scheff's inappropriate remarks
22 and behavior, and he has avoided Scheff for a
23 period of time.  And that information would have
24 been taken off of his written statement.

## Page 72

1          The last nine, ten months, I've avoided
2  contact with Mark by not responding to questions,
3  avoiding his office, going where he is not, I'm
4  uncomfortable around him.  And also Mr. Sandidge
5  was upset or disturbed by Scheff's comments about
6  PK Luttrell, about him committing suicide.
7      Q    That was not a sexual comment, there was
8  something else there?
9      A    Right.
10     Q    Going back then to Exhibit 30 the next
11 interview you had I believe was with Marvin Ross?
12     A    Yeah.
13             (Discussion off the record.)
14             (Whereupon said document was
15             duly marked for purposes of
16             identification as Exhibit 38
17             as of this date.)
18     MR. BAKER:  Q  Is Exhibit 38 the interview
19 sheet prepared following Mr. Ross's interview?
20     A    Yes.
21     Q    And is that something you prepared on or
22 about October 18 when you were leaving the case?
23     A    Yes.
24     Q    Do you recall anything about Mr. Ross's

18  (Pages 69 to 72)

## Page 73

1  demeanor during the interview?
2      A    He was nervous.  He didn't know
3  anything.  I remember him telling me:  I just stay
4  in my office.  And I, once the interview was
5  finished, was writing a statement, in my mind, I
6  made a mental note that I would reinterview him.
7      Q    Why was it you wanted to reinterview him?
8      A    Because I believe there were some other
9  interviews that needed to be conducted to ask folks
10 about his management style, if he managed by
11 walking around, based upon his statement to me,
12 which is not included in his interview sheet, nor
13 would it have been included in his written
14 statement, and I was going to go back to it to
15 interview him again to find out what his management
16 style was.
17     Q    The next entry, it looks like you were
18 working overtime at 5:45 p.m.
19     A    Yeah.
20     Q    E-mailed to Raven Knighten --
21     A    Reference updated interview info.
22     Q    Would that be typical in this type of
23 investigation you continued --
24     A    For me I would have notified her to see

## Page 74

1  again if I needed any clarification or direction
2  from an EEO standpoint.
3      Q    Let me mark this as an exhibit.
4               (Whereupon said document was
5               duly marked for purposes of
6               identification as Exhibit 39
7               as of this date.)
8      Q    Laura, I'm going to hand you Exhibit 39,
9  and I believe if you go through that entire
10 document, it's an extension of E-mails going back
11 to your E-mail of October 13, what I am interested
12 in are the E-mails that appear on the top of page
13 1.
14     A    Okay.
15     Q    It looks as though you E-mailed
16 Ms. Knighten on October 16, not quite as late as
17 you claimed you were there?
18     A    Again, that was a note, it was estimated.
19     Q    You were within 19 minutes.
20     A    Well, I was -- I'm accountable.  Sorry.
21     Q    And is that the E-mail you referred to in
22 your log?
23     A    Case log, yes.
24     Q    You ask a question, and I'm going to read

## Page 75

1  it:  Do you think these from a sexual harassment
2  standpoint merit termination, question mark; do you
3  see that?
4      A    Yes.
5      Q    Why did you ask that question?
6      A    I asked that question because I needed to
7  firm up what had already been reported.  She would
8  -- Raven would oftentimes say if an allegation
9  came in, she would say, well, you need to ask this,
10 you know, you want to ask about this, and this, and
11 this.
12          This particular line showed that, based
13 upon the information that's documented here, and in
14 my experience, termination is a viable option for
15 the department as is suspension, written reprimand,
16 whatever.  And I had worked with Raven enough to
17 know that we're basically on the same page.
18     Q    My question is why did you want her
19 opinion about whether Scheff's conduct merited
20 termination?
21     A    Because if she felt from her standpoint
22 that this particular conduct that was reported
23 merited -- merited?
24     MS. KERLEY:  Uh-huh.

## Page 76

1      THE DEPONENT:  (Continuing)--termination, that
2  she would give me more direction on how to firm it
3  up.
4      MR. BAKER:  Q  How to build a case?
5      A    How to build a case.
6      Q    And then if you go to the E-mail at the
7  top, it appears to be Raven's E-mail to you the
8  following morning?
9      A    Yes.
10     Q    In her E-mail she asks about if he had --
11 her pertinent area of inquiry is if he had any
12 previous counseling or discipline for inappropriate
13 behavior; do you see that?
14     A    Yes.
15     Q    After receiving her E-mail, did you make
16 any inquiry into Mr. Scheff's disciplinary history?
17     A    No because I had other things that were
18 more important and pertinent to handle because I
19 could always go back to that because that stuff is
20 in his personnel -- an employee's personnel jacket,
21 and I could get that at any time.
22          And plus she had said she'll ask Jan,
23 Janice Johnson, by way of this E-mail, if she has a
24 record of previous complaints.  And Jan oftentimes

Page 77

1    -- she worked right in personnel, so.
2        Q    By the way, in connection with the work
3    you were doing on the Thallman slash Scheff
4    investigation, did you have any dealings with
5    Janice Johnson?
6        A    No, not until after when she was asking
7    for a statement or something, and I told her she
8    needed to go see Terry or ask Terry.  No, I didn't
9    utilize Ms. Johnson's services.
10        Q    At some point I think in Raven's E-mail
11    to you, she talked about making inquiry into
12    whether Mark Scheff had received any sexual
13    harassment training?
14        A    Yes.
15        Q    If you know, back in 2000, were employees
16    of the Department of Public Aid supposed to receive
17    that kind of training?
18        A    Yes.
19                    (Whereupon said document was
20                     duly marked for purposes of
21                     identification as Exhibit 40
22                     as of this date.)
23        Q    I'm going to hand you Exhibit Number 40.
24    That appears to be E-mails exchanged between you

Page 78

1    and a person named Cas --
2        A    Stombaugh.
3        Q    (Continuing)--Stombaugh, is Cas a he or a
4    she?
5        A    Cas is a she.
6        Q    She.  Okay.
7             Who is Cas Stombaugh?
8        A    At the time, Cas Stombaugh was in
9    training and development, and perhaps a record
10    liaison, she was clerical, and I would often use
11    her to secure training records -- training
12    histories.
13        Q    And as I understand it, you made inquiry
14    with Cas about the level of sexual harassment
15    training Mark Scheff had received and she replied
16    to that E-mail?
17        A    If he received, yes.
18        Q    And, apparently, he did receive some
19    training; am I correct?
20        A    That would have been the mandatory
21    training.
22        Q    And the preventing sexual harassment,
23    colon, the employee's role; is that the typical
24    training Department of Public Aid employees

Page 79

1    received on that subject?
2        A    For employees and there's a separate one
3    for managers.
4        Q    By the way, had you attended the
5    manager's training on sexual harassment.
6        A    I attended employee and manager's and I'd
7    like to do that every -- I like to try to do that
8    every year regardless.
9        Q    Back in 2000, how often did managers go
10    to sexual harassment training?
11        A    It was mandatory is my understanding.
12    This was a mandated training for all.
13        Q    How long was the training, the manager's
14    training?
15        A    A half -- I think it's a half a day.
16        Q    During the training were managers
17    informed about what their roles should be with
18    respect to issues of sexual harassment occurring
19    during the work --
20        A    Yes, they were given a packet of
21    information prepared by the trainer.
22        Q    What was the role?  What were managers
23    supposed to do with respect to situation where
24    inappropriate sexual conduct was occurring in the

Page 80

1    workplace?
2        A    They needed to report it either to their
3    -- they could report it to their supervisor,
4    Bureau of Internal Affairs, EEO.  They could
5    contact labor relations if they wanted to handle it
6    themselves internally.
7        Q    Going back to Exhibit 30, it appears that
8    on October 16 at approximately 5:50 p.m., you
9    E-mailed Mike Taylor?
10        A    Correct.
11        Q    And as I'm reading that:  Need more
12    detailed --
13        A    Info.
14        Q    Info.
15        A    Reference Sullins' interview sheet,
16    reference.
17        Q    Regarding whether or not she was
18    offended?
19        A    Correct.
20        Q    Had you received his interview sheet of
21    Sullins?
22        A    I don't believe I did at that point.
23        Q    Why had you E-mailed him indicating you
24    need more detailed information?

Baldwin Court Reporting & Legal Video Services
1-800-248-2835

## Page 81

1    A    I probably had seen her written
2 statement. Mike was new to this, just brought on
3 board, I don't know what kind of background he
4 has. From the investigations that I conducted
5 prior to this, this was an incomplete statement
6 obtained from Debbie Sullins because it didn't
7 cover all the basis.
8    Q    Okay.
9    A    I --
10    Q    Go ahead.
11    A    I think that Mike Taylor had learned from
12 Debbie in her interview that Scheff had made a
13 comment about penises and -- you have to have a
14 penis -- or you have to have a vagina not a penis
15 to get promoted and I think something about strong
16 -- strong pussy was made, and it wasn't covered in
17 her interview -- or her written statement whether
18 or not she liked the comment, she was offended by
19 the comment, did it bother her, what did she do.
20    Q    All right. Let's go down then to your
21 entry for October 17 at 8:35 a.m., and what I'm
22 going to ask you is if you would read that entry
23 into the record.
24    A    Met with Jodi Edmonds, advised I would

## Page 82

1 not be talking with her, but she would be talked to
2 today. I will recuse myself from interviewing
3 Edmonds, as she's Sullins' immediate supervisor.
4 Advised Edmonds I will need to interview Pam DeFour
5 then Joe Roberts.
6    Q    Do you recall anything occurring during
7 that conversation other than --
8    A    With Jodi Edmonds, she came in -- most
9 people aren't happy or jubilant when they come in
10 to an interview, she was very bubbly, that's what I
11 know about her.
12    Q    So she was coming in to be interviewed?
13    A    Yeah, I think I had arranged so that she
14 would be -- you know -- or she would come in to set
15 up an interview. I'm not quite sure. But I knew
16 then that I would not interview her --
17    Q    Okay.
18    A    (Continuing)--for sure.
19    Q    We can go over to the next page, can you
20 read the entry that appears for 10:30 to 10:45.
21    A    Caught by Thallman, first floor break
22 room, she asks what constitutes a release of
23 information. I asked if someone released the
24 content of the written statement and/or the content

## Page 83

1 of their interview, she said that didn't apply.
2 She said someone who was interviewed yesterday was
3 taking about -- oh.
4    Q    Don't look to me for help.
5    A    I'll skip.
6         They were afraid they would lose their
7 job.
8         I believe it's talking about whether they
9 were -- I don't know -- they were afraid they would
10 lose their job. I said Jim Schuh. She confirmed.
11 She asked if -- I asked her if she felt comfortable
12 with me to speak with Schuh. She asked if I could
13 reassure him. I said I would.
14         Schuh in DeGroot's office discussing the
15 case.
16    Q    What do you mean by Schuh in DeGroot's
17 office discussing the case?
18    A    I had learned from her that she heard
19 Leena DeGroot and Jim Schuh talking in Leena
20 DeGroot's office. Apparently DeGroot and Thallman
21 shared the same office wall. And she thought there
22 was some sort of release of information from Schuh
23 to DeGroot.
24    Q    If they were --

## Page 84

1    A    If.
2    Q    If they were, was that appropriate?
3    A    For Schuh and DeGroot to --
4    Q    Yes.
5    A    (Continuing)--discuss the content of an
6 interview or a written statement?
7    Q    Correct.
8    A    No.
9    Q    Do supervisors know or receive any
10 training in what they can and cannot talk to an
11 employee about who has given a statement to your
12 office?
13    A    No.
14    Q    If we can then let's go to your next
15 entry, which it looks like it's the same time
16 period, 10:30 to 10:45.
17    A    Yeah.
18         Schuh was standing with the security
19 officer outside the Bloom, moved to the lobby near
20 -- something. I saw Schuh outside of Bloom and
21 spoke with him in the Bloom. Reassured him he was
22 a source of information, not the subject of,
23 meaning the investigation. He is concerned of
24 losing his job. I advised him he was a source and

Page 85

1  not the subject.
2      Q    Do you recall anything about that
3  conversation?
4      A    He was very nervous.  He was afraid he
5  was going to lose his job.  I don't know why, his
6  name was never brought up as a subject or anything
7  like that.
8      Q    Can you read the entry for October 17 at
9  11:00 a.m.
10     A    Advised TT, Terrance Tranquilli, of
11  computer games on Scheff's system.  That would have
12  been related to Mr. Bradley's earlier statement.
13  TT updated on the info from DeFour's statement, Pam
14  DeFour.  Supported Sullins and Bradley.  TT said
15  just get statements reflective.  Basically reflect
16  if I -- something of Jodi Edmonds.
17     Q    As I look at this, you had an interview
18  with Joe Roberts on October the 17th?
19     A    Yeah.
20     Q    I will represent to you that I don't
21  think I have anything here from Mr. Roberts.  Do
22  you have any recollections of anything that
23  occurred in that interview?
24     A    He didn't know a lot.

Page 86

1      Q    Did you notice anything unusual about his
2  demeanor?
3      A    It was almost like he was bothered being
4  there.
5      Q    What do you mean by that?
6      A    In interviews an investigator -- I'll
7  retract -- I feel that I have an instinct that I
8  can pretty much tell when people are interested,
9  have information, whether it's based upon their
10  verbal replies or their body language of whether or
11  not they know anything, if they're hiding anything
12  and they're just not telling me.
13         Mr. Roberts didn't impress me.
14     Q    He didn't impress you as...
15     A    One that really cared.  Plus I had had a
16  previous, not an exchange with Mr. Roberts, but
17  during the Steve... -- Can I have a minute?
18     Q    Sure.
19     A    In a previous sexual harassment
20  allegation investigation in BCHS on another BCHS
21  employee, we were doing interviews in that
22  particular area, I used -- we used Marvin Ross's
23  interview room -- or office.  And in the course of
24  walking down a hallway, I noticed Mr. Roberts had a

Page 87

1  screen saver which had woman in skimpy bikini swim
2  suits on his screen saver on his department
3  computer.  And I advised Mr. Bradley of that.  So I
4  knew that you know -- I recalled that, so that was
5  in my mind.
6      Q    By the way, without mentioning any
7  specific names, how many sexual harassment
8  investigations have you been involved in involving
9  individuals who worked in the same bureau that
10  Mr. Scheff worked in?
11     A    I'm aware of one that I can recall with
12  certainty.
13     Q    And again without identifying any names,
14  can you just identify what the allegations were and
15  if they were founded or not?
16     A    If they were founded?
17     Q    Right.
18     A    The allegations were substantiated.
19     Q    Generally what were those allegations?
20     A    Verbal innuendo, how females felt about
21  this particular employee's behavior toward them.
22     Q    Was this during Mr. Bradley's tenure as
23  bureau chief?
24     A    Yes.

Page 88

1      Q    Do you know what discipline came to this
2  employee?
3      A    He was --
4      MS. KERLEY:  Objection as to relevance.
5      MR. BAKER:  Go ahead and answer.
6      THE DEPONENT:  The department discharged him.
7      MR. BAKER:  Thank you.
8      Q    If you were to compare his conduct
9  with the conduct of Mr. Scheff based upon the
10  information you gathered in your investigation, how
11  did Mr. Scheff's conduct compare to his?
12     MS. KERLEY:  Objection as to relevance.  She
13  is not a decision maker.
14     MR. BAKER:  You can answer.
15     THE DEPONENT:  Based upon that particular
16  investigation, Mr. Scheff, the allegations against
17  Mr. Scheff, and the information gleaned from the
18  interviews, it was far more than the previous BCHS
19  employee.
20     MR. BAKER:  Q  Mr. Scheff's misconduct was
21  greater than the other individual's.
22     THE DEPONENT:  Yes.
23     MR. BAKER:  Okay.  Thank you.  Off the
24  record.

Baldwin Court Reporting & Legal Video Services
1-800-248-2835

## Page 89

1    (Discussion off the record.)
2    (Whereupon said document was
3    duly marked for purposes of
4    identification as Exhibit 41
5    as of this date.)
6    MR. BAKER:  Q  Laura, I understand on the
7  afternoon of October 17 at 1:16 p.m., you
8  interviewed Sheri Bangert?
9    A    Yes.
10    Q    Can you read into the record what your
11  comments are at that entry in your log sheet.
12    A    Interviewed Sherry Bangert.  Written
13  statement obtained.  Marie Watts interrupted asking
14  if she was needed.  Bangert said no, I don't think
15  so, but if I do -- I don't know -- I'll get her,
16  meaning Marie Watts.  I'll let you know.  I'll let
17  her know.
18    Q    Okay.
19    A    I asked Watts how she found out about the
20  interview, Bangert's interview, and Marie Watts
21  replied she asked where she -- meaning
22  Sheri Bangert -- was going.
23    Q    Now, was Marie Watts a union steward or
24  representative?

## Page 90

1    A    She was a steward -- or a representative.
2    Q    And if Sheri Bangert had wanted Marie
3  present, that was her right?
4    A    Correct.
5    Q    In your interview sheet, which I assume
6  you prepared, there's a reference to a person named
7  Nielsen?
8    A    Yes.
9    Q    That's Tonya Nielsen?
10    A    I think it's Tony.
11    Q    Tony Nielsen.
12    Was that Sheri's supervisor?
13    A    That would have been a contact for
14  Sheri's particular unit.  She was an acting
15  supervisor, I'm not certain if -- I would assume
16  that she would have been over Ms. Bangert because
17  again, we do, as a courtesy, contact the supervisor
18  and say, hey, we need to know, we need to talk with
19  so and so.
20    Q    And there's some discussion concerning
21  conversation that Sherry apparently had with
22  Ms. Nielsen when, as I understand it, Marie Watts
23  knocked on the door?
24    A    Yes.

## Page 91

1    Q    Was Ms. Bangert cooperative during the
2  course of the interview?
3    A    Yes.  In fact, after Marie Watts's
4  interruption, Ms. Bangert commented to me on how
5  well I had handled that.  And I also told
6  Ms. Bangert if at any point she wanted Marie Watts
7  or a union rep to be there, she could do that.
8    Q    During the oral portion of your interview
9  with Sheri, did she explain to you a comment she
10  had heard relating to a local realtor?
11    A    Yes.
12    Q    Tell me what she explained to you.
13    A    She said that during that summer she was
14  in Debbie's office.
15    Q    Debbie Sullins?
16    A    Debbie Sullins.  And during -- while she
17  was there, she heard Mark Scheff -- she saw Mark
18  walk into the office next to Debbie Sullins'
19  office, Joe Roberts and Mike Sandidge, they shared
20  an office, and Bangert heard Roberts and Sandidge
21  talk about a realtor named Fritz Pfister.  And
22  Scheff responded Pfister, I had a Pfister once.
23  And she said her rely to that was, God, can't you
24  do some keagles or something, get out of here.

## Page 92

1    And Bangert shut the door in
2  Debbie Sullins' office because she was offended by
3  the comment.
4    (Whereupon a recess
5    was taken.)
6    MR. BAKER:  Q  Laura, going back to Exhibit
7  30, you made an entry for something that occurred
8  on October 17 at approximately 1:25 p.m., could you
9  read into the record your entry, and if we need
10  some clarification we'll ask for it.
11    A    Telephoned Steve Bradley of interview and
12  of my interaction with Tony Nielson.  The fact that
13  I had telephoned her in his absence to advise I
14  needed to speak with Bangert for an internal
15  affairs interview.
16    Nielsen immediately responded:  I'd like
17  Marie there with her.  I responded:  Marie who.
18  And Nielsen's response was:  Marie Watts.  I
19  directed Nielsen not to advise Bangert she could
20  have union rep present as Bangert was the source of
21  info and she, Bangert, is supposed to know her
22  contract.
23    I then advised Nielsen I was located on
24  the first floor building conference room and

## Page 93

1   Nielsen said she would respond.  I then hung up the
2   phone.  Bradley said he would handle the matter.
3   Nielsen, Watts in her recent -- got me on that one,
4   I don't know -- set numerous times during our brief
5   conversation.
6           Bangert was not to be told of her need of
7   a union rep.  Nielsen's telephone call, which I
8   made to her, was estimated to have occurred at or
9   almost 1:17 p.m.
10  Q    As a matter of practice in your division,
11  do investigators typically not inform employees of
12  a right to have a union rep?
13  A    When an internal affairs investigation is
14  underway and folks come in, employees come in, it
15  is their responsibility, collective bargaining,
16  it's their responsibility to know their contract.
17  And if they wish to have union rep, they can either
18  bring them with, or during the course of interview,
19  they can say I think I would like my union rep.
20          I've had conversations prior to this
21  investigation and after this investigation of
22  managers who say, well, do I need to call the
23  union, no, you don't, because this is not a pre-D,
24  which is handled differently, there's a clear

## Page 94

1   distinction between pre-D handlings and IA
2   interviews.  And I told Nielsen not to tell Bangert
3   she could have union representation there.  That's
4   common practice.
5   Q    The line of dichotomy is that if they're
6   there because of discipline or potential discipline
7   involving them, then the wine garden rule applies
8   where they're entitled to union representation; am
9   I correct?
10  A    I believe so, yeah.  Because the pre-D is
11  handled internally, like if Tony Nielson wanted to,
12  as an example, discipline Marie Watts for smacking
13  somebody upside the head in the workplace, and if
14  management chose to handle that internally in house
15  without notifying IA, they could do that.
16          But when they feel that they have enough
17  information gathered and they want to do the pre-D,
18  just to say, hey, we have enough information to
19  substantiate whatever it is we're going to
20  substantiate, you have a rebuttal up to such and
21  such a time, and we will notify the union.  I
22  believe management notifies union of a pre-D.
23          But Tony Nielsen was very good friends
24  with Marie Watts so there was the connection.

## Page 95

1   Q    The next page, and maybe it's not where
2   it should be, I don't know.  But up at the top it
3   has 01-073-MO.
4   A    Yes.
5   Q    And page five.  Is that a part of your
6   case log?
7   A    That would be if I didn't have enough
8   case log blanks with me and I used another
9   document.
10  Q    And as I understand it, you interviewed
11  both Judy Stephenson and Marina Powell?
12  A    Yes.
13  Q    Am I correct?
14  A    Yes.
15  Q    Who is Marina Powell?
16  A    Marina Powell, I believe she -- is she an
17  E 1 perhaps, or E 2.  I can't remember but...
18  Q    E 2.
19  A    E 2
20                  (Whereupon said document was
21                  duly marked for purposes of
22                  identification as Exhibit 42
23                  as of this date.)
24  Q    I'm going to hand you Exhibit 42, and my

## Page 96

1   question with respect to that document is to ask
2   you to identify it, if you would.
3   A    It's Marina Powell's written statement
4   which I secured on the 17th of October.
5   Q    I think earlier today we talked about
6   Exhibit 28.
7   MS. KERLEY:  I have that we started with 29 --
8   THE DEPONENT:  Yeah, 29.  Mary Thallman
9   interview.
10  MS. KERLEY:  (Continuing)--today.
11  MR. BAKER:  Okay.  You're right.
12  Q    Let me ask you this:  I'm going to
13  hand you what is my marked copy of Exhibit Number
14  28, it was a document used in another deposition,
15  can you identify that document for me.
16  A    This is the interview sheet from Judy
17  Stephenson's October 17 interview, her written
18  statement that she provided, and a copy of the
19  acknowledgment form.
20  Q    Do you recall anything unusual that
21  occurred either in Judy Stephenson's interview or
22  the interview of Marina Powell?
23  A    Both woman provided information that they
24  knew that Scheff had made comments that were of a

Sullins v. Illinois Department of Public Aid

## Page 97

1  sexual nature, whether it was sexual innuendo. As
2  far as Marina Powell, she knew that Mark had made
3  direct comments about having to be a female to be
4  promoted, and that he did not have the equipment
5  that she interpreted as implying sexual organs to
6  be promoted.
7          Her observations that he -- her
8  observation that Scheff leered at Edmonds and how
9  Powell found this to be unprofessional and
10  inappropriate on Mr. Scheff's behalf, and that she
11  was indirectly aware of the penis tree.
12         As far as Ms. Stephenson, I believe she
13  made comment -- she heard -- she's known Scheff
14  since, I want to say, Logan county. I believe they
15  worked together in Logan county. And that Mark had
16  made comments that were of a sexual nature or
17  sexual innuendo while employed at the Logan county
18  local office.
19         She was aware of his behavior. She
20  learned to tune him out because it was so
21  frequent. I remember her saying she had knowledge
22  of a conversation that Scheff had with her about
23  Scheff going out of town, about getting some sex or
24  getting some; and I think, if I recall, a Post-it

## Page 98

1  note, that you probably should have a copy of, that
2  it referred to going to St. Louis and dealt with a
3  BJ, which is a blow job.
4      Q     That's something he told --
5      A     Stephenson.
6            She was aware of his behavior -- similar
7  behavior while at the Bloom building as well when
8  we worked at the Bloom building. She was housed at
9  the time on Walnut Street, I think.
10     Q     After your interview with
11  Judy Stephenson, according to page five of Exhibit
12  30, you talked with Jodi Edmonds, was that talk
13  limited with indicating who you wanted to interview
14  next?
15     A     That was it.
16     Q     And as I understand it, on October 17,
17  you called Debby Davis?
18     A     Yes.
19     Q     And Debby Davis was the labor relations
20  representative for that particular bureau; is that
21  her job title or job description?
22     A     Yes. Why did you talk with Debby Davis?
23     Q     Why did you talk with Debby Davis?
24     A     I informed her about Marie Watts'

## Page 99

1  interruption. Tony Nielsen's behavior as far as a
2  conversation I had with her about Nielsen saying,
3  well, I'll have Marie come with her, basically.
4          I believed, as a manager, that was
5  inappropriate, Nielsen's behavior, and I wanted
6  Debby Davis to be made aware of that.
7      Q     What was her reaction?
8      A     Well, she has the right to
9  representation, being Sheri Bangert, which is true,
10  but not that management has the right to let the
11  collective bargaining employee know that they can
12  have IA -- or union representation in the IA
13  interview.
14     Q     I know that having a collective
15  bargaining representative there is a right that
16  someone has. When there is a union representative
17  there, does it impede the interview?
18     A     Sometimes. It depends on how animated
19  the rep wants to be. Their sole purpose is to
20  maintain themselves in that interview to ensure
21  that we do not violate the contract and the rights
22  of that employee. So they sit there and take
23  notes, that should be -- in a perfect world, that
24  should be the way it goes.

## Page 100

1      Q     All right.
2            Do I understand you also interviewed
3  Pam DeFour?
4      A     Yes, I did.
5      Q     And how was it you came about
6  interviewing Pam?
7      A     I'm not -- without looking at the
8  interview sheet, I'm not quite certain. Obviously
9  she was named at some point of perhaps having some
10  knowledge, whether that would be -- I learned that
11  Mr. Thallman's --
12     Q     Well, if you go down to page 5 again,
13  after you talk about Marie Watts' regarding calling Pam
14  contacted by Deb Sullins' regarding calling Pam
15  DeFour?
16     A     Uh-huh.
17     Q     Do you recall that conversation?
18     A     Other than what's recorded, probably
19  just, hey, Pam DeFour's talking about a conflict of
20  interest.
21     Q     Okay.
22            (Whereupon said document was
23            duly marked for purposes of
24            identification as Exhibit 43

Baldwin Court Reporting & Legal Video Services
1-800-248-2835

## Page 101

1                    as of this date.)
2        Q    I'm going to hand you what's marked 43.
3        A    Oh, I interviewed Pam DeFour because she
4   was included in the PK Luttrell discussion or the
5   -- her husband committing suicide.
6        Q    It looks like you interviewed Pam on
7   October 17?
8        A    Yes.
9        Q    And then did you again talk with her on
10  October 18?
11       A    Yes.  Because I believe I had the small
12  conference -- or the large conference room still
13  reserved to conduct interviews, and I think is when
14  I walked in the Bloom building, as I walked in by
15  the security desk, she was coming out of the
16  elevator and she caught me.
17       Q    Pam called you?
18       A    Pam caught me, I thought.  I thought she
19  caught me.  She caught me.  I'm not sure at that
20  point.
21       Q    Tell me what happened when you talked
22  with Pam as she was coming out of the elevator.
23       A    She had said that there was a lot of talk
24  about my involvement in the investigation.  And I

## Page 102

1   said -- I asked her to define who, was it just
2   union, was it management.  She says -- I said:
3   Don't tell me who, just tell me union or
4   management.  She said:  Both.  And I said:  Okay,
5   that's okay.
6        Q    And was it after that that you approached
7   Mr. Moscardelli about recusing yourself from the
8   investigation?
9        A    I left the Bloom and went to her office
10  at 2040 Timber Brook.
11       Q    At any time while you were involved in
12  the investigation, did you interview Mark Scheff?
13       A    No.
14       Q    And I take it then, you didn't
15  participate in Mark Scheff's interview?
16       A    Correct, I did not.
17       Q    Do you recall at any time during the
18  period you were involved in the Mary Thallman
19  investigation that you had a conversation in Debbie
20  Sullins' office with Jodi Edmonds?
21       A    Yes.
22       Q    And if I asked you when that conversation
23  occurred, during the course of the investigation,
24  could you tell me?

## Page 103

1        A    I would probably say it was the 13th of
2   October or the 16th of October.
3        Q    Okay.  Do you recall the time of day, was
4   it early in the day, late in the day?
5        A    I believe it might have been in the
6   morning.  It was at a break time, either in the
7   morning break or afternoon break, and the door was
8   open.
9        Q    Okay.  Were you in Debbie's office at the
10  time Jodi came into the office or was she already
11  there?
12       A    I was there and she came to the doorway
13  in the door jam, she stood in the door jam.
14       Q    Tell me what occurred.
15       A    She asked me basically what the
16  investigation was about, what was going on.  And I
17  told her to come in the office, I shut the door
18  behind her, and I told her don't ever ask me that
19  again.
20       Q    Why did you do that?
21       A    Because she was asking me in an open area
22  what was going on.  She asked me in front of a
23  subordinate, her subordinate, and it was
24  inappropriate.

## Page 104

1        Q    The subject matter was inappropriate?
2        A    The subject matter was inappropriate, the
3   timing of her asking me.
4        Q    What was there about the subject matter
5   that was inappropriate?
6        A    She asked me, in front of Debbie, what
7   was going on with, you know, the investigation,
8   what's going on, something to that affect.
9        Q    Is that a subject that's off limits?
10       A    It's more along the lines of on a
11  need-to-know basis, and Ms. Edmonds did not need to
12  know because she was the supervisor over Leena
13  DeGroot, Marvin Ross, and those folks, as part of
14  the management team, were going to have to be
15  interviewed.
16       Q    How did she react with the comments you
17  made to her?
18       A    She was ticked off.
19       Q    What do you mean she was ticked off?
20       A    Her body language.  I believe that is
21  also documented in my response about the
22  allegations placed against me.
23       Q    During the course of your involvement
24  with the Mary Thallman investigation, other than

26  (Pages 101 to 104)

Page 105

1  conversations with Jodi where you said I need to
2  see a certain employee at a particular time, was
3  this the only conversation you had with her
4  concerning the investigation?
5       A    Other than just, you know, again setting
6  up the interviews, yeah, that would have been it.
7       Q    If you look at the next entry, it looks
8  like it's a telephone message that says:  Please
9  call Jodi Edmonds.  Was that a message for you or
10 was that something you filled out?
11      A    That would have been for me.
12      Q    Do you have any recollection of calling
13 Jodi after receiving the message?
14      A    No.
15      Q    What I'm going to ask you to do is, if
16 you could, read in your entry on October 18 at
17 9:15.
18      A    Meeting with DJM, TT, reference my
19 request to be recused from this case.  Advised
20 roommate status of Sullins effective October 12,
21 2000.  DJM, TT, discussed E-mail I sent.  That
22 would have been the one probably on the -- was it
23 the 16th, 8:00 o'clock, something like that,
24 E-mail.

Page 106

1            DJM asked if Sullins was offend or filed
2  a complaint against Scheff.  I said according to
3  written statement, it didn't appear.  But in
4  talking with Mike Taylor this morning, he indicated
5  Sullins was offended by Scheff's remarks to his
6  vagina/penis strong pussy comment.  And prior to
7  Sullins departs the interview room, indicated --
8  she indicated she was fearful of Scheff.
9            Advised DJM, TT that I told Mike Taylor
10 he needed to have Sullins incorporate same in her
11 written statement.  Mike asked if he needed to have
12 her amend her statement, I said no, just to add
13 it.
14            DJM said he'd contact Debby Davis and get
15 her opinion on how to proceed.  I said no problem
16 as I do not want to get in the way with any
17 discipline which may be imposed against Scheff.  I
18 told DJM I have problems continuing in the case as
19 I can, and have -- it should read I do not have,
20 but I wrote I have problems continuing.  I did not
21 and I do not have problems continuing the case --
22 as I can and have stayed impartial throughout.
23            DJM said if I am removed it is not
24 discipline as a result of.  DJM said he would like

Page 107

1  me to continue with the investigation but will go
2  with what Debby Davis directs.  I said I had no
3  problem.  DJM commented if I am removed, it's not
4  because of being disciplined.  He said that twice.
5       Q    Okay.  If you go back to the top of that
6  entry, something occurred on October 12, 2000, what
7  occurred then?
8       A    Debbie and I moved into 608 Flora.
9       Q    Became apartment mates or roommates?
10      A    Yes.
11      Q    And I'm taking it --
12      A    And I believe I E-mailed -- I had
13 E-mailed a change of address.
14      Q    So at least your relationship with Debbie
15 had progressed to the point where you and she were
16 living under the same roof?
17      A    Yes.
18      Q    Laura, have we basically covered your
19 activities while you were involved in the Thallman
20 investigation or did something occur that we have
21 not yet talked about?
22      A    I had conversation with Debby Davis -- is
23 she the tall one or the short -- the tall one's
24 Debby Davis, right?

Page 108

1       MS. KERLEY:  Yes.
2       THE DEPONENT:  (Continuing)--Debby Davis in
3  our office in the Penta building after the
4  investigation, if you will, was forwarded to -- was
5  at labor relations unit.  And I sat in her office,
6  and I told her -- I told her that my involvement in
7  the investigation had no bearing on Mr. Scheff's
8  behavior or actions and was not a conflict because
9  Debbie was not -- she was not the complainant nor
10 was she the subject, she was a source of
11 information like everyone else that was
12 interviewed.  And she said let the union prove that
13 it's a conflict of interest.
14      Q    Let me ask this:  Typically, if you make
15 any findings it's after all the investigation is
16 concluded; --
17      A    Correct.
18      Q    (Continuing)--am I correct?
19            And you had never gotten to the point
20 where the investigation was concluded so you could
21 make any findings or recommendations; am I correct?
22      A    Correct.
23      Q    Why was it you had this conversation with
24 Debby Davis, did you initiate it or did she

27 (Pages 105 to 108)

Page 109

1  initiate it?
2      A    I was probably over there on a mail run
3  it was in the afternoon.  I just always stop and
4  talk to people that are friendly.  It's not often I
5  can do that.  And I knew that it was -- I knew that
6  the case was over there, so.
7      Q    Was that after there were some
8  allegations that you had done something during the
9  investigation were made against you?
10     A    That would have been before.  I had that
11 conversation with her before the allegations
12 against me, I think around, I want to say,
13 Thanksgiving of 2000.
14     Q    Now, as I understand it, by October 12,
15 your relationship with Debbie Sullins had developed
16 to the point where you and she were --
17     A    Under the same house.
18     Q    (Continuing)--living under the same
19 roof?
20     A    Yes.
21     Q    At any time prior to October 12, had you
22 and she, in an unofficial sort of way ever talk
23 about Mark Scheff?
24     A    Unofficial, can you define "unofficial."

Page 110

1      Q    Well, outside of your duties for the
2  Department of Public Aid?
3      A    Not Mark Scheff.  No one was specifically
4  identified.
5      Q    Did Debbie ever indicate to you prior to
6  October 12 that there was someone around the
7  workplace who she felt was a boar or offensive or
8  vulgar?
9      A    Yes.
10     Q    But she didn't identify that person?
11     A    Didn't identify the individual.
12     Q    During your involvement in the
13 investigation, did Debbie ever indicate to you that
14 the individual who she deemed to be vulgar or
15 offensive was Mark Scheff?
16     A    During --
17     Q    During your involvement with the
18 investigation.
19     A    No.
20     Q    During the course of your involvement
21 with the investigation, did you ever discuss
22 details of the investigation with Debbie Sullins?
23     A    No.
24     Q    Since that time have you ever discussed

Page 111

1  details of the investigation with Debbie Sullins?
2      A    No.
3      Q    So there's been some sort of glass
4  curtain between you and she concerning this subject
5  matter?
6      A    Yes.  She knew from the onset that I had
7  a clear distinction, it was not to be discussed at
8  home, she could not ask me questions.  I never told
9  her she couldn't call me -- and obviously she's
10 relay information, you know, Mary Thallman wants to
11 talk to you or Pam DeFour.  But, no, she knew it
12 was off limits.
13     Q    All right.
14                (Whereupon said document was
15                 duly marked for purposes of
16                 identification as Exhibit 44
17                 as of this date.)
18     MR. BAKER:  Q  You have before you Exhibit 44,
19 which appears to be a six -- excuse me -- may be
20 six-and-a-quarter page, single-spaced document, and
21 I'm assuming on page 7 is your signature and the
22 date, December 1, 2000?
23     A    Yes.
24     Q    Are you the author of this document?

Page 112

1      A    Yes.
2      Q    What were the circumstances that caused
3  you to write this document?
4      A    I was notified, and it's in my daily
5  planner of the day I was told or asked by Terry or
6  Rick if I was going to be in on that particular
7  day, whatever day that was at 2:00 or 2:30, and I
8  said yes.  I think it was Terry.  And Terry,
9  whoever it was, said we need to discuss a case.
10 Okay, what case is it.  Well, it's just a case.
11          Well, what case is it so I can prepare
12 for this 2:00 or 2:30 meeting.  He said just 2:00
13 or 2:30.  So I followed him.  He left and I
14 followed him into his office.  I said what is this
15 about.  I said you don't want me to prepare for
16 this case and discussion.  And he said you'll learn
17 this afternoon.  Okay.
18     Q    This is Terry now?
19     A    I believe -- yeah, it's Terry because I'm
20 in his office.
21          And he said -- and I just said okay.  And
22 I walked away puzzled.  And I got the same feeling
23 that the way he was acting was the same way that
24 was quite similar to when two other -- two

Baldwin Court Reporting & Legal Video Services
1-800-248-2835

## Page 113

1  investigators, Chris Valentine and Jimmy Jones were
2  under investigation, that same sort of demeanor.
3      Q    Okay.
4      A    I immediately began to clean out my
5  office, based upon my experience, and I did.
6      Q    You thought your days were numbered?
7      A    Hours.
8      Q    Did you have any idea, as you were
9  cleaning out your office, what it related to?
10     A    No.
11     Q    Had you had any prior discipline during
12 your career at the Department of Public Aid?
13     A    No.
14     Q    Had you received at least satisfactory
15 evaluations while you worked at Public Aid?
16     A    Yes.
17     Q    And if you know, at least from your point
18 of view, as of the fall of 2000, did you have what
19 you would consider a satisfactory working
20 relationship with both Mr. Tranquilli and
21 Mr. Moscardelli?
22     A    Yeah, it was family, you know.  I mean we
23 had our disagreements like everything that's
24 healthy and that's balance.

## Page 114

1      Q    I take it that Mr. Tranquilli was
2  behaving in a way that was a whole lot different
3  than how he normally behaved around you?
4      A    Yeah.
5      Q    All right.  Well, now I'm at the edge of
6  my seat.  2:30 came, I assume, and you had your
7  meeting?
8      A    It was before 2:30 or whatever the
9  meeting was, and I was shredding documents because
10 I'm leaving, this is my mind set.  And I asked, I
11 said you can't tell me what this is about.  He said
12 you'll find out.
13     Q    Just not to let the record be cluttered
14 by any inference that may not need to be there,
15 were you shredding anything that was something that
16 should not properly be shredded?
17     A    Oh, no.  No.
18     Q    It was not a Watergate situation, was it?
19     A    No.  No.  No.  No.
20     Q    Okay.  Well go on with your story.
21     A    I asked him again and he finally said
22 there were some complaints made against you.
23 Okay.  And I know that earlier that morning, he had
24 told me also that the interview would take place at

## Page 115

1  -- I have to think of the address for a moment --
2  405 or 404 North Fifth Street, the main
3  administration for OIG there on North Fifth
4  Street.  And I said well why does it got to be
5  there.  So that was the other thing that got my --
6      Q    Is that Mr. Moscardelli's office?
7      A    No.  That is where, at the time, the
8  Inspector Rob General -- or Rob Miller was the
9  inspector general was housed at.
10     Q    Okay.
11     A    And so that's another feather in my cap
12 that knows that the light at the end of the tunnel
13 is going to consume me quite soon.
14     Q    You didn't go down to the Bureau of
15 Employment Security?
16     A    No.  No.  But I did have --
17     So I said all right.  And I said, well,
18 can't we do this interview -- again this was
19 earlier that day -- can't we do this interview
20 here.  No, we want to do it over there.  Rick and I
21 are going to be talking to -- you're going to meet
22 with Rick and I because we don't want to draw --
23 what did he say -- we don't want to draw
24 attention.  And I'm thinking, well, makes perfect

## Page 116

1  sense to me.
2      I said I don't have a problem with this
3  interview being taken place here because the only
4  people that were in the office were Derrick,
5  myself, Terry, Marylou, and Connie McMillan.  There
6  were no investigators in the building.
7      Q    Marylou and Connie are --
8      A    Marylou Seymour Smith, administrative
9  assistant; and Connie McMillan.
10     He says, no, we want to meet you there.
11 I said okay.
12     So again, the afternoon came, I'm by the
13 shredder, he says about allegations or complaints
14 come in about you.  Okay, no problem.
15     Q    Did he identify what the case was, the
16 allegations?
17     A    No.  No.  No.
18     Went to the building I was supposed to
19 go, I sat in the lobby until Rick and Derrick
20 showed up.  I saw Steve Hilgers by the elevator.
21     Q    Who is he?
22     A    He was -- he is a B of I investigator, he
23 might have been with the Medicaid fraud task force
24 at that point with ISP on loan.  And he said, ah,

Sullins v. Illinois Department of Public Aid

Page 117

1  what you doing here.  I said I got to meet Rick and
2  Terry.  And he says, oh, you getting fired.  I said
3  one doesn't know.
4      I said, yeah, they don't want to draw
5  attention to me to me being talked to.  He says,
6  oh.  And he left.  And then Rick and Terry come in
7  and Terry goes first, I'm in the middle, and Rick's
8  right behind me.
9      Now obviously it didn't draw attention.
10  I thought, gees, whatever.  We go to a room, and
11  they begin to tell me about three or four
12  allegations by three or four different people.  The
13  numbers are just one off, but.  And --
14      Q    Do they identify the people?
15      A    Yeah.
16      Q    And do they identify the allegations?
17      A    Yes.
18      Q    Who were the people?
19      A    Pam DeFour had complained about
20  something.  I don't know, I remember her
21  complaining something about Mark Scheff and
22  probation and zero tolerance.  And Mike Sandidge
23  was another one that I allegedly made a
24  gender-based comment in response to his information

Page 118

1  he shared about Scheff masturbating or jacking off
2  at some hotel up north.  Jodi Edmonds about me
3  making a comment about Debbie's ABT being included
4  in her evaluation.
5      Q    Tell me about that, that incident, if you
6  would.
7      A    The was at 2040 Timber Brook trying to
8  set up interviews, and I called Jodi Edmonds from
9  Connie McMillan's phone in an open area, and asked
10  her -- when I got ahold of Jodi I said I need to
11  set up some interviews.  She either went to her
12  door to shut it so no one would hear or move
13  somebody out of the office.
14      And when she came back, in order to get
15  her settled, you know, I could hear her getting --
16  you know how you hear people getting set to sit
17  down or something.  And I filled the time up with
18  saying, you know, something about Debbie's having
19  ABT time included in her evaluation, it was a good
20  idea.
21      Q    What is ABT time?
22      A    Available benefit time, sick time,
23  vacation time, personal business days which you
24  have accrued.  And I thought, you know, I was

Page 119

1  supportive of her.  But in the back of my mind, I
2  thought what a great manager she might have been.
3  And I'm being facetious.  Because that should never
4  be put in an evaluation, but anyway.  I learned
5  that years later in a training that that shouldn't
6  be in there.
7      But that was it and I set up an
8  interview.  I don't know which one it was.
9  Sandidge, DeFour, Edmonds, and Mr. Schuh.
10  Mr. Schuh alleged that I assaulted him.
11      Q    How did you -- what was his allegation of
12  assault?
13      A    Without looking at whatever he provided
14  me, probably I grabbed his arm or hit his arm.  I'm
15  not sure.
16      Q    If you can recall, how large a man is
17  Mr. Schuh?
18      A    At the time, 2000, we were -- I was 20,
19  25 pounds lighter.  He's very small, slender kind
20  of guy, kind of wiry.
21      Q    So I take it Mr. Moscardelli and
22  Mr. Tranquilli present these allegations to you.
23  Was it presented in written form, and by that I
24  mean were you given copies of some statements or

Page 120

1  interviews that these people had given or something
2  in writing they had provided or were you just
3  orally informed of what they said?
4      A    I was orally informed.  And I took notes.
5      Q    After you got this information, what next
6  occurred?
7      A    I had to prepare this.  I had to prepare
8  my responses.
9      Q    You're referring to Exhibit 44?
10      A    Exhibit 44.
11      Q    Okay.  Other than being told you had to
12  respond to it, did anything else occur during this
13  meeting?
14      A    I was just thankful that I didn't conduct
15  myself like they conduct themselves in interviews,
16  it was just my only personal view.  They're very --
17  we all have different styles.
18      Q    Mean cop, nice cop sort of thing?
19      A    Um, Terry was quite.  I don't think Terry
20  likes confrontation, especially dealing with
21  females, that was my take.  Derrick was just -- he
22  doesn't like confrontation either, but who does,
23  other than you lawyers.
24      MS. KERLEY:  Right.

Baldwin Court Reporting & Legal Video Services
1-800-248-2835