1   to say?
2       A.   Yeah.
3       Q.   Who else besides Mary Thallman was present?
4       A.   Velva may have been.  Because, like I said,
5   I think we were at the coffee machine and that's
6   usually one of those collection spots.  I don't know
7   if Jim was there or not because Jim was a heavy coffee
8   drinker, or he used to.  Be I don't know if he still
9   is.  And Jim may have been there, too.  And Jim really
10  liked Marvin, so.
11      Q.   Do you recall, as you sit there today,
12  whether or not Jim was present?
13      A.   I don't remember right now.  I can't
14  remember.
15      Q.   Okay.
16      A.   I know for sure Mary Thallman was because
17  Mary Thallman had talked to me later about how
18  offensive it was and how that you would think that as
19  close friends as Marvin and Lenna and Jodie all are
20  that this would have been something that would have
21  pushed them or motivated them to take action with
22  Mark.
23          MS. KERLEY:   Okay.  I think that this would
24  be a good place to stop.

1          MR. BAKER:   Okay.
2          MS. KERLEY:   Oh, wait, one last question.
3   Or, as the kids, say psyche.
4   BY MS. KERLEY:
5       Q.   With regard to the Marvin's comment, did you
6   complain about that comment to anyone?
7       A.   Yes, I did.
8       Q.   And to whom?
9       A.   To Lenna and Jodie both, and they were in
10  the same room.
11      Q.   And where were they?
12      A.   Lenna was sitting at her desk, Jodie was
13  standing just beyond the door, and I was standing
14  right inside of the door.
15      Q.   Of Lenna's office?
16      A.   Of Lenna's office.
17      Q.   And what did you tell them?
18      A.   I told them that down at the coffee pot and
19  what was said and that's why later I said to Mary and
20  I talked about it.  I told her that I had said
21  something to them and thinking that maybe that would
22  motivate them.  I told them the story and who was
23  there.
24      Q.   Okay.  And do you recall about when that

1   was?
2       A.   Marvin's birthday.  The actual day after his
3   birthday, the day the comment was made.
4       Q.   Was the day after Marvin's birthday?
5       A.   Yeah.  It was the day after his
6   39th birthday.
7       Q.   And you don't recall when Marvin's birthday
8   is --
9       A.   Well, no.
10      Q.   -- as you sit here?
11      A.   No.
12      Q.   Okay.  With regard to the comments that
13  we've discussed where you had testified about verbal
14  complaints that you made to various officials, were
15  any of those -- did you complain in writing as to any
16  of the comments that we've just discussed?
17      A.   Between May and October of 2000 or February
18  is that what you're saying?
19      Q.   Yeah.  February and October of 2000?
20      A.   Not prior to the Internal Affairs, it was
21  all verbal.
22      Q.   And when you say "Internal Affairs" you're
23  referring to the complaint filed by Mary Thallman on
24  October 13th of 2000?

1       A.   Yes.
2          MS. KERLEY:   Okay.  Now we're at a good
3   place to stop.
4          MR. BAKER:   Okay.
5          MS. KERLEY:   Off the record.
6          [WHEREUPON A SHORT LUNCH BREAK WAS
7          TAKEN.]
8   BY MS. KERLEY:
9       Q.   Welcome back from lunch.  We're going to
10  shift gears a little bit and talk about something a
11  little different.  You had testified -- just touched
12  on briefly that there was a complaint of sexual
13  harassment filed by Mary Thallman with the Office of
14  Internal Affairs?
15      A.   Yes.
16      Q.   Is that correct?
17      A.   Yes.
18      Q.   You're aware of that complaint?
19      A.   Yes.  I was a witness in it.
20      Q.   Okay.  It's my understanding -- well,
21  actually, if you know, how did Mary Thallman lodge
22  that complaint?
23      A.   She came to my office the morning that it
24  happened -- the incident that she wanted to complain

1   about. She told me that she had been talking to Velva
2   Fletcher and Velva Fletcher told her that I had a
3   friend that worked for the OIG office and would I give
4   her that person's phone number or have her call me.
5   And I said, whatever you want. And she said, well,
6   ask her to call me. And I said, well, I know that
7   she's in this building today. So, I left a phone
8   number -- I called Laura's beeper and left a number
9   and she called me and I told her to call Mary Thallman
10   and gave her Mary Thulman's number and told her that
11   Mary Thallman wanted to file a complaint of sexual
12   harassment. And she said the next question was, who
13   was her supervisor? And I told her. And that's what
14   happened.
15      Q.   Okay. And that would have been on
16   October 13th, 2000; does that sound about right?
17      A.   Somewhere around in there.
18      Q.   Okay. And the friend that you have in OIG
19   is Laura Whetstone?
20      A.   Yes.
21      Q.   And is it correct that you and Laura live
22   together?
23      A.   Yes.
24      Q.   And did at the time of that call?

1      A.   Just started.
2      Q.   Just started. And Laura and -- you and
3   Laura are in a relationship currently?
4      A.   Yes.
5      Q.   Okay. And when did that relationship begin?
6      A.   August kind of more -- we moved in together
7   the end of September, first of -- we rented a house
8   together in October. We were living together at the
9   end of September.
10      Q.   Okay. And Laura is an internal investigator
11   with the Department of Public Aid; is that correct?
12      A.   Yes.
13      Q.   And she was at the time?
14      A.   Yes.
15      Q.   In 2000?
16      A.   Yes.
17      Q.   Okay. And that relationship is one of a
18   romantic nature; is that correct? For lack of a
19   better term. And an appropriate answer can be,
20   sometimes it's romantic.
21      MR. BAKER:   Committed relationship.
22      THE WITNESS:   It's a committed relationship.
23      MR. BAKER:   To be politically correct.
24   *BY MS. KERLEY:*

1      Q.   So, in or around the time frame that we've
2   been talking about late 2000, early 2001, if you
3   referred to either a partner or a spouse, would you
4   have been referring to Laura Whetstone?
5      A.   Yes, I would have.
6      Q.   Okay. Give me one second.
7      THE WITNESS:   Off the record.
8      MS. KERLEY:   Off the record.
9            [WHEREUPON THERE WAS A SHORT
10            DISCUSSION OFF THE RECORD.]
11   *BY MS. KERLEY:*
12      Q.   Back on the record. In your complaint you
13   have a separate count where you allege that the
14   Department discriminated and retaliated against you
15   because of your efforts in opposing sexual misconduct
16   described above; is that correct?
17      MR. BAKER:   Do you want her to look at it?
18      MS. KERLEY:   You may.
19      MR. BAKER:   Where are you, Sarah?
20      MS. KERLEY:   For the record, we are looking
21   at the complaint. If you look at Page 6 of 7 of the
22   complaint in Paragraph 17.
23      THE WITNESS:   Okay. What was the question?
24   *BY MS. KERLEY:*

1      Q.   The original question was that in your
2   complaint you allege the Department discriminated and
3   retaliated against you because of your efforts in
4   opposing the sexual misconduct described throughout
5   the complaint and the failure of your supervisor to
6   intervene; is that correct?
7      A.   Yes.
8      Q.   We're going to talk a little bit about that
9   retaliation now. I would like for you to describe for
10   me what allegations you're making of retaliation.
11   What conduct you believe was in retaliation for you
12   opposing sexual misconduct?
13      Actually, I'll ask you that question in
14   about 30 seconds. Before that, when you say -- when
15   you allege that you oppose sexual misconduct, are you
16   referring to your role in the Mary Thallman
17   investigation which you previously testified as a
18   witness -- or that you testified you were a witness?
19      MR. BAKER:   Are you talking about a specific
20   paragraph of the complaint?
21      MS. KERLEY:   No. She's making -- in
22   Paragraph 17 she makes a general allegation of
23   discrimination in retaliation and she goes on to say
24   that her efforts in opposing sexual misconduct. What

1    is she referring to when she says opposing sexual
2    misconduct?
3              MR. BAKER:   For the record, I'm going to
4    lodge a general objection.  The allegations in the
5    complaint are statements of law that are interwoven
6    with the federal statute that prohibits certain types
7    of conduct and creeds liability for engaging in the
8    type of conduct.  But the complaint is a legal
9    instrument prepared by a lawyer and I have no
10   objection of the witness answering facts to the extent
11   she knows them.  But, to the extent answering this
12   would require her to exercise legal judgments or
13   certain legal knowledge, there's been no foundation
14   made that she has the capability of doing that.
15   *BY MS. KERLEY:*
16        Q.   Ms. Sullins, without coming to a legal
17   conclusion, I am asking for the factual basis as you
18   know it and as you best recollect it as to your
19   opposition to sexual misconduct?
20        A.   I'm still lost in what -- did you call it
21   legalese or lawyerese?
22             MS. KERLEY:   Except it's not easy, so I
23   don't know why we call it that.
24             THE WITNESS:   My objections to sexual

1    misconduct?  Is that what it says?
2    *BY MS. KERLEY:*
3        Q.   Yes.  Your opposition to sexual misconduct I
4    can rephrase.
5             Is it your allegation that you were
6    retaliated against for being a witness in the OIG
7    investigation of Mary Thulman's complaint?
8        A.   Yes.
9        Q.   Okay.  Is there anything, in addition to
10   your being a witness in -- for the Mary Thallman's OIG
11   investigation that you think was the basis for
12   retaliation on the part of the Department?
13        A.   I think what you're asking me is, and let me
14   clarify this, why do I think I was retaliated against
15   for witnessing -- for being a witness?  I'm confused.
16        Q.   That was a better question than the one that
17   I asked.
18        A.   I'm sorry.  Maybe not enough sugar at lunch.
19        Q.   No.  No.  You're doing fine.  It's a complex
20   issue.
21             So, you just -- and I'll try and
22   rephrase again.  I want to make sure that you
23   understand what I'm asking you.
24             You previously, just very previously,

1    testified that it's your allegation that the
2    Department has retaliated against you for your role as
3    a witness in Mary Thulman's investigation and that you
4    being a witness was the basis of retaliation by the
5    Department?
6        A.   Okay.
7        Q.   Is there any other conduct that you engaged
8    in that you think the Department retaliated against
9    you for?
10       A.   Not to my knowledge.
11       Q.   Okay.  And now to your well-worded question
12   and easily understandable question:  What acts of
13   retaliation do you allege the Department engaged in?
14       A.   One, they fostered Mark's conduct by not
15   stopping it from being ongoing on a daily basis.  And
16   telling me that, as a supervisor, even though I wasn't
17   a supervisor, I supervised no one when I came into the
18   position after I was a witness, was told that I had to
19   toughen up and take whatever people could dish out.
20       Q.   And who made that comment?
21       A.   Jodie Edmonds.
22       Q.   Okay.
23       A.   I was told by Jodie Edmonds that I was to
24   take all complaints directly to her and never refer

1    people to outside of the Unit ever again.
2        Q.   And --
3        A.   Which does not follow the employee's
4    handbook.
5        Q.   We'll get to that too, okay.  Anything else?
6        A.   I was retaliated on -- I was treated
7    differently from the time that this all came out --
8    actually, I began to be treated differently the day
9    that Jodie Edmonds came into my office on a lunch
10   break when Laura was in there and she demanded -- came
11   in and demanded to know what the investigation was all
12   about and asked her about what was going on.  And
13   she -- then Laura told her to shut the door.  And she
14   shut the door.  And Laura made the comment to
15   something to the effect of, this is not an appropriate
16   conversation.  You know that you're not supposed to be
17   asking this, and you're not supposed to be asking it
18   in front of one of your subordinates, too.  And I've
19   talked to Steve Bradley and if you need to talk to me,
20   we can go to Steve's office.
21       Q.   And from this conversation --
22       A.   From that point on, I was treated
23   differently by Jodie.  Before Jodie had been
24   lighthearted, easy to get along with, when I went down

1  and ask questions, I normally got an answer. By the
2  time I left I couldn't hardly get an e-mail out of the
3  lady much less an answer for a question. Her
4  attitude -- it turned totally around. I mean, it was
5  like Dr. Hyde (sic), Dr. Jekyll type atmosphere. And
6  I was not placed in that position -- I was not Jodie's
7  pick, I was Cheryl Beckner's pick for that position
8  because of my background with computers and what they
9  were wanting to do with that system and take it from
10  the antiquated version that the program was into a
11  more updated system. And I think that just
12  fostered -- I don't want to say "fostered." I think
13  that Jodie began to -- Jodie thought from that point
14  on that I wasn't a team player because of the fact
15  that I testified with the Union people against
16  management. And, see, I don't believe that there's an
17  us against them attitude. I think we all should be a
18  team. Yes, there's a time that you have to, as a
19  manager, discipline, or whatever, but I think when we
20  are all taxpayers paying each other's salary that we
21  need to work together as a group. But I believe Jodie
22  took this as me going against management.
23     Q.   And by "this," you mean --
24     A.   Witnessing -- being a witness.

1     Q.   Being a witness?
2     A.   For -- against Mark Scheff and the
3  Department's lack of action with his and Jim Schuh's
4  conduct. I think she saw that as I wasn't part of the
5  management team.
6     Q.   Okay. The conversation that you related --
7     A.   And I think she saw that as; I'm the boss.
8  I demand to know everything and, Laura, you should be
9  saying it to me. And Laura is -- Laura and I never
10  discuss the case as long as she was on the case. When
11  we began our relationship there was a line in the sand
12  that was drawn that we never crossed, that we don't
13  cross now. If she's out on surveillance and going to
14  be home late, she calls me and tells me, I'm in
15  surveillance, I'm in town or I'm out of town. I
16  expect to be home at such and such. I don't know who
17  she is doing surveillance on or who the case that she
18  has. Both of us have high ethical standards. So, for
19  Jodie -- I believe Jodie assumed I knew what was going
20  on by her doing that. And I believe that she took a
21  personal threat, or whatever, I'm not for sure, but I
22  think that that was the catalyst for starting the
23  retaliation was the fact that I just didn't push
24  anything under the carpet the way management does in

1  BCHS.
2     Q.   Okay. The conversation -- just to clarify,
3  the conversation that -- that you have just related
4  between Jodie and Laura took place in your office on a
5  break?
6     A.   (Nodded head up and down.)
7     Q.   Is that a yes?
8     A.   Yes. Sorry.
9     Q.   Those are both yeses?
10     A.   Sorry.
11     Q.   That was my bad for asking a question while
12  you were drinking.
13     MR. BAKER:   Coca-Cola.
14  *BY MS. KERLEY:*
15     Q.   When is the time frame? Was this
16  conversation shortly after a complaint was lodged?
17  Was it after -- do you recall if it was after
18  interview statements were made or do you recall?
19     A.   I don't recall.
20     Q.   Where that conversation was made?
21     A.   No.
22     Q.   Okay. You have related that Jodie's
23  attitude towards you changed and you thought that was
24  an act of retaliation. Is there -- what other conduct

1  or comments or things do you think were based on
2  retaliation?
3     MR. BAKER:   Objection; ambiguous.
4  *BY MS. KERLEY:*
5     Q.   Do you understand the question or do you
6  need me to clarify?
7     A.   Would you please?
8     Q.   Sure. You have just related one instance of
9  retal -- well, several instances of retaliation, the
10  last being Jodie's change in behavior. Do you recall
11  anything else that occurred that you believe was
12  retaliation by the Department against you?
13     A.   I think that when she would hold meetings
14  and invite the other programs that didn't supervise
15  besides me into a meeting and then I wouldn't be
16  invited in, but yet, there was things discussed in the
17  meeting from the agenda that was given to me by other
18  parties.
19     Q.   And by many "she" you mean Jodie Edmonds?
20     A.   Meaning Jodie Edmonds.
21     Q.   Okay.
22     A.   From the conversation that she has passed on
23  to other people about me, calling me a trouble maker
24  in the Department.

Q.    And who -- okay.  Who did you hear those comments from?

A.    Brad Wallner told me that Brian Brinker told him that Jodie Edmonds told him during that time frame.  And that he was not to promote me, and then Brian was moved to another section and Brad did promote me.  But then after Brian came back to the section, we began to have problems again.

Q.    Okay.

A.    And I believe it has to do with what Jodie Edmonds has said and done.

Q.    Okay.

A.    I believe in the local office or in the local central unit when the retaliation was going on, I was ostracized.  I was even asked about it by Steve Bandy, who in previous time had been my supervisor.

Q.    When you say "local central unit"?

A.    Meaning the unit.

Q.    You mean the hospital MACs?

A.    Yeah.

Q.    Okay.

A.    I don't think I was retaliated against by -- well, let me say this:  The women of the unit -- entire unit retaliated were against by the men.  They

quit speaking to everyone but P.K. Luttrell.  I do not believe that any of the woman in that unit retaliated against me.  I believe Mark Scheff, Jim Schuh, Joe Roberts and Mike Sandidge did retaliate against me.  I did believe that Marvin, Lenna and Jodie retaliated against me and my position and chose not to deal with me in the position that I was in, unless it was absolutely necessary, because I brought to light some things that were misconduct in the unit.

Q.    Okay.  Let's go through those one by one.  What -- how do you think that Mike Sandidge retaliated against you?

A.    When this investigation started -- Mike and I would talk.  We talk about work, we talk about his kids, measles, chicken pox, things kids go through, about books, just normal conversation in the course that coworkers would talk about.

After this happened, he would stand outside of my office -- you come outside of my office and then there was a long wall, it was a half wall, and then there was what we called the clerical pool out in front of it.  And there was a gal that sit out there and her name was Angie Defanbach and he would stand out there and talk about me saying things about

myself, about Laura, about the investigation, which he shouldn't have even been talking about, and what a waste of everyone's time for me -- and that I instigated it.  And he was very -- his remarks were pointed, so that I would understand what was being said.  And it was always aloud so that I would hear what he was saying, if I didn't have your radio on -- you know how sometimes you turn your radio on, you know.  But he made a point of not doing -- turning in the renal applications timely, when always before he had been an excellent worker.  That whole slow down -- all the guys started to slow down in their work.  A lot of comments were made about me and about my relationship with Laura.

Q.    And these are from Mike?

A.    Mike and Mark and Jim.

Q.    And do you -- with regard to the comments that you have said that Mike made, do you recall specifically any of the comments that he made about you and/or about your relationship with Laura?

A.    He made a comment about -- this happened about the time -- I thought I was having a nervous breakdown because of so many things that was going on outside of my office, and all the guys saying

different things, Jodie being nasty toward me when she had to talk to me, and Marvin and Lenna wouldn't give me an answer and told me to talk to Jodie, and she would give me a curt, nasty answer.  I thought I was going to have a nervous breakdown.

Q.    What time frame are you talking about there?

A.    Towards the end of October.

Q.    Okay.

A.    And I got to where I would close my door because I didn't want to come to work.  And when I would come to work, I would sit there and cry while I did my job.  Just sob.  And this one particular day I had my door open, I had just came back from somewhere, I don't know, copy machine, something I'm not for sure, and Mike was standing out there talking to Angie and asked her why did I always have my door closed and remarked about, you know, after her girlfriend blew the investigation on Mark that probably would have got him fired or dismissed, he used one of those two words, I don't remember exactly, but he made a comment that it was all Laura's fault and Angie defended Laura and that, you know, she got out of that interview and she didn't do anything wrong.  You know, everyone else is talking and breaking confidentiality is what

1   screwed up on that one.

2      Q.   Okay.  Do you recall any other comments from

3   Mike?

4      A.   He did give me a warning that somebody was

5   going to do something to my car.

6      Q.   And when was that?

7      A.   I don't remember the date, but it was a few

8   days before I walked out and found poop -- actually, I

9   was driving Laura's car that day, so it was on the

10   handles of the car door.

11      Q.   And you said that that was a couple days -- his

12   warning was a couple days before that?

13      A.   Uh-huh.

14      Q.   And?

15      A.   It was -- he said, I notice you have a new

16   car.  And I said, yeah, and he asked me how I liked

17   it.  It was a Monte Carlo and I said, you know, it's a

18   nice car, sporty, makes me feel young, you know.  And

19   he said, well, be careful and take care of it and

20   watch it.  So that night I went home and said

21   something to Laura and she said, well, don't drive it.

22   Drive mine.  So I started driving her car to work and

23   it wasn't very many days and there was poop.

24      Q.   Okay.  And at that time Laura worked in a

1   different building than the Bloom Building; is that

2   correct?

3      A.   She only works in the Bloom Building if

4   she's doing an investigation or is over there to talk

5   to somebody.

6      Q.   But that's not where her office is?

7      A.   Right.

8      Q.   Her regular reporting place?

9      A.   Right.

10      Q.   Okay.

11      A.   And at that time I was paying for parking.

12   I had an assigned lot behind the Bloom Building.

13      Q.   Uh-huh.  Okay.  Is there anything else that

14   you can recall that -- a way that you thought that

15   Mike was retaliating against you?

16      A.   Other than they wouldn't -- the whole -- if

17   you went to get a cup of coffee and he was standing

18   there, he would immediately turn off and run, like,

19   wouldn't even stop.  He would just leave his cup and

20   go off.  I mean, it was like I was a leper and that's

21   the way I was treated by all the guys.

22      Q.   Okay.

23      A.   But I wasn't just the only one.  I seen them

24   do that to Velva and to Mary Thallman, too.

1      Q.   Okay.

2      A.   There was totally -- totally a change of

3   atmosphere.  The only woman that they spoke to was, of

4   the Union employees, was Lynn -- P.K. Luttrell,

5   because she had been off during this time because her

6   husband had shot himself.

7      Q.   Okay.  With regard to the conduct by Mike

8   that you feel was retaliatory, did you complain about

9   that behavior to anyone?

10      A.   Yes, I did.  I complained about it to Jodie.

11   I complained about it to Marvin and Lenna.  The -- it

12   got to the point where that if they were doing renal

13   applications that -- where always before they would

14   come to me and ask me questions, but since it was my

15   program, they quit going to me, they would go to Jodie

16   or Lenna or Marvin.  And instead of referring them to

17   me so that they wouldn't have to talk to me, they

18   would answer the question or take care of the issue or

19   bring it to me that so and so, you know, had this

20   problem -- Mike had this problem.  Yes, we did talk

21   about it.  And what I was told in a meeting with all

22   three of them present is that you aren't a supervisor

23   and they do not report to you.

24      Q.   Okay.

1      A.   So they don't have to ask you questions,

2   even though I'm ultimately responsible for the work,

3   whether it was done correctly or not.

4      Q.   Okay.  Do you recall about what time frame

5   these conversations took place?

6      A.   No, not off the top of my head.

7      Q.   Okay.

8      A.   Actually, those conversations were

9   continual.  Every couple weeks issues would come back

10   and forth.  It was a hostile environment.  If I asked

11   a question of Jodie or Lenna or Marvin, I was talked

12   down to.  All of a sudden I was stupid.  I didn't know

13   anything.

14      Q.   Okay.

15      A.   Things like, well, I thought you knew

16   computer programs, I thought you knew the program, I

17   thought you knew this, demeaning and degrading.

18      Q.   Okay.  So is that what we've previously

19   discussed what you feel was retaliatory by Mike?

20      A.   Yeah.

21      Q.   With regard to Joe, you previously

22   testified that all of the men in the Unit, which would

23   include Joe, treated you like a leper?

24      A.   Uh-huh.

Q.    That they slowed down in their work and that they weren't timely?

A.    Uh-huh.

Q.    Besides these -- those issues that you previously identified, what conduct by Joe did you deem to be retaliatory?

A.    Joe would walk past with any of the guys -- usually Joe and Mike walked past together, like, being -- to a meeting or doing something, and they would walk past and make remarks to each other about me.

Q.    Like?  Do you have an example?  Do you recall specific comments?

A.    This would have been -- it was winter because I had my heater on and I had it on full blast and the basement can be pretty cold sometimes, and I guess there was a lot of heat coming out of my office and there was a remark made about hoping that I would -- that something about my heater coming on and that she's in there roasting and burning in Hell for all the trouble that she's caused.

Q.    And who made that comment?

A.    Mike Sandidge to Joe.  And Joe said something about, that wouldn't be good enough.

Q.    And did you complain about that comment to anyone?

A.    Yes, I did.

Q.    To who?

A.    Ms. Edmonds, who never has any conversations with me.

Q.    And what did you tell Jodie?

A.    The comment what was said and she said, you know, when you became a witness, you pitted yourself and you're only getting what you deserve.

Q.    And where was that conversation?

A.    In Jodie's office.

Q.    Okay.  Anything else with Joe?  Any other retaliatory conduct by Joe?

A.    Not off the top of my head.

Q.    Okay.  How about Jim Schuh?  What conduct did he engage in that you deemed to be retaliation?

A.    Mr. Schuh.  Let's see, him and Mark would trade off.  They were assigned certain breaks.  They had been assigned these breaks for months and months and months, maybe even years, who knows, as to when they could go take their smoking break, their regular break.  And I would, knowing what their schedule is, would try to vary my break so that I wouldn't have to

run into them and have any issues.  And if I was upstairs or outside or wherever and Jim would see me, he would put his cigarette out if he was outside smoking and run downstairs and miraculously Mark would appear.  That went on from October to the end of May when I moved over to the Churchill Building when I took my demotion.  I've been given the finger by Mr. Schuh and Mr. Scheff in the building.  I had watched them stand -- I would be sitting on a bench for a while - there were benches and then they took the benches out and now they're back in - in the lobby of the Bloom Building the girl that I did break with Maria Hayes, who is no longer with the Agency, we would sit on one of the benches and take our break because she had had open-heart surgery, and we had a tendency to try to walk when the weather was in the right condition for her to walk, but we would be sitting on the benches and, like, after Steve Bradley gave him an ultimatum -- or a directive not to come near my side of the building, if I was sitting on this bench, then he would stand over where the Sebastians coffee shop is in the lobby, Jim and Mark and stand and watch Maria and I and laugh out loud and try to do the intimidation thing.

But Jim just pretty much was a person that, it appeared from the outside to me, that would just feed Mark the information and Mark was the one that would carry out whatever was going to happen that day.

Q.    Okay.

A.    Whether it be following me around at the book fair upstairs or the craft show or the plant sale.

Q.    Okay.  We will touch on Mark momentarily.
You have -- with regard to Marvin, Jodie and Lenna, you mentioned several things; that they didn't include you in meetings, that they tried not to deal with you, that Jodie was curt with you and that Marvin and Lenna wouldn't direct their subordinate employees to take their questions to you.  Beyond those things that you've previously testified about, are there any other instances of retaliation that we haven't previously discussed about with either of those three employees?

A.    Well, let's see.  There was the time that I went to go to the bathroom and Mark's office was in the corner and I needed to drop some stuff off at Jodie's office, which would have been catty corner to

121

```
1   the corner from Mark's cube, and -- plus I had things
2   to drop off at other people's offices along the way,
3   so I went around the back hallway, because I didn't
4   want to walk past Mark's cube, so I was going to kill,
5   like, 15 birds -- multi task.
6       Q.   Right.
7       A.   So I was going to drop these applications
8   off and drop some stuff off at Marvin and Lenna's
9   office, go by Jodie's, drop something off there, and
10  then go to the bathroom and go back upstairs.  Make
11  one big swoop.
12      Q.   This is when you worked on the first floor?
13      A.   When I worked on the first floor.
14      Q.   And we'll clarify that in a moment, too.
15      A.   And I went to go to Marvin's office and
16  Lenna was in there, and there was -- somebody was
17  leaving or something -- there was some type of potluck
18  being planned.  And Marvin said something about, well,
19  we got to remember to make sure we invite Deb.  And
20  Lenna says, we're not inviting that bitch.
21      Q.   Okay.  And you were outside Marvin's office?
22      A.   I was standing in the doorway and he looked
23  up and saw me and she is continuing to talk about me.
24  And I'm standing right there.  And I let her finish
```

122

```
1   going on about the bitch and we're not inviting that
2   bitch, she's nothing but a troublemaker, and her day
3   is coming, and she'll get it and Marvin goes (witness
4   makes sound of clearing throat) and clears his throat.
5   And he looks around and I said, the bitch is standing
6   here.
7       Q.   And what was her response?
8       A.   Nothing.  Not one word.
9       Q.   Did you relate this conversation you
10  overheard to anyone?
11      A.   Well, actually, what she did, she about
12  plowed me over trying to get to Jodie's office.
13      Q.   So, Lenna went to Jodie's office?
14      A.   Yep.  And I followed.
15      Q.   And did a conversation occur following that?
16      A.   Yes, it did.
17      Q.   And what was that conversation?
18      A.   That -- what happened?  And Lenna was told
19  that she was out of line.  And she said to Lenna she
20  said, I will deal with you in a minute.  Go ahead and
21  leave.  And she asked me to sit down and shut the
22  door, and I did.  And she said, I told you this before
23  but you deserve whatever comes to you for stirring up
24  this problem down here that won't seem to die down.
```

123

```
1       Q.   Okay.
2       A.   And my responses to that was, if you guys
3   were effective managers, this problem would have gone
4   away a long time ago.
5       Q.   Okay.  And when did this conversation occur?
6       A.   I don't know.  It was after I moved
7   upstairs.
8       Q.   And do you recall when you moved upstairs?
9       A.   March or April 2001.
10      Q.   Okay.  We will clarify that in just a
11  minute.
12           Okay.  Anything else by Marvin, Lenna
13  or Jodie that we haven't already talked about that you
14  deem to be retaliatory?
15      A.   Not right now.
16      Q.   Before we visit any retaliatory conduct by
17  Mark Scheff, I think it will clarify the record if we
18  revisit momentarily your employment history.
19           My understanding is we have your
20  employment history from the early '80s until you
21  became an E2 in October of 2000; is that correct?
22      A.   Yes.
23      Q.   Okay.  You previously testified that when
24  you became an E2 or shortly there -- shortly before
```

124

```
1   you became an E2, you moved to another office in the
2   basement; is that correct?
3       A.   Correct.
4       Q.   Okay.  And from your recent testimony --
5   your recent testimony, I understand that at some point
6   you moved to the first floor?
7       A.   Yes.
8       Q.   Okay.  Please tell me about what led up to
9   you being moved to the first floor and where you
10  moved.
11           Let me break that down.  You previously
12  testified that you moved to the first floor in March
13  or April?
14      A.   Uh-huh.
15      Q.   Okay.  When you were on the first floor,
16  were you doing the same job duties as you had as an E2
17  when you worked in the basement?
18      A.   Yes.
19      Q.   Okay.  Where was your office location in --
20  on the first floor?
21      A.   If you came in the front door, there was a
22  set of double doors on the right.  You go through
23  those, and then you make a left immediately, and you
24  go to the end of a short hallway, which is just a
```

1  small wall and you make a right, and there's a door
2  and I sit right in front of that door.
3      Q.    Okay.  Is that what's referred to as the
4  east wing of the first floor?
5      A.    Yeah.
6      Q.    Has anyone besides me ever called it the
7  east wing?
8      A.    I think so.
9      Q.    Okay.  It is the east side of the building
10 on the first floor, right?
11     A.    Yes.
12     Q.    Okay.  And who else -- what other units were
13 located around where your first floor desk was?
14     A.    In the room with me were other -- were MACs
15 for the NIPS Unit, MAC2s and I don't know if the other
16 two had been reported to 3s yet or not, but MACs for
17 the NIPS Unit.
18     Q.    Okay.  How many people were in your
19 office -- I guess back up.  Did you have an office?
20     A.    I was in a conference room that had been
21 converted into an office.
22     Q.    Were you the only one in the conference
23 room?
24     A.    No.  Three or four other people.

1      Q.    Either four or a five people shared this
2  conference room space as their workspace?
3      A.    Yes.
4      Q.    Were they divided by cubes?
5      A.    No.
6      Q.    By walls?
7      A.    No.
8      Q.    Okay.  And those were the MACs that you just
9  described that worked for the NIPS Unit?
10     A.    Yes.
11     Q.    Okay.  How did you come about moving to the
12 first floor?
13     A.    Conversation between myself and Steve
14 Bradley.
15     Q.    Okay.  And when did that conversation take
16 place?
17     A.    Sometime in May.
18     Q.    I'm sorry?
19     A.    Sometime in May of 2001.
20     Q.    Okay.  You previously testified that you
21 moved -- oh, maybe I misspoke.  I would like to know
22 how you moved to the first floor from the basement.
23 You previously testified that you moved to the first
24 floor in either March or April?

1      A.    I can't remember, did I?  I think it was --
2  whenever it was that I moved, I don't know.  I don't
3  know the exact month, but I moved because of a
4  conversation with Steve Bradley.
5      Q.    Okay.  And where was that -- where did that
6  conversation take place?
7      A.    When I was in -- he was in my office in the
8  Bloom Building in the bottom floor.
9      Q.    In the basement?
10     A.    In the basement and he was talking to me
11 about the problem between Jodie and myself and with
12 Mark Scheff and myself would not go away if I didn't
13 get out of the building.  He didn't think me promoting
14 to another position or demoting to another position
15 within the Bloom would stop either one.
16     Q.    Okay.  And as a result of that conversation,
17 you moved physical work locations within the Bloom
18 Building?
19     A.    Yes.
20     Q.    You just testified that Steve Bradley said
21 that you needed to move out of the building, was that
22 something that he worked toward?
23     A.    I told him that I had bid on a position
24 within BCHS, which he was still over, which was a

1  demotion, to get away from the situation with Mark and
2  Jodie, that I could not continue to work in the
3  atmosphere.  And he said that position was under him
4  and he would see what he could help me do.
5      Q.    Okay.  And what position was that?
6      A.    MOA1 drug rebate.
7      Q.    Okay.  We will -- okay.
8      A.    I had bid on that position because I knew --
9  was a personal friend of Marvin Hazelwood.  I ran with
10 his kid.  And Marvin assured me that there was enough
11 distance between me and Jodie that I wouldn't suffer
12 any ill effects from what happened.
13     Q.    And who is Mr. Hazelwood?
14     A.    Retired Assistant Bureau Chief.
15     Q.    Was he still the Assistant Bureau Chief?
16     A.    Yes.
17     Q.    Over the drug rebate --
18     A.    Yes.
19     Q.    -- at the time you applied?
20     A.    Yes.  He was with the entire pharmacy unit.
21     Q.    Okay.  Let's, if we can -- and hopefully we
22 don't get too confused doing so, I'd like to
23 revisit -- now clarifying that you moved to the first
24 floor and had the same job duties, I'd like to revisit

1  the issue of retaliation that we've previously been
2  talking about.
3        And you had previously testified that
4  you were retaliated against by Mark Scheff for your
5  opposition to sexual misconduct and to being a witness
6  in Mary Thallman's internal investigation.  If you
7  could, please describe what conduct Mark Scheff
8  engaged in that you thought was in retaliation for
9  being a witness?
10       A.    Let's see, once he received the copies of
11 the investigation and read everyones and he had talked
12 to some people, it appeared that he had came to the
13 conclusion that I was behind the investigation and
14 that's where the comment you alluded to earlier about
15 a hard on comes from, it comes back clearly now, I had
16 a hard on for him, that I was coming after him, I was
17 out to get him, whatever.
18       Q.    Okay.
19       A.    He thought that I was behind Mary Thallman
20 calling OIG, because no one would have ever called OIG
21 if it hadn't been for me.  People knew that I was a
22 friend with Laura because after -- we became friends
23 before we became partners, that on lunchtime a lot of
24 times if she was in the Bloom Building, she would stop

1  and we would go out for lunch.  So people saw her
2  around and knew that she worked for Internal Affairs.
3        Q.    Okay.
4        A.    So, I'm assuming that's where that
5  assumption came from that I was behind it because of
6  my relationship with Laura.
7        Q.    Okay.
8        A.    Mark began to say things.  Hold
9  conversations with, like, Jim or Joe or anyone that
10 would give audience to him at his office or at the fax
11 machine outside of my office or to the clerical staff
12 sitting out in front of me about being drug through
13 the mud by five of his coworkers and one of their
14 girlfriends, and that he was going to sue everyone,
15 and sue them, and they would get theirs.  He had
16 worked 18 years, or however many years, for the Agency
17 and he had never been disciplined before and never had
18 any problems until this had happened.  During the time
19 when he was the most vocal, which was when I was
20 downstairs, because when I was upstairs, I couldn't
21 hear him.
22       Q.    So meaning October until about March?
23       A.    Yeah.
24       Q.    Okay.

1        A.    He would -- it's almost like he would go in
2  cycles, waves, I don't know, up and down.  Like he
3  would get past it or maybe something else would
4  happen, or -- because then all of a sudden he would be
5  right outside of my door and he was really good about
6  doing this right after lunch and wearing what I call
7  his Columbine coat.  I always knew that either he was
8  in trouble, he had been thinking about it, or
9  something was up, because instead of wearing -- he had
10 a short down filled jacket that he wore a lot, but on
11 the days that he seemed to be upset about the work
12 situation or whatever was going on, he would show up
13 in his long western duster.  And I called it the
14 Columbine coat, along with several other people who
15 would see him coming up in this, which he showed up in
16 for like two weeks straight in a row after he was
17 first being investigated on the Mary Thallman count.
18       Q.    With regard to that coat, do you -- was that
19 something new that Mark had acquired around the time
20 of the investigation?
21       A.    No.  I don't know that.
22       Q.    Do you recall ever seeing him wear it prior
23 to the investigation?
24       A.    Maybe once.

1        Q.    Okay.
2        A.    When he wore jeans one day.
3        Q.    Okay.
4        A.    But the rest of the time he wore -- usually
5  he wore the -- if it was real cold, he wore the
6  quilted type down filled thing.  But a lot of times he
7  wore a black nice dress overcoat.
8        Q.    Okay.
9        A.    No.  The Columbine coat would be -- it was
10 just -- it was like he was out to intimidate or to be
11 Mr. Tough Guy.  I don't know what it was.  But he
12 would come across in this coat, and this happened to
13 be about the time not very long after the Columbine
14 incident, so it really became a stir about him wearing
15 that coat for intimidation factors, and the way he
16 talked about guns was he going to bring a gun in.
17       Q.    And did you have these conversations with
18 other coworkers?
19       A.    I even had these conversations with Jodie
20 that she was scared that he was going to do that.
21       Q.    And when was that?
22       A.    Between October and a March.  And to further
23 go along with that, I was told last August by Brian
24 Brinker that at that time, and even since then, that

1    Jodie Edmonds has complained to the current Director
2    about Mark Scheff and his issues.
3        Q.    Okay.
4        A.    Because of the Columbine coat and fear
5    factor.
6        Q.    Okay. To maybe clarify some of the players
7    jumping back to your employment history. Off the
8    record.
9                    [WHEREUPON THERE WAS A SHORT
10                   DISCUSSION OFF THE RECORD.]
11   BY MS. KERLEY:
12       Q.    Did at some point you leave the first floor
13   of the Bloom Building?
14       A.    When I took a demotion to an MOA1 in BCHS,
15   2001, June 1st.
16       Q.    June 1?
17       A.    I went to work at 2200 Churchill Building.
18       Q.    And who was your supervisor there?
19       A.    Alberta LeVan.
20       Q.    Could you say that name again?
21       A.    Alberta, A-L-B-E-R-T-A; LeVan, L-E-V-A-N.
22   Who is now retired.
23       Q.    Okay. And who was her supervisor?
24       A.    Marvin Hazelwood.

1        Q.    And did at some point your supervisor
2    change?
3        A.    Yes.
4        Q.    And who did it change to?
5        A.    In October of 2001 it changed to Bradley
6    Wallner. He was above Alberta. Alberta was above me,
7    so the chain of command was Alberta, Brad, Brian
8    Brinker and then Fred Backfield. And then Brian was
9    only there for 30 or 60 days and he moved into another
10   unit within Finance and Budget and there was no one
11   between Brad and Backfield.
12       Q.    Did Backfield take Hazelwood's position or
13   was Hazelwood above all those people?
14       A.    Hazelwood stayed with BCHS. We, as a unit,
15   on October 1st was placed under the Division of
16   Finance and Budget.
17       Q.    Okay. So the unit had a reorganization?
18       A.    (Nodded head up and down.)
19       Q.    Okay.
20       A.    Actually, we had one twice in a three-month
21   period. We went under John Hyde first, and then we
22   went -- the next month we went under Backfield.
23       Q.    Okay. All right. That should clarify who
24   the parties are that you're referring to. Okay. We

1    were previously discussing conduct -- retaliatory
2    conduct by Mark Scheff. Do you recall any other
3    retaliatory conduct by Mark Scheff?
4        A.    Let's see, they put dirt clods in his office
5    and told people that if I was going to throw dirt at
6    him, at least I should be big enough to do it to his
7    face and not to his back.
8        Q.    When was that comment made?
9        A.    Sometime between October and May, somewhere
10   in there. I don't remember exactly.
11       Q.    Do you recall if it was when you were in the
12   basement or when you were on the first floor?
13       A.    No.
14       Q.    Okay.
15       A.    No, not at this moment. He taped a screw to
16   his wall - and if you're wanting the names of people
17   that he told this to Sue Kramer, Pam Dufour.
18       Q.    And who is Sue Kramer?
19       A.    I guess she still works for the Agency, I
20   don't know. Susan Kramer, she was a switchboard
21   operator when we worked together in BCHS, and then
22   went to Kid Care as a caseworker.
23       Q.    At the time of these comments, was she the
24   switchboard operator?

1        A.    Maybe. I don't remember.
2        Q.    Okay.
3        A.    Because during this time frame she also was
4    working with Kid Care because when I left the building
5    she was at Kid Care. I think she had just gone to Kid
6    Care.
7        Q.    Okay. Anything else?
8        A.    He taped a screw to the wall about -- to
9    represent me screwing him on his job with all of this
10   investigation that I initiated through Mary Thallman,
11   and then when I initiated on myself with the
12   retaliation that I was screwing him.
13       Q.    Do you know when that happened, when was
14   that?
15       A.    About the same time when I came back to work
16   one day for Alpha signs for himself and Beta signs for
17   the rest of the guys. That he was the head dog and
18   the rest of them followed him in the retaliation and
19   everything else.
20       Q.    Did you ever overhear a comment by Mark
21   Scheff about what the Alpha and Beta signs meant?
22       A.    Yes, I did.
23       Q.    And what did he say?
24       A.    That he was the head dog, and Steve Bradley

1 was a head dog, he considered Steve Bradley a head
2 dog, and everyone else was Beta dogs and they followed
3 whatever they told them to do.
4     Q.    Okay.  Any other conduct?
5     A.    Let me see.  I guess cartoons on the outside
6 of his cube putting down woman and management - they
7 had two different ones up there - and how that these
8 represented the woman management and me for all the
9 problems we gave him.
10     Q.    And are you relating to me a conversation
11 that you overheard?
12     A.    I'm relating to you a conversation that he
13 had with Sue Kramer.
14     Q.    Okay.
15     A.    A couple of different times.
16     Q.    So Mark Scheff told Sue Kramer that cartoons
17 referred to something and Sue related them to you?
18     A.    Uh-huh.
19     Q.    And what time frame?
20     A.    And Sue Kramer also related the
21 conversations to Roni Kaluza, who was still there as
22 an Assistant Bureau Chief.
23     Q.    And were you with Sue when she told
24 Ms. Kaluza?

1     A.    No, Roni told me.
2     Q.    Roni told you?
3     A.    Yeah.
4     Q.    Okay.  When did Roni tell you that Sue
5 Kramer had related conversations to her?
6     A.    Whenever I went to talk to Roni about -- let
7 me see.  I went in to have a conversation with Roni
8 because Steve Bradley was off, and Roni had told me
9 that she knew because Sue had came and reported them
10 to her, but they were still up.
11     Q.    The cartoons?
12     A.    And the dirt clods were still there, and the
13 Alpha, Beta signs, and the screw.  In fact, I came
14 back in on the weekend and took a picture.
15     Q.    Do you have a copy of that picture?
16     A.    I think I turned it over to John Taylor.
17     MS. KERLEY:   Off the record.
18     [WHEREUPON THERE WAS A SHORT
19     DISCUSSION OFF THE RECORD.]
20 BY MS. KERLEY:
21     Q.    Back on.  We were just discussing
22 retaliatory conduct by Mark Scheff and in the midst of
23 that you mentioned that you went to have a
24 conversation with Roni Kaluza because Steve Bradley

1 was out of the office.  What was the purpose of that
2 conversation?
3     A.    I had never came to work and told any of my
4 coworkers that I was gay.
5     Q.    Okay.
6     A.    I had told -- Pam knew because I used to
7 work with Pam.  Velva, who I had worked with, didn't
8 know it until after the investigation and it came out
9 that I was gay.  I had broke up a relationship back in
10 August and I talked -- several months later I was
11 at -- somewhere and ran into somebody and they told me
12 that Pam Dufour had told me that I had broke -- I was
13 no longer with Patsy that I was with Laura.  And that
14 Pam told them that I had -- or that Patsy tried to
15 commit suicide when I broke up with her.  And I said,
16 I never told Pam that.  I said, the only person --
17 people that knew that was management staff.  I told
18 them the week that it happened and that week was
19 probably going to be a hard week because Patsy was
20 still calling me and wouldn't leave me alone.  And I
21 said but give me the one week to get past getting her
22 to calmed down and I'll be back on track because I
23 had -- I was happy to be out of the relationship.  It
24 had been dead a long time.  And I went to Roni and

1 this person told me that Pam told her that Lenna
2 DeGroot had told Pam.
3     Q.    Who are you having the conversation with?
4     A.    Michelle Hare.
5     Q.    Okay.
6     A.    I think she's an Assistant Deputy Director,
7 or something like that, in DHS.
8     Q.    So Michelle Hare --
9     A.    Uh-huh.
10     Q.    -- related to you that Pam Dufour --
11     A.    Had told her at bingo.
12     Q.    -- had told her --
13     A.    That Lenna DeGroot had told her that Patsy
14 had tried to commit suicide.  And I had told nobody
15 but Lenna, Jodie and Marvin that.
16     Q.    And you took that string of conversation to
17 Roni Kaluza?
18     A.    Yes.
19     Q.    Because Steve Bradley was out of the office?
20     A.    Yes.  And asked that because Jodie and
21 Cheryl -- Lenna, Jodie and Cheryl were in Chicago at
22 some kind of a meeting.  They were all out of the
23 office.  And Marvin you didn't bother with personal
24 issues.  He would flat out tell you, hold it until

1  Jodie gets here. I don't deal with personnel.
2      Q.    Okay. Do you recall when you found that
3  out?
4      A.    I found it out on a weekend, and this was a
5  few days later when Pam came into my office to tell me
6  that Mark was being called over to OIG for some reason
7  and she wanted to know if I had been called over. And
8  I said, no, and if I had I wouldn't tell you and you
9  need to quit telling things, too. And I told her what
10  had been told to me and she turned around and walked
11  out of the office. And I walked over and sat down and
12  talked to Roni about it. When I stopped by Steve's
13  office and he was gone and Carla Collins, his
14  secretary, told me that he was off but I should go
15  talk about Roni about whatever was going on. Because
16  see said, you look upset. And I said, I am. So I
17  went over and told her what had happened over the
18  weekend. Because I was going to take it to Jodie when
19  Jodie got back. I was going to hold off on it. Since
20  it happened on the weekend, this was the first -- the
21  week and they were still in Chicago but here now Pam
22  was coming down trying to get something and it just
23  kind of stirred me to the point that I emotionally
24  went over and...

1      Q.    Now is this --
2      A.    Roni Kaluza.
3      Q.    When did this Roni Kaluza conversation take
4  place?
5      A.    I don't remember. I don't remember. I just
6  know it was in the time frame that the dirt clods and
7  all that stuff started appearing and I even talked to
8  her about that stuff and she said Sue Kramer had even
9  talked to her about it.
10      Q.    Okay. And this is sometime after the
11  investigation began?
12      A.    Uh-huh.
13      Q.    Okay. Other conduct by Mark Scheff, if you
14  recall any, that you thought was in retaliation for
15  your being a witness?
16      A.    Of course the stalking of when I moved
17  upstairs that he would come and stand outside of my
18  office.
19      Q.    Okay.
20      A.    And stare.
21      Q.    And when did that occur?
22      A.    From the first day I was upstairs.
23      Q.    And you said that he would stare at you?
24      A.    He would stand out there and stare.

1      Q.    He would stand outside of your office?
2      A.    Yeah. There is -- right outside of my
3  office was a copy machine that was behind the wall,
4  and then there was another wall and sometimes they
5  would put a mail cart there or boxes from claims
6  processing where they would box - I don't know what
7  they box - but they boxed it up and they would stack
8  it up until somebody came and took it somewhere else
9  to be stored or processed. He would lean against the
10  boxes and just stand out there and stare at me and
11  laugh.
12      Q.    And how often did that occur?
13      A.    Whenever he went to his cigarette break, two
14  or three times a day. In the morning and afternoon
15  both.
16      Q.    Okay. And --
17      A.    And that occurred -- I complained about it
18  daily until I saw it was getting nowhere. And another
19  girl came to me and said she knew what was going on,
20  she had been observing it for some time, and she
21  called Carla Collins, who called Steve Bradley, and
22  then Shari Bangert.
23      Q.    Shari Bangert is who observed this conduct?
24      A.    And him coming through my office. He would

1  just come down there -- he never was on -- I don't
2  want to say never. He was upstairs every day, every
3  morning that he was there, walking through my area,
4  when he didn't have a need to, he wasn't doing
5  business with anybody else in my section. But he
6  would come walking through there on his way to the
7  break room, which break room is on the west side of
8  the building. He would come up and use the copy
9  machine versus the one that was right around the
10  corner from his office. He would find people to pull
11  over and do conversation right in front of my office.
12  Roy Klein, Mike Beal, of course, Ms. Watts. What was
13  her first name? The Union Steward, I should know
14  this.
15      MR. BAKER:    Is it Marie.
16      THE WITNESS:    Marie, very good.
17  BY MS. KERLEY:
18      Q.    And any other conduct besides what we've
19  already talked about and the stalking upstairs
20  conduct?
21      A.    There was a couple several nights that he
22  followed me home.
23      Q.    In his car?
24      A.    Oh, no, nice old gray Ford pick-up truck.

Q.   Okay.

A.   I called Southern View police about it and they said there was nothing they could do as long as he was just driving by.  That went on for a couple of weeks.

Q.   Did you talk -- complain to anyone?

A.   Yeah.  I talked to Jodie and Steve Bradley both.

Q.   Okay.

A.   It got to the point that I was getting hang-up calls at home and at work.  I put a privacy manager on my telephone, found out that he had my Social Security Number, as well as everybody else's.  I talked to Social Security about changing my Social Security Number.  And they told me that they very rarely change a Social Security Number.  And they give me this whole line of things that I had to prove over the next 18 months --

Q.   Okay.

A.   -- in order to change my Social Security Number.

Q.   Okay.  Did -- did you ever experience something that made you think that your Social Security Number was being used by someone, other than

yourself?

A.   I began to get all kinds of packages and things sent to my house that I refused.

Q.   And --

A.   Like, you know, books, tapes, CDs from places that I wouldn't order.

Q.   Like what?

A.   Well --

Q.   If you recall any?

A.   Yeah.  Let me see The Rifleman, or National Rifle Association, what is that NRA?

Q.   Uh-huh.

A.   Music from different music groups.  Music companies.  Magazine from an Outdoorsman, or something.  And then there was a few -- I got a Playgirl that I refused.  I think he thought that probably would be funny that that would be to my liking.  Different pieces of things that I would just refuse.  I would see where it was coming from, know I hadn't ordered those things, put "refuse" and take it back to the Post Office.

Q.   Okay.  And from your testimony do I understand that you think these were coming from Mark?

A.   Uh-huh.

Q.   Okay.  Anything beyond what we've talked about?

A.   There are other instances.  I'm probably just not plugging into them right now.

Q.   Okay.  So, do I take that to mean that your recollection is exhausted as to any other conduct by Mark?

A.   For now.

Q.   Okay.

A.   Because like when you made the comment earlier about the hard on, when you brought up the other situation it was like, oh, yeah, this happened, this happened, that happened.  So, it triggers.

Q.   Okay.  Of the conduct my Mark Scheff, you previously said that you complained daily.  Who did you complain to?

A.   To Jodie.  And I had been told by Jodie several times that I was not to take anything above her ever again.

Q.   Okay.

A.   After the OIG investigation that Mary Thallman has, I was told never to go above her.  The time I went to Roni Kaluza she came in and she shut my door and told me, I told you before that you were not

supposed to do that.  You should have waited until I got here.  And I didn't even -- I didn't even answer.  It got to the point I knew whatever my reasoning behind what I was going to tell her, it was going to go against me, so I didn't even answer her.

Q.   Okay.  Were these complaints written or e-mails?

A.   I would verbally -- now the one about the dog poop, I did send in the mail.  No, I verbalized them, and then I documented them in my own notes, which you should have copies of all of that stuff.

Q.   Since you bring that up, I'm going to --

MS. KERLEY:   How are we looking at on time?  What time is it?

COURT REPORTER:   2:44.

MS. KERLEY:   Oh, then I will wait one second on that.  Okay.

MR. BAKER:   Off the record.

[WHEREUPON THERE WAS A SHORT DISCUSSION OFF THE RECORD.]

BY MS. KERLEY:

Q.   Back on.  Ms. Sullins, you alluded to, earlier in your testimony, the Department of Public Aid's employee handbook?

1    A.    Uh-huh.

2    Q.    Is that a yes?

3    A.    Yes. That's a yes.

4    Q.    And you are aware that there is a handbook?

5    A.    Yes, I am.

6    Q.    And at the time you were employed at BCHS,

7    you knew of the handbook?

8    A.    Yes.

9    Q.    Okay. And were you -- are you also aware

10   that the Department of Public Aid has a sexual

11   harassment policy?

12   A.    I do.

13   Q.    Okay. And were you trained on the

14   Department's sexual harassment policy?

15   A.    Yes, I was.

16   Q.    And what is your understanding of what an

17   employee's responsibility is?

18   A.    I better understand it today than I did then

19   because since -- now I've taken the class twice.

20   Q.    Okay. Well --

21   A.    As a manager, and then again as an employee

22   to make sure that I understood if this ever happened

23   to me again.

24   Q.    Okay. Well, as of 2000, what did you

1    understand an employee's responsibility was under the

2    Department's sexual harassment policy?

3    A.    To report it to your supervisor.

4    Q.    Okay. And was that your understanding that

5    that was your only option?

6    A.    Yes.

7    Q.    Okay.

8    A.    When I took sexual harassment, it was under

9    someone who is no longer with the Agency. For the

10   first time it was Marie Watts, she drove home the idea

11   everything goes to your supervisor. Now, when I took

12   it later under Gail or Sandy I can't remember, Gail

13   Longmeyer or Sandy Lee, they brought in EEO, they

14   talked about Internal Affairs with us, it was totally

15   different.

16   Q.    Okay. Well let's talk about 2000. In 2000

17   you were aware of the Office of Internal Affairs or

18   OIG?

19   A.    I was aware it was there.

20   Q.    Okay. At some point in the summer of 2000,

21   am I correct in assuming that you were more aware of

22   the office, due to your relationship with Laura?

23   A.    I was more aware that there was an Internal

24   Affairs. As to what she actually did on the

1    day-to-day, she told me she worked with employee

2    conduct. Did we actually talk about that, honestly,

3    no.

4    Q.    Right. Okay.

5    A.    Did we actually talk about reporting and

6    those kind of things? No. This is what a lot of

7    people don't understand. My personal life is my

8    personal life. My work life is my work life. When I

9    come to work, my employees do not know if I've had a

10   fight at home. I do not show that. It's none of

11   their business. On the other hand, because I spend

12   more time at home -- or at work than I do at home,

13   yes, I can bring home some bad attitudes. But we do

14   not discuss things that do not -- that are considered

15   confidential on Laura's part or on my part. And,

16   quite honestly, I didn't want to know what she was

17   doing because at that time we were getting to know

18   each other. We were talking about where we grew up,

19   where we went to school, about our parents, about a

20   lot of similarities. We were in that young love stage

21   where we didn't talk about OIG. I could have cared

22   less there was an OIG, because at work I felt that I

23   was doing everything that I had been instructed to do,

24   and that was to go to my supervisors.

1    Q.    Okay. You have, prior to -- strike all

2    that.

3           Okay. At some point in late 2000,

4    early 2001, it's my understanding that you became

5    aware of the ability to file an internal complaint of

6    employee misconduct with the Office of Inspector

7    General; is that correct?

8    A.    Correct.

9    Q.    Okay. At any time prior to, we'll say

10   October 13th, 2000, the date of Mary Thallman's

11   complaint, did you ever file an internal complaint of

12   employee misconduct?

13   A.    No, because I had been told by Jodie Edmonds

14   and Cheryl Beckner these issues would be taken care

15   of.

16   Q.    At any time after October 13th, 2000, did

17   you ever file an internal complaint of employee

18   misconduct?

19   A.    When I went and gave my statement, I was

20   told that I could not. When I filed -- when I went to

21   give my statement in the Mary Thallman and I told all

22   the different things that I was party to -- or some of

23   the incidences that I had heard. I was told that I

24   could not file a separate complaint by Terry

1    Tranquilli. When I filed my complaint against the
2    retaliation in March and asked to bring back up the
3    sexual harassment, Terry Tranquilli told me -- left
4    and came back told me that he had been told by
5    personnel, whoever that was at that time, that I could
6    not reopen that.
7        Q.    Okay.
8        A.    So I tried.
9        Q.    At the time --
10       A.    In October --
11       Q.    -- of October 2000?
12       A.    In October when I was told what my rights
13   were in the OIG office, I tried. And I tried again in
14   March and I was told emphatically no.
15       Q.    Okay.
16       A.    And since that time I have had someone else
17   come to me and tell me they have been told no until
18   this is settled between and the State regarding Mark.
19       Q.    Who was that?
20       A.    The girl's name is Suzie and she was -- I
21   don't know if she still is, I haven't talked to this
22   girl in ages, she was Jodie's secretary. I don't know
23   her last name.
24       Q.    Okay. And where did she have this

1    conversation with you?
2        A.    She had the conversation and had somebody
3    call me and ask me if that was true.
4        Q.    Who did she have the conversation with?
5        A.    With Pam Dufour and asked Pam to call me.
6        Q.    When did Pam call you?
7        A.    It was a few months ago. I don't know how
8    long it's been ago. I don't remember. I don't
9    remember. It was when she had filed a complaint with
10   Internal Affairs about Mark and wanted to go through
11   EEO and the Department of Human Rights and she was
12   told she couldn't.
13       Q.    And who told --
14       A.    I don't know who told her because I never
15   personally called her. I told her if she wanted to
16   talk to me to call me and I would give her some names
17   of people to call and left it at that. I gave Pam the
18   names and told Pam to call her.
19       Q.    Okay.
20       A.    Because Pam and her worked in the same
21   section.
22       Q.    Okay. You said you have since -- you
23   previously testified that you have, since 2000, taken
24   the sexual harassment training on two separate

1    occasions, once as employee and once as a supervisor?
2        A.    I think it's two.
3        Q.    Okay. As you sit here today, what is your
4    understanding of what the Public Aid sexual harassment
5    policy is, as to what an employee's responsibility is?
6        A.    Their responsibility is first to tell the
7    person that they don't want to hear it. Second, take
8    it to their supervisor. And, if that doesn't work, to
9    take it to the next level, to the next level. If none
10   of those reach satisfaction or it doesn't stop, they
11   have a right to go to EEO. And they have a right to
12   contact Internal Affairs anywhere along that chain.
13       Q.    Okay.
14       A.    But I will tell you in the Bureau of
15   Comprehensive Health Services and in the Division of
16   Finance, you are told not to take anything to Internal
17   Affairs, absolutely, positively not to -- not to call
18   Labor Relations or personnel.
19       Q.    And who has told you those things?
20       A.    I have been told that by Cheryl Beckner. I
21   was told that by Jodie Edmonds when I worked for BCHS.
22   I was -- and that was also came out in a meeting in
23   January of 2002 from Cheryl Beckner. The only
24   supervisor meeting I was ever called into attendance

1    to attend.
2        Q.    Do you mean January 2001?
3        A.    2001. I'm sorry.
4        Q.    Okay.
5        A.    I've been told by Brad Wallner and Brian
6    Brinker and, of course, how could I forget Mr. Andy
7    Kane?
8        Q.    And who is Andy Kane?
9        A.    He used to be Deputy Administrator -- or the
10   Administrator for the Division of Finance. That we do
11   not conduct those things. But when I see no
12   satisfaction done or no justice being done to people,
13   I have decided that even under directives that I will
14   step in if it hurts other people. Even if it's a
15   direct order because it says in the handbook that I
16   have that right and responsibility because my civil
17   rights are being stepped on when I'm being told no.
18       Q.    Okay.
19       A.    And I've been told that several times within
20   this Agency, I've had personnel Kevin Conner tell me I
21   cannot contact the Governor's office. It's in
22   writing.
23       Q.    Was that --
24       A.    Totally about something --

Q. -- communication about anything to do with this case?

A. No. But I'm just staying that is standard operating procedures in the Department of Public Aid that is passed along, that people keep quiet about and do.

Q. Okay. Did you ever file -- have you ever filed a complaint with the Illinois Department of Human Rights?

A. Yes.

Q. Have you filed more than one complaint with the Illinois Department of Human Rights?

A. Are you calling the amendment to include Jim Schuh a different one?

Q. No.

A. Not to my knowledge. I think there's just one.

Q. I'm assuming that you're saying the amendment arises out of the same fact pattern we've been talking about today?

A. As far as -- if I'm understanding the question right, I filed one complaint.

Q. Okay. I'm going to show you what is -- I guess we can mark that.

(Whereby, Defendant's Exhibit 1 was marked for identification.)

BY MS. KERLEY:

Q. You can have this copy. Ms. Sullins, I'm showing you what's been marked Defendant's Exhibit 1 for the purposes of that deposition. Do you recognize to document?

A. Yes I do.

Q. And what is it?

A. It's a complaint with the Department of Human Rights.

Q. Okay. And is this the complaint that we were just talking about?

A. Yes, it is.

Q. And this is the only complaint that you filed with the Department of Human Rights?

A. Regarding this matter, yes, it is.

Q. Okay. Have you --

A. To my knowledge.

Q. Have you filed a complaint with the Department of Human Rights with regard to any other incidents of employment?

A. I don't remember ever.

Q. Okay.

A. I thought about it.

Q. Okay.

A. But I'm not for sure that I followed through.

Q. Okay. Okay. You have -- you just testified about an amendment to a Department of Human Rights complaint to include conduct of Jim Schuh?

A. Jim Schuh.

Q. Would that be an amendment to this charge -- or what has been labored as Defendant's Exhibit 1?

A. I think so. You should have that.

Q. So there's an amendment somewhere that is not housed in Defendant's Exhibit 1?

MR. BAKER: Are you talking about is there an initial charge that predates this one?

THE WITNESS: No, it just includes the changes and adds one name.

BY MS. KERLEY:

Q. If it --

A. It's the same charge.

Q. And just had an amendment?

A. Yeah.

Q. That's just what I wanted to clarify that this isn't necessarily --

A. That's why I was confused, because I know that they called it an amendment to this charge.

Q. That is fine.

A. But I didn't know if it was considered separate or not.

Q. I'm just clarifying that that's all the same fact pattern that there was an amendment just to this charge. Okay.

You have previously talked about taking a voluntary demotion to the position of MOA, right?

A. Yes.

Q. Is that correct?

A. Yes.

Q. What is an MOA?

A. Management Operations Analyst 1.

Q. Okay. And when did you bid on that job?

A. I think it was posted in April.

Q. And how did the duties differentiate or how were they different than the work you were doing as an E2?

A. It was more analytical in that in Direct Rebate every time a medical card is used for a prescription through a federally funded program, the state is allowed to receive a rebate on each drug,

meaning for each pill each ounce or milliliter or gram. This case was -- this position was analyzing that, but it was also more on the technical side for setting up reports, doing the computer parts, and being a liaison with the computer section of the Department, which is called BIS Bureau of Information Services.

Q. Okay. Did the MOA position pay less than the Exec 2 position?

A. It has a lower top end. So, I took the demotion and was able to retain my salary, but I could never make as much under that position as I could under an E2.

Q. So when you went from the E2 position to the MOA position, you retained the same salary?

A. Yes.

Q. Okay. Was there a change in benefits -- in health benefits or benefit time?

A. No, but my career ladder was taken away.

Q. Okay. What is the top end for an E2? I assume you -- when you say "top end" whether there's different levels --

MR. BAKER: Salary range.

THE WITNESS: I don't know what the top end

of the salary range is now.

BY MS. KERLEY:

Q. What it was at the time that E2? Do you know?

A. It's an E2. I think it's around 5200. MOA is not 5200, it's less than that. It's a step underneath that.

Q. Okay. Is my understanding correct that an Executive 2 is kind of a general title that has a bunch of working titles under it --

A. No.

Q. -- where a MOA -- okay.

A. No, I don't --

Q. Is your MOA position -- was the MOA position an E2 position?

A. No.

Q. Those are different positions?

A. It's a step grade under.

Q. Okay.

A. Okay. The potential earning power within a MOA1 is not as high as a potential earning power of an E2.

Q. E2?

A. It is a step seven and I went to a step six.

So there is differences of several hundred dollars between the top salary of an E2 versus the top salary of a MOA1.

Q. When you were an E2, you were not making a top salary?

A. No. But the potential was taken away.

Q. I understand that. I'm talking about at the time of your change in position?

A. Right.

Q. Okay. Have you since been promoted from -- are you in a different position now than a MOA1?

A. Yes, I am.

Q. And what position are you in?

A. I'm an E2.

Q. Okay. And when did you get promoted?

A. October 2002. October or November of 2002, I think.

Q. So you would have been a MOA for just a little over a year from June --

A. June 1st -- June '01 to, actually, it was November 2002.

Q. Okay. Did you receive any raises while you were a MOA1?

A. Did I get a step increase? Did I get a

raise? I think I got -- yes.

Q. Do you recall what your raise was?

A. No, I don't. I do remember that when I was being promoted into the E2, I'm not for sure that I got a raise because Brad wanted to negotiate that because he said that if I did -- something about if you took a raise or if you didn't take a raise that you -- something about not getting the full 10 percent that you would get within the Division of Finance and Budget because they only get 10 percent versus the Medical Unit which gives 15 percent for a raise.

Q. So, you don't recall --

A. I can't remember if I got one or not because there was something to do with they were --

Q. Because your units were changing back between BCHS and Finance?

A. No, because it had been a year. But it was the way that Bureau of the Budget, Division of Finance and Budget looked at -- I didn't quite understand it.

Q. Okay.

A. I still don't quite understand it.

Q. Well then I surely won't, so.

A. It's something to do with trying to help me get the most money. I'm not quite for sure what he

1  meant out of that, because I would never get a total
2  of more than 10 percent from the two of them, he said,
3  anyway. So I'm not sure how that ended up. I don't
4  remember.
5  Q. Okay.
6  A. I would have to go back and look at my check
7  stubs and see.
8  Q. Okay. In October of 2002 when you were
9  promoted to an E2 position, were you making more than
10  when you left your E2 position on May 30th, 2001?
11  A. I understand. I got it. Yes, I was because
12  Alberta LeVan did my next payee valuation and Martin
13  Hazelwood and, yes, I did get a pay raise. I don't
14  think I got a pay raise under Bureau of Budget in that
15  year. I would have to go back and see.
16  Q. So, you're unsure whether you got a raise as
17  a MOA, but you did get a raise as an E2?
18  A. I got a raise the first year through Marvin
19  Hazelwood. I don't know for sure if I got one the
20  next year.
21  Q. The first year as a MOA?
22  A. Yes.
23  Q. Okay.
24  A. Did I get one the second year, I don't know

1  because of the fact that they were getting ready to
2  promote me. I would have to go back and check.
3  Q. Okay. And then is your answer -- was your
4  answer, yes, then, that when you were -- when you were
5  promoted to an E2 in October 2002, you were making
6  more money than when you were an E2 in May of 2001?
7  A. I believe so.
8  Q. Okay. All right. Just so we're clear.
9  A. But can I clarify that?
10  Q. Sure.
11  A. Bureau of the Budget and the Bureau of
12  Division of -- and BCHS gave out different amounts of
13  money.
14  Q. Right.
15  A. And I lost money by having to come over here
16  because they did not pay as high on their raises --
17  Q. Yearly raises?
18  A. Yearly raises or their promotional rates as
19  BCHS did.
20  Q. Okay.
21  A. And BCHS, if things would have gone
22  according to Cheryl's plan, by the time I was an E2 in
23  Drug Rebate, I would have already had been to a PSA,
24  which I would have got a 15 percent raise, plus a

1  couple raises in between to get me into the position
2  she wanted me to get into.
3  Q. Which was?
4  A. She was going to put me into a PSA working
5  in the computer side and having something to do
6  ultimately with Steve Bandy's unit and whatever Cindy
7  Cox and those guys did, but it had to do with the
8  financial part.
9  MS. KERLEY: Okay. Let's go off the record
10  for a second.
11                (WHEREBY A SHORT BREAK WAS TAKEN.)
12  BY MS. KERLEY:
13  Q. Back on the record. Ms. Sullins, I'm going
14  to show you just a couple of things that we've touched
15  on briefly and just to have you identify them.
16                (Whereby, Defendant's Exhibits 2 &
17                3 were marked for identification.)
18  BY MS. KERLEY:
19  Q. Ms. Sullins, I'm going to hand you two
20  documents marked Defendant's Exhibits 2 and 3. Do you
21  recognize these documents?
22  A. I've never seen this one.
23  Q. Okay. Well, let me show --
24  A. Is this me? Okay. I thought it was Mark's.

1  I'm sorry.
2  Q. Okay. Can you identify Defendant's
3  Exhibit 2?
4  A. Should be my witness statement, I'm
5  assuming, from the Mary Thallman investigation.
6  Q. Okay. I'm going to direct your attention
7  to -- to the third -- to the third page of that
8  exhibit. Do you recognize this document or the
9  document within a document?
10  A. My handwritten investigation sheet.
11  Q. Okay. And so the handwriting that appears
12  there is yours?
13  A. Yes.
14  Q. And the signature at the bottom page is your
15  signature?
16  A. Yes, it is.
17  Q. Okay. And I see that by flipping through
18  there, there are six pages of -- of your handwritten
19  statement; is that correct?
20  A. Correct.
21  Q. On the page following the sixth page of your
22  written statement, do you recognize that sheet of
23  paper?
24  A. That's an acknowledgment that I signed.

3:04-cv-03009-JES-BGC   # 20-4   Page 20 of 23

1    Q.    Okay.  And that would have been still for
2  the same Mary Thallman investigation; is that correct?
3    A.    Correct.
4    Q.    Okay.  And the following page, do you
5  recognize though document?
6    A.    Yes.  I got an e-mail from Michael Taylor
7  asking me some more questions and that he was sending
8  me some additional -- I guess they're called written
9  statement sheets, and I answered his questions.
10   Q.    Okay.  If a document refers to an addendum
11 to your statement in the Mary Thallman investigation,
12 would it be referring to these three or four pages?
13   A.    Okay.
14   Q.    Is that correct?
15   A.    Yes.
16   Q.    Okay.  And at the time you gave your
17 statements to Mr. Taylor, was that a complete and
18 accurate statement of your recollection at that time?
19       MR. BAKER:    Recollection of what?
20       MS. KERLEY:   Of the events that she's
21 describing in her statement.
22       MR. BAKER:    Okay.
23       THE WITNESS:  I would say yes.
24 BY MS. KERLEY:

1    Q.    Okay.  Let's look at Defendant's Exhibit 3.
2  Do you see that this document is in the same format as
3  Defendant's Exhibit 2?
4    A.    Yes.
5    Q.    Okay.  And do the first three pages of that
6  document represent a sort of write up of the documents
7  to follow?
8    A.    From the -- I'm sure it does.  I haven't
9  read it to see if it's word to word.
10   Q.    Is that your understanding of what the first
11 part is to be?
12   A.    My understanding?
13   Q.    On the third page, do you recognize that
14 document?
15   A.    Yes I do.
16   Q.    And what is that?
17   A.    Acknowledgment of interview for
18 administrative purposes only.
19   Q.    And is the first of the three signatures on
20 the bottom of that third page your signature?
21   A.    Yes, it is.
22   Q.    And if you could please read the date that
23 that was signed.
24   A.    March 29th, '01.

1    Q.    Okay.  And in the following 14 pages, do you
2  recognize those generally?
3    A.    Yes.  It's my handwriting.
4    Q.    Okay.  Is that your handwritten statement?
5    A.    Yes, it is.
6    Q.    And is the signature on the bottom of the
7  page yours?
8    A.    Yes, it is.
9    Q.    And this would have been -- rather, was this
10 statement the statement that you gave when you filed
11 an internal complaint of retaliation that we've been
12 discussing?
13   A.    Yes.
14   Q.    Okay.  And at the time you gave this
15 statement to the OIG, was that a complete and accurate
16 statement of your recollection at that time?
17   A.    Yes.
18   Q.    Okay.  I am going to show you one other
19 thing which you eluded to previously in your
20 testimony.  During your time at BCHS, you testified
21 that you kept notes; is that correct?
22   A.    Part of the time.
23   Q.    Okay.  And do you know about when -- or you
24 testified that that started sometime in the summer?

1    A.    I did a few earlier in the year based on the
2  fact of a meeting -- actually, it was learning -- a
3  training session at a church where it talked about
4  dealing with frustrations of being a Christian in a
5  non-Christian world and -- to use journaling as a way
6  to put things into perspective by writing it down and
7  setting it aside and going back and looking at it to
8  see if the events -- if you were over applying it,
9  making it too big, making it too small.
10   Q.    And that was not necessarily related to work
11 alone, that seminar?
12   A.    I tried it at work off and on.  And --
13 because I'm more disciplined at work than I am in my
14 home life.
15   Q.    Okay.  And the state of Illinois is glad for
16 that.  I don't have a copy and I'm not going to mark
17 it into the record but I'm going to show you a set of
18 documents that I have received through discovery in
19 this case.  And I'd like for you to identify,
20 generally, what these documents are, if you can.
21       MR. BAKER:    Off the record.
22       [WHEREUPON THERE WAS A SHORT
23       DISCUSSION OFF THE RECORD.]
24       (Whereby, Defendant's Exhibit 4

was marked for identification.)

BY MS. KERLEY:

1. Q. I'm going to show -- Ms. Sullins, I'm going to show you what will be later marked as Defendant's Exhibit 4 and I will tell you that these are some documents that I received from Mr. Baker in discovery in this case. Can you please identify those documents for me?

A. E-mails, some journaling notes that I kept.

Q. Okay. So, you do recognize the typed-written dated entries as part of what you would have journaled?

A. Uh-huh, yes, I do.

Q. Okay. The journal entries represent several dates throughout a chunk of time?

A. Uh-huh.

Q. Would you have given Mr. Baker your entire journal that would have then been given to me?

A. I think --

Q. Let me rephrase that question.

Do you have journal entries that relate to the issues in this case that we've been talking about today that you have not turned over to your attorney?

A. No.

Q. Okay. And when did you usually make journal entries?

A. When I felt something significant had happened.

Q. Okay. And would these journal entries be an accurate, complete depiction of what significant events you --

A. I think they were a summary.

Q. -- that occurred?

A. They were a topographical.

MR. BAKER: Snapshot.

THE WITNESS: Snapshot of the incident.

BY MS. KERLEY:

Q. Okay. Was it always word for word verbatim?

A. No, it would have took me quite a long time to journal like that.

Q. Got you. Okay.

I would like to ask you a few questions on a different subject. In your complaint, you allege that as a result of the conduct described in the complaint, and, namely, that that we've talked about today, you sustained monetary damages, loss of employment benefits, physical and emotional trauma,

mental anguish, embarrassment, humiliation, inconvenience and loss of enjoyment of life; is that correct?

A. Yes, it is.

Q. Okay. We've talked about loss of employment benefits, correct?

A. Correct.

Q. Okay. And I understand that you're going to complete some discovery, some written discovery as to your monetary damages in full, or, I guess you can say as best you know.

A. Okay.

Q. Okay. I'd like to ask you about this kind of other category of damages where you describe -- or where you say that the conduct described resulted in the physical and emotional trauma, et cetera. If you could, please, describe for me what allegations or what allegations you have of physical and emotional trauma, and any of the things that fall into those categories?

A. Because of the situation I at first had a loss of appetite and began to cry a lot. And I am an emotional person when I talk, I'm not a crier by nature. I'm not a person that breaks down, but in the

beginning stages of when this started, especially around October of 2000 of that year, I began to cry daily, and would try to pull it together by the time I got to the house so that Laura wouldn't know it because, once again, we were in the first stages of a relationship and I was trying to separate home from work as best as I could. But it got to the point that I couldn't quit crying. And I locked myself in the room one night and I didn't want to come out and Laura called my -- I had went to a therapist because Laura told me she said, you're not acting right, maybe you need to go see a doctor and see if you need to talk to someone since we can't talk about what's going on at work, maybe you need to find someone you can talk to. So, --

Q. And that was in October of 2000?

A. Yes, because I had began -- I was having some changes in my personality and behavior.

Q. Okay.

A. And, so, I went to see Deborah Taylor.

Q. Okay.

A. And we talked about the work issues and she asked me if I thought that this situation with parting from Patsy had anything to do with it, and after we

talked and she questioned me about that, she also came
to the understanding that I was more than happy to be
out of that relationship and well on my way into a new
one. But what was bothering me was work. And that I
also was in a situation where normally you get to go
home and you have pillow talk or get to go over your
day's work, I didn't have that at home. You know, so,
I didn't have a release for all of the nonsense going
on at work. And, so, when I -- Laura ended up
breaking into the bedroom, and I ended up having to go
to Urgent Care and get medicine that night.

Q. What kind of medicine did you get?

A. I got an antidepressant and I spent probably
an hour to hour and a half with Dr. Yu that night.
And he had been my doctor ever since I had come to
Springfield and he was quite concerned because he had
said -- being in the basement, I had had a chronic
sinus infection and been back and forth. And he had
told me that night that he had noticed that I wasn't
my cheerful self and he said, you know, I've seen you
go through momentary things that bothered you, he
said, but, this has gone deeper than that, that you're
really -- this is really hurting you.

So, he talked about putting me on an

antidepressant and doing follow-ups and coordinating
it through with Debbie Taylor. And, so, they could
refer me to a psychiatrist, which, for me, was very
hard. It was a very hard situation because I was
raised that you don't go to a psychiatrist or to a
therapist for help. That you pull yourself up by your
bootstraps and you go on.

But I went on the medicine and I went
back to see Debbie and began to realize that it's okay
that sometimes you do what you got to do.

Q. Uh-huh.

A. But I was -- then I went from not eating to
binging on ice cream every night, half a gallon at a
time, which, as of this last two weeks knowing this
date was coming, I'm doing it again. I'm going
through about a five quart gallon of ice cream every
two days right now, without any help. Because this
brings up bad memories, you know.

I had rashes that -- welts, just red
welts all over my body that came out. I quit going
home. I wouldn't go down to visit my family, because
I'm the baby of nine children and I have older
brothers that are very protective and one, if not two,
would threaten to come and whip somebody. I didn't

want to go there, because they're older and having
health problems. And I did call my sister, who lived
in Alabama, every morning and night and talk and cry
about what was going on.

We started going to a different church
and the Pastor Kreston Lipscomb began to come over
every night to talk with me and pray with me,
basically, to hold my hand through a lot of it.

And antidepressants had to keep being
changed. They weren't working. They weren't being
effective. Finally ended up going to a different one
that seemed to stabilize where I didn't cry all the
time.

But in the meantime, I also started
having blood pressure problems from internalizing. I
went on -- and I'm still on high blood pressure
medicine, which means I'm also on a water pill because
you have to take a water pill when you go on blood
pressure medicine, and this is all from hypertension,
and they believe it's from the stress factor.

Q. "They" being?

A. Medical physicians.

Q. Just to clarify, off the record.

[WHEREUPON THERE WAS A SHORT

DISCUSSION OFF THE RECORD.]

BY MS. KERLEY:

Q. When you went to Urgent Care you said in
October and you spent time with Dr. Yu that was your
physician who just happened to be at Urgent Care?

A. Yes.

Q. And were you -- was there a diagnosis made
by Dr. Yu?

A. I don't know.

Q. Okay. And the only other question I have --

A. I'll be real honest with you, that night is
just -- a lot of what he said to me is was kind of
foreign in the fact that it was like this can't -- in
my mind I was thinking, I can't believe I'm here. I
can't believe I'm here. I can't believe this is me.

Q. Okay.

A. So, I kind of went in and out of the
conversation.

Q. Okay.

A. Because I was in denial that I had got that
bad.

Q. Okay. Prior to October 2000, had you ever
seen a therapist before?

A. 1996 or 1997 I went for about six months --

```
 1   maybe not six months with Karen Broquet to deal with
 2   grief therapy.  My mother had not died yet, but she
 3   was in that stage where she didn't know us and she was
 4   slipping away every day.  And I didn't understand what
 5   was happening because I never dealt with death before
 6   because I was so young when my father passed away and
 7   it was the first death in my family.  And being a
 8   mommy's baby, I went to learn that I was grieving her,
 9   because, other than the shell, she as already gone
10   from me.  And I went to understand to learn how to
11   deal with letting go.
12         Q.    And, other than that, have you ever seen a
13   therapist?
14         A.    No.  Nope.
15         Q.    Okay.
16               MS. KERLEY:   That's as good of spot as we'll
17   find to stop for today.
18               MR. BAKER:   Very good.
19                   (Whereby, the deposition was ended
20                    for today and will be resumed on
21                    an unspecified later date.)
22                   (Whereby, signature was not
23                    waived.)
24
```

TRANSCRIPT CORRECTION SHEET

Upon reading the deposition and before subscribing
thereto, the deponent indicated the following changes:

(Any misspellings may be noted once with the notation
to change throughout transcript.)

Page ___, Line __, Should read:
Reason for change:

Page ___, Line __, Should read:
Reason for change:

Page ___, Line __, Should read:
Reason for change:

Page ___, Line __, Should read:
Reason for change:

Page ___, Line __, Should read:
Reason for change:

Page ___, Line __, Should read:
Reason for change:

Page ___, Line __, Should read:
Reason for change:

Page ___, Line __, Should read:
Reason for change:

                    SIGNATURE OF WITNESS

Christina J. Riebeling, CSR, CCP

        I, DEBORAH R. SULLINS, have read the
foregoing testimony given by me in this cause and find
said testimony to be true and correct as put at the
time of the taking of the deposition.

                    _____

                         OR

        I, DEBORAH R. SULLINS, have read the foregoing
testimony given by me in this cause and have made all
the necessary corrections on the attached errata
sheet.

                    _____

Subscribed before me this

day of                , 2005.

My commission expires

                    _____
                         Notary Public.

STATE OF ILLINOIS      )
                       ) SS
COUNTY OF SANGAMON     )

        I, Christina J. Riebeling, do hereby
certify that I am a Certified Shorthand Reporter,
Certified Court Reporter and Notary Public within and
for the County of Sangamon and State of Illinois, and
that I reported by stenographic means the proceedings
and had on the hearing of the above-entitled cause on
September 8th, 2005, and that the foregoing is a true
and correct transcript of my shorthand notes so taken.

Dated this 21st day of September, A.D., 2005

                    _____
                    Certified Shorthand Reporter
                    Certified Court Reporter
                    Notary Public
                    (CSR #_084-004006)

My commission expires:
November 12, 2006

                    Official Seal
                    Christina J Riebeling
                    Notary Public State of Illinois
                    My Commission Expires 11/12/06