# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| DEBORAH R. SULLINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  04-3039 |
| | ) | |
| THE ILLINOIS DEPARTMENT OF PUBLIC AID, | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF DEBORAH R. SULLINS

| | |
|---|---|
| STATE OF ILLINOIS | ) |
| | ) ss. |
| COUNTY OF SANGAMON | ) |

Deborah R. Sullins, being duly sworn upon her oath, deposes and states as follows:

1.   I am an adult resident of Springfield, Illinois.  I am the Plaintiff in the above captioned lawsuit.

2.   In the year 2000 I worked for the Illinois Department of Public Aid ["DEPARTMENT"]. I began my employment with the DEPARTMENT in November of 1986.

3.   In February of 2000 I transferred to the Bureau of Comprehensive Health Services ["BUREAU"].  At that time Steve Bradley was the BUREAU Chief.  I was assigned the position of a medical assistant consultant II ["MAC"].  I worked in the hospital unit which was headed by Jodie Edmonds.

4.   In 2000 there were two teams of MACs who worked in the hospital unit.  One team was headed by Marvin Ross.  The other team was headed by Lenna DeGroot.  I was a member of the DeGroot team.  Lenna DeGroot was my immediate supervisor.

5.   The hospital unit in 2000 was located in the basement of the Bloom Building in Springfield, Illinois.  Mr. Ross and his team and Ms. DeGroot and her team were located together along a u-shaped corridor.  In the center of the corridor was a conference room and the office of Marvin Ross.  The MACs along with Lenna DeGroot and Jodie Edmonds were located along the circumference of the "U".

6.   As a MAC in the hospital unit, most of the workday was spent on the telephone assisting providers with billing inquiries.  The telephone system closed at 3:00 p.m. each day.  For the balance of the day, MACs would do paperwork and return phone calls which had been

missed. My quitting time was 5:00 p.m.

7.     In 2000 there were five female non-supervisory employees and five male non-supervisory employees in the hospital unit.

8.     When I began working in the medical unit, Mark Scheff was working that unit as a MAC. I first met Mr. Scheff in 1995 or 1996 when I worked in the Springfield field office of the DEPARTMENT. However, I had little contact with him until I joined the hospital unit.

9.     Between February of 2000 when I joined the hospital unit and October of 2000, I worked around Mr. Scheff on a daily basis. During that time period I saw him multiple times each day and was able to observe him interacting with both male and female employees.

10.     Although Mr. Scheff during that time period was generally friendly with everyone, I noticed that he tended to talk differently around women than men. Around women when he addressed them, he would typically make comments associated with their sex. For example it would not be unusual for him to mention to Velva Fletcher, a female MAC who is short, "how's the little woman today?" With other females he would refer to their physical characteristics. For example, with respect to P.K. Luttrell, he would often refer to her as the big blonde bombshell.

11.     I also noticed that Mr. Scheff tended to talk down to women when he was around them.

12.     In almost every conversation that I was present with Mr. Scheff or overheard him having with a female employee, he would turn every conversation into an opportunity to make a sexual comment. While he would frequently make sexual remarks in front of men, it was not with the same frequency that he did in the presence of females. There was rarely a conversation I heard Mark Scheff have with any female employee that he did not turn it into an opportunity for him to make a sexually suggestive comment.

13.     A reoccurring subject of conversation by Mark Scheff was the inability of men to advance within the BUREAU. On several occasions promotional opportunities came open. On each occasion, Mark Scheff would find out who was interested in applying and would make comments that the females had a better chance of securing the position than did men. Mark Scheff maintained statistics of the relative number of females and males in the BUREAU and the relative numbers of females and males that had high ranking positions.

14.     Mark Scheff referred to Steve Bradley, the BUREAU Chief, as a traitor to men who tended to surround himself with "strong pussy." He made this comment frequently in connection with his conversations about males being unable to secure advancement in the BUREAU.

15.     It was common that MACs would consult with one another concerning how to deal with a particular problem. Not only was this common it was encouraged by our supervisors. All

MACs sought out assistance from other MACs. Mark Scheff would never seek out assistance from female MACs. Frequently, he would comment that they were not as intelligent as men. This was a comment that he made on a number of occasions during the time period I worked with him in the hospital unit.

16. In 2000 Ed Maddox, a male employee who worked in a policy writing unit, was passed over for promotion in favor of a female employee. When that occurred, Mark Scheff made demeaning comments about the female who received the promotion and asserted that the Maddox situation was another example of men being discriminated against in favor of females. This was not an isolated topic of discussion on Mark's part. He talked about that situation all the time.

17. Outside of the presence of both Marvin Ross and Lenna DeGroot, Mark Scheff would make frequent comparisons of the supervisory abilities of Marvin and Lenna. In this respect, he characterized Marvin as the superior supervisor because he was a male and had more sense than Lenna.

18. With respect to both male and females employees in the hospital unit, it was not uncommon for most of them to occasionally either utter a profanity or to make a comment or joke having a sexual connotation. In my experience that was fairly typical of the way adults behaved both in and out of the workplace.

19. Beginning with the first week I was in the hospital unit and continuing on, I noticed that Mark Scheff was different than other employees in the unit when it came to using profanities and making comments that had a sexual connotation. While others did it occasionally, Mark Scheff did it all the time. In all the conversations I had with Mark Scheff or was present when he was talking between February of 2000 and October of 2000 there was only one conversation where a comment of a sexual nature was not made.

20. Mark Scheff's conversations not only turned upon sexual topics, but they were fairly graphic in their subject matter. He would frequently describe sex acts that either he engaged in or had observed in pornographic movies. These types of comments were made by Mark Scheff all of the time between February and October of 2000.

21. Initially, my work station in the hospital unit was in an office I shared with P.K. Luttrell which was located adjacent to an office shared by Mike Sandidge and Joe Roberts.

22. On almost a daily basis Mark Scheff after the phones were turned off at 3:00 p.m. would come to the office of Sandidge and Roberts. Frequently, Jim Schuh would also be present. During this time period each day, the four men would engage in conversations much of it non business related. The females in the unit began referring to this daily conclave as the "boys club."

23. On a daily basis during these conclaves in the office of Mike Sandidge and Joe Roberts, Mark Scheff would make comments of a sexual nature. His conversation during these

sessions was laced with a wide variety of comments having either subtle or explicit reference to matters of a sexual nature. Oftentimes he would talk in graphic terms about sex acts. These were not isolated comments on his part, but instead occurred during these boys club sessions almost every time they got together. While Jim, Joe and Mike would also talk during these conversations, Mark Scheff always elevated the level of his voice so that it could be heard outside of the office.

24.  Eventually, after 3:00 p.m. when I was working, I would put a cd headphone set over my ears with the hope that music would drown out what I was hearing from the next room. I would also close the door to my office. Even doing that, however, Mark Scheff's voice was loud enough that I could still hear him.

25.  Occasionally, Lenna DeGroot on her way to the conference room would tell the individuals in Sandidge's office that they should not speak quite so loud because people in the conference room were complaining that they could be heard.

26.  After several weeks in the hospital unit I began complaining to Lenna DeGroot about Mark Scheff's comments. At that time I had worked fourteen years in state government and was amazed that an employee would be allowed to engage in the behavior such as Mark's. I asked Lenna DeGroot why management put up with what he was doing. Frequently, between February and October I would complain to Lenna asking her if she could do something to get Mark to shut up. Lenna's comments generally ranged from "boys will be boys" to "that's just Mark" to "Jodie has tried before to correct Mark and it has not worked." At no time did Lenna ever indicate to me that she would talk to Mark or take other steps to change his behavior.

27.  I also spoke with Marvin Ross, Mark Scheff's supervisor, about Mark's comments. I talked with Marvin after I had spoken with Lenna and no change had occurred in Mark's behavior. I spoke with Marvin Ross several times about Mark's comments. His typical reaction was that if everyone went to their office and did their jobs this would not be a problem. Marvin never indicated to me that he would speak with Mark or would look into the problem.

28.  When I had no success in complaining about Mark to Lenna DeGroot and Marvin Ross, I began speaking to Jodie Edmonds. I first went to Jodie sometime in the early spring of 2000 and talked with her periodically thereafter complaining about Mark's comments. She indicated to me that she had in the past tried to correct Mark and it had not worked. She stated that that is just how Mark was and that we would have to put up with it.

29.  Between February and October of 2000 I noticed that female workers in the unit would tend to avoid Mark Scheff. In this respect, when they were at a place where he was they would tend to excuse themselves and tried to avoid having contact with him.

30.  In the late summer or early fall of 2000, I bid upon an open executive II position. Eventually, I was the successful candidate and in early October of 2000 I was promoted to

that position.

31. When Mark Scheff discovered that I had been awarded the position, he came to my work station and commented to me that the only reason I got the position was "because I had a vagina and not a penis."

32. Upon my promotion to the executive II position, I was reassigned to a new office in the basement of the Bloom Building. My new office was around the corner from the office of Mark Scheff. After my promotion, my work station was closer to Mark Scheff's than it had earlier been.

33. In October of 2000 Mary Thallman came to my work station. She related an incident that occurred with Mark Scheff and asked for the telephone number of friend of mine who was an investigator in the Office of the Inspector General ["OIG"]. I gave Mary the telephone number of my friend, Laura Whetstone. I then called Laura Whetstone and informed her that she would be receiving a call from Mary Thallman.

34. Eventually, I was interviewed by Mike Brown, an OIG investigator, concerning the Mary Thallman incident. During that interview, Mr. Brown had a series of questions which he posed to me. The interview consisted of me answering those specific questions.

35. Within several days of the day I gave Mary Thallman Laura Whetstone's telephone number, Laura came to my office to meet me for lunch. When she arrived in my office, Jodie Edmonds came into the office and appeared to be very angry. Raising her voice, she asked Laura Whetstone what was going on with Mark Scheff. Laura shut the door and explained to Jodie that she had discussed the subject with Steve Bradley, the BUREAU Chief, and that Mr. Bradley would tell Jodie what she needed to know. Laura explained to her that she was not free to discuss that subject with Jodie. Jodie then made a derogatory remark that Laura was tearing up her unit and turned around and walked out of the office slamming the door behind her.

36. As an executive II my immediate supervisor was Jodie Edmonds. Prior to the Mary Thallman incident, I had a very cordial working relationship with Jodie. We would engage in both work and non work related conversations frequently.

37. Following the incident described above in my office between Jodie Edmonds and Laura Whetstone, Jodie Edmonds changed in her treatment toward me. She would no longer speak to me unless it was absolutely necessary for purposes of a work related matter. She frequently excluded me from staff meetings.

38. During several work related conversations I had with Jodie Edmonds, she indicated that she did not believe that I was a part of the management team because of the incident involving Mark Scheff. These conversations with Jodie occurred in late February and early March of 2001.

39.     After I moved to the first floor of the Bloom Building, Jodie Edmonds refused to talk to me. Our mode of communication at that time was through either email or Jodie's secretary delivering to me both work and messages from her. On several occasions, I attempted to talk with Jodie. On each of those occasions, she was in her office. She kept her head bowed toward her desk as if she was working and would do nothing more than make curt responses to each comment I made to her.

40.     Within a day or two of the day I gave Mary Thallman the telephone number of Laura Whetstone, Lenna DeGroot came to my office. She began engaging in small talk and then asked me about the investigation into Mark Scheff. Lenna was aware from earlier conversations I had with her that I had an ongoing relationship with Laura Whetstone. She began asking me what Laura had told me about the investigation. I indicated to her that Laura had told me nothing about the investigation and I knew little about it.

41.     After the conversation described in the preceding paragraph, both Lenna DeGroot and Marvin Ross refused to speak to me. When I might have a chance encounter with either of them, each would turn and walk the other way.

42.     After I moved to the office around the corner from Mark Scheff and prior to the Mary Thallman incident, Mark Scheff rarely passed my office. In order for him to enter and exit his work area, go to the restroom, go to break areas, and to communicate with his supervisors and other MACs, it was not necessary for him to walk past my office. Thus, he almost never went by my office during the time period I was in it prior to the Mary Thallman incident.

43.     After the Mary Thallman incident, Mark Scheff went by my office multiple times each day. Outside of my office was the work stations of several clerical employees. Prior to the Mary Thallman incident, Mark had never gone to the work station of those employees. After the Mary Thallman incident, he would frequently go to the work station of Angie Dieffenbach, a clerical employee who was located outside of my office. While my door was open, he would frequently comment to Angie about the pending investigation and the lawsuit he was going to file against people who had given information in the investigation.

44.     When Mark Scheff walked by my office, he would tend to look into it and would often scowl at me. I rearranged the furniture in my office so that when I was sitting at my desk I would not be looking out the office door, but instead toward a wall. From time to time when I was working at my desk I would turn to my right and notice Mark staring at me from the hallway.

45.     I also noticed that following the Mary Thallman incident while my office was still in the basement of the Bloom Building, Mark Scheff changed his dress. Formerly, he had typically worn a coat and tie to work. After the Mary Thallman incident he began wearing boots and blue jeans and started to wear a duster of the type that the boys involved in the Columbine massacre had worn.

46.    While my office was still located in the basement of the Bloom Building, I complained to Jodie Edmonds about Mark's conduct toward me. She indicated that I had upset Mark and he was doing nothing wrong. She also said it would get worse before it got better.

47.    While I was in the basement of the Bloom Building, I spoke on several occasions with Steve Bradley about Mark Scheff's conduct. During my first conversation with Mr. Bradley, he seemed to be supportive of me. He indicated I had done nothing wrong and he would speak to Mark.

48.    Because there was no change in Mr. Scheff's behavior, I spoke with Mr. Bradley again. During this conversation, he indicated that he would again speak with Mark Scheff and would also speak with Jodie Edmonds, Marvin Ross and Lenna DeGroot.

49.    While my office was still in the basement of the Bloom Building, one evening when I left work and went to my car I discovered that feces had been spread on my door handle. I reported that incident to Jodie Edmonds and the security office of the DEPARTMENT.

50.    At some time in early March 2001 I had another conversation with Steve Bradley. At that time, I explained to Mr. Bradley once again the conduct of Mark Scheff toward me which is more fully described above. There had been no change in Mr. Scheff's conduct between the time the Thallman investigation began and this conversation with Mr. Bradley. I also complained to Mr. Bradley that I felt Jodie Edmonds had been abusive to me. I explained to Mr. Bradley how Jodie had been treating me as more fully described above. Mr. Bradley indicated that he did not think anything could be done to change the situation for me as long as I remained in the Bloom Building. He told me about an open position at the Churchill Road facility of the DEPARTMENT. I explained to him that I was aware of the position and had applied for it.

51.    The next day Mr. Bradley again spoke to me. At that time he indicated that he could not move me to the Churchill Road position at that time, but could relocate me to the first floor of the Bloom Building.

52.    During the conversation described in the preceding paragraph, Jodie Edmonds was present with Mr. Bradley. When Mr. Bradley left the room, Jodie stated "I hope you're satisfied." She then accused me of being a crybaby and turned and left my office.

53.    I was moved sometime in the middle of March 2001 to the first floor of the Bloom Building. My office was located in the east wing of that building. While I was a MAC in the hospital unit, I did the same type of work as Mark Scheff. In my job in that unit, I never had business that took me to the first floor of the Bloom Building. Moreover, other MACs did not have work related business which took them to the first floor of the Bloom Building in the area where my office was assigned.

54.    When I was relocated to the first floor of the Bloom Building, I was assigned to a room which had formerly been a conference room. Three other individuals worked in that

room as well. There was a door at each end of the room.

55.    At approximately 9:30 a.m. on my first day at my new work station on the first floor of the Bloom Building, Mark Scheff entered the conference room at one door and walked through the conference room to another door. He had no reason to be in that room. Thereafter, Mark Scheff would come to the area where my work station was located 5-6 times a day. Although there was a copying machine in the basement of the Bloom Building fairly close to his work station, Mark Scheff would use the copy machine located outside of my new work station on the first floor of the Bloom Building. He would copy and stare in at me.

56.    In the hospital unit employees took breaks at fifteen minute increments between 9:45 a.m. and 10:30 a.m. From my assignment in the hospital unit, I was aware that Mark Scheff typically took his break between 10:00 a.m. and 10:15 a.m. Accordingly, I began taking my break between 10:15 a.m. and 10:30 a.m. I continued that practice after I moved to the first floor of the Bloom Building.

57.    When weather was nice during my break I would walk several blocks outside the building with a friend. After I moved to the first floor of the Bloom Building, Mr. Scheff began altering his break time and took it between 10:15 a.m. and 10:30 a.m. During periods of nice weather he would loiter outside the building in the area I had to pass when I returned to the Bloom Building from my walk.

58.    When weather was not nice I typically took my break by sitting on a bench in the main entrance to the Bloom Building. Mr. Scheff began visiting with a security officer at the security desk of the Bloom Building in open view of where I took my breaks. While I was on the first floor of the Bloom Building, Mr. Scheff would have contact with me almost every day during break periods. Prior to moving to the first floor of the Bloom Building, this had never occurred.

59.    My scheduled quitting time was 5:00 p.m. After I moved to the first floor of the Bloom Building, I noticed that whenever I left the building at the end of the day Mr. Scheff would be waiting at the front door of the Bloom Building. I would have to pass him and then he would leave the Bloom Building behind me. I began staggering the times I left the Bloom Building. I would leave as early as 4:55 p.m. or as late as 5:15 p.m. That made no difference. Whenever I left the Bloom Building, Mr. Scheff was at the doorway.

60.    Because of Mr. Scheff's efforts to be around me at break time, I discontinued leaving my work station at lunchtime.

61.    In April of 2001 I complained to Jodie Edmonds about Mark Scheff's behavior. She did not acknowledge my complaint. I also complained to Ronni Kulsa, the Assistant BUREAU Chief. That complaint was not productive in changing Mark Scheff's behavior.

62. In early March of 2001 I had bid on another position on Churchill Road as a management operations analyst I. That position was in a lower job series than my position as an executive II and would have represented a demotion. The only reason I bid on that position was to get away from my work environment around Mark Scheff and Jodie Edmonds.

63. In May I interviewed for the management analyst I position. I was awarded that position and in June of 2001 relocated to the Churchill Road facility of the DEPARTMENT. Although my position was still in the BUREAU, I did not work under the supervision of Jodie Edmonds and my new work location was many miles away from the Bloom Building and Mark Scheff. In order to relocate, however, I was required to take a demotion to one pay grade lower.

64. As a management analyst I, my opportunities for promotion within the DEPARTMENT were diminished from what they had been as an executive II.

65. Prior to working in the hospital unit, I rarely used sick time. Between March 2000 and October 2000 I began taking sick time so that I could leave the office around or about 3:00 p.m. I did not do this all the time, but began doing it with increasing frequency so that I could avoid hearing Mark Scheff.

66. In early 2001 because of emotional and physical symptoms I was experiencing I began taking much more time off of work.

67. This Affidavit is based upon my personal knowledge. If called upon, I could competently testify to the matters set forth above.

FURTHER YOUR AFFIANT SAYETH NOT.

Signature redacted pursuant to
USDC-CDIL Adm.Proc.Rule II(I)(f)

DEBORAH R. SULLINS

Subscribed to and sworn to before
me this 13th day of December, 2005.

NOTARY PUBLIC
(Affidavits/sullinsd 121205)

OFFICIAL SEAL
CAREN MANSFIELD
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 5-13-2008