3:04-cv-03039-JES-BGC    # 21-5    Page 1 of 14    SEP 07 2005 FILED

8/24/05    Sullins v. Department of Public Aid    Tuesday, 03 January, 2006 12:06:21 PM
Judy Stephenson Bixler    Clerk, U.S. District Court, ILCD

## Page 1

```
         IN THE UNITED STATES DISTRICT COURT
        FOR THE CENTRAL DISTRICT OF ILLINOIS
                  SPRINGFIELD DIVISION

DEBORAH R. SULLINS,
              Plaintiff,
vs.                                No.  04-3039
THE ILLINOIS DEPARTMENT OF
PUBLIC AID,
              Defendant.


         THE DEPOSITION of JUDY STEPHENSON BIXLER,
taken in the above-entitled case before Angela C.
Turner, a Notary Public of Sangamon County, acting
within and for the County of Sangamon, State of
Illinois, at 12:55 o'clock P.M., on August 24, 2005, at
415 South Seventh Street, Springfield, Sangamon County,
Illinois, pursuant to notice.


         Baldwin Reporting & Legal-Visual Services
            Serving Illinois, Indiana & Missouri
         24 hrs   (217)788-2835   Fax (217)788-2838
                       1-800-248-2835
```

## Page 2

```
1   APPEARANCES:
2           BAKER, BAKER & KRAJEWSKI, LLC
            BY:    James P. Baker, Esq.
3                  415 South Seventh Street
                   Springfield, Illinois  62701
4                  On behalf of Plaintiff.
5           OFFICE OF THE ATTORNEY GENERAL
            BY:    Sarah Kerley, Attorney at Law.
6                  500 South Second Street
                   Springfield, Illinois  62701
7                  On behalf of Defendant.
```

## Page 3

```
                    I N D E X
DEPONENT                                PAGE NUMBER
Judy Stephenson Bixler
      Examination by Mr. Baker             5, 47
      Examination by Ms. Kerley            44


                  E X H I B I T S
NUMBER                         MARKED FOR IDENTIFICATION
Plaintiff's Exhibit 28                    13
```

ORIGINAL

## Page 4

```
                S T I P U L A T I O N
        It is stipulated and agreed, by and
between the parties hereto, through their attorneys,
that the deposition of JUDY STEPHENSON BIXLER may be
taken before Angela C. Turner, a Notary Public and
Certified Shorthand Reporter, upon oral
interrogatories, on the 24th of August A.D. 2005, at
the instance of the Plaintiff at the hour of 12:55
o'clock P.M., 415 South Second Street, Springfield,
Sangamon County, Illinois;
        That the oral interrogatories and the
answers of the witness may be taken down in shorthand
by the Reporter and afterwards transcribed;
        That all requirements of the Federal
Rules of Civil Procedure and the Rules of the Supreme
Court as to dedimus, are expressly waived;
        That any objections as to competency,
materiality or relevancy are hereby reserved, but any
objection as to the form of question is waived unless
specifically noted;

        That the deposition, or any parts thereof
may be used for any purpose for which depositions are
competent, by any of the parties hereto, without
foundation proof;
        That any party hereto may be furnished
copies of the deposition at his or her own expense.
```

3:04-cv-03039-JES-BGC  # 21-5   Page 2 of 14
8/24/05
Judy Stephenson Bixler                              Sullins v. Department of Public Aid

## Page 5

1    (Whereupon the Deponent was sworn by
2    the Notary Public.)
3    J U D Y   S T E P H E N S O N   B I X L E R,
4    having been first duly sworn by the Notary Public,
5    deposeth and saith as follows:
6                    EXAMINATION
7    BY MR. BAKER:
8        Q    Good afternoon, again, Ms. Bixler. Would
9    you state your name and address for me?
10       A    My name is Judy Stephenson Bixler and I
11   have three addresses, so I don't know which one you
12   want.
13       Q    Let's do it this way. If I were to write
14   a letter to you or try to reach you by telephone, where
15   would I have the greatest chance of getting a hold of
16   you?
17       A    This month, it would be 454 South Spring
18   Road, Number 1, Elmhurst, Illinois.
19       MS. KERLEY:  And she's always able to be reached
20   by Sarah Kerley.
21       THE DEPONENT:  I am going to Florida sometime
22   the middle of -- somewhere from the middle of September
23   until October and I'll be there until May, except for
24   two weeks in December.

## Page 6

1        MR. BAKER:  Q  Why don't you then, if you could,
2    give us your Florida address and telephone number?
3        A    Sure. In Florida, it's 14431 Spyglass
4    Street, Orlando, Florida, 32826. And I have a cell
5    phone that stays the same if you would rather use that
6    or if you want the home phone.
7        Q    Sure. Cell's great.
8        A    It's 217-871-4903.
9        Q    And I'll represent to you that we're not
10   going to bug you. But in the remote likelihood we need
11   to get a hold of you, we'd like to know how to do it.
12       A    I am not sure when I am going to Florida.
13   Sometime after the 14th of September. And between then
14   and first part of October. And then I will be back in
15   Elmhurst December 14 through 29. After that, I will be
16   back in Florida.
17       Q    Very good.
18            Were you at one time employed at the
19   Illinois Department of Public Aid?
20       A    Yes, I was.
21       Q    And would you identify for me when you
22   started at the Department of Public Aid?
23       A    I started in February of 1972.
24       Q    And when did you leave the Department of

## Page 7

1    Public Aid?
2        A    August of 2002.
3        Q    Which was a little more than 30 years.
4    So I am assuming you retired?
5        A    Yes, I did.
6        Q    And do I understand correctly that while
7    you worked at the Department of Public Aid, your name
8    was Judy Stephenson?
9        A    Yes. I believe it was Judith Stephenson
10   is how it's listed.
11       Q    Judith M. to be precise.
12            What I would like to do --. Is it okay
13   if I call you Judy?
14       A    Sure.
15       Q    Judy, could you kind of trace with me the
16   various positions you had at the Department of Public
17   Aid? And if possible, go in chronologic order.
18       A    Okay. I started out as a case aid in
19   '72. Do you want to know where?
20       Q    Yes, please.
21       A    I was in Mason County. And I did case
22   work there. And from there, I went to Logan County in
23   1982. And I was a case worker there. I don't know if
24   you need the exact titles that I had.

## Page 8

1        Q    No, I really don't.
2        A    And then from there, I went to
3    Springfield to the Bureau of Comprehensive Health
4    Services in 1995. And I was there until I went to
5    contract management in the Bloom Building in 1999. And
6    I was there until I retired.
7        Q    When did you go to the Bureau of
8    Comprehensive Health Services?
9        A    October of '95.
10       Q    When you worked in that bureau, what was
11   your job?
12       A    I was a MAC in the hospital billing
13   session.
14       Q    MAC is an acronym for something, isn't
15   it?
16       A    Medical Assistance Consultant.
17       Q    Can you tell us in layman's terms what
18   your job involved as a MAC?
19       A    I worked with hospital billers, training
20   them on how to bill for the Department of Public Aid
21   bills. And I did some on-site training in the
22   hospitals. I did some seminars. And then I did a lot
23   through the mail and audit phone.
24       Q    When you worked in Logan County, did you

### Page 9

1 work at the field office for the Department of Public
2 Aid, which was located in Logan County?
3     A    It was the county office that was located
4 in Logan County. I was a case worker, I was an intake
5 worker there.
6     Q    How large an office was that?
7     A    Probably about 14. Just kind of
8 guessing.
9     Q    And when you worked in the Logan County
10 office, did you work in an enclosed office or were you
11 in a cubical or were you out in a room with a bunch of
12 other people or all of the above?
13     A    I was in a cubical. I guess it's what
14 you consider is cubical. It didn't have a door on it.
15 And it was an enclosed area and had a wall that went
16 three-fourths of the way up.
17     Q    Three-fourths the way of the ceiling?
18     A    Yes. Sidewalls went clear to the ceiling
19 and the front wall went about three-fourths of the way
20 up, with no door.
21     Q    And when you worked as a case worker in
22 Logan County, did your work involve you to be in the
23 office most the time or were you out in the field or a
24 combination of both?

### Page 10

1     A    I was probably in the office 90 to 95
2 percent of the time.
3     Q    I was a little remiss in not telling you
4 why you're here. Let me do that right now.
5     I represent Deborah Sullins who is an
6 employee of the Department of Public Aid. And Ms.
7 Sullins has a lawsuit against the Department of Public
8 Aid based upon papers were provided to us by the
9 Department of Public Aid. You may have some
10 information that relates to this lawsuit. And I just
11 want to spend a little time this afternoon -- I assure
12 you, I am not going to spend a lot of time -- asking
13 you some questions concerning some information you
14 might have.
15     If you don't understand a question, just
16 let me know that. If you need a break for any reason,
17 that's fine. We're willing to accommodate. I am going
18 to ask that you respond verbally to questions. And if
19 either Ms. Kerley or I are speaking, that you refrain
20 from saying anything until we complete our expression.
21 Finally, I am going to ask you not use the terms uh-huh
22 and huh-uh. The reason for that is when a transcript
23 is prepared of your deposition and I read it, I can't
24 tell which it is. Okay.

### Page 11

1     In anticipation of your deposition, have
2 you done anything to prepare for it?
3     A    I talked with Sarah one day last week.
4     Q    Ms. Kerley?
5     A    Yes.
6     Q    Anything else?
7     A    That's pretty much it.
8     Q    I am assuming Ms. Kerley is not your
9 lawyer?
10     A    That's correct.
11     Q    Am I correct in that respect?
12     A    That's correct.
13     Q    Do you recall where you talked with Ms.
14 Kerley, in person or by telephone?
15     A    In person.
16     Q    Was it at her office here in Springfield?
17     A    Yes.
18     Q    Do you recall how long you spoke?
19     A    Probably half hour.
20     Q    Was anyone else present?
21     A    No.
22     Q    Can you relate to me your discussion with
23 Ms. Kerley?
24     MS. KERLEY: Can we go off the record?

### Page 12

1     (Discussion off the record.)
2     MS. KERLEY: For the record, Ms. Stephenson
3 Bixler is represented by me today through the --
4 because she's entitled to indemnification under the
5 Illinois Indemnification Act. For the record, I will
6 state my ongoing objection to any questions regarding
7 our conversations of last week, but I will not direct
8 the witness not to answer.
9     MR. BAKER: That's fine. I think it's a
10 given -- and if it's not a given I will so state --
11 that Ms. Bixler is here today only because her name was
12 identified in documents we reviewed. We view her at
13 most as a witness that may have relevant information.
14 We have no reason to believe that there is any basis
15 for pursuing any claim against her by Ms. Sullins. And
16 we do not intend to pursue any claim against her. And
17 I don't think anything has arisen, nor will arise,
18 which gives any need for indemnification of her
19 interest by the state of Illinois.
20     I understand that, just like any witness,
21 she has a right to have her personal counsel appear
22 with her to advise her on what she can say and what she
23 doesn't have to say. And I recognize that right. But
24 I don't think, Ms. Kerley, in view of your capacity in

Page 13

1  this case, there is any type of attorney/client
2  relationship that would justify or invoke a privilege.
3           Having said that, I am going to continue
4  my interrogation. I am going to ask you some questions
5  relating to your discussions with Ms. Kerley. So let
6  me do that.
7           Can you tell me what you and Ms. Kerley
8  talked about?
9       A    We, basically, just talked about what I
10 had written earlier when I was called in by the
11 investigations. And basically, that's all we talked
12 about was she told me that I should -- that I needed to
13 come and that I needed to appear and to answer the
14 questions to the best of my ability. She said if I
15 didn't remember something, I didn't -- you know, just
16 say I don't know. And to answer yes or no.
17      Q    Okay. Anything else that she told you or
18 you told her?
19      A    That's basically it.
20      Q    She gave you good advice.
21                (Whereupon said document was
22                 duly marked for purposes of
23                 identification as Plaintiff's
24                 Exhibit 28, as of this date.)

Page 14

1       MR. BAKER: Q Judy, I am going to hand you
2  Exhibit 28. And in a moment, I'll let you take as much
3  time as you want to review it and read it. But my
4  question right now is, is Exhibit 28 the document you
5  discussed with Ms. Kerley when you met with her last
6  week?
7       A    Yes, it is.
8       Q    If you would like, let's take a moment to
9  look through that document.
10      A    I think this might be a little misleading
11 on the times here and probably it is the way I wrote
12 it.
13      Q    Why don't you clarify it for us then, if
14 you could?
15      A    It says I worked with Mark Scheff for the
16 first time in late '89. Which is correct. I worked
17 with him in Logan County. And then it says in early
18 '99. The early '99 was --.
19      Q    Second time?
20      A    The second time.
21      Q    And was that in Springfield, the early
22 '99?
23      A    Well, now wait a minute. I think that
24 probably should have been '90. I think what I meant

Page 15

1  there when I am reading it again is I worked with him
2  in Logan County in late '89 and early '90, because he
3  did leave in 1990. Because down here, as I am reading
4  farther, it says I also worked with him approximately
5  for one and a half years while at the Bloom building.
6  So when I worked with him in the Bloom building, it was
7  in like '98. Probably '97, '98.
8       Q    Which would have been roughly two and a
9  half years prior to the time you gave the statement?
10      A    Right. Because I changed jobs in '99 and
11 he was still working there in '99. And he came
12 approximately a year and a half before that.
13      Q    Okay.
14      A    So that's my error. When I was writing
15 this, I am sure I meant 1990.
16      Q    Okay.
17      A    Sorry about that.
18      Q    That's okay.
19           Have you had an opportunity to read it?
20      A    Yes, I have.
21      Q    Before we talk about the events that are
22 discussed in this particular document, do you recall
23 what the circumstances were for you preparing the
24 written statement that's a part of this document?

Page 16

1       A    I was called by the inspector general's
2  office to come over and to file, because there was a
3  pending -- there was a grievance against him. What the
4  grievance was all about, I don't know. I just know
5  that it was as the result of a grievance that had been
6  filed.
7       Q    And did you receive a telephone call?
8       A    I received a telephone call at work to
9  come to meet with Laura Whetstone. And it was like
10 right now to come. Like I --. It wasn't an
11 appointment to come in a half hour or ten minutes. It
12 was to come now and file this report. And all she told
13 me was there had been a grievance filed against Mark
14 Scheff. And she asked me to file a report.
15      Q    Did she ask you questions before she
16 asked you to file a report?
17      A    She explained my rights, you know, as
18 being a state employee. And that I needed to --. And
19 I can't remember exactly what she asked. She did ask
20 if, you know, I was aware of the person. And she said
21 she understood that I had shared an office with him.
22      Q    And the person being Mark Scheff?
23      A    Mark Scheff, right.
24           She asked me if I was aware of the two

### Page 17

1  things that I wrote down.  She mentioned them to me
2  first.
3      Q    What did she ask you?
4      A    I can't remember exactly.  You know, it's
5  been two or three years ago.  I can't remember exact
6  words.  But she was aware of the two incidences,
7  because she was the one that brought them up.
8      Q    So it would be reasonable to think she
9  talked to someone else before she talked to you?
10     A    Right.  Somebody else evidently had told
11 her about them, because she was aware of the two
12 incidences.
13     Q    And then what occurred prior to the time
14 that you wrote out your report?
15     A    Basically, she asked me --.  She verbally
16 discussed it with me and gave me a piece of paper and
17 said I needed to write down what I told her.
18     Q    So if we go to the second and third pages
19 to Exhibit 28, which appears to be a pre-printed form
20 headed at the top, written statement, does it not?
21     A    Yes, it does.
22     Q    And then there is handwriting in that
23 document, am I correct?
24     A    Yes.

### Page 18

1      Q    When we get down to the handwriting
2  that's in cursive beneath the word statement --.
3      A    Yes.
4      Q    Is that your handwriting?
5      A    Yes, it is.
6      Q    And is your signature at the bottom of
7  the first page?
8      A    Yes, it is.
9      Q    And if we go to the second page, is that
10 your handwriting as well?
11     A    Yes, it is.
12     Q    Now, if I understand what you're telling
13 me is she interviewed you briefly and then she asked
14 you to, basically, write down what you told her?
15     A    Yes.
16     Q    When you were writing it down, where was
17 she?
18     A    She was sitting at the table with me.
19     Q    Was she telling you what to write down?
20     A    I don't think she was.  I don't remember
21 her telling me.
22     Q    As you review the text of your
23 statement -- I am talking about the handwritten pages
24 now -- is there anything in that statement that you

### Page 19

1  believe is not correct?
2      MS. KERLEY:  With the exception of the dates
3  she's already identified?
4      MR. BAKER:  That's correct.
5      THE DEPONENT:  Other than the dates, I don't see
6  anything that I would change.
7      MR. BAKER:  Q    When you worked with Mr. Scheff
8  at the Logan County office, what was his position and
9  what was your position?
10     A    I was an intake.  I did the intake
11 processing.  And he was -- I think, he was what they
12 call a screener.  I am not sure what the technical term
13 was.  But what he did was when people came in to apply
14 for public aid, he took the initial information and set
15 up the appointment and gave them the information that
16 they needed to bring back.  And then I did the
17 interview.
18     Q    Was your position a higher one than his?
19     A    Yes, it was.
20     Q    Were you his supervisor?
21     A    No.
22     Q    Did you and Mr. Scheff have the same
23 supervisor?
24     A    No.

### Page 20

1      Q    Back when you and Mr. Scheff worked at
2  the Logan County office, who was the individual that
3  was in charge of that office?
4      A    Shirley Opper.
5      Q    Can you spell her name for us?
6      A    O-P-P-E-R.
7      Q    And her first name is Shirley?
8      A    Shirley, yes.
9      Q    If you know, where is Ms. Opper now?
10     A    She lives in Lincoln.
11     Q    Is she retired from the department?
12     A    Yes, she's retired.
13     Q    How long was it that you and Mr. Scheff
14 worked together or worked in the same building in Logan
15 County?
16     A    I really don't remember when he came.  I
17 know he left in the early part of 1990.  I would say
18 maybe a year.  I don't remember when he came.
19     Q    When you were both working in the Logan
20 County office, where was his work station in relation
21 to yours?
22     A    It was three stations down.  There were
23 two between us.
24     Q    And was his work station similar to

3:04-cv-03039-JES-BGC   # 21-5   Page 6 of 14
8/24/05                                      Sullins v. Department of Public Aid
Judy Stephenson Bixler

## Page 21

1  yours, a cubical-type facility?
2     A   Yes, it was.
3     Q   I think I am probably taxing your memory
4  here. But I want you to just give me your best
5  estimate. On a typical day at the Logan County office,
6  how frequently would you have contact with Mr. Scheff?
7     A   You mean different times?
8     Q   Yes. Roughly, would it be a situation
9  where you and he would talk together or engage in
10 conversations together multiple times a day, something
11 you would only do weekly?
12    A   It would be several times a day.
13    Q   Did you and Mr. Scheff take breaks
14 together?
15    A   On occasion. Not on a regular basis.
16    Q   Do you have any recollection one way or
17 another -- back to the Logan County days for a
18 moment -- concerning Mr. Scheff's propensities to make
19 remarks about sex or remarks that had some sexual
20 inference or connotation?
21    A   I can't think of anything specific. He
22 would talk about his various girlfriends from time to
23 time. He would brag about that he was seeing three and
24 four girls at a time. But as far as making any sexual

## Page 22

1  overtones in the office, he would brag, you know, about
2  how he would spend his days. And I can remember him
3  making comments about how he would have a revolving
4  door where he might see three people all in the same
5  evening. He would get rid of one and have another one
6  come in. That type of thing. But as far as making
7  sexual remarks to workers or to people coming into the
8  office, I can't remember any.
9     Q   Other than just saying he saw a lot of
10 women, did he ever talk about any of his sexual
11 exploits with those women?
12    A   I think he probably did. I can't think
13 of anything that I could --.
14    Q   Off your head right now?
15    A   I can't think of a specific instance.
16 But he would brag.
17    Q   I realize I am probably taxing your
18 memory, because this goes back 15 years. But just do
19 your best.
20    A   He would make comments like he had to
21 make sure --. He had a brass bed and he had to clean
22 the bed off before the next one came in. Things like
23 that. But nothing like real explicit.
24    Q   That's pretty explicit.

## Page 23

1     A   To me, it was just bragging.
2     Q   Now, there came a point in time which I
3  guess began sometime in 1990 and continued up until
4  1999 where you did not work with Mark Scheff.
5     A   It was 1990 to about -- whenever he came
6  to the department of BCHS. Comprehensive health is
7  when we started working again. I stopped working with
8  him in 1999, because that's when I changed jobs was
9  January of '99. And I can't remember. He came after I
10 did. I went there in '95. And I think it was probably
11 less than a year when he came.
12    Q   Between 1999 -- between 1990 when he left
13 Logan County and in the time after '95 when you and he
14 worked together again, during that time frame, six,
15 seven years, whatever it was, did you have any contact
16 with Mark?
17    A   I had contact with him probably maybe
18 five or six times.
19    Q   And would that be contact that arose
20 because of the necessity of your job or was it social
21 contact or did you see him at a grocery store? What
22 type of contact was it?
23    A   He called me at home two or three times
24 after he left Logan County. He called me a couple of

## Page 24

1  times just to see how I was, because I was in a bad
2  accident and was still off work when he left. And he
3  called to see how I was doing. He called once or twice
4  to ask me questions. When he came to Springfield, he
5  went to a case work job and he called to ask me how to
6  do something. And I think one time when I was down
7  here, I think I met him for supper one night after I
8  had a doctor's appointment and he said, "I will stop
9  and have pizza with you." I had pizza and he went home
10 and I went home. Other than that, I don't remember
11 talking with him.
12    Q   At all times while you worked for the
13 Department of Public Aid, did you live in Lincoln?
14    A   Yes, I did.
15    Q   Do you know where Mark lived?
16    A   No, I don't.
17    Q   Now, if I understand correctly, at some
18 time in the late '90s, you worked with Mark for a year
19 and a half and you shared a cubical with him?
20    A   I shared a cubical for probably a year
21 and a half. I probably worked with him for a little
22 bit longer than that. But I shared a cubical with him
23 for quite a while. I am guessing like a year and a
24 half.

### Page 25

1  Q   At the time you worked with Mark, who was
2  your boss?
3  A   Marvin Ross.
4  Q   And during that same time period, who was
5  Mark's boss?
6  A   At the time we shared the cubical, when
7  we first started sharing it, it was Kim Knoxs. And
8  then she moved on to a different job and I think the
9  whole time he had Marvin Ross from then on.
10 Q   Did the people who reported -- did the
11 MAC's who reported to Mr. Ross do a particular type of
12 work that's different than MAC's did for other
13 supervisors?
14 A   We all did the same work, the same type.
15 And then half of the people in the unit reported to
16 Marvin Ross. The other half reported to Lenna
17 DeGroot (sp.). And they did the same thing also. They
18 just shared the unit.
19 Q   So Lenna had half the MACs and Marvin had
20 the other half?
21 A   Right.
22 Q   At least during a portion of the time
23 that you and Mark worked together, you both reported to
24 Marvin?

### Page 26

1  A   Right.
2  Q   When you and he were in the same office
3  space, was it an enclosed office or cubical?
4  A   I guess you would call it an enclosed
5  office. It had a door.
6  Q   And did the four walls go to the ceiling?
7  A   Right, yes.
8  Q   And where was your office in relation to
9  the office of Marvin Ross?
10 A   Ours was almost to the end of the hallway
11 and Marvin's was on the opposite side of the same
12 hallway and down. It was probably about four offices.
13 Q   Four offices down?
14 A   Probably.
15 Q   So maybe 30 feet away?
16 A   Probably.
17 Q   I am not holding you to mathematic
18 precision, but get some idea.
19     And were you all in the basement of the
20 Bloom building?
21 A   Yes, we were.
22 Q   At that time when you reported to Mr.
23 Ross or Mark reported to Mr. Ross, who was his boss?
24 A   Jodi Edmonds was his boss and earlier

### Page 27

1  than that it was Karen Daniels.
2  Q   When Karen Daniels left, did Jodi take
3  Karen's office?
4  A   Yes, she did.
5  Q   Where was that office in relation to your
6  office?
7  A   It was farther down, down the hall. It
8  was probably about 30 feet or so beyond where Marvin
9  Ross's office was.
10 Q   When you and Mark shared an office
11 together, in the typical workday, was the office door
12 left open or would it be closed?
13 A   It was open most of the time.
14 Q   My understanding -- and correct me if I
15 have it wrong -- but my understanding is that back when
16 you were a MAC in that particular unit, MACs spend a
17 great deal of the day on the telephone?
18 A   Yes, they did.
19 Q   So in a typical day, when would you start
20 using the telephone?
21 A   We started work at 8:30. And I can't
22 remember exactly, but it seems like that we had calling
23 from 9:00 in the morning until 3:00 and that the
24 switchboard didn't put calls through until 9:00 or

### Page 28

1  after 3:00.
2  Q   What was quitting time?
3  A   5:00. I left at 4:30, but the normal day
4  was 5:00.
5  Q   What would MAC's do after the phones were
6  shut down at 3:00?
7  A   They would work on mail and paperwork
8  that needed to be done.
9  Q   And what would MACs do in the morning
10 before 9:00?
11 A   They would work on their mail or any
12 projects or anything that needed to be done.
13 Paperwork.
14 Q   Desk type work?
15 A   Right.
16 Q   As a MAC, did you get a break every day?
17 A   Yes, I did.
18 Q   How many breaks would you get?
19 A   Two.
20 Q   Were those 15 minute breaks?
21 A   Yes.
22 Q   And did you get a lunch break?
23 A   Yes.
24 Q   How long was that?

3:04-cv-03039-JES-BGC   # 21-5   Page 8 of 14
8/24/05
Judy Stephenson Bixler                    Sullins v. Department of Public Aid

Page 29

1  A   An hour.
2  Q   Did all MACs take their lunch break and
3  15 minute break at the same time or was it staggered?
4  A   The lunch break was supposed to be all at
5  the same time. When I was there, the morning break and
6  afternoon breaks were all within a half hour period.
7  There were some that took like 2:00 to 2:30 and some
8  would take 2:00 to 2:15, some 2:15 to 2:30. Same in
9  the morning. They were pretty much all --.
10 Q   When you took your lunch break, did you
11 take it with Mark Scheff?
12 A   No, I didn't. I took at the same time.
13 Q   He would go one way and you would go the
14 other?
15 A   Right.
16 Q   What about the mid-morning and
17 mid-afternoon breaks, did you take those with Mark?
18 A   No.
19 Q   During the time period that you worked
20 with Mark in the Bloom building as a MAC, what was your
21 experience with Mark when he would make comments of a
22 sexual nature?
23     MR. KERLEY: Objection as to foundation. She
24 hasn't testified that she ever did overhear any or that

Page 30

1  there were comments made of a sexual nature.
2      MR. BAKER: Q  You can go ahead and answer.
3  A   I usually would ignore them just figuring
4  it was him. Or if it was bothering me or something I
5  didn't think I wanted to hear, I would get up and walk
6  out. Or occasionally, I would say, "Mark, that's too
7  much information. I don't care to hear that." But
8  most the time, I would just ignore him.
9  Q   Was he any different in terms of making
10 comments of a sexual nature during the time period you
11 worked with him in the Bloom building than he had been
12 back in the Logan County days?
13 A   I think he was worse.
14 Q   And I am not going to ask you to give me
15 a blow by blow account what he said every day beginning
16 with day one and then the last day. But can you give
17 me a general idea of the types of things he would talk
18 about?
19 A   He would just flirt. He was a flirt. He
20 would --. Whenever he was talking to a woman, he would
21 be very interested maybe. And you know, like if they
22 had boyfriend or if they --. I really don't remember a
23 whole lot. It was just. He seemed kind of a flirt.
24 Q   How frequently would he say things or

Page 31

1  make comments which either directly or by inference had
2  a sexual connotation?
3  A   I don't know. Probably daily anyway. He
4  would talk to somebody. But then a lot of times too,
5  he had a lot of personal phone calls. And I don't know
6  when he was talking, you know, to a personal friend of
7  his and when he was talking to like one of the hospital
8  billers. Which I would think less of him talking to
9  just a friend of his in that kind of context than
10 somebody that was a worker.
11 Q   I want to make sure I understand your
12 testimony.
13     He would make comments having some sort
14 of sexual connotation to them daily. And oftentimes,
15 it was by telephone and you didn't know always whether
16 he was talking to someone that had official business
17 with the department or someone that was a personal
18 friend of his?
19 A   Right, yes.
20 Q   But nonetheless, they were made in your
21 presence?
22 A   Yes.
23 Q   And were these comments made by Mark in a
24 normal conversational tone of voice?

Page 32

1  A   Yes, they were.
2  Q   Like we're talking back and forth?
3  A   Yes.
4  Q   Would the cubical where you and Mark
5  worked have been larger or smaller than the room we're
6  in right now?
7  A   It was probably about this size. Maybe.
8  I would say it was about this size.
9  Q   So maybe 10 by 12?
10 A   It wasn't very big.
11 Q   So they were made in a way you could
12 easily overhear them?
13 A   Yes.
14 Q   If you go to your statement on page --
15 bottom of page 1.
16 A   Okay.
17     MS. KERLEY: For clarification, one of her
18 written statements?
19     MR. BAKER: Correct.
20 Q   What I would like you to do is to
21 read into the record for us just so we know exactly
22 what this is. The second line from the bottom on page
23 1 appears the word a go and then a period. And then a
24 phrase following that.

Page 33

```
 1      A    It says during that time?
 2      Q    Right.  Can you read that into the record
 3  for us?
 4      A    During that time, at times, phone
 5  conversations were heard with sexual overtones.
 6      Q    And that's what we have just been talking
 7  about, am I correct?
 8      A    Uh-huh.
 9      Q    Is that a yes?
10      A    Yes.
11      Q    Then, can you read the next sentence?
12      A    I would tune these conversations out as
13  that is just Mark's way.
14           Do you want me to continue?
15      Q    If you would.
16      A    If they became bothersome to me, I would
17  get up and leave.
18      Q    That's fine.
19           What did you mean when you said you would
20  tune the conversations out?
21      A    I just had my own work to do and I would
22  just kind of get to the point where I was aware he was
23  talking, but I wasn't really aware of what he was
24  saying, because I was busy working.  And then there
```

Page 34

```
 1  were times if I didn't want to hear it, I would just
 2  not listen.
 3      Q    Did you attempt to ignore him?
 4      A    Yes, I did.
 5      Q    Now, you say that was just Mark's way.
 6  What did you mean by that or what do you mean by that?
 7      A    That was just his personality.  He was
 8  arrogant.  He was a bragger.  It was just that's how
 9  Mark was.  I just considered, you know, that was his
10  personality and just overlooked it.
11      Q    You go on to say if they became
12  bothersome to me.  And I assume "they" referred to
13  these conversations we have been talking about?
14      A    Yes, it does.
15      Q    I would get up and leave.
16      A    Yes.
17      Q    How frequently did that happen?
18      A    Maybe once a week.  Maybe not even that
19  often, because a lot of stuff I just figured that's
20  just Mark and didn't let it bother me.  If he got into
21  being too graphic sexually, I thought I don't need to
22  listen to this and I would get up and walk out.
23      Q    Did you ever talk with Marvin Ross about
24  Mark's propensities for engaging in these type of
```

Page 35

```
 1  conversations?
 2      A    I don't think I ever did.
 3      Q    Did you ever talk with Jodi Edmonds about
 4  these conversations?
 5      A    No.
 6      Q    Was there a reason why you didn't?
 7      A    I just attributed it to that's the way
 8  Mark is.  And I figured everybody that worked with Mark
 9  knew Mark was this way and they probably heard the same
10  stuff I had.
11      Q    Why did you feel that way?
12      A    Just by sitting in meetings with him and
13  sitting around, you know, when there were other people
14  in the unit talking.  He didn't change his demeanor or
15  anything.  I figured everybody knew how he was.
16      Q    Would that include supervisors?
17      A    Yes.
18      Q    Have you ever heard him make comments to
19  the type we have been talking about in the presence of
20  Mr. Ross?
21      A    I can't specifically think of anything,
22  but I am sure he did.
23      Q    And did you ever hear him make comments
24  to the type we have been talking about in the presence
```

Page 36

```
 1  of Lenna DeGroot?
 2      A    I can't think of anything specific.  But
 3  I know Marvin Ross and Lenna DeGroot were in and out of
 4  the office often enough and he never changed his
 5  demeanor.  That I am sure that they were.
 6      Q    Did you ever hear him make comments of
 7  the type we have been talking about to Jodi Edmonds or
 8  in the presence of Jodi Edmonds?
 9      A    No, I don't.  She wasn't in her office as
10  much as the other two were.
11      Q    In 1999, you left the Bureau of
12  Comprehensive Health Services and went into some sort
13  of contract management position?
14      A    Yes, I did.
15      Q    Was that a promotion?
16      A    Yes, it was.
17      Q    Do you know a woman by the name of Mary
18  Thawman?
19      A    Yes, I did.
20      Q    And when you worked as a MAC in the
21  bureau, did she work in the bureau?
22      A    Yes, she did.
23      Q    Did you ever talk with Mary Thawman about
24  the comments Mark was making that we have been talking
```

3:04-cv-03039-JES-BGC  # 21-5  Page 10 of 14
8/24/05  Sullins v. Department of Public Aid
Judy Stephenson Bixler

Page 37

about?

A  In general conversation, yes. I can't remember if there was anything specific that I talked to Mary about, a specific instance. But in discussion, you know, of different things, you know, people would discuss Mark just as, you know, he was the way he was and nobody appreciated it.

Q  You said you had conversations with people and talked about Mark. Other than yourself and Mary Thawman, who participated in these conversations?

A  I think probably everybody knew it at one time or another. Just generally about how he was -- had a bad attitude and was arrogant and that he wasn't appreciated. I talked with Pam before and Donna Pinter, who was in the unit at the time. She shared an office with him before I did. And I talked with Marvin and Lenna. Marvin Ross and Lenna DeGroot. Just general conversations. As far as complaints, I didn't make any formal complaints or say any specifics as this is what he did. But just on general.

Q  When you say you had general conversations with Marvin and Lenna relating to Mark, can you be a little more specific about the types of things you would talk about?

Page 38

A  I really don't remember. I don't remember anything specific. I don't think I ever specifically said, "Well, Mark did this or Mark said this." But just the fact of how he was. Nothing specific though.

Q  In your written statement, you talk about two specific incidents. And I want to talk with you about each of those. The first incident had to do with training a dog or something to that effect.

A  Yes.

Q  Do you recall approximately when that conversation occurred?

A  Timewise, I don't. It was probably --. I left that bureau in January of '99 and I had been out of sharing an office with him probably for about a year. And it wasn't too long before I left sharing the office with him, but I don't remember exactly when.

Q  By the way, why did you no longer share an office with him?

A  Marvin moved me in with a worker that was new to the unit to kind of help train her or to help her with it.

Q  Was that at your request?

A  No. It was at Marvin's request.

Page 39

Q  Getting back to this incident where the dog comment was made. Can you tell me what you recall occurring?

A  I remember it was a new biller that had called him and was asking questions. And she had called him several times. I don't remember if it was like over a week or over a month. But she used to call him daily asking questions. And this one day --. She was a new worker. And normally, with new workers, you did spend a lot of time with them. And he just told her that -- he said, "You aren't learning." He's like, "I tell you and I tell you and I tell you. And you don't learn." He said, "I have a dog at home that I can repeat things to and he gets it. He listens to me."

Basically, that's how I remember it anyway. And then I do know that there was a follow up on that that this girl's supervisor called Jodi Edmonds to complain about Mark referring to one of his workers as a dog.

Q  How do you know that happened?

A  Mark told me.

Q  Did Mark tell you if he got any discipline for it?

Page 40

A  Mark told me he got disciplined for it. And he also told me that he filed procedures against -- I don't know. I suppose against Jodi Edmonds or against the department. But he said, "I followed up and beat that." And he was bragging to me about how they tried to get him in trouble and that he won.

Q  I outsmarted them?

A  Yes. That's the only reason I knew is because he started bragging to me about how he beat the system.

Q  And you also refer to a comment made by someone about taking long trips with a female companion.

A  When I wrote this, I couldn't remember. Laura Whetstone asked me if I was aware of him making a phone conversation. At the time, I remembered the story, but couldn't remember if I heard it or if somebody else told me. And as I recall now, as I look back, I am the one that heard the story. I mean, heard him make the conversation.

Q  Was this during a telephone conversation?

A  It was a telephone conversation, yes.

Q  Do you know if it was a conversation with a friend or someone that had business with the

Page 41

1  department?
2       A     I think it was, it was a friend.  But I
3  think it was a co-worker.  I think it was someone he
4  worked with in the past.  It was a friend of his.
5       Q     And as best you can, can you tell us what
6  he said during that conversation?
7       A     I don't remember the exact, you know,
8  what all was involved.  I remember him calling and
9  asking if she would like to take a trip in the country
10 or to St. Louis.  I think it was to St. Louis.  That he
11 needed taken care of.
12      Q     He said that he needed to be taken care
13 of?
14      A     Or I believe that's what he said.  But I
15 wouldn't swear to it.  I remember when he got off the
16 phone, he made the comment to me that he liked driving
17 out in the country with a girl.
18      Q     With a girl or with a particular girl?
19      A     No.  He just said with a girl.
20      Q     Did you draw any inference from that?
21      A     Well, you know, I figured that it was
22 sexual.  And that may not have been his exact words.
23 It's kind of the gist of it anyway with my memory.
24      Q     After you gave the statement which we

Page 42

1  have been talking about to Laura Whetstone, did you
2  have any contact with Mark?
3       A     You mean directly afterwards?
4       Q     Well, not directly afterwards
5  necessarily.  Let me ask the question this way.
6             At the time you gave the statement, I
7  understand that you had been promoted and worked in
8  another area.
9       A     Right.
10      Q     And did you work in the Bloom building?
11      A     I worked in the Bloom building for
12 approximately seven or eight months.  And then we were
13 transferred out to a building on Walnut Street.  And I
14 was out there for probably a little over a year.  And
15 then we were transferred back to the Bloom building.
16      Q     Moved around.
17      A     Yes.
18            The job that I had still worked with the
19 hospital reviews.  And so I did still have some contact
20 with the hospital unit.
21      Q     After you left the unit where Mark was
22 working, what was the frequency of your contact with
23 Mark?
24      A     He would call whenever he needed

Page 43

1  information on the hospital reviews.  And he would call
2  up and he might have one to ten, twelve reviews that he
3  needed checked on to see if they had been done.  And he
4  would do that whenever he needed.  You know, it wasn't
5  like on a weekly basis.  It might be two or three times
6  a month or it might be three days in a row.
7       Q     During any of those conversations, did he
8  ever make comments that had some sexual connotation?
9       A     I don't really remember any.
10      Q     At any time, did Mark ever discuss with
11 you any type of investigation that was ongoing or
12 involving him?
13      A     He didn't really discuss it.  He
14 mentioned to me that he had the investigation and he
15 had the reports.  Because he mentioned to me, as I
16 understand, you were called in.  And he said, "I read
17 your report and I have no problem with it."  But as far
18 as discussing the investigation, no, we didn't.
19      Q     Did you or do you know Debbie Sullins?
20      A     I have talked with her.  As far as
21 knowing her well, no, I don't.
22      Q     When you worked in the bureau, did she
23 work outside of the bureau?
24      A     Yes, she did.

Page 44

1       Q     And in you doing your job --.
2       A     Well, she worked in the same bureau, but
3  she worked outside of the unit I was in.
4       Q     So would it be an accurate
5  characterization that you knew who she was, but didn't
6  have much contact with her?
7       A     I would talk with her.  We knew each
8  other by name.  She had an office --.  Well, she had a
9  desk and a common office right next to a friend of
10 mine that I went on break with.  So I would be in there
11 and she would stop and make idle conversation.
12      Q     Who is your friend?
13      A     Nancy Eddy (sp.).
14      Q     At any time after you gave your statement
15 that we have been talking about, did Mark Scheff ever
16 mention to you Debbie or refer to her?
17      A     I can't really recall that he did.
18      MR. BAKER:  I don't think I have no further
19 questions.  Thank you very much.
20      MS. KERLEY:  I just have a couple just to
21 clarify.
22            EXAMINATION
23            BY MS. KERLEY:
24      Q     When you were talking about Marvin's

3:04-cv-03039-JES-BGC   # 21-5   Page 12 of 14
8/24/05
Judy Stephenson Bixler                           Sullins v. Department of Public Aid

Page 45

1  office, you described it was on the opposite side of
2  the hallway, four offices down?
3       A    Yes.
4       Q    Would that hallway have been between
5  Marvin's office and your office?  Or let me rephrase.
6            It's my understanding that there's kind
7  of a conference room that's in the middle of all the
8  MACs?
9       A    Yes.
10      Q    Just for clarification, was Marvin in the
11 same hallway as you or hallway on the other side of the
12 conference room?
13      A    Same hallway.  He was at the end of the
14 conference room on the same side as the conference
15 room.  And I was at the opposite end of the conference
16 room on the opposite side.
17      Q    Thank you.
18           More out of curiosity.  We have heard
19 lots of testimony where these places are and I still
20 probably couldn't find anybody.
21           You also testified that Mark Scheff was a
22 flirt.  And you said when he talked to a woman, he was
23 very interested.  When you say a woman, were you
24 referring to female billers, co-workers, any specific

Page 46

1  class of women or were you referring to any specific
2  type of woman?
3       A    Pretty much any woman.
4       Q    You were asked some questions about
5  conversations that you may have had with Marvin and
6  Lenna generally regarding Mark.  And when you talk
7  about generally, you had testified that Mark had a bad
8  attitude, that he was arrogant and that people in the
9  unit didn't appreciate his arrogance and bad attitude.
10      MR. BAKER:  I think you're mischaracterizing her
11 testimony.  Didn't appreciate him is what she said.
12      THE DEPONENT:  Basically, it's about the same.
13      MS. KERLEY:  Thank you for the clarification.
14      Q    You testified that he had a bad
15 attitude in that he was arrogant, correct?
16      A    Yes.
17      Q    And that he was not appreciated?
18      A    Yes.
19      Q    What about him was not appreciated?
20      A    Just his --.  The way he was.  He was
21 very cocky.  He was a bragger.  He was lazy.  He didn't
22 really pull his weight of work.  I can remember one
23 instance that Marvin Ross came in to me to ask me a
24 question and Mark was sitting there reading a

Page 47

1  newspaper.  And Marvin went over, grabbed the newspaper
2  and says, "I don't have time to deal with this today."
3  And walked out.  Things like that.
4            He went to a regional meeting one time in
5  bib overalls, which wasn't appreciated by the rest of
6  us.  Things like that.  He would do stuff just to stand
7  out, to be different.
8       Q    And those were --.  That's the type of
9  things when you testified you had conversations with
10 Marvin and Lenna?
11      A    It would be general things like that.
12      Q    Like you have just described?
13      A    Right.
14      MS. KERLEY:  And I think that's all I have.
15           EXAMINATION
16           BY MR. BAKER:
17      Q    When you say he was not appreciated, did
18 that include his sexual comments?
19      A    They weren't appreciated.
20      Q    Did Mark have a curiosity or
21 preoccupation with death?
22      A    With death?  I know that his mother died
23 when he was young.  Like, I don't know if he was --.
24 He was late teens, maybe early 20s.  And he used to

Page 48

1  talk about how he -- that bothered him.  He would talk
2  about that.  Other than that, I don't remember him ever
3  really talking about death.
4       Q    Okay.
5       A    I remember him talking to me at one time
6  about my mother dying and how, you know, it bothers you
7  when you lose your mother.  But other than that, I
8  don't remember him even discussing it.
9       Q    You talked about him wearing bib overalls
10 to a meeting.
11      A    Uh-huh.
12      Q    Putting that aside, that incident aside,
13 was there ever anything else you recall curious or
14 unusual about how he dressed?
15      A    Not really.  He usually dressed about the
16 way the rest of them did.
17      Q    What type of garment did he wear in cold
18 weather?
19      A    I don't remember.  It must not have been
20 anything that was too out of the way or else I probably
21 would have remembered it.
22      MR. BAKER:  Very good.
23      MS. KERLEY:  I don't have any further questions.
24      MR. BAKER:  Thank you much.  Just so we can

## Page 49

1  fulfill our obligation, the young lady to your left and
2  my right has dutifully been transcribing what you have
3  said today. And she's going to run back to the office
4  and spend all night typing it up. And she'll have a
5  book. You have a right to review your testimony. And
6  if you think that she incorrectly took down either a
7  question was asked or something you said, to note the
8  correction. And then sign off on the deposition.
9          You also have a right not to do that.
10 And the choice is entirely yours. She just needs to
11 know your preference so she can make arrangements to
12 get the transcript to you.
13         THE DEPONENT: Would she just mail it to me?
14         MS. KERLEY: We can just make sure you get it.
15 And then you just send back the correction sheet.
16         MR. BAKER: If you have any uncertainty right
17 now, think it over and just let Sarah know or me know.
18              FURTHER DEPONENT SAITH NOT.

## Page 50

1        I, JUDY STEPHENSON BIXLER, having read the above
2  and foregoing, find the same to be true and correct
3  with the following additions and/or corrections, if
4  any:
5  Page_____  Line_____  Change:
6  Page_____  Line_____  Change:
7  Page_____  Line_____  Change:

24 JUDY STEPHENSON BIXLER (8/24/05)        DATE

## Page 51

1  STATE OF ILLINOIS )
                     ) SS
2  COUNTY OF SANGAMON )
3              C E R T I F I C A T E
4       I, Angela C. Turner, a Notary Public and
5  Certified Shorthand Reporter in and for said County and
6  State do hereby certify that the Deponent herein, JUDY
7  STEPHENSON BIXLER, prior to the taking of the foregoing
8  deposition, and on the 24th of August A.D. 2005, was by
9  me duly sworn to testify to the truth, the whole truth
10 and nothing but the truth in the cause aforesaid; that
11 the said deposition was on that date taken down in
12 shorthand by me and afterwards transcribed, and that
13 the attached transcript contains a true and accurate
14 translation of my shorthand notes referred to.
15          Given under my hand and seal this 5th day
16 of September A.D. 2005.

                    _Angela C. Turner_
                    _____
                    Notary Public and
                    Certified Shorthand Reporter

21 License No. 084-0041?

[OFFICIAL SEAL / ANGELA C. TURNER / NOTARY PUBLIC, STATE OF ILLINOIS / MY COMMISSION EXPIRES 6-18-2008]