3:04-cv-03039-JES-BGC    # 21-6    Page 1 of 20
7/12/05
Steve Bradley
Sullins v. Illinois Department of Public Aid
E-FILED
Tuesday, 03 January, 2006 12:07:32 PM
Clerk, U.S. District Court, ILCD

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

DEBORAH R. SULLINS,
         Plaintiff,
vs.                              No. 04-3039
THE ILLINOIS DEPARTMENT OF PUBLIC AID,
         Defendant.

THE DEPOSITION of STEVE BRADLEY, taken in the above-entitled case before Rhonda K. O'Neal, CSR, RPR, a Notary Public of Sangamon County, acting within and for the County of Sangamon, State of Illinois, at 1:35 o'clock P.M., on July 12, 2005, at 415 South Seventh Street, Springfield, Sangamon County, Illinois, pursuant to notice.

BALDWIN REPORTING & LEGAL-VISUAL SERVICES
SERVING ILLINOIS, INDIANA & MISSOURI
24 hrs (217) 788-2835  Fax (217) 788-2838
1-800-248-2835

## Page 2

APPEARANCES:
    BAKER, BAKER & KRAJEWSKI, LLC
    BY: James P. Baker, Esq.
        415 South Seventh Street
        Springfield, Illinois 62701
        On behalf of Plaintiff.
    MS. SARAH R. KERLEY
        Assistant Attorney General
        500 South Second Street
        Springfield, Illinois 62701
        On behalf of Defendant.

ORIGINAL

## Page 3

I N D E X

| DEPONENT | PAGE NUMBER |
|---|---|
| Steve Bradley | |
| Examination by Mr. Baker | 5, 77 |
| Examination by Ms. Kerley | 74 |

E X H I B I T S

| NUMBER | MARKED FOR IDENTIFICATION |
|---|---|
| Exhibit 7 | 13 |
| Exhibit 8 | 24 |
| Exhibit 9 | 36 |
| Exhibit 10 | 39 |
| Exhibit 11 | 43 |
| Exhibit 12 | 45 |
| Exhibit 13 | 59 |
| Exhibit 14 | 61 |
| Exhibit 15 | 63 |
| Exhibit 16 | 71 |

(Exhibits retained by Counsel.)

## Page 4

S T I P U L A T I O N

It is stipulated and agreed, by and between the parties hereto, through their attorneys, that the deposition of STEVE BRADLEY may be taken before Rhonda K. O'Neal, a Notary Public, Certified Shorthand Reporter, and Registered Professional Reporter, upon oral interrogatories, on the 12th of July A.D., 2005, at the instance of the Plaintiff at the hour of 1:35 o'clock P.M., 415 South Seventh Street, Springfield, Sangamon County, Illinois;

That the oral interrogatories and the answers of the witness may be taken down in shorthand by the Reporter and afterwards transcribed;

That all requirements of the Federal Rules of Civil Procedure and the Rules of the Supreme Court as to dedimus, are expressly waived;

That any objections as to competency, materiality or relevancy are hereby reserved, but any objection as to the form of question is waived unless specifically noted;

That the deposition, or any parts thereof may be used for any purpose for which depositions are competent, by any of the parties hereto, without foundation proof;

That any party hereto may be furnished copies of the deposition at his or her own expense.

3:04-cv-03039-JES-BGC   # 21-6   Page 2 of 20
7/12/05
Steve Bradley
Sullins v. Illinois Department of Public Aid

Page 5

1               (Whereupon the Deponent was
2               sworn by the Notary Public.)
3         S T E V E   B R A D L E Y
4    having been first duly sworn by the Notary Public,
5    deposeth and saith as follows:
6                    EXAMINATION
7                 BY MR. BAKER:
8        Q    Good afternoon, Mr. Bradley. Would you
9    state your name and address, please.
10       A    My name is Steve Bradley, B-r-a-d-l-e-y.
11   My home address is 124 Landsdowne,
12   L-a-n-d-s-d-o-w-n-e, in Sherman, Illinois.
13       Q    Where do you work?
14       A    I work for the, formerly the Illinois
15   Department of Public Aid, now Health Care and
16   Family Services.
17       Q    Was that a name change recently?
18       A    Yeah. It was a name change effective
19   July 1.
20       Q    It's the same agency, just different
21   name?
22       A    Different name. For convenience sake, we
23   can say Public Aid.
24       Q    All right, fine. How many years have you

Page 6

1    worked for Public Aid?
2        A    All in all, 19 years. Nineteen and a
3    half.
4        Q    Have you given a deposition before?
5        A    Yes, I have.
6        Q    So you have some idea of what the
7    procedure is?
8        A    Yes, I do.
9        Q    I'm going to ask at the outset several
10   things of you. First thing I'm going to ask you
11   is to let me know if you don't understand a
12   question, and I'll be happy to restate it or
13   rephrase it so that it's put to you in an
14   understandable form. Second is that I'm going to
15   ask that you respond verbally to questions rather
16   than using body gesture. And the third thing I'm
17   going to ask you is that you not use the phrase
18   uh-huh or huh-uh in responding to questions.
19       A    Okay.
20       Q    Can you do those things for me?
21       A    I'll try.
22       Q    Great. Have you done anything to prepare
23   for your deposition today?
24       A    No, I have not.

Page 7

1        Q    Okay. I notice in front of you is what
2    looks like a coil-bound notebook.
3        A    Uh-huh.
4        Q    Does that have any relationship to why
5    you are here today?
6        A    No. I just bring this along in case I
7    want to jot my own notes down. And this is the
8    copy of the appointment off of my, what we call
9    Groupwise, the electronic calendar for the office.
10       Q    Okay, very good. What is your present
11   position at the Department of Public Aid?
12       A    I'm the bureau chief for the bureau of
13   comprehensive health services in the division of
14   medical programs.
15       Q    Is the mission of the division of medical
16   programs the same today as it was in the year
17   2000?
18       A    Yes.
19       Q    And can you kind of give me a
20   50-word-or-less explanation as to what the mission
21   is of that division?
22       A    Yeah. Basically the division of medical
23   programs is responsible for paying for the health
24   care needs of nearly two million Medicaid

Page 8

1    beneficiaries. We, my bureau provides billing,
2    assistance, policy interpretation, policy
3    development, promulgation of administrative rules.
4         We provide input on pending legislation,
5    provide expert testimony in criminal and civil
6    cases relating to the department's policies on
7    Medicaid billing and policies. And that's
8    probably a few more than 50 words, but that pretty
9    much summarizes what we do.
10       Q    Okay. And you were speaking as to the
11   mission of the division rather than your bureau?
12       A    My bureau, the division of medical
13   programs has a variety of different functions. We
14   have a fiscal division, we also have a claims
15   processing area. We have bureau of long-term
16   care, bureau of pharmacy. They all have similar
17   responsibilities as far as administrative rules
18   and policies and getting bills paid and so on and
19   so forth.
20        My actual bureau is responsible for
21   paying the bills for every medical service other
22   than pharmacy and nursing homes. Everything else
23   is in my bureau.
24       Q    Okay. So if there's a Public Aid

## Page 9

1 recipient who is billed for services by
2 St. John's Hospital, your bureau would become
3 involved in some phase of the payment process?
4    A    Yeah. They don't bill Medicaid
5 participants, they bill the department just as if
6 when you go to the doctor they bill Blue Cross.
7 We're the Blue Cross for the poor people.
8    Q    Okay. Within your bureau in the year
9 2000, were there functional subunits?
10   A    Yes.
11   Q    And can you kind of take me through as
12 many of those subunits as you recall? I'm not
13 going to hold you to it.
14   A    Wow. Let me think. There was a subunit
15 that was responsible for hospital inpatient and
16 outpatient billing. There was a unit that was
17 responsible for durable medical equipment prior
18 approval and billing. There was a unit that was
19 responsible for pharmacy including drug rebates.
20 There was another unit that was responsible for
21 what we call NIPS providers or noninstitutional
22 providers; physicians, ambulance companies, any
23 noninstitutional provider other than pharmacies.
24       There was a section responsible for those

## Page 10

1 billing issues. And then we had another one
2 called special payments that takes care of people
3 with special cash flow needs. We also took care
4 of the intergovernmental transfer with the
5 University of Illinois in Cook County, which is a
6 very convoluted way to leverage additional federal
7 funds, but that area was also under my
8 jurisdiction at that time.
9    Q    Did your bureau have responsibilities for
10 the entire state of Illinois, or was there a
11 Chicago counterpart to your bureau?
12   A    Had some individuals that were housed in
13 Chicago, but my bureau had statewide
14 responsibility.
15   Q    When did you become the chief of that
16 bureau?
17   A    August of '99.
18   Q    What was your job at Public Aid before
19 August of '99?
20   A    I was the bureau chief for the bureau of
21 medical quality assurance in the Inspector
22 General's office from '97 till '99.
23   Q    The bureau of what again?
24   A    Medical quality assurance. It's the

## Page 11

1 fraud and abuse arm of the Inspector General's
2 office where we review Medicaid billing for fraud
3 and abuse.
4    Q    So you worked at that point under the
5 Inspector General?
6    A    That's correct.
7    Q    What type of work did you do before you
8 worked in the Inspector General's office?
9    A    I was the manager of hospital and
10 noninstitutional reimbursement from '93 to '97.
11 Rate setting primarily for hospitals and
12 noninstitutional providers.
13   Q    I take it in the positions you've just
14 described you have supervised other individuals?
15   A    Yes, I have.
16   Q    And in those positions, did you have the
17 job classification of public service administrator
18 or whatever its counterpart before there was such
19 a thing?
20   A    Yes. The last, well, the last three
21 positions I was in, this current bureau chief, the
22 previous bureau chief, and the manager of hospital
23 and noninstitutional reimbursement was, they were
24 all what they call senior public service

## Page 12

1 administrators, which is a step above a public
2 service administrator.
3    Q    Now, are you a term appointee?
4    A    No, I am not.
5    Q    Okay. So you're a normal Civil Service--
6    A    Yes, I am.
7    Q    (Continuing)--type guy?
8    A    Yeah.
9    Q    In August of 2000, approximately how many
10 employees worked in the bureau of comprehensive
11 health services?
12   A    I would guess in excess of 120 to 130.
13   Q    Were they all located in Springfield?
14   A    No. They were located in Chicago, here
15 in Springfield, and then we had four or five
16 satellite locations throughout the state where we
17 had individuals located as well.
18   Q    How many of the employees were located in
19 Springfield in 2000?
20   A    I'm just guessing, just round numbers,
21 but I'd guess around 100.
22   Q    Were all the employees in the bureau that
23 worked in Springfield located at one central
24 facility back in 2000?

3:04-cv-03039-JES-BGC    # 21-6    Page 4 of 20
7/12/05
Steve Bradley                                    Sullins v. Illinois Department of Public Aid

## Page 13

1  A    Trying to remember when we moved over to
2  Walnut. I believe they were. Everybody was in
3  the Bloom Building at that time.
4           (Whereupon a document
5            was duly marked for
6            purposes of
7            identification as
8            Exhibit Number 7 as of
9            this date.)
10       MR. BAKER:  Q  Mr. Bradley, I'm going to
11 hand you what appears to be Plaintiff Exhibit
12 Number 7. And I'm going to ask you some questions
13 about it, but take a look at it and just
14 familiarize yourself with it before I do.
15    A    Okay.
16    Q    Have you seen a document if not exactly
17 as Exhibit Number 7 very similar to it before?
18    A    Yes, I have.
19    Q    Can you identify for me what that
20 document is?
21    A    It's a portion of the org chart for the
22 bureau of comprehensive health services.
23    Q    I'm assuming that this is an
24 organizational chart showing the reporting line in

## Page 14

1  a certain functional subunit of your bureau, am I
2  correct?
3     A    That's correct.
4     Q    And what is that, the name that would be
5  given to that particular subunit?
6     A    It would be the billing and payment
7  subunit, under which there's the universal
8  billing, which is the hospital billing, and then
9  what we call the NIPS billing, noninstitutional
10 provider services billing, which is physicians and
11 ambulance providers, so on and so forth.
12    Q    Okay. I want to take you through this
13 organizational chart for a moment. It looks like
14 in February of 2001, the head of that subunit was
15 Cheryl Beckner?
16    A    That's correct.
17    Q    Was she the head of the unit in 2000 as
18 well?
19    A    Yes.
20    Q    And then beneath Ms. Beckner, it appears
21 that there are two sub-subunits, for lack of a
22 better term. One is universal billing, and I
23 understand that deals with hospital billings?
24    A    That's correct.

## Page 15

1     Q    And that was headed in February of 2001
2  by Jodie Edmonds?
3     A    That's correct.
4     Q    And did she also hold that position in
5  2000?
6     A    I believe so. I'm not quite certain, but
7  I believe that was, that's the time she was in
8  there.
9     Q    Did she come into that position after you
10 became the bureau chief?
11    A    I don't recall for certain, but I believe
12 she was there when I came.
13    Q    Okay. And then the other sub-subunit was
14 headed by Karen Daniels, and that's NIPS billing.
15 And what is that again?
16    A    NIPS stands for noninstitutional provider
17 services.
18    Q    Like doctors?
19    A    Doctors, ambulance providers, durable
20 medical equipment providers, those kinds of
21 things. That's what they would deal with.
22    Q    Now, in February of 2001, it looks as
23 though there were two positions that reported to
24 Ms. Edmonds. One is a position held by Stephanie

## Page 16

1  Ray?
2     A    That's one of the two positions, that's
3  one of the positions, right, that was a direct
4  report to Jodie.
5     Q    And I understand there are other
6  positions. I'm just going down the line here.
7     A    Right.
8     Q    Another position was an executive II
9  position held by Deborah Sullins?
10    A    Okay.
11    Q    Am I correct?
12    A    Uh-huh.
13    Q    Is that a position Debbie Sullins secured
14 in approximately October of 2000?
15    A    Could have been. I don't recall. It was
16 somewhere along that time period.
17    Q    Do you recall who held the position
18 before Debbie held it?
19    A    No, I don't.
20    Q    Tell me if you could what the, what the
21 functions were of the executive II position held
22 by Debbie?
23    A    It's been so long ago I don't even
24 remember because those positions are abolished

3:04-cv-03039-JES-BGC   # 21-6   Page 5 of 20
7/12/05
Steve Bradley
Sullins v. Illinois Department of Public Aid

## Page 17

now. Without going back and looking, I would be guessing. I really don't know for certain.

Q  Okay. Now, it looks like under Jodie Edmonds' chain of command there were two--and I'm going to use the term team. I don't know if that's the appropriate term to use or not, but for lack of a better term that's the one I'm going to use. One was headed by Marvin Ross, and the other one was headed by Lenna DeGroot?

A  That's correct.

Q  Can you tell me what the function was of each of those teams?

A  They were both relating to hospital billing, and they divided up the hospitals alphabetically. That's the primary distinction between the two.

Q  So one team may have A to M, and the other one has N to Z?

A  Right.

Q  Okay. And what would each team do?

A  They, they're primarily responsible for answering questions that hospitals or providers that use the, what they call the UB92 billing form may have on what do we put in this box, why is

## Page 18

this claim being rejected, how much can I get paid, how much am I expecting to be paid for this, those types of questions.

Q  Okay. Now, on each team it looks like there are people that held the position, is it medical assistant consultant II?

A  Yes. That's correct.

Q  With respect to the people on this document that held that position, what was their job?

A  That's, they're the ones that actually are manning the phones, talking to the providers. The supervisors, Marvin and Lenna, primarily are responsible for answering questions that came up from the MAC level, the medical assistant consultant level that they had trouble with or they demanded to speak to a supervisor or they were doing problem resolutions trying to get the computers fixed in order to be able to process the claims in a more timely and efficient manner. But the actual day-to-day contact with the providers was done at the MAC level.

Q  Okay. Now, as I understand it, in 2001 both Marvin Ross and Lenna DeGroot were, held the

## Page 19

Civil Service classification of executive II?

A  Yes.

Q  And did they also hold that classification in the year 2000?

A  I believe so, yes.

Q  Now, putting aside the responsibilities or mission of their subunits, did they have the traditional supervisory responsibilities for individuals that worked in those units?

A  Yes.

Q  So would Mr. Ross and Ms. DeGroot have been the individuals that would have done the annual performance evaluations of the medical assistant counselor IIs?

A  Yes.

Q  And would they have been individuals that to the extent that there's any recommendation concerning a salary increase they would make it?

A  The, primarily the bargaining unit staff are automatic increases. They're not merit based, so what they had to say, it was irrelevant to salary adjustments.

Q  Did they have any role or responsibility when it came to counseling and disciplining

## Page 20

employees? And again, I'm talking about Ms. DeGroot and Mr. Ross?

A  Their subordinates below them on the organizational chart, yes, they did.

Q  What would their role have been in any disciplinary undertaking?

A  They would have been the first level of discipline that the employee comes into contact with.

Q  If an employee working under either Ms. DeGroot or Mr. Ross had some concern about how he or she was being treated, would it be appropriate for that employee to take that concern to his, to his or her immediate supervisor?

A  Yes, it would.

Q  And is that part of the immediate supervisor's job to consider and address those concerns?

A  Yes.

Q  Now, if a supervisor in the year 2000 having the level that Mr. Ross or Ms. DeGroot held had an employee report to him behavior or conduct of another employee which the complaining employee felt was improper, what was the supervisor to do?

3:04-cv-03039-JES-BGC   # 21-6   Page 6 of 20
7/12/05
Steve Bradley
Sullins v. Illinois Department of Public Aid

Page 21

1  A  Well, it's pretty much individualized. I
2  personally have a very strict set of functions
3  that I do when I have a complaint that's raised to
4  my level as far as inappropriate behavior in the
5  workplace. I notify our bureau of personnel. I
6  also notify the Office of Inspector General
7  internal affairs, and at which point then I
8  whistle the employee in, give them direct orders.
9      In the case we're speaking of here, give
10 them direct orders not to have any contact with
11 this individual inside or outside of work and,
12 under no circumstances should there be any contact
13 with this individual by yourself or with anyone
14 else.
15 Q  You say that's what you do?
16 A  That's what I do in my normal course of
17 business.
18 Q  And is that what you've directed your
19 subordinate supervisors to do?
20 A  Supervisory staff should be doing the
21 same thing, yes.
22 Q  And at least you provided some
23 information to your subordinate supervisors back
24 in 1999 and 2000 concerning what they should do in

Page 22

1  this situation we've been talking about--
2  A  Well, it was all part of the ongoing
3  training that the agency has as far as sexual
4  harassment and appropriate conduct in the
5  workplace.
6  Q  Okay. We'll get to that in a moment. I
7  wasn't necessarily limiting it to sexual
8  harassment.
9  A  No, I understand. But inappropriate
10 activity in the workplace should be addressed by
11 the individual supervisors.
12 Q  Okay. And the process that you described
13 that you did. Is that consistent with the
14 training supervisors were receiving back in 2000?
15 A  That's the process I follow. Whether or
16 not the individual supervisors take it upon
17 themselves to talk with the individual and find
18 out both sides of the story, some of them do that,
19 I don't know.
20 Q  Back in the year 2000, if you're aware,
21 did the Department of Public Aid have certain
22 procedures or protocols that a supervisor was
23 expected to follow when a subordinate employee
24 complained about the behavior of another employee?

Page 23

1  A  If it was specific enough, yeah.
2  Q  What were the procedures or protocols
3  that were to be followed?
4  A  Again, similar to what I had described
5  earlier, they need to discuss with the individual
6  making the complaint as well as the individual
7  that the complaint was alleged toward and find out
8  what's going on, and it's their responsibility to
9  make sure it doesn't happen further.
10     Normally if it ever gets elevated to my
11 level, I ask if it's gone through the appropriate
12 chains, and if it has, then that's what I usually
13 do is actually go through the process of taking it
14 that final step and reporting it to the Inspector
15 General, let independent investigations take their
16 course.
17 Q  Okay. If an employee complains about the
18 behavior of another employee to a first-line
19 supervisor, is the supervisor required to report
20 that complaint to either the Inspector General or
21 the human resource office of the department?
22 A  I don't believe it's mandatory that it's
23 reported, no.
24 Q  But the supervisor is supposed to do

Page 24

1  something to investigate it then and take whatever
2  action is appropriate in the way of any
3  investigation--
4  A  If it's specific enough, yes, they should
5  be investigating it further.
6  Q  Okay. And if they're not doing that, are
7  they not doing their job properly?
8  A  I would say they're not, they're perhaps
9  not doing that portion of their job appropriately.
10 MR. BAKER: Sure. Let's go off the record for
11 a second.
12     (Whereupon a document
13     was duly marked for
14     purposes of
15     identification as
16     Exhibit Number 8 as of
17     this date.)
18 MR. BAKER: Q  Mr. Bradley, I am handing you
19 what I think has been marked as Exhibit 8.
20 A  Correct.
21 Q  And I will represent to you that that is
22 an incomplete document, there are certain pages
23 missing, and Ms. Kerley and I had a conversation
24 off the record concerning that subject, and if I

Page 25

1  understand correctly, the Attorney General's
2  office is going to attempt to run down the missing
3  pages and--
4      MS. KERLEY: That is correct.
5      MR. BAKER: Continuing)--hopefully when they
6  come back, we can stipulate to an amended exhibit.
7      MS. KERLEY: That is fine.
8      MR. BAKER: Q  Okay.  But for the moment,
9  we'll talk about what we have, okay?
10     MR. KERLEY: I say that's fine with the caveat
11 unless he testifies to language that's obviously
12 different, then it would cause confusion, but
13 hopefully that won't be the problem.
14     MR. BAKER: Right.  We'll take it one step at
15 a time.
16     MR. KERLEY: Yes.  Yes, yes.
17     MR. BAKER: Q  Okay.  What I'd like you to do,
18 Mr. Bradley, take a look at this document.  And my
19 primary interest with respect to it are pages 266
20 and 267.  You are certainly free to look at
21 whatever portion of it you want.
22  A   Okay.
23  Q   To begin with, the first page of Exhibit
24 8 is headed Administration Manual Illinois

Page 26

1  Department of Public Aid.  Do you see that?
2   A   That's correct.
3   Q   Back in 2000 what was the administration
4  manual?
5   A   I'm not sure I understand what you mean.
6   Q   Well, what was the administration manual?
7  What did it do?  What was its function or purpose?
8   A   To be perfectly frank with you, I don't
9  think I've ever seen the administrative manual in
10 its entirety, but it's my understanding that the
11 administrative manual contains the policies and
12 procedures by which the department functions.
13  Q   And was a copy of that available to you
14 as a bureau chief?
15  A   I knew where I could get it.  It wasn't
16 at my ready disposal.  It was located up in the
17 personnel area, medical administrative support.
18  Q   And was it also available in the same
19 office to supervisors who worked beneath you?
20  A   Uh-huh, yes.
21  Q   Okay.  Would you agree with me that the
22 document you have contains some but certainly not
23 all of the pages of the administration manual?
24  A   I think that would be a fair statement.

Page 27

1   Q   Okay.  And I'm assuming that the
2  administration manual is a very comprehensive
3  document?
4   A   Yes, it is.
5   Q   Does it appear to you that the exhibit
6  you have in front of you has pages from the
7  administration manual which relate to the topic of
8  sexual harassment?
9   A   Yes.
10  Q   Okay.  And I think we can agree that
11 there may be some pages missing from this document
12 that may relate to sexual harassment?
13  A   Yes.
14  Q   Am I correct?
15     Okay.  Back in 2000, if you know, how
16 were supervisors instructed with respect to sexual
17 harassment and how to deal with sexual harassment
18 issues in the workplace?
19  A   I don't recall the exact timing of it,
20 but I know that there was mandatory in-services
21 that the agency had for supervisors and
22 subordinate employees alike on what constitutes
23 sexual harassment and what to do about it.
24  Q   Okay.  And back in 2000, did you have an

Page 28

1  understanding concerning what role a supervisor
2  had with respect to sexual harassment issues in
3  the workplace?
4   A   I know what I heard in those training
5  seminars, and I'm assuming that everyone heard the
6  same thing.
7   Q   Can you tell me what you heard with
8  respect to the role of a supervisor?
9   A   Well, again, with any employee, it's
10 their responsibilities to ensure that it's not a
11 hostile work environment, that employees are, have
12 the right to come to work and not feel intimidated
13 or harassed because of their sexuality or any
14 other gender-related comments or any comments
15 whatsoever that are considered to be offensive by
16 the person overhearing the comments.  That's, it's
17 not appropriate conversation for the workplace.
18  Q   Okay.  And if a supervisor heard a
19 comment of a sexual nature in the workplace, what
20 was the supervisor supposed to do?
21  A   Well, again, the supervisors are
22 responsible for making sure that it is not
23 considered a hostile work environment.  There's
24 very few around us that can say that they've never

3:04-cv-03039-JES-BGC   # 21-6   Page 8 of 20
7/12/05
Steve Bradley
Sullins v. Illinois Department of Public Aid

## Page 29

1  heard or told an off-color joke around the office.
2      It's the responsibility of the
3  individuals, both supervisor and subordinate alike
4  that if it is offensive to someone that that
5  activity is to cease. You know, that the best
6  thing to do is don't talk about anything at work
7  besides work. However, we all know that that's
8  not something that by human nature anyone is going
9  to be able to do.
10     Q   Right. From time to time an occasional
11 dirty joke will happen in the workplace?
12     A   I have to be honest and say I've heard a
13 few over my 20 years.
14     Q   Sure. Probably have even told them in
15 the workplace?
16         You don't have to answer that question.
17     A   I'll take the Fifth on that one.
18     Q   You don't have to answer that question.
19         And I understand that sometimes it may be
20 a nebulous line to draw when comments of a sexual
21 nature become?
22     A   That's correct.
23     Q   Offensive?
24     A   It's not intent, it's interpretation.

## Page 30

1      Q   If one employee complains to a supervisor
2  that another employee is making comments of a
3  sexual connotation which offend the complaining
4  employee, back in 2000 what was the appropriate
5  steps that the supervisor was to take in that
6  situation?
7      A   Ensure that that activity no longer
8  exists and that it's not a hostile work
9  environment for the complaining employee.
10     Q   And would that be at least as an initial
11 matter to talk with the other employee and direct
12 that that employee--
13     A   I would hope that's the route it would go
14 first, yes.
15     Q   And would it also involve monitoring the
16 employee to see that--
17     A   To the extent possible, yeah. I mean,
18 there's absolutely no way you can sit and monitor
19 someone's conversations from 8:30 in the morning
20 till 5 at night.
21     Q   Right.
22     A   But to the extent that they can be
23 cognizant of what this individual's doing and
24 saying in the workplace, yes, they should be doing

## Page 31

1  that as well. But knowing it's impossible to do.
2      Q   And should the supervisor then go back to
3  the complaining party and indicate what he or she
4  did?
5      A   That would be correct. That's what I
6  would do. I don't know that the administrative
7  manual says that you have to report back to the
8  complainant.
9      Q   Right. If you know, under the sexual
10 harassment policies of the agency as they existed
11 back in 2000, if an employee felt that he or she
12 was a victim of sexually inappropriate conduct,
13 whether or not it rises to the level of sexual
14 harassment, was an appropriate recourse for the
15 employee to report that conduct to his or her
16 supervisor?
17     A   With as much specificity as possible,
18 yes.
19     Q   Right. Say basically what was said and
20 when it was said--
21     A   What was said, who said it, who, what,
22 when, where and why.
23     Q   All right. If you go to the third page
24 of Exhibit 8.

## Page 32

1      A   Is that 266?
2      Q   I believe so.
3      A   Or 268?
4      Q   I think it's 66.
5      A   Sixty-six?
6  MS. KERLEY: Eleven?
7  THE DEPONENT: Yes.
8  MR. BAKER: Q   And down at the bottom it has
9  PO-245 with 11 in parentheses.
10     A   Okay.
11     Q   The subsection beginning with the letter
12 C about midpage. Was that, at least from what we
13 can read here because I don't think we have it
14 all, but at least what you read here, is that
15 consistent with your understanding as to what the
16 responsibility was of a supervisor with respect to
17 sexually inappropriate conduct in the workplace?
18     A   Yes.
19     Q   Okay. And if you go down to the bottom,
20 it says, a supervisor must, and then a colon, and
21 there are at least two bullet points, and I
22 believe even Ms. Kerley would agree with me that
23 there are probably more bullet points--
24 MS. KERLEY: Since it ends with a comma, I

Page 33

1  would guess.
2      MR. BAKER: Q  Those are things, is it your
3  understanding, that a supervisor must do when
4  confronted with at least an allegation of sexually
5  inappropriate conduct?
6      A   Right.  Address and observe the incident
7  of sexual harassment or a complaint of its
8  seriousness, yes.
9      Q   Would there ever be a circumstance where
10 a supervisor should ignore a complaint of sexually
11 inappropriate conduct in the workplace?
12     A   With any degree of specificity, no.
13 Vague complaints, well, you know, is it, so and so
14 said something and you know, well, was there
15 anybody else around, or is it going to be a
16 he-said-she-said type situation.  I'm not
17 condoning any activity of that nature, but if it's
18 someone making a general complaint, this guy's an
19 idiot, no.
20         Are we supposed to be out there
21 investigating these things to make sure he truly
22 is in fact an idiot?  Absolutely not.  If we have
23 specificity in a complaint that says, this person
24 said this on this day and this on this day and

Page 34

1  this on this day, yes, absolutely.  We have a
2  mandate to do that.
3      Q   Even if there are only two witnesses to
4  the incident, the complaining party and the
5  alleged perpetrator?
6      A   If we have a degree of specificity, it
7  should be addressed.
8      Q   Okay.  But a degree of specificity means
9  that the individual complaining is descriptive in
10 at least identifying what occurred?
11     A   What occurred and an approximate when
12 too.  But simply--and I'm just paraphrasing here.
13 I don't know what the exact terminology should be,
14 but someone saying, this guy's an idiot, no.
15 We're not going to be investigating that type of
16 thing.
17     Q   Okay.  Prior to October 1, 2000, did you
18 know Mark Scheff?
19     A   Yes.
20     Q   And prior to October 1, 2000, while you
21 were bureau chief of the bureau Mr. Scheff worked
22 in, had anyone ever brought to your attention the
23 fact that Mr. Scheff might be behaving in a
24 sexually inappropriate sort of way in the

Page 35

1  workplace?
2      A   No, not that I recall.
3      Q   Okay.  Lenna DeGroot never brought that
4  to your attention?
5      A   Not that I recall.
6      Q   And Jodie Edmonds never brought that your
7  attention?
8      A   Not that I recall.
9      Q   And Marvin Ross never brought that to
10 your attention?
11     A   Not that I recall.
12     Q   They never asked your assistance or
13 intervention in dealing with any problems with
14 Mr. Scheff?
15     A   No, sir.
16     Q   Okay.  At any time has it come to your
17 attention that Mr. Scheff has engaged in some
18 conduct at the workplace of a sexual nature that
19 was inappropriate?
20     A   Yes.
21     Q   And do you recall how many times that's
22 been brought to your attention?
23     A   At least two, perhaps three.
24     Q   Do you recall approximately when it was

Page 36

1  brought to your attention for the first time?
2      A   No.  Late 2000, early 2001, somewhere in
3  that vicinity.  The first time I heard about it
4  was--let's just cut right to the chase.  The first
5  time I heard about it was when Deb brought it to
6  my attention.
7      Q   Deb Sullins?
8      A   Right.
9      Q   All right.  And do you recall what Deb
10 told you?
11     A   It's contained in an e-mail.  It was
12 never, it was not initially a face-to-face
13 conversation.  It was in an e-mail.
14     Q   Was she complaining about something that
15 was done to her?
16     A   It was, she was complaining about conduct
17 in the workplace, yes.
18     Q   Okay.
19         (Whereupon a document
20          was duly marked for
21          purposes of
22          identification as
23          Exhibit Number 9 as of
24          this date.)

3:04-cv-03039-JES-BGC   # 21-6   Page 10 of 20
7/12/05
Steve Bradley
Sullins v. Illinois Department of Public Aid

Page 37

1    THE DEPONENT: Okay.
2    MR. BRADLEY: Q  Have you looked at Exhibit
3  Number 9?
4    A  Uh-huh.
5    Q  Is that the e-mail you're referring to?
6    A  Yes.
7    Q  Okay. She speaks about, the third
8  paragraph from the bottom, to a crude remark. Do
9  you see that?
10   A  Uh-huh.
11   Q  Did you ever ask her what that remark was
12 or--?
13   A  I don't recall ever asking her personally
14 what the remark was. I have since come to
15 understand that Mr. Scheff had been concerned that
16 the only employees that were being promoted were
17 women.
18   Q  She refers to reporting that remark to
19 Lenna. I'm assuming that's Ms. DeGroot?
20   A  It is.
21   Q  Upon receiving the e-mail, did you ever
22 discuss with Ms. DeGroot what Debbie was referring
23 to there?
24   A  I don't recall if I did or not. I don't

Page 38

1  believe that I did.
2    Q  In November of 2000, were you aware that
3  there was an investigation ongoing concerning
4  Mr. Scheff?
5    A  I had heard that there was. I wasn't, I
6  wasn't sure of what the allegations were. I know
7  that the stuff that I had sent over shortly after
8  this was part of it, but I don't know what the
9  initial investigation was. I don't recall anyway
10 what the original investigation was on.
11   Q  I'm going to hand you what I think has
12 been marked as Exhibit 1.
13   A  Okay. So this was--my timing is off. I
14 apologize. Okay, go ahead.
15   Q  Can you identify Exhibit 1 for us,
16 please?
17   A  This is a notice to Mr. Mark Scheff from
18 me. Notice to cease activity. Do you want me to
19 read it?
20   Q  That's not necessary.
21   A  Okay.
22   Q  That in some way, respect relates to a
23 Mary Thallman?
24   A  Uh-huh.

Page 39

1    Q  And it was your understanding at the time
2  you wrote that memo that Mr. Scheff was being
3  investigated concerning something he may have said
4  to Ms. Thallman?
5    A  That's correct.
6    Q  And how did that come to your attention?
7    A  You're asking me about stuff that I can't
8  remember what I had for lunch yesterday.
9    Q  I tell you what. We're going to make it
10 easier for you.
11   A  Okay. Would you do that, please? Thank
12 you. I don't recall the actual chronology of
13 events.
14           (Whereupon a document
15            was duly marked for
16            purposes of
17            identification as
18            Exhibit Number 10 as of
19            this date.)
20   THE DEPONENT: Okay.
21   MR. BAKER: Q  Can you identify Exhibit Number
22 10?
23   A  Yes, I can. It's a e-mail from myself to
24 Derek Moscardelli, who's in charge of internal

Page 40

1  affairs for the department.
2    Q  Why was it you wrote to Mr. Moscardelli?
3    A  To inform him of the directive that I had
4  given Mark regarding cease and, notice to cease
5  activity. And was just basically following up
6  with what I had done, so that's part of his case
7  file.
8    Q  Reading the first paragraph, I'm assuming
9  that by October 19, 2000 there was an
10 investigation underway that in some respect
11 related to sexual harassment?
12   A  Uh-huh.
13   Q  Is that a yes?
14   A  Yes. I'm sorry.
15   Q  That's okay.
16      What was your understanding about the
17 nature of the investigation at the time you called
18 Mr. Scheff into your office?
19   A  To be perfectly frank with you, that time
20 period is pretty much a blur, and I don't recall
21 if that was Mary Thallman's complaint that the
22 Inspector General was looking at or what the
23 activity was that they were looking at. I do know
24 that there was an investigation, but I don't know

### Page 41

1 which particular activity it was.
2    Q    Okay.
3    A    Sorry.
4    Q    All right. Now, in the second paragraph
5 you indicate an awareness that Mark had attempted
6 to contact Mary the preceding evening?
7    A    Outside of the workplace, yes.
8    Q    And how was it you were aware of that?
9    A    To be honest with you, I'm not sure if
10 Mary told me this or who told me that. I don't
11 honestly recall.
12    Q    Other than meeting with Mark Scheff on
13 October 19 and sending to him Exhibit Number 1?
14    A    Yes.
15    Q    Did you do anything else with respect to
16 the investigation relating to Mary Thallman?
17    A    No, I did not. That was part of the
18 Inspector General's activity after that.
19    Q    Back in October of 2000, who was Mark
20 Scheff's supervisor?
21    A    I believe it was Marvin Ross.
22    Q    Did you ever talk with Mr. Ross
23 concerning in any respect Mr. Scheff's behavior in
24 the workplace?

### Page 42

1    A    Before this incident occurred?
2    Q    Well, let's talk about either before or
3 after.
4    A    I believe there was a conversation I had,
5 and I don't recall the timing of it, if it was
6 before, during, or after this, about what he had
7 or had not done. But, you know, that, I don't
8 recall the exact timing of it.
9    Q    Do you recall the general nature of the
10 conversation?
11    A    Basically asking if he was aware of
12 people complaining of Mark's activities, and he
13 said that he had heard of those things but he had
14 nothing specific, as I recall. I mean, I'm
15 paraphrasing here, but I'm believing that was what
16 the crux of the conversation was.
17    Q    So he had heard those things? What are
18 the things he had heard?
19    A    The inappropriate behavior in the
20 workplace.
21    Q    Of Mark Scheff?
22    A    Of Mark, Mr. Scheff, yes.
23    Q    Are we talking about with respect to the
24 Mary Thallman incident or other incidents?

### Page 43

1    A    To be perfectly frank, I don't recall.
2 These things all happened together, and as I said,
3 I can't remember what I had for lunch yesterday.
4         (Whereupon a document
5          was duly marked for
6          purposes of
7          identification as
8          Exhibit Number 11 as of
9          this date.)
10   MR. BAKER:  Q    Also going to hand you Exhibit
11 Number 2. Can you identify for me what Exhibit
12 Number 2 is?
13   A    Number 2?
14   Q    Yes.
15   A    This is a list of charges that were
16 brought, for lack of a better term, brought
17 against Mark Scheff as a result of his activity in
18 the workplace.
19   Q    Okay. And was that a charge that was
20 presented to him on January 25 at the time of a
21 predisciplinary meeting?
22   A    Yes. I believe that's correct. These
23 were, this was given to him at the time.
24   Q    And--.

### Page 44

1    A    Yes.
2    Q    And was some disciplinary action taken
3 against Mr. Scheff?
4    A    Eventually, yes.
5    Q    And do you recall what the discipline was
6 he received?
7    A    I don't recall the duration of the
8 suspension, but there was a suspension involved.
9    Q    What if any role did you play in the
10 decision to the take some disciplinary action
11 against him?
12   A    Minimal. I wanted something done, but I
13 didn't specify a number of days. But I wanted
14 something to be done that would send a message
15 that this activity would not be tolerated.
16   Q    And Jodie Edmonds, did she play any role
17 in the disciplinary process or--
18   A    She was present during the
19 predisciplinary meeting.
20   Q    Did she make any recommendations
21 concerning the nature or type of discipline, if
22 any, that should be taken against him?
23   A    No. No. It was really a negotiated
24 thing with labor relations what they could support

3:04-cv-03039-JES-BGC   # 21-6   Page 12 of 20
7/12/05
Steve Bradley
Sullins v. Illinois Department of Public Aid

Page 45

1 and what they couldn't support based on the
2 evidence before them.
3   Q   Negotiation with whom?
4   A   Labor relations. Our bureau of labor
5 relations, which deals with employee and
6 discipline and union grievances, knowing full well
7 this would be grieved and what we could support
8 based on the evidence and what we couldn't. I
9 mean, there was talk to termination down to a
10 three-day paper suspension versus actual time off,
11 so it ran the gamut.
12   Q   Are you aware or were you aware in
13 January of 2001 what Mr. Scheff's disciplinary
14 record was like with the Department of Public Aid?
15   A   No. Prior to that I don't know.
16           (Whereupon a document
17            was duly marked for
18            purposes of
19            identification as
20            Exhibit Number 12 as of
21            this date.)
22   THE DEPONENT: Okay.
23   MR. BAKER: Q  Do you recall receiving Exhibit
24 Number 12?

Page 46

1   A   I'm sure I did, but I don't recall the
2 actual document right off the top of my head. But
3 I'm sure I did.
4   Q   Okay. Exhibit 12 appears to be a letter
5 written to Derek Moscardelli and yourself from
6 Carol Posegate, who is a local lawyer, am I
7 correct?
8   A   That's correct.
9   Q   And she addresses a couple of topics in
10 the letter. The first is a reference to some
11 supplemental interviews given by a Mike Sandidge
12 and Jim Schuh. Do you see that?
13   A   Uh-huh. Yes, I do.
14   Q   Do you know anything about those
15 interviews?
16   A   No, I don't.
17   Q   And the second relates to I guess
18 the timing of the discipline assessed against
19 Mr. Scheff?
20   A   Yes.
21   Q   Were you aware back at the time of the
22 predisciplinary meeting that Mr. Scheff had had
23 some involvement as a witness in support of a
24 claim by an Edward Maddox?

Page 47

1   A   No. I was not part of that case, so no,
2 I didn't.
3   Q   Did Mr. Maddox work in your bureau?
4   A   Yes, he did.
5   Q   And did he have some sort of claim of
6 discrimination--
7   A   Yes, he did.
8   Q   Against the Department of Public Aid?
9   A   Yes, he did.
10   Q   Do you have any recollection as to what
11 his claim involved or related to?
12   A   Basically it was reverse sex
13 discrimination. We were promoting--similar
14 complaints that Mr. Scheff made. We were
15 promoting only women.
16   Q   You say similar complaints to what
17 Mr. Scheff had made?
18   A   Mr. Scheff had made allegations to Deb,
19 to Ms. Sullins also that the only way to get
20 promoted is to be a female.
21   Q   Okay.
22   A   However, Mr. Maddox's interviews were
23 done by an independent panel, and he was not
24 chosen as the number-one candidate.

Page 48

1   Q   That a Rutan interview panel?
2   A   Yes.
3   Q   At any time after Debbie Sullins wrote
4 her memo to you that we've already talked about,
5 which I think was in November of 2002, did she
6 ever complain to you about the treatment she was
7 receiving either from Mr. Scheff or from anyone
8 else in the bureau?
9   A   I honestly don't recall. It's quite
10 possible. Deb spent a lot of time in and out of
11 my office over the next several months, but it is
12 possible she said something along those lines, but
13 I don't recall the conversation firsthand.
14   Q   As a normal part of her job, would she
15 spend a lot of time in your office?
16   A   No, sir.
17   Q   Do you recall why she was spending a lot
18 of time in your office at that period of time?
19   A   For one reason or another, she felt like
20 she had a sympathetic ear, somebody that was
21 trying to help her, someone that was trying to
22 make sure that the workplace was not a hostile
23 environment and someplace where she could actually
24 look forward to coming to work and not have to

3:04-cv-03039-JES-BGC  # 21-6  Page 13 of 20
7/12/05
Steve Bradley
Sullins v. Illinois Department of Public Aid

Page 49

1  fear retaliation and reprisals in any activities
2  that she had done in the past.
3      Q    And that sympathetic ear was you?
4      A    Yes, sir.
5      Q    Okay. And do you have any recollection
6  of the types of things she told you when she came
7  to your office?
8      A    No. I mean, she had been very
9  forthcoming with a lot of her personal life but,
10 you know, nothing, nothing that sticks out that
11 needed some immediate attention. I mean, after
12 getting her out of the work environment, moving
13 her to a different office in the basement, then
14 moving her up to the first floor, then eventually
15 moving her out of the building altogether, those
16 were the activities that we tried to do in order
17 to maintain a neutral workplace for her to
18 eliminate the fear and discomfort that she had of
19 coming to the office.
20     Q    Did any of those moves involve her taking
21 a demotion?
22     A    No.
23     Q    I'm sorry?
24     A    I don't recall that it did. I don't

Page 50

1  think that--I can't remember the position she took
2  out at drug rebate, but it wasn't a mandatory
3  thing, it was voluntary. I don't recall what the
4  position was out there that she took at drug
5  rebate, but the office moves were not a demotion.
6      Q    When was the first office move
7  approximately?
8      A    To be honest with you, I don't know. It
9  happened, it was shortly after this thing all
10 started. It was probably before the first of
11 January.
12     Q    And can you tell me where her office was
13 before the move and where she went?
14     A    I'm sorry. It was--no. I can't tell you
15 the exact location without looking at a floor
16 plan. But it was--
17     Q    Was it still in the basement?
18     A    It was still in the basement, but it was
19 in an area that was a separate and distinct from
20 where Mr. Scheff was located.
21     Q    Okay. And was that a request made by
22 Debbie?
23     A    No. It was a request I initiated. I
24 wanted to get her out of the environment.

Page 51

1      Q    Why was it you wanted to get her out of
2  the environment?
3      A    Because of the allegations made against
4  Mr. Scheff.
5      Q    Why didn't you get him out of the
6  environment?
7      A    I asked if she would, if that would--what
8  she wanted to do, and she indicated that she would
9  be okay if we moved offices.
10     Q    And had she complained about Mr. Scheff?
11     A    Well, yes, she had.
12     Q    And what--give me in a general sense what
13 the nature of her complaints were.
14     A    The things we've just been talking about.
15 The inappropriate conversation in the workplace.
16 And we moved her in an effort to get her out of
17 the firing range of Mr. Scheff's daily activities.
18     Q    Did you ever talk to Mr. Scheff about his
19 inappropriate conduct or the complaints made by--
20     A    Yes, we have.
21     Q    When did you do that?
22     A    On numerous occasions. You had a
23 document, Exhibit 1, which is the notice to cease
24 and desist.

Page 52

1      Q    That didn't relate to Debbie, though, did
2  it?
3      A    No. But it did of any other
4  unprofessional conversation in the workplace. So
5  it's--that in my opinion is not a, an
6  incident-specific directive.
7      Q    Okay. Was Exhibit 1 the first document
8  you ever sent to Mr. Scheff concerning--
9      A    I believe that's correct.
10     Q    (Continuing)--inappropriate conduct in
11 the workplace?
12     A    I believe that's correct.
13     Q    Between sending him that document and his
14 predisciplinary hearing, did you send him any
15 other documents saying you would not tolerate
16 inappropriate conduct in the workplace?
17     A    I don't recall. I don't believe so.
18     Q    At any time between the time you sent him
19 Exhibit Number 1--and I think you met with him on
20 that day if my recollection's correct?
21     A    Huh-uh.
22     Q    And the time of his predisciplinary
23 hearing, did you ever discuss with Mr. Scheff any
24 of the complaints Debbie Sullins had?

3:04-cv-03039-JES-BGC   # 21-6   Page 14 of 20
7/12/05
Steve Bradley
Sullins v. Illinois Department of Public Aid

## Page 53

1   A   I don't honestly recall. I would have to
2   assume I did, but I don't know for certain.
3   Q   Would you have anything that would be
4   able to refresh your recollections? Notes or
5   memos or a supervisory file you maintained for
6   Mr. Scheff? Anything like that?
7   A   No. Probably not.
8   Q   At any time between the time you wrote
9   Exhibit Number 1 and Mr. Scheff's predisciplinary
10  hearing, did you ever report Debbie's complaints
11  to anyone in the Inspector General's office?
12  A   Mr. Moscardelli.
13  Q   How did you do that? Verbally or in
14  witting?
15  A   I believe it was in writing and verbally.
16  MR. BAKER:   Let's go off the record.
17          (Discussion off the record.)
18  MR. BAKER:   Rhonda, can you read back the last
19  answer.
20          (Whereupon the requested
21           portion of the record was read
22           back by the Reporter.)
23  MR. BAKER:   Q   Let's talk about each of those.
24       Do you have any recollection of your

## Page 54

1   conversation with Mr. Moscardelli concerning
2   Debbie's complaints?
3   A   I know that I informed Mr. Moscardelli of
4   the complaints and as being collateral with Mary
5   Thallman's complaint because it all related to
6   inappropriate behavior in the workplace as well as
7   relating to the same individual, so I don't recall
8   whether I sent it in writing or if it was on a
9   telephone call.
10  Q   Okay. So if I understand your testimony,
11  you believe you reported it to Derek Moscardelli,
12  you're not sure if it was in writing?
13  A   That's correct.
14  Q   Okay, got you. Did Debbie ever complain
15  to you after the time you wrote Exhibit Number 1
16  and prior to Mr. Scheff's predisciplinary meeting
17  that Mr. Scheff was abusive to her in the
18  workplace and was doing things to make her feel
19  uncomfortable that may not have been of a sexual
20  nature?
21  A   I do recall a conversation where she had
22  indicated that he had come by and for lack of a
23  better term glared at her or didn't say anything
24  but just glared at her as he was walking by. I

## Page 55

1   don't recall her ever complaining of any further
2   verbal contact. It was just the occasional pass
3   by the office and the glaring, as I recall, was
4   the only conversations I had about those issues.
5   Q   And the glaring that she complained
6   about. Did that occur after her first move?
7   A   I don't remember the timing of it. I
8   mean, there was actually three moves involved out
9   of the current, her original office and up to the
10  first floor and eventually out to Churchill.
11  Q   So as I understand it, she complained
12  about Mark Scheff, and you asked her if moving to
13  another area might be a solution and she said that
14  would be fine?
15  A   Yes.
16  Q   And she was moved to another area in the
17  basement?
18  A   Yes.
19  Q   And she still complained about some
20  things Mr. Scheff was doing after she moved to
21  that area?
22  A   Yes.
23  Q   While she was in that area before she
24  underwent another move, did you do anything to

## Page 56

1   investigate her complaints?
2   A   No.
3   Q   Did you talk with Mr. Scheff about the
4   complaints she had in her new location?
5   A   I don't recall if we had a, if Mr. Scheff
6   and I had a conversation about that.
7   Q   What was the circumstance for Debbie
8   moving to the first floor?
9   A   Gosh. I wish I had a memory like I used
10  to. I don't recall if it was continuing to remove
11  her from the place where Mr. Scheff had, had daily
12  contact or what the reasoning was but, or whether
13  there was not office space on the first floor when
14  this first happened, but regardless, we moved her
15  to get her further out of harm's way.
16  Q   Okay. So she was moved to the first
17  floor to give her more distance from Mr. Scheff?
18  A   Right. That's correct. There is, on
19  any given day or daily basis, there is no reason
20  Mr. Scheff has business on the first floor in that
21  part of the building.
22  Q   All right. For those of us that don't go
23  to the Bloom Building on a daily basis, can you
24  tell me where Debbie's work location was on the

Page 57

1  first floor after she was moved?
2      A    I believe it was on the first floor on
3  the west side south corner.
4      Q    Okay. And if I understand correctly,
5  that was in an area of the Bloom Building where
6  Mr. Scheff would have no reason to go as part of
7  his job?
8      A    That's correct.
9      Q    And it was also in a part of the building
10 where he would not have reason to go to take
11 breaks or to get in or out of the building?
12     A    That is correct.
13     Q    Okay. And that's why that place was
14 selected?
15     A    Yes, sir.
16     Q    Is that correct?
17         Okay. After Debbie was transferred to
18 that location.
19     A    To the first-floor location?
20     Q    Yes.
21     A    Okay.
22     Q    Were there any other complaints she made
23 to you about Mark Scheff?
24     A    Again, whether or not the complaint of

Page 58

1  glaring was on the first floor or in the basement
2  after the initial move, I don't recall the timing.
3  But I don't--trying to remember if she did make an
4  allegation again that he was in that area for no
5  reason. I don't recall.
6      Q    Now, when Debbie was relocated to the
7  first floor, was Mr. Scheff instructed that he was
8  to stay away from that particular location?
9      A    Yes. That I know for certain was a
10 verbal conversation I had with him.
11     Q    So you told him that Debbie was going to
12 an office on the first floor, and he was forbidden
13 from going into that area?
14     A    There was absolutely no reason on a daily
15 basis that he needs to be in that part of the
16 building. Break room is in the other direction,
17 and the door is right through the middle.
18     Q    Okay. And that was made at or prior to
19 the time Debbie went to the first floor?
20     A    That's correct.
21         (Whereupon a document
22         was duly marked for
23         purposes of
24         identification as

Page 59

1         Exhibit Number 13 as of
2         this date.)
3      THE DEPONENT: Okay. So I put it in writing.
4      MR. BAKER: Q   Go ahead and review that
5  document.
6      A    Okay.
7           Okay.
8      Q    Can you identify Exhibit 13 for us,
9  please?
10     A    Yes. It's an e-mail I sent to Mr. Scheff
11 on March 28 basically indicating to him again my
12 instructions not to be on the first floor anywhere
13 close to Ms. Sullins' area.
14     Q    Now, that was after Ms. Sullins had been
15 on the first floor?
16     A    I believe that's correct. The timing is
17 about right, yes.
18     Q    Okay. And as I'm going through this, I'm
19 operating on the premise that someone had told you
20 that Mark had been on the first floor on the east
21 side of the Bloom Building?
22     A    That's correct.
23     Q    Do you recall who told you that?
24     A    I'm quite certain Deb was one of them,

Page 60

1  but I had it corroborated by others. I don't
2  recall who else, but if I put down according to
3  other persons, according to persons in that area,
4  that means that there was more than one. So
5  somebody else I had queried about that as well.
6      Q    So it came to your attention at least by
7  March 28 that Mr. Scheff had not complied with
8  your earlier instructions to him?
9      A    Uh-huh.
10     Q    Am I correct?
11     A    Yes, that is correct.
12     Q    Okay. Is there any reason why you didn't
13 initiate any type of discipline against Mr. Scheff
14 for violating your instructions?
15     A    In retrospect I wish I would have, but
16 no.
17     Q    Okay. Did Mr. Scheff ever respond to
18 this e-mail by offering some explanation as to why
19 he was in that location?
20     A    Not in writing.
21     Q    Did he verbally?
22     A    He may have. I don't recall.
23     Q    Okay.
24         (Whereupon a document

3:04-cv-03039-JES-BGC    # 21-6    Page 16 of 20
7/12/05
Steve Bradley
Sullins v. Illinois Department of Public Aid

## Page 61

1           was duly marked for
2           purposes of
3           identification as
4           Exhibit Number 14 as of
5           this date.)
6      THE DEPONENT: Okay.
7      MR. BAKER: Q  Can you identify Exhibit Number
8  14 for us, please?
9      A    Yes. That is a request from Deb Sullins
10 to me requesting a transfer to another supervisor
11 within the bureau.
12     Q    She refers to discourteous treatment from
13 her supervisor. Back on March 13, 2001, who was
14 her supervisor?
15     A    Direct report I believe was Jodie
16 Edmonds.
17     Q    And did Debbie ever explain to you what
18 her problems were with Jodie Edmonds?
19     A    No.
20     Q    On March 13, 2001, was Debbie in an
21 executive series job description?
22     A    I believe she was an executive II, that's
23 correct.
24     Q    And she asked if she could be transferred

## Page 62

1  to a program under Cindy Cox?
2      A    That's correct.
3      Q    Was there any opportunities for positions
4  under Cindy Cox?
5      A    There was nothing available at the time.
6      Q    Okay. And then she asked for an open MOA
7  I?
8      A    MOA 1.
9      Q    MOA 1?
10     A    Right. That's a management operations
11 analyst I.
12     Q    Is that a higher or a lower position than
13 the one Debbie had?
14     A    I'm not well versed on the personnel
15 code, but I believe it was a reduction, although
16 it probably would not have cost her any money.
17     Q    Okay. After receiving this e-mail, did
18 you ever talk with Debbie about the subject she
19 was raising in it?
20     A    To be honest with you, I don't recall.
21 I'm sure we did because I pursued the transfer
22 under Alberta.
23     Q    Where did Alberta Lebbon's (sp) unit
24 work?

## Page 63

1      A    They were, at that time they were located
2  out at Churchill, which is Churchill Drive. It's
3  out on the west side of town. It's physically
4  removed from the Bloom Building.
5      Q    Okay. And eventually did Debbie go to
6  that position?
7      A    Yes, she did.
8           (Whereupon a document
9           was duly marked for
10          purposes of
11          identification as
12          Exhibit Number 15 as of
13          this date.)
14     THE DEPONENT: Okay.
15     MR. BAKER: Q  If I am interpreting Exhibit 15
16 correctly, it appears to be a series of e-mails
17 written or exchanged between Janice Johnson and
18 yourself on March 19, 2001?
19     A    That's correct.
20     Q    At the time who was Janice Johnson?
21     A    I believe she was--she is I believe
22 retired now. She was the equal employment
23 opportunity officer for the agency.
24     Q    Okay. I think if we go in chronologic

## Page 64

1  order, we start at the bottom of this document, do
2  we not?
3      A    Right.
4      Q    The first message appears to be one you
5  wrote to Janice on the morning of March 19 at
6  approximately 8:34 a.m., am I correct?
7      A    That's correct, yes.
8      Q    That refers to you having Mr. Scheff's
9  EEO3?
10     A    Yeah. Apparently, yes.
11     Q    What is an EEO3?
12     A    I have no idea. It was a document that I
13 was asked to have him complete by Janice. And I
14 have, to be honest with you, I couldn't tell you
15 today what EEO3 means.
16     Q    Okay. And if we go up to the message at
17 9:51 a.m.?
18     A    Yes. Uh-huh, yes.
19     Q    That's a message you wrote to Janice, am
20 I correct in that respect?
21     A    That's correct.
22     Q    And it refers to Janice I assume starting
23 interviews?
24     A    Yes.

Page 65

1  Q  Do you know what the interviews were
2  relating to?
3  A  I don't know unless it was the interviews
4  for an EEO complaint. I honestly don't recall
5  what the interviews were supposed to be.
6  Q  Okay. Do you have any recollection of
7  Deb Sullins filing any type of EEO complaint in
8  early 2001?
9  A  I don't have any recollection of it.
10 It's possible, but I don't, it doesn't come
11 roaring to the front.
12 Q  Okay. Then if we go above that, Janice
13 wrote to you at 10:56 a.m.?
14 A  Uh-huh, yes.
15 Q  And she says, I'm not sure that this
16 complaint has status. He has blamed everything
17 that happened to him as Sullins' fault and part of
18 a conspiracy to make him look bad.
19    Do you know what that refers to?
20 A  I'm not sure. That may be--again, I'm
21 speculating. It may be that Scheff's filed a EEO
22 complaint, and he's blaming the equal employment
23 issues on a widespread conspiracy, although I'm
24 purely speculating. I don't recall what the EEO

Page 66

1  document was that, and I believe Janice was
2  referring to a complaint Scheff made, not one that
3  Sullins made. But I don't know for certain.
4  Q  Was it your sense in March of 2001 that
5  Mark Scheff felt that Deb Sullins had some
6  responsibility for the events that gave rise to
7  his discipline?
8  A  Absolutely.
9  Q  And did you have some sense that he was
10 acting out at Deb Sullins because of that belief?
11 A  I have anecdotal evidence that he was
12 based upon the complaints that we've had from both
13 Deb and those complaints corroborated by others in
14 the general vicinity that, yeah, he was trying to
15 act out.
16 Q  Okay.
17 A  I'm speculating that's what he was trying
18 to do but--.
19 Q  Sure. Now, if you know, if an employee
20 who was the recipient of an allegation of sexual
21 misconduct, if that employee acts out against a
22 person who either made the allegation against him
23 or gave evidence in support of the allegation, can
24 he or she be disciplined for that conduct?

Page 67

1  A  I believe they can, yes.
2  Q  And was that the case back in the year
3  2000?
4  A  Yes.
5  Q  If you know, at any time has Mark Scheff
6  ever been disciplined because of anything he did
7  to Debbie Sullins?
8  A  I'm not sure if his discipline was in
9  conjunction with what he did with Deb Sullins or
10 as a result of what he did with Deb Sullins, but
11 I'm comfortable with the fact that his discipline
12 had something to do with Deb Sullins' complaint.
13 Directly or indirectly.
14 Q  Okay. Going to hand you Exhibit Number
15 2.
16 A  Okay.
17 Q  And I believe that is a charge that gave
18 rise to the discipline against Mr. Scheff in early
19 2001?
20 A  Yes, that's correct.
21 Q  And that charge alleges misconduct
22 dealing with Mary Thallman?
23 A  That is correct.
24 Q  Can we agree that there's nothing in it

Page 68

1  dealing with anything he did to Deb Sullins?
2  A  There is nothing overt about what he did
3  to Deb Sullins in this, correct.
4  Q  Now, you indicated in what probably seems
5  like hours ago to you, but it's probably no more
6  than an hour and a half that you believe Mark
7  Scheff has been disciplined several times?
8  A  I believe so. I couldn't say with all
9  certainty without looking at his personnel record.
10 Q  Yes, sure. Do you recall what other
11 things he was disciplined for or any of the other
12 things he was disciplined for?
13 A  Not right off the top of my head. It
14 would be speculation to try and, but I do believe
15 that there's been other discipline in there.
16 Q  Do you have any recollection of him ever
17 being disciplined because of some comments he made
18 to a provider of your department?
19 A  I recall something about a provider, but
20 I don't recall if there was discipline involved
21 with that or not. Could very well have been.
22 Q  Tell me what you recall about that
23 incident.
24 A  It was a complaint from an individual

3:04-cv-03039-JES-BGC  # 21-6  Page 18 of 20
7/12/05
Steve Bradley
Sullins v. Illinois Department of Public Aid

## Page 69

1  that lived out in Washington state. And Mark had,
2  she had or apparently written an e-mail to me with
3  a complaint of inappropriate conversation that
4  Mr. Scheff had with her on the telephone.
5    Q   Was it inappropriate in a sexual sense?
6    A   As I recall, yes.
7    Q   And do you have any recollection what he
8  claimed he had said or what she claimed he had
9  said?
10   A   Not right off the top of my head. I
11 mean, I got an e-mail that she had sent to me
12 basically reiterating what, you know,
13 regurgitating the conversation she had with him.
14 But the actual context I, it was something
15 inappropriate. That's all I know. I don't
16 remember the exact conversation.
17   Q   When you got that e-mail, what did you do
18 with it?
19   A   Took it upstairs to Carol Luttrell, who
20 was the personnel person, and allowed it to go
21 down a track, and internal affairs was involved in
22 that as well.
23   Q   So you gave it to Ms. Luttrell, and then
24 there was some sort of inquiry and investigation?

## Page 70

1    A   Right. Based upon his history, yes.
2    Q   In the year 2000, what was Ms. Luttrell's
3  position at the department?
4    A   She was the bureau chief for medical
5  administrative support, called BMAS. Bureau of
6  medical administrative support. And they
7  basically support the activities of the
8  administrative body of medical programs. They do
9  the personnel transactions, they have provider
10 participation unit which helps enroll providers
11 and get them eligible to receive Medicaid
12 reimbursement.
13      They process special payment vouchers.
14 They do a lot of contract work processing the
15 contracts for contractual employees. It was an
16 administrative support function.
17   Q   Did she deal with personnel issues in
18 2000 and 2001?
19   A   Yes. Yes.
20   Q   So if you needed guidance about how to
21 handle a particular personnel problem, you would
22 go to her?
23   A   Yes.
24   Q   At any time in 2000 or 2001, did you ever

## Page 71

1  go to Ms. Luttrell concerning Deb Sullins'
2  complaints about Mark Scheff?
3    A   I believe we had conversations about
4  that. I don't know for certain what the timing
5  was but--.
6    Q   Do you know if Ms. Luttrell initiated any
7  type of investigation into those complaints?
8    A   I believe it was through the Inspector
9  General's activities. But her--no. No
10 independent investigations that I'm aware of.
11   Q   Okay. At any time in 2001, were you ever
12 interviewed by anyone in the Inspector General's
13 office concerning Mark Scheff?
14   A   I don't recall, but I don't think so. I
15 may have been, but I don't recall.
16   Q   Okay.
17   A   Things like that should stick out but
18 they don't.
19      (Whereupon a document
20      was duly marked for
21      purposes of
22      identification as
23      Exhibit Number 16 as of
24      this date.)

## Page 72

1    MR. BAKER: Q   Can you identify Exhibit Number
2  16?
3    A   Yes.
4    Q   Would you, please?
5    A   Yes. It's an e-mail from Jodie Edmonds
6  to me indicating that Deb Sullins had just been
7  seen walking through the work area in Mark
8  Scheff's area of the basement.
9    Q   Do you know why she wrote that e-mail to
10 you?
11   A   I can only assume it's because that we
12 have given Mark orders not to be anywhere close to
13 Deb, but yet Deb is walking downstairs close to
14 Mark.
15   Q   Did you ever talk with Jodie about this
16 e-mail?
17   A   No. I don't recall. I know, I believe I
18 talked to Deb about it. I don't recall, you know,
19 specificity, but I do recall that I, or I believe
20 I did talk to Deb about this that, you know, if
21 you don't want Mark around you, you don't need to
22 be around Mark either so--.
23   Q   What did she say?
24   A   She said I understood. It was

Page 73

1 a--basically I'm paraphrasing here, but she said
2 she understood my concern.
3    Q    Sounds to me like Jodie Edmonds was not
4 very sympathetic to the complaints that Deb was
5 making. Was that your sense?
6    A    I don't want to, I don't want to assume
7 what the intent of one's e-mail is, but it could,
8 I suppose it could be taken that way.
9    Q    Do you have any recollection of any
10 conversations you had with Jodie Edmonds
11 concerning Deb Sullins and the complaints she was
12 making?
13    A    To be honest with you, no, I don't have
14 any direction recollection, no.
15    Q    Okay.
16    A    Doesn't mean it didn't happen, but I
17 don't recall.
18    Q    Do you know a man named Steven Boyke,
19 B-o-y-k-e?
20    A    No, I can't say that I do. Somehow I've
21 heard that name, but I can't place how I know it.
22    Q    During the time that you have been bureau
23 chief in this particular bureau, on how many
24 occasions have you been required to deal with a

Page 74

1 subordinate employee who was at least alleged to
2 have engaged in inappropriate sexual conduct?
3    A    With how many employees? One.
4    Q    Is that Mr. Scheff?
5    A    Yes.
6    Q    He's the only one?
7    A    Yes.
8    Q    In the interest of completeness, do you
9 recall anything else you did other than what you
10 have already testified to in dealing with the
11 complaints that Debbie Sullins brought to you
12 about Mark Scheff other than what you've already
13 testified to?
14    A    No. That pretty much takes care of it.
15    MR. BAKER: Okay. Fine. Then I have no
16 further questions.
17    MS. KERLEY: I have just a couple.
18             EXAMINATION
19             BY MS. KERLEY:
20    Q    You previously testified in response to a
21 question regarding whether or not you talked to
22 Marvin Ross about--
23    A    Yes.
24    Q    (Continuing)--Mark Scheff's behavior.

Page 75

1         Paraphrasing your testimony, you
2 responded that you had talked to Marvin about
3 whether or not he was aware of Mark's conduct and
4 that he had heard of these, he had heard these
5 things. When you talked to Mr. Ross, did he
6 respond to you that he had heard inappropriate
7 conversations or that he had heard through the
8 grapevine that there may be activity out there?
9    A    The latter.
10    Q    Okay. I wanted to clarify that because
11 that would have been two different things.
12        In talking about the discipline that
13 Mr. Scheff received, you mentioned that the, that
14 no one in your bureau made a recommendation,
15 rather it was negotiated with labor relations?
16    A    That's correct.
17    Q    To clarify, that would have been
18 negotiated between someone at the, someone in the
19 bureau and labor relations or someone in personnel
20 and labor relations, not someone in Public Aid's
21 labor relations and AFSCME?
22    A    No. It was, as I recall, it was
23 negotiated between Carol Luttrell, labor
24 relations, and our major, our main personnel,

Page 76

1 Public Aid personnel.
2    Q    Okay. So it would have been completely
3 internal negotiation?
4    A    Relatively, yeah. Internal relatively
5 speaking, yes. It did not involve AFSCME.
6    Q    Okay. With regard to Ms. Sullins' first
7 office move where she moved from the location
8 where the other MACs were located to an office
9 with a door still in the basement, did that move
10 come after her complaint or her e-mail to you?
11    A    I believe it did, yes.
12    Q    And how soon after you received her
13 e-mail did she move offices?
14    MR. BAKER: Which e-mail are you referring to?
15    MR. KERLEY: I can refer to an exhibit.
16        Yes. Plaintiff's Exhibit 9.
17    MR. BAKER: Thank you.
18    MR. KERLEY: Q An e-mail of November 2, 2000.
19    A    I'm not, I don't recall the actual move
20 date, but it was in fairly short order after the
21 complaint.
22    Q    And without holding you to a date or a
23 time, generally what are you referring to when you
24 say fairly short order?

Page 77

1   A    I would guess within two weeks.  Although
2  I don't know for certain what the dates, but I'm
3  assuming it was within two weeks.
4       MS. KERLEY:  Okay.  I have no further
5  questions.
6            EXAMINATION (CONT'D)
7            BY MR. BAKER:
8   Q    Just a follow-up.  When you say two weeks
9  of the complaint, are you referring to the
10 complaint as being Exhibit Number 9?
11  A    Within two weeks of me becoming aware of
12 the issue.
13  Q    Okay.  So it would be within two weeks
14 of--?
15  A    November 2.
16  Q    November 2?
17  A    That's correct.
18  Q    Okay.
19  A    It's on or around that time, yes.
20      MR. BAKER:  Okay.  That's fine.  Thanks a lot.
21      MS. KERLEY:  That is all I have.
22              (Further deponent saith not.)
23
24

Page 78

1       I, STEVE BRADLEY, having read the above and
2  foregoing, find the same to be true and correct
3  with the following additions and/or corrections,
4  if any:
5  Page_____Line_____Change:
6  Page_____Line_____Change:
7  Page_____Line_____Change:
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24 Steve Bradley (07/12/05)              DATE

Page 79

1  STATE OF ILLINOIS  )
                      )  SS
2  COUNTY OF SANGAMON )
3            C E R T I F I C A T E
4       I, Rhonda K. O'Neal, a Notary Public,
5  Certified Shorthand Reporter, and Registered
6  Professional Reporter, in and for said County and
7  State do hereby certify that the Deponent herein,
8  STEVE BRADLEY, prior to the taking of the
9  foregoing deposition, and on the 12th of July
10 A.D., 2005, was by me duly sworn to testify to the
11 truth, the whole truth and nothing but the truth
12 in the cause aforesaid; that the said deposition
13 was on that date taken down in shorthand by me and
14 afterwards transcribed, and that the attached
15 transcript contains a true and accurate
16 translation of my shorthand notes referred to.
17      Given under my hand and seal this 27th day
18 of July A.D., 2005.
19            Rhonda K. O'Neal
20            Notary Public and
            Certified Shorthand Reporter
21          and Registered Professional Reporter
22
23 License No. 084-004195
24

OFFICIAL SEAL
RHONDA K. O'NEAL
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 9-13-2008

20 (Pages 77 to 79)