3:04-cv-03039-JES-BGC    # 21-7    Page 1 of 6

7/12/05
Cindy Cox

Sullins v. Illinois Department of Public Aid

JUL 28 2005    E-FILED
Tuesday, 03 January, 2006  12:08:18 PM
Clerk, U.S. District Court, ILCD

## Page 1

```
         IN THE UNITED STATES DISTRICT COURT
         FOR THE CENTRAL DISTRICT OF ILLINOIS
                   SPRINGFIELD DIVISION

DEBORAH R. SULLINS,
             Plaintiff,
      vs.                              No. 04-3039
THE ILLINOIS DEPARTMENT OF PUBLIC
AID,
             Defendant.


        THE DEPOSITION of CINDY COX, taken in the
above-entitled case before Rhonda K. O'Neal, CSR,
RPR, a Notary Public of Sangamon County, acting
within and for the County of Sangamon, State of
Illinois, at 11:43 o'clock A.M., on July 12, 2005,
at 415 South Seventh Street, Springfield, Sangamon
County, Illinois, pursuant to notice.




           BALDWIN REPORTING & LEGAL-VISUAL SERVICES
             SERVING ILLINOIS, INDIANA & MISSOURI
           24 hrs (217) 788-2835  Fax (217) 788-2838
                      1-800-248-2835
```

## Page 2

```
1    APPEARANCES:
2         BAKER, BAKER & KRAJEWSKI, LLC
          BY: James P. Baker, Esq.
3             415 South Seventh Street
              Springfield, Illinois 62701
4             On behalf of Plaintiff.
5         MS. SARAH R. KERLEY
              Assistant Attorney General
6             500 South Second Street
              Springfield, Illinois 62701
7             On behalf of Defendant.
```

ORIGINAL

## Page 3

```
                    I N D E X
DEPONENT                              PAGE NUMBER
Cindy Cox
    Examination by Mr. Baker              5




                   E X H I B I T S
NUMBER                MARKED FOR IDENTIFICATION
(None.)
```

## Page 4

```
                    S T I P U L A T I O N
        It is stipulated and agreed, by and
between the parties hereto, through their
attorneys, that the deposition of CINDY COX may be
taken before Rhonda K. O'Neal, a Notary Public,
Certified Shorthand Reporter, and Registered
Professional Reporter, upon oral interrogatories,
on the 12th of July A.D., 2005, at the instance of
the Plaintiff at the hour of 11:43 o'clock A.M.,
415 South Seventh Street, Springfield, Sangamon
County, Illinois;
        That the oral interrogatories and the
answers of the witness may be taken down in
shorthand by the Reporter and afterwards
transcribed;
        That all requirements of the Federal Rules
of Civil Procedure and the Rules of the Supreme
Court as to dedimus, are expressly waived;
        That any objections as to competency,
materiality or relevancy are hereby reserved, but
any objection as to the form of question is waived
unless specifically noted;
        That the deposition, or any parts thereof
may be used for any purpose for which depositions
are competent, by any of the parties hereto,
without foundation proof;
        That any party hereto may be furnished
copies of the deposition at his or her own
expense.
```

Page 5

1  (Whereupon the Deponent was
2  sworn by the Notary Public.)
3  C I N D Y   C O X
4  having been first duly sworn by the Notary Public,
5  deposeth and saith as follows:
6  EXAMINATION
7  BY MR. BAKER:
8  Q   Good morning, Ms. Cox.
9  A   Good morning.
10 Q   Would state your name and address,
11 please?
12 A   Cindy Cox, 2136 Barberry Drive,
13 Springfield.
14 Q   Are you employed?
15 A   Yes.
16 Q   And where do you work?
17 A   Health care and Family Services, formerly
18 Department of Public Aid.
19 Q   In 2000 and 2001 where did you work?
20 A   Same location.
21 Q   Same place?
22 A   Uh-huh.
23 Q   In 2001 was it part of the Department of
24 Public Aid, or was it in another agency?

Page 6

1  A   No. It's always been Public Aid. They
2  just changed the name this July 1.
3  Q   Okay. What type of work did you do for
4  Public Aid when you worked for Public Aid?
5  A   In 2000?
6  Q   Yes.
7  A   I was over the payment support unit,
8  which consisted of various programs but mainly
9  dealt with advanced payments, expedited payment
10 program. Collins Bradley is a consent decree that
11 is one of the programs under me. And then I had
12 DME too. Durable medical equipment prior approval
13 area.
14 Q   What bureau did you work in?
15 A   Comprehensive health services.
16 Q   Who was the individual you reported to in
17 2000?
18 A   In 2000 her name was Ronnie Kalusa. She
19 was the bureau chief.
20 Q   Did you work in a different bureau from
21 the one that Steve Bradley headed?
22 A   Steve took Ronnie's place. No. It was
23 all the same bureau.
24 Q   And do you recall approximately when

Page 7

1  Steve became the bureau chief?
2  A   I think he came over in '99.
3  Q   Okay. In 2000 where was your office
4  located?
5  A   Unfortunately I'm in the basement, always
6  been in the basement, still in the basement.
7  Q   Would that be in the Bloom Building?
8  A   Uh-huh.
9  Q   Okay. You don't have to worry about
10 sunburn.
11 A   Yeah.
12 Q   Did you know in 2000 a lady named Jodie
13 Edmonds?
14 A   Yes.
15 Q   And in 2000 what was Jodie's job, if you
16 know?
17 A   She was a supervisor over the hospital
18 education unit.
19 Q   Okay. Did your unit, the unit you were
20 responsible for, and Jodie's unit work in the same
21 area?
22 A   We're adjacent, located adjacent to each
23 other, yes.
24 Q   Okay. Do you know a lady named Becky

Page 8

1  Ryan?
2  A   Yes.
3  Q   And in 2000 did you work with Becky?
4  A   When I first came, Becky worked for
5  Jodie, and then I hired her when I had an opening.
6  It might have been around 2000.
7  Q   Okay. And is Becky on a medical leave of
8  absence from the department right now?
9  A   Becky filed for permanent disability.
10 She's gone, she won't be back.
11 Q   And I understand, I've recently come to
12 understand that she has some fairly serious health
13 problems?
14 A   Tremendous, yeah.
15 Q   Do you know a Mark Scheff?
16 A   Yes.
17 Q   And do you know a Jim Schuh?
18 A   Yes.
19 Q   At any time did Becky ever complain to
20 you or discuss with you the conduct of Jim Schuh
21 or Mark Scheff?
22 A   Nothing more than overall not enough work
23 being done, lot of chatter going on. Becky had a
24 tremendous work ethic, and so she would find fault

3:04-cv-03039-JES-BGC   # 21-7   Page 3 of 6
7/12/05
Cindy Cox
Sullins v. Illinois Department of Public Aid

Page 9

1  with that, of course.
2  Q   Did she ever discuss with you the
3  inappropriate language used by Mark Scheff and Jim
4  Schuh at work?
5  A   No.
6  Q   In 2000 where was your office in relation
7  to the--
8  A   My staff is adjacent to the hospital
9  unit.  I am not.  I'm up front next to Steve
10 Bradley's office.
11 Q   So you're not, where you work is not--
12 A   I'm not in earshot or anything else.
13 Q   You're not proximate to where Mark Scheff
14 works or Jim Schuh works?
15 A   No.
16 Q   How long have you been a supervisor with
17 the Department of Public Aid?
18 A   Since '98.
19 Q   As a supervisor, did you receive any
20 training on sexual harassment?
21 A   I did go through that, yes.
22 Q   And I'm not going to ask you to tell me
23 word for word everything you were told, but can
24 you generally describe the training you received

Page 10

1  and when you received it?
2  A   No to both questions.  I don't remember
3  what they said, and in my opinion, most of it's
4  common sense.
5  Q   Were you ever given any direction about
6  what a supervisor was supposed to do if an
7  employee brought to that supervisor complaints
8  that coemployees were engaging in inappropriate
9  conduct of a sexual nature?
10 A   If I had that happen today, I would have
11 to file a discipline and counseling and, you know,
12 the tools that are available to you.
13 Q   And what about in 2000?
14 A   I would have done the same thing.
15 Q   Okay.  And if a supervisor did not at
16 least investigate the conduct, would the
17 supervisor not be doing his job?
18 A   That's my opinion.
19 Q   Have you ever had--do you know a Lenna
20 DeGroot?
21 A   Lenna, uh-huh.
22 Q   Is that Lenna?
23 A   Uh-huh.
24 Q   Have you ever had any conversations with

Page 11

1  Lenna DeGroot concerning Mark Scheff?
2  A   No.
3  Q   Have you ever had any conversations with
4  Lenna concerning Jim Schuh?
5  A   No.
6  Q   Do you recall ever having any
7  conversations--let me back up.
8      Do you know Debbie Sullins?
9  A   Yes.
10 Q   And how is it you know Debbie?
11 A   She worked for me at one time.
12 Q   Do you still have contact with her?
13 A   No.  Haven't talked to her or seen her
14 for a long, long time.
15 Q   Back in the year 2000, did you have
16 contact with her?
17 A   I'm not sure when she left being a
18 medical analysis consultant II for me and got
19 promoted to the exec II position that was in
20 charge of the state renal program.  That sounds
21 about right, 2000.
22 Q   After she got her promotion, did you have
23 any contact with her?
24 A   Yes.  At that time my boss between Steve

Page 12

1  and I--her name was Cheryl Beckner, and she had
2  Debbie doing some special projects, analytical on
3  the renal program, and my friend Becky used to run
4  the renal, state renal program so, and had, was
5  working for me at the time so her involvement and
6  then mine with Deb on these projects.
7  Q   You're talking about Becky Ryan now?
8  A   (Nodded head up and down.)
9  Q   At any time in either 2000 or 2001, did
10 you have, ever have any conversations with Debbie
11 Sullins in which Mark Scheff was in any respect
12 discussed?
13 A   No.  The conversations that Debbie would
14 come up and talk to me about regarded her personal
15 life.
16 Q   So she never talked with you about Mark
17 Scheff?
18 A   No.  I mean, I heard the, you know,
19 grapevine rumors, but no.  Not to my recollection.
20 Q   Okay.  You heard what types of grapevine
21 rumors?
22 A   That he had made an insult.  I couldn't
23 even tell you what it was.  I don't even ever
24 recall knowing what it was.  But there was

Page 13

1  dissension among the staff, I mean.
2      Q    And was that just something that was in
3  the rumor mill in the Bloom Building?
4      A    For that week, yes. It'll always be
5  there and it'll be a different subject the next
6  week, and as a supervisor--well, I just don't
7  conduct myself like that. I'm way too busy, and I
8  don't want to know.
9      Q    During the time period that you have
10 worked for the Department of Public Aid or its
11 successor, how frequently did you have contact
12 with Mark Scheff?
13     A    Little to none. He's never worked for
14 me. He's a hospital MAC. I am outside the
15 billing arena, so I've never had to ask him
16 anything work-related. And I would never ask him
17 anyway. I would always go to Marvin Ross, the
18 supervisor.
19     Q    So in you doing your job and in Mark
20 doing his job, you would have no reason to have
21 contact with one another?
22     A    No, no.
23     Q    And he's located, as I understand it, in
24 another part of the building from where you were

Page 14

1  located?
2      A    At opposite ends.
3      Q    Did you ever have--do you take breaks
4  during the day?
5      A    Uh-huh. Smoke breaks.
6      Q    Do you ever have any contact or did you
7  ever have any contact back in 2000 and 2001 with
8  Mark Scheff at smoke breaks?
9      A    Yeah. He would sit down with me. I
10 mean, not on a regular basis. Maybe the last
11 cigarette of the day. May I sit here, and hi, how
12 are you.
13     Q    Is that about the extent of it?
14     A    The one complaint that he's known for
15 there and has made to everyone and their brother
16 is how the bureau chief, especially when Ronnie
17 was there and Cheryl, that they discriminated
18 against men and they would never put men in any
19 sort of supervisory positions. It's like a
20 mantra. I mean, it's been out of his mouth every
21 year for--and so at times he would say to me, you
22 know, there's no way to ever get promoted here
23 and--.
24     Q    So he thought that there was a glass

Page 15

1  ceiling for males?
2      A    Isn't that funny? Yeah. Uh-huh.
3      Q    Was that something that was particular to
4  him?
5      A    Yes.
6      Q    Or would other males make those comments?
7      A    Particular to him. Never heard it out of
8  anyone else's mouth.
9      Q    Okay. Do you recall him ever talking
10 with you about Deb Sullins getting promoted to an
11 executive series position?
12     A    I don't know if when she got that he
13 again lamented on this, I would have applied for
14 that. I don't recall that.
15     Q    Okay. And just as a matter of
16 clarification, when Deb received her
17 executive-level position, did she fill the shoes
18 that formerly had been filled by Becky?
19     A    Nobody can fill Becky's shoes.
20     Q    I knew you were going to say that.
21          Was she doing the same job Becky had
22 formerly done?
23     A    One component. Becky ran three programs
24 by herself. But when Deb worked for me, she was a

Page 16

1  good worker. Cheryl had ridiculously crazy, in my
2  opinion, unrealistic expectations. Deb did, she
3  tried very, very hard in that position, from my
4  observation, yes.
5      MR. BAKER: Okay. I have no further
6  questions.
7      MS. KERLEY: I have no questions.
8           (Further deponent saith not.)

Page 17

```
 1     I, CINDY COX, having read the above and
 2  foregoing, find the same to be true and correct
 3  with the following additions and/or corrections,
 4  if any:
 5  Page_____Line_____Change:
 6  Page_____Line_____Change:
 7  Page_____Line_____Change:
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24  Cindy Cox (07/12/05)               DATE
```

Page 18

```
 1  STATE OF ILLINOIS )
                     ) SS
 2  COUNTY OF SANGAMON )
 3            C E R T I F I C A T E
 4     I, Rhonda K. O'Neal, a Notary Public,
 5  Certified Shorthand Reporter, and Registered
 6  Professional Reporter, in and for said County and
 7  State do hereby certify that the Deponent herein,
 8  CINDY COX, prior to the taking of the foregoing
 9  deposition, and on the 12th of July A.D., 2005,
10  was by me duly sworn to testify to the truth, the
11  whole truth and nothing but the truth in the cause
12  aforesaid; that the said deposition was on that
13  date taken down in shorthand by me and afterwards
14  transcribed, and that the attached transcript
15  contains a true and accurate translation of my
16  shorthand notes referred to.
17       Given under my hand and seal this 26th day
18  of July A.D., 2005.
19         [signature: Rhonda K. O'Neal]
20         Notary Public and
            Certified Shorthand Reporter
21         and Registered Professional Reporter
22
23  License No. 084-004158
24
```

[SEAL: OFFICIAL SEAL / RHONDA K. O'NEAL / NOTARY PUBLIC, STATE OF ILLINOIS / MY COMMISSION EXPIRES 9-13-2008]