3:04-cv-03039-JES-BGC     # 21-10     Page 1 of 12                    AUG 12 2005    E-FILED
7/18/05                      Sullins vs. Illinois Dept. of Public Aid      Tuesday, 03 January, 2006 12:12:10 PM
Deborah Hensey                                                              Clerk, U.S. District Court, ILCD

### Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
 2         FOR THE CENTRAL DISTRICT OF ILLINOIS
 3                   SPRINGFIELD DIVISION
 4   DEBORAH R. SULLINS,
 5              Plaintiff,
 6        vs.                          No. 04-3039
 7   THE ILLINOIS DEPARTMENT OF PUBLIC
     AID,
 8
                Defendant.
 9
10
11         THE DEPOSITION of DEBORAH HENSEY, taken
12   in the above-entitled case before Julie A. Brown, a
13   Certified Shorthand Reporter of Christian County,
14   acting within and for the County of Sangamon, State
15   of Illinois, at 11:15 o'clock A.M., on July 18,
16   2005, at 415 South Seventh Street, Springfield,
17   Sangamon County, Illinois, pursuant to notice.
18
19
20
21
22
            Baldwin Reporting & Legal-Visual Services
23            Serving Illinois, Indiana & Missouri
           24hrs (217)788-2835    Fax (217)788-2838
24                  1-800-248-2835
```

### Page 2

```
 1   APPEARANCES:
 2        BAKER, BAKER & KRAJEWSKI, LLC
          BY:  James P. Baker, Esq.
 3             415 South Seventh Street
               Springfield, Illinois  62701
 4             On behalf of Plaintiff.
 5        MS. SARAH R. KERLEY
               Assistant Attorney General
 6             500 South Second Street
               Springfield, Illinois  62701
 7             On behalf of Defendant.
```

### Page 3

```
 1                     I N D E X
 2   DEPONENT                           PAGE NUMBER
 3   Deborah Hensey
 4       Examination by Mr. Baker            5
 5
 6
 7
 8
 9
10                    E X H I B I T S
11   NUMBER               MARKED FOR IDENTIFICATION
12   (None.)
```

ORIGINAL

### Page 4

```
 1                    S T I P U L A T I O N
 2           It is stipulated and agreed, by and
     between the parties hereto, through their
 3   attorneys, that the deposition of DEBORAH HENSEY
     may be taken before Julie A. Brown, a Certified
 4   Shorthand Reporter, upon oral interrogatories, on
     the 18th of July A.D., 2005, at the instance of the
 5   Plaintiff at the hour of 11:15 o'clock A.M., 415
     South Seventh Street, Springfield, Sangamon County,
 6   Illinois;
 7           That the oral interrogatories and the
     answers of the witness may be taken down in
 8   shorthand by the Reporter and afterwards
     transcribed;
 9
             That all requirements of the Federal
10   Rules of Civil Procedure and the Rules of the
     Supreme Court as to dedimus, are expressly waived;
11
             That any objections as to competency,
12   materiality or relevancy are hereby reserved, but
     any objection as to the form of question is waived
13   unless specifically noted;
14           That the deposition, or any parts thereof
     may be used for any purpose for which depositions
15   are competent, by any of the parties hereto,
     without foundation proof;
16
             That any party hereto may be furnished
17   copies of the deposition at his or her own expense.
```

3:04-cv-03039-JES-BGC   # 21-10   Page 2 of 12

7/18/05                                    Sullins vs. Illinois Dept. of Public Aid
Deborah Hensey

### Page 9

1 was there a Bureau of Comprehensive Health
2 Services?
3    A   Yes.
4    Q   And do you recall in 2000 and 2001 who
5 the personnel liaison was in that bureau?
6    A   Not within that actual division, but
7 Carol Luttrell was for the Bureau of Medical
8 Programs which that was a part of.
9    Q   Okay. With respect to disciplinary
10 matters, as a general matter how would your bureau
11 work with the personnel liaison in another bureau
12 when it came to a proposed discipline against an
13 employee in that bureau?
14    A   Again, that would vary depending upon
15 their level of competency. Some people had brand
16 new personnel liaisons. You'd have to walk them
17 from step to step. Carol Luttrell had 35 years of
18 experience. She was pretty capable of handling
19 most situations herself.
20    Q   Okay. Do you, if an employee is assessed
21 discipline or was assessed discipline and that
22 employee files a grievance through his collective
23 bargaining unit, would your bureau be involved at
24 any stage of the grievance resolution process?

### Page 10

1    A   Yes, we would be. I believe Debbie Davis
2 heard third level grievances on behalf of the
3 director. She may have counseled during the first
4 and second level but I believe she was third level.
5    Q   Would Debbie Davis be the person who
6 would make decisions at the third level?
7    A   Primarily. There were some cases that
8 she would bring to my attention. Some we would
9 have to take before the director's office. Some
10 she would consult with CMS labor relations for what
11 would be appropriate, what would be upheld.
12 Routine things, yes.
13    Q   Okay. Back while you were the Division
14 Chief of the Bureau of Personnel in Labor Relations
15 did your bureau become involved in sexual
16 harassment matters?
17    A   We did. We had, the EEO officers
18 reported to me functionally. On paper they report
19 to the directors of the agency. So Janice Johnson
20 and Raven Niten (sp) did report to Gordon who then
21 reported to me. My involvement was largely
22 limited.
23    Q   Okay. Were you familiar with the bureau
24 manager concerning what the, concerning what the

### Page 11

1 process was when an allegation of sexual harassment
2 was made?
3    A   I know they contacted one of our EEO
4 officers and they worked with OIG. I don't know
5 any more than that. They kept their procedures
6 pretty much to themselves.
7    Q   Okay. I'm assuming, and correct me if
8 I'm mistaken, that you doing your job had very
9 little involvement with sexual harassment matters.
10    A   Yes.
11    Q   If you know, let me ask you this.
12    A   Unless the cases got to a large extent.
13 You know, if it was a big case, sure, but routine
14 things, no.
15    Q   When you say big case, you mean?
16    A   If there were a lot of charges involved.
17 If it was more complicated than a routine sexual
18 harassment allegation.
19    Q   Okay. I'm going to hand you what's been
20 marked as Exhibit 8 and right now I'm just going to
21 ask you about the first page and if I go beyond
22 that I'll ask you to review it.
23    A   Uh-huh.
24    Q   The first page of Exhibit 8 makes

### Page 12

1 reference to an administration manual. Do you see
2 that?
3    A   Uh-huh. Yes.
4    Q   What was the administration manual?
5    A   I know we had a policy manual. I don't
6 know that it was called the administration manual.
7 That doesn't sound familiar.
8    Q   Let me ask the question this way. Was
9 there some sort of document, be it a manual, a
10 pamphlet or something else that set forth the
11 various rules of conduct expected of Department of
12 Public Aid employees?
13    A   Yes. There was a policy manual of some
14 sort.
15    Q   Okay. This was one, one document?
16    A   Yes.
17    Q   And was it a fairly lengthy document?
18    A   It was in a binder. Yes. Yes.
19    Q   In you doing your job would you consult
20 or deal with the materials in that binder?
21    A   Yes.
22    Q   Okay. If you know, let me ask the
23 question this way. Would you agree with me that in
24 a typical sexual harassment situation one employee

3:04-cv-03039-JES-BGC    # 21-10    Page 3 of 12

7/18/05                                           Sullins vs. Illinois Dept. of Public Aid
Deborah Hensey

### Page 17

1  cooperated in a sexual harassment investigation?
2     A    Yes.
3     Q    And that was a fairly important thing to
4  do, was it not?
5     A    Yes.
6     Q    If employees, not one but multiple
7  employees transferred out of a particular work area
8  because they felt the conduct of another employee
9  was offensive--
10    A    Yes.
11    Q    (Continuing.)--would that give rise to
12 some sort of either investigation or disciplinary
13 inquiry?
14    MR. KERLEY: Objection. Foundation. She
15 hasn't testified that she has any role in the
16 actual investigation. She's testified that
17 investigations and or recommendations for
18 discipline may come to her but until she's--
19    MR. BAKER: Why don't we read the question
20 back. You may be right.
21           (Whereupon the requested
22           portion of the record was read
23           back by the Reporter.)
24    MR. BAKER:   Q    If you understand the

### Page 18

1  question you can go ahead and answer it.
2     A    It would if it was bought to someone's
3  attention. I mean lots of times people leave
4  because they're disgruntled with a boss, a coworker
5  and don't, if the manager or someone is really
6  watching what is going on in that division and it's
7  been brought to their attention it should.
8     Q    And if it's been brought to the
9  department's attention through an OIG
10 investigation.
11    A    That would be one way, yes.
12    Q    By the way, when OIG investigates an
13 employee and prepares a report summarizing the
14 investigation, as a matter of course does that
15 report go to the Bureau of Personnel?
16    A    Yes.
17    Q    Okay. Would it also go to the bureau
18 chief of the bureau where the employee worked if
19 you know?
20    A    I think it did but I'm not sure.
21    Q    Okay. And if a report contained
22 conclusions that individuals had left a particular
23 work unit because they did not feel comfortable
24 working around a specific individual, would your

### Page 19

1  bureau do something about that or at least look
2  into it?
3     A    I believe so. Possibly in the EEO area
4  more likely than within labor relations. Probably
5  one of those two areas.
6     Q    Okay. I'm a little unclear about this.
7  I know you attempted to answer it earlier, but was
8  EEO kind of a stand alone organization functionally
9  distinct from your bureau?
10    A    They were functionally supervised by one
11 of my managers. EEO reports directly to the
12 directors in, I believe in statute. However, they
13 typically are functionally assigned somewhere
14 else. Our EEO officers believed themselves to be a
15 stand alone entity. Therefore, getting information
16 from them about cases, etcetera usually was the
17 result of an OIG investigation at the end rather
18 than at the beginning.
19    Q    Okay. All right.
20    A    How's that?
21    Q    Okay. And if the OIG investigated sexual
22 harassment allegations or allegations that the
23 subject of a sexual harassment investigation was
24 intimidating employees, the work product of those

### Page 20

1  reports would go to the EEO representative?
2     A    If there was a recommendation for
3  discipline they would have also gone to labor
4  relations as well.
5     Q    If there was not a recommendation for
6  discipline?
7     A    I don't know that we ever would have seen
8  them.
9     Q    Where would they have gone?
10    A    EEO.
11    Q    EEO would have gotten them?
12    A    Yes. Yes. I don't know that ones that
13 didn't have recommendations came to personnel and
14 labor relations.
15    Q    Okay. While you were employed at the
16 Department of Public Aid did you know Mark Scheff?
17    A    These names mean nothing to me.
18    Q    Okay.
19    A    I've tried. They mean nothing.
20    Q    Okay. Let me hand you what has been
21 marked as Exhibit 2.
22    A    This means nothing to me.
23    Q    Okay. Exhibit Number 2 in the upper
24 left-hand corner refers to a man named Mark

3:04-cv-03039-JES-BGC     # 21-10     Page 4 of 12

7/18/05                         Sullins vs. Illinois Dept. of Public Aid
Deborah Hensey

### Page 25

1  nothing to me when I look at it.
2     Q    Are you acquainted with the woman named
3  Laura Whetstone?
4     A    Yes. She was an investigator in OIG.
5     Q    And are you acquainted with a woman named
6  Debbie Sullins?
7     A    No.
8     Q    Okay.
9     A    Not to my knowledge.
10    Q    At any time was it bought to your
11 attention that Laura Whetstone might be involved in
12 an investigation relating to Mr. Scheff in which
13 she had some personal involvement?
14    A    In which Laura had personal involvement?
15    Q    Yes.
16    A    I remember a case where it was alleged
17 that Laura had involvement but I don't remember
18 specifics. That jogs something, but no.
19    Q    Okay. Do you recall how it came to your
20 attention?
21    A    No.
22    Q    Do you ever recall talking about that
23 subject with Derek Moscardelli?
24    A    It may have been through Derek. It may

### Page 26

1  have been through Debbie. No.
2     Q    Debbie Davis?
3     A    Yes.
4     Q    When discipline is contemplated against
5  an individual did someone in your bureau offer
6  recommendations about what the appropriate
7  discipline should be?
8     A    Yes.
9     Q    Would that have been someone other than
10 yourself?
11    A    Most often it was Debbie. Labor
12 relations was not my strong suit. It definitely
13 was hers and I let her have it as often as I could.
14    Q    Okay. If you know, with respect to
15 sexually inappropriate comments in the workplace by
16 an employee, what was the typical form of
17 discipline when that situation occurred?
18    A    I don't know. It would depend on the
19 case and the specifics of the case. I really don't
20 know what the distinction would be.
21    Q    I want to go through kind of a sexual
22 harassment scenario. Am I correct in my
23 understanding that when a complaint of sexual
24 misconduct in the workplace, either physical

### Page 27

1  contact or verbal comments of a sexual nature, when
2  those allegations were made they were typically
3  investigated by OIG?
4     A    Yes.
5     Q    And then if OIG came back with findings
6  that conduct of some nature did occur--
7     A    Yes.
8     Q    (Continuing.)--of a sexual nature, would
9  it go to your bureau for the purpose of
10 recommending discipline?
11    A    Yes, likely.
12    Q    And would it have also gone to the bureau
13 where the employee worked?
14    A    I believe so. I don't recall that for
15 sure but I believe so.
16    Q    Okay. And who in your bureau would be
17 the person who would make the decision about A,
18 whether discipline should be assessed and B, what
19 discipline should be assessed assuming some
20 discipline should be?
21    A    Debbie Davis.
22    Q    What was the standards or criteria that
23 guided Debbie Davis in making those decisions if
24 you know?

### Page 28

1     A    I can tell you the things we talked
2  about. The severity of it, the record of the
3  employee, the impact within the bureau, prior
4  discipline that was somewhat like this discipline,
5  like this charge. What she actually went through I
6  don't know, but those were some of the things that
7  we would discuss.
8     Q    Okay. You say we would discuss.
9     A    Debbie and I if she needed to, yes.
10    Q    Would she typically discuss those things
11 with you in a sexual harassment situation?
12    A    If there was something unique about it
13 that she hadn't dealt with before. Yes, but not
14 always.
15    Q    When was it in approximate terms you
16 discovered that you would be leaving Public Aid and
17 going to bigger and better things if that's a
18 correct term?
19    A    Looking back, hmm. I think I first had
20 the inkling right before Christmas. I started
21 getting questions that looked like I would be
22 considered.
23    Q    Okay. By January of 2001 would you have
24 been phasing out of your activities in the Bureau

3:04-cv-03039-JES-BGC    # 21-10    Page 5 of 12

7/18/05                                Sullins vs. Illinois Dept. of Public Aid
Deborah Hensey

Page 33

1    I, DEBORAH HENSEY, having read the above and
2    foregoing, find the same to be true and correct
3    with the following additions and/or corrections, if
4    any:
5    Page ____ Line ____ Change:
6    Page ____ Line ____ Change:
7    Page ____ Line ____ Change:

24    DEBORAH HENSEY (7/18/05)           DATE

Page 34

1    STATE OF ILLINOIS  )
                        ) SS
2    COUNTY OF CHRISTIAN)
3              C E R T I F I C A T E
4         I, Julie A. Brown, a Certified Shorthand
5    Reporter in and for said County and State do hereby
6    certify that the Deponent herein, DEBORAH HENSEY,
7    prior to the taking of the foregoing deposition,
8    and on the 18th of July A.D., 2005, was by me duly
9    sworn to testify to the truth, the whole truth and
10   nothing but the truth in the cause aforesaid; that
11   the said deposition was on that date taken down in
12   shorthand by me and afterwards transcribed, and
13   that the attached transcript contains a true and
14   accurate translation of my shorthand notes referred
15   to.
16        Given under my hand this 10th day of
17   August A.D., 2005.
18
19
         Certified Shorthand Reporter
20
21
22
23   License No. 084-004174
24

3:04-cv-03039-JES-BGC   # 21-10   Page 6 of 12

7/18/05 Sullins vs. Illinois Dept. of Public Aid
Deborah Hensey

1        I, DEBORAH HENSEY, having read the above and

2    foregoing, find the same to be true and correct

3    with the following additions and/or corrections, if

4    any:

5    Page __30__ Line __20__ Change: Steve ~~Klokkenga~~ Klokkenga was no longer there. Chris Valentine had replaced him. My error.

6    Page_____ Line _____ Change:

7    Page_____ Line _____ Change:

8

9

10   Throughout document, Ms. Davis is referred to
11   as Debbie. The correct spelling is Debby.

12

13

(signature) Deborah Hensey        2 Sept 05

DEBORAH HENSEY (7/18/05)           DATE

Page 33

3:04-cv-03039-JES-BGC    # 21-10    Page 7 of 12

3:04-cv-03039-JES-BGC   # 21-10   Page 9 of 12
7/18/05                                  Sullins vs. Illinois Dept. of Public Aid
Deborah Hensey

Page 29

1  of Personnel?
2     A    Yes.  Around February 16th I started
3  going back and forth from CMS to DPA primarily
4  moving forward.
5     Q    Okay.  Since knowing you were going to
6  come in and visit with me today have you talked
7  with Debbie Davis about the Schell case?
8     A    I have not.  I have not.  You know, I
9  looked all three of the individuals up on the
10 computer to see if it would jog some memory and it
11 didn't.  I stopped short of calling Debbie because
12 as much as I've been investigated these days often
13 times you hear well, you didn't talk to so and so,
14 did you, so I did not.
15    Q    Okay.
16    A    It was tempting.
17    Q    I guess my question is back in early
18 January or late January of 2001 which is I think
19 the date of these charges--
20    A    Yes.
21    Q    (Continuing.)--at that point in your
22 career at Public Aid would you have had much
23 involvement with this type of case?
24    A    If Debbie needed it.

Page 30

1     Q    Okay.  And if she didn't need it then you
2  wouldn't?
3     A    Probably not.
4     Q    But she typically would have had
5  involvement I take it?
6     A    Yes.  Yes.
7     MR. BAKER:  Okay.  All right.  Very good.  I
8  don't think I have any further questions.
9     THE DEPONENT:  You do know Debbie had a staff.
10 Correct?  She had a couple of people reporting to
11 her as well.  My dealings would have been with
12 Debbie.
13    MR. BAKER:  Let me reopen then.
14    THE DEPONENT:  I mean I don't want to appear,
15 I'm sorry.  I don't want to appear that it's just,
16 Debbie is the Bureau of Labor Relations.
17    MR. BAKER:  Q    That's what I assumed.  Back
18 in late 2000, early 2001 how many people were on
19 Debbie's staff?
20    A    Steve Klockenga and Margaret Hines.  Lee
21 Ball as well.  Everything reported through Debbie
22 though.
23    Q    Okay.  If you know, and if you don't know
24 that's fine, when it came to the issuance of

Page 31

1  charges against an employee back in early 2001 what
2  would Debbie's role of involvement have been?
3     A    She managed the area so she would have
4  been very involved in and improving and things like
5  that.
6     Q    She would have had some hands on
7  involvement with each case?
8     A    Yes.  Yes.  Yes.  When I speak of Debbie
9  I was always dealing directly with Debbie, whether
10 she had someone doing leg work on the case.  I just
11 wanted to be clear that she did have a staff.
12    Q    I'm glad you pointed that out.  If you
13 know, what was her role as compared to the role of
14 her staff when it came to contemplated discipline
15 against employees?
16    A    She would have been the final say so.
17 Cases like this would have likely been referred
18 directly to her or referred at some point during
19 the process to her.
20    Q    Okay.  So this would have been a case
21 that would have landed on her desk for some active
22 involvement?
23    A    Yes.
24    Q    Rather than just putting the rubber stamp

Page 32

1  on what someone else did?
2     A    Yes.  Yes.
3     MR. BAKER:  Thank you.  I appreciate that.
4     MS. KERLEY:  And I have no questions.
5             (Whereupon signature was
6             reserved.)
7             FURTHER DEPONENT SAITH NOT.

3:04-cv-03039-JES-BGC   # 21-10   Page 10 of 12
7/18/05
Deborah Hensey
Sullins vs. Illinois Dept. of Public Aid

Page 21

1  Scheff. Am I correct so far?
2      A    Yes. Yes.
3      Q    And I'm just asking you to read along
4  with me.
5      A    Yes. Yes.
6      Q    And his social security number is blacked
7  out and then beneath that is presumably the
8  position he held in the bureau he worked in at the
9  Department of Public Aid. Am I correct?
10     A    Yes.
11     Q    And then beneath that is the word 5 day
12 suspension. Beneath that is predisciplinary
13 meeting, colon, January 25, 2001 and rebuttal,
14 colon, January 31, 2001.
15     A    Yes.
16     Q    And then beneath that is the word charges
17 and then three paragraphs.
18     A    Yes.
19     Q    Okay. Without reference to the specifics
20 of Mr. Scheff, in your experience at the Bureau of
21 Personnel Labor Relations can you tell me what this
22 type of document was?
23     A    This would be the charge that accompanied
24 whatever discipline was going to be contemplated

Page 22

1  and or imposed. It was in both the beginning and
2  the end of the process. The document submitted to
3  CMS as well as the document submitted to the
4  employee prior to the rebuttal.
5      Q    Okay. Now, the employee under CMS rule
6  would be entitled to some information prior to the
7  predisciplinary meeting. Am I correct?
8      A    Either prior or during. They're entitled
9  to their charges. I believe sometimes it was given
10 at the predisciplinary hearing.
11     Q    Okay. When an employee is assessed
12 discipline for sexual misconduct--
13     A    Yes.
14     Q    (Continuing.)--and the allegations were
15 investigated by OIG, does the employee also get a
16 copy of the OIG investigation?
17     A    I don't believe so. I believe just the
18 charges and anything that was deemed relevant to
19 the case and I don't believe it was the entire
20 investigation or summary from, Debbie would be
21 better at that one than I. I don't recall.
22     Q    Okay. Do you know if they're entitled to
23 receive copies of witness statements?
24     A    I don't believe so. That's a guess. I

Page 23

1  don't believe so.
2      Q    Is that again something that's more in
3  Debbie's--
4      A    Yeah. You're going back a few years for
5  me.
6      Q    Okay. Fair enough. Now, with respect to
7  Exhibit 2, assuming that in early 2001 Mr. Scheff
8  worked for the Department of Public Aid and
9  assuming these charges were issued against him--
10     A    Yes.
11     Q    (Continuing.)--would your bureau have had
12 any level of involvement with these charges?
13     A    Yes.
14     Q    And can you tell me what role your bureau
15 would have played?
16     A    Labor relations would have either helped
17 draft the charges, reviewed the charges depending
18 on if they were drafted by someone like Carol
19 Luttrell who was very capable of drafting charges,
20 and approved the charges, yes.
21     Q    So before a document like Exhibit 2 could
22 be issued your bureau would have had to approve
23 them?
24     A    I believe so, yes. I believe we had a

Page 24

1  policy oral and written reprimands didn't need to
2  come through us but a suspension I believe did.
3      Q    Okay. When discipline in the form of a
4  suspension was contemplated, would your bureau have
5  had to approve that form of discipline?
6      A    Yes, and we were also consulted about
7  what may be the level of appropriate discipline
8  depending on the experience of the liaison.
9      Q    Okay. If you know, did Carol, is it
10 Luttrell?
11     A    Luttrell.
12     Q    Had she had experience with discipline
13 for sexually inappropriate behavior in the
14 workplace before January of 2001?
15     A    I would imagine Carol had experience in a
16 lot of personnel issues.
17     Q    Okay.
18     A    Yes.
19     Q    Did you have any involvement in anything
20 associated with the charges that are embodied in
21 Exhibit 2?
22     A    Not to my recollection. To kind of put
23 this in context, I already knew I was going to CMS
24 and I was starting to transition. This means

6 (Pages 21 to 24)

3:04-cv-03039-JES-BGC  # 21-10   Page 11 of 12
7/18/05                           Sullins vs. Illinois Dept. of Public Aid
Deborah Hensey

## Page 13

1   is claiming improper conduct against another
2   employee?
3       A    Yes.
4       Q    And that typically is how it works?
5       A    Yes.  Yes.
6       Q    When that occurs, when one employee makes
7   a claim of inappropriate conduct against another
8   employee was there at the Department of Public Aid
9   any policy that the employees were to be separated?
10      A    I don't know.
11      Q    Was there any policy or directive given
12  to supervisors of employees to monitor the conduct
13  of both the complaining party and the alleged
14  perpetrator to make sure that their contact with
15  one another was limited?
16      A    Once the allegation had--
17      Q    Yes.
18      A    It would be my assumption through OIG or
19  through the EEO but I don't know for sure.
20      Q    Okay.  If you know, if a person who was
21  alleged to have engaged in sexual harassment, if
22  that person threatened to take some action of a
23  retaliatory nature against the person making the
24  complaint would that be a policy violation?

## Page 14

1       A    If it wasn't a direct policy violation
2   you could always call it conduct unbecoming and
3   yes.
4       Q    Would that be grounds for disciplinary
5   action?
6       A    It may be, depending on the circumstance.
7       Q    Okay.  If the person who was the subject
8   of the sexual harassment allegation, in other words
9   the alleged wrongdoer, alleged to take action of
10  some sort against not only the person bringing the
11  allegation but also witnesses who cooperated in the
12  investigation would that be grounds for
13  disciplinary action?
14      A    It could be depending on the
15  circumstances again.
16      Q    If the threats did not involve physical
17  harm but other forms of retaliatory action would
18  that be grounds for discipline?
19      A    That may be.  Less likely than if it was
20  physical harm.
21      Q    While you were at the Department of
22  Public Aid could employees go to a central office
23  and secure the social security numbers of other
24  employees?

## Page 15

1       A    I don't know that there's one place they
2   could get that information.  However, we had
3   hotlines that would carry that information.  They
4   may be able to obtain it from, you know, friends
5   that worked within the department but there was not
6   one place where you went to get a social security
7   number of someone.
8       Q    Were social security numbers of employees
9   considered confidential information?
10      A    Yes.
11      Q    Okay.  So if I were to come to you and
12  say Ms. Hensey, I want the social security number
13  of Joe Jones who works in one of the bureaus of the
14  Department of Public Aid as a matter of course you
15  would not give me that information?
16      A    Correct.
17      Q    If an employee threatened to bring a
18  lawsuit against individuals who cooperated with the
19  sexual harassment investigation, I'm not talking
20  about actually bringing the lawsuit but just
21  threatening in the workplace to do it in a loud
22  voice that people could overhear, would that be
23  inappropriate conduct?
24      A    It would depend on the context.

## Page 16

1       Q    When would it not?
2       MS. KERLEY:  Objection.  Speculation.  You have
3   to, you can go ahead and answer.
4       THE DEPONENT:  I guess if it was investigated
5   and deemed to be done in a joking manner or without
6   merit or, I can't say it would never happen.
7       MR. BAKER:  Q   So if the employee was just
8   kidding around it would not be grounds for
9   discipline?
10      A    I'm sure there's an example or two out
11  there.  I don't know.
12      Q    Okay.  If an employee came on a frequent
13  basis to the work area of an employee who had given
14  information against him in a sexual harassment
15  investigation under circumstances where the
16  employee really had no business reason to be in
17  that area, would that be grounds for some sort of
18  disciplinary action?
19      A    Discipline, counseling, a verbal warning,
20  something.
21      Q    Okay.  Would you agree with me that it
22  was at least the intention of the Department of
23  Public Aid to protect employees who either
24  maintained allegations of sexual harassment or

3:04-cv-03039-JES-BGC   # 21-10   Page 12 of 12
7/18/05
Deborah Hensey
Sullins vs. Illinois Dept. of Public Aid

## Page 5

1  (Whereupon the Deponent was
2  sworn by the Court Reporter.)
3  D E B O R A H   H E N S E Y
4  having been first duly sworn by the Court Reporter,
5  deposeth and saith as follows:
6  EXAMINATION
7  BY MR. BAKER:
8  Q   Would you state your name and address,
9  please?
10  A   Deborah Hensey. My work address or
11  home?
12  Q   Either.
13  A   Stratton Building, fifth floor.
14  Q   Ms. Hensey, where are you employed?
15  A   Central Management Services.
16  Q   And how long have you worked at the
17  Department of Central Management Services?
18  A   This last instance March of '01. I was
19  there previously in '90, '92.
20  Q   Okay. Have you ever worked for the
21  Illinois Department of Public Aid?
22  A   Yes.
23  Q   And when did you work for that
24  department?

## Page 6

1  A   February of '98 through February of '01.
2  I started with CMS in March of '01.
3  Q   February of '98 to February of 2001?
4  A   Through the end of February of 2001.
5  Q   When you worked at Public Aid what was
6  your job?
7  A   I was the Bureau Manager for Personnel
8  and Labor Relations.
9  Q   Before going to Public Aid did you work
10  in state government?
11  A   I've worked in state government since
12  '86.
13  Q   And have your positions in state
14  government before going to Public Aid been
15  personnel related?
16  A   Primarily personnel. I've had some
17  legislative stints as well.
18  Q   Okay. While you were at Public Aid were
19  you the bureau manager the entire time period?
20  A   Yes.
21  Q   And can you tell me in a hundred words or
22  less and I won't count--
23  A   Okay.
24  Q   (Continuing.)--what the mission was of

## Page 7

1  the Bureau of Personnel and Labor Relations?
2  A   I oversaw such actions as transactions,
3  all of the transactions necessary to put a person
4  on payroll, pay them at the correct address, things
5  like that. Classifications, labor relations,
6  selection and recruitment. I had ADA under me and
7  the temp services. The temporary services ran
8  through my area.
9  Q   If an employee in the Department of
10  Public Aid was being considered for possible
11  disciplinary action did your bureau have some
12  involvement in that activity?
13  A   Yes. It would have been Debbie Davis's
14  area, labor relations.
15  Q   Okay. Where is Debbie Davis now?
16  A   CMS.
17  Q   Small world. Did you both go at the same
18  time?
19  A   We did. We did.
20  Q   What is her job at CMS?
21  A   Manager of transactions. I don't know if
22  they consider that payroll or whatever, but manager
23  of transactions.
24  Q   If you know, when it came to disciplinary

## Page 8

1  matters what was the role played by your bureau
2  while you worked in it?
3  A   Well, I think the role would vary. I
4  mean we had various levels of competency in the
5  personnel liaisons. So it would just depend on the
6  bureau. It would depend on whether OIG was
7  involved as well. Anything from giving
8  recommendations. We were the final approval before
9  it went to CMS for approval.
10  Q   Okay.
11  A   Sometimes we held their hands from step
12  one. Sometimes we didn't get involved until later
13  in the process.
14  Q   Would it be accurate, an accurate
15  statement that your role was primarily advisory in
16  nature concerning what might be the appropriate
17  discipline given the allegations of misconduct?
18  A   Sure.
19  Q   And would your agency also offer advice
20  concerning the various steps that need to be
21  followed in a procedural sense in the disciplinary
22  matters?
23  A   Yes.
24  Q   Back at the time you were at Public Aid