3:04-cv-03039-JES-BGC   # 21-11   Page 1 of 20
7/18/05
Janice Johnson
Sullins vs. Illinois Dept. of Public Aid
E-FILED
Tuesday, 03 January, 2006 12:13:12 PM
Clerk, U.S. District Court, ILCD

## Page 1

```
      IN THE UNITED STATES DISTRICT COURT
     FOR THE CENTRAL DISTRICT OF ILLINOIS
               SPRINGFIELD DIVISION
DEBORAH R. SULLINS,
          Plaintiff,
     vs.                         No. 04-3039
THE ILLINOIS DEPARTMENT OF PUBLIC
AID,
          Defendant.


     THE DEPOSITION of JANICE JOHNSON, taken
in the above-entitled case before Julie A. Brown, a
Certified Shorthand Reporter of Christian County,
acting within and for the County of Sangamon, State
of Illinois, at 1:00 o'clock P.M., on July 18,
2005, at 415 South Seventh Street, Springfield,
Sangamon County, Illinois, pursuant to notice.




          Baldwin Reporting & Legal-Visual Services
             Serving Illinois, Indiana & Missouri
          24hrs (217)788-2835   Fax (217)788-2838
                    1-800-248-2835
```

## Page 2

```
APPEARANCES:
    BAKER, BAKER & KRAJEWSKI, LLC
    BY:  James P. Baker, Esq.
         415 South Seventh Street
         Springfield, Illinois  62701
         On behalf of Plaintiff.
    MS. SARAH R. KERLEY
         Assistant Attorney General
         500 South Second Street
         Springfield, Illinois  62701
         On behalf of Defendant.
```

## Page 3

```
                    I N D E X
DEPONENT                             PAGE NUMBER
Janice Johnson
    Examination by Mr. Baker         5, 66, 70
    Examination by Ms. Kerley        66, 69




                   E X H I B I T S
NUMBER                     MARKED FOR IDENTIFICATION
Exhibit 22                           28
Exhibit 23                           36
Exhibit 24                           44
Exhibit 25                           60
```

ORIGINAL

## Page 4

```
                  S T I P U L A T I O N
     It is stipulated and agreed, by and
between the parties hereto, through their
attorneys, that the deposition of JANICE JOHNSON
may be taken before Julie A. Brown, a Certified
Shorthand Reporter, upon oral interrogatories, on
the 18th of July A.D., 2005, at the instance of the
Plaintiff at the hour of 1:00 o'clock P.M., 415
South Seventh Street, Springfield, Sangamon County,
Illinois;
     That the oral interrogatories and the
answers of the witness may be taken down in
shorthand by the Reporter and afterwards
transcribed;
     That all requirements of the Federal
Rules of Civil Procedure and the Rules of the
Supreme Court as to dedimus, are expressly waived;
     That any objections as to competency,
materiality or relevancy are hereby reserved, but
any objection as to the form of question is waived
unless specifically noted;
     That the deposition, or any parts thereof
may be used for any purpose for which depositions
are competent, by any of the parties hereto,
without foundation proof;
     That any party hereto may be furnished
copies of the deposition at his or her own expense.
```

3:04-cv-03039-JES-BGC   # 21-11   Page 2 of 20
7/18/05
Janice Johnson
Sullins vs. Illinois Dept. of Public Aid

### Page 5

1           (Whereupon the Deponent was
2           sworn by the Court Reporter.)
3             J A N I C E   J O H N S O N
4 having been first duly sworn by the Court Reporter,
5 deposeth and saith as follows:
6               EXAMINATION
7             BY MR. BAKER:
8    Q   Good afternoon, Ms. Johnson. Would you
9 state your name and address, please?
10    A   Janice Johnson, 16 Sunnyside Acres,
11 Edinburg, Illinois, 62531.
12    Q   Are you presently employed?
13    A   No.
14    Q   Are you happily retired from state
15 service?
16    A   Yes.
17    Q   When did you retire?
18    A   When everyone else did. December 31st,
19 '02.
20    Q   Okay. Have you ever given a deposition
21 before?
22    A   No.
23    Q   Well, let me tell you why you're here.
24 As you probably know and have known for sometime, I

### Page 6

1 represent a lady named Deborah Sullins and Ms.
2 Sullins is an employee of the Department of Public
3 Aid who presently has pending a lawsuit against
4 that department. Your name has been identified as
5 an individual that had some involvement in the
6 dispute giving rise to her case. So what I'm going
7 to do this afternoon is just ask you some questions
8 to find out what your knowledge level is. Okay?
9    A   (Moved head up and down.)
10    Q   And how we will go about doing that is
11 I'll ask a question and after each question I ask
12 that you respond to it. If you don't understand a
13 question, let me know that and I'll be happy to
14 rephrase the question. If a question, well, let
15 me, I want your response to questions to be verbal
16 rather than a body gesture because the Court
17 Reporter is going to be transcribing your
18 testimony.
19    A   Yes.
20    Q   And if a question calls for an
21 affirmative or negative response, you can answer it
22 just about anyway you want other than I ask that
23 you not use the words uh-huh and uh-uh. Can you do
24 all those things for me?

### Page 7

1    A   All right.
2    Q   Good. Since finding out you were going
3 to give a deposition in this case what have you
4 done to prepare for it?
5    A   Basically nothing. I met with her on
6 Friday and I think she asked me a couple of
7 questions, but it's been so long. The amount I
8 remember of the case, not much, I don't think.
9    Q   Okay.
10    A   It would be different if I was working.
11    Q   Have you reviewed any papers or documents
12 to assist you in giving your deposition today?
13    A   No, other than she asked me to identify a
14 couple of things where it's my handwriting and
15 maybe one or two other pieces of paper.
16    Q   Okay. All right. Before your retirement
17 where did you work?
18    A   Where did I work?
19    Q   Yes.
20    A   The Department of Public Aid.
21    Q   And how long did you work at the
22 Department of Public Aid?
23    A   Thirty-one years.
24    Q   On your retirement date what was your

### Page 8

1 position at the department?
2    A   Equal Employment Opportunity Officer
3 Executive II.
4    Q   Okay. How long had you been an equal
5 employment opportunity officer?
6    A   Twenty years. Different positions, but
7 roughly 20 years.
8    Q   Sounds to me like almost two thirds of
9 your career was related to equal employment
10 opportunity matters with the department?
11    A   I hadn't thought of it that way, but I
12 guess, yes.
13    Q   Before you became an EEO officer or held
14 an EEO capacity, what type of work did you do at
15 Public Aid?
16    A   I was a caseworker in the county offices.
17    Q   Okay. Can you tell me what the extent of
18 your education is?
19    A   I have a bachelor's degree.
20    Q   In what field?
21    A   Psychology.
22    Q   From where did you receive that degree?
23    A   University of Illinois Urbana Champaign.
24    Q   Prior to becoming an EEO officer, did you

3:04-cv-03039-JES-BGC    # 21-11    Page 3 of 20
7/18/05
Janice Johnson
Sullins vs. Illinois Dept. of Public Aid

## Page 9

1 receive any training in equal employment matters?
2   A   No.
3   Q   After becoming an EEO officer during your
4 21 years approximately in those capacities, what
5 kind of training did you receive in EEO matters?
6   A   Basically on-the-job training and
7 conferences, meetings with other EEO officers.
8   Q   I want to go back to the year 2000 which
9 I think is close to the end of your employment with
10 the Department of Public Aid.
11   A   Yes.
12   Q   Did you have a particular area of
13 responsibility within the department at that time
14 in terms of responsibilities for particular units
15 of the department or geographic locations?
16   A   Everything outside of the Chicago area.
17   Q   Okay.  I-80 south as we say?
18   A   No.  North as well.
19   Q   Okay.  Can you tell me what your various
20 duties were in the year 2000?
21   A   I investigated internal external
22 complaints of discrimination.  I gathered
23 statistics and provided statistics to the
24 Department of Human Rights quarterly and yearly

## Page 10

1 including working on and producing a yearly EEO
2 booklet for the Department of Public Aid.
3   Q   Anything else?
4   A   That's it in a nutshell, I believe.
5   Q   Did you provide any training to employees
6 or supervisors of the department concerning EEO
7 matters?
8   A   Basically, no.  We had a training unit.
9   Q   You didn't provide then any training on
10 sexual harassment?
11   A   I didn't.
12   Q   Have you ever received any training on
13 sexual harassment?
14   A   I sat in on training that was provided by
15 our training unit and read information and we got
16 information dealing with cases and outcomes of
17 cases.
18   Q   Okay.  Let's follow up on that a bit.
19 The training you received, was that classroom
20 training in part?
21   A   Uh-huh.  Yes.
22   Q   And did you receive the same sexual
23 harassment training that other employees of the
24 Department of Public Aid received or did you

## Page 11

1 because of your area or position with the
2 department receive a different type of training?
3   A   No.  It was basically the same training.
4   Q   Okay.  So you didn't go to any particular
5 courses dealing with sexual harassment to equip you
6 in your job as an EEO officer?
7   A   Only at conferences.  EEO people.
8   Q   I beg your pardon?
9   A   EEO people were at conferences together
10 and we would have information provided and
11 speakers.
12   Q   Do you recall in the last five years of
13 your employment with Public Aid any conferences you
14 attended in which you received instruction on
15 sexual harassment?
16   A   No, I don't remember.
17   Q   You indicated you read material on sexual
18 harassment and you referred to some cases?
19   A   Yes.
20   Q   What kind of materials did you read?
21   A   We would get information on cases from a
22 publishing company that I do not remember the name
23 of that we would get periodically.
24   Q   When you say periodically, lawyers will

## Page 12

1 get as frequently as daily or at least weekly
2 information concerning updates in the law.  Is that
3 the type of material you received or--
4   A   Not daily.
5   Q   How frequently would you receive--
6   A   Monthly maybe.  I don't really remember.
7   Q   Do you recall who the publisher was of
8 those materials?
9   A   No, I don't.
10   Q   Were these court case opinions that you
11 received or was it something else?
12   A   They were the results of court cases.
13   Q   Were these court cases involving your
14 department?
15   A   No.  More so just in general I believe
16 and they weren't restricted to sexual harassment
17 cases but they were EEO type cases.
18   Q   Okay.  So you might get cases dealing
19 with age discrimination or the Americans with
20 Disabilities Act as well as sexual harassment?
21   A   Yes.
22   Q   Okay.  As a part of your job at the
23 department did you play any role in sexual
24 harassment investigations?

3:04-cv-03039-JES-BGC    # 21-11    Page 4 of 20
7/18/05
Janice Johnson
Sullins vs. Illinois Dept. of Public Aid

Page 13

1  A  Yes.
2  Q  And what was the role you played?
3  A  I'd investigate allegations of sexual
4  harassment.
5  Q  Okay. Are you familiar or were you
6  familiar with a unit of the department called the
7  Office of Inspector General?
8  A  Yes.
9  Q  If you know, did that office investigate
10 allegations of sexual harassment?
11 A  I believe only if it was included with
12 other allegations.
13 Q  Did you as a matter of course participate
14 with the Office of Inspector General in their
15 investigations of sexual harassment allegations?
16 A  You want to repeat that, rephrase it more
17 specific?
18 Q  Well, as a part of your job would you
19 provide any assistance or input to the Office of
20 Inspector General when that office was conducting
21 an investigation into allegations of sexual
22 harassment?
23 A  Well, no. They might provide me with
24 copies of their results and ask me whether sexual

Page 14

1  harassment or other EEO bases were involved if in
2  fact that was one of the allegations they were
3  investigating.
4  Q  They would ask for your input concerning
5  whether conduct constituted sexual harassment?
6  A  Whether the results of their
7  investigation that they gave me indicated whether,
8  they wanted to know whether there would be sexual
9  harassment or other kinds of EEO bases based on the
10 results of their investigation.
11 Q  So they would give you some facts from
12 their investigation and they would seek out your
13 expertise concerning whether the facts indicated
14 that there was sexual harassment or some other form
15 of discrimination?
16 A  Correct.
17 Q  What kind of training did you get to be
18 able to give that type of--
19 A  It was the fact that I was an EEO officer
20 and had many years of background in investigating
21 allegations, discriminatory allegations.
22 Q  Okay. So your on-the-job experience, is
23 that what you're telling me?
24 A  Basically, yes.

Page 15

1  Q  Okay. Did the Department of Public Aid
2  while you worked for it have policies dealing with
3  sexual harassment?
4  A  Yes.
5  Q  Were those policies in writing?
6  A  Yes.
7  Q  Did you have any part in the development
8  or enactment of those policies?
9  A  The policies would be developed and the
10 information that was relevant would be given to us
11 and we would look at it and determine if it was
12 correct.
13 Q  How would you go about doing that?
14 A  Myself and other EEO officers would
15 review it and if there were any questions, we'd
16 raise those questions to the people that were
17 developing the manual or whatever came in.
18 Q  Okay. Can you speak and give us a little
19 idea of what your training was in sexual harassment
20 law?
21 A  Didn't you ask that earlier?
22 Q  I was talking more generally about your
23 experience with sexual harassment.
24 A  Okay. So what is the question?

Page 16

1  Q  What your training was in the laws
2  relevant to sexual harassment.
3  A  I don't know. I don't remember as far as
4  specifics.
5  Q  Did you take any courses dealing with the
6  law of sexual harassment?
7  A  Well, again, when we would have our
8  conferences with the EEO officers we would have
9  different types of training and DHR would also have
10 different times of training when they would meet
11 us, meet with the EEO officers because we had to
12 provide information to them. So it could be any of
13 those.
14 Q  What kind of training did the Department
15 of Human Rights give you on sexual harassment?
16 A  I don't know. It's been too long.
17 Q  Can you tell me during the last five
18 years of your employment at the Department of
19 Public Aid on average how many hours a year of
20 sexual harassment training you received?
21 A  I couldn't tell you.
22 Q  Would it be more than three hours?
23 A  I don't know.
24 Q  Could you tell me, you have no idea at

4 (Pages 13 to 16)

3:04-cv-03039-JES-BGC   # 21-11   Page 5 of 20

7/18/05
Janice Johnson
Sullins vs. Illinois Dept. of Public Aid

### Page 17

1  all?
2     A   No. I haven't even thought of this for
3  two and a half years.
4     Q   Did you regularly each year attend
5  training on sexual harassment or was it more
6  frequently or less frequently than that?
7     A   Each year? I don't know.
8     Q   How many hours on average a month would
9  you spend reviewing literature dealing with either
10 sexual harassment or discrimination topics?
11    A   I have no idea.
12    Q   Well, would it have been more than an
13 hour?
14    A   I don't know.
15    Q   I'm not going to hold you to mathematic
16 precision, but can you give me some general idea of
17 how much time you spent?
18    A   I don't know. It would vary, I'm sure.
19    Q   Would it be easier if I asked you how
20 many hours a month?
21    A   No.
22    Q   What was your practice in reading the
23 literature you received? Did you read it at work?
24 Would you read it at home on the weekend? Would

### Page 18

1  you read it in the evenings?
2     A   I'd read it at work.
3     Q   And would you set aside a particular time
4  of the day to read it?
5     A   No.
6     Q   And you can't tell me whether it was 15
7  minutes a month or eight hours a month?
8     A   No.
9     Q   Have no idea?
10    A   No.
11    Q   Do you consider yourself an expert in the
12 field of sexual harassment?
13    A   No.
14    Q   As a part of your job were you expected
15 to offer opinions to other individuals in the
16 Department of Public Aid concerning matters
17 relating to sexual harassment?
18    A   Occasionally to OIG.
19    Q   All right. On average, and I understand
20 that you'll have periods where it will vary, but
21 going back during the last five years of your
22 employment with Public Aid on average how often
23 would you become involved in a complaint of sexual
24 harassment?

### Page 19

1     A   I don't know. We have all kinds of
2  complaints. You know, I didn't compartmentalize
3  them.
4     Q   Why were you pointing to your head?
5     A   I didn't compartmentalize the different
6  kinds of EEO complaints mentally.
7     Q   Well, I'm not holding you to a precise
8  number, but would you at any one time have at least
9  one sexual harassment complaint you were
10 investigating?
11    A   I don't know.
12    Q   Are you on any medication, Ms. Johnson?
13    A   No, other than asthma, high blood
14 pressure.
15    Q   Is there anything medically related to
16 you that's affecting your memory?
17    A   No.
18    Q   You suffer from no mental impairments?
19    A   Not that I know of.
20    Q   I don't mean to be offensive to you and
21 if I'm appearing that way I apologize, but I'm
22 taken with your almost complete lack of memory.
23    A   I haven't thought about this for two and
24 a half years. I have no statistics. I have no

### Page 20

1  information to draw on.
2     Q   I'm not asking you for statistics. You
3  had a job for 21 years and certainly you recall
4  something about that job, don't you?
5     A   It varied a lot.
6     Q   Let me get this straight. You have no
7  idea as you sit here how often during the last five
8  years of your employment with the Department of
9  Public Aid you were involved in a complaint of
10 sexual harassment?
11    A   I don't know how often.
12    Q   It could have been one a year, it could
13 have been a hundred a year. Is that what you're
14 telling me?
15    A   I don't know. It could be I suppose.
16    Q   As you sit here do you have any
17 recollection of when and under what circumstances
18 you would be asked to do a sexual harassment
19 investigation?
20    A   When an individual came to me or DHR
21 provided me with the complaint.
22    Q   Okay. Would you investigate it the same
23 way in each of those situations?
24    A   No. DHR has their own system.

3:04-cv-03039-JES-BGC    # 21-11    Page 6 of 20
7/18/05
Janice Johnson                    Sullins vs. Illinois Dept. of Public Aid

Page 21

1    Q    Okay.  When DHR came to you that's
2    because one of your employees filed a charge of
3    sexual harassment against the department.  Am I
4    correct?
5    A    A discrimination charge with DHR against
6    the department.
7    Q    And in that situation your role was to
8    represent the department before DHR?
9    A    Yes.
10   Q    Okay.  And your job as I understand it
11   was to be an advocate for the Department of Public
12   Aid in DHR proceedings?
13   A    Well, I represented the department as far
14   as, yes, I represented the department.
15   Q    And if you were doing your job to its
16   maximum efficiency you would receive a favorable
17   decision for the department from DHR.  Am I
18   correct?
19   A    If there was no questions, no
20   discrimination, yes.
21   Q    It was your job to try to see that that
22   was the result that was reached.
23   A    My job was to investigate charges
24   completely and find out whether the charge had some

Page 22

1    basis or not.
2    Q    Okay.  And you're telling me that your
3    job was just to investigate, not to try and protect
4    the Department of Public Aid in DHR proceedings?
5    A    I represented the agency in DHR
6    proceedings.
7    Q    Okay.  For what purpose did you represent
8    the agency?  What were you attempting to do for the
9    agency?
10   A    To indicate that our findings as much as
11   possible showed that there was no discrimination.
12   Now, this wasn't just off the top of my head.
13   Q    Okay.  So your job was to try and
14   convince DHR that there was no discrimination.
15   A    Yes.
16   Q    Okay.  When an individual came to you not
17   through DHR but came to you with a complaint of
18   sexual harassment, what were you supposed to do?
19   What was your objective?
20   A    To investigate the complaint.
21   Q    For what purpose?
22   A    To determine whether there was any
23   discrimination or not.
24   Q    And if your conclusion was that there was

Page 23

1    discrimination what were you to do?
2    A    I would confer with others in the
3    department to try to get an equitable agreement.
4    Q    Okay.  Do you recall any cases you
5    investigated where an employee brought a complaint
6    of sexual harassment where as a result of your
7    investigation you determined that the complaint had
8    legitimacy?
9    A    No.
10   Q    Do you recall any time you investigated a
11   complaint of sexual harassment before the
12   department based upon a complaint with the
13   Department of Human Rights where your investigation
14   revealed that the complaint of sexual harassment
15   had a legitimacy?
16   A    No.
17   Q    Do you recall any time in your experience
18   at the Department of Public Aid where you were
19   involved in a complaint of sexual harassment
20   maintained by an employee where you concluded that
21   the complaint had legitimacy?
22   A    No.
23   Q    Okay.  During the last five years of your
24   employment at the Department of Public Aid who was

Page 24

1    your boss?
2    A    Raven Niten.
3    Q    Is that Mr. or Ms. or Mrs.?
4    A    Mrs.
5    Q    Was she located in Chicago?
6    A    Yes.
7    Q    I want you to take me through what your
8    process was in investigating an allegation or
9    complaint of sexual harassment and let's talk for a
10   moment about the situation where it's the employee
11   that makes the complaint to you rather than going
12   through the Department of Human Rights.  Okay?
13        From the point the complaint first comes
14   to your attention, can you kind of take me through
15   the procedure you followed in investigating it?
16   A    The individual would contact me.  I'd ask
17   them to put the complaint in writing specifically.
18   I would get the complaint.  Based on the complaint
19   I would then investigate by getting documentation,
20   interviewing people, addressing all of the
21   information in the complaint.
22   Q    Okay.  Would you put the employee's
23   supervisor on notice that the employee had filed a
24   sexual harassment complaint assuming that the

3:04-cv-03039-JES-BGC  # 21-11  Page 7 of 20
7/18/05  Sullins vs. Illinois Dept. of Public Aid
Janice Johnson

Page 25

1  complaint was not directed at the supervisor?
2    A  Probably.
3    Q  Okay. During the process of your
4  investigation would you interview the individual
5  who was alleged to have engaged in sexual
6  harassment?
7    A  Yes.
8    Q  And when you interviewed that individual
9  would you tell the individual the name of the
10 person complaining about him or her?
11   A  Only if necessary.
12   Q  Okay. Would you agree with me that
13 sometimes individuals are reluctant to come forward
14 with complaints of sexual harassment?
15   A  I don't know. If they don't come forward
16 I wouldn't know about it.
17   Q  You don't know?
18   A  I think that many people will not come
19 forward with complaints of discrimination period.
20 My personal opinion.
21   Q  Okay. When a person came forward with a
22 complaint of sexual harassment, what if anything
23 would you do to provide reasoned assurance that
24 there would be no retribution taken against the

Page 26

1  complainant?
2    A  I could only assure them that the
3  individuals that would be interviewed would be told
4  to remain, to not discuss it. I also have told
5  people that sometimes it gets worse before it gets
6  better so they're aware that they could feel worse
7  about things than they do at that moment.
8    Q  When you say could get worse before it
9  gets better, do you mean that the intensity of the
10 sexual misconduct would increase?
11   A  No.
12   Q  What is it?
13   A  I just mean that the stress that the
14 person feels could get worse.
15   Q  Do you take any steps or did you take any
16 steps to monitor the complainant and the alleged
17 perpetrator to make sure that they either had
18 limited contact or when they did have contact that
19 there was no inappropriate exchanges between them?
20   A  How could I do that?
21   Q  I'm asking the questions, Ms. Johnson.
22   A  I'm not two or three people. We aren't a
23 big unit. We have no ability to monitor other,
24 other individuals in the agency.

Page 27

1    Q  So your answer is no?
2    A  Basically.
3    Q  Did you ever indicate to a supervisor of
4  an employee that the one employee had complained
5  about the conduct of another employee and asked
6  that that supervisor monitor their behavior?
7    A  No. I had an employee complain about the
8  individual. I talked to the bureau chief and the
9  bureau chief handled it.
10   Q  Okay. Do you recall when that was?
11   A  Pardon me?
12   Q  Do you recall when that was?
13   A  No.
14   Q  Do you recall what bureau it was?
15   A  No. I don't remember the name of the
16 bureau.
17   Q  Was any disciplinary action taken against
18 either of the employees involved?
19   A  No.
20 MS. KERLEY: Can we take a short break?
21         (Whereupon a short break was
22          taken.)
23 MR. BAKER:  Q  I want to make sure I
24 understand your testimony and if I don't understand

Page 28

1  it, then be sure and correct me, but as I
2  understand what you're telling me as a matter of
3  course when a complaining individual brings to your
4  attention or brought to your attention a complaint
5  of sexual harassment, you took no steps to insure
6  or provide reasonable assurance that that employee
7  would be free from retaliation or--
8    A  That's correct.
9    Q  Okay.
10         (Discussion off the record.)
11         (Whereupon said document was
12          duly marked for purposes of
13          identification as Exhibit 22,
14          as of this date.)
15 MR. BAKER:  Q  Have you seen Exhibit Number
16 22 before, Ms. Johnson?
17   A  Yes.
18   Q  Can you identify what that is for me?
19   A  That's the information about sexual
20 harassment in the administrative manual of Public
21 Aid.
22   Q  To the best of your knowledge is Exhibit
23 22 the sexual harassment policy of the Department
24 of Public Aid as it existed in the year 2000?

7 (Pages 25 to 28)

3:04-cv-03039-JES-BGC  # 21-11  Page 8 of 20
7/18/05
Janice Johnson
Sullins vs. Illinois Dept. of Public Aid

Page 29

1  A  As far as I know, yes.
2  Q  Okay. In you doing your job were you
3  required to be familiar with that policy?
4  A  Yes.
5  Q  Now, see on the first page that it has a
6  definition of sexual harassment?
7  A  Yes.
8  Q  Do you see that? And it cites examples
9  of what was commonly considered to be sexual
10  harassment. Do you see that?
11  A  Yes.
12  Q  And the first example deals with verbal
13  conduct. Do you see that?
14  A  Right. Yes.
15  Q  When and under what circumstances would
16  verbal comments made by an employee in the
17  workplace having a sexual connotation not be
18  considered sexual harassment?
19  A  If it's under this definition it wouldn't
20  ever not be.
21  Q  Okay. In you doing your job did you
22  operate under the definition that's contained in
23  Exhibit Number 22?
24  A  Yes.

Page 30

1  Q  If you go to the second page of that
2  document do you see the section dealing with
3  responsibilities of supervisory personnel?
4  A  Yes.
5  Q  Were supervisory personnel at the
6  Department of Public Aid given a copy of the sexual
7  harassment policy?
8  A  Yes.
9  Q  Were they instructed concerning what
10  their role was in dealing with sexual harassment
11  issues in the workplace?
12  A  Yes.
13  Q  If an employee believed that he or she
14  was the subject of offensive sexual conduct brought
15  on by another employee could that employee complain
16  to his or her supervisor about the conduct?
17  A  Yes.
18  Q  And would, would that supervisor bring
19  that complaint to your attention?
20  A  Not necessarily.
21  Q  Okay. What was the supervisor supposed
22  to do when that complaint was brought to his or her
23  attention?
24  A  The individual supervisor can investigate

Page 31

1  it themselves and handle it, document it and stop
2  the harassment there.
3  Q  Okay.
4  A  Then they would report it to me.
5  Q  They would report to you what they did to
6  deal with the issue?
7  A  Yes.
8  Q  So if I understand it a supervisor when
9  confronted with a complaint of sexual harassment
10  was required to do two things. Number one, take
11  steps to bring the conduct to an end and also
12  report to you what occurred.
13  A  Yes.
14  Q  Okay. I may have asked this but at my
15  age I guess forgetting what you ask is forgivable.
16  If an employee has a complaint of sexual harassment
17  the employee could go to you, could go to OIG or
18  could bring the complaint to the attention of his
19  supervisor.
20  A  Yes.
21  Q  Okay. The department's policies did not
22  mandate that the employee bring the complaint to
23  you.
24  A  Right.

Page 32

1  Q  Okay.
2  A  That's correct.
3  Q  If you turn to the top of page 3, you see
4  the sentence maybe a quarter of the way down that
5  page that said supervisors must insure that no
6  retaliation will result against an employee making
7  a sexual harassment complaint?
8  A  Yes.
9  Q  Are supervisors told that that's one of
10  their jobs?
11  A  Yes.
12  Q  And how is a supervisor supposed to go
13  about doing that?
14  A  I don't know. I assume the supervisors
15  would make sure that the individual that was
16  complained about didn't talk to the complainer and
17  whatever the supervisor decided must be done.
18  Q  Would a supervisor be expected to monitor
19  how the alleged harasser was treating the person
20  making the complaint?
21  MS. KERLEY: Objection. Speculation and lack
22  of foundation. She just testified that she doesn't
23  have any knowledge as to what a supervisor would be
24  instructed to do in order to meet this mandate.

8 (Pages 29 to 32)

3:04-cv-03039-JES-BGC    # 21-11    Page 9 of 20
7/18/05                                              Sullins vs. Illinois Dept. of Public Aid
Janice Johnson

Page 33

1  MR. BAKER:  Q  Was that your testimony, Ms.
2  Johnson?
3     A  I don't know what exactly the supervisors
4  would do.  It is the supervisors' job to determine
5  what they should do in the individual cases.
6     Q  Let me get this straight.  You were an
7  EEO officer at the Department of Public Aid for
8  over 20 years.
9     A  That's correct.
10    Q  And you were responsible for overseeing
11 the sexual harassment policies of the department?
12    A  No.
13    Q  You were not?
14    A  No.
15    Q  Oh, okay.  Who was?
16    A  We have a training unit that trained the
17 supervisors on this information.
18    Q  So you--
19    A  I do not do that training.
20    Q  You don't provide any guidance or
21 consultation to supervisors concerning what they
22 should or shouldn't do?
23    A  They can call and request information of
24 the EEO officer and the EEO officer will talk to

Page 34

1  each individual supervisor for their particular
2  question.
3     Q  Anything related to sexual harassment.
4     A  Anything related to discrimination
5  complaints.
6     Q  Okay.  And it's still your testimony you
7  have no idea what a supervisor should do to monitor
8  against retaliation occurring in the workplace?
9     A  Specifics, no.
10    Q  In general anything can you tell me what
11 a supervisor should do?
12    A  No.  Each individual case is different.
13    Q  I understand each case is different some
14 what but you're telling me you have no idea what a
15 supervisor should do in any circumstance to guard
16 against retaliation occurring in the workplace.  If
17 that's your testimony we'll move on.
18    A  That's correct.  Depends on each
19 individual case.
20    Q  And you can't give me any guidance.
21    A  No.  There's, one generality will not fit
22 a specific case.
23    Q  Can you think--
24    A  That's their job.

Page 35

1     Q  Sounds like a state employee.  Can you
2  think of anything a supervisor should do to guard
3  against retaliation from occurring?
4     A  It depends on the individual case.  It
5  would depend on what they called and asked me
6  about.
7     Q  Well, I'm asking you to use your fertile
8  imagination and experience of 21 years of doing
9  this kind of work and you can't give me any idea of
10 anything a supervisor should do?
11    A  Imagination doesn't work in this line of
12 work.
13    Q  Can't give me any idea.  Is that your
14 testimony?
15    A  No, that's correct.
16    Q  Never had any training in that subject?
17    A  I may have, but again--
18    Q  You've forgotten?
19    A  (Continuing.)--you look at specifics.
20 You answer specific questions.
21    Q  Okay.  Do you know a lady named Deborah
22 Sullins?
23    A  I had to think about it when I got the
24 summons.  I thought who is that but I remember now.

Page 36

1     Q  In your professional career at the
2  Department of Public Aid did you ever have any
3  professional dealings with Deborah Sullins?
4     A  Yes.
5     Q  And can you describe for me what the
6  nature of those dealings was?
7     A  She came to me and told me she had filed
8  a complaint with DHR and talked about it with me.
9     Q  Okay.  Prior to her filing that complaint
10 had you had any dealings with Deborah Sullins?
11    A  Not that I remember.
12              (Whereupon said document was
13              duly marked for purposes of
14              identification as Exhibit 23,
15              as of this date.)
16    MR. BAKER:  Q  Can you identify Exhibit
17 Number 23?
18    A  This is the position statement from
19 myself to Jim Bormann in Department of Human
20 Rights.
21    Q  What is a position statement?
22    A  It's an answer to each section that DHR
23 sent to me and I answered.
24    Q  Okay.  My understanding is, and see if

3:04-cv-03039-JES-BGC   # 21-11   Page 10 of 20
7/18/05
Janice Johnson                                    Sullins vs. Illinois Dept. of Public Aid

## Page 37

1  you would agree with me, that if an individual
2  believes that they've been the victim of some form
3  of discrimination they can file a charge of
4  discrimination with the Department of Human
5  Rights. Am I correct?
6      A    That's correct.
7      Q    And then the Department of Human Rights
8  sends the charge to the employer?
9      A    Yes.
10     Q    Am I correct? And then the employer is
11 required in writing to respond to the charge?
12     A    Yes.
13     Q    And when you say position statement, are
14 you referring to the response to the charge?
15     A    Yes.
16     Q    Okay. As a general matter, when a charge
17 of discrimination was filed against the department
18 before the Department of Public Aid would you be
19 the person that would prepare the position
20 statement for the Department of Public Aid?
21     A    Yes.
22     Q    And as a general manner, how would you go
23 about doing that?
24     A    I'd investigate the complaint, get

## Page 38

1  documentation, interview people.
2      Q    And would one of the people you interview
3  normally be the complainant?
4      A    Yes.
5      Q    Okay. Would you also interview the
6  person against whom the complaints were directed?
7      A    Yes.
8      Q    And your process in that effort was to
9  set forth a position statement on behalf of the
10 Department of Public Aid to the Department of Human
11 Rights that would be helpful to the Department of
12 Public aid in successfully defending against the
13 charge?
14     A    Yes.
15     Q    With respect to Exhibit Number 23 would
16 you agree that that is a document you prepared in
17 response to a charge filed by Deborah Sullins with
18 the Department of Human Rights?
19     A    Yes.
20     Q    Other than interviewing Deborah Sullins
21 what other information did you gather to prepare
22 this position statement?
23     A    I interviewed people that she said either
24 witnessed it with her or were talking to Mr. Scheff

## Page 39

1  when she alleged he was sexually harassing her.
2      Q    Based upon your investigation, did you
3  conclude that Mr. Scheff had engaged in any verbal
4  conduct of a sexual nature around Ms. Sullins?
5      A    No.
6      Q    Did you interview a woman named Mary
7  Thallman?
8      A    I don't remember. I interviewed many
9  many, many women.
10     Q    Did you interview any female employees
11 who worked around Mr. Scheff?
12     A    I don't know. Deborah gave me names of
13 individuals.
14     Q    And did you interview all the individuals
15 whose name she gave you?
16     A    As far as I remember, yes.
17     Q    And did you prepare memoranda summarizing
18 what those individuals told you?
19     A    What?
20     Q    Did you prepare anything in writing
21 summarizing what those individuals told you?
22     A    This. Well, I don't summarize it. I
23 provide the information and if necessary I will
24 provide copies of their statements.

## Page 40

1      Q    So you do take written statements from
2  these individual?
3      A    I write. They review and sign.
4      Q    Okay. And is it your recollection that
5  there was no female employee that corroborated in
6  any respect Ms. Sullins' claims that Mr. Scheff had
7  used sexually inappropriate language?
8      A    Some did, some didn't.
9      Q    How was it that you concluded then that
10 Mr. Scheff had not used sexually inappropriate
11 language?
12     A    I interviewed the people that were
13 talking to him at the times that Deborah said he
14 was sexually harassing her and they said no, we
15 didn't say that, whatever it was.
16     Q    And you believed them rather than Ms.
17 Sullins?
18     A    All I did was take their statements and
19 indicate the preponderance.
20     Q    Meaning you had three people said it
21 didn't happen and she said it did and you rejected
22 what she said?
23     A    Well, she had witnesses also.
24     Q    Okay. So there was some people that said

3:04-cv-03039-JES-BGC  # 21-11  Page 11 of 20

7/18/05
Janice Johnson
Sullins vs. Illinois Dept. of Public Aid

Page 41

1  it did happen. There was some people who said it
2  didn't happen.
3      A   Yes.
4      Q   And you chose to believe the ones that
5  said it didn't happen.
6      A   The information indicated here, yes.
7      Q   And how was it you credited the ones who
8  said it didn't happen and discredited those who
9  said it did happen?
10     A   The specifics that were brought up here.
11     Q   I'm not sure I understand what you're
12 trying to tell me.
13     A   There were specifics where she said this
14 is what happened and the specifics were opposite to
15 what she said and it was close enough where
16 sometimes it could have been misinterpreted.
17     Q   Okay. I think you know what you're
18 talking about but I don't. Can you be a little
19 clearer for me?
20     A   Sometimes, as an example she said they
21 said something or other.
22     Q   Okay.
23     A   Took that down. When I talked to them,
24 three, four, five people, whoever, they said we

Page 42

1  didn't, we weren't talking about that at all. We
2  were talking about this and the words used could
3  have been misheard.
4      Q   So you believed them and didn't believe
5  her?
6      A   Well, it's just that there was a
7  preponderance.
8      Q   Here is the point of my confusion. You
9  said that there were people you interviewed who
10 supported what she said. Am I correct so far?
11     A   Some.
12     Q   Okay. Why was it you didn't credit what
13 they said?
14     A   Well, I did. However, as me being
15 representing the agency, I took the preponderance.
16     Q   Your job was to defend the agency.
17     A   Yes.
18     Q   And if you admitted that the conduct
19 occurred and put it in a position statement that
20 might be an admission against the agency.
21     A   If it was so obvious I would talk to my
22 superiors and we would have tried to get an
23 agreement then. It wouldn't have gone any
24 further. She could have then withdrawn her

Page 43

1  complaint.
2      Q   Did you talk to your superiors?
3      A   I didn't find a preponderance.
4      Q   What is your definition of a
5  preponderance?
6      A   The specifics indicated could have been
7  misconstrued at times. At times there were no
8  witnesses to agree with her. At other times what
9  was said wasn't sexual harassment as far as I
10 remember. I have not reviewed this case.
11     Q   Are you aware that the Department of
12 Human Rights issued a finding of substantial
13 evidence in that case?
14     A   Yes, because I know one of the people
15 that interviewed everybody that she interviewed.
16 She sent information to me that indicated that this
17 had to be determined somewhere else because there
18 was conflicting information. She would not
19 determine it based on the conflicting information.
20     Q   And that's what was presented to you,
21 conflicting information?
22     A   I don't know what was presented to her
23 versus what was presented to me. She did not share
24 that with me.

Page 44

1      Q   Well, actually you got her report, did
2  you not?
3      A   I got a statement that said due to the
4  conflicting information we cannot make a decision
5  on that. Let it go to the next level and I am
6  paraphrasing because I don't remember the exact
7  statement.
8                  (Whereupon said document was
9                  duly marked for purposes of
10                 identification as Exhibit 24,
11                 as of this date.)
12     MR. BAKER:  Q   I'm going to hand you Exhibit
13 24 and you can take whatever time you want to look
14 at it and I'm going to tell you in advance what my
15 question is. Okay? Is Exhibit 24 a copy of the
16 report from the Department of Human Rights that you
17 received after its investigation of Deborah
18 Sullins' complaints?
19     A   Can you repeat the question?
20     MR. BAKER: Can you read the question back?
21                 (Whereupon the requested
22                 portion of the record was read
23                 back by the Reporter.)
24     THE DEPONENT: That's the notice of substantial

3:04-cv-03039-JES-BGC  # 21-11  Page 12 of 20
7/18/05
Janice Johnson
Sullins vs. Illinois Dept. of Public Aid

Page 45

1  evidence. Yes.
2     MR. BAKER:   Q   And I believe the
3  department's report is either affixed to or a part
4  of the notice of substantial evidence?
5     A   Yes. I need a break.
6              (Whereupon a short break was
7              taken.)
8     MR. BAKER:   Q   Okay. I want to go back to
9  Exhibit Number 23 if we could. Can you see down in
10 paragraph, I think Exhibit 23 is your position
11 statement. If you go down to the first page to the
12 paragraph that has the Arabic Number 2. Do you see
13 where I'm talking about?
14    A   Uh-huh.
15    Q   The second full sentence I will read it
16 into the record and then I want to ask you about
17 it. He allegedly made comments of a sexual nature
18 but most coworkers, male and female, tended to tune
19 him out and do the work or leave the area no matter
20 what topic of Mr., what the topic of Mr. Scheff's
21 conversation. Do you see that sentence?
22    A   Yes.
23    Q   Do you mean by that that Mr. Scheff did
24 make comments of a sexual nature but employees

Page 46

1  tended to ignore him or leave the work area?
2     A   No.
3     Q   Okay. Tell me what you meant with that
4  sentence.
5     A   It says he allegedly based on Deborah's
6  allegations, but the point is no matter what he
7  talked about people tended to tune him out because
8  he ran his mouth apparently.
9     Q   Did other employees that you interviewed
10 indicate he made comments of a sexual nature?
11    A   No, other than some of the females that
12 Deborah said heard what she heard allegedly.
13    Q   Did you talk to a lady named Mary
14 Thallman?
15    A   I don't believe so.
16    Q   Was there a reason why you didn't talk to
17 her?
18    A   She wasn't on, Deborah didn't mention her
19 as far as I know. Her name came up later as far as
20 I remember.
21    Q   Are you sure about that?
22    A   No. No, because I haven't had a chance
23 to look at any of this but I thought that when, the
24 way I remember it at this moment when Deborah

Page 47

1  complained, she didn't bring up her name as far as
2  I remember because I think at that time she was no
3  longer in the unit. I don't know. I thought she
4  was in a different unit when I got her name, when
5  her name came up.
6     Q   Did you interview a woman named Velva
7  Fletcher?
8     A   Yes.
9     Q   And do you recall if she said Mr. Scheff
10 made comments of a sexual nature in the workplace?
11    A   I think she never thought so except one
12 time he said something in front of her mother that
13 she didn't appreciate but I don't know that it was
14 sexual per se. I don't remember.
15    Q   At any time did you review the work
16 product of an investigation conducted by the office
17 of internal investigation into either Ms.
18 Thallman's complaints of sexual harassment or Ms.
19 Sullins' claims against Mr. Scheff?
20    A   She, Ms. Sullins complained to OIG after
21 she filed with DHR I think and OIG did an
22 investigation because she claimed retaliation and
23 this is, you know, this is off the top of my head.
24 I don't know if it's what actually happened. It's

Page 48

1  sort of how I remember it. And something else
2  where she felt threatened, afraid of assault and
3  she also mentioned apparently to them about sexual
4  harassment.
5          Well, they did the investigation based on
6  her complaint of fear and whatever else it was and,
7  you know, when they did the investigation they also
8  looked into the sexual harassment and they asked me
9  based on what they gave me which was their summary
10 whether it appeared that this also was sexual
11 harassment. For that particular information, no.
12    Q   Do you recall how it was you came to that
13 conclusion?
14    A   Reading their summary.
15    Q   I understand reading their summary, but
16 do you recall why it was you didn't think it was
17 sexual harassment?
18    A   No. I assumed it was because they
19 didn't, there wasn't anything to indicate sexual
20 harassment. I assume that's why it was.
21    Q   And the Office of Internal Investigation
22 asked you for your input at the same time you were
23 representing the Department of Public Aid in a
24 proceeding before the Department of Human Rights?

3:04-cv-03039-JES-BGC   # 21-11   Page 13 of 20
7/18/05
Janice Johnson
Sullins vs. Illinois Dept. of Public Aid

Page 49

1  A  Well, it was all in the same time
2  period. I don't know exactly when it occurred
3  versus when the Department of Human Rights
4  investigated, you know, the meeting happened and
5  when we got the notice of substantial evidence. I
6  don't remember exactly when what part happened
7  when.
8  Q  Okay. Why don't we do it this way. I
9  want to hand you what has been marked as Exhibit 20
10 and take whatever time you need to review that
11 document.
12 A  Okay. Read it.
13 Q  Have you ever seen Exhibit Number 19
14 before today?
15 A  Yes.
16 Q  And do you recall how it was you first
17 saw it?
18 A  OIG gave it to me.
19 Q  If you turn to page 3 of that document
20 the last little paragraph, this report indicates
21 that someone from OIG spoke with you and provided
22 you information on June 27, 2001. Does it not?
23 A  Yes.
24 Q  Do you have any reason to believe that's

Page 50

1  not the date you were provided information and
2  consulted about that case?
3  A  It probably is the date.
4  Q  Do you recall who from OIG provided you
5  the information?
6  A  No, but it was probably whoever, must
7  have been Loren Larsen.
8  Q  Why do you believe it must have been
9  Loren Larsen?
10 A  Well, it says I provided and the
11 investigator's name at the top of the first page
12 says Loren Larsen.
13 Q  So you're putting two and two together?
14 A  Yes.
15 Q  I see. Sure. You have no recollection
16 of that encounter though?
17 A  What encounter?
18 Q  The encounter with the OIG representative
19 that we've been talking about?
20 A  I'm sure he gave me a copy of their
21 findings.
22 Q  Okay. Would you agree with me by looking
23 at Exhibit 23 that on June 27, 2001 the
24 investigation before the Department of Human Rights

Page 51

1  was still pending?
2  A  Yeah. Yes.
3  Q  Okay. In fact. It wasn't until January
4  of 2002 that the Department of Human Rights issued
5  its report of substantial evidence, was it?
6  A  That's what it says.
7  Q  Okay. That's what Exhibit 24 says?
8  A  Yes.
9  Q  Okay. At the time you provided the input
10 requested by OIG as indicated on Exhibit Number 20,
11 what did the term hostile environment mean to you?
12 A  They have it in here and I took their
13 definition. It says pervasive animosity or extreme
14 rudeness directed only at women. There was no
15 evidence Scheff or Schuh engaged in relentless and
16 continuing unwelcome sexual conduct. I believed
17 their investigation.
18 Q  Okay. So you discredited then what was
19 told by them by lower even Sheri Bangert?
20 A  Where is that?
21 Q  Deborah Masten?
22 A  Where is that?
23 Q  Velva, well, you read the report, did you
24 not? You read what Ms. Masten and Ms. Fletcher and

Page 52

1  Ms. Thallman and Ms. Bangert said?
2  A  I agreed with OIG's determination.
3  Q  Did you read--
4  A  Based on their investigation, their
5  conclusion. That's all I agreed with.
6  Q  Did you read in the report that at least
7  two females left the unit because of Mr. Scheff?
8  A  Probably.
9  Q  That didn't mean anything to you?
10 A  People leave units all the time.
11 Q  Are you, people leave units all the time?
12 A  Sure.
13 Q  People are abused all the time. Is that
14 what you're trying to say?
15 A  No. That is not what I said.
16 Q  Did you spend any time looking at this
17 investigation?
18 A  When I got it from OIG, yes.
19 Q  How much time did you spend?
20 A  I don't know.
21 Q  Was it more than two or three minutes?
22 A  Oh, yes.
23 Q  Was it more than 15 minutes?
24 A  I don't know. It's four or five years

Baldwin Court Reporting & Legal Video Services
1-800-248-2835

3:04-cv-03039-JES-BGC   # 21-11   Page 14 of 20
7/18/05
Janice Johnson
Sullins vs. Illinois Dept. of Public Aid

## Page 53

1  ago.
2  Q   You were just rubber stamping what OIG
3  wanted you to say.
4  A   No. I read this information. I read
5  their conclusion. Based on their conclusion I
6  agreed. There was no evidence.
7  Q   What does the term retaliation mean to
8  you?
9  A   It has, it means that people are treated
10 differently because of some way they acted.
11 Q   If a coemployee said he was going to
12 cause financial harm to an individual that provided
13 information against him in an investigation, would
14 that be retaliation?
15 A   Not necessarily. I can't deal with
16 maybes.
17 Q   If an employee did that, would that be
18 retaliation?
19 A   Possibly.
20 Q   Are you aware that two employees, two
21 female employees indicated to OIG that Mr. Scheff
22 said he had the social security numbers and could
23 cause financial harm to individuals who had
24 cooperated against him in the investigation? Are

## Page 54

1  you aware of that?
2  A   I didn't read that.
3  Q   You didn't read it in this report?
4  A   No.
5  Q   Look at the second to the last paragraph
6  on page 2.
7  A   Okay. It says he could. He might.
8  Q   Is that just another day at the office to
9  you?
10 A   That's, that's a maybe. That's, I can't
11 deal with a maybe.
12 Q   Well, this woman said it occurred. Did
13 you ever talk with her about it?
14 A   I don't know. Probably because that
15 isn't a discrimination that I deal with. It isn't.
16 Q   Retaliation is not an issue you deal
17 with?
18 A   This is an allegation that he's going to
19 do something.
20 Q   And that doesn't warrant any further
21 inquiry or investigation or any action taken
22 against the employee?
23 A   No, and no one came to me with it
24 either. They went to OIG.

## Page 55

1  Q   Doesn't strike you in any event that Mr.
2  Scheff did anything wrong in making that statement?
3  A   Not as far as me being an EEO officer.
4  Q   Can you explain what you mean by that?
5  A   In my duties as an EEO officer that is
6  not something I would investigate.
7  Q   You wouldn't look into acts of
8  retaliation or threats of retaliation?
9  A   No, not this and no one brought it to my
10 attention.
11 Q   I thought--
12 A   They went to OIG. They, OIG dealt with
13 it.
14 Q   I thought you indicated you reviewed the
15 findings of OIG at their request.
16 A   Yes. They did the investigation. They
17 did the conclusion. I agreed with their
18 conclusion.
19 Q   Okay. Well, I guess my question is if
20 Ms. Thallman is to be believed in terms of what Mr.
21 Scheff said, would that in your view be an act of
22 retaliation?
23 A   According to OIG's investigation, no.
24 Q   Well, OIG did asked your opinion.

## Page 56

1  A   And I agreed with their conclusion.
2  Q   Well, OIG asked for your opinion, your
3  expertise. Am I correct?
4  A   Based on their investigation and their
5  conclusion I agreed with them.
6  Q   Do you always agree with OIG's
7  conclusions?
8  A   I don't, no, mainly because I don't have
9  many dealings with their investigations because
10 they normally don't investigate something that they
11 would ask my expertise on.
12 Q   Okay. Let me get this straight. OIG did
13 ask you for your opinions based upon your
14 expertise. Am I correct?
15 A   Yes.
16 Q   And they provided you with an
17 investigation report of some sort. Am I correct?
18 A   Yes.
19 Q   And among other things, that
20 investigation report indicated that two female
21 employees left the work unit because of Mr.
22 Scheff's behavior. Am I correct?
23 A   I believe that's what was alleged here,
24 yes.

3:04-cv-03039-JES-BGC   # 21-11   Page 15 of 20
7/18/05                                     Sullins vs. Illinois Dept. of Public Aid
Janice Johnson

## Page 57

1  Q   That's what the employee said at OIG. Am
2  I correct? That was your understanding.
3  A   (Moved head up and down.)
4  Q   Is that yes?
5  A   Yes. Sorry. I thought I had answered.
6  Q   Well, you nodded your head.
7  A   I thought I had answered earlier.
8  Q   Maybe you did. I apologize. And at
9  least one and perhaps two employees indicated
10 hearing Mr. Scheff say that he had obtained the
11 social security numbers of the people involved in
12 the sexual harassment investigation and could
13 damage their credit ratings if he had a mind to do
14 so. Am I correct?
15 A   That's what it says here, yes.
16 Q   Okay. And it didn't strike you that that
17 comment might be an act of retaliation?
18 A   No.
19 Q   Why not?
20 A   He could be just blowing in the wind.
21 Q   How would you know whether he is or
22 isn't?
23 A   Apparently Mr. Scheff says things like
24 this frequently. That's what I kept hearing from

## Page 58

1  all kinds of people. He runs his mouth. If he
2  runs his mouth I can't deal with running his mouth.
3  Q   So if you say I'm going to bring a gun to
4  work tomorrow and shoot you--
5  A   Oh, I think OIG would be involved in
6  that. I would not be.
7  Q   So if someone threatens possible harm, in
8  your view that's not an act of retaliation?
9  A   Not necessarily, no.
10 Q   Is it ever an act of retaliation?
11 A   I don't know. I'd have to have the
12 individual, the thing, the exact thing, not
13 speculation.
14 Q   Okay. Did you conclude based upon your
15 review of the OIG report and the information you
16 gathered after interviewing many people in
17 connection with your investigation into the charges
18 of Ms. Sullins that at no time had Mr. Scheff
19 behaved inappropriately?
20 A   That is not asking me as an EEO officer
21 what, part of my job. Inappropriate is not, is not
22 what I investigate. That would be something
23 someone else would deal with.
24 Q   Okay. That's a good point. You

## Page 59

1  concluded that none of his conduct constituted
2  sexual harassment.
3  A   That's correct.
4  Q   You concluded that the likelihood is he
5  made no comments of a sexual nature in the
6  workplace.
7  A   Yes.
8  Q   And you did that even though several
9  people indicated he had.
10     (Discussion off the record.)
11 MR. BAKER:  Q   And would you agree with me
12 during the course of your investigation several
13 female employees indicated that Mr. Scheff had made
14 comments of a sexual nature?
15 A   I don't remember that specifically.
16 Q   You don't remember one way or another
17 whether they made those comments to you?
18 A   Right.
19 Q   Okay. In what probably seems like
20 centuries ago but was probably less than an hour
21 ago I asked you if you ever spoke with Mary
22 Thallman while you were investigating Ms. Sullins'
23 charge of discrimination. Am I correct?
24 A   Yes.

## Page 60

1  Q   When you received the report of OIG would
2  you agree with me that there were comments made by
3  Ms. Thallman concerning Mr. Scheff?
4  A   I'll agree that OIG interviewed her.
5  Q   At any time after reviewing OIG's report
6  did you ever contact Ms. Thallman?
7  A   I don't remember. I truly do not
8  remember.
9  Q   Okay. If the supervisor at the
10 Department of Public Aid ignored an employee's
11 complaints that another coemployee was engaging in
12 sexually inappropriate behavior in the workplace,
13 is the supervisor doing something wrong?
14 A   Not following the administrative manual.
15 Q   Okay. And that would be contrary to the
16 sexual harassment policies of the Department of
17 Public Aid?
18 A   Correct.
19         (Whereupon said document was
20          duly marked for purposes of
21          identification as Exhibit 25,
22          as of this date.)
23 MR. BAKER:  Q   Have you had an opportunity
24 to review Exhibit 25?

3:04-cv-03039-JES-BGC   # 21-11   Page 16 of 20
7/18/05
Janice Johnson                              Sullins vs. Illinois Dept. of Public Aid

## Page 61

1   A   Yes.
2   Q   As I interpret that document it consists
3   of a series of e-mails exchanged between Steve
4   Bradley and yourself on March 19, 2001.
5   A   Yes.
6   Q   If we go in chronologic order, I think we
7   start with the bottom e-mail.  Is that correct?
8   A   Yes.
9   Q   In the bottom e-mail, Mr. Bradley to you,
10  he refers to an EEO-3 of Mr. Scheff?
11  A   Yes.
12  Q   What is an EEO-3?
13  A   An internal complaint form.
14  Q   Okay.  And do you recall what the nature
15  was of Mr. Scheff's complaint?
16  A   Not specifically.
17  Q   Do you recall anything about it?
18  A   No, other than what it said here.
19  Q   Well, doesn't say much here.  That's why
20  I was asking.
21  A   Right.  I don't know what it was at this
22  point.
23  Q   Okay.  If you go up to the e-mail that
24  was written, I think it's by you at 10:56 A.M.

## Page 62

1   A   Yes.
2   Q   I'm going to read this statement into the
3   record.  Thanks.  I'm not yet sure that this
4   complaint has status.  He has blamed everything
5   that happened to him as Sullins' fault and part of
6   a conspiracy to make him look bad.  Do you see that
7   sentence?
8   A   Yes.
9   Q   What does that refer to?
10  A   His EEO-3 complaint.
11  Q   When you say he has blamed everything
12  that's happened to him--
13  A   Whatever he said in the EEO3.
14  Q   Okay.  So that comment is just what he
15  said in the EEO-3?
16  A   His personal complaint, yes.
17          (Whereupon a short break was
18           taken.)
19  MR. BAKER:  Q   Ms. Johnson, I understand
20  it's been four years ago and that I guess when you
21  left state government you kind of forgot about a
22  lot of this stuff but I don't have the EEO-3 so I'm
23  trying to piece the information together here and
24  as I think you're telling me he said something in

## Page 63

1   the EEO-3 that indicated he blamed Deborah Sullins?
2   A   That's what it says here, yes.
3   Q   Okay.  Then you have a sentence after
4   that that says has Sullins moved yet.
5   A   Yes.
6   Q   Can you tell me the context in which that
7   question was raised?
8   A   I can only tell you from reading this.
9   Q   Were you aware that she was going to be
10  moved?
11  A   Apparently.
12  Q   Do you recall anything about how you
13  found out?
14  A   I must have been talking to Steve
15  Bradley.
16  Q   Do you recall what the circumstances were
17  for her being moved?
18  A   No.  I think, well, I don't really know
19  now.
20  Q   Okay.  We have talked about your role in
21  giving input to OIG when they presented you with
22  their investigative report, have we not?
23  A   Yes.
24  Q   And do you recall anything more about the

## Page 64

1   information provided them or the basis of the
2   information other than what you've already told me?
3   A   No.
4   Q   Okay.  And we've also talked about your
5   role investigating Ms. Sullins' Human Rights
6   complaints before the Department of Human Rights.
7   Am I correct?
8   A   Yes.
9   Q   And just in the interest of completeness,
10  have we talked about all you can recall concerning
11  that particular investigation?
12  A   Yeah.  Yes.
13  Q   Okay.  Well, the reason I'm asking is I
14  don't want, if you don't remember things, I don't
15  want to engage in repetitive behavior and there's a
16  lot you don't remember which, I mean sometimes I
17  guess that happens but in the interest of
18  completeness I want to make sure that I have it,
19  gathered together all the information you recall.
20  Is there anything else in connection with the
21  investigation you remember that you have not told
22  me?
23  A   All I remember is when Deborah came into
24  my office she said I didn't want to file a Human

3:04-cv-03039-JES-BGC    # 21-11    Page 17 of 20

7/18/05
Janice Johnson
Sullins vs. Illinois Dept. of Public Aid

### Page 65

1  Rights complaint. I was more concerned about my
2  social security number but as I talked to them they
3  basically said you have, you know, you need to file
4  this case. So she filed it. She originally said
5  she didn't go to DHR to file a Human Rights
6  complaint. I remember that. She said I was
7  concerned about my social security number and I was
8  hoping they would help me.
9      Q    What was her concern about her social
10 security number?
11     A    At that time she told me that allegedly
12 Scheff had said that he had everybody's social
13 security number and that disturbed her.
14     Q    Okay. If you know, at the Department of
15 Human Rights are social security numbers normally
16 considered confidential information?
17     A    I think so.
18     Q    Other than the consultation you gave OIG
19 and the investigation you did for the Department of
20 Human Rights in connection with your employment at
21 the Department of Public Aid did you ever have any
22 other dealings with Mr. Scheff?
23     A    Did I have any other dealings with Mr.
24 Scheff?

### Page 66

1      Q    Yes.
2      A    Other than this case?
3      Q    Yes.
4      A    No.
5      Q    And when we say this case, we're talking
6  about the two undertakings that you and I have
7  already talked about. Correct?
8      A    Yes.
9      MR. BAKER: All right. I have nothing
10 further.
11     MS. KERLEY: I only have a couple of things. I
12 forgot to tell you I'd ask questions.
13                 EXAMINATION
14               BY MS. KERLEY:
15     Q    Okay. We'll probably just feel like a
16 million years ago as well. You were asked some
17 questions about when you get cases, complaints from
18 IDHR and that you represent the department?
19     A    Yes.
20     Q    There were also some questions about
21 whether or not you had ever investigated complaints
22 either externally or internally and internally
23 meaning when an individual comes to you or a
24 supervisor comes to you and asked whether or not

### Page 67

1  you recalled if you'd ever found that there was in
2  fact discrimination.
3      A    Yes.
4      Q    When you answered those questions about
5  whether or not you recall if there were
6  discrimination, was your testimony, just for
7  clarification, was your testimony that you don't
8  recall whether or not there were or you recall that
9  there were no cases where you found discrimination?
10     A    I have had cases where there were
11 discrimination.
12     Q    But you didn't, in response you couldn't
13 recall?
14     A    Specifics.
15     Q    Okay. And does that answer hold true
16 also for the question whether or not, whether you
17 had ever found sexual harassment did in fact occur?
18     A    I don't remember sexual harassment
19 specifically.
20     Q    Okay. Okay. I'm going to ask you to
21 look at, can I see that stack of exhibits? Just
22 all those. I don't know which number it is.
23          Showing you Exhibit 22, you had been
24 asked a question about the definitions of sexual

### Page 68

1  harassment as they appeared in Exhibit 22. Is it
2  your understanding of specifically that first page
3  that definition of sexual harassment and the
4  conduct commonly considered that those go hand in
5  hand or that they, each part acts independently?
6      A    They can act independently.
7      Q    So it was your understanding that there
8  could be something that was identified as conduct
9  on the bottom half that even if it doesn't fall in
10 the definition of sexual harassment somehow it
11 could be sexual harassment?
12     A    That's correct.
13     MS. KERLEY: Okay. I have no further
14 questions.
15                 EXAMINATION
16               BY MR. BAKER:
17     Q    Bad news is, Ms. Johnson, questions beget
18 questions and I want to, I just want to get some
19 clarification. Ms. Kerley asked for some
20 clarification of your earlier testimony and I think
21 in your clarification to her you indicated that in
22 the past in connection with investigations you had
23 found cases where discrimination had occurred but
24 you just don't recall those cases as you sit here

3:04-cv-03039-JES-BGC    # 21-11    Page 18 of 20
7/18/05
Janice Johnson                           Sullins vs. Illinois Dept. of Public Aid

Page 69

1  now. Do I have that correct?
2    A   Yes.
3    Q   And then you were asked the same question
4  with respect to sexual harassment and you said
5  quote, I don't remember sexual harassment
6  specifically. What do you mean by that?
7    A   I remember that we have had internal
8  cases where I have found discrimination was handled
9  but I don't remember the specific discrimination,
10 whether it was sexual harassment or whatever.
11   Q   Okay. Let me ask you this question
12 then. With respect to investigations you've done
13 concerning sexual harassment as opposed to other
14 forms of discrimination, do you recall any
15 investigations where you concluded that sexual
16 harassment occurred?
17   A   I don't remember.
18 MR. BAKER: Okay. All right.
19              EXAMINATION
20           BY MS. KERLEY:
21   Q   Finally, when you say you don't remember,
22 you mean you don't know one way or another whether
23 your office had found sexual harassment or did not
24 find sexual harassment?

Page 70

1    A   Correct. I can't remember the specifics
2  of the cases.
3  MS. KERLEY: Okay.
4              EXAMINATION
5           BY MR. BAKER:
6    Q   Just one other question. Have you ever
7  testified in a disciplinary proceeding such as a
8  Civil Service Commission hearing or an arbitration
9  where an employee had been disciplined or
10 discharged because of sexual harassment in a case
11 that you had investigated?
12   A   No.
13 MR. BAKER: Okay. Thank you.
14 MS. KERLEY: No further questions.
15           (Whereupon signature was
16           reserved.)
17           FURTHER DEPONENT SAITH NOT.

Page 71

1    I, JANICE JOHNSON, having read the above and
2  foregoing, find the same to be true and correct
3  with the following additions and/or corrections, if
4  any:
5  Page_____Line_____Change:
6  Page_____Line_____Change:
7  Page_____Line_____Change:

24 JANICE JOHNSON (7/18/05)          DATE

Page 72

1  STATE OF ILLINOIS  )
                      ) SS
2  COUNTY OF CHRISTIAN)
3           C E R T I F I C A T E
4    I, Julie A. Brown, a Certified Shorthand
5  Reporter in and for said County and State do hereby
6  certify that the Deponent herein, JANICE JOHNSON,
7  prior to the taking of the foregoing deposition,
8  and on the 18th of July A.D., 2005, was by me duly
9  sworn to testify to the truth, the whole truth and
10 nothing but the truth in the cause aforesaid; that
11 the said deposition was on that date taken down in
12 shorthand by me and afterwards transcribed, and
13 that the attached transcript contains a true and
14 accurate translation of my shorthand notes referred
15 to.
16    Given under my hand this 16th day of
17 August A.D., 2005.

              Certified Shorthand Reporter

23 License No. 084-004174

7/18/05 Sullins vs. Illinois Dept. of Public Aid
Janice Johnson

```
1       I, JANICE JOHNSON, having read the above and
2   foregoing, find the same to be true and correct
3   with the following additions and/or corrections, if
4   any:
5   Page  24  Line  2  Change:          KNIGHTEN
6   Page _____ Line _____ Change:
7   Page _____ Line _____ Change:
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23   [signature: Janice Johnson]
24   JANICE JOHNSON (7/18/05)              DATE 8/29/05
```

Page 71

Baldwin Court Reporting & Legal Video Services
1-800-248-2835