3:04-cv-03039-JES-BGC    # 21-13    Page 1 of 10
7/12/05
Marvin Ross
Sullins v. Illinois Department of Public Aid

E-FILED
Tuesday, 03 January, 2006 12:15:13 PM
Clerk, U.S. District Court, ILCD

## Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
 2           FOR THE CENTRAL DISTRICT OF ILLINOIS
 3                   SPRINGFIELD DIVISION
 4
 5   DEBORAH R. SULLINS,
 6           Plaintiff,
 7       vs.                         No. 04-3039
 8   THE ILLINOIS DEPARTMENT OF PUBLIC
     AID,
 9
             Defendant.
10
11
12       THE DEPOSITION of MARVIN ROSS, taken in
13   the above-entitled case before Rhonda K. O'Neal,
14   CSR, RPR, a Notary Public of Sangamon County,
15   acting within and for the County of Sangamon,
16   State of Illinois, at 3:27 o'clock P.M., on July
17   12, 2005, at 415 South Seventh Street,
18   Springfield, Sangamon County, Illinois, pursuant
19   to notice.
20
21
22
         BALDWIN REPORTING & LEGAL-VISUAL SERVICES
23          SERVING ILLINOIS, INDIANA & MISSOURI
         24 hrs (217) 788-2835  Fax (217) 788-2838
24                    1-800-248-2835
```

## Page 2

```
 1   APPEARANCES:
 2       BAKER, BAKER & KRAJEWSKI, LLC
         BY: James P. Baker, Esq.
 3           415 South Seventh Street
             Springfield, Illinois 62701
 4           On behalf of Plaintiff.
 5       MS. SARAH R. KERLEY
             Assistant Attorney General
 6           500 South Second Street
             Springfield, Illinois 62701
 7           On behalf of Defendant.
```

ORIGINAL

## Page 3

```
 1                    I N D E X
 2   DEPONENT                            PAGE NUMBER
 3   Marvin Ross
 4       Examination by Mr. Baker              5
 ...
10                    E X H I B I T S
11   NUMBER                MARKED FOR IDENTIFICATION
12   Exhibit 17                       21
13   (Exhibit retained by Counsel.)
```

## Page 4

```
 1                S T I P U L A T I O N
 2       It is stipulated and agreed, by and
     between the parties hereto, through their
 3   attorneys, that the deposition of MARVIN ROSS may
     be taken before Rhonda K. O'Neal, a Notary Public,
 4   Certified Shorthand Reporter, and Registered
     Professional Reporter, upon oral interrogatories,
 5   on the 12th of July A.D., 2005, at the instance of
     the Plaintiff at the hour of 3:27 o'clock P.M.,
 6   415 South Seventh Street, Springfield, Sangamon
     County, Illinois;
 7
         That the oral interrogatories and the
 8   answers of the witness may be taken down in
     shorthand by the Reporter and afterwards
 9   transcribed;
10       That all requirements of the Federal Rules
     of Civil Procedure and the Rules of the Supreme
11   Court as to dedimus, are expressly waived;
12       That any objections as to competency,
     materiality or relevancy are hereby reserved, but
13   any objection as to the form of question is waived
     unless specifically noted;
14
         That the deposition, or any parts thereof
15   may be used for any purpose for which depositions
     are competent, by any of the parties hereto,
16   without foundation proof;
17       That any party hereto may be furnished
     copies of the deposition at his or her own
18   expense.
```

3:04-cv-03039-JES-BGC   # 21-13   Page 2 of 10
7/12/05                         Sullins v. Illinois Department of Public Aid
Marvin Ross

## Page 5

1  (Whereupon the Deponent was
2  sworn by the Notary Public.)
3  M A R V I N  R O S S
4  having been first duly sworn by the Notary Public,
5  deposeth and saith as follows:
6  EXAMINATION
7  BY MR. BAKER:
8  Q  Good afternoon, Mr. Ross. Would you
9  state your name and address, please.
10 A  Marvin Ross, 2140 East Reservoir,
11 Springfield, Illinois.
12 Q  Have you ever given a deposition before?
13 A  One.
14 Q  Okay. Let me tell you a little bit about
15 why you are here. I represent Debbie Sullins, who
16 I believe is still an employee of your department.
17 And she has filed a lawsuit, and the defendants
18 have identified you as a person that might have
19 some knowledge concerning the lawsuit. So I'm
20 going to spend some time today just asking you
21 questions to find out what you know, okay?
22 A  All right.
23 Q  Hopefully the deposition will not last a
24 real long time, although I cannot guarantee that

## Page 6

1  you may not have to feed your meter, but at any
2  time you want to take a break we can. I'm going
3  to ask that if you don't understand a question,
4  don't be embarrassed. Just tell me you don't
5  understand it. I'll be happy to rephrase it.
6  I'm going to ask that you respond
7  verbally to questions rather than using a body
8  gesture as a response. Finally, I'm going to ask
9  that you not use the phrase either uh-huh or the
10 phrase huh-uh in answering a question. Can you do
11 those things for me?
12 A  Yes.
13 Q  Where do you work?
14 A  Illinois Department of Public Aid.
15 Q  How long have you worked there?
16 A  For the department going on 24 years.
17 Q  And where do you work presently?
18 A  Bureau of comprehensive services.
19 Q  What is your position in the bureau?
20 A  My current title is senior supervisor
21 over the UB92 unit.
22 Q  In 2000 where did you work in the
23 department?
24 A  The same unit as just an executive II

## Page 7

1  supervisor.
2  Q  As an executive II supervisor in 2000,
3  what were your job duties?
4  A  I supervised over I believe like five
5  medical consultants and referred system issues to
6  the proper area.
7  Q  Do you recall who you supervised in 2000?
8  A  No, not everybody because there's been
9  people that's come and gone.
10 Q  I'm going to hand you what has been
11 marked as Exhibit 7.
12 A  Okay. On this chart I would have
13 supervised Pam DuFour, Patricia Luttrell, Kevin
14 Mayer, Mark Sandidge, and Mark Scheff.
15 Q  Exhibit 7 I think is dated February 16,
16 2001. See that up at the top?
17 A  Yes.
18 Q  If we go back to the year 2000, do you
19 have any reason to believe you supervised
20 different individuals from the ones identified on
21 Exhibit 7?
22 A  It may have been because a couple of them
23 had left, but I don't know.
24 Q  Do you know if you supervised Mark Scheff

## Page 8

1  during the year 2000?
2  A  Yes.
3  Q  Yes, you did?
4  A  Yes, I did.
5  Q  To prepare you for your deposition today,
6  what did you do?
7  A  Met with Sarah Kerley to kind of go over
8  what to expect at a deposition.
9  Q  Okay. Other than talking with Sarah, did
10 you do anything?
11 A  I looked at just a quick thing I did for
12 a hospice presentation just to see how long I
13 actually had been supervising because I couldn't
14 remember.
15 Q  Okay. How long had you been supervising?
16 A  Since '95.
17 Q  Okay. Have you done anything else to
18 prepare you for your deposition?
19 A  No.
20 Q  Okay. Can you tell me the supervisory
21 positions you've held in the department between
22 1995 and 2000?
23 A  That would be the executive II
24 supervisor.

Page 9

1  Q  You were in the same unit?
2  A  Uh-huh.
3  Q  Is that a yes?
4  A  Yes.
5  Q  Okay. Do you recall how long prior to
6  the year 2000 it was that you supervised Mark
7  Scheff?
8  A  That would have been 1995 because he was
9  in the unit I started supervising.
10 Q  All right. So would you have
11 continuously supervised Mark Scheff from 1995 to
12 February of 2001?
13 A  Yes.
14 Q  Okay. Were you the individual that
15 during that time period gave Mr. Scheff periodic
16 personnel evaluations?
17 A  Yes.
18 Q  And do you recall as a general matter how
19 you evaluated him as an employee?
20 A  He was basically a good employee.
21 Q  Do you recall on the evaluation form that
22 you evaluated him concerning his human relations
23 skills and his communication skills?
24 A  No. I don't remember the exact markings

Page 10

1  I would have given him.
2  Q  In the year 2000, where was your office
3  located?
4  A  I don't remember. I'm wanting to think
5  once I started supervising, I was in a different
6  office to begin with. It would have been in the
7  same general location.
8  Q  Would that have been in the basement of
9  the Bloom Building?
10 A  Yes. Yeah. Yes.
11 Q  While you were a supervisor between 1995
12 and 2000, as a general matter, was your office
13 located close to the workstations of those you
14 supervised?
15 A  Yes.
16 Q  You were all in the same area?
17 A  Yes. We were all in the same area.
18 Q  Did you receive any training to become a
19 supervisor or receive any training in supervision
20 after you became a supervisor?
21 A  Yes.
22 Q  What was your understanding in 2000
23 concerning the role you played when it came to
24 assessing discipline against a subordinate

Page 11

1  employee that worked under your supervision?
2  A  What was that again?
3  Q  In 2000 what was your understanding about
4  the role you played if one of your subordinate
5  employees needed discipline?
6  A  If one of them needed discipline, it was
7  discussed with the higher-ranking manager and then
8  decisions were made, and if discipline was
9  warranted, then I would be the one that would
10 issue the discipline.
11 Q  Did you have some authority to recommend
12 discipline?
13 A  Yes. Supervisors have the authority to
14 recommend. It's, yeah.
15 Q  And if you believed an employee was
16 acting in a way so that discipline was warranted,
17 was it your responsibility to bring that to the
18 attention of the people above you in the chain of
19 command?
20 A  Yes.
21 Q  Prior to October of 2000, had you
22 received any sexual harassment training?
23 A  I don't remember when we had that
24 training.

Page 12

1  Q  In 2000 did you have an understanding one
2  way or another what the term sexual harassment
3  meant?
4  A  Yes.
5  Q  And what was your understanding
6  concerning what it meant?
7  A  My understanding is just about anything
8  someone feels, you know, in a sexual nature of any
9  kind that is bad to them could be considered
10 sexual harassment.
11 Q  So if an individual was offended by
12 someone's sexual comments or gestures, that could
13 constitute sexual harassment?
14 A  Yes.
15 Q  Did you have any understanding as to what
16 your role was as a supervisor when it came to
17 dealing with sexual harassment issues engaged in
18 by your subordinate employees?
19 A  What was that again?
20 Q  In 2000 did you have any understanding as
21 to what your role was if there was an allegation
22 made that one of our subordinate employees had
23 engaged in sexual harassment?
24 A  Yes. I would need to report it.

3:04-cv-03039-JES-BGC   # 21-13   Page 4 of 10
7/12/05
Marvin Ross
Sullins v. Illinois Department of Public Aid

Page 13

1   Q   And to whom would you need to report it?
2   A   Initially I would go to my immediate
3   manager, and then we would report it to OIG.
4   Q   And if you didn't report it, would you
5   not be doing your job?
6   A   Yes.
7   Q   And if you didn't report it, do you have
8   reason to believe that that might be grounds for
9   discipline being taken against you?
10  A   Yes.
11  Q   Okay.  I'm going to hand you what has
12  been marked as Exhibit 8.  And before you get too
13  far into it, I will represent to you that that is
14  an incomplete document.  Have you ever seen the
15  pages that are identified as a part of Exhibit 8
16  before?
17  A   Yes.  I've read these before, yes.
18  Q   If you go to what I believe is the third
19  page of that document in the middle of the page.
20  MS. KERLEY:   Bates number.
21  MR. BAKER:   Q   Bates number 000266.
22  MS. KERLEY:   Okay.
23  MR. BAKER:   Q   Do you see in the middle of the
24  page there is a paragraph or a letter C and then a

Page 14

1   phrase, responsibility of supervisory personnel?
2   A   Yes.
3   Q   Can you read that material for me just to
4   yourself.
5   A   Okay.
6   Q   I will represent to you that the
7   following page we don't have in this document.
8   But is the material you have read on page Bates
9   stamped 266 as far as it goes consistent with your
10  understanding as to what your responsibilities
11  were when it came to sexual harassment issues?
12  A   Yes.
13  Q   Okay.  Can you tell me generally what you
14  did to keep your environment free of sexual
15  harassment?
16  A   Well, one thing I know every new employee
17  got the employee handbook, and one of the things
18  we stressed was for them to read the entire
19  handbook and they have to sign a document that
20  they did read that so they would have the
21  understanding of all the material in there.  And
22  you know, I would, periodically if I'm out of my
23  office, if I ever seen anything that shouldn't
24  have been going on, I would have said something,

Page 15

1   but I don't remember ever seeing anything like
2   that.  Our area's usually kind of quiet.
3   Q   Do you know a man named Mike Sandidge?
4   A   Yes.
5   Q   In 2000 how far was his workstation from
6   your office?
7   A   Would have been about I think four
8   offices down.
9   Q   So--
10  A   I believe he was on the end.
11  Q   So translate that.  Would that be 25, 30
12  feet?
13  A   Fifty or 60 feet.  I'm not--.
14  Q   Okay.  In 2000 did you know a Jim Schuh?
15  A   Yes.
16  Q   Where was his office in relation to
17  yours?
18  A   The same because I believe they shared an
19  office.  I'm not for sure now if Mike was in that
20  office or the one before that.  Just, I don't
21  remember.
22  Q   Do you know Mary Thallman?
23  A   Yes.
24  Q   In 2000 where was her office in relation

Page 16

1   to yours?
2   A   Maybe 15 feet, 20 feet.
3   Q   In the normal course of events, would you
4   keep your office door open?
5   A   Normally unless I'm in a meeting or
6   working on a project or conference call.
7   Q   And if you know, did Mary Thallman
8   normally keep her office door open?
9   A   From what I can remember, the office
10  doors were always open.
11  Q   Okay.  In 2000 did you supervise Mary
12  Thallman?
13  A   No.
14  Q   Do you know who did?
15  A   Lenna DeGroot.
16  Q   At any time prior to June of 2001, did
17  you ever hear or observe Mark Scheff at any time
18  make any comment that had a sexual connotation to
19  it?
20  A   Not that I can remember.
21  Q   If you had what should you have done
22  about it?
23  A   Immediately stopped him and then would
24  have proceeded with going through the proper

## Page 17

1 channels, notifying my immediate supervisor and
2 then taken the appropriate steps.
3    Q    And if you didn't do that, that would be
4 evidence you were not performing your job?
5    A    Yes.
6    Q    Okay. And that could create some
7 problems for you?
8    A    Yes.
9    Q    At any time prior to June of 2001, did
10 you ever hear anyone comment upon Mark Scheff
11 making comments that had some sexual connotation
12 to them?
13   A    No. No.
14   Q    Never did?
15   A    I don't remember.
16   Q    Never heard any rumors in the office that
17 he had done that?
18   A    Not that I can remember.
19   Q    Don't recall ever telling Steve Bradley
20 that you had heard those comments?
21   A    Which comments are you--?
22   Q    Comments that Mark Scheff had made
23 comments of a sexual nature?
24   A    I don't remember. I don't remember it

## Page 18

1 off the top of my head, no.
2    Q    Do you know Debbie Sullins?
3    A    Yes.
4    Q    At this time did you supervise Debbie?
5    A    No.
6    Q    Did you work in the same area where
7 Debbie worked?
8    A    Yes.
9    Q    And on an average day, would you have
10 verbal exchanges with Debbie? Conversations, that
11 sort of thing?
12   A    Yeah. Yes.
13   Q    Prior to October of 2000, had you ever
14 had any unpleasant issues or experiences with
15 Debbie?
16   A    No.
17   Q    Did you ever have any reason prior to
18 October of 2000 to believe Debbie was not a
19 truthful individual?
20   A    No.
21   Q    At any time since October of 2000, have
22 you had any reason to believe that Debbie was not
23 a truthful individual?
24   A    I would have to say no.

## Page 19

1    Q    Okay. Did you ever become aware at any
2 time that Mary Thallman complained to anyone that
3 Mark Scheff had made sexually inappropriate
4 comments?
5    A    You mean did I know that she had
6 done--what was it again?
7    MR. BAKER: I'll have her read the question
8 back.
9              (Whereupon the requested
10              portion of the record was read
11             back by the Reporter.)
12   THE DEPONENT: No. Not until I was
13 interviewed by OIG.
14   MR. BAKER:  Q    And do you recall who at OIG
15 interviewed you?
16   A    Trying to think of which--I think that
17 time it would have been Laura, I think.
18   Q    Okay. Is that Laura Wellstone?
19   A    Yeah.
20   Q    Whetstone, excuse me.
21        Do you recall what occurred during that
22 interview?
23   A    No. It's been way too long ago.
24   Q    Did you know Laura before the interview?

## Page 20

1    A    No.
2    Q    Do you have any recollection as to what
3 Laura's demeanor was like during the interview?
4    A    I got the impression she didn't like
5 Mark. That's about the only thing I remember.
6    Q    All right. What did you get that
7 impression from?
8    A    I don't know. It could have just been
9 the way she talked. I'm not for sure. That's
10 just how she come across.
11   Q    How did she treat you during the
12 interview?
13   A    Good.
14   Q    She didn't try and badger you, did she?
15   A    No, no.
16   Q    And she didn't try to get you to answer
17 questions that she wanted a particular answer to,
18 did she?
19   A    No, not that I can remember.
20   Q    And she didn't verbalize any threats to
21 you, did she?
22   A    No.
23   Q    Okay. Did Pam DuFour ever complain to
24 you about Mark Scheff?

3:04-cv-03039-JES-BGC   # 21-13   Page 6 of 10
7/12/05                          Sullins v. Illinois Department of Public Aid
Marvin Ross

Page 21

1   A    The only thing that I can remember
2   actually was her and then Deb when Mark was
3   talking on the phone to his lawyer a little loud,
4   and they overheard him and come down and told me.
5   And I immediately went and interrupted him and
6   told him he was talking way too loud and he
7   shouldn't be talking about--at the time I didn't
8   know he was talking to his lawyer, and so I told
9   him he wasn't supposed to be discussing the
10  investigation with anybody, and that's when he
11  said it was his lawyer. And I made him be really
12  quiet. That's the only time.
13  Q    During the workday back in 2000, did you
14  spend most of your time in your office?
15  A    I would have to say right now I don't
16  remember. There was a time period when we were
17  starting to implement HIPAA and all that, and we
18  were in meetings like three mornings a week. And
19  I don't remember if it was that far back or not.
20          (Whereupon a document
21           was duly marked for
22           purposes of
23           identification as
24           Exhibit Number 17 as of

Page 22

1            this date.)
2   MR. BAKER:  Q  Can you identify Exhibit 17?
3   A    Was a statement that apparently I wrote
4   that Mark Scheff had went, had attended a session
5   that Deb has done. We had Rena Powell, one of our
6   executives, set in on the training, and she said
7   that Mark didn't say anything during the training
8   session.
9   Q    Why did you write that statement?
10  A    I have no idea.
11  Q    Can you read the first sentence of the
12  statement?
13  A    To my knowledge, Mark Scheff has not
14  talked to Deb Sullins since October 2000. In
15  February 2001 Mark did a training session
16  conducted by Deborah. Rena Powell, executive I,
17  sat in on the training session and did tell me
18  that Mark did not say anything in the training
19  session. My signature and the date, March 15,
20  '01.
21  Q    How was it you know the nature of the
22  interaction if any between Mark Scheff and Deborah
23  Sullins after October of 2000?
24  A    It would just, interaction if I seen them

Page 23

1   at work, and he just stayed away from her.
2   Q    Would there have been times where they
3   may or may not have been together when you were
4   not around them? Let me--that's a dumb question.
5        Were there times during the workday where
6   you were not in visual contact with Deborah
7   Sullins?
8   A    Yes.
9   Q    And were there times during the workday
10  where you were not in contact with Mark Scheff?
11  A    Yes.
12  Q    Would you agree with me that during most
13  of the workday you were not in visual contact of
14  either Mark Scheff or Deborah Sullins?
15  A    Yes.
16  Q    Did someone ask you to prepare that
17  statement?
18  A    I don't remember.
19  Q    Do you know a lady named Janice Johnson?
20  A    Yes.
21  Q    Did she ask you to write that statement
22  out?
23  A    I don't remember.
24  Q    Did you ever discuss that statement with

Page 24

1   Lenna DeGroot?
2   A    I don't think so. I don't remember.
3   Q    Is it your testimony you don't remember
4   whether you did?
5   A    Yes.
6   Q    Do you continue to supervise Mark Scheff?
7   A    No, not directly.
8   Q    Are you aware of an incident in which
9   Mark Scheff was disciplined because of comments he
10  allegedly made to a provider over the telephone?
11  A    Yes. I'm aware of that.
12  Q    And were you his supervisor at the time
13  of that incident?
14  A    Yes.
15  Q    And did you have any involvement in that
16  particular incident? I'm not saying you were
17  involved with the incident itself, but in dealing
18  with the incident once it came to the department's
19  attention?
20  A    No. I discussed it with Steve Bradley
21  who immediately referred it up for review, and
22  that's the main part I had in it until it was
23  settled.
        MR. BAKER:  Off the record.
            (Discussion off the record.)
        MS. KERLEY:  I don't have any questions.
24          (Further deponent saith not.)

Page 25

1    I, MARVIN ROSS, having read the above and
2    foregoing, find the same to be true and correct
3    with the following additions and/or corrections,
4    if any:
5    Page_____Line_____Change:
6    Page _____Line_____Change:
7    Page_____Line_____Change:
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24   Marvin Ross (07/12/05)              DATE

Page 26

1    STATE OF ILLINOIS  )
                        ) SS
2    COUNTY OF SANGAMON )
3            C E R T I F I C A T E
4        I, Rhonda K. O'Neal, a Notary Public,
5    Certified Shorthand Reporter, and Registered
6    Professional Reporter, in and for said County and
7    State do hereby certify that the Deponent herein,
8    MARVIN ROSS, prior to the taking of the foregoing
9    deposition, and on the 12th of July A.D., 2005,
10   was by me duly sworn to testify to the truth, the
11   whole truth and nothing but the truth in the cause
12   aforesaid; that the said deposition was on that
13   date taken down in shorthand by me and afterwards
14   transcribed, and that the attached transcript
15   contains a true and accurate translation of my
16   shorthand notes referred to.
17           Given under my hand and seal this 27th day
18   of July A.D., 2005.
19       *[signature: Rhonda K. O'Neal]*
20       Notary Public and
         Certified Shorthand Reporter
21       and Registered Professional Reporter
22                          OFFICIAL SEAL
                            RHONDA K. O'NEAL
23   License No. 084-004158  NOTARY PUBLIC, STATE OF ILLINOIS
24                           MY COMMISSION EXPIRES 9-13-2008

3:04-cv-03039-JES-BGC    # 21-13    Page 9 of 10
7/12/05                 Sullins v. Illinois Department of Public Aid
Marvin Ross                                                                    ✓

```
 1       I, MARVIN ROSS, having read the above and
 2   foregoing, find the same to be true and correct
 3   with the following additions and/or corrections,
 4   if any:
 5   Page  7   Line 14   Change: Mark Sandridge to Mike Sandridge
 6   Page 22   Line  5   Change: Rena to Marina
 7   Page 22   Line 15   Change: did to attended
 8        22        16           Rena to Marina
 9        23         4           Beginning with Let was said by
10                               Mr. Baker.
11
12
13
14
15
16
17
18
19
20
21
22                                          Marvin Ross
23
24   Marvin Ross (07/12/05)              DATE 8/26/05
```

Page 25