3:04-cv-03039-JES-BGC    # 21-16    Page 1 of 10                    E-FILED
8/26/05                  Sullins v. Illinois Department of Public Aid    Tuesday, 03 January, 2006  12:18:38 PM
Laura R. Whetstone                                                   Clerk, U.S. District Court, ILCD

Page 121

1    MR. BAKER:  Cops love it.  Don't you watch Law
2 and Order.
3    THE DEPONENT:  Rick probably thought I was
4 guilty from the get go, as does Terry -- as did
5 Terry, which I later learned that was correct.
6    MR. BAKER:  Q  Laura, as an investigator at
7 the Department of Public Aid in late 2000, were you
8 in a union?
9    A   No.
10   Q   Were you a merit comp. employee?
11   A   Yes.
12   Q   And if you know, is your employment
13 covered by the Illinois Personnel Code?
14   A   Yes.
15   Q   So you were certified in your position?
16   A   Correct.
17   Q   And I guess that means before you can be
18 fired, there has to be some sort of cause; am I
19 correct?
20   A   Yes.
21   Q   Was this a pre-disciplinary interview,
22 were you told that it was?
23   A   No.
24   Q   Were you told that this was a part of an

Page 122

1 investigation?
2    A   I wasn't told that.  But when allegations
3 are made against investigators, you know, they can
4 either inquire -- I think I've only had to provide
5 two written statements in investigation format like
6 I hate to say normal employees, but the format.
7        But this was -- I don't know if it was an
8 internal affairs investigation, all I know is my
9 supervisors were inquiring.
10   Q   Were you relieved of any duties after
11 that or told that until it's cleared up, we're not
12 going to give you cases to investigate?
13   A   No.  No.
14   Q   So the next thing you did was to prepare
15 Exhibit 44?
16   A   Yes.
17   Q   And you submitted that to
18 Mr. Moscardelli?
19   A   It would have been to Terry, I believe.
20   Q   I see.
21       And then what happened?
22   A   That was it.  I was not told anything.
23   Q   Well, a few minutes ago, you indicated --
24 maybe; I don't want to put words in your mouth that

Page 123

1 aren't accurate -- you thought Mr. Moscardelli
2 believed you were guilty?
3    A   And Terry.
4    Q   And you later discovered that was the
5 case?
6    A   I learned from someone, yes.
7    Q   How did you learn that?
8    A   Debby Davis.  It's reported in my daily
9 planner toward the end of December 2000 where she
10 said that Terrick -- Terrick -- Derrick and Terry
11 wanted to discipline me as a result of this but
12 Rob Miller stepped in on my behalf and supported me
13 that no discipline -- you know, there would be
14 nothing done.
15   Q   Would Debby Davis's labor relations
16 functions have embraced your division?
17   A   What do you mean embrace?
18   Q   Well, my understanding is that the labor
19 relations professionals provide personnel
20 consultation to line departments.
21   A   Yes.
22   Q   And some might have responsibility for
23 three or four bureaus at Public Aid.  Did Debby
24 Davis's labor relations responsibilities include

Page 124

1 the division or bureau within which you worked?
2    A   Yes.  We're no different than anyone
3 else.
4    Q   Okay.  So if there was a personnel issue
5 involving you, Debby Davis might become involved in
6 it?
7    A   If discipline would be imposed, yes.
8    Q   Okay.  So I take it, you unpacked your
9 bags and are still in that office?
10   A   I kept them in boxes in the garage for a
11 number of months before I brought anything close to
12 what I had in there.
13   Q   Following this incident, was there any
14 change in your relationship with either
15 Mr. Tranquilli and Mr. Moscardelli than how it had
16 been before that incident?
17   A   Yeah.  I was more reserved around them, I
18 went to them only if I had to.  Nothing like having
19 your boss show their support.
20           (Whereupon said document was
21           duly marked for purposes of
22           identification as Exhibit 45
23           as of this date.)
24   Q   Exhibit 45 looks like it's an E-mail you

Page 125

1  sent to Terry Tranquilli?
2      A    Yes.
3      Q    And it relates to some observations you
4  noted concerning Mark Scheff and Jim Schuh earlier
5  that day; am I correct -- or excuse me -- several
6  days earlier; why was it you sent that E-mail?
7  What was your concern?
8      A    I was there on another investigation, I
9  was assisting EEO. I was using the kid care
10 conference room in the basement of the Bloom. And
11 it was my understanding that union employees had
12 basically set time frames of when they go to lunch
13 and so on and so forth.
14          And obviously with -- I'm still involved
15 in this particular -- or I wasn't involved, but
16 because of my involvement, I was a little bit more
17 aware of Mr. Scheff, his presence whenever I was at
18 the Bloom. And I was not going to stand down, I
19 was going to treat him no differently than I would
20 anybody else passing in the hallway. And I just
21 noticed that he left at 11:45 and I documented
22 that.
23     Q    Is that too early to leave for lunch?
24     A    No. 11:45's fine. You know, 11:45,

Page 126

1  12:45, 1:45, whatever their schedules were. And he
2  came back at 12:59. And I don't know of any
3  employee that has an hour and 14 minute lunch. I
4  would do that with anybody else that I was aware
5  of.
6           Same thing with Mr. Schuh, I believe he
7  worked until -- his hours were 8:30 to 5:00. And
8  this was before the -- my inquiry that I had my
9  seven-page detailed statement.
10              (Whereupon said document was
11               duly marked for purposes of
12               identification as Exhibit 46
13               as of this date.)
14     Q    I'm going to hand you Exhibit Number 46.
15     A    I'm done.
16     Q    Exhibit Number 46 is an E-mail which you
17 wrote to Derrick Moscardelli and
18 Terrance Tranquilli?
19     A    Yes.
20     Q    And apparently it relates to information,
21 as I understand it, which was communicated to Deb
22 Sullins and she passed along to you?
23     A    Yes.
24     Q    And as I understand, this E-mail, you

Page 127

1  told Derrick and Terry what Deb had told you?
2      A    Right.
3      Q    Why was it you did that?
4      A    I think the E-mail speaks for itself. I
5  mean you've got -- she told me this on a Friday. I
6  made a point to have her pull over. We were
7  driving somewhere and I called from a Jiffy Stop
8  there somewhere at a Shell station I think, because
9  I wanted some -- I wanted Terry to be aware of that
10 if I could catch him.
11          And Debbie told me this is what Pam told
12 her. It was not right for Edmonds to call DuFour
13 in her office -- or in Jodi's office and asked her
14 what was talked about in the content of an internal
15 affairs' investigation interview.
16     Q    Why is that not proper?
17     A    You've got a supervisor who is asking --
18 or anyone asking, hey, what was the content of your
19 -- hey, what was going on. Did you know about so
20 and so. What was going on. This is what they told
21 me in my interview.
22          You don't do that. You have now impeded
23 -- you could impede an investigation by that.
24     Q    If the employee disclosed to his

Page 128

1  supervisor what occurred during the interview,
2  would be the employee be violating the agreement he
3  made in that statement he signs?
4      A    Yes. Yes. And I would imagine -- well,
5  I don't know when Jodi Edmonds' interview was, I
6  don't even know if she was interviewed, I would
7  assume so. She would have been given the same
8  spiel, don't discuss it, if you take a written
9  statement, if you ask for a statement, it's given
10 to you, do not disclose it, do not photo copy it,
11 do not discuss it, don't let anybody read it.
12 She's pumping her staff for information.
13     Q    Let me ask you this: You got yanked off
14 the investigation before it was concluded?
15     A    Yes.
16     Q    But as you had planned to conduct the
17 investigation, were you kind of going up the
18 pyramid?
19     A    Yes.
20     Q    And did you intend to interview Jodi?
21     A    No. There was -- she was going to be
22 interviewed, yeah.
23     Q    As I understand, because she was Debbie's
24 supervisor, you felt --

3:04-cv-03039-JES-BGC    # 21-16    Page 3 of 10
8/26/05                                          Sullins v. Illinois Department of Public Aid
Laura R. Whetstone

## Page 129

1  A   Yeah.
2  Q   (Continuing)--that that might be a
3  conflict?
4  A   No, not a con... -- Well, conflict,
5  yeah. I remember thinking retaliation. And I
6  thought when I talked with you on Monday that there
7  was a record of that in my notes, no, it didn't
8  reflect it, that was -- yeah. And I'd never met
9  Edmonds, I had never -- I didn't -- nothing.
10 Q   So in any event, you had planned for
11 someone to interview Edmonds?
12 A   Yes. Yes.
13     I believe these things were -- it needed
14 to be forwarded up my chain. I was very upset with
15 this.
16 Q   After you filled out this -- or sent this
17 E-mail, were you ever interviewed and give a
18 written statement of any type to any internal
19 affairs investigator like you had done in the
20 Thallman investigation?
21 A   No.
22          (Whereupon said document was
23          duly marked for purposes of
24          identification as Exhibit 47

## Page 130

1           as of this date.)
2  Q   Exhibit 47 appears to relate to a request
3  Pam DeFour made for a copy of her statement?
4  A   Yes.
5  Q   Is an employee entitled to get a copy of
6  a statement they gave to internal affairs?
7  A   Yes. They can ask at the time of the
8  interview but they have to ask.
9  Q   A copy of this E-mail and these series of
10 E-mails, as I understand it, was passed along to
11 Derrick and Terry?
12 A   Yes.
13 Q   And why was that?
14 A   At this point I'm not involved in the
15 case, but she called me. I asked her why she
16 needed it because Terry always seemed -- I never
17 quite asked all the questions Terry wanted to ask,
18 so I did that.
19     You know, this was her reply. Mark's
20 made comments about suing, and we better learn our
21 statements word-for-word. And I just told her what
22 I would be doing and that was it. Forwarded it up
23 to Terry.
24          (Whereupon said document was

## Page 131

1          duly marked for purposes of
2          identification as Exhibit 48
3          as of this date.)
4  Q   Laura, in what probably seems like a
5  century ago to you but was less than four hours
6  ago, you told me that we had -- or reminded me we
7  had met once at the Department of Human Rights?
8  A   Yeah.
9  Q   And as I look at Exhibit 48, that seems
10 to relate to a meeting at the Department of Human
11 Rights that you claimed to have attended with
12 Debbie Sullins; is that correct?
13 A   To accompany her, yeah.
14 Q   Okay.
15 A   And I met you after this, after the
16 meeting or the hearing or whatever we all had.
17 Q   Okay. Why was it you wrote this memo?
18 A   I wanted to cover my butt.
19 Q   What do you mean by that?
20 A   I had already seen how -- I didn't want
21 to give anybody anymore fuel to anything I did with
22 regards to this. Wanting to attend the meeting, I
23 had submitted by ABT time, up the chain. I wanted
24 to have written documentation that I had asked for

## Page 132

1  authorization and it was all right to show up to be
2  there on my own time. And I just didn't want
3  anything to come of it.
4  Q   Okay.
5  A   I couldn't imagine anybody wanting to
6  file a complaint against me. Sorry, I guess we
7  couldn't strike that, could we.
8  MS. KERLEY: Let the record reflect chuckles.
9          (Whereupon said document was
10         duly marked for purposes of
11         identification as Exhibit 49
12         as of this date.)
13 MR. BAKER: I'm going to hand you 49 and just
14 give me a nod when you're ready to go.
15 A   Nod.
16 Q   It looks like Exhibit 49 are a couple of
17 E-mails written in March of 2002?
18 A   Uh-huh.
19 Q   Am I correct?
20 A   Correct.
21 Q   And as I understand it, and I think they
22 probably speak for themselves but Mary Thallman
23 called you, and you reported the substance of her
24 telephone call onto someone, I take it?

Page 133

1  A  Either to Terry or Derrick.
2  Q  And the E-mail at the top from Steve
3  Bradley to Terry Tranquilli, you were copied in on
4  that?
5  A  Yes.
6  Q  Did you see the photograph that was
7  referred to by Mary Thallman?
8  A  No. No. I limited my activity in the
9  bottom of the Bloom.
10         (Whereupon said document was
11         duly marked for purposes of
12         identification as Exhibit 50
13         as of this date.)
14  Q  Laura, tell me about Exhibit Number 51
15  (sic).
16  A  We were -- our unit was, after 9-11, we
17  were required to do security details basically at
18  buildings to check for proper ID display of our
19  employees. I was at the Bloom this particular
20  point in time, October 9. We had to stand all day,
21  make sure people coming and going had their ID
22  badges properly displayed below the chin and above
23  the waist. And Mr. Scheff didn't have it displayed
24  as stipulated in policy.

Page 134

1  Q  So you said something to him?
2  A  Yeah.
3  Q  Were you picking on him or did you say it
4  to everyone who --
5  A  It needs to be displayed, you need to
6  have it properly -- I do, it's right here. If they
7  say it's under my armpit, if I couldn't see it, it
8  has to be displayed between the bottom of your chin
9  and your waistline.
10  Q  Do I understand that one of your
11  responsibilities was to remind employees where they
12  had to display it?
13  A  Yes.
14  Q  So did you tell employees other than
15  Mr. Scheff the same thing?
16  A  Yes.
17  Q  Tell me what then occurred.
18  A  Mr. Scheff, after I brought it to his
19  attention, he continued walking, and then he just
20  stopped and turned around and did one of these.
21  Q  You're showing --
22  A  Flipped his --
23  Q  (Continuing)--flipping his hand against
24  his belt area?

Page 135

1  A  His -- it's by his pocket, it's below the
2  waistline, below the belt line, and he flipped it
3  up.
4      MS. KERLEY: "It" being his ID badge.
5      THE DEPONENT: "It" being his ID badge.
6      I, by that time, requested well over 30
7  employees to properly display their badges, yeah,
8  including: Cheryl Beckner, Edmonds, Leena DeGroot,
9  Marvin Ross, Pam DuFour, PK Luttrell, Marina
10  Powell.
11      I saw him later that day at 2:01, and he
12  had kind of moved his badge to his zipper area.
13  Q  Okay. Was wearing jeans?
14  A  Yeah, probably, because he only wears a
15  suit when he comes to our office. I'm sorry, I
16  shouldn't --
17  Q  But you referred to the zipper area of
18  his blue jeans, that kind of --
19  A  Oh, yeah. That kind of gets you, doesn't
20  it.
21  Q  (Continuing)--gives you the hint.
22  A  Yeah.
23  Q  So this would have been below the area
24  where one would wear his belt if he had a belt with

Page 136

1  blue jeans?
2  A  Uh-huh.
3  Q  How far below the area where the belt
4  would be would it have been?
5  A  It was inbetween the top of his zipper to
6  the bottom of the zipper where it would be, it was
7  clearly here. And when one stands, it's right
8  there. It just wasn't displayed in the right area.
9  Q  With respect to -- well, let me be very
10  direct, we're all adults here. With respect to the
11  area where a man's penis would be, --
12  A  Yes.
13  Q  (Continuing)--where was it?
14  A  If a man needed to relieve himself in the
15  rest room, the penis would come out of the zipper,
16  that's where the ID badge was.
17  Q  And then something happened at 4:45?
18  A  Yeah, he come up -- upstairs, he had
19  walked, I saw the back of his head, he had walked
20  to the smokers' break room. And when I saw him --
21  I don't know if he -- I never saw him come out of
22  the break room but I saw him in the hallway by the
23  break room, and he was talking with someone else,
24  and looked in my direction, and went a totally

3:04-cv-03039-JES-BGC   # 21-16   Page 5 of 10
8/26/05                                    Sullins v. Illinois Department of Public Aid
Laura R. Whetstone

Page 137

1  different way than what he had come.
2     Q   Other than the Mary Thallman
3  investigation, had you ever had any work-related
4  dealings with Mr. Scheff prior to the incident
5  we've just been talking about?
6     A   No.
7     Q   And did you maintain any type of social
8  relationship, even a casual social relationship
9  with him, at any time while you and he worked at
10 the Department of Public Aid?
11    A   If I would see him, I might hello. There
12 was a point -- there was a 2004 blood drive, I was
13 responsible for spearheading that out of the Bloom
14 Building. And I was sitting with Brenda Beal in
15 the lobby by of the Bloom, and I was sitting here,
16 Brenda was sitting here.
17        Mr. Scheff had come up the stairwell and
18 walked. And he was in a very good mood which I
19 thought was surprising.
20    MS. KERLEY: Let the record reflect that the
21 deponent has motioned that Mr. Scheff approached
22 from behind where she was sitting.
23    MR. BAKER:  Q  Is that correct?
24    A   Yeah.

Page 138

1        And he saw -- I guess he saw Brenda, but
2  he obviously didn't recognize me, and he went: Oh,
3  high. And I went: Oh, high. And he went
4  (Whereupon the Deponent is showing a facial
5  expression.) after noticing it was me.
6     Q   His facial expression changed?
7     A   Oh, yeah.
8        And Brenda and I had talked about that.
9  I said: Well, that was a mistake. And she said:
10 Yep. And then she went on to relay something that
11 -- she told me that she was in a line at one point
12 at Sebastian's, which is on the other side of the
13 lobby area, and she was standing in line, facing
14 the door, and Mark Scheff had come behind her and
15 hugged her. And I thought: Oh, that's great.
16 That's great.
17        He say's: Oh, I'm sorry, I thought you
18 were someone else. And my thought was: Well, why
19 would you be hugging another employee from behind.
20    Q   Do you know a woman named April Cool?
21    A   Yes.
22    Q   Does April work at the Department of
23 Public Aid?
24    A   She did at that time. She currently is

Page 139

1  employed by CMS.
2     MS. KERLEY: If I may clarify what time frame
3  she worked there.
4     THE DEPONENT: Whenever the new division with
5  this knew CMS umbrella. I think she's a computer
6  programer or operator or something, so it was just
7  relatively early or recently that she is now been
8  under CM --
9     Q   She left?
10    A   Well, she still stays -- she's still
11 housed in a Public Aid building but she works for
12 CMS.
13    Q   Through one of the myriad of the state
14 reorganizations, she --
15    A   Yes.
16    Q   (Continuing)--now is technically on
17 someone else's payroll other than Public Aid?
18    A   I think so. Yes.
19    Q   She probably does the same type of job --
20    A   Yes.
21    Q   (Continuing)--in the same location?
22    A   Yes.
23        That was easy.
24    MS. KERLEY: Off the record.

Page 140

1        (Discussion off the record.)
2     MR. BAKER:  Q  Who is Carla Collins Larson?
3     A   Carla Collins Larson -- Lawson --
4     Q   Lawson. Excuse me.
5     A   (Continuing)--is Steve Bradley's -- was
6  at this time in 2000 his secretary, she sat right
7  outside his office.
8     Q   Okay. At any time did you ever have any
9  conversations with her relating or concerning
10 Mark Scheff?
11    A   Yeah, I believe I had two.
12    Q   Two?
13    A   At least two, that I can recall.
14    MS. KERLEY: Are we back at the 2000 time
15 frame?
16    MR. BAKER: I don't know, --
17    THE DEPONENT: Yes.
18    MR. BAKER: (Continuing)--I haven't gotten
19 that far.
20    MS. KERLEY: I wasn't sure if you had
21 identified and I wasn't listening.
22    MR. BAKER: I had. Ms. Kerley is doing a good
23 job of asking the questions I should.
24    MS. KERLEY: Just here to help.

3:04-cv-03039-JES-BGC   # 21-16   Page 6 of 10
8/26/05                                    Sullins v. Illinois Department of Public Aid
Laura R. Whetstone

Page 141

1   MR. BAKER: Q  Give me an idea, Laura, when
2  these conversations occurred, if you could?
3       A    October of 2000 during the course of the
4  investigation.
5       Q    You're referring --
6       A    To page 8 of the case log, Exhibit 30.
7       Q    Can you read into the record the entry
8  and what the date and time it was.
9       A    In October 18, 2000, 4:40, estimate, time
10 call to TT, advised him Carla Collins should be
11 interviewed as I had spoke to Collins in passing if
12 Scheff had ever said anything to her. And Collins
13 immediately put her head down and said no.
14      Q    Okay.
15      A    And I need to continue because this entry
16 was recorded on the 19th of October. I also told
17 TT, Scheff had approached Collins 10-18, 2000,
18 advising her he was aware of the investigation,
19 "he" being Mark Scheff.
20      Q    Is that what Collins told you?
21      A    Yes, because it's noted in there Scheff
22 had approached Collins, and he was advising her he
23 was aware of the investigation.
24      Q    Why was it you felt that Collins should

Page 142

1  be interviewed?
2       A    Her body language when I asked have you
3  ever -- you know -- has he ever done anything to
4  you. Carla Collins at that time, and this time,
5  she's petit, and she's well endowed for her size,
6  and she wears clothing that is low cut or tight,
7  and I just asked her knowing that, based on what I
8  had learned here, you know, in the interviews, that
9  I could ask that -- is everything okay, has he ever
10 done anything to you. And she: No. And put her
11 head down.
12           And Jim Jones, when he worked there, we
13 would always joke in-house about when people would
14 anti-up to the fact that they did wrong, they were
15 engaged in misconduct, and Jimmy would always say
16 they said no and hung his head lowly. I didn't do
17 anything wrong but no, nope, and hung their head
18 lowly.
19           She's giving me, based upon my
20 experience, an answer which was quite opposite -- a
21 nonverbal answer which is quite opposite from what
22 she told me. And plus I had known Carla Collins
23 from when she worked at the OIG, and there was
24 another incident involving Carla Collins, a

Page 143

1  conversation with her regarding an OIG employee
2  that was also under investigation for sexual
3  harassment.
4       Q    Did you have another conversation with
5  her other than that one?
6       A    There was another conversation, and I'm
7  not certain if I have it documented. I was
8  standing at her desk, this would have been after I
9  was removed from the case, when Debbie was having
10 problems with the office lingo talk, Scheff's
11 behavior. And Carla made the comment to me Steve
12 needs to move her. This is well before she was
13 moved up to the first floor. Now, if Carla Collins
14 knows that, you know.
15      Q    Needs to move her referring to Debbie?
16      A    Debbie. Move her from the bottom
17 basement, move her somewhere.
18      Q    Let's use October 12, 2000 as kind of a
19 date for a moment. How long prior to that had you
20 known Debbie Sullins; I'm not talking about a
21 dating relationship but just how long had you known
22 her?
23      A    Through church probably -- I had a
24 conversation with her in July -- May, June, 2000.

Page 144

1  I don't remember, I mean exactly.
2       Q    And when did you and Debbie begin dating
3  one another? And I'm not going to hold you to
4  precision, and I'll redact this portion of your
5  deposition before my client looks at it.
6       A    September. I know it was after -- I know
7  it was after August, it was the fair, July or
8  August.
9       Q    Sometime after the state fair?
10      A    Yeah. I mean -- yeah, something like
11 that.
12      Q    Based upon your observations of Debbie up
13 to October 12, 2000, which is the date you and she
14 moved in together, what was your view concerning
15 Debbie's happiness level? Probably not using an
16 artful term, but.
17      A    I know that she was excited about -- I
18 think she was going for an E one or E two interview
19 or something, so she was looking forward to that.
20 She had gotten over -- there was -- her
21 relationship with her previous partner had
22 terminated. I mean she seemed like, you know, she
23 could handle everything. She liked her job. Liked
24 doing her job. She seemed okay.

Page 145

1   Q   During your exposure to her, was she,
2   prior to October 12, was she tearful?
3   A   No.
4   Q   Did she seem to have frequent periodic
5   outbursts of anger?
6   A   Before October 12?
7   Q   Right.
8   A   No.
9   Q   Was she easily irritated?
10  A   No.
11  Q   Did she seem to interact appropriately
12  with others in social settings?
13  A   Yes.
14  Q   She wasn't withdrawn?
15  A   No.
16  Q   Did you ever notice her having trouble
17  focusing on thoughts or concentrating on tasks,
18  that sort of thing?
19  A   No.
20  Q   Earlier today, in what again probably
21  seems like months ago to you, but it was only a
22  couple hours ago, you gave a very long answer to a
23  question. And during your answer, you said you saw
24  what impact this had on Debbie, or words to that

Page 146

1   affect, what did you mean by that?
2   A   After she was interviewed by Mike Taylor,
3   she changed. She would tell me or call me or if I
4   would happen to call her during the day, she would
5   say Mark's standing outside the office talking
6   about how he's going to sue five people and
7   somebody's girlfriend, going to retaliate, knows
8   who's going to get, who started this
9   investigation. She would tell me -- she said, you
10  know, I reported it. I told her to document
11  everything.
12      She -- her whole demeanor changed. She
13  would -- and I remember the 31st, October, she'd
14  come home, and she was crying, she went into the
15  bedroom, she locked herself in the bedroom, and I
16  couldn't talk to her. I, you know, asked her what
17  was going on. And she just cried. I could hear
18  her cry. I went in the living room, sat down. It
19  was Halloween.
20      And I finally called her therapist, Deb
21  Taylor, at home and told her what was going on.
22  And I told Debbie that Deb Taylor was on the
23  phone. She wouldn't open the door, I opened the
24  door.

Page 147

1   Q   Shame on you.
2   A   I jimmied the lock. And she talked to
3   Deb Taylor. And I also took her to Urgent Care
4   after she got off the phone with Deb Taylor, and on
5   the way there she puked in the Jeep. And she saw
6   Dr. Yu.
7       And it was a progression of her -- her
8   behavior has changed. Her whole demeanor changed
9   after she was interviewed. And Scheff started
10  running his mouth at work. And people were
11  constantly talking about it or -- it changed.
12      I remember we went to Beauty and the
13  Beast at The Fox sometime in November, and we had
14  to leave the performance because she just wasn't
15  there.
16  Q   When you say The Fox, you're talking
17  about the Fox theater in St. Louis?
18  A   The Fox Theatre in St. Louis, yeah.
19  Q   Those aren't 75 cent tickets, are they?
20  A   No, they're not. We had floor seats.
21  Q   When you left The Fox, what was her
22  demeanor like or what was she doing?
23  A   Quite, withdrawn, she'd cry. And that
24  was just par for the course at that point in time.

Page 148

1   She would be at the dinner table, and she would
2   cry, she would sob. I don't know what she would
3   sob about. You could tell with Debbie when things
4   affect her because her ears get red, her checks get
5   red.
6   Q   Did you notice any change in her sleep
7   patterns?
8   A   Her sleep patterns decreased. She wanted
9   to sleep during the day. She didn't want to do
10  anything. She ate more. Intimacy levels decreased
11  if not stopped. She'd get angry.
12  Q   What would the context be of her getting
13  angry?
14  A   It could be I didn't pick up a bath towel
15  and put it on the towel hanger and she'd go off.
16  There was a point where she just -- she wouldn't
17  talk. I mean I was kind of dating myself, so to
18  speak, I didn't have anybody to talk to, she wasn't
19  there. She couldn't concentrate. The classic
20  symptoms of a victim, she had them.
21  Q   The symptoms that you have described, if
22  I understand from your testimony, they began
23  sometime in October of 2000?
24  A   Yes.

Page 149

1　Q　And how long did they continue?
2　A　They still continue.
3　Q　You and Debbie still live together?
4　A　Yes.
5　Q　And is there any change in the symptoms,
6　say, today from what they were two years ago or
7　three years ago?
8　A　I would say no because when I came home
9　from the day of depositions, I had commented to her
10　that I didn't -- I didn't realize the impact this
11　had on me because I had never addressed it, I never
12　allowed myself to address it.  And she started
13　crying, and she said I just want it to be over.
14　And she just wants closure to it all.
15　Q　Laura, earlier, and again probably what
16　seems like being in the dentist chair for hours
17　without Novocaine, but it was maybe only a couple
18　hours ago, you indicated you had participated maybe
19　in 20 to 25 sexual harassment investigations?
20　A　Yes.
21　Q　I assume that's a round number, maybe a
22　little more one way, maybe a little less the other?
23　A　Yes.
24　Q　The way that the department oversees and

Page 150

1　conducts a sexual harassment investigation, is
2　there anything done to separate the victim and the
3　individuals who testify in support of the victim
4　from the subject of the investigation?
5　A　I have seen some, yes.
6　Q　Is there anything done to counsel the
7　subject of the investigation concerning what he can
8　and cannot do with respect to individuals who have
9　either complained or participated in an
10　investigation?
11　A　Yes, I'm aware of that.
12　Q　And what do they -- what is to be done in
13　that respect?
14　A　That would be up to the manager, the
15　specific manager of the division how to handle it.
16　I know of one case in child support where that
17　occurred where subjects were told to stay away from
18　a victim or complainant, don't have any contact
19　with.
20　Q　You indicated that you had taken the
21　management training course in sexual harassment.
22　A　Yes.
23　Q　Does that management training course deal
24　with what managers are to do in overseeing

Page 151

1　employees during the course of an investigation?
2　A　No.
3　MR. BAKER:  I have no further questions.
4　MS. KERLEY:  I may have just a couple to clear
5　up the record.
6　MR. BAKER:  If it is a couple go ahead, if
7　it's going to be more than a couple, I would like
8　to take a relatively short rest room break.
9　MS. KERLEY:  It really will be, I think two.
10　MR. BAKER:  Okay.
11　MS. KERLEY:  You know, go ahead and take the
12　break just so I'm sure.
13　　　　　　(Whereupon a short recess
14　　　　　　was taken.)
15　　　　　　EXAMINATION
16　　　　　　BY MS. KERLEY:
17　Q　Ms. Whetstone, just a couple
18　clarification questions real quick.
19　　　　　Just moments ago you were asked about any
20　change in Ms. Sullins' symptoms, and you mentioned
21　day of deposition, were you really referring to
22　Monday, the day of our deposition prep?
23　A　Yeah.  Because I was upset.
24　Q　Okay.  Just to clear that up.

Page 152

1　　　　　Because you haven't given any other
2　depositions in this case, have you?
3　A　No.
4　Q　Or in reference to the allegations that
5　you investigated?
6　A　No.
7　Q　You had also testified that prior to
8　October 12, 2000, Ms. Sullins had indicated that
9　there was some one at work that was a problem but
10　had not identified a name?
11　A　Correct.
12　Q　With regard to that incident, did you
13　make a referral to the internal affairs office?
14　A　She told me either, I think it was in
15　July -- June or July of 2000, we were at church,
16　and she told me that somebody at work was making
17　inappropriate sexual and derogatory statements at
18　work and learned that she had already reported the
19　matter to her supervisors.  And I didn't -- when
20　she told me that, I didn't ask any further.
21　Q　I guess just for my information, as a set
22　up, it's my understanding that police officers are
23　always on duty whether or not they're really on
24　duty, they can step in any time they see --

3:04-cv-03039-JES-BGC   # 21-16   Page 9 of 10
8/26/05
Laura R. Whetstone                    Sullins v. Illinois Department of Public Aid

Page 153

1  MR. BAKER: Like assistant attorney general.
2  MS. KERLEY: Similar to the respectable AAGs
3  of the State of Illinois, yes.
4      Is that a similar -- do internal
5  investors from the Department of Public Aid, do
6  they have that same type of 24/7 --
7  A   Mentality.
8  Q   (Continuing)--mentality?
9  A   I did.
10 Q   So if you had been made aware of conduct
11 of a DPA employee, you would have taken that as a
12 complaint and gone through the proper channels?
13 A   If she would have told me she hadn't
14 notified the management team, but normally --
15 Q   Generally without respect to anything --
16 A   Yeah, if they would --
17 Q   (Continuing)--Ms. Sullins may have said.
18 MR. BAKER: Let her finish her answer.
19 THE DEPONENT: If they would -- if someone
20 would say something, you know, that there was
21 employee misconduct after hours to me, I would make
22 a referral if it hadn't been reported already
23 because I would follow-up with that.
24 MS. KERLEY: Okay. I have no further

Page 154

1  questions.
2  MR. BAKER: I have nothing further.
3      You have a right to read the transcript
4  of your deposition, which this lady is going to
5  type up in a booklet form, and make sure that she
6  has correctly transcribed everything that's been
7  said today. And if you think she has something
8  wrong, you can make a note of that and sign off on
9  it.
10     You also have the right to give up that
11 right, meaning you don't have to review your
12 deposition. And that's a choice you can make. If
13 you know what you want to do now, that's fine. If
14 you're not sure what you want to do, my suggestion
15 would be that you reserve the right to sign, and
16 then she can at least know that, and you can make
17 arrangements later on, and then if you want to give
18 it up you can.
19 MS. KERLEY: And if you do reserve the right,
20 the process is that she sends me my copy of the
21 transcript and we just -- at the AG's office -- and
22 we just make a copy and send it to you at work and
23 you can do it whenever. Would you like to
    reserve.
23 THE DEPONENT: I would like a copy of it.
        FURTHER DEPONENT SAITH NOT.
24

Page 155

1  I, LAURA R. WHETSTONE, having read the above
2  and foregoing, find the same to be true and correct
3  with the following additions and/or corrections, if
4  any:
5  Page_____Line_____Change:
6  Page_____Line_____Change:
7  Page_____Line_____Change:

23 Laura R. Whetstone (8-26-05)           DATE

Page 156

1  STATE OF ILLINOIS  )
2                     ) SS
3  COUNTY OF MENARD   )
4        C E R T I F I C A T E
5  I, Tricia L. Gudgel, a Notary Public and
6  Certified Shorthand Reporter in and for said County
7  and State do hereby certify that the Deponent
8  herein, LAURA R. WHETSTONE, prior to the taking of
9  the foregoing deposition, and on the 26th of August
10 A.D., 2005, was by me duly sworn to testify to the
11 truth, the whole truth and nothing but the truth in
12 the cause aforesaid; that the said deposition was
13 on that date taken down in shorthand by me and
14 afterwards transcribed, and that the attached
15 transcript contains a true and accurate translation
16 of my shorthand notes referred to.
17     Given under my hand and seal this 16th
18 day of September A.D., 2005.
19                  *Tricia Gudgel*
20             Notary Public and
21             Certified Shorthand Reporter
22 License No. 084-004053

OFFICIAL SEAL
TRICIA GUDGEL
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 11-3-2007

39 (Pages 153 to 156)