E-FILED
Tuesday, 03 January, 2006 12:23:13 PM
U.S. District Court, ILCD

# ILLINOIS DEPARTMENT OF PUBLIC AID
## Office of Inspector General
### Bureau of Internal Affairs



EXHIBIT 2AB
20
7-18-05

## REPORT OF INVESTIGATION

| CASE NUMBER:<br>01-172-MO | REPORT DATE:<br>June 28, 2001 | INVESTIGATOR:<br>Loren Larsen |
|---|---|---|

| NATURE OF INCIDENT:<br>1. Discourteous Treatment of Co-workers<br>2. Release of Confidential Information<br>3. Intimidation |||

| DIVISION:<br>Medical Programs | LOCATION:<br>Bureau of Comprehensive Health Services (BCHS)<br>Bloom Building<br>Springfield, Illinois |
|---|---|

| SUBJECT:<br>Mark T. Scheff et al | TITLE:<br>Medical Assistance Consultant II | SUBJECT NUMBER:<br>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 |
|---|---|---|

### Allegation:

On March 27, 2001, Executive II Deborah R. Sullins alleged that since the investigation of Medical Assistance Consultant II Mark T. Scheff in fall 2000, she has been the subject of sexual harassment, intimidation, and retaliation. Sullins alleged Scheff made veiled threats (e.g., getting even, suing co-workers, having an attorney) to other employees that were relayed to her by co-workers and made loud comments of a threatening nature outside her office. She identified Medical Assistance Consultant II James E. Schuh as a Scheff accomplice who was rude to her and contributed to the hostile environment. Further, she alleged the three supervisors, Executive II Lenna J. DeGroot, Executive II Marvin E. Ross, and Public Service Administrator Jodie L. Edmonds, were negligent when they failed to take any action after she complained to them verbally about Scheff. Also, Sullins alleged Scheff's relentless, continuing conduct and the failure of the supervisors to act interfered with her work performance, and created a hostile environment. Sullins alleged Scheff's rudeness and animosity directed toward her has caused stress, lowered self-esteem, fear for her personal safety, absenteeism, and caused her to request a transfer to another office. Last, Sullins alleged DuFour told DHS employee Michelle D. Hare about the investigation in fall 2000.

### Investigative Summary:

000003

I interviewed complainant Sullins, subjects Scheff, Schuh, Ross, DeGroot, and Edmonds, and witnesses Pamela S. DuFour, Mary L. Thallman, Michael E. Sandidge, James W. Fitzpatrick, Michael A. Beall, Shari L. Bangert, Velva A. Fletcher, and Debra L. Masten. I also interviewed DHS employee Michelle D. Hare.

When I interviewed Sullins, she repeated the allegations contained in her initial complaint dated March 27, 2001. I advised Sullins that Scheff's conduct for the period October 2000 to January 2001 was investigated in an earlier investigation (01-073-MO), and our investigation would commence the day Scheff had his pre-disciplinary hearing for an earlier investigation that was on or about January 24. Sullins advised that on January 25, Scheff was talking loudly about suing five of his co-workers and one of them's girlfriend. That evening, Sullins found dog feces on the door handles of her automobile. She noted that on January 25, she drove

Investigator Laura Whetstone's (Bureau of Internal Affairs) automobile to work. On January 26. Scheff continued to speak aloud he intended to sue five co-workers and one of them's girlfriend. it was all lies. they can't prove anything, and they would hear from his lawyer. Sullins believes Scheff was referring to her (Sullins) as one of the co-workers and Whetstone as the girlfriend. Sullins has a relationship with Whetstone. Later January 26, Sullins went to Ross. who is Scheff's immediate supervisor, to complain about Scheff's loud talking. DeGroot was in Ross' office at the time. DuFour later entered the office and also complained about Scheff's loud talking. Ross left. spoke to Scheff, and returned. Sullins and DuFour left Ross' office. at which time Sullins heard DeGroot say to Ross, "what's she complaining for. she started all this mess." On January 29, Scheff was still talking aloud about the investigation. Sullins then met with the next level supervisor, who was Edmonds, told Edmonds about the hostile work environment, and said she was afraid of Scheff. On or about February 27, Sullins filed a complaint with the Department of Human Rights alleging Scheff sexually harassed her from August 2000 to February 2001. On March 13, Sullins sent an e-mail and also went in person to see Chief Steve Bradley, and requested a transfer to another supervisor and section. She was then moved from the lower level of the Bloom Building to the first floor, effective March 16. On that day, March 16, Scheff walked by her office three times, and walked by again on March 21 and 26, looked at Sullins in an intimidating manner, and said "we'll see who wins." On March 28, Bradley ordered Scheff by e-mail and in person to stay away from Sullins. Sullins believes Scheff has singled her out based upon her testimony in the first investigation and her sexual orientation in that she has a relationship with Whetstone. Sullins said Schuh is a Scheff accomplice, is subservient to Scheff, will not speak to Sullins, and has contributed in the creation of a hostile "them versus us" environment. Scheff refers to himself as the alpha dog (dominant male), refers to the other males in the unit as beta dogs (subservient males), and the other males in the unit appear to go along with the alpha/beta dog scenario. On June 1, 2001, Sullins was moved out of the Bloom Building to an office at 2200 Churchill Road.

DuFour advised that in January 2001, she heard Scheff make comments to the effect he planned to sue the State of Illinois, five of his co-workers, and one of them's girlfriend. She also overheard Scheff discussing the internal investigation on the telephone that same month, stating he had copies of everyone's statements and their social security numbers. On January 26, 2001, she complained to Ross and DeGroot about Scheff's loud conversations about the investigation and recalled seeing Sullins in Ross' office at the time. DuFour did not hear DeGroot make a comment to the effect "what's she complaining for, she started all this mess." On April 6, 2001, Schuh quizzed her about the investigation and later she overheard Schuh on the telephone discussing the investigation with Sandidge. Last, DuFour said there was a divisiveness in the workplace (e.g., them versus us atmosphere), increased turn over, lower morale and less teamwork among employees.

In January or February 2001, while in the break room, Thallman overhead Scheff telling a group of people he planned on suing at least 10 people who were involved in the investigation and did not care if it took 10 years to get compensated for his trouble. In March 2001, she overheard Scheff telling a group of people he had obtained the social security numbers of the people involved in the investigation, and he could damage their credit ratings and bank accounts if he had the mind to do so. Thallman left BCHS for a higher paying position, but advised the main reason for leaving was to get away from the hostile environment created by Scheff. She described Scheff as a sexist with an obnoxious behavior, and the one most responsible for the hostile work environment. She also noticed a divisiveness among the employees. for the most part along gender lines. and less cooperation among employees.

Bangert and Masten observed Scheff in Sullins' work area on the first floor from March 16 to March 28. After Sullins was moved from the lower level to the first floor. Bangert observed Scheff walk past Sullins once or twice a day. On March 26, Bangert saw Scheff give Sullins a mean dirty look. Masten noticed Scheff in Sullins' work area on the first floor several times during this time period and thought it strange because Scheff worked in the lower level and Sullins was on the first floor.

000001

Sandidge and Schuh admitted discussing the investigation on April 6, 2001 on the telephone. Sandidge advised he telephoned Schuh after he was interviewed by Internal Affairs April 6, told Schuh about the investigation, and discussed at least one question Internal Affairs asked him. Sandidge told Schuh Internal Affairs asked him about dog feces on Sullins' car door handle. Schuh advised that on April 6, he asked DuFour about the investigation after she returned to the office. He also acknowledged Sandidge told him there was an investigation and one of the questions asked was about the dog feces. Schuh acknowledged the alpha/beta dog scenario with Scheff being the alpha dog and Schuh and the other males being beta dogs. Neither Sandidge or Schuh speak to Sullins, but both denied being rude or discourteous to her. Both said they avoid Sullins in the office. Sandidge moved to another section to get away from the gossiping and personality clashes in the medical assistance section.

Fletcher advised that on March 16, 2001, Scheff told her he had copies of the witness statements, everyone better get copies of their statements, and their stories better not change. Fletcher considered this a veiled threat as she was a witness in the first investigation (01-073-MO). She recently accepted a new position outside DPA which was a promotion, but more importantly got her away from Scheff.

DeGroot, Ross and Edmonds denied that Sullins approached any of them to complain about Scheff's conduct or that documentation existed regarding such. Further, they denied that Sullins accused them of contributing to the creation of a hostile work environment. Sullins had no documentation to support that she complained to DeGroot, Ross or Edmonds about Scheff or that she advised them their actions (or lack of actions), were contributing to the creation of a hostile work environment. Ross acknowledged Sullins and DuFour coming to his office to complain about Scheff's loud talking on January 26, 2001, and recalled DeGroot being present. He did not recall DeGroot making any comment as Sullins and DuFour were leaving, DuFour did not hear DeGroot make any comment, and DeGroot did not recall making any comment about Sullins. Sullins alleged she heard DeGroot say to Ross, "what's she complaining for, she started all this mess" as Sullins and DuFour left Ross' office.

Scheff denied sexually harassing Sullins, denied being discourteous to her or anyone else, denied trying to intimidate Sullins, and denied going near Sullins on the first floor. He denied disobeying any orders to stay away from Sullins. He denied making threats of any kind to any employee, to include suing co-workers. He denied asking anyone about the investigation or discussing the investigation with anyone. Scheff acknowledged being the alpha dog (dominant male) in the medical assistance unit and viewed the other males as beta dogs (subservient males).

Beall and Fitzpatrick were interviewed, but provided nothing relevant to the investigation.

Hare advised that both DuFour and Sullins attempted to tell her about the investigation in fall 2000, and each time she terminated the conversation before any details were disclosed and told the employees they should not be discussing the investigation.

On June 27, 2001, I provided Executive II Janice Johnson, Equal Employment Opportunity, a copy of our findings and requested an opinion as to if Scheff's and Schuh's actions constituted sexual harassment, a hostile environment, or retaliation. Johnson reviewed the investigative findings and concluded Scheff's and Schuh's conduct did not constitute sexual harassment, a hostile environment, or retaliation.

000005

## Conclusion:

The allegation that Medical Assistance Consultant II Mark T. Scheff and Medical Assistance Consultant II James E. Schuh sexually harassed Sullins January to March 2001 was not substantiated. Scheff has discussed suing co-workers, to include Sullins, but there was no evidence he engaged in unwelcome sexual conduct toward Sullins, singled her out because of her sexual orientation, or threatened her personal safety. Also, there was no evidence she requested a transfer to get away from Scheff. On the contrary, in her e-mail to Bradley dated March 13, 2001, she requested a transfer because of problems with her supervisor (Jodie Edmonds) and made no mention of Scheff. There was no evidence Schuh sexually harassed Sullins or was discourteous to Sullins. When interviewed by Internal Affairs, Scheff and Schuh denied engaging in any type of unwelcome sexual conduct.

The allegations that Scheff and Schuh created an intimidating, hostile work environment or engaged in retaliation January to March 2001 were not substantiated. A hostile environment is defined as relentless and continuing unwelcome sexual conduct in the workplace that interferes with an employee's work performance or that creates an intimidating, hostile, abusive or offensive work environment. Pervasive animosity or extreme rudeness directed at only women can also be the basis for a hostile environment. There was no evidence Scheff or Schuh engaged in relentless and continuing unwelcome sexual conduct in the office, or that their conduct was pervasive, extreme, or retaliatory.

Sullins alleged Schuh refused to speak to her, was cold toward her, and these actions contributed to the hostile environment. Schuh admitted he refused to speak or socialize with Sullins. However, there is no rule that requires one employee to speak to or socialize with another employee. Sullins is not Schuh's supervisor, and Schuh is not required to speak with Sullins in the conduct of his duties, nor is Sullins required to speak with Schuh in the conduct of her duties.

Executive II Janice Johnson, EEO, reviewed the investigative findings and concurred with Internal Affairs that the conduct of Scheff and Schuh did not constitute sexual harassment, a hostile environment, or retaliation.

The allegation that Scheff was discourteous to co-workers, to include Sullins, was not substantiated. Scheff talked about suing five co-workers and one of them's girlfriend, mentioned his attorney, discussed having employees social security numbers, and suggested employees get a copy of their statements and their stories better not change because he had copies of all the statements used against him. Several employees were uncomfortable with Scheff's remarks and Fletcher perceived the remarks as a veiled threat. However, remarks about hiring an attorney, suing someone, or appealing discipline, do not constitute discourteous behavior. Scheff did not use profanity, direct threats, finger pointing, name calling, or other inappropriate behavior as a means to intensify the suing remarks. He increased the volume of his voice January 26, was instructed by Ross to lower his voice, and lowered his voice.

The allegation that DeGroot, Ross and Edmonds knew of Scheff's behavior and failed to act, and thus contributed to the creation of a hostile environment was not substantiated. There was no evidence Sullins told the managers verbally or in writing Scheff sexually harassed her, and all three managers denied Sullins ever complained about Scheff's behavior. On January 26, Sullins and DuFour went to Ross and complained about Scheff's loud conversations on the telephone, and Ross subsequently asked Scheff to lower his voice. DeGroot, who was in Ross' office at the time, did not recall making a remark about Sullins, Ross did not hear DeGroot make a remark, and DuFour denied hearing DeGroot make a comment about Sullins. On January 29, Sullins

000006

alleged she went to Edmonds and requested to be moved to another office or that Scheff be moved to another office. Edmonds denied Sullins came to her January 29 and Sullins had no evidence to show she contacted Edmonds that date. On March 13, Sullins went to Chief Steve Bradley, requested a transfer, and was moved from the lower level to the first floor March 16. After hearing Scheff was observed in Sullins' work area on the first floor, Bradley later ordered Scheff verbally and in writing to stay away from Sullins. Bradley issued the order to Scheff March 28, 2001. Scheff was not observed near Sullins after Bradley's order. On June 1, Sullins was relocated to an office at 2200 Churchill Drive.

The allegation that Pamela S. DuFour told Michelle D. Hare about the investigation in October 2000 was not substantiated. Hare advised that DuFour and Sullins attempted to tell her (Hare) about the investigation in October 2000, and each time she terminated the conversation and told DuFour and Sullins they should not be discussing the investigation.

Medical Assistance Consultant II Michael E. Sandidge and Medical Assistance Consultant II James E. Schuh violated IDPA Rules of Personal Conduct (PO 245.2a) #4 (Failing or refusing to follow instructions) and IDPA Conditions of Employment (PO 245.14 - Referral of Alleged Employee Misconduct) on April 6, 2001, when they discussed the investigation. Sandidge admitted he telephoned Schuh after his interview with Internal Affairs, told Schuh of the investigation, and told Schuh of the dog feces question Internal Affairs asked him, and Schuh acknowledged the conversation. Schuh further engaged in conduct unbecoming when he quizzed DuFour about the investigation that same day. Schuh and Sandidge were interviewed October 16, 2000 in reference to investigation 01-073-MO, both employees completed acknowledgment forms at that time, and both were instructed not to discuss the investigation. Additionally, Sandidge was interviewed April 6, 2001, completed another acknowledgment form that date, and again was instructed not to discuss the investigation.

### Attachments:

1. E-mail from Deborah Sullins to Derrick Moscardelli, March 27, 2001
2. Interview Sheet, Deborah Sullins, March 29, 2001
2A. Acknowledgment Form, Deborah Sullins, March 29, 2001
3. Written Statement, Deborah Sullins, March 29, 2001
4. Typed Notes of Incidents Documentation, Deborah Sullins, March 29, 2001
4A. Department of Human Rights Complaint, Deborah Sullins, February 27, 2001
5. E-mail from Steve Bradley to Mark Scheff, March 28, 2001
6. Interview Sheet, Pamela DuFour, April 6, 2001
6A. Acknowledgment, Pamela DuFour, April 6, 2001
7. Written Statement, Pamela DuFour, April 6, 2001
7A. Written Statement, Pamela DuFour, June 22, 2001
8. Interview Sheet, Mary Thallman, April 6, 2001
8A. Acknowledgment, Mary Thallman. April 6, 2001
9. Written Statement, Mary Thallman, Mary, April 6, 2001
10. Interview Sheet. Michael Sandidge, April 6, 2001
10A. Acknowledgment, Michael Sandidge, April 6, 2001
10B. Acknowledgment, Michael Sandidge, October 16, 2000
11. Written Statement, Sandidge, Michael, April 6, 2001
12. Interview Sheet, Marvin Ross. April 9, 2001
12A. Acknowledgment, Marvin Ross, April 9, 2001

000007

13. Written Statement, Marvin Ross, April 9, 2001
13A. Written Statement, Marvin Ross, June 22, 2001
14. Interview Sheet, Lenna DeGroot, April 20, 2001
14A. Acknowledgment, Lenna DeGroot, April 20, 2001
15. Written Statement, Lenna DeGroot, April 20, 2001
15A. Written Statement, Lenna DeGroot, June 22, 2001
16. Interview Sheet, Jodie Edmonds, April 20, 2001
16A. Acknowledgment, Jodie Edmonds, April 20, 2001
17. Written Statement, Jodie Edmonds, April 20, 2001
17A. Interview questions for Jodie Edmonds, April 20, 2001
18. Interview Sheet, James Fitzpatrick, April 24, 2001
18A. Acknowledgment, James Fitzpatrick, April 24, 2001
19. Written Statement, James Fitzpatrick, April 24, 2001
20. Interview Sheet, Michael Beall, April 24, 2001
20A. Acknowledgment, Michael Beall, April 24, 2001
21. Written Statement, Michael Beall, April 24, 2001
22. Interview Sheet, Shari Bangert, May 1, 2001
22A. Acknowledgment, Shari Bangert, May 1, 2001
23. Written Statement, Shari Bangert, May 1, 2001
24. Interview Sheet, Pamela DuFour, May 1, 2001
24A. Acknowledgment, Pamela DuFour, May 1, 2001
25. Written Statement, Pamela DuFour, May 1, 2001
26. Interview Sheet, Velva Fletcher, May 2, 2001
26A. Acknowledgment, Velva Fletcher, May 2, 2001
27. Written Statement, Velva Fletcher, May 2, 2001
27A. Written Statement, Velva Fletcher, June 25, 2001
28. Interview Sheet, James Schuh, May 18, 2001
28A. Acknowledgment, James Schuh, May 18, 2001
28B. Acknowledgment, James Schuh, October 16, 2000
29. Written Statement, James Schuh, May 18, 2001
29A. Written Statement, James Schuh, June 22, 2001
30. Interview Sheet, Mark Scheff, May 18, 2001
30A. Acknowledgment, Mark Scheff, May 18, 2001
31. Written Statement, Mark Scheff, May 18, 2001
31A. Written Statement, Mark Scheff, May 21, 2001
32. Interview Sheet, Debra Masten, June 1, 2001
32A. Acknowledgment, Debra Masten, June 1, 2001
33. Written Statement, Debra Masten, June 1, 2001
34. Interview Sheet, Michael Sandidge, June 4, 2001
34A. Acknowledgment, Michael Sandidge, June 4, 2001
35. Written Statement, Michael Sandidge, June 4, 2001
36. E-mails between Deborah Sullins and Loren Larsen, April 12, 16 & 17, 2001
37. E-mail from Pamela DuFour to Loren Larsen, April 9, 2001
38. E-mails from Jodie Edmonds to Cheryl Beckner, April 13 & 16, 2001
39. E-mail from Deborah Sullins to Steve Bradley, November 2, 2000
40. E-mail from Deborah Sullins to Cheryl Beckner and Jodie Edmonds, March 13, 2001

000008

41.   E-mail from Deborah Sullins to Steve Bradley, March 13, 2001
42.   E-mail from Deborah Sullins to Jodie Edmonds, March 13, 2001
43.   Interview Sheet, Michelle Hare, June 28, 2001
44.   Acknowledgment, Michelle Hare, June 28, 2001
45.   Written Statement, Michelle Hare, June 28, 2001

000009