E-FILED
Tuesday, 03 January, 2006  12:27:14 PM
Clerk, U.S. District Court, ILCD

## Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

DEBORAH R. SULLINS,      )
        Plaintiff        )
Vs.                      )Cause No. 04-3039
THE ILLINOIS DEPARTMENT  )
OF PUBLIC AID,           )
        Defendant.       )

DEPOSITION OF DEBORAH R. SULLINS, taken in

the above-entitled case before Christina J. Riebeling,

CSR, CCR, and Notary Public for Sangamon County,

acting within and for the Central District of

Illinois, Springfield Division, at 10:15 o'clock A.M.,

on September 8th, 2005, at 3000 Montvale Drive,

Springfield, IL, pursuant to notice.

GOLEMBECK REPORTING SERVICE
Connie S. Golembeck, Owner
(217) 523-8244
(217) 632-8244

## Page 2

```
 1   APPEARANCES:
 2                                    SEP 22 2005
 3   JAMES BAKER
     Baker, Baker & Krajewski, LLC
 4   415 South Seventh Street
     Springfield, IL 62701
 5     On behalf of the Plaintiff
 6
 7   SARAH R. KERLEY
     TOM KLEIN
 8   Assistant Attorney General
     500 South Second Street
 9   Springfield, IL 62706
       On behalf of the Defendant
10
11
12   ALSO PRESENT: Susan Moorehead, General Counsel,
13   Department of Healthcare and Family Services
14
15
16
17
18
19
20
21
22
23
24
```

## Page 3

```
                    I N D E X
 
DEPONENT                                  PAGE
 
DEBORAH R. SULLINS
 
     Direct Examination by Ms. Kerley      5
 
 
                  E X H I B I T S
 
NUMBER               MARKED FOR IDENTIFICATION
 
Defendant's Exhibit 1            157
Defendant's Exhibits 2 & 3       167
Defendant's Exhibit 4            172
```

## Page 4

-o0o-

S T I P U L A T I O N

It is stipulated and agreed, by and between the
parties hereto, through their attorneys, that the
deposition of DEBORAH R. SULLINS may be taken before
Christina J. Riebeling, A Notary Public and Illinois
Certified Shorthand Reporter and Missouri Certified
Court Reporter, upon oral interrogatories, on the 8th
of September A.D., 2005, at the instance of the
Defendant at the hour of 10:15 o'clock A.M., at 3000
Montvale Drive, Springfield, IL;

That the oral interrogatories and the answers of
the witness may be taken down in shorthand by the
Reporter and afterwards transcribed;

That all requirements of the Civil Practice Act
and the Rules of the Supreme Court as to dedimus, and
the reading over and signing of the deposition by the
witness was not expressly waived;

That any objections as to competency, materiality
or relevancy are hereby reserved, but any objection as
to the form of the question is waived unless
specifically noted;

That the deposition, or any parts thereof may be
used for any purpose for which depositions are
competent, by any of the parties hereto, without
foundation proof;

That any party hereto may be furnished copies of
the deposition at his or her own expense.

1      (Whereupon the Deponent was sworn
2          by the Notary Public.)
3      DEBORAH R. SULLINS,
4  having been first duly sworn by the Notary Public,
5  deposeth and saith as follows:
6          DIRECT EXAMINATION
7  BY MS. KERLEY:
8      Q.   Good morning, Ms. Sullins.  I previously
9  introduced myself as Sarah Kerley, an Assistant
10 Attorney General that is going to be asking you some
11 questions today.
12          Before we get started, I want to kind
13 of give some ground rules, which I'm sure Mr. Baker
14 has already kind of prepped you with.  I am going to
15 ask you questions and, as you can see, there's a Court
16 Reporter here today.  So, in the -- to be as helpful
17 as possible to her, if we could -- I will agree not to
18 speak when you're speaking, if you can try to not
19 speak when I am speaking.
20          Second big rule is, because she is
21 taking down everything that is said today, it's
22 important that you answer audibly and not use the
23 phrases uh-huh or huh-uh, because those are very hard
24 to read back and understand what it is you are trying

1  to say.
2          If you do not understand a question
3  it's probably because it was long and not that well
4  phrased, so if you would like -- if you don't answer a
5  question -- or if you don't understand a question,
6  rather, I do ask that you let me know that you don't
7  understand it and I'll try and rephrase.  If you
8  answer a question, I'll assume that you understand the
9  question that was asked and that you are answering
10 responsively to that question.
11     A.   (Nodded head up and down.)
12     Q.   Do you have any questions before we get
13 started?
14     A.   (Shook head from side to side.)
15     Q.   Okay.  If you could, please state your name
16 and address for the record?
17     A.   My name is Deborah Ruth Sullins.  I live at
18 3450 Woodhaven Drive in Springfield, Illinois.
19     Q.   Okay.  And I understand that you are
20 currently employed?
21     A.   Yes.  As --
22     Q.   And are you currently employed with the
23 newly named Department of Healthcare and Family
24 Services?

1      A.   Yes, I am.
2      Q.   For convenience sake today I hope that we
3  can agree to refer to it as the Department of Public
4  Aid; is that agreeable?
5      A.   That's agreeable.
6      Q.   Okay.  I'm going to ask you some questions
7  about your employment background.  And, specifically,
8  we're going to start back -- I guess we'll go ahead
9  and start back with your first job after high school.
10 If you could, please state what position you held?
11     A.   I worked for Long John Silvers in Marion,
12 Illinois as a cashier.  Just general all around...
13     Q.   Okay.  And what did you do after you left
14 Long John Silvers?
15     A.   Went to work at a discount store by the name
16 of More Value that was bought out by Wal-Mart.
17     Q.   And following that position?
18     A.   I believe that from that point I went to
19 work for the United Methodist Church at the Lighthouse
20 Youth Ministry Outreach in Brighton, Illinois.  I
21 worked part-time at Behman's (phonetic) Ice Cream Shop
22 called the Beehive in Brighton and attended classes at
23 Greenville College.
24     Q.   Okay.  And what time frame are we talking

1  about with those -- that work, school trifecta?
2      A.   That would have been the early '80s.
3      Q.   Okay.  And what did you do when you finished
4  school?
5      A.   I, actually, didn't finish school, I dropped
6  out of school and went to work for Hardee's -- that's
7  not correct.  I worked for Long John Silvers and left
8  Long John Silvers to go to work for Hardee's back in
9  the fast foods management.  And worked for Hardee's
10 until I came to Public Aid.
11     Q.   And when did you work at Hardee's?  What
12 time frame?
13     A.   Approximately '83 to '86, I would think.
14     Q.   Okay.  In these positions that we have just
15 talked about, were these -- why did you leave those
16 positions?
17     A.   I went to a higher position.
18     Q.   Okay.  So, you were seeking promotion --
19     A.   Yes.
20     Q.   -- when you were leaving?
21     A.   Yes.
22     Q.   Okay.  And what did you do in 1986 when you
23 changed positions?
24     A.   I came to work for the Department as a

1  caseworker in East Alton, Illinois, Madison County
2  local office.
3    Q.   Okay.  And who was your supervisor there, if
4  you recall?
5    A.   Started out with Peggy Wagnor, who left the
6  Agency.  And then it was Rebecca Sulsberger.  The LOA
7  was Norma Shaffer and the Assistant LOA was Patsy
8  Cowsert.
9    Q.   Okay.  And how long did you work in that
10  position?
11    A.   I'm not quite for sure.  I was promoted from
12  there into a -- we had -- back at that time we had
13  caseworkers 2s, 3s and 4s.  You came in as a 2, you
14  were certified, you went automatically to a 3 and from
15  a 3 position I went to a 4 position, it would have
16  been approximately a year, year and a half.
17    Q.   Okay.  And where was your Caseworker 4
18  position?  Was it in the same --
19    A.   It started in Madison County and I ended up
20  going to work for regional out of East St. Louis under
21  the old Region 9 under the direction of John Barnett.
22    Q.   And what was your position at regional?
23    A.   I was a floating Caseworker.
24    Q.   And were your duties similar to that of when

1  you were a Caseworker 2 and 3?
2    A.   Similar, other than the fact that I also was
3  trained to do any clerical function and any first
4  level supervisory function, so that in the absence of
5  any one of those people, I could fill in.
6    Q.   And that was your role was to fill in for
7  wherever they needed assistance?
8    A.   Yes.
9    Q.   Okay.  And you said that you were in the
10  Caseworker 3 position for approximately one year.  How
11  long were you working in the regional office?
12    A.   Close to two years.
13    Q.   Okay.  And from the regional office where
14  did you go or what position did you take?
15    A.   Bumped from the regional office position to
16  a caseworker position in Granite City, Illinois.
17    Q.   And when you say "bumped" is that a
18  reference to a Collective Bargaining Agreement bumping
19  rights?
20    A.   Yes.  There was a layoff situation.
21    Q.   Okay.  And I'm sorry could you repeat where
22  that was at?
23    A.   Granite City.
24    Q.   Okay.  And how long were you in the Granite

1  City office?
2    A.   Approximately three to six months.
3    Q.   Okay.  And who was your supervisor there?
4    A.   My direct supervisor was -- started with
5  Jeri Kilmer and switched to -- when they shifted loads
6  to Pat Gochlan.
7    Q.   Okay.  And why did you leave that position?
8    A.   My partner at the time and I felt that it
9  would be mutually to our -- mutually agreeable -- it
10  would be to our advantage to move to Springfield for
11  upward mobility reasons.  So, I took a lateral
12  transfer to Sangamon County.
13    Q.   Okay.  And from what I can tell from your
14  answer was that you requested that transfer?
15    A.   Yes.
16    Q.   And you stated two reasons, and correct me
17  if I'm wrong, but one was a family reason -- a
18  personal change in where your family would choose to
19  be geographically located; and then secondly you
20  mentioned upward mobility purposes; is that correct?
21    A.   Yes.
22    Q.   And could you please explain what you meant
23  by "upward mobility"?
24    A.   In Southern Illinois because of the effect

1  of the layoff it was harder to be recalled to a higher
2  position once you had been bumped, because of the
3  seniority issues.  I happened to be very fortunate,
4  when I went to a Caseworker 4 I had a little over
5  three years experience and normally people who get
6  those positions are people who have 20 to 30 years.
7  And in that particular situation that someone thought
8  that the highest bidder or highest seniority person
9  was going to bid and they didn't and I got it because
10  I was the only person that bid.  And, so, the
11  likelihood of getting back into a position like that
12  in downstate Illinois is one in a million.
13    Q.   So when you say upward mobility, it was a
14  fear of being bumped?
15    A.   No.  I went back to -- I wanted to come to
16  Sangamon County because I knew in Sangamon County,
17  from having friends in Sangamon County, that I could
18  be back into a Caseworker 4 position in a matter of
19  months.
20    Q.   So, promotional opportunity?
21    A.   Yes.
22    Q.   Okay.  So I understand from your answer that
23  you then began working as a caseworker in Sangamon
24  County?

1    A.   Yes.

2    Q.   Okay.  And was that a Caseworker 3 position?

3    A.   No.  They had changed the titles.

4    Q.   Okay.

5    A.   I'm not familiar with -- I don't remember

6 what the titles were at that time.

7    Q.   Was it equivalent to the work that you did

8 as a Caseworker 3?

9    A.   Yes.

10    Q.   Okay.  And who was your supervisor there?

11    A.   For a month, approximately, it was Jon

12 Gentry.

13    Q.   Okay.

14    A.   And then they switched me to an AFDC, which

15 is now called TANF, which is Temporary Assistance for

16 Needy Families, and I began to work for --

17    Q.   I'm --

18    A.   That's terrible.

19    Q.   Let me tell you, I'm impressed by your

20 memory thus far, so.

21    A.   I can see her name, Bonnie Fearson.

22    Q.   Okay.  You mentioned that you were

23 transferred to TANF -- what is now referred to as

24 TANF.  Was that merely a different working unit but

1 the same position and duties?

2    A.   Yes. Most of my experience and my

3 background has been in the total package of cash,

4 medical and food stamps when I was a caseworker.

5 Where when I first came in, they put me on a medical

6 only program.

7    Q.   When you first came in to Sangamon County?

8    A.   To Sangamon County.

9    Q.   Okay.

10    A.   So they moved me where I had a greater area

11 of expertise.

12    Q.   And you said approximately one month you

13 were in the medical only program; is that correct?

14    A.   Correct.

15    Q.   And how long were you working in the

16 Sangamon County office under what's now TANF?

17    A.   I don't remember exactly how many months,

18 but in X amount of months, I was put back into the

19 next position, which would have been the old

20 Caseworker 4 but was considered an intake position.

21    Q.   Okay.

22    A.   And then I worked in that until I left

23 Sangamon County.

24    Q.   Okay.  So, you're not sure how long you were

1 in any of the three positions.  Can you give me a

2 ballpark as to how long total you worked it at the

3 Sangamon County office?

4    A.   Not right off the top of my head.  I would

5 say around three years, maybe more.  I would have to

6 go back and look.

7    Q.   Okay.  Approximately -- do you know

8 approximately what year you started in Sangamon County

9 when you made the move?

10    A.   '94, '95.

11    Q.   Okay.  And from the Sangamon County -- I

12 understand that's the County field office?

13    A.   Correct.

14    Q.   What position did you take following that?

15    A.   Went to a MOA, which is -- 1, which is a

16 Management Operations Analyst 1 for what was then the

17 newly formed DHS in the child care section -- child

18 care and policy, I think is what it's called, to

19 become a representative monitor -- monitor.  I

20 contract for child care entities in Cook County.

21    Q.   Okay.  When you left Sangamon County to go

22 to the newly formed DHS, why did you leave your

23 Sangamon County position?

24    A.   Money.

1    Q.   So I assume that the DHS was a promotion?

2    A.   It was a promotion.

3    Q.   Okay.  And how long did you work as a MOA?

4    A.   Less than a year.

5    Q.   Okay.  And who was your supervisor there?

6    A.   My direct supervisor was Mike Jones, who was

7 stationed in the Clinton Building in Chicago.

8    Q.   Okay.  And where were you physically

9 located?

10    A.   Iles Park Place in Springfield.

11    Q.   So do I understand that you didn't have a

12 supervisor at your work area?

13    A.   I had his supervisor directly above me was

14 there.

15    Q.   And who was that?

16    A.   Anne Wharf.

17    Q.   Anne Wharf, okay.

18         And why did you leave that position?

19    A.   I decided to go back to school and I didn't

20 want to be on the road so that I could take classes.

21    Q.   Okay.  So I understand that the MOA position

22 you were expected to travel?

23    A.   Extensively.

24    Q.   Okay.  And do I take it that you did go back

1   to school?
2       A.   Yes, I did.
3       Q.   And where did you go?
4       A.   I attended Lincoln Land Community College
5   for computer courses.
6       Q.   Okay.  And about -- if you recall, when were
7   you at Lincoln Land?
8       A.   Still.
9       Q.   Okay.  Do you know when you began taking
10  courses at Lincoln Land?
11      A.   No.
12      Q.   Okay.
13      A.   No.  Not off the top of my head.
14      Q.   You previously testified that you came to
15  Sangamon County in 1994 or 1995 and that you stayed
16  there approximately three years, does it jive, then,
17  that you would have been at DHS approximately 1997,
18  1998?
19      A.   It had to be '98.
20      Q.   And that you stayed there for less than a
21  year, so sometime in either 1998 or 1999 you took time
22  off to go to school?
23      A.   I didn't take time off.  I demoted to a MAC
24  at the Bloom Building.

1       Q.   Okay.  So following the MOA position, you
2   took a voluntary demotion?
3       A.   Yes, to get off the road so I could go to
4   school.
5       Q.   Okay.  Do you recall when you started as a
6   MAC?
7       A.   No.
8       Q.   And from your previous time line that we
9   just talked -- could we agree that it's close --
10  around 1999?
11      A.   I would say somewhere in 1999.
12      Q.   Okay.
13      A.   '98, '99.
14      Q.   Okay.  And what were your duties as a MAC?
15      A.   I worked for Steve Bandy and I did what they
16  call Collins versus Bradley claims and it was -- that
17  dealt with people who were responding to what they
18  thought were -- it was a place where people
19  complained, filed grievances, complaints about medical
20  bills that they felt like should have been paid by the
21  Agency and wasn't.
22      Q.   Okay.
23      A.   That was part of my job.  The other part of
24  my job was I worked with electronic transmission of

1   bills from pharmacies.
2       Q.   Okay.  So am I to understand that you did
3   not -- when you started as a MAC you didn't work
4   with -- directly with hospitals?
5       A.   No, I started in a different section.  I was
6   asked to transfer to the Hospital Unit by Cheryl
7   Beckner and Jodie Edmonds.
8       Q.   So my understanding is there's more than --
9   MACs have more than -- the title of MAC has more than
10  one set of duties?
11      A.   Depends on the section that you're in.
12      Q.   So what section did you start in?
13      A.   Collins versus Bradley.
14      Q.   And that's what they called it?
15      A.   Uh-huh.
16      Q.   Okay.  And how long were you -- were you
17  working as a MAC doing Collins versus Bradley claims
18  under Steve Bandy?
19      A.   Less than a year.
20      Q.   And why did you transfer to the Hospital
21  Unit?
22      A.   Because Cheryl Beckner asked me to and she
23  was the Assistant Bureau Chief at the time.
24      Q.   And how did your duties change when you went

1   from working in the Collins versus Bradley Unit to the
2   Hospital Unit?
3       A.   Let me clarify something.  She asked me --
4       Q.   Please.
5       A.   She asked me at the end of 1999 to take a
6   transfer to the hospital section to set myself into a
7   role where that they could pull me from a unit,
8   because when they do a promotion they normally go
9   in-house within a unit and then look outside, as far
10  as qualifications.  Because of my going back to school
11  and doing programming and working in that field, she
12  wanted my expertise in the Hospital Unit.  So she
13  asked me to take a transfer.  There was a position
14  coming open in early 19 -- 2000 to come to the
15  Hospital Unit because she was going to put me into an
16  E2 position in the hospital section, which eventually
17  they did, which was a five-day posting.
18      Q.   Okay.  So, when you -- did you request that
19  transfer?
20      A.   Yes, I did.
21      Q.   Okay.  And when you requested the transfer
22  to the Hospital Unit, was it with the understanding
23  that you were being groomed for a promotional position
24  as need to?

1    A.    I was told that, yes.

2    Q.    Okay.  How did your duties change from being

3  a MAC under Collins V Bradley to a MAC in the Hospital

4  Unit?

5    A.    Instead of dealing with recipients, I began

6  to deal more -- I dealt with hospital staff, billing

7  clerks.

8    Q.    And am I correct in my understanding that

9  you would answer their questions about using certain

10  billing forms?

11    A.    Correct.

12    Q.    Okay.

13    A.    And why a bill was rejected, how to keep a

14  bill from getting rejected if they had special

15  circumstances that they needed to have billed.

16    Q.    Okay.  And is that the UB92?

17    A.    I think it still is.  I'm not for sure.

18    Q.    Is that what you dealt with at the time?

19    A.    At that time.

20    Q.    Okay.  And who was your supervisor when you

21  were a MAC in the Hospital Unit?

22    A.    Lenna DeGroot.

23    Q.    And how long was she your supervisor?

24    A.    From February 2000 to October 2000 when I

1  was promoted to an E2.

2    Q.    Okay.  And what position did Cheryl Beckner

3  hold?

4    A.    Senior PSA, Assistant Bureau Chief to Steve

5  Bandy -- or to Steve Bradley, excuse me.  She has

6  since retired.

7    Q.    So she would have been above the chain of

8  command of Lenna DeGroot?

9    A.    Yes.  Above Lenna DeGroot was Jodie Edmonds;

10  above Jodie Edmonds was Cheryl Beckner; above Cheryl

11  Beckner was Steve Bradley.

12    Q.    Okay.  We have spent a little bit of time

13  discussing your past work history.  Through any of

14  those positions that we've talked about or at the time

15  of any of those positions, did you find -- did you

16  ever file any internal complaints of discrimination?

17    A.    Would you clarify discrimination?

18    MR. BAKER:    And complaint.

19    MS. KERLEY:    Yes.  To both of you.

20    MR. BAKER:    Thank you.

21  BY MS. KERLEY:

22    Q.    Have you ever filed an internal complaint,

23  either lodged a - for lack of a better term - formal

24  internal written complaint if your employer had a

1  complaint structure or complaint of discrimination to

2  a supervisor.  And when I say "discrimination", I'm

3  referring to either sexual harassment, gender

4  discrimination, race discrimination, or religious

5  discrimination.

6    MR. BAKER:    Sarah, for purposes of

7  clarification, what would what you're requesting

8  include verbal complaints Ms. Sullins might have made

9  to a supervisor about a co-employee's conduct.

10    MS. KERLEY:    Yes.

11    MR. BAKER:    So any type of complaint,

12  written, verbal, formal, or informal, she may have

13  had?

14    MS. KERLEY:    Yes.

15    MR. BAKER:    Okay.  Do you understand that,

16  Debbie?

17    THE WITNESS:    Uh-huh.  I filed a complaint

18  sometime when I worked in the Intake Unit for June

19  Denton, with June Denton as my supervisor.  It was

20  verbal as a Union Steward, as a first level grievance,

21  against Mark Scheff.

22  BY MS. KERLEY:

23    Q.    Who was June Denton?

24    A.    My immediate front-line supervisor.

1    Q.    At what location?

2    A.    Sangamon County local DHS office.

3    Q.    Okay.  And with regard to that verbal

4  complaint that you filed with Ms. Denton, to the best

5  of your recollection can you please tell me what your

6  complaint was, in using the most specific terms as you

7  recall them?

8    MR. BAKER:    You want her to do her best to

9  recall what she was complaining about?

10    MS. KERLEY:    And how she stated her

11  complaint.

12    THE WITNESS:    As a Union Steward it was a

13  complaint on behalf of several people in the unit.

14  BY MS. KERLEY:

15    Q.    Is it my understanding that you were the

16  Union Steward?

17    A.    Yes, ma'am.

18    Q.    Okay.  And I'm sorry, I just broke one of

19  our rules cutting you off.  You were saying that you

20  were the Union Steward and you were complaining on

21  behalf of a number of employees in the unit?

22    A.    Yes.

23    Q.    Okay.  Please proceed.

24    A.    It had to do with Mark and some way that he

1 treated a client and we overheard the conversation
2 that he was having during the course of an intake
3 interview with this recipient -- I don't remember the
4 terminology he used. I don't remember but it was --
5 but it was discourteous treatment of a client. But it
6 was filed on behalf of the unit because they were
7 upset at how he treated this person.
8     Q. Okay. You have mentioned, number of
9 employees in the unit and that it was filed on behalf
10 of the unit. Who were the other members of the unit
11 that your complaint was filed on behalf of?
12     A. Brenda Farmer, Pam Lynch -- no I take it
13 back, it wasn't Pam it was Kim Harter that sat in a
14 cube. Darelyn Potter. I don't remember the
15 fourth person. It was the cubes right around Mark
16 that overheard this conversation, because he was
17 pretty loud in it, and it was those people.
18     Q. Okay. So there were four employees who had
19 overheard a conversation from Mark Scheff and wanted
20 to issue a complaint. And, as Union Steward, you
21 lodged that complaint to June Denton?
22     A. Right. On behalf of them. But as a Union
23 Steward I also filed numerous complaints for different
24 reasons for different people from things such as they

1 didn't agree with their quarterly review or their
2 yearly evaluation, or they felt like somebody got a
3 job when they had more seniority. So to go back and
4 tell you complaint by complaint where I've personally
5 filed, no, I haven't, because as long as I was a Union
6 employee at different times I was a Union Steward.
7     Q. Okay. When -- when you refer to this
8 complaint filed that you filed as a Union Steward, you
9 filed it on behalf of those four employees; is that
10 correct?
11     A. Uh-huh.
12     Q. Okay.
13     A. I myself, other than -- not to my knowledge
14 do I remember filing a complaint about discrimination.
15     Q. In any of the positions that you've
16 previously held?
17     A. I never -- I don't remember. I just don't
18 remember if I have.
19     Q. Okay. With regard to this statement that
20 these four employees overheard Mark Scheff make, do
21 you recall the general subject of his comment?
22     A. I remember that it was discriminating
23 against the person's gender and economic status.
24     Q. Okay. Do you remember the client's name?

1     A. No, ma'am, I sure don't.
2     Q. Okay. With regard to the complaint that we
3 were just discussing that was filed when you were a
4 Union Steward, do you recall the time period when you
5 were a Union Steward and filed that complaint?
6     A. Probably -- no, I don't. I can't tell you
7 for sure.
8     Q. Okay. And do you recall what the resolution
9 of that complaint was?
10     A. No, I don't.
11     Q. Okay. With -- with the exception of the
12 internal complaint that we've just talked about and
13 the various complaints that you would have filed as a
14 Union Steward, have you engaged in any other
15 litigation? Have you ever -- let me clarify. Have
16 you ever been a plaintiff or a defendant in a lawsuit?
17     A. Yes, I have.
18     Q. Okay. Can you describe that for me, please?
19     A. I was involved in a car wreck.
20     Q. Okay.
21     A. I think it was 1982.
22     Q. Okay. And where was that filed?
23     A. Godfrey, Illinois, Madison County.
24     Q. And were you the plaintiff in that case?

1     MR. BAKER: Did you bring the suit?
2     THE WITNESS: Yes, I did.
3 BY MS. KERLEY:
4     Q. With the exception of the 1982 car wreck
5 suit that you've just discussed, have you been party
6 to any other litigation either having filed suit or
7 having been sued?
8     A. Sure. Eighteen months to the day I was in
9 another car wreck.
10     Q. Oh, you poor, unfortunate woman. And was
11 that also in Madison County, Illinois?
12     A. That's not true, I didn't file suit. I
13 didn't file suit. I was just in a car wreck 18 months
14 to the day and there was a hundred dollar settlement.
15     Q. Okay. So it would have been something that
16 was handled by the insurance company and not something
17 that went to court?
18     A. I'm sorry. Yeah. Sorry.
19     Q. Other than that unlucky two-year period,
20 where have you been involved in any other litigation,
21 either by bringing suit or being sued?
22     A. Bankruptcy.
23     Q. Okay. And when was that?
24     A. '98.

```
 1        Q.    Okay.  And any other litigation?
 2        A.    Not to my knowledge.  I've been a witness
 3   before in court, but never...
 4        Q.    With the exemption of the incident case
 5   that's been filed against the Department of Public
 6   Aid?
 7        A.    No.
 8        MR. BAKER:   Sarah, just for purposes of
 9   clarification, there is a parallel case that is
10   pending before the Human Rights Commission and I think
11   the State and I assume when you talk about this case
12   you're talking globally?
13   BY MS. KERLEY:
14        Q.    Yes.  The cases that arose out of the same
15   fact pattern, so I would include both the federal
16   litigation against the Department and whatever may be
17   ongoing in the Department of Human Rights or Human
18   Rights Commission.  So, other than that global issue
19   and the car wreck and the bankruptcy is there any
20   other litigation that you've been involved in?
21        A.    No.
22        Q.    Okay.  Have you ever been convicted of a
23   crime, felony or misdemeanor?
24        A.    No.
```

```
 1        Q.    Okay.  One thing I didn't mention at the
 2   outset, if you ever need a break for whatever reason
 3   if it's to get more coffee, bathroom break, or if you
 4   just need a minute, please let me know.  And that goes
 5   for you too Mr. Baker?
 6        MR. BAKER:   Off the record.
 7             [WHEREUPON THERE WAS A SHORT
 8             DISCUSSION OFF THE RECORD.]
 9   BY MS. KERLEY:
10        Q.    I am going to direct your attention to the
11   time that you were a MAC in the bureau that is
12   generally called BCHS?
13        A.    Okay.
14        Q.    And is that the Bureau of Comprehensive
15   Health Services?
16        A.    Yes, ma'am.
17        Q.    And would your position as a MAC under Steve
18   Bandy also be under the Bureau of BCHS?
19        A.    Yes, it was.
20        Q.    Okay.  So there's -- they were just
21   different units within the same bureau?
22        A.    Yes.
23        Q.    Okay.  And was Steve Bradley the Bureau
24   Chief the whole time you were in the Bureau of
```

```
 1   Comprehensive Health Services?
 2        A.    I think.
 3        Q.    Okay.
 4        A.    There might -- that might have been a time
 5   just around when I came to be BCHS that Roni Kaluza
 6   was the Bureau Chief and took a demotion to an
 7   Assistant Bureau Chief and that Steve came in as
 8   Bureau Chief.  I think that all came in about the time
 9   that I was coming or just got there.
10        Q.    Okay.
11        A.    I think that happened maybe shortly after I
12   came into the bureau.
13        Q.    Okay.  I'm going to direct your attention
14   specifically to when you were a MAC in the Hospital
15   Unit?
16        A.    Okay.
17        Q.    And you had briefly mentioned your duties as
18   they related to dealing with hospital billers.  Could
19   you expand on that and how -- and tell for me how you
20   spent your time as a MAC in the Hospital Unit?
21        A.    From the time that you start work, which I
22   started work at 8:30 in the morning and worked until
23   5:00 in the afternoon.  From 8:30 to whenever your
24   break time was, and brakes were scattered, some people
```

```
 1   went 10:00 to 10:15, some people went to 10:15 to
 2   10:30 until your allotted break time, switchboard
 3   would put phone calls through to you from the
 4   hospitals that were on your hospital list of clients
 5   to cover and you would take calls from them.  If you
 6   didn't have a call, then you worked on billing
 7   problems that had been given to you or through the
 8   mail or maybe you told them to mail you something, so
 9   you could get it processed differently than just the
10   general ways.  Sometimes we had to do what we call
11   program override for programming purposes for the
12   computer.
13        Q.    Okay.
14        A.    So you were either on the telephone, unless
15   it was your break time or lunchtime, or you worked on
16   paperwork dealing with the billing issues from the
17   different hospitals that you were responsible for.
18        Q.    Okay.  So was the majority of your time
19   spent on the phone?
20        A.    Not really.
21        Q.    Okay.  And if you can give me your best
22   guesstimate as an average amount of time during the
23   day that you spent on the phone?
24        A.    Roughly two to three hours.
```

1     Q.   Okay.

2     A.   It depended on the hospitals that you were

3 assigned to. Since I was the newest MAC in the area,

4 I was not given the hard hospitals. They don't break

5 you in that way.

6     Q.   The problem child hospitals, if you will?

7     A.   Those go to the people that are -- have been

8 around for some time. I was assigned hospitals, since

9 I was the last one to come into the unit, that were

10 relatively easy with problems and that they generally

11 didn't call, they just sent their problems in with a

12 note that these needed to be done such and such

13 because what had happened. There are certain computer

14 glitches back at that time before we got a more

15 advanced system, where that you just knew that claim

16 wasn't going to go through and that you needed an

17 override on it given by someone within the Claims

18 Processing Unit. So, it had to come through a MAC

19 through the Hospital Unit first before it could go to

20 claims processing.

21     Q.   Okay. So you spent a great deal of your

22 time doing mail and problem solving with billing

23 questions that came through the mail?

24     A.   And renal applications for the renal

1 dialysis program.

2     Q.   Was that the renal dialysis program, was

3 that a regular duty of a MAC?

4     A.   It wasn't, then it was, then it wasn't, then

5 it was.

6     Q.   So, at some times?

7     A.   At the time that I was working, yes, because

8 of the fact that that position was vacant, which was

9 the position they were going to promote me into.

10     Q.   Okay. So to make sure that I understand

11 what you're saying. The renal -- the position of the

12 person who would handle the renal --

13     A.   Was vacant.

14     Q.   -- was vacant; therefore, those duties were

15 farmed out to the MACs?

16     A.   Correct.

17     Q.   And when that position was filled, the MACs

18 no longer did the renal work?

19     A.   Sometimes.

20     Q.   Okay.

21     A.   There's a database that was being kept by

22 the renal worker, who also took calls from renal

23 social workers and set up subcommittee meetings around

24 the state and did an overall general board committee

1 meeting that had to be held once a year. But,

2 generally, the actual work of getting the information

3 into the system was done by MACs. But during this

4 time frame, while that position was empty, more of

5 that work was given to the MACs than in what would

6 have been a normal time frame.

7     Q.   More than just the data entry portion of the

8 renal work?

9     A.   Right.

10     Q.   And the time frame you're talking about is

11 from February 2000 to October 2000?

12     A.   (Nodded head up and down.)

13     Q.   Okay.

14     A.   Yes, for the record.

15     Q.   Good to catch yourself.

16         Was there a time of the day where MACs

17 did not take phone calls?

18     A.   From 3:00 o'clock to the end of the day --

19 the end of their workday.

20     Q.   And what was that time set aside for?

21     A.   To do paperwork.

22     Q.   And would that have been necessary because

23 of some of the MACs spent a great deal more time on

24 the phone than others?

1     A.   Correct.

2     Q.   Okay. During -- when a MAC did not have a

3 phone call, was it normal to wear headphones or listen

4 to music?

5     A.   While working on their paperwork, yes.

6     Q.   And that was common within the MACs?

7     A.   For some of us. For some of us, it wasn't.

8     Q.   Okay. When you say "us" am I to take that

9 as you were one of the MACs who did wear headphones?

10     A.   Occasionally.

11     Q.   Okay. And on average how often do you think

12 you were wearing headphones during the week?

13     A.   After 3:00 o'clock a lot. Almost every day.

14     Q.   Okay. So you would -- when you --

15     A.   Depending on the conversation next door to

16 me.

17     Q.   Okay. So it was common practice for you to

18 have headphones on during the end of the day?

19     A.   If the conversation next door was not in

20 what I would call a professional manner, okay.

21     Q.   I promise we will get to that.

22         You also testified that in October 2000

23 you received a promotion to an E2 position; is that

24 correct?

```
 1         A.    Yes, I did.
 2         Q.    And would that have been the renal position
 3   that we were just talking about that had been vacant?
 4         A.    Yes.
 5         Q.    Okay.  And do you recall what your start
 6   date was as an E2?
 7         A.    I think it was the 16th or the 17th of
 8   October.
 9         Q.    Okay.  October 16th-ish.
10               And what were your duties in that
11   position?
12         A.    To oversee about a $1.2 million budget to
13   see that the funds were appropriated out correctly to
14   the renal dialysis units, based on the applications
15   that were sent to the Agency.  And that the people
16   were, based on the information the social workers gave
17   us, that the information was correct to release the
18   funds.
19         Q.    Okay.
20         A.    It also included training sessions for
21   social workers, when needed; rewriting the policy,
22   because this was a program that had been given to the
23   Agency - I say "given" loosely - from Public Health
24   and the -- there was no policy or procedure manual,
```

```
 1   there was just a statute that, depending on who was
 2   doing the program, interpreted it to make the rules
 3   the way they wanted to, okay.
 4         Q.    Not to be confusing, and I apologize I want
 5   to jump back real quick to when you were a MAC.
 6               Where physically were you located?  You
 7   had mentioned that you worked at the Bloom Building,
 8   where were you located within the Bloom Building?
 9               MR. BAKER:   Are you talking about when she
10   was in the Medical Unit?
11               MS. KERLEY:   When she was in the Hospital
12   Unit.
13               THE WITNESS:   When I worked in the Hospital
14   Unit, I worked in the basement of the Bloom Building.
15   BY MS. KERLEY:
16         Q.    Did you have an office?
17         A.    I shared an office with P.K. Luttrell.
18         Q.    And was she the only person that you shared
19   and office with?
20         A.    Yes.
21         Q.    And did you share an office with her the
22   entire time you were in the Hospital Unit?
23         A.    The entire time I was a MAC -- no, two weeks
24   before I was promoted -- two to three weeks before I
```

```
 1   was promoted I was moved into the office that I would
 2   have as an E2.
 3         Q.    Okay.  So -- but that was just a transition
 4   period?
 5         A.    Right.
 6         Q.    Okay.  So if I understand -- to make sure I
 7   understand:  When you were a MAC in the non-Hospital
 8   Unit, you worked in the same location as the MACs who
 9   did work in the Hospital Unit; is that correct?
10         A.    When I was non-Hospital?
11         Q.    Yes.
12         A.    No, I worked on the first floor.
13         Q.    Okay.  So when you moved to -- your first
14   location in the Bloom Building was the first floor?
15         A.    Let me think about this.  They moved us
16   about three times.  When I went to work as a MAC for
17   the Collins versus Bradley, I worked in the basement
18   floor in a huge conference room with one, two,
19   three -- three other people directly across from the
20   elevator.  Then they moved us to the first floor and I
21   was on the first floor until I transferred to the
22   Hospital Unit, and then I went into the office that I
23   stayed in until the few weeks before I became an E2.
24         Q.    Okay.  So your whole time in the Hospital
```

```
 1   Unit you shared an office with P.K. Luttrell with the
 2   exception of the two-week transition time?
 3         A.    Two to three week.
 4         Q.    Okay.  And where physically was that
 5   located, in relationship to the other MACs?
 6         A.    One wall starting at one end was a clerical
 7   supervisor with a different unit, and then there was
 8   two MACs in that office, two MAC's in that office,
 9   myself and P.K., two MACs in that office, then Lenna
10   DeGroot, then across from her was Marvin Ross and
11   right outside of our office was long tables like this,
12   not quite as long, with coffee pots and microwave
13   where we would get our coffee daily, which would have
14   been right outside of my office.
15         Q.    Okay.  And who -- what MACs were in the
16   office directly to -- on either side of you?
17         A.    On one side of me was Mike Sandidge and Joe
18   Roberts, and on the other side was Jim Schuh and Mary
19   Thallman.
20         Q.    Okay.  I also understand that when you were
21   a MAC in the Hospital Unit, you also worked with Mark
22   Scheff?
23         A.    Yes, I did.
24         Q.    And he would have worked in a location
```

## 41

1  somewhat removed from the offices you just described?
2      A.   Around the corner.
3      Q.   Okay.  And there were -- he wasn't the only
4  MAC on the other -- there were other MACs around the
5  corner as well, correct?
6      A.   Correct.  There was him, there was Pam
7  Dufour and then there was an empty office.
8      Q.   Okay.
9      A.   No, that's not true.  It wasn't empty.  She
10  was a field consultant, so she traveled.  She was more
11  gone than she was there.
12      Q.   Okay.  And when you became an E2, where was
13  your office in relationship to the former office you
14  shared with P.K. Luttrell?
15      A.   Where I said the empty office was that
16  really isn't empty that was a field position, it was
17  right around the corner.  Directly around the corner
18  there's the first office.
19      Q.   Okay.  So you shared a wall with the field
20  supervisor's office?
21      A.   Yes, I would have.
22      Q.   Okay.  And was --
23      A.   There was an incove (sic) -- there was an
24  incove of the main wall where there's a fax machine.

## 42

1  The only fax machine for the unit -- the whole section
2  was downstairs, was right there.
3      Q.   So the fax machine incove would have been
4  between your office and the field supervisor's office?
5      A.   We share the same back wall.
6          MS. KERLEY:   Okay.  I think now would be a
7  good time to take a quick break and get you some
8  coffee.
9          [WHEREUPON THERE WAS A SHORT
10          DISCUSSION OFF THE RECORD.]
11  BY MS. KERLEY:
12      Q.   Okay.  We have heard from your testimony
13  that you worked with Mark Scheff at the Sangamon
14  County local office?
15      A.   Yes.
16      Q.   And that would have been, I think you said,
17  around -- actually, you said you didn't know when that
18  was.  Do you recall about when you worked with him?
19      A.   Mid-'90s.  I'm not quite sure.
20      Q.   Okay.  And how long did you work with him?
21      A.   I don't remember.
22      Q.   Okay.
23      A.   He left and went to the Hospital Unit after
24  I came into intake section, but I don't remember.

## 43

1      Q.   Whether it was right when you went to intake
2  or later?
3      A.   It was later.
4      Q.   Okay.
5      A.   But I don't remember how long, or.
6      Q.   Okay.  You had testified that you -- when
7  you worked at the Sangamon County office that you
8  worked there for only approximately a month in the
9  medical program and then you went to TANF?
10      A.   (Nodded head up and down.)
11      Q.   And then you were promoted to the intake
12  position, which would have been the old caseworker
13  position?
14      A.   Uh-huh.
15      Q.   . Which of those three positions at the
16  Sangamon County office did you work with Mark Scheff?
17      A.   Intake.
18      Q.   Okay.  And he was also an intake worker?
19      A.   Yes.
20      Q.   Okay.  And then again when you became a MAC
21  in the Hospital Unit in early 2000, you again worked
22  with Mark Scheff; is that correct?
23      A.   Yes.
24      Q.   Okay.  And you testified that Jim Schuh was

## 44

1  also a MAC.  So, during that same time you worked with
2  Jim Schuh, as well?
3      A.   Yes.
4      Q.   Okay.  In your complaint you allege that you
5  were exposed to verbal comments of a graphic sexual
6  nature uttered by Mark Scheff and Jim Schuh; is that
7  correct?
8      A.   Yes.
9      Q.   Okay.  What I would like to do now is go
10  through your best recollection of the comments that
11  you overheard while a MAC, starting with the first
12  comment of a graphic sexual nature that you
13  overheard -- or that you heard Mark Scheff utter while
14  you were a MAC?
15          MR. BAKER:   Do you want her to speak to each
16  one?
17          MS. KERLEY:   As best as she can recall.
18          MR. BAKER:   We're not going to be out by
19  4:00 o'clock.
20          MS. KERLEY:   We might.
21          THE WITNESS:   I think the first time was in
22  February of 2000.  That was when a conversation was
23  about one of the gentleman that worked in the office
24  next to me Mike Sandidge was having problems at home

1  and what it was -- he was having marital problems, but
2  on that particular day his child had been sick and he
3  had been up most of the night with the youngest one.
4  It appeared from what I could see as an outsider from
5  talking to him as a person that he took more of an
6  active role at night when he was home than his wife
7  did.  They both worked, but he seemed to take more of
8  the parenting issues.  And Mike was very grouchy that
9  day.  He had talked to me earlier in the day.  I told
10 him, you don't look very good, are you okay?  And he
11 said he had been up most of the night with a sick
12 child.  And he said, I'm not in a really good frame of
13 mind.  So if I act snorty just blow it off.  We were
14 standing at the coffeepot.  That was early in the
15 morning.  So, later that afternoon, I think it was Pam
16 Dufour, maybe, was sitting at my office explaining
17 something at my desk, and the proximity of my office
18 and the office that Mike Sandidge and Joe Roberts
19 shared, this was my office, this was their office.
20 Where this staple is is my door, if there was a staple
21 there, that would be the door and it was a paper thin
22 wall.
23        MS. KERLEY:   Let the record reflect --
24        MR. BAKER:   That the two doors adjoin.

1        MS. KERLEY:   The two doors adjoin and they
2  share a central wall between the doors.
3        THE WITNESS:   My desk faced the outer wall
4  and was right next to the door.
5  BY MS. KERLEY:
6        Q.   And by "outer wall" you mean door to the
7  hallway?
8        A.   Door to the hallway.  The only door in the
9  room.  And Pam was sitting beside me.  Since I was
10 new, she was one of the ones that was helping to train
11 me.  And we were -- this was about 3:30 in the
12 afternoon and Joe and Mike were in their office and
13 Mark Scheff had came down there and Jim Schuh and they
14 were all sitting in there.  And Pam and I were sitting
15 there going over whatever she was training me on, I
16 don't remember.  And somebody said something and Mike
17 said something to the effect, you can all leave any
18 time now brake is over.  And Mark started in about,
19 well, you wouldn't be so grouchy if your wife put out.
20 And, you know, I know that you like it and he began to
21 describe different styles of intercourse.  And I said
22 to Pam, I said, what is going on in the room next
23 door?  And she said, that's typical.  She said, that's
24 almost an every day occurrence.  She said, if not four

1  or five days out of the week, as long as Mark is
2  around.  And I said, I don't understand.  Have you
3  complained about it?  And she says, oh, yeah, we've
4  all complained, but nothing has ever been done about
5  it.  And that was in my first week or two of being
6  there.  And I said, well, I'm not going to sit here
7  and listen to it.  So, I got up and I went to Lenna's
8  office and I told Lenna that I did not appreciate what
9  Mark was doing and what was being said down there.
10 And the response that I got that day, and I would get
11 many days of complaining, was, that's just Mark and
12 boys will be boys.
13       Q.   Okay.
14       A.   So that's --
15       Q.   So you testified that you and Pam were in
16 your office and that Mark Scheff, Jim Schuh, Joe
17 Roberts and Mike Sandidge were in the office next to
18 you?
19       A.   Yes.
20       Q.   With regard to the comment that you
21 overheard Mark say, you mentioned that his wife put
22 out or that -- something to the effect of Mike's wife
23 putting out?
24       A.   Uh-huh.

1        Q.   And then described intercourse?
2        A.   Uh-huh.
3        Q.   Do you recall what language he used when he
4  was describing the intercourse?
5        A.   I will tell you that he -- word for word, no
6  I can't, but I will tell you that he talked about a
7  shaft in the back end.
8        Q.   Okay.  And that is in -- okay, shaft.  And
9  that's the best you recall?
10       A.   Of that one.
11       Q.   Okay.
12       A.   Because I immediately got up and left the
13 room and went down to Lenna's office because I
14 thought, I'm not going to sit here and listen to this.
15       Q.   Okay.  And when you went to Lenna's office,
16 to the best that you recall, what did you tell Lenna?
17       A.   I told her verbatim what was said because it
18 was still fresh in my mind, and I told her that I
19 didn't appreciate it and I didn't think the workplace
20 was a place for that kind of conversation.
21       Q.   Okay.
22       A.   And actually she told me to get used to it.
23       Q.   Okay.  When is -- and that's -- and you said
24 in February of '02 -- or, I mean, February of 2000?

## 49

1     A.   Uh-huh.

2     Q.   When do you recall as -- and something that

3 may speed it along is if you start with the statement

4 and I can follow-up.  But, of course, it's your

5 prerogative.

6            What do you recall is the next

7 statement that you overheard that you found to be a

8 comment of graphic sexual nature?

9     A.   I can't tell you an exact date.  I can tell

10 you that almost every day between February and October

11 that I complained about the comments coming from next

12 door, as well as Velva Fletcher and Mary Thallman.

13 And that -- comments were anywhere from talking about

14 anal sex and talking about -- and describing anal sex

15 to describing sex when a woman was on her period to

16 coarse remarks about other employees by Mark was a

17 daily thing when Mark was there for the four of them

18 to meet -- or the three of them, depending on who was

19 there, to meet almost every day.

20     Q.   Okay.

21     A.   Different times different people -- I mean,

22 there's the time that Mark talked about the penis

23 tree.  He carved a penis tree, he says, in his home in

24 his front yard and supposedly that it had balls and

## 50

1 everything.  He went around and told everybody in the

2 unit about this.  He told student workers in the smoke

3 room.  He told people in the other units what he had

4 done.

5     Q.   With regard to the penis tree comment, did

6 you -- did Mark tell you about the penis tree?

7     A.   Yes, he did.

8     Q.   And where were you when he told you about

9 the penis tree?

10     A.   I think I was standing at the coffee

11 machine.  I think there was food there.

12     Q.   Like most state offices there's often food.

13     A.   Yeah.

14     Q.   Yes.

15     A.   And I think he was getting food and I was

16 getting coffee.  He told me he had a new chainsaw.

17 That's something that Laura and I do lawn care service

18 on the side, but I've always been a person who likes

19 to work outside, to talk about chainsaw to me was a

20 common ground, so we were talking about a chainsaw.

21 And he got a new Dremel drill too and he had used it

22 on carving a penis and balls into a tree.  And I said,

23 Mark, why do you have to talk like this?  And, of

24 course, he always laughed off anything you said to

## 51

1 him.  And, once again, I told him I didn't appreciate

2 his conversation.

3     Q.   Okay.  So, you were at the coffee machine or

4 that area.  Were there any other employees there?

5     A.   I think Velva Fletcher was standing there.

6     Q.   And, so, she overheard the conversation, as

7 well?

8     A.   And she also got the privilege of hearing

9 the entire story again as he was telling it in the

10 smoking break room.  Because she came down and

11 asked -- I complained that day, she complained that

12 day, that not only was he telling it outside of the

13 unit and that they were letting it go on outside of

14 the unit, now he was spreading it all through the

15 smoking break room.  And Lenna's remark was -- and

16 Jodie's was, we can't stop people from doing what they

17 want to do on their break.  That it's their time.

18     Q.   Let's back up.  You said you complained

19 about the penis tree story.

20     A.   I complained to Lenna DeGroot and Marvin

21 Ross on an average to three times a week from February

22 to October.  I was in and out of Jodie's office at

23 least once a week complaining about Mark Scheff's

24 mouth.  You know, it's one thing if you go to work and

## 52

1 somebody tells a joke or they stub their toe and they

2 cuss, but every day when you have to hear between

3 3:15 and 4:00 o'clock, or 4:30 some days vulgarity day

4 after day after day, it gets old real fast.  So I

5 complained constantly.

6     Q.   Okay.

7     A.   I asked to be moved.

8     Q.   Okay.  Let's, if we can, focus on the penis

9 tree comment.  With regard that comment, who did you

10 complain to?

11     A.   Lenna and to Jodie both.

12     Q.   Okay.  And what did you tell Lenna?

13     A.   That Mark was telling the story and I felt

14 like it was something that he needed to keep to

15 himself and that was maybe something for after hours

16 if he wanted to tell someone about it that was his

17 prerogative then.

18     Q.   And what did you tell Jodie?

19     A.   That -- once again, that Mark was out

20 telling things.  And I told her about the tree and I

21 told her that it was very offensive.

22     Q.   Okay.  And do you recall a time frame -- so,

23 you don't recall a specific date, do you recall a time

24 frame to the penis tree comments when you overheard

1  that?
2      A.    Not today.
3      Q.    Do you recall whether it was in the spring?
4      A.    No, I don't.
5      Q.    Do you recall if it was in the summer?
6      A.    No, I don't.
7      Q.    Okay.
8      A.    I don't remember the time frame now.
9      Q.    Okay. And you don't recall whether it was
10  close to the time that you were promoted or close to
11  the time that you began in the Hospital Unit?
12      A.    I know it wasn't, like, February or March
13  because it was too cold for us to be talking about
14  outside work.
15      Q.    Okay.
16      A.    So, it had to be between spring and fall
17  when most people are out in their yard, but today I
18  can't tell you off the top of my head a date.
19      Q.    Okay.
20      A.    But I know it wasn't February or March
21  because it was too cold for outside work.
22      Q.    Okay. We've talked about the comment that
23  you overheard Mark make with regard to Mike's grouchy
24  mood in February and the penis tree comment. What is

1  another comment that you overheard?
2      A.    I was on break and Shari Bangert came down
3  from the NIPS Unit which is Non-Institutional
4  Providers Service. She was a MAC 2 up there. And she
5  came down and we were just generally talking and next
6  door they were talking about somebody wanting to sell
7  a house, I'm not for sure which of the guys because I
8  wasn't really zeroing in on the conversation, I was
9  listening to Shari, and then somebody said something
10  about having listed it with the real estate dealer
11  Pfister, I can't remember his first name.
12      Q.    Are you referring to Fritz?
13      A.    Yes.
14      Q.    Do you recall who made the comment?
15      A.    About listing their house, no. I can recall
16  what Mark Scheff said because Shari and I discussed
17  what he said and then she told her supervisor and I
18  told my supervisor. He made a comment about fisting
19  her too and about fisting her every time I get a
20  chance. And went on. At which point, we shut the
21  door and Shari said to me, how often do you hear these
22  kind of conversations? And I said, Shari, constantly
23  every day this type of conversation goes on next door.
24  And she went to her supervisor, who at that time was

1  Kim Knox and I went to Lenna DeGroot that afternoon
2  and talked to Lenna. And then seeing it wasn't
3  getting anywhere, I went across the hall to Mark's
4  supervisor, Marvin Ross, who refuses to acknowledge
5  anything that anybody does. If you don't want to talk
6  to him about work, he don't want to talk to you.
7      Q.    Okay.
8      A.    And he doesn't see that as a work problem,
9  as long as the work is being done.
10      Q.    What did you tell -- when -- to the best of
11  your recollection, what language did you use to
12  complain to Lenna?
13      A.    I explained that, hey, we're making fun of
14  the realtor's name and that -- what he said. And she
15  laughed. She said, it is funny.
16      Q.    Okay. And what did you tell Marvin?
17      A.    That they were making fun of the -- that I
18  had been across the hall to Lenna and told Lenna about
19  it, and Lenna didn't see it as an issue, and I thought
20  as his supervisor he should be aware of it and maybe
21  he should take control since, obviously, my supervisor
22  wasn't going to. And I told him the story and he made
23  a remark about he's just blowing off and as long as he
24  does his job he's going to get by with it. Jodie has

1  tried to discipline him and didn't get it, so we
2  pretty much leave him alone.
3      Q.    Okay. And when did you -- when did you
4  overhear this comment?
5      A.    It was --
6          MR. BAKER:    Excuse me. When you say "this
7  comment" are you talking about Scheff's comment?
8          MS. KERLEY:    Scheff's comment regarding the
9  realtor.
10          THE WITNESS:    I think it was in the summer,
11  I think.
12  BY MS. KERLEY:
13      Q.    Okay.
14      A.    I'd have to check dates.
15      Q.    Okay. If you can please relate another
16  comment that you overheard?
17      A.    The conversation when the E2 position was
18  posted that I filled.
19      Q.    The E2 position?
20      A.    For the state renal program. Velva Fletcher
21  had came down to my office and was waiting for P.K.
22  Luttrell to get off the phone and go to smoking break
23  with her and Mary Thallman. Mark came up to the door
24  and said, did you apply for the E2 position. And I

1   said, yes, I did, and I also applied for a MOA1
2   position out of the Bargaining Unit in the direct
3   rebate program.  And he said, are you the one that
4   it's posted for - something to that effect - since
5   it's only a five-day posting.  And I avoided a direct
6   answer because I knew that it was posted for me and
7   said something about, well, we'll have to wait and see
8   who gets it to know who it was posted for.  And then
9   side stepped to say something else.  And he said,
10  well, you'll probably get it if you did because you
11  have a pussy and not a penis.  That I come unglued at
12  and even Velva said something to him about, Mark, you
13  know you're really gross.  And we both went to, once
14  again, our supervisor.  She went to Marvin, who was
15  her supervisor.  I went to Lenna, and then I went to
16  Jodie, she went to Jodie.
17      Q.    Did you go to Jodie's office with Velva?
18      A.    No.  We went separately.  I also talked to
19  Cheryl Beckner about it.
20      Q.    And what --
21      A.    I told Cheryl what was said to me and she
22  told me she would talk to Jodie about it.  And what I
23  got from Jodie was, don't ever go over my head again.
24  You follow the chain of command.  And I said, I did

1   and it didn't set well.
2       Q.    What did you tell Mark -- or did you respond
3   in any way to Mark when he made that comment?
4       A.    I told him that it was uncalled for and I
5   was offended and that I would be saying something to
6   his supervisor and my supervisor and Jodie about it.
7   And he laughed at me and he said, so.
8       Q.    Okay.  You said that this conversation
9   occurred when the E2 position was posted?
10      A.    Uh-huh.
11      Q.    And it was -- you had mentioned that it was
12  a five-day posting and that you started on
13  October 16th or 17th, so this -- would this comment
14  have been made in the early part of October?
15      A.    Huh-uh.
16      Q.    Is that a no?
17      A.    That's a no.  That comment probably would
18  have happened in August or September.
19      Q.    Okay.
20      A.    Because you have to post a position, then
21  you have to call for a list, and then you have to do
22  an interview -- a routine interview, and then
23  there's -- sometimes you get the call the same day.
24  They have up to two weeks to tell you.

1       Q.    Okay.  So it would have been some lag time
2   between the posting and the starting of the position?
3       A.    It would have been the day after the posting
4   was up.
5       Q.    Okay.
6       A.    Whenever that was.
7       Q.    Okay.  And Velva overheard the comment?
8       A.    Yes, ma'am.
9       Q.    And P.K. would not have because she was on
10  the phone?
11      A.    She was on the phone.
12      Q.    Okay.
13      A.    And he said the same comment to me later in
14  front of Pam Dufour, once again, questioning me while
15  I was over at Pam's office talking about some renal
16  applications, Mark came back - and I'm assuming he was
17  coming from smoking because he wasn't carrying any
18  papers at that time - he made the comment again.  And
19  he, in fact, said it the third time to me, and both of
20  which I think Pam was standing there also, was the
21  time I -- I was standing in his cube asking him about
22  a case and noticed on his computer he was playing
23  solitaire and prior to coming into the Hospital Unit I
24  had been what they call a LAN coordinator, which is --

1       Q.    LAN, L-A-N?
2       A.    L-A-N.
3       Q.    Is that computer or something?
4       A.    Local - I want to say - area network.  I
5   know local and network -- applications -- Local
6   Applications Network Coordinator, which means that
7   when a person had a problem with their PC, you would
8   report it to that person first, and I would try to
9   resolve it.  And we had to go through a training that
10  says if there was certain issues that we were to try
11  those things before we sent it on to the next level
12  for them to keep from having computer consultants and
13  computer management people or any computer technician
14  coming out because somebody accidentally unplugged
15  something.  You know, by pulling too hard on the
16  mouse, they unplugged their mouse or something.  So
17  there were certain things that we were trained to look
18  for.  We were also trained to look for things that
19  were not to be on a system.
20      Q.    Okay.
21      A.    Such as games, outside screen savers, that
22  kind of stuff.
23      Q.    And you were a LAN Coordinator when you were
24  in what position?

1      A.    When I was a MAC under Steve Bandy.
2      Q.    And you were no longer a LAN Coordinator
3   when you were on the Medical Unit?
4      A.    No.  But I noticed it on there and asked him
5   what he was doing with games still loaded on the --
6   his system.  Normally when we get a computer system,
7   they take all that stuff off.  You don't get a radio,
8   you don't get anything, you get what you're supposed
9   to have to do your job.  And as I was talking to him
10   about this hospital case.  He had a half wall in his
11   cube, and I kind of leaned on the wall and looked over
12   at him, you know, and just leaning and here he's
13   playing solitaire.  And I questioned him about
14   solitaire and he went into this long story about why
15   he plays solitaire and that -- because he used to care
16   about his job, but he doesn't care about his job
17   anymore because only gay people and woman get a
18   promotion.  And I said, that's not true and it's no
19   reason to break the rules.
20          And by that time Pam came up here and
21   that's -- Pam is nosey.  That's just -- she is.  If
22   there's gossip, Pam knows the gossip.  And she came up
23   because she saw the two of us standing there talking,
24   and so she figured there's got to be something to hear

1   and came up and I said, Mark that is not true, other
2   people have got promotions that are not gay and that
3   are men.  He said, no, you know you have to have a
4   pussy -- if you got a pussy you get a promotion and
5   not a penis, you don't get one.  And Pam and I both
6   said something to him about it.  And at that time we
7   together went to Jodie's office.
8      Q.    Okay.  What did you tell Mark?
9      A.    What did I tell Mark?
10      Q.    Uh-huh.
11      A.    That it that wasn't true that other people
12   got promotions, and that was offensive and he
13   shouldn't be saying things like that.  And I was also
14   told him I was reporting the solitaire on the system.
15      Q.    And do you recall about when that was?
16      A.    September, August, somewhere in there.
17      Q.    Okay.  So Pam and you both went to Jodie?
18      A.    Yep.
19      Q.    And what did you tell Jodie?
20      A.    The conversation and about the solitaire.
21      Q.    And what was her response?
22      A.    As for the conversation she said, that's
23   just Mark, you're going to have to get used to it, you
24   know, that's the way he is.

1      Q.    Okay.  You said that you just -- you
2   previously testified that Mark made this same pussies
3   get promoted not penis type comment in front of Pam in
4   Pam's office.  When was that?
5      A.    In -- all those the pussies comment was made
6   during that time frame of when that was -- when that
7   job was posted and until that job was filled.  I think
8   Mark had some animosity about people getting promoted
9   but yet -- because when I talked to Lenna about it,
10   Lenna told me -- actually, Lenna approached me about
11   applying for that job that there was some good people
12   and that I may not get it.  And I said, that's fine,
13   if there's some -- a more qualified person, then they
14   need to get the job.  I don't have a problem with
15   being beat out in a competition like that.  There were
16   a whole lot of qualified people around and I said who
17   had bid against me?  Any one of them, except for one
18   exception, I thought really could have done the job
19   and done it very well if any one of those other three
20   people get it more power to them.  And that's why I
21   bid on other positions, nothing is a guarantee in
22   life.  And I said what about Mark, did he bid?  And
23   she said, no, he didn't bid.  And I said -- she asked
24   me why, and I told her what he said to me again.  She

1   said, Debbie, Mark isn't going to bid out of the
2   Union.  The Union protects him.  And for what he has
3   to say, he knows it's not true and he's just trying to
4   get next to you.  And I said, is that a way to justify
5   what he does?
6      Q.    Okay.
7      A.    And she changed the subject.
8      Q.    Okay.  Of the people who were applying for
9   the job, who was the one person that you thought
10   wouldn't be able to do the job?
11          MR. BAKER:   Excuse me.  I'm going to object
12   to the question because it has nothing to do with the
13   case.  And I'm going to instruct Debbie not to answer.
14   And let me tell you why so that we, perhaps, can move
15   on.  People form judgments all the time about
16   co-employees, and obviously, the deposition is usable
17   in a variety of context and I think that any negative
18   comment Debbie might make about a co-employee that's
19   unrelated to any issue in this case would just create
20   a potentially disruptive issue in the workplace.  So,
21   I would hope that you would withdraw the question, but
22   if you don't, unless you can show me how it relates to
23   the case, I'm going to instruct her not to answer.
24          MS. KERLEY:   I will -- I can rephrase the

1  question and if you have the same objection, I will
2  argue for the record why it's relevant.
3      MR. BAKER: Okay. And if you can give it to
4  me, I may withdraw the objection.
5  *BY MS. KERLEY:*
6      Q. Was the one person that you thought could
7  not -- that would not do a good job in the E2 position
8  Jim Schuh?
9      A. I don't remember. I honestly don't
10 remember. I know that two other people that had bid
11 were Donna Pinter and Pam Dufour, they are both very
12 knowledgeable hard workers, but the other two people,
13 I cannot remember what their names are today.
14     Q. And one of those two people that you don't
15 remember that you thought -- that you had made the
16 comment?
17     A. Yes.
18     MR. BAKER: Okay. Much to do about nothing,
19 wasn't it.
20     MS. KERLEY: Yes, but eloquently done.
21 *BY MS. KERLEY:*
22     Q. Okay. We've talked about several comments
23 that you have heard Mark Scheff make. Do you recall
24 any other comments that you heard Mark Scheff make?

1      A. Conversation about standing out at the
2  coffee pot again, favorite hang out with state
3  employees.
4      Q. And visiting attorneys.
5      A. And visiting attorneys.
6      Three or four of us standing there and
7  something was said about Carla Collins, who had just
8  came over, and once again, there had to be food
9  because Carla had came over and got something to eat.
10 Carla Collins is Executive Secretary for Steve
11 Bradley, and Mark made a comment to -- Joe Roberts was
12 standing there, he was one -- he was one of the guys.
13 I know Velva was standing there, and I think Pam was
14 standing there, and he made a comment to Joe about she
15 ought to be in there on your big-breasted screen
16 saver -- women screen saver. And Joe said something
17 like, shut up, Mark, you're going to get me in
18 trouble, or you're trying to get me in trouble.
19 Something to the comment, you're trying to get me in
20 trouble or going to get me in trouble. And he said
21 something about, well, you know, Carla wears low cut
22 shirts and push up bras for us guys so that we can
23 look down her shirt and look at her boobs. And the
24 three of us -- there were three woman standing there

1  and we all started in about, now, that's uncalled for.
2  And even if you do it, do you have to tell us that you
3  do it? Nobody wants to know what your personal
4  problems are. And it started out a general good
5  natured, don't do that, leave it alone, you know.
6  Mark never takes anything without taking it to an
7  extreme. He has to get on a soap box and give a
8  dissertation, and he started in about Steve Bradley is
9  surrounding himself with strong pussy and big-breasted
10 woman and everyone knew that he and Carla had had an
11 affair the same way that everyone knew that Jodie
12 Edmonds and Brian Brinker had had an affair. And they
13 talked about the merits of woman sleeping with their
14 bosses to get ahead in the Agency and that's why he as
15 a white man could get nowhere. And, of course, as
16 he's carrying on like this we're trying to get him to
17 shut up. And finally Pam stomps off down to Lenna's
18 office, I've gone back into my office and sat down,
19 and Lenna does come out and say to Mark, Mark go sit
20 down. And that was -- and then she went back to her
21 office. But he talked about Steve Bradley and
22 surrounding himself with woman.
23     Q. Okay. And when was that comment?
24     A. September, October -- August, September,

1  October.
2      Q. Okay. Next comment that you recall?
3      A. Of a sexual nature?
4      Q. Yes.
5      A. I'm trying to think. It had to do with a
6  motorcycle. I can't remember. There's one about a
7  motorcycle and he was asking if -- Mark used to have
8  MGs. I don't know if he still has MGs. It's a car,
9  and he said something about, have you ever tried to
10 have -- actually what he said did you ever try to fuck
11 on a motorcycle? It's a whole lot harder even than
12 trying to do it in an MG. And I don't know who he was
13 talking to. Once again, it was the guys next door and
14 he proceeded to tell about some -- I don't know if it
15 was his girlfriend who is now his wife at the time or
16 somebody from his past, I don't know, but he got
17 graphic about the position and what they did in the
18 MG. And Mike Sandidge was going, oh, my God, that is
19 so gross, why are you even talking like that? And,
20 once again, I went down and told Lenna and she came
21 down the hall that day. There's two times I ever
22 remember her doing anything about anything; once she
23 told Mike to go to his office; this time she come down
24 and said: You guys are a bunch of fucking babies.

1  When are you going to learn to keep your mouth shut
2  and told him to get out of that office. Two times in
3  six, eight months.
4      Q.  And when was this comment?
5      A.  August, September.
6      Q.  And you've -- well, okay. And where were
7  you when you heard that comment?
8      A.  Seated at my desk.
9      Q.  Okay. And where was Mark Scheff?
10     A.  He was in the room next door.
11     Q.  The office that Mike Sandidge and Joe
12  Roberts shared?
13     A.  Uh-huh. And he was sitting in a chair right
14  beside the door.
15     Q.  Okay. And when you said that Mark was
16  graphic about a position, do you recall what he said?
17     A.  He talked about putting this lady's butt on
18  the windowsill and she was laying down with, like,
19  where her head would probably be at the gearshift
20  between the two seater, and that he was kneeling over
21  her kind of on the armrest and he was talking about
22  shoving her and how fast he was and how hard he was
23  and he was telling about how that she couldn't get
24  enough of him and...

1      Q.  Okay. You have identified several comments
2  that were either August, September, October; do you
3  recall whether the Carla Collins comment, the
4  motorcycle comment --
5      A.  Some of that --
6      Q.  The Fritz Pfister comment, do you recall any
7  order that they would have come in?
8      A.  Not off the top of my head right now. I
9  know one of those conversations -- a couple of those
10  conversations happened in July because I had had a
11  conversation one evening. I had went to work at the
12  church to do some outside landscaping and M.T. Vann
13  was there, she was one of the members of the church
14  M.T. stands for Mary Theresa, that's a secret she
15  doesn't want out. And she said something about me
16  being kind of down. And I said I had a rough day this
17  afternoon. And I told her the circumstance of how I
18  went down and talked to a supervisor. And she told
19  me, you know, for your own safety, if you're not
20  documenting it, you should begin to document it, she
21  said, because that man is sick and some day he's going
22  to do something sick in that workplace.
23     Q.  Did you begin --
24     A.  That was in July.

1      Q.  Okay. And you don't recall what comment or
2  what conversation you overheard that led to that
3  conversation with M.T. Vann?
4      A.  No. Not right off the top of my head. I
5  know that it had been one of those weeks that he had
6  been particularly graphic, but, no, right off the top
7  of my head, no, I can't remember. I just remember
8  talking to M.T. because normally people -- when I'm at
9  church or when I'm away from work, people think I'm
10  one of the most outgoing people you've ever seen. But
11  since all of this has happened. I've become a very
12  withdrawn person at work and on the outside, too, and
13  that night I just wasn't myself.
14     Q.  Okay.
15     A.  And she said what's the matter? What's
16  going on?
17     Q.  Okay. Can you recall another comment or
18  conversation?
19     A.  A conversation where close to the end of
20  summer, maybe the beginning of fall, Mike Sandidge
21  filed for divorce or was separated, a legal separation
22  or a divorce, and Mike had began to work out, and he
23  was letting his hair grow longer, and he was taking on
24  a whole different look, as far as his appearance. And

1  one afternoon I think it was Jim said to Mark -- or to
2  Joe -- or to Mike, I mean, something about I can tell
3  you've been working out you're starting to get some
4  biceps. And big guys they were talking about flexing
5  their arms and who has got the biggest muscles and
6  that kind of stuff, and Mark said, well, I have the
7  biggest muscle, but it's not in my arms. And Mike
8  told him to shut up that he didn't want to talk about
9  sex, that they were talking about bodybuilding. And
10  he said the only reason you're doing bodybuilding is
11  because you haven't had sex for two years. And Mike
12  just totally come unglued and come flying out of the
13  room and stomping off down the hallway. And,
14  actually, I got up and went after him to see if he was
15  okay. I didn't know that he was separated. And when
16  I found him, he started to telling me that he was
17  separated or divorced and this was not an easy time
18  for him and he didn't need Mark, you know, saying
19  things like that, making it any rougher on him. And
20  he had been to Lenna and asked Lenna about moving and
21  they said they didn't have a office or cubical
22  position where they can move Mike, because he wanted
23  to get away from being with the guys every afternoon.
24  But Mark had started in on him about not having sex

1    for two years.
2        Q.    And you said that was end of summer or fall?
3        A.    Somewhere around in there, I think, was when
4    it was --
5        Q.    And you were in your office?
6        A.    Right next to the door and Mark was
7    sitting --
8        Q.    And they were in -- and Mark was in Mike and
9    Joe's office?
10       A.    They had had a seating arrangement that they
11   did.  Mike faced -- if this was the office and that
12   was the door, Mike set here facing that -- that's
13   where his computer faced and his desk, Joe sat here
14   facing -- that's not nice is it?  North -- or south
15   and north.  And next to the wall, which we'll say was
16   west, was a chair where the visitors usually sat when
17   they came in.  And then there was a chair back over
18   against the east wall.  Joe would usually turn around,
19   unless it was something he didn't want to talk about
20   and he would keep his back turned.  Mike would turn
21   around and Jim always sat over against the east wall
22   and Mark always sat next to the door.  Always.  And if
23   somebody was sitting in his chair, he asked them to
24   get up.  That was his spot.

1        Q.    Okay.  And was there anyone else in your
2    office when you overheard this comment regarding Mike
3    Sandidge working out?
4        A.    No.  But later that afternoon Jim Schuh came
5    in with Kevin Mayer and Kevin Mayer had brought down a
6    picture of when he was a body builder, because he
7    was -- he was talking about he too had started working
8    out again, and him and Mike, I think, were working out
9    together or compete -- something about they were
10   always talking about bodybuilding.  And Kevin said
11   something to me about that he had been in bodybuilding
12   competitions and I said, really?  And he said, yeah.
13   So he went to his desk and brought a picture down.
14   And Jim came in, it was close to their quitting time,
15   which was going on 4:15, 4:20, something like that.
16   And it was the same afternoon.  And I said to Kevin, I
17   said, are you going to start competing again?  Is this
18   something that you're going to do?  And how does your
19   wife feel about this time away from your kids and
20   stuff?  And we were just talking, general
21   conversation.  And Jim said something about, well,
22   Mike should go into it the way he's working out
23   because you would do that too if you hadn't had sex
24   for two years.  And I said, you know, I said to Jim,

1    Jim you shouldn't talk that way about Mike.  That
2    conversation was hard on him this afternoon.  And he
3    said, I know, he got angry at Mark.  He said, but we
4    were just teasing.  And I said, he didn't take it that
5    way.  He took it hard because it's a hard time in his
6    life.
7        Q.    Okay.  Did you do anything after you heard
8    Mark make the original comment?
9        A.    Yes, I did.  After I talked to -- to Mike, I
10   told Mike I was going to tell -- talk to Lenna about
11   it and he told me to quit wasting my breath going in
12   there and complaining all the time.  He said, they're
13   not going to move me and they're not going to do
14   anything with Mark.  And I said, well, at least it's
15   on the record that I'm complaining because this can't
16   continue to go on.  He said, well, as long as you work
17   in this bureau you're going to watch them sweep it
18   under the carpet.
19       Q.    And following --
20       A.    I went to Lenna.
21       Q.    And what did you tell Lenna?
22       A.    I told her about the conversation with Mike
23   and she said that that was uncalled for and she would
24   talk to Mark.  But it wasn't going to do any good for

1    her to do it, because he was going to say what he
2    wanted to say because Mark was Mark.
3        Q.    Okay.  Do you recall any other comments?
4        A.    Let's see.  There was a conversation between
5    the pros and cons of having intercourse - except Mark
6    never called it intercourse, it was fucking - someone
7    when they're on a period versus when they're not on a
8    period and that how he missed that now that his
9    girlfriend, who is now his wife, I've heard, was real
10   dry because she had her ovary or uterus or something
11   removed, because she had cancer.  And he proceeded to
12   tell about how much more lubrication and how much
13   faster you could go and how much more sensual it was.
14       Q.    Were you in your office when you heard this
15   conversation?
16       A.    Yes, I was.
17       Q.    And was Mark in Mike and Joe's office?
18       A.    Yes, he was.
19       Q.    Do you recall when this conversation was
20   taking place?
21       A.    That was in the summer.
22       Q.    You think earlier than August, September,
23   October time frame that you've set up for other ones?
24       A.    I say it was either June or July.

1    Q.    Okay.

2    A.    That was about the time that I -- that --

3 probably the first time I asked to be moved.

4    Q.    Okay.  Following this conversation, what

5 action did you take?

6    A.    I went to the Lenna and I went to Marvin

7 again, and I went to Mark -- I mean to Jodie over that

8 one -- it was -- it was gross.  It was real gross.  It

9 was to the point that Joe and -- Joe and Mike both

10 were trying to get him to shut up.  And Jim was

11 yelling at him, literally yelling at him to shut up,

12 and he just kept getting louder and louder.

13    Q.    Okay.  What did you tell Lenna and Marvin?

14    A.    The conversation and what was -- how the

15 others acted and what was going on.  And Lenna didn't

16 even come out of her office.  See said, Debbie,

17 they're on their break.  There's nothing we can do

18 about people on their break.  I said, they're in a

19 public place where other people are hearing what

20 they're saying.  She said, I can't do anything about

21 it.  So I went to Marvin.  Marvin said, nothing is

22 going to be done to him -- or to them.  Jodie has

23 tried, she failed, end of story.  You need to quit

24 bothering us about this.  I went to Jodie.  Jodie

1 said, I'll have Lenna and Marvin take care of it.

2    Q.    Okay.  You mentioned requesting to be moved?

3    A.    Uh-huh.

4    Q.    When did you make that request?

5    A.    That day.

6    Q.    Following this conversation?

7    A.    Uh-huh.

8    Q.    And who did you request that from?

9    A.    To Lenna and she told me that Mike was

10 first.  I asked again at the end of September, first

11 of October before I was moved and Jodie said, yes,

12 we'll go ahead and move you.  And Lenna was in on the

13 conversation that day.  It was Jodie and Lenna and I

14 in Jodie's office.  We had been in there talking about

15 something that I was doing on a special project, and I

16 don't remember exactly, but it was something to do

17 with doing some testing on a new system that was

18 coming in.

19    Q.    Okay.

20    A.    And Jodie said, yeah, we'll go ahead and

21 move you because, you know, we were waiting for the

22 official yes.  This is your position, you know,

23 personnel hasn't got back with me, so, we'll go ahead

24 and do it.  And Lenna said, no you can't.  You

1 promised Mike that he can have this first move.  And

2 if you do that this early, then they will know that

3 she was hand picked for this position.

4    Q.    And you said that that conversation took

5 place at the end of September or early October?

6    A.    It was a week or two before they actually

7 moved me.

8    Q.    And they moved you two weeks before you

9 actually started the position, correct?

10    A.    Yes.  Two to three weeks before.  So I asked

11 early in September.  I think maybe the interviews were

12 in August, I think.

13    Q.    Okay.  Other comments, do you recall any?

14    A.    You have to realize every day almost any

15 conversation Mark turned into sexual.  You could say

16 trains and by the time you finished saying is leaving

17 the station at 3:30 he had found a way to make it into

18 a sexual comment -- to turn the conversation into sex.

19 So, a lot of the conversations every day were about

20 sex in some way or another he would turn it back to

21 sex, and that is the time when usually people would

22 start leaving the room.

23    Q.    Meaning whatever room Mark was in, or?

24    A.    Like Jim would leave and say my break is

1 over now and go back to his office.  One of the other

2 two would say, I think we need to go back to work.

3 Even the guys got tired of it because every day there

4 were sexual connotations made about trains and -- or

5 you could talk about a book title, you know, I'm

6 reading this -- Mike and Joe were readers.  And they

7 would discuss whatever book they were reading.  Mark

8 would take the title of the book and totally make it

9 into something sexual and start in about one of his

10 sexual experiences and how powerful he was in his

11 manhood and how he -- you know, they should write a

12 book about him.  He always turned it around to sex.

13    Q.    Do you recall a specific instance when he

14 did that?  Turned a book title into about his

15 sexuality?

16    A.    Right off the top of my head, I can't

17 remember right now.

18    Q.    Okay.  Do you recall any other specific

19 comments or conversations that you heard?

20    A.    There was a conversation between Mark and

21 Jim.  I don't think Mike was there that day.  I think

22 Mike was off.  And Joe was there and Mike -- no, Jim

23 was talking about they -- his wife had a relative a

24 little girl staying with them who was young, six or

1  seven years old, and how that he was talking about how
2  that she had been sexually abused by different
3  boyfriends of the mother and that the mother was an
4  alcoholic and drug addict and he called her a whore
5  and that she would do anything for drugs and alcohol
6  even to selling her own child, and they had taken the
7  child in. And Mark asked him questions about, well,
8  how do you know that she was a whore? How do you know
9  that she sold herself and her child? And Jim was
10  telling about a counter at a restaurant where this
11  little girl told the story of being put on this
12  counter where they served donuts, I guess the mother
13  was working in a restaurant and it was after close or
14  before opening and she -- the girl had told a social
15  worker something about being put on a counter top and
16  that she had been raped. And it was really kind of
17  strange because it was kind of an eerie silence from
18  Joe and the room was just really strangely quiet and
19  Mark was listening very intently as Jim was talking
20  and -- because usually Mark can't keep his mouth shut.
21  He has to interrupt every conversation and do a one up
22  on people. And when Jim finished telling this story,
23  Mark started talking about how the little girl was
24  going to be just like her mother. And that it won't

1  be any time before you'll be telling me that, you
2  know, that she's screwing your son and she's taught
3  your son how to have oral sex and masturbate and he'll
4  like it up the ass because, you know, that's the way
5  people usually get raped. And he went into this whole
6  scenario to Jim about this little girl and what she --
7  what she was going to turn out to be like. And Jim
8  was loud, not screaming but loud and threatening to
9  Mark. About don't talk that way. You don't know
10  that. This girl can change, you know. And he just --
11  he just didn't -- wouldn't shut up. And Jim walked
12  out of that room and I don't know if he went to
13  Lenna's office or if he went to his own office,
14  wherever he went, he slammed that door. So that, you
15  know, it was just a wham, you know. And Mark just
16  laughed. He just sat there and laughed. And I
17  waited, I don't know, probably 20 minutes just
18  thinking that maybe Jim had went in to talk to Lenna
19  or Jodie and walked down to Lenna and he hadn't said a
20  word to Lenna about it. He went into his office and
21  he shut the door. And I don't know what he did in his
22  office, I didn't go in and check on him. And I told
23  Lenna what was going on. And, once again, that's just
24  Mark, you know, he's rude, he's crude, if you don't

1  want to talk to him, just ignore him, leave him alone.
2  You know, if Jim doesn't want to talk to him, he knows
3  better than to go in that room with him.
4      Q.   Okay. And when -- what's the time frame of
5  that conversation, if you recall?
6      A.   That was summer -- sometime in the summer
7  because there had been some conversation about a
8  swimming pool just before that about kids playing in a
9  pool.
10     Q.   Okay. Prior to the August, September,
11  October time?
12     A.   Yeah. July, August.
13     Q.   Okay.
14          THE WITNESS:  Can we take a break and I can
15  get some more coffee?
16          MS. KERLEY:  We can.
17               [WHEREUPON THERE WAS A SHORT
18               DISCUSSION OFF THE RECORD.]
19  BY MS. KERLEY:
20     Q.   We're back on the record after a break and
21  continue with the same line of questioning. You were
22  telling me about comments that you overheard Mark
23  Scheff or Jim Schuh make. Do you recall any other
24  comments?

1          MR. BAKER:  I think they were comments about
2  Mark Scheff was what the questions were.
3          MS. KERLEY:  And she testified as to
4  comments made by Jim Schuh, as well. So, we can keep
5  the question to Mark Scheff. And if others come up, I
6  can ask you about them separately, if you would
7  prefer.
8          THE WITNESS:  Whatever is best -- easiest.
9          Okay. Hospital MACs when it was fully
10  staffed, prior to the time that I came into that unit,
11  used to go out and do hospital seminars. And what
12  they would do is they would rent, like, the Holiday In
13  or find the hospital that had a huge conference room
14  and they would borrow it and they would go in and they
15  would train billing procedures for your new billing
16  people at the hospitals. Like a lot of other jobs,
17  billing people seemed to go -- to be run through real
18  easy at hospitals and doctor's offices. And I was
19  going -- they had one during the time frame that I was
20  a hospital MAC sometime in spring. I don't remember
21  exactly the date but it was in spring, and Lenna was
22  giving the training seminar, it was in St. Louis. So
23  I, Lenna, Mike and Joe rode down to this seminar.
24  They took us because we had never seen one of these

1  training seminars and in hoping that someday they
2  would go back to full staff where they could go out
3  and do these training seminars again, they wanted us
4  to be at least familiar with what happened in a
5  training seminar.
6      Q.   Okay.
7      A.   So, when word got around that we were going
8  to these training seminars, Mark came to my room.  I
9  think he was on the way next door and he stopped in,
10  hi, how are you doing?  Hi, Mark.  What's up?  Oh, I
11  just found out you guys were going to a billing
12  seminar.  Those are really good.  You'll learn a lot
13  of things.  You'll get to hear a lot of questions.
14  And he was, you know, he said, I'm really good of
15  giving training seminars.  And he said, I enjoy going
16  and doing them.  And I said, really, have you done
17  very many?  And he proceeded to tell me some of the
18  different places he had been.  And he said, but do you
19  know what I like best about training seminars?  And I
20  said, oh, being out of the office.  And he said, no,
21  staying in a motel.  And I said, really?  And he said,
22  yeah, well, most of the hospitals are in the Chicago
23  area and he said I like to go and stay in a hotel
24  because I like the X-rated movies and I can go in

1  there and find pleasure in myself at the end of the
2  movie.  I was shocked.  Literally shocked.  In fact, I
3  wasn't for sure that what he was saying to me was --
4  that he was saying it.  You know, it was like what?
5  And I said something about, that was totally too much
6  information for me.  And I said, please don't share
7  like that with me again.  And I said, we've already
8  had a conversation about me finding things you say
9  offensive and I asked you to please refrain from this.
10      So, the next day when we went -- or the
11  next week, I think we went on a Monday, whenever the
12  four of us were in the car I said to Lenna, so that it
13  would be in front of witnesses, which is conveniently
14  forgotten, I'm sure, what he said to me, and one of
15  the guys said, oh, no, he's told that story several
16  times that that is his favorite part of training, and
17  we heard it too before we came.
18      Q.   Do you recall who made that statement?
19      A.   It was Joe or Mike, I don't know which one.
20  I sat up front with Lenna, they sat in the back.  And
21  I don't know which one said it.
22      Q.   Okay.
23      A.   But it was said.
24      Q.   Okay.

1      A.   And Lenna got really angry and she said, you
2  know he's not going to change and I wish we could
3  change him, there's nothing we can do, we've tried and
4  it just isn't working.
5      Q.   Okay.  Do you recall any other statements?
6      A.   You know, there were lots of them.  I'm
7  telling you it happened almost every day, but right
8  now I'm starting to -- everything seems to run
9  together and I'm getting tired.  Off the top of my
10  head right now.
11      Q.   Okay.  Is that -- the comments and specific
12  conversations that we've discussed thus far, as you
13  sit here today, is that the extent of your
14  recollection?
15      MR. BAKER:   I think that's what she said.
16      MS. KERLEY:   I'm just clarifying for the
17  record that the witness' recollection has been
18  exhausted.
19      THE WITNESS:   For the moment, yes.
20  BY MS. KERLEY:
21      Q.   Okay.  Do you recall a conversation or
22  recall a comment where Mark Scheff said that you had a
23  hard on? ·
24      A.   Let me see, no.  Not off the top of my head

1  right now.  I remember him calling me a prude.  I
2  remember him calling me a lot of other things, but.
3      Q.   What were some of the other things that he
4  called you?
5      A.   I've been called a prude, a bitch, a dike
6  bitch, a yes person, which, that's okay.
7      Q.   I'm sorry.  What was that last one?
8      A.   A yes person.
9      Q.   Oh, a yes person.  Sorry.
10      A.   A snitch.  Those are a few of the things
11  that I, right off the top of my head, can remember him
12  calling me.
13      Q.   Did he say those things to you?
14      A.   Yes, he said those things to me.
15      Q.   And where were you when he said those things
16  to you?
17      A.   Usually in conversation.  Either him
18  standing right in the doorway of my office or in
19  conversations in the hallway where he would stop me
20  and talk to me and confront me.
21      Q.   And what's the time frame of these comments?
22      A.   This was before -- between, I would say, May
23  and October.
24      Q.   And what were the conversations referencing?

1    A.    Usually to do with procedures of, you know,
2  phone calls that were being transferred that shouldn't
3  have been transferred.  Or, you know, a lot of times
4  we would get billing people who would call and say,
5  Mr. Scheff is my billing person but I don't want to
6  talk to him.  So what they would do is put them
7  through to somebody else and when you got a call like
8  that, you were supposed to transfer it to Mark or to
9  the supervisor.  And Mark preferred that we cover for
10  him and let -- just take the call and answer the
11  problems, and if you sent it to Lenna or Marvin --
12  like, if Marvin wasn't there, you sent it to Lenna,
13  since it was Marvin's person, you sent it to Marvin.
14  And, of course, they're going to say something to him
15  about, why doesn't this person want to talk to you?
16  You were snitching on him, you were narking on him,
17  you were a bitch for doing that, you know, that kind
18  of stuff.
19    Q.    Okay.  And, so, the comments that you just
20  have set out were comments that he said to you based
21  on the call transfers?
22    A.    Yeah.
23    Q.    Okay.  And this would have -- and did you
24  give me a time frame between May and October?

1    A.    Yeah.
2    Q.    Okay.
3    A.    The first month that you're usually in that
4  position, they don't have you take a lot of phone
5  calls and they carefully screen your phone calls so
6  that you won't get something you don't know and cause
7  a lot of liability issues for the Billing Unit.
8    Q.    Right.
9    A.    So, you're almost -- your first month,
10  basically, almost every phone call you have somebody
11  sitting with you.
12    Q.    Okay.
13    A.    The second month then they lax up a little
14  bit, you know, have somebody sitting with you but
15  before you make very many answers, you're putting that
16  person on hold and you're running back and forth
17  between your office and the supervisor's office to
18  make sure that you're telling the procedure correctly
19  or that your -- that was the right policy that you
20  quoted or read to them, or whatever.  So the first two
21  months in the training process it's -- you don't get a
22  lot of outside calls.
23    Q.    Right.
24    A.    You just get what they want you to get.

1    Q.    Okay.  When -- as a result of the
2  conversations where Mark called you the things that
3  you just mentioned, what did you do in response to
4  those conversations?
5    A.    Same thing.  Talked to Lenna.  Talked to
6  Marvin.  Talked to Jodie.
7    Q.    Do you recall any of those conversations
8  specifically?
9    A.    No.  I will tell you this, that almost every
10  one of them had the phrase, that's just Mark, we'll
11  take care of it, it won't happen again, for it to
12  happen again.
13    Q.    Okay.  And you don't recall those
14  conversations, though --
15    A.    No.
16    Q.    -- specifically?
17    A.    No.
18    Q.    Okay.  Do you recall overhearing a
19  conversation or a comment made by Mark Scheff with
20  regard to Marvin Ross?
21    A.    Oh, yeah.  Marvin's birthday.  Marvin is gay
22  and Marvin called off the day after his birthday
23  celebration and Mark told that the reason -- Mark said
24  that the reason he called off was because he got too

1  much beef up the ass.  It was a comment about anal sex
2  and Marvin getting too much.
3    Q.    And where were you when you heard that
4  comment?
5    A.    I don't know if it was said when I was
6  standings in the hallway at the coffee machine and
7  Mark was there or after we sat down.  It was in the
8  morning -- the morning right after his birthday.  It
9  was done in the morning, I remember that, but I don't
10  remember where I was standing or sitting, but I
11  remember that conversation.
12    Q.    Was -- were any other employees around?
13    A.    Oh, yeah.  Oh, yeah.
14    Q.    Who do you --
15    A.    Mary Thallman was around and -- which,
16  really upset Mary.  And I remember that because Mary
17  and Marvin had been at one time good friends.  When
18  Marvin had left his wife and told her he was gay, and
19  there was a lot of issues with that because they both
20  worked for the same agency at the time and it wasn't
21  very pretty the break up, from what I understand, I
22  don't know, I wasn't around then.  And Mary had really
23  supported Marvin and tried to, you know.
24    Q.    Be a good friend, is that what you're trying

## 93

```
 1   to say?
 2        A.    Yeah.
 3        Q.    Who else besides Mary Thallman was present?
 4        A.    Velva may have been.  Because, like I said,
 5   I think we were at the coffee machine and that's
 6   usually one of those collection spots.  I don't know
 7   if Jim was there or not because Jim was a heavy coffee
 8   drinker, or he used to.  Be I don't know if he still
 9   is.  And Jim may have been there, too.  And Jim really
10   liked Marvin, so.
11        Q.    Do you recall, as you sit there today,
12   whether or not Jim was present?
13        A.    I don't remember right now.  I can't
14   remember.
15        Q.    Okay.
16        A.    I know for sure Mary Thallman was because
17   Mary Thallman had talked to me later about how
18   offensive it was and how that you would think that as
19   close friends as Marvin and Lenna and Jodie all are
20   that this would have been something that would have
21   pushed them or motivated them to take action with
22   Mark.
23        MS. KERLEY:   Okay.  I think that this would
24   be a good place to stop.
```

## 94

```
 1        MR. BAKER:   Okay.
 2        MS. KERLEY:   Oh, wait, one last question.
 3   Or, as the kids, say psyche.
 4   BY MS. KERLEY:
 5        Q.    With regard to the Marvin's comment, did you
 6   complain about that comment to anyone?
 7        A.    Yes, I did.
 8        Q.    And to whom?
 9        A.    To Lenna and Jodie both, and they were in
10   the same room.
11        Q.    And where were they?
12        A.    Lenna was sitting at her desk, Jodie was
13   standing just beyond the door, and I was standing
14   right inside of the door.
15        Q.    Of Lenna's office?
16        A.    Of Lenna's office.
17        Q.    And what did you tell them?
18        A.    I told them that down at the coffee pot and
19   what was said and that's why later I said to Mary and
20   I talked about it.  I told her that I had said
21   something to them and thinking that maybe that would
22   motivate them.  I told them the story and who was
23   there.
24        Q.    Okay.  And do you recall about when that
```

## 95

```
 1   was?
 2        A.    Marvin's birthday.  The actual day after his
 3   birthday, the day the comment was made.
 4        Q.    Was the day after Marvin's birthday?
 5        A.    Yeah.  It was the day after his
 6   39th birthday.
 7        Q.    And you don't recall when Marvin's birthday
 8   is --
 9        A.    Well, no.
10        Q.    -- as you sit here?
11        A.    No.
12        Q.    Okay.  With regard to the comments that
13   we've discussed where you had testified about verbal
14   complaints that you made to various officials, were
15   any of those -- did you complain in writing as to any
16   of the comments that we've just discussed?
17        A.    Between May and October of 2000 or February
18   is that what you're saying?
19        Q.    Yeah.  February and October of 2000?
20        A.    Not prior to the Internal Affairs, it was
21   all verbal.
22        Q.    And when you say "Internal Affairs" you're
23   referring to the complaint filed by Mary Thallman on
24   October 13th of 2000?
```

## 96

```
 1        A.    Yes.
 2        MS. KERLEY:   Okay.  Now we're at a good
 3   place to stop.
 4        MR. BAKER:   Okay.
 5        MS. KERLEY:   Off the record.
 6        [WHEREUPON A SHORT LUNCH BREAK WAS
 7        TAKEN.]
 8   BY MS. KERLEY:
 9        Q.    Welcome back from lunch.  We're going to
10   shift gears a little bit and talk about something a
11   little different.  You had testified -- just touched
12   on briefly that there was a complaint of sexual
13   harassment filed by Mary Thallman with the Office of
14   Internal Affairs?
15        A.    Yes.
16        Q.    Is that correct?
17        A.    Yes.
18        Q.    You're aware of that complaint?
19        A.    Yes.  I was a witness in it.
20        Q.    Okay.  It's my understanding -- well,
21   actually, if you know, how did Mary Thallman lodge
22   that complaint?
23        A.    She came to my office the morning that it
24   happened -- the incident that she wanted to complain
```