# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | |
|---|---|
| DEBORAH R. SULLINS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No.  04-3039 |
| ) | |
| ILLINOIS DEPARTMENT OF ) | |
| PUBLIC AID, ) | |
| ) | |
| Defendant. ) | |

## OPINION

JEANNE E. SCOTT, U.S. District Judge:

This matter is before the Court on Defendant's Motion for Summary Judgment and Memorandum in Support (d/e 15).  Plaintiff Deborah Sullins' two-count Complaint (d/e 1) alleges violations of Title VII of the Civil Rights Act of 1964 by her employer, the Illinois Department of Public Aid (Department).  See 42 U.S.C. § 2000e et seq.  In Count 1, Plaintiff alleges that she was a victim of gender discrimination in violation of 42 U.S.C. § 2000e-2(a).  In Count 2, Plaintiff alleges that she was subjected to retaliatory acts in violation of 42 U.S.C. § 2000e-3.  The Department moves for summary judgment.  For the reasons set forth below, the Motion for

Summary Judgment is allowed, in part, and denied, in part.

BACKGROUND

The facts recited below are based on the evidence which has been presented, when viewed in the light most favorable to Sullins, as the Court is required to do. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Sullins began working for the Department in 1986. In February 2000, Sullins was assigned to a Medical Assistant Consultant (MAC) position in the Department's Bureau of Comprehensive Health Services (Bureau). Steve Bradley was the Bureau Chief. The Bureau was a part of the Department's Division of Medical Programs. According to Bradley, the Division of Medical Programs is responsible for paying for the health care needs of nearly 2 million Medicaid beneficiaries. The Bureau provides billing assistance and policy interpretation to medical service providers and works with policy development and the promulgation of administrative rules.

Sullins worked in the Bureau's hospital unit which was headed by Jodie Edmonds. In 2000, there were five female and five male non-supervisory employees in the hospital unit. The MACs who worked in the hospital unit were divided into two teams, which were headed by Marvin

Ross and Lenna DeGroot, respectively.  Ross and DeGroot reported to Edmonds.  Ross and DeGroot had first level responsibility for disciplining the employees who were beneath them, and they were the individuals to whom these employees could voice concerns.  Sullins was a member of the DeGroot team, and as such, DeGroot was Sullins' immediate supervisor. The hospital unit maintained offices in the basement of the Bloom Building in Springfield, Illinois.  Ross, DeGroot, and their teams were situated together along a u-shaped corridor in the basement.

At the time Sullins began working in the hospital unit, Mark Scheff was working in the unit as a MAC.  Scheff was supervised by Marvin Ross. Sullins had met Scheff in 1995 or 1996 in connection with her work for the Department; however, she had little contact with Scheff until she joined the hospital unit.  Between February 2000 and October 2000, Sullins worked around Scheff on a daily basis.  Sullins noticed that Scheff was different than other employees in the unit when it came to using profanities and making comments that had sexual connotations.  According to Sullins, while other employees did so occasionally, Scheff did so all the time.  Sullins states that in all the conversations she had with Scheff, or in those she overheard in which Scheff participated, between February and October

2000, only one conversation did not involve a comment of a sexual nature. Scheff's comments were fairly graphic. He would frequently describe sexual acts that he had engaged in or had observed in pornographic movies.

Another recurring topic of Scheff's conversations was his perception that men were unable to advance within the Bureau. Scheff maintained statistics regarding the relative number of males and females in the Bureau and the relative number of males and females in high ranking positions. Scheff frequently referred to Bradley as a traitor to men who tended to surround himself with "strong pussy." <u>Memorandum of Plaintiff, Deborah R. Sullins, in Opposition to the Defendant's Motion for Summary Judgment (d/e 21)</u> (Plaintiff's Memorandum), Ex. 1, <u>Affidavit of Deborah R. Sullins</u> (Sullins Affidavit), ¶ 14. Outside the presence of Ross and DeGroot, Scheff would frequently compare the two individuals' supervisory abilities. Scheff characterized Ross as the superior supervisor because he was male and, in Scheff's opinion, had more sense than DeGroot. According to Sullins, Scheff often commented that women were not as intelligent as men, and while Scheff sought help with work problems from male MACs, he never did so from female MACs. Sullins stated that the female workers in the hospital unit would tend to avoid having contact with Scheff.

The MACs in the hospital unit spent most of their workday on the telephone assisting providers with billing inquiries. However, the telephone system closed at 3:00 p.m. each day. From 3:00 p.m. until the end of the workday, the MACs would complete paperwork and return missed phone calls. Thus, as a MAC, Scheff's position required him to be on the telephone constantly between 8:30 a.m. and 3:00 p.m., except for his lunch and break periods.

When Sullins started with the hospital unit, she shared an office with P.K. Luttrel. Sullins and Luttrel's office was adjacent to an office shared by Mike Sandidge and Joe Roberts. On an almost daily basis, Scheff would come to Sandidge and Roberts' office after the phones were turned off at 3:00 p.m. Jim Schuh was also frequently present in the office. The men would engage in conversations, much of which was unrelated to business. As a part of these conversations, Scheff would make comments of a sexual nature. He often talked in graphic terms about sex acts. Scheff engaged in vulgarity from 3:15 p.m. to 4:00 or 4:30 p.m. on most work days.

While the other men also spoke during the conversations, Scheff elevated his voice and could be heard outside of the office. To counter the noise from the next room, Sullins often listened to music through

headphones and closed the office door after 3:00 p.m.  Scheff's voice was loud enough, however, that Sullins could still hear him, despite these efforts. On occasion, when DeGroot passed by Sandidge and Roberts' office, she would tell the men that they should not speak so loudly.  Prior to transferring to the hospital unit, Sullins rarely took sick leave.  However, from March 2000 to October 2000, she began using sick time with increasing frequency so she could leave the office around 3:00 p.m. to avoid having to hear Scheff's comments.

When Sullins had been in the hospital unit for several weeks, she began complaining to DeGroot about Scheff's comments.  In response, DeGroot made comments including "boys will be boys," "that's just Mark," and "Jodie has tried before to correct Mark and it has not worked." Plaintiff's Memorandum, p.13, Plaintiff's Additional Undisputed Facts, ¶ 52.  Sullins also spoke to Ross, who was Scheff's supervisor, about Scheff's comments.  Neither DeGroot nor Ross indicated to Sullins that they would take any steps to change Scheff's behavior.  Sullins then began voicing her complaints to Edmonds, who informed Sullins that she would just have to

put up with Scheff's behavior.[1]

In October 2000, Edmonds promoted Sullins to an Executive II position. When Scheff heard that Sullins had been awarded the promotion, he came to her work station and commented that the only reasons she got the promotion was "because [she] had a vagina and not a penis." <u>Sullins Affidavit</u>, ¶ 31. In the new position, Sullins became the coordinator of the state renal program. In connection with her promotion, Sullins was assigned to a new office in the basement of the Bloom Building. This office was around the corner from Scheff's office and closer to Scheff's office than Sullins' previous office had been.

Mary Thallman was another MAC on DeGroot's team. During 2000, she worked in close proximity to Scheff's work station. According to Thallman, Scheff made graphic sexual comments on a constant basis. Thallman complained to supervisors, but no change in Scheff's behavior resulted. In October 2000, Thallman was sharing an office with Schuh. One day during the month, Scheff came into Thallman and Schuh's office and had a conversation with Schuh. During the conversation, Scheff made

---

[1]The Court notes that Defendant contests the materiality of these facts, arguing that Scheff's behavior did not constitute sexual harassment and, thus, it is irrelevant whether Sullins' complaints were ignored.

comments of a graphic sexual nature. Scheff's comments were similar to the types of comments he made all of the time.

After the conversation, Thallman went to Sullins' work station and talked with her about Scheff's comments. Sullins indicated that the only way to change Scheff's behavior was to make a formal complaint against him with the Office of the Inspector General (OIG). Thallman considered Sullins' statement and determined that a formal complaint would be the proper course of action. Thallman asked Sullins for the telephone number of Laura Whetstone, an investigator in the OIG. Sullins was involved in an on-going relationship with Whetsone at this time. Sullins gave Thallman Whetstone's phone number and then phoned Whetstone herself to inform her that Thallman needed to talk to her.

Whetstone contacted Thallman on October 13, 2000, and Thallman made a complaint to Whetstone relating to Scheff's sexual comments in the conversation with Schuh. Later that day, Thallman filed a formal internal sexual harassment charge against Scheff with the OIG. Whetstone contacted Bradley and informed him of the allegations against Scheff. On October 19, 2000, Bradley sent a memo to Scheff, directing him to immediately cease engaging in activities of an unprofessional nature,

including making comments of a sexual nature.  <u>Plaintiff's Memorandum</u>, Ex. 14.  The memo further directed Scheff to have no contact with Thallman.  <u>Id</u>.  Bradley also met with Scheff on October 19, 2000, to discuss the investigation.  At that time, Scheff told Bradley that he would have retribution against individuals making frivolous accusations against him.

During a meeting on October 23, 2000, OIG investigator Terry Tranquilli told Scheff that Sullins had led Thallman to Whetstone.  Scheff was also informed by OIG of statements that had been made against him by Thallman, Sullins, and other co-workers.  At this time, Scheff formed the opinion that Sullins was attempting to discredit him.  In his deposition in the present case, Scheff testified that he believes that Thallman lied in making the allegations against him and that Sullins coached Thallman in connection with the complaint.    <u>Plaintiff's Memorandum</u>, Ex. 12, <u>Deposition of Mark T. Scheff</u> (Scheff Dep.), p. 68-69.

Prior to the Thallman complaint, Scheff rarely passed Sullins' new office.  It was not necessary for him to walk past her office to enter or exit his work area, to go to the restroom or break areas, or to communicate with his supervisors or other MACs.  After the Thallman complaint, however,

Scheff walked by Sullins' office many times each day. Prior to the Thallman complaint, Scheff had never gone to the work stations of clerical employees stationed outside Sullins' office. However, after the Thallman complaint, Scheff would frequently go to the work station of one particular clerical employee which was located outside Sullins' office. Scheff would frequently make comments to the clerical employee about the pending Thallman investigation and the lawsuit he was planning on filing against individuals who had given information to the OIG investigators. When Scheff passed Sullins' office, he would tend to look into the office and scowl at Sullins. As a result, Sullins rearranged her office furniture so that she would no longer face the office door when working at her desk. After making this change, however, from time to time, Sullins would turn toward the door and see Scheff staring at her from the hallway. Sullins asserts that she noticed a change in Scheff's attire following the Thallman complaint. Specifically, Sullins noticed that Scheff, who had previously worn a coat and tie to work, began wearing blue jeans and boots to work. Sullins also asserts that Scheff "started to wear a duster of the type that the boys involved in the Columbine massacre had worn." Sullins Affidavit, ¶ 45. Edmonds, however, testified that the duster coat was not new, but one Scheff had

always worn.

Several days after the Thallman complaint was filed, Whetstone came to Sullins' office to meet Sullins for lunch.  At that time, Edmonds confronted Whetstone about the investigation.  At the conclusion of the confrontation, Edmonds left the office, slamming the door behind her. After this incident, Edmonds changed her treatment toward Sullins.  Prior to this time, Edmonds and Sullins had a very cordial working relationship. After the incident, Edmonds would no longer speak to Sullins unless it was absolutely necessary to do so.  Edmonds frequently excluded Sullins from staff meetings and indicated to Sullins that she did not consider Sullins a part of the management team because of the Scheff incident.

Several days after the Thallman complaint was filed, DeGroot came to Sullins' office and inquired as to what Whetstone had told Sullins about the investigation.  Sullins told DeGroot that she knew little about it.  After this conversation, DeGroot and Ross refused to speak to Sullins.

Following the Thallman complaint, Sullins complained to Edmonds about Scheff's conduct toward her.  Edmonds informed Sullins that Sullins had upset Scheff and that he was doing nothing wrong.  Edmonds also stated that "it would get worse before it got better."  <u>Sullins Affidavit</u>, ¶ 46.

Sullins also spoke to Bradley about Scheff's conduct.  In their first conversation Bradley was supportive of Sullins and told her that he would speak to Scheff.  There was, however, no change in Scheff's behavior, so Sullins spoke with Bradley again.  He stated that he would speak to Scheff again, as well as to Edmonds, Ross, and DeGroot.  One evening when Sullins left work, she found feces had been spread on the door handle of Whetstone's car, which Sullins had driven to work.  Sullins reported this to Edmonds and to building security.

As a part of the investigation of the Thallman complaint, OIG interviewed Thallman, Sullins, Scheff, Schuh, Sandidge, Roberts, Velva Fletcher, Pam DuFour, Ross, and DeGroot.  All of these individuals were employees in the hospital unit.  At the conclusion of the OIG investigation, the Department proposed suspending Scheff for five calendar days for conduct unbecoming a state employee and discourteous treatment of co-workers.  Scheff's suspension was eventually reduced to a four calendar day suspension.  Although OIG customarily prepares a written report at the conclusion of a sexual harassment investigation to be submitted to the EEO office, no final report was prepared of the Thallman investigation.

In February 2001, Sullins filed a charge of discrimination with the

Illinois Department of Human Rights alleging sex discrimination and retaliation claims against the Department and Scheff.[2]  In early March 2001, Sullins again spoke with Bradley regarding Scheff's conduct. Additionally, Sullins complained to Bradley that Edmonds had been abusive toward her.  Bradley stated that he did not think that anything could be done to change the situation as long as Sullins continued to work in the Bloom Building.  Bradley mentioned an open position at the Department's Churchill Road facility, also in Springfield, Illinois.  Sullins told Bradley that she was aware of the opening and had applied for the position.  According to Sullins, the Churchill Road position was a lower job series than her position as an Executive II.  Sullins stated that the only reason she bid on the position was to get away from her work environment, specifically Scheff and Edmonds.

The next day, Bradley informed Sullins that he could not move her to the Churchill Road facility at that time, but that he could relocate her within the Bloom Building.  Edmonds was present during this conversation. After Bradley left the room, Edmonds stated "I hope you're satisfied" and accused Sullins of being a "crybaby."  Sullins Affidavit, ¶ 52.

---

[2]Sullins amended this charge in July 2001 to include Schuh.

13

On March 7, 2001, Scheff filed a contract grievance protesting his suspension.  Plaintiff's Memorandum, Ex. 16.  In the grievance, Scheff alleged that Sullins had been urging co-workers to make complaints about him for about four to six weeks prior to the Thallman complaint.  Id.

On March 14, 2001, Bradley approved an office relocation for Sullins, allowing her to move her work location to the east side of the first floor of the Bloom Building.  Sullins began working on the first floor on March 16, 2001.  Sullins' new work station was located in a conference room, and three other individuals worked in the room as well.  After Sullins moved to the first floor, Edmonds refused to talk to her, and the two women communicated either through email or through Edmonds' secretary.

On Sullins' first day in her new work station, Scheff walked through the conference room.  He had no reason to be there.  Thereafter, Scheff would come to the area where Sullins' work station was located five or six times a day.  While Scheff had a copy machine near his work station, Scheff would use a copy machine located outside Sullins' new work station.  As he made copies, Scheff stared at Sullins.  On March 28, 2001, Bradley sent Scheff an email, stating that it had come to Bradley's attention that Scheff had been sighted on the east side of the first floor of the Bloom Building,

which was characterized as "highly unusual."  <u>Plaintiff's Memorandum</u>, Ex. 23.  Bradley advised Scheff that under no circumstances was he to be on the east side of the first floor of the Bloom Building.  <u>Id</u>.

When Sullins worked in the basement of the Bloom Building, she noticed that Scheff typically took his morning break between 10:00 a.m. and 10:15 a.m.  In order to avoid Scheff, Sullins began taking her break between 10:15 a.m. and 10:30 a.m.  Sullins continued this practice after her office was moved to the first floor.  After Sullins moved, Scheff began taking his break between 10:15 a.m. and 10:30 a.m.  During his break, Scheff would loiter near the areas where Sullins took her breaks.  After she moved to the first floor, Sullins encountered Scheff almost every day during her break periods.  Prior to the move, this had never occurred.  Sullins stopped leaving her work station at lunch to avoid encountering Scheff.

Additionally, after Sullins moved to the first floor, she noticed Scheff waiting at the front door of the Bloom Building when she got off work at 5:00 p.m.  Sullins would have to pass him to leave the building, and then he would follow her out.  Sullins began staggering her departure time from 4:55 p.m. to 5:15 p.m., but whenever she left, Scheff was waiting at the door.

In early 2001, Sullins, who had previously had a good record of

attendance at work, began taking more time off work, eventually exhausting her sick leave.  Edmonds characterized Sullins' absences during this period as excessive.  When Edmonds counseled Sullins about her attendance, Sullins informed her that she was required to take time off work to go to doctor's appointments and counseling sessions as a result of the problems she was experiencing at work.  On March 27, 2001, Sullins filed an internal complaint of retaliation with the Department's Office of Internal Affairs. Sullins complained about Scheff's actions and the lack of action by supervisors Edmonds, DeGroot, and Ross on her complaints to them about Scheff's intimidation.  Motion for Summary Judgment, Ex. O.

In April 2001, Sullins complained to Edmonds and Assistant Bureau Chief Ronni Kulsa about Scheff's behavior, but no change resulted.  On April 30, 2001, Scheff made a written statement accusing Sullins of fabricating sexual harassment and harassment.  Plaintiff's Memorandum, Ex. 17.  Also in April 2001, a Management Operations Analyst I (MOA) position within the Bureau was posted for bidding.  The MOA position was located at the Churchill Road facility and fell under different supervisors than Sullins had at the time.  Sullins bid on the MOA position, and Bradley worked with the supervisor for the MOA position to assist Sullins in

obtaining a transfer to the position.  Sullins was awarded the position and began to work in it on June 1, 2001.  Sullins maintained the same salary and benefits in the MOA position, although it was one pay grade lower.  Because the MOA position was one pay grade lower, it had a lower top-end salary than Sullins' previous Executive II position.  However, in October or November 2002, Sullins was promoted to another Executive II position within the Department.

ANALYSIS

I.    <u>Motion to Strike</u>

As a part of her response to the Department's Motion for Summary Judgment, Sullins moves pursuant to Federal Rule of Civil Procedure 56(e) to strike the Affidavit of Michael Sandidge that was submitted by the Department.  <u>See</u> <u>Motion for Summary Judgment</u>, Ex. H, <u>Affidavit of Michael Sandidge</u> (Sandidge Affidavit).  Under Rule 56(e), affidavits supporting a motion for summary judgment must be based on personal knowledge of the affiant, set forth facts admissible in evidence, and show that the affiant is competent to testify to the matters stated in the affidavit.  <u>Fed. R. Civ. P.</u> 56(e).  Sullins contends that the Sandidge Affidavit fails to comply with Rule 56(e) for various reasons.  The Court has examined the

17

four-paragraph Affidavit. As Sullins correctly points out, ¶ 4 of the Sandidge Affidavit fails to establish a foundation for the assertions it includes. Thus, ¶ 4 violates Rule 56(e), and Sullins' Motion to Strike is allowed, in part. The Court strikes ¶ 4 of the Sandidge Affidavit and will not consider it in analyzing the Department's Motion for Summary Judgment. The remainder of the Sandidge Affidavit, however, is in compliance with Rule 56(e). The Court, thus, rejects Sullins' remaining arguments and denies the Motion to Strike in all other respects.

II.    <u>Motion for Summary Judgment</u>

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." <u>Fed.R.Civ.P.</u> 56(c). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>See</u> <u>Anderson</u>, 477 U.S. at 248. The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact and that judgment as a matter of law is appropriate. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986). When a properly supported

18

motion for summary judgment has been made, the party opposing summary judgment may not merely rest on the pleadings but must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "A party must present more than mere speculation or conjecture to defeat a summary judgment motion." Liu v. T & H Machine, Inc., 191 F.3d 790, 796 (7th Cir. 1999). The Court must consider the evidence in the light most favorable to the nonmoving party, here Sullins, and draw all reasonable inferences in her favor. See Anderson, 477 U.S. at 255.

A.    Sexual Harassment Claim (Count 1)

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment," based on the individual's gender. 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has expressly recognized that Title VII prohibits employers from "requiring people to work in discriminatorily hostile or abusive environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). In the present case, Sullins bases her sexual harassment claim on a hostile work environment theory. In order to succeed on this claim, Sullins must establish that: "'(1) she was subjected to unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of

a sexual nature; (2) the conduct was severe or pervasive enough to create a hostile work environment; (3) the conduct was directed at her because of her sex; and (4) there is a basis for employer liability.'" <u>Whittaker v. Northern Ill. Univ.</u>, 424 F.3d 640, 645 (7th Cir. 2005)(quoting <u>Rhodes v. Ill. Dep't of Transp.</u>, 359 F.3d 498, 505 (7th Cir.2004)).  Furthermore, as the parties recognize, harassment which is motivated by a desire to retaliate for a prior complaint of sexual harassment is actionable in a retaliation claim, but not in a sexual harassment one.  <u>Berry v. Delta Airlines, Inc.</u>, 260 F.3d 803, 809 (7th Cir. 2001).

The Department argues that Sullins cannot establish: (1) that the conduct was severe or pervasive enough to create a hostile work environment or (2) that the conduct at issue was directed at her because of her sex.  As set forth below, the Court finds the Department's arguments to be persuasive and grants summary judgment in favor of the Department on Sullins' sexual harassment claim.

The Department argues that Scheff's comments were not sufficiently severe or pervasive to create a hostile work environment.  In order to constitute a hostile work environment, "the alleged harassment must be both subjectively and objectively so severe or pervasive as to alter the

20

conditions of her employment and create an abusive working environment."
Whittaker, 424 F.3d at 645 (internal quotations and citation omitted).  "In
determining whether the environment was objectively hostile, a court must
consider all of the circumstances, including the frequency and severity of
conduct, whether it is threatening and/or humiliating or merely offensive,
and whether the harassment unreasonably interferes with an employee's
work."  Id. (internal quotations and citation omitted).  Plaintiff must meet
a high threshold under the hostile work environment theory; as the Seventh
Circuit has noted, "[t]he workplace that is actionable is one that is 'hellish.'"
Id. (internal quotations and citation omitted).

The Seventh Circuit examined the issue of an actionable hostile work
environment in Baskerville v. Culligan Int'l Co., 50 F.3d 428 (7th Cir. 1995).
The Baskerville Court recognized that "[t]he concept of sexual harassment
is designed to protect working women from the kind of male attentions that
can make the workplace hellish . . . .  It is not designed to purge the
workplace of vulgarity"  Id. at 430.  Drawing the line between the two,
however, is not always easy.  Id.  The Seventh Circuit grouped "sexual
assaults; other physical contact, whether amorous or hostile, for which there
is no consent express or implied; uninvited sexual solicitations; intimidating

words or acts; obscene language or gestures; pornographic pictures" on one side and "occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers" on the other. <u>Id</u>. The "line between a merely unpleasant working environment on the one hand and a hostile or deeply repugnant one on the other" is not a bright one. <u>Id</u>. at 431.

In <u>Baskerville</u>, the Seventh Circuit held that the plaintiff could not establish an objectively severe environment even though, over a seven-month period, the plaintiff's supervisor had called her a "pretty girl", grunted when the plaintiff wore a leather skirt to the office, told the plaintiff that her presence made the office "hot", commented that an announcement actually meant "All pretty girls run around naked", used the term "tilly" to refer to women, told the plaintiff that he left the company Christmas party early to avoid losing control at the sight of so many "pretty girls", and suggested to the plaintiff that he consoled himself by masturbating in his wife's absence. <u>Id</u>. at 430. The Court of Appeals observed that the supervisor was "not a man of refinement," but concluded that no reasonable jury could find that his actions created a hostile work environment and, thus, defendant was entitled to summary judgment. <u>Id</u>. at 431.

Sullins cites the Court to <u>Dey v. Colt Const. & Development Co.</u>,

which was decided prior to <u>Baskerville</u>.  <u>See</u> <u>Dey</u>, 28 F.3d 1446 (7th Cir.
1994).  In <u>Dey</u>, the Seventh Circuit reversed an order granting summary
judgment on a sexual harassment claim.  For a two year period, the plaintiff,
Dey, was subjected to almost daily comments, gestures, and innuendo made
by the defendant company's vice president and general counsel, Michael
Chernoff, that she considered to be sexually suggestive and harassing.  <u>Id</u>.
at 1449.  Dey worked directly with Chernoff only on occasion, and he was
not her supervisor.  However, Dey had limited, daily contact with Chernoff
whenever he was in the office because the company's office was small.  <u>Id</u>.
Dey was unable to remember the specifics of much of the alleged
harassment, but she recounted in some detail the following five incidents,
which stood out in her memory as the most blatant:

> (1) in talking with Dey sometime in either 1983 or 1984,
> Chernoff referred to a female attorney with whom he was then
> working on a Colt project as a "flat-chested cunt"; (2) when Dey
> returned from a Phoenix vacation in January 1983, Chernoff
> suggested she had not gotten a tan because she had spent the
> week on her back in bed; (3) when Dey and Chernoff were
> commenting one day between November 1982 and September
> 1983 on the strong body odor of Chernoff's secretary, Chernoff
> stated that he "would eat [Dey] no matter how [she] smelled";
> (4) in March or April 1985, after more than two years of alleged
> harassment, Dey and Chernoff were riding alone on an elevator
> from Colt's fourth-floor offices to the basement parking garage
> when Chernoff asked Dey to hold some papers for him; he then

unzipped his slacks, whereupon Dey turned her back until the elevator reached the basement; Dey heard Chernoff unzip and then zip his slacks, although Chernoff did not say anything and did not touch Dey during this incident; she later indicated that she had felt trapped and "very afraid"; and (5) in September or October 1985, Chernoff said to someone on the telephone that "there is a girl in my office going down on me" as Dey leaned down to put some documents on Chernoff's floor.

Id. at 1449-50.  Dey maintained that Chernoff made similar harassing comments on an almost daily basis.  Id. at 1450.  There was, however, no physical component to the harassment.  Id.

The Court of Appeals concluded that this evidence was sufficient to defeat a motion for summary judgment under a hostile work environment theory.  Dey, 28 F.3d at 1457.  With respect to the objective prong of the analysis, the Court noted that if Dey were subjected each day that Chernoff was in the office to comments and conduct similar to the five incidents that were specifically identified, the Court would "have no doubt that her work environment could be considered objectively hostile and abusive."  Id. at 1456.

In the present case, viewing the evidence in the light most favorable to Sullins, Scheff made graphic sexual comments on a daily basis for approximately nine months.  The majority of these comments were made in

conversations with men that were overheard by Sullins in her adjacent office. The comments ranged from descriptions of Scheff's own purported sexual exploits and preferences, to graphic comments about sexual intercourse and sexual assaults, to comments regarding the anatomy and sexual preferences of co-workers. Scheff told Sullins directly that he enjoyed traveling for work because he could masturbate in his hotel room while watching x-rated movies. On one occasion, Scheff told Sullins and others that he carved a tree into the shape of a penis. Scheff also confronted Sullins about office procedures, specifically the way in which she handled calls with complaints about Scheff. In the resulting conversations, Scheff called Sullins a prude, a bitch, a dike bitch, a "yes" person, and a snitch among other things. Scheff's vulgarity was constant; Sullins recalls hearing only one conversation in which Scheff participated, between February and October 2000, that did not contain a sexual comment. Other women in the Department also assert that Scheff made sexual comments on a daily basis.

Scheff also made comments regarding what he perceived to be a female oriented gender bias in the Department's management. Once again, the majority of these comments were not made directly to Sullins; however, when Scheff discovered that Sullins had received the Executive II

promotion, he commented to her that the only reason she received the promotion was "because [she] had a vagina and not a penis." <u>Sullins Affidavit</u>, ¶ 31.

The Department argues that the majority of the comments were merely overheard by Sullins and that the comments that were directed at Sullins were not severe enough to constitute a hostile work environment. The Seventh Circuit has recognized that, while incidents directed at others and not the plaintiff have some relevance in demonstrating the existence of a hostile work environment, "the impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff." <u>Gleason v. Mesirow Financial, Inc.</u>, 118 F.3d 1134, 1144 (7th Cir. 1997). Moreover, "sexually explicit insults that arise solely from altercations over work-related issues, while certainly unpleasant, do not violate Title VII." <u>Spearman v. Ford Motor Co.</u>, 231 F.3d 1080, 1086 (7th Cir. 2000). It is clear from the record that the majority of Scheff's comments were directed at others, not at Sullins. Furthermore, the majority of Scheff's direct interaction with Sullins involved sexually explicit insults arising out of work-related issues, including his comments regarding her handling of phone complaints and his comment regarding her promotion. However, the

mainly second-hand nature of Scheff's comments must be balanced against the almost constant nature of the offensive comments, because the frequency of offensive comments is relevant in assessing their impact. Baskerville, 50 F.3d at 431.

In assessing hostile work environment claims, it is also important for the Court to take into account what did not occur. Whittaker, 424 F.3d at 646; Gleason, 118 F.3d at 1145. In the present case, there is no evidence that Scheff ever touched Sullins, propositioned her, or exposed himself to her. The present case is distinguishable from Dey in that very little of Scheff's conduct was directed at Sullins personally, while Dey was the target of the majority of Chernoff's harassment. Considering the totality of the circumstances and the definition of sexual harassment adopted by the Seventh Circuit in Baskerville, the Court finds that Sullins fails to present evidence such that a reasonable jury could be persuaded that Scheff's conduct, objectively speaking, was severe and pervasive enough to create a hostile work environment. Therefore, the Department is entitled to summary judgment on Sullins' sexual harassment claim.

However, even if Sullins were able to establish a hostile work environment, the Department would nevertheless be entitled to summary

27

judgment on the sexual harassment claim, because Sullins cannot establish the third necessary element, i.e. that the conduct at issue was directed at her because of her gender. Title VII by its express terms is designed to eliminate discrimination; thus, proof of different treatment of the sexes is necessary. The Seventh Circuit has defined the "critical issue" in hostile work environment cases as "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed...Inappropriate conduct that is 'inflicted regardless of sex is outside the statute's ambit.'" <u>Berry</u>, 260 F.3d at 808.

The record in the present case is replete with inappropriate, vulgar, and disgusting comments by Scheff. There is, however, a lack of evidence that Scheff harassed Sullins because of her gender. The majority of the comments that Scheff directed at Sullins, while completely inappropriate for the workplace, arose from altercations over work-related issues, and were not made because of her gender. Additionally, the comment regarding the penis-shaped tree was made to both men and women.

Considering Sullins' own testimony, it is clear that the majority of Scheff's comments were made to men. Sullins recounted several instances when the men to whom Scheff was speaking indicated their displeasure with

his comments.   For example, on one occasion, Sullins overheard Scheff discussing the pros and cons of having intercourse with a woman who is menstruating.   Sullins Dep. at 76.   Sullins recalled the conversation becoming so "gross" that Schuh, Sandidge, and Roberts were all trying to get Scheff to stop.  Id. at 77.  On another occasion, Sullins overheard Scheff graphically describing a sexual position he had performed with his girlfriend in a car, when Sandidge exclaimed, "oh, my God, that is so gross, why are you even talking like that?"   Id. at 68.   Sullins overheard another conversation that began between the men about bodybuilding.  Scheff made a comment with a sexual connotation, and Sandidge told Scheff to "shut up that he didn't want to talk about sex, that they were talking about bodybuilding."  Id. at 72.  Scheff replied that the only reason Sandidge was involved in bodybuilding was that he had not had sex in two years. Sandidge "totally [came] unglued and [came] flying out of the room and stomping off down the hallway."   Id.   Sullins followed Sandidge and comforted him.

On yet another occasion, Sullins overheard the men discussing a young girl who had been sexually abused.  Id. at 80-82.  When Scheff began to make vulgar comments about the girl, Schuh became loud and

29

threatening and told Scheff not to talk that way.  Id. at 82.  When Scheff persisted, Schuh walked out of the room and slammed the door.  Id.  The instant case is similar in this respect to Wyninger v. New Venture Gear, Inc., 361 F.3d 965 (7th Cir. 2004).

In Wyninger, two male supervisors used vulgar language, exhibited fiery tempers, and mocked the female plaintiff when she made mistakes in her work.  Wyninger, 361 F.3d at 972.  The Seventh Circuit held that Wyninger could not base a hostile environment claim on the supervisor's vulgar language because they were, at most "'crude individual[s] who treated [everyone] poorly.'"  Id. at 976 (quoting Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 346 (7th Cir.1999)).  The Court of Appeals specifically noted "Other employees, including men, were also afraid of and offended by [one supervisor]'s criticism and vulgarity and insulted by [the other supervisor]'s approach to his supervisory role. [The supervisors] did not interact with Wyninger any differently than they did with other male coworkers and subordinates."  Id.

As the Seventh Circuit has noted, "Title VII proscribes only workplace discrimination on the basis of sex, race, or some other status that the statute protects; it is not a 'general civility code' designed to purge the workplace

of all boorish or even all harassing conduct." <u>Berry</u>, 260 F.3d at 807. In the present case, Scheff was as vulgar and abusive with men as he was with women. There is no evidence to support a finding that Scheff's conduct was directed at Sullins because of her gender. Thus, the Department is entitled to summary judgment on Sullins' sexual harassment claim on this basis as well.

B.    Retaliation Claim (Count 2)

Under Title VII, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Sullins asserts that the Department unlawfully retaliated against her for her participation in the Thallman investigation. The Department asserts that it is entitled to summary judgment on Sullins' retaliation claim.

Sullins may establish a <u>prima</u> <u>facie</u> case of retaliation, sufficient to overcome the Department's Motion for Summary Judgment under either the direct method or the indirect method. Under the direct method, Sullins

31

"'must present direct evidence of (1) a statutorily protected activity; (2) an adverse employment action taken by the employer; and (3) a causal connection between the two.'" <u>Davis v. Con-Way Transp. Central Express, Inc.</u>, 368 F.3d 776, 786 (7th Cir. 2004) (<u>quoting</u> <u>Sitar v. Indiana Dept. of Transp.</u>, 344 F.3d 720, 728 (7th Cir. 2003)).  "'Direct evidence' is defined the same for discrimination and retaliation claims -- that is, it can be an admission of intentional discrimination or a 'mosaic' of circumstantial evidence that directly points to a discriminatory intent." <u>Davis</u>, 368 F.3d at 786.  Under the indirect method, Sullins "must show that (1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite her satisfactory job performance, she suffered an adverse action from the employer; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." <u>Sitar</u>, 344 F.3d at 728.  If Sullins establishes these elements, the burden of production shifts to the Department to establish "a legitimate, non-invidious reason for its adverse action." <u>Id</u>.  If the Department comes forward with a legitimate, non-invidious reason for the adverse action, the burden shifts back to Sullins to show that the proffered reason is pretextual.  <u>Id</u>.

32

Under either the direct method or the indirect method, Sullins must establish that she engaged in a statutorily protected activity. The Department asserts that Sullins cannot do so. The Department argues that the conduct Sullins opposed, Scheff's use of vulgarity in the workplace, did not raise Title VII concerns. The Department relies on two Seventh Circuit cases involving retaliation claims arising out of complaints of harassment based on sexual orientation. See Hamm v. Weyauwega Milk Products, Inc., 332 F.3d 1058 (7th Cir. 2003); Hamner v. St. Vincent Hosp. and Health Care Center, 224 F.3d 701 (7th Cir. 2000). These cases are distinguishable from the instant case. Clearly, sexual orientation is not a protected classification under Title VII. See Hamner, 224 F.3d at 707. The underlying complaints in Hamm and Hamner did not assert that the plaintiffs were treated differently because of their genders.

In the instant case, Thallman complained of sexual harassment, which is prohibited under Title VII. The investigators and supervisors all recognized her claim as one based on sexual harassment. Indeed, Bradley included a copy of the Department's sexual harassment policies with his October 19, 2000, memo to Scheff regarding the investigation. See Plaintiff's Memorandum, Ex. 14. Bradley's memo instructed Scheff to read

33

the policies and to comply with them.  Id.  Even where the degree of discrimination does not reach a level that affects the terms and conditions of employment, the complaint may be sufficient to support a retaliation claim under § 2000e-3(a) as long as it is not utterly baseless and involves discrimination that is prohibited by Title VII.  Dey, 28 F.3d at 1457-58.  Thus, at the very least, a triable factual issue exists as to whether Sullins engaged in statutorily protected activity in connection with her actions in the Thallman investigation.

Under either the direct method or the indirect method, Sullins must also establish that she suffered an adverse action by her employer.  Again, the Department asserts that Sullins cannot meet this necessary element.  The Seventh Circuit recently cautioned that "[a]lthough the anti-retaliation rule in § 2000e-3(a) is broader than the anti-discrimination rule in § 2000e-2(a) in the sense that it extends beyond pay and other tangible employment actions, nothing in § 2000e-3(a) says or even hints that the significance or materiality requirement has been dispensed with."  Washington v. Illinois Dept. of Revenue, 420 F.3d 658, 661 (7th Cir. 2005).  Additionally, the Court of Appeals reiterated that a response deemed immaterial with respect to self-interested charges could be material in a

context in which an employee supported a colleague's charge of discrimination, as "it takes less to deter an altruistic act than to deter a self-interested one." Id. at 661-62.

The Seventh Circuit has recognized:

three categories of cases where the courts have found the criteria for materially adverse employment action to be met: (1) cases in which the employee's compensation, benefits or other financial terms of employment are diminished, including cases where employment is terminated; (2) cases in which a nominally lateral transfer without a change in financial terms significantly reduces the employee's career prospects by preventing him from using the skills in which he is trained and experienced; and (3) "[c]ases in which the employee is not moved to a different job or the skill requirements of his present job altered, but the conditions in which he works are changed in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment . . . ."

Tart v. Illinois Power Co., 366 F.3d 461, 475 (7th Cir. 2004) (quoting Herrnreiter v. Chicago Housing Authority, 315 F.3d 742, 744-45 (7th Cir. 2002)). Sullins asserts that her case falls within the second and third categories. Specifically, Sullins contends that, following the Thallman complaint: (1) Scheff made her work environment hellish and supervisors did nothing to deter him, and (2) she was eventually forced to accept a voluntary demotion, reducing her career prospects, to escape Scheff's

treatment.  As set forth below, the Court finds that a triable issue of fact remains on Sullins' work environment theory.

The Seventh Circuit has recognized that "[t]he law deliberately does not take a 'laundry list' approach to retaliation, because unfortunately its forms are as varied as the human imagination will permit." Knox v. State of Ind., 93 F.3d 1327, 1334 (7th Cir. 1996).  Title VII encompasses retaliation "against a complainant by permitting her fellow employees to punish her for invoking her rights under Title VII." Id.  An employer can be held liable under Title VII for retaliation by an employee's co-workers if the employer had actual or constructive knowledge of the harassment and failed to address the problem adequately. Id.

In the instant case, it is undisputed that Scheff believed that Thallman lied about him and that Sullins coached Thallman in connection with her complaint against Scheff.  Viewing the evidence in the light most favorable to Sullins, a reasonable jury could conclude that Scheff's conduct toward Sullins after the filing of the Thallman complaint constituted a materially adverse change in Sullins' working conditions.[3]  While Scheff never

---

[3]The Court notes that Sullins does not contend that her supervisors engaged in retaliatory conduct themselves, but only that they refused to take effective action to deter Scheff's conduct. Plaintiff's Memorandum, p. 57-58.

expressly threatened Sullins, he stalked her in the building, during break periods, and when she exited work. Moreover, Scheff had informed Bradley that he would have retribution on his accusers. The Department was aware of Scheff's retaliatory conduct through Sullins' complaints to Edmonds and Bradley.

Summary judgment may, nevertheless, be appropriate if Sullins cannot show that the Department failed to adequately address Scheff's retaliation. The law does not require the employer to prevent harassment, but rather to respond in a way that is reasonably likely to prevent future harassment. Parkins v. Civil Constructors of Illinois, Inc., 163 F.3d 1027, 1036 (7th Cir. 1998). In February 2001, Bradley stated his opinion that nothing could be done to change the situation unless Sullins was removed from the Bloom Building. Bradley did not immediately move Sullins from the building; however, in March 2001, Bradley approved an office relocation for Sullins, to the first floor of the Bloom Building. When Scheff loitered around Sullins' new first floor office, Bradley ordered Scheff to stay away from the first floor, east side of the building. After the warning, Scheff continued to stalk Sullins on breaks and as she exited work. Sullins continued to complain to supervisors about Scheff's conduct.

The Department points to evidence that, at the end of March, Sullins reported that the move to the first floor was a positive change and that she "'loved being upstairs.'" <u>Motion for Summary Judgment</u>, p. 17.  However, the documents containing these positive comments also contain references to on-going harassment.  <u>See</u> <u>Motion for Summary Judgment</u>, Exs. D & E. In telling Steve Bandy that she loved being upstairs, Sullins further stated that she was being ostracized by her unit and that the hostility was overwhelming.  <u>Motion for Summary Judgment</u>, Ex. D.  In her email to Derrick Moscardelli of the Department's Office of Internal Affairs in which Sullins recounts the positive benefits of the move, Sullins also details Scheff's stalking, asks Moscardelli to investigate, states that she fears escalated retaliatory acts from Scheff, and states her opinion that the hostile work environment was the direct result of the Thallman investigation. <u>Motion for Summary Judgment</u>, Ex. E.  At the very least, a triable issue of fact exists on the issue of adequacy of the Department's response as well. Thus, a triable issue of fact exists as to whether Scheff's post-complaint conduct constituted a significantly negative alteration in Sullins' working environment for which the Department can be held liable.

Turning to Sullins' voluntary demotion argument, the Court notes

that the Seventh Circuit has recognized that, under certain circumstances, an employee's request for a demotion can constitute an adverse employment action.  Simpson v. Borg-Warner Automotive, Inc., 196 F.3d 873, 876 (7th Cir. 1999).  In order to establish a constructive demotion, Sullins must show that: (1) her working conditions were so intolerable that a reasonable person would have been compelled to ask for the demotion, and (2) the conditions were intolerable because of unlawful discrimination. Id. at 877. The Department contends: (1) that the Churchill Road position did not constitute a demotion, and (2) that Sullins was not subjected to conditions that were so intolerable that a reasonable person would have felt compelled to take a demotion to get away from the environment.[4]  Because the Court agrees with the Department's first argument, it need not reach the second.

It is undisputed that the transfer to the Churchill Road position did not result in a change in the financial terms of Sullins' employment.  She retained the same salary and benefits in the MOA position that she had in

---

[4]In order to succeed under a constructive demotion theory, Sullins must show not only that a hostile work environment existed, but also that the environment was so intolerable that a request for a demotion was an appropriate response. See McPherson v. City of Waukegan, 379 F.3d 430, 440 (7th Cir. 2004).  The working conditions under a constructive demotion theory must be more egregious than would satisfy the high standard for a hostile work environment, because an employee is expected to remain employed while seeking redress. Id.

the Executive II position.  Nor is there any evidence that the transfer prevented Sullins from using the skills in which she was trained and experienced.  Because the MOA position was one pay grade lower, it had a lower top-end salary than Sullins' previous Executive II position.  However, by October or November 2002, Sullins was promoted to another Executive II position within the Department.  Therefore, there is no evidence to support a finding that Sullins experienced a significant reduction in career prospects in connection with the move to the Churchill Road facility.  Thus, the Department is entitled to summary judgment on the constructive demotion aspect of Sullins' retaliation claim.  However, as set forth above, triable issues of fact remain regarding whether Scheff's conduct resulted in a significantly negative alteration in Sullins' workplace environment and, if so, whether the Department can be held liable.

Despite the fact that a material issue of fact exists as to the adverse action prong, the Department, nevertheless, may be entitled to summary judgment if Sullins is unable to establish the remaining elements of her case under either the direct method or the indirect method.  The Department contends that Sullins cannot do so.  Specifically, the Department asserts that Sullins cannot establish a causal connection between the protected

activity and the adverse action under the direct method.  The Department further asserts that Sullins fails to identify a similarly-situated employee who was treated more favorably as required under the indirect approach.

Turning first to the causal connection, the record clearly supports a finding that Scheff's harassing conduct toward Sullins following the Thallman complaint was in retaliation for Sullins' involvement with the Thallman investigation.  However, the adverse action alleged in the present case is that the Department retaliated against Sullins by permitting Scheff to punish her for exercising her rights under Title VII.  Thus, Sullins must establish that the Department's failure to deter Scheff was retaliatory.  Sullins points to the actions of Edmonds in an attempt to show retaliation by the Department.  Sullins asserts that Edmonds ignored her complaints about Scheff's behavior, refused to communicate with Sullins, and made negative comments regarding Sullins' involvement in the Thallman investigation.  As an initial matter, the Department asserts that Edmonds consistently ignored Sullins' complaints about Scheff's behavior, both before and after the Thallman complaint.  Thus, according to the Department, there is no evidence to support a finding that Edmonds' lack of action on Sullins' complaint following the Thallman complaint was retaliatory.

However, the conduct that Sullins complained of changed after the filing of the Thallman complaint.    Moreover, Edmonds refused to communicate with Sullins after the complaint and made negative comments which included accusing Sullins of being a crybaby and not a team member. When Sullins' complaints were raised to Bureau Chief Bradley, Bradley voiced his opinion that the situation would not resolve as long as Sullins remained in the Bloom Building, yet he left her in the building and did not discipline Scheff.  Given these facts, a triable issue remains as to whether the Department retaliated against Sullins by permitting Scheff to punish her for exercising her rights under Title VII.    The Department's request for summary judgment on this basis is denied.

The Department's Motion for Summary Judgment asserts that Sullins failed to identify a similarly-situated employee who was treated more favorably as required under the indirect approach.  Sullins failed to address this argument in her response.  However, because the Court has found that Sullins' evidence at least creates a genuine issue of fact under the direct method of proof, there is no need to analyze the facts under the indirect method.

<u>CONCLUSION</u>

42

THEREFORE, as set forth above, the Department's Motion for Summary Judgment and Memorandum in Support (d/e 15) is ALLOWED, in part, and DENIED, in part. The Department's Motion is denied to the extent that it seeks summary judgment on Sullins' claim of retaliation in Count 2, based on the theory that the Department retaliated against Sullins by permitting Scheff to punish her for exercising her rights under Title VII. The Motion is allowed in all other respects. The Department is entitled to summary judgment on Count 1 and on all other theories in Count 2.

IT IS THEREFORE SO ORDERED.

ENTER:   March 10, 2006.

FOR THE COURT:

s/  Jeanne E. Scott
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE